IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ADAM GRAY | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Special | ) | |
| Representative of the Estate of | ) | |
| NICHOLAS C. CRESCENZO, JR., | ) | |
| Special Representative of the Estate of | ) | **COMPLAINT** |
| GEORGE JENKINS, Special | ) | |
| Representative of the Estate of | ) | |
| MICHAEL A. POCHORDO, Special | ) | |
| Representative of the Estate of CRAIG | ) | |
| CEGIELSKI, ERNEST R. ROKOSIK, | ) | |
| Executor of the Estate of ERNEST W. | ) | |
| ROKOSIK, DANIEL MCINERNEY, | ) | |
| PERCY DAVIS, ROBERT | ) | |
| FITZPATRICK, L. MARTINEZ, | ) | |
| JOSEPH GRUSZKA, JAMES R. | ) | |
| BROWN, COOK COUNTY, and AS-YET | ) | |
| UNKNOWN CHICAGO POLICE | ) | |
| DETECTIVES, | ) | |
| | ) | |
| Defendants. | ) | |

Now comes Plaintiff, ADAM GRAY, by his attorneys, Loevy & Loevy, and

complaining of Defendants CITY OF CHICAGO, Special Representative of the

Estate of former Chicago Police Detective NICHOLAS C. CRESCENZO, JR.,

deceased, Special Representative of the Estate of former Chicago Police Detective

GEORGE JENKINS, deceased, Special Representative of the Estate of former

Chicago Police Detective MICHAEL A. POCHORDO, deceased, Special

Representative of the Estate of former Chicago Police Detective CRAIG

CEGIELSKI, deceased, ERNEST R. ROKOSIK, Executor of the Estate of former

Chicago Police Detective ERNEST W. ROKOSIK, deceased, former Chicago Police

1

Detective DANIEL MCINERNEY, former Chicago Police Youth Officer PERCY DAVIS, former Chicago Police Detective ROBERT FITZPATRICK, former Chicago Police Officer L. MARTINEZ, former Chicago Fire Marshal JOSEPH GRUSZKA, former Assistant State's Attorney JAMES R. BROWN, COOK COUNTY, ILLINOIS, and AS-YET UNKNOWN CHICAGO POLICE DETECTIVES, states as follows:

## Introduction

1.      Plaintiff Adam Gray spent the majority of his life—over 24 years—in prison for an arson-double murder that he did not commit.

2.      Mr. Gray ("Adam" or Plaintiff) was convicted in 1996 of setting fire to a building which resulted in two deaths. He was convicted after the Defendants manipulated witnesses, fabricated evidence, and withheld evidence that would have demonstrated his absolute innocence of setting the fire.

3.      Included among that fabricated evidence was an involuntary false confession attributed to Plaintiff, which was concocted and coerced by Defendants after hours of illegal interrogation. During this interrogation, Plaintiff, then barely past his 14th birthday, was prevented from seeing or talking to his mother and adult brother, who were at the police station trying to talk to him. Instead, Defendants falsely told Plaintiff that his brother came to the police station briefly and left and that his mother told police that she did not care about him and refused to come to the police station altogether. In truth, Plaintiff's mother and brother waited at the police station for hours and repeatedly asked Defendants to see

2

Plaintiff but were denied while Defendants were attempting to—and finally successful in—obtaining a false, involuntary confession from Plaintiff.

4.     To corroborate Plaintiff's false, involuntary confession, Defendants also fabricated evidence, including a milk jug which they claimed contained gasoline used to set the fire. In truth, the jug did not contain gasoline, could not have been used to set the fire, and both the relevance of the jug and Plaintiff's confession to the use of the jug to carry gasoline to set the fire were entirely concocted by Defendants.

5.     Defendants also used unduly suggestive identification procedures and pressured witnesses to falsely identify Plaintiff.

6.     Additionally, to buttress the false confession and fabricated evidence, the Defendants fabricated arson evidence. Defendants manufactured bogus "findings" to corroborate their knowingly false claim that the fire was an arson. Just as with the confession, witness statements, and milk jug, the Defendants knew this evidence was false but nonetheless used it to wrongfully detain and convict Plaintiff.

7.     As a result of the Defendants' misconduct, Plaintiff was wrongfully convicted of arson and murder and sentenced to life in prison without parole. He was a 14-year-old boy at the time of his arrest and only 17 years old at the time of his conviction and sentence.

8.     In May 2017, Plaintiff's conviction was vacated, his charges were dismissed, and he was finally exonerated.

9.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## Jurisdiction and Venue

10.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events giving rise to this complaint occurred in this judicial district.

## Parties

13.     Plaintiff Adam Gray is a 39-year-old resident of Chicago, Illinois. At the time of his arrest in March 1993, he was 14 years old and lived with his family in the Brighton Park neighborhood of Chicago.

14.     The Special Representative of the Estate of Nicholas C. Crescenzo, Jr. ("Crescenzo") is named as Defendant in his/her capacity as Special Representative of Crescenzo's estate, to defend Crescenzo in this action. At all relevant times, Crescenzo (Star #20445) was a detective with the Chicago Police Department

("CPD") and acted under color of law and within the scope of his employment for the Defendant City of Chicago.

15.     The Special Representative of the Estate of Michael A. Pochordo ("Pochordo") is named as Defendant in his/her capacity as Special Representative of Pochordo's estate, to defend Pochordo in this action. At all relevant times, Pochordo (Star #20246) was a detective with the CPD and acted under color of law and within the scope of his employment for the Defendant City of Chicago.

16.     The Special Representative of the Estate of George Jenkins ("Jenkins") is named as Defendant in his/her capacity as Special Representative of Jenkins's estate, to defend Jenkins in this action. At all relevant times, Jenkins (Star #20137) was a detective with the CPD and acted under color of law and within the scope of his employment for the Defendant City of Chicago.

17.     The Special Representative of the Estate of Craig Cegielski ("Cegielski") is named as a Defendant in his/her capacity as Special Representative of Cegielski's estate, to defend Cegielski in this action. At all relevant times, Cegielski (Star #20442) was a detective with the CPD and acted under color of law and within the scope of his employment for the Defendant City of Chicago.

18.     Ernest R. Rokosik, Executor of the Estate of Ernest W. Rokosik ("Rokosik"), is named as a Defendant in his capacity as executor or personal representative of Rokosik's estate, to defend Rokosik in this action. At all relevant times, Rokosik (Star #20099) was a detective with the CPD and acted under color of law and within the scope of his employment for the Defendant City of Chicago.

5

19.     At all relevant times, Defendants Detective Daniel McInerney (Star #20666), Youth Officer Percy Davis (Star #8805), Detective Robert Fitzpatrick (Star #13948), Officer L. Martinez (Star #13302), and As-Yet Unknown Chicago Police Detectives were officers or detectives with the CPD. They acted under color of law and within the scope of their employment for the Defendant City of Chicago.

20.     Defendants Crescenzo, Rokosik, Pochordo, Jenkins, McInerney, Davis, Cegielski, Fitzpatrick, and As-Yet Unknown Chicago Police Detectives will be referred to collectively as the "Police Officer Defendants" throughout this Complaint.[1]

21.     At all relevant times, Defendant Joseph Gruszka was a Fire Marshal with the Chicago Fire Department ("CFD"). He acted under color of law and within the scope of his employment for the Defendant City of Chicago.

22.     At all relevant times, Defendant James R. Brown was an attorney employed as an Assistant State's Attorney in the Cook County State's Attorney's Office. He acted under color of law and within the scope of his employment for the Cook County State's Attorney's Office. Defendant Brown is sued for actions he undertook, in conspiracy with the Police Officer Defendants.

23.     All individual Defendants are sued in their individual capacities unless otherwise noted.

24.     Defendant City of Chicago ("City") is a municipality incorporated under the laws of the State of Illinois, and it operates the CPD and CFD. Defendant

---

[1] The deceased detectives (Nicholas C. Crescenzo, Jr., Ernest W. Rokosik, Michael A. Pochordo, George Jenkins, and Craig Cegielski), rather than the special representatives or executors of their estates, are included in the references to "Police Officer Defendants" and "Defendants."

City employed the Defendants, including the As-Yet Unknown Chicago Police Officers or Detectives.

25.     Defendant Cook County is a governmental entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office. Cook County is responsible for paying any judgment entered against Defendant Brown.

## The Fire

26.     At approximately 3:00 a.m. on March 25, 1993, a fire broke out at the two-flat apartment building at 4139 S. Albany Avenue in Chicago, Illinois. The family living in the first-floor apartment—the Parises—were able to escape through the front door. Two elderly second-floor residents were unable to escape in time and died after firefighters pulled them from the building.

27.     Plaintiff Adam Gray had nothing whatsoever to do with the fire. To the contrary, on the evening of March 24, 1993, Adam slept over at his 13-year-old friend Mel Gonzalez's house, as witnessed by Mel and the rest of his family who were home that night.

28.     Adam had just turned 14 in February 1993. He attended the eighth grade. He lived with his mother and sister one block south of 4139 S. Albany.

## Defendants Rokosik's and Gruszka's Fabrication of Arson Evidence

29.     Soon after the fire was extinguished, Defendant Joseph Gruszka, a Fire Marshal with the CFD, began his investigation into the fire's cause and point of origin.

7

30.     Defendant Ernest W. Rokosik of the CPD Bomb and Arson Unit also arrived on the scene, examined the building, and conferred with Defendant Gruszka on the fire investigation.

31.     At the scene, Defendant Rokosik also spoke to other detectives who had arrived on the scene, including Defendants George Jenkins, Daniel McInerney, and Nicholas Crescenzo.

32.     Defendant Gruszka used a hydrocarbon detector at the edge of the first floor porch. He claimed that he received a "strong response" from his hydrocarbon detector, which he claimed indicated the presence of a liquid accelerant.

33.     An alert from a hydrocarbon detector does not mean that a liquid accelerant was used. A hydrocarbon detector is utilized only for the purpose of isolating an area in the fire scene from which to take samples to test in a laboratory. An alert from a hydrocarbon detector does not supersede laboratory confirmation of the presence of an ignitable liquid.

34.     At the time, Defendant Gruszka knew this information about hydrocarbon detectors.

35.     Subsequently, Defendants Rokosik and Gruszka claimed, in their reports, to other law enforcement and fire department personnel, and to prosecutors, that the cause of the fire was the use of an accelerant based on the presence of heavy charring, shiny blistering, and "alligatoring" on the wooden porch and stairs, and that the origin for the fire was the enclosed rear porch and stairs of the building.

36.     Defendants Rokosik and Gruszka made these claims even though they knew they were false.

37.     At the time Defendants Rokosik and Gruszka made these claims, they knew that there is no correlation between heavy charring, shiny blistering, or alligatoring of wood and the use of an accelerant. They knew that charred wood is likely to be found in all structure fires, and that heavy blistering merely indicated direct flame contact with the wood.

38.     Defendants Rokosik and Gruszka also knew, in 1993, based on their familiarity with NPFA 921 and other then-existing standards for fire investigation, that fire investigators should not claim indications of accelerant on the basis of appearance of the char alone.

39.     Defendant Rokosik took two samples of debris from the fire scene for laboratory testing.

40.     The laboratory testing revealed that both samples were negative for gasoline.

41.     One of the samples was negative for any hydrocarbon residue.

42.     The other sample contained heavy petroleum distillate ("HPD") and possible medium petroleum distillate ("MPD"). These categories of petroleum distillates include many common background substances often associated with wooden structures due to their use as preservatives for wood. Gasoline is in a separate class of petroleum distillates and is not a HPD or a MPD.

9

43.     There was never any evidence that an ignitable liquid was present in the fire debris.

44.     There was no physical evidence from either the fire investigation or the arson debris analysis to support the conclusion of the use of an accelerant.

45.     By March 1993, Defendants Rokosik and Gruszka knew that the determination of the cause of a fire requires the identification of the ignition source, the first fuel ignited, and the ignition sequence. However, neither Defendant Rokosik nor Gruszka—nor anyone else—had identified, documented, or collected any evidence of any elements of a fire cause.

46.     Defendants Rokosik and Gruszka also knew that a fire investigator must eliminate all reasonably possible natural and accidental causes before declaring the cause of a fire to be incendiary and an arson. Despite this knowledge, they declared the cause of the fire to be incendiary and an arson even though they did not eliminate all reasonably possible natural and accidental causes.

47.     For instance, Defendant Gruszka knew that in order to eliminate electrical causation within a heavily burned area such as the porch, it would be necessary to inspect the entire circuit. However, Gruszka did not conduct such an inspection and did not eliminate electrical causation.

48.     In 1993, the cause of the fire at 4139 S. Albany should have been classified as "undetermined," and Defendants Rokosik and Gruszka knew it. Despite this knowledge, Defendants Rokosik and Gruszka declared that the fire was an arson caused by use of an accelerant.

10

49.    Defendants Rokosik and Gruszka knew that their "findings" were scientifically indefensible, wholly fabricated, and false, but they withheld this from Plaintiff, his defense attorneys, and prosecutors. These fabricated opinions and reports caused Plaintiff's arrest, detention, prosecution, and conviction.

## Defendants Speak to Witnesses at the Scene

50.    After Defendants Rokosik and Gruszka examined the scene, Defendants Rokosik and Crescenzo spoke with Kasey Paris, a 14-year-old girl who lived in the first floor apartment of 4139 S. Albany.

51.    Kasey knew Adam. She was angry at him because she liked his friend Mel Gonzalez, whom she had dated, and she believed that Adam caused Mel to break up with her. Kasey told Defendants Rokosik and Crescenzo that she and Adam had not been getting along.

52.    Defendants Rokosik and Crescenzo also spoke with 23-year-old Karrie Kelly, whose boyfriend lived around the corner from 4139 S. Albany. Karrie told the Defendants that she left her boyfriend's house at approximately 2:45 a.m. and returned after her boyfriend told her about the fire. Karrie told the Defendants that she saw someone who was carrying something and wearing a black knit hat, black shirt, black pants, and black shoes in the alley behind 4139 S. Albany.

53.    At the time that Karrie spoke to the Defendants, she was on muscle relaxants, exhausted, and feeling ill.

54.    When the Defendants interviewed Karrie, they had every reason to know that she was not credible.

11

55. Defendants Rokosik and McInerney went looking for Adam.

## Plaintiff's Arrest

56. Defendants Rokosik and McInerney of the CPD Bomb and Arson unit went to Ms. Gray's house and asked to speak with Adam. Ms. Gray informed them that Adam had slept over at the Gonzalezes' house but was now at his brother Michael's house.

57. Defendants Rokosik and McInerney did not tell Ms. Gray that they intended to arrest Adam or that they were planning to take him to the police station.

58. Defendants Rokosik and McInerney then went to Michael Gray's apartment and arrested Adam.

59. Defendants Rokosik and McInerney did not tell Adam that he was under arrest or read him any *Miranda* warnings.

60. Defendants had no probable cause to arrest Adam at that time.

61. There was never probable cause to arrest Adam.

62. Adam was taken to the Area 1 police station at 51st and Wentworth.

## Plaintiff's Interrogation

63. Adam arrived at the police station at around 5:00 or 5:15 a.m. on March 25, 1993.

64. Once there, Defendants Rokosik and McInerney took Adam to a room on the second floor. There was a bench and a desk in the room. The room was very cold. Adam was left alone in the room. He lay down on the bench.

65.     After a period of time, Defendant Crescenzo entered the room and told Adam to get up from the bench. Defendant Crescenzo searched Adam's school bag, which Adam had brought with him to the police station, and then Crescenzo left the room.

66.     Over a period of time, approximately three or four of the Police Officer Defendants came into the room and searched through Adam's school bag. At one point, one of the Police Officer Defendants entered the room and smelled the bottom of Adam's shoes. At another point, one of the Police Officer Defendants came into the room and told Adam to empty his pockets.

67.     Defendant James R. Brown was at the police station and actively working on this investigation with the Police Officer Defendants starting in the early morning of March 25, 1993 through the time that he took Adam's false, coerced confession. Defendant Brown participated with the Police Officer Defendants in the unlawful interrogation of Adam and cooperated with the Police Officer Defendants in obtaining Adam's false and inculpatory statement.

68.     Eventually, Defendant Brown entered the room in which Adam was being held. Defendant Brown moved Adam into another, larger room with a two-way mirror in it. Defendant Brown sat very close to Adam. Defendant Brown told Adam that he was there to ask him questions.

69.     During this first interview, the Police Officer Defendants were present. The door to the interview room was closed.

70.     Defendant Brown asked Adam questions, as did the Police Officer Defendants. At first, the tone that Defendant Brown and the Police Officer Defendants used with Adam was benign, as were their questions.

71.     Adam did not realize that he was a suspect for the fire. At some point while he was left alone in an interrogation room, Adam took his homework out of his school bag and began working on it. He thought he was going to school that day.

72.     Over the course of the next several hours, however, Defendant Brown and the Police Officer Defendants harshly interrogated Adam, isolating him, denying him the right to counsel, denying him access to family members who had asked to talk to him, and fed him information about the fire. The Defendants did this even though they had no reason to believe that Adam was involved in the fire. They used these tactics to coerce him into adopting their fabricated version of events, which was that he left Mel's house in the middle of the night, bought gasoline at a nearby gas station, and set Kasey's house on fire.

73.     Adam repeatedly asserted his innocence and denied involvement in the fire. He told Defendant Brown and the Police Officer Defendants that he did not leave Mel's house and did not set the fire.

74.     Unsatisfied with Adam's protestations of innocence, Defendant Brown and the Police Officer Defendants worked to overbear Adam's will and force him to falsely implicate himself in the fire. They became more and more aggressive and hostile.

75.     Defendant Brown actively led the interrogations and kept repeating, "Yes, you did," every time Adam said he did not set the fire.

76.     Despite having knowledge of Adam's young age, Defendant Brown and the Police Officer Defendants interrogated him on and off for hours outside the presence of a parent, guardian, attorney, or other adult interested in his welfare.

77.     Defendant Percy Davis, who was wearing a badge, also actively participated in Adam's interrogations in the same manner as the other Police Officer Defendants and kept accusing Adam of involvement in the fire. Defendant Davis never did anything to intervene to prevent Adam's false confession, or to protect Adam's interests and rights during the interrogations.

78.     Whenever Adam gave an answer that Defendant Brown and the Police Officer Defendants did not like, the Defendants repeated their questions.

79.     During the multiple interrogations, Adam cried and was confused and scared.

80.     At one point, Defendant Brown and the Police Officer Defendants left the room. Adam put his head in his hands on the table and tried to sleep. He was tired, scared, nauseous, and cold.

81.     Defendant Brown came into the room and banged loudly on the desk, telling Adam words to the effect of, "No lying around." Defendant Brown and the Police Officer Defendants resumed interrogating Adam.

82.     At one point, Defendant Crescenzo falsely told Adam that a little old lady had seen him set the fire. One of the Police Officer Defendants also falsely told

15

Adam that Mel told them that he did not know if Adam had left Mel's house the previous evening. All of this confused and scared Adam.

83.     At another point, Adam asked for his brother, saying something to the effect of, "Is my brother here?"

84.     Defendant Brown and the Police Officer Defendants ignored Adam's requests to see his family. Adam was falsely told by Defendant Brown or one or more of the Police Officer Defendants that his brother had come to the police station but left after only a few minutes.

85.     Defendant Brown or one or more of the Police Officer Defendants also falsely told Adam that they called his mother at work, and that she said that she did not care what happened to him and would not come to the police station.

86.     The Defendants' lies made Adam feel confused and hopeless. The Defendants' lies were intended to and did create a sense of hopelessness and despair in Adam, because until then, Adam had believed that he would be able to leave the police station with his mother or brother.

87.     In fact, both Ms. Gray and Michael Gray came to the police station not long after Defendants Rokosik and McInerney brought him there. Ms. Gray arrived at the police station after Michael.

88.     Ms. Gray and Michael repeatedly asked to see and speak to Adam, but they were denied. They waited at the police station for hours.

89.     Defendant Brown and the Police Officer Defendants knew that Ms. Gray and Michael were there to see Adam, but they prevented them from talking to Adam so that they could unlawfully obtain a false confession from him.

90.     Defendant Brown and the Police Officer Defendants agreed among themselves and acted to exploit Adam's vulnerabilities—including his young age—to secure a confession, regardless of whether it was true or false, and knowing that there was no evidence to suggest that Adam was involved in the fire.

91.     After several hours and multiple rounds of interrogation, Defendant Crescenzo took Adam to the bathroom. On the way back from the bathroom, Crescenzo stopped at a copy machine. Defendant Crescenzo told Adam that the machine could determine if he had lead from gasoline on his hands. Defendant Crescenzo placed Adam's hands on the copy machine and told him that if he had lead on his hands, his hands would show up when copied. Defendant Crescenzo copied Adam's hands.

92.     Defendant Crescenzo told Adam that the machine showed that he had lead from gasoline on his hands. Defendant Crescenzo's lies were intended to and did cause Adam to doubt himself. Adam responded that he had been drawing the previous evening and had pencil lead on his hands. Defendant Crescenzo falsely told Adam that this was evidence of his guilt.

93.     Defendant Crescenzo took Adam back to the interview room and left him alone there for a period of time.

94.     When Defendant Crescenzo returned, he told Adam something to the effect of, "I believe you that you didn't do it, but the only way you'll get out of here is if you say you did it." Defendant Crescenzo told Adam that if he confessed to setting the fire, he would be put where "little fire bugs" are put, and that if he did not confess, he would be given the electric chair. Adam told Defendant Crescenzo that he did not set the fire. Defendant Crescenzo told Adam that the only way to get out of there would be to say that he did it. He told Adam that if he said he did it, he would drop him off at school. He told Adam that he had to give Defendant Brown something telling him that he started the fire.

95.     Eventually, Defendant Brown and the Police Officer Defendants wore down Adam. Even though he was innocent of the fire, Adam succumbed to the Defendants' manipulation and coercion and falsely implicated himself in the fire. Because of Defendants' lies and manipulation, Adam believed that the only way to get out of the police station was to say that he set the fire.

96.     Defendant Brown and the Police Officer Defendants gave Adam numerous details and pieces of information relating to the fire.

97.     Defendant Brown and the Police Officer Defendants rehearsed the statement that they had fabricated for Adam repeatedly before Adam gave a transcribed statement. When Adam said something that Defendant Brown and the Police Officer Defendants did not like, the Defendants forced him to start over and "corrected" his mistakes.

18

98.     As a result of the coercive and unconstitutional tactics used by Defendant Brown and the Police Officer Defendants, Adam gave a false confession to a purported crime that he did not commit.

99.     In his transcribed statement, Adam parroted Defendant Brown and the Police Officer Defendants' concocted scenario in which he left Mel's house in the middle of the night, went to the Clark gas station, bought gasoline in a milk jug, and then went to Kasey's house and set the enclosed porch and stairs on fire. None of that was true.

100.    Adam was not given anything to eat until after he gave the false confession.

101.    This is what Adam looked like when he was at the police station on March 25, 1993:



102.    After giving the statement, Adam believed that he was going home, because Defendant Crescenzo had told him that he would drop him off at school if he confessed.

103.    Adam was taken downstairs by Defendant Davis. He asked Defendant Davis if he could call his mother. Defendant Davis picked up the phone, pretended to call Adam's home, and claimed that no one was home. Adam asked to try to call himself but Defendant Davis refused to let him use the phone. Defendant Davis told Adam that he would be going to the Audy Home.

104.    Defendant Brown and the Police Officer Defendants knew that Adam's statement was coerced and false and merely a recitation of their fabrications. Nevertheless, the Defendants used Adam's coerced, fabricated confession to obtain his arrest, detention, prosecution, and conviction, all without probable cause.

## Unduly Suggestive Identifications and Fabrication of Evidence

105.    At some point between interrogations, one or more of the Police Officer Defendants placed Adam in a lineup with Mel and two other boys from his neighborhood.

106.    Adam was not similar in physical appearance to the other boys in the lineup. The lineup was unduly suggestive.

107.    Karrie Kelly viewed the lineup.

108.    One or more of the Police Officer Defendants, including Defendants Pochordo and Crescenzo, made it clear to Karrie who she should pick.

20

109.    In the alternative, one or more of the Police Officer Defendants, including Defendants Pochordo and Crescenzo, knew that Karrie would pick Adam because she was familiar with him, and not because she had actually seen him in the alley near 4139 S. Albany.

110.    As a result of Defendants' misconduct, Karrie picked Adam out of the lineup.

111.    Defendants Brown and Crescenzo and one or more of the other Police Officer Defendants also questioned Mel at Area 1 on the morning of March 25, 1993. These Defendants threatened Mel, telling him that if he loved his parents, he would tell them what they wanted to hear, or they would put him in jail for the rest of his life. Defendants fabricated reports claiming that Mel had told them that he did not know if Adam may have left his house in the middle of the night.

112.    Mel never told any of the Defendants that he did not know if Adam may have left his house in the middle of the night.

113.    Furthermore, at some point on March 25, 1993, Defendants Crescenzo, Pochordo, Cegielski, Jenkins, and L. Martinez fabricated physical evidence used to arrest, detain, prosecute, and convict Plaintiff. To support Adam's false confession, Defendants Crescenzo, Pochordo, Cegielski, Jenkins, and Martinez obtained an empty milk jug, which they claimed was used by Adam to buy gasoline and carry it from the gas station to 4139 S. Albany. In truth, the milk jug did not contain gasoline or gasoline residue, could not have been used to set the fire, and its purported role in the fire was entirely concocted by Defendants.

21

114.    The milk jug was subjected to laboratory testing. The HPD and possible MPD found in the fire debris are different substances from the HPD in the milk jug. The HPD in the fire debris did not come from the HPD in the milk jug.

115.    To further shore up their false charges against Adam, Defendants Crescenzo and Pochordo or Cegielski went to the Clark gas station at 40th and Kedzie in the early morning hours of March 26, 1993.

116.    Brenda Thomas, an attendant at the gas station, had sold gasoline to someone the day before. Defendants Crescenzo, Pochordo, and/or Cegielski showed Thomas a four-photo array that included Adam's photo.

117.    Defendants Crescenzo, Pochordo, and/or Cegielski told Thomas to identify the person to whom she had sold gasoline. She told them that she could not identify the person from the photo array because she did not recognize anyone. Defendants Crescenzo, Pochordo, and/or Cegielski became aggressive and repeatedly told her in an angry tone to "keep looking."

118.    When Thomas was about to pick a photo that was not Adam's photo, Defendants Crescenzo, Pochordo, and/or Cegielski made it clear to her that she should not pick that photo and that she should pick Adam's photo. Thomas picked Adam's photo not because she recognized him but because the Defendants pressured her to pick his photo.

119.    The photo array was unduly suggestive.

120.    Thomas made an in-court identification of Adam and testified at trial that she picked out his photo from the photo array. Thomas gave this testimony not

22

because she recognized Adam but because of Defendants' misconduct and being told that she would go to jail if she did not appear in court to testify.

121.    Later, while Adam's case was being prepared for trial, one or more of the Police Officer Defendants worked with Kasey Paris to prepare false testimony for trial in which she testified that Adam had threatened her or threatened to kill her.

122.    Defendants Brown, Gruszka, Martinez, and the Police Officer Defendants concealed from Plaintiff, his criminal defense attorneys, and prosecutors that they had coerced a false confession, fabricated evidence, used unduly suggestive witness identification procedures, manufactured witness testimony against Plaintiff, and withheld exculpatory evidence.

123.    As a result of the misconduct of Defendants Brown, Gruszka, Martinez, and the Police Officer Defendants, Plaintiff was arrested, detained, prosecuted, and convicted for a purported crime that they knew he did not commit.

### Plaintiff's Trial and Conviction

124.    In April 1996, Plaintiff was tried for the fire and resulting deaths at 4139 S. Albany.

125.    Plaintiff's confession was introduced against him at trial, and it was the State's primary evidence of his guilt. The only physical evidence that supposedly linked Adam to the fire was the milk jug fabricated by Defendants Crescenzo, Pochordo, Cegielski, Jenkins, and Martinez, which the prosecution claimed contained gasoline.

23

126.    None of the Defendants who testified against Adam at his trial or during his motion to suppress, including Defendants Brown, Rokosik, and Crescenzo, disclosed how they obtained the false and involuntary inculpatory statement from Adam. Nor did any of the Defendants disclose how they had fabricated arson evidence or the milk jug, or how they had engaged in an unduly suggestive lineup and photo array or manipulated witnesses, such as Karrie Kelly, Kasey Paris, and Brenda Thomas, to testify falsely against Adam.

127.    As a result of the above-described misconduct on the part of the Defendants, Adam was wrongfully convicted of arson and murder, and, at the age of 17, he was sentenced to life imprisonment without parole.

## Plaintiff's Exoneration

128.    Throughout his prosecution and before and after his incarceration, Adam continued to maintain his innocence and pursued all possible legal avenues to prove it.

129.    After conducting an independent investigation of the case, the Cook County State's Attorney's Office agreed that Adam had been wrongfully convicted and filed a joint motion with Adam asking the Illinois appellate court to overturn his convictions, dismiss the underlying indictment, and grant him immediate release. On May 3, 2017, the appellate court granted the relief requested.

130.    On November 15, 2017, Adam filed a petition in the Circuit Court of Cook County for a Certificate of Innocence. This petition was ultimately unopposed

24

by the State's Attorney's Office. The Circuit Court granted his petition on February 21, 2018.

### The Defendant Officers' Pattern of Misconduct and the Defendant City of Chicago's Policies and Practices Facilitating Such Misconduct

131. The egregious misconduct of the Police Officer Defendants and Defendant Martinez in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

132. Plaintiff was coerced into giving a false and inculpatory statement pursuant to such municipal policy. The CPD and its detectives and police officers have a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal cases, causing hundreds of false confessions and wrongful convictions in the City.

133. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence and/or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

134. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and/or psychologically coercive tactics to obtain involuntary and false confessions, particularly from juveniles and other vulnerable individuals; (2)

25

fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; (5) using unduly suggestive identification procedures; and (6) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

135.    At all relevant times, the City had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions. Pursuant to this municipal policy and practice, CPD officers, including the officers at Area 1, used interrogation tactics identical or similar to those employed by the Defendants in this case to extract confessions. These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the misleading of parents/guardians and denial of access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the form of a confession; (h) sleep and food deprivation; and (i) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt or innocence of the offense.

136.    Juveniles and young adults, in particular, including Adam, were the most vulnerable targets of this municipal policy. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to

26

manipulation, and frequently lack the ability to fully understand—let alone assert—their rights during an interrogation. As a matter of widespread custom and practice, CPD officers, including but not limited to the Defendants in this case, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close open cases. CPD detectives systematically denied juvenile suspects access to their parents/guardians and to counsel, even when those individuals were present in the station asking to see the juvenile, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure until they "confessed." This practice is aided, perpetuated, and enhanced by the CPD's policy and practice of using so-called "youth officers" to assist in coercion of juveniles during interrogations as set forth more fully in this Complaint.

137. Also pursuant to municipal policy and practice, members of the CPD, including Defendants in this case, systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory information was concealed both from trial attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers, including the Defendants in this case, repeatedly committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques.

138. The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an

27

interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

139.    At all relevant times, the City also had in place *de facto* policies and practices by which CPD officers, including Defendants in this case, were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices include: failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; conducting unduly suggestive lineups and arrays; fabricating identifications and/or withholding exculpatory evidence regarding the identifications; withholding evidence and/or fabricating evidence regarding lineups and arrays; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

140.    At all relevant times hereto, members of the CPD, including Defendants in this case, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other

information in the files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

141.   Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City, including Defendants in this case, concealed exculpatory evidence from Plaintiff.

142.   The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Fields v. City of Chicago*, 10-CV-1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87-CV-2536, 88-CV-1127 (N.D. Ill.).

143.   The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the fire and investigation at issue here.

144.   The City and the CPD routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

145.   Prior to and during the period in which Plaintiff was falsely charged and convicted of the fire, the City operated a dysfunctional disciplinary system for

Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

146. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

147. As a result of the City's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the CPD, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practice of the City, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens.

148.    The City and its Police Department also failed in the years prior to
Plaintiff's wrongful charging and conviction to provide adequate training to Chicago
police detectives and other officers in any of the following areas, among others:

a.  The constitutional requirement to disclose exculpatory evidence,
    including how to identify such evidence and what steps to take
    when exculpatory evidence has been identified in order to ensure
    that the evidence is made part of the criminal proceeding;

b.  The need to refrain from physical and psychological abuse, and
    manipulative and coercive conduct, in relation to suspects and
    witnesses, and juvenile suspects in particular;

c.  The rises of wrongful conviction and the steps police officers should
    take to minimize risks;

d.  The risks of engaging in tunnel vision during investigation;

e.  The need for full disclosure, candor, and openness on the part of all
    officers who participate in the police disciplinary process, both as
    witnesses and as accused officers, and the need to report
    misconduct committed by fellow officers; and

f.  The constitutional requirement not to engage in unduly suggestive
    identification procedures, including lineups or arrays.

149.    The need for police officers to be trained in these areas was and
remains obvious. The City's failure to train Chicago police officers as alleged in the

31

preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

150.    Additionally, the misconduct described in this Complaint was undertaken by employees and agents of the City, including but not limited to Defendants Rokosik and Gruszka, pursuant to the policies and practices of the CFD to pursue wrongful convictions through profoundly flawed investigations. This includes system-wide use of bogus arson science to manufacture false, inculpatory evidence, such as relying on "alligatoring," which was debunked well before the fire for which Plaintiff was wrongfully convicted.

151.    The City's failure to train, supervise, and discipline its officers, including the Defendants in this case, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

152.    The City and final policymaking officials within the CPD and CFD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

153.    All of the policies and practices described in the foregoing paragraphs were knowingly approved by City policymakers, who were deliberately indifferent to

32

the fact that its officers and investigators systematically violated the rights of the people they were sworn to protect.

## Plaintiff's Damages

154.    Plaintiff Adam Gray spent over 24 years in custody for a purported crime that he did not commit, beginning when he was just 14 years old.

155.    Plaintiff was detained for approximately three years at the Audy Home while awaiting trial. During this time, his mental, emotional, and physical suffering was especially severe.

156.    In serving the majority of his young life behind bars, Plaintiff was wrongfully deprived of his entire youth. He must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

157.    The emotional pain and suffering caused by losing 24 years in the prime of life has been enormous. During his incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

158.    As a result of the foregoing, Plaintiff has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## COUNT I—42 U.S.C. § 1983
### False Confession
### (Fifth and Fourteenth Amendments)

159.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

160.    In the manner described more fully above, the Police Officer Defendants and Defendant Brown, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

161.    In addition, the Police Officer Defendants and Defendant Brown, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, used extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, as it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

162.    In addition, the Police Officer Defendants and Defendant Brown,
acting as investigators and without probable cause to suspect Plaintiff of any crime,
individually, jointly, and in conspiracy with one another and others, as well as
under color of law and within the scope of their employment, fabricated a false
confession, which was attributed to Plaintiff and used against Plaintiff in his
criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the
Fourteenth Amendment.

163.    Specifically, Police Officer Defendants and Defendant Brown
conducted, participated in, encouraged, advised, and ordered an unconstitutional
interrogation of Plaintiff, then a 14-year-old boy, using psychological coercion,
which overbore Plaintiff's will and resulted in him making involuntary statements
implicating himself in the fire at 4139 S. Albany and the deaths of two individuals.

164.    Those false incriminating statements were wholly fabricated by
Defendant Brown and the Police Officer Defendants and attributed to Plaintiff.

165.    Those false incriminating statements were used against Plaintiff to his
detriment throughout his criminal case. They were one of the main reasons that
Plaintiff was prosecuted and convicted of the 4139 S. Albany arson and murders.

166.    The misconduct described in this Count was objectively unreasonable
and was undertaken intentionally, and in total disregard of the truth and Plaintiff's
clear innocence.

167.    As a result of Defendants' misconduct described in this Count, Plaintiff
suffered loss of liberty, great mental anguish, humiliation, degradation, physical

and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

168.   The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT II—42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

169.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

170.   In the manner described more fully above, the Police Officer Defendants, Defendant Martinez, and Defendant Gruszka, individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

171.   In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

172.   These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

36

173.     The judicial proceedings against Plaintiff were terminated in his favor when the Illinois Appellate Court granted request of the Cook County State's Attorney's Office to dismiss all charges against him.

174.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

175.     As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

176.     The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT III—42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

177.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

178.     As described in detail above, the Police Officer Defendants, Defendant Martinez, and Defendant Gruszka, while acting individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

179. In the manner described more fully above, the Police Officer Defendants, Defendant Martinez, and Defendant Gruszka deliberately withheld exculpatory evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

180. The Police Officer Defendants, Defendant Martinez, and Defendant Gruszka also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the fire, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case. In addition, these Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the fire, contained statements and described events that were fabricated and that Defendants knew to be false. These Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

181. In addition, based upon information and belief, the Police Officer Defendants, Defendant Martinez, and Defendant Gruszka concealed and fabricated additional evidence that is not yet known to Plaintiff.

182. In the manner described more fully above, the Police Officer Defendants also procured supposed eyewitness identifications of Plaintiff, implicating him in the fire, by using unduly suggestive identification techniques

38

during a photo array and in a live lineup. Defendants used the resulting false identifications to taint Plaintiff's criminal trial. The identification procedures were so unnecessarily suggestive and conducive to irreparable mistaken identification that the identification's use violated due process of law.

183. The misconduct of the Police Officer Defendants, Defendant Martinez, and Defendant Gruszka directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and there is a reasonable probability that he would not have been convicted.

184. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

185. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

186. The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT IV—42 U.S.C. § 1983
### Failure to Intervene

187.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

188.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants, Defendant Martinez, Defendant Gruszka, and Defendant Brown stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

189.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

190.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

191.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

192.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

40

## COUNT V—42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

193.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

194.    The Police Officer Defendants, Defendant Martinez, and Defendant Gruszka, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

195.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

196.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

197.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

198.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

199.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the CPD, in the manner more fully described below in Count VI.

## COUNT VI—42 U.S.C. § 1983
## Policy and Practice Claim against the City of Chicago

200.    Plaintiff incorporates each paragraph of this Complaint as if fully restated herein.

201.    As described more fully herein, the Defendant City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

202.    Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City, as well as by the actions of policymaking officials for the City.

203.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City failed to promulgate proper or adequate rules, regulations, policies, or procedures on: the conduct of interrogations and questioning of criminal suspects by officers and agents of the CPD and the City; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the obtaining statements and testimony from witnesses; the interviews or interrogations of juvenile suspects; access to juvenile suspects by their parents and/or guardians; the maintenance of investigative files and disclosure of those files in criminal proceedings; the conduct of proper lineups and arrays and unduly suggestive identification procedures; and meaningfully disciplining officers accused

42

of such unlawful conduct. In addition or in the alternative, the City failed to train or supervise officers and agents of the CPD and the City, on the above topics, as well as the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses, and access to juvenile suspects by their parents and/or guardians. The City declined to implement any or adequate policies or training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

204.    The failure to promulgate proper or adequate rules, regulations, policies, procedures, and training was committed by officers and agents of the CPD and the City, including the Defendants.

205.    At all times relevant herein, final policymakers for the City and the CPD knew of these problems and allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

206.    The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip Chicago police officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory evidence; how to conduct juvenile suspect interrogations; and how to conduct proper identification procedures, including lineups and arrays.

43

207. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of a widespread practice and custom by officers and agents of the CPD and the City under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the CPD and the City falsely confessed, under extreme duress and after suffering physical and/or psychological abuse, to committing crimes to which they had no connection.

208. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess

44

involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

209. Furthermore, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had interrelated *de facto* policies, practices, and customs which included: (1) conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects, and arrestees, in order to obtain confessions, including from juveniles and teenagers; (2) manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles or teenagers; (3) the use of "youth officers" to disguise, excuse, and perpetuate the practices of conducting physically, psychologically, and otherwise illegal and improperly coercive interrogations of juveniles, including the use of youth officers in such interrogations, denying parents and/or guardians access to the juvenile in custody, and failing to notify a parent and/or guardian of a juvenile in custody; (4) filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements; (5) suppressing evidence concerning the circumstances of these interrogations and confessions; (6) pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements; (7) failing to video and/or

45

audio record the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in parts (1) and (2), above; (8) failing to properly train supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or making false reports and statements; (9) conducting unduly suggestive lineups and arrays; (10) fabricating identifications and/or withholding exculpatory evidence regarding the identification; (11) withholding evidence and fabricating evidence regarding arrays and identifications; and (12) the police code of silence, specifically in cases where officers engaged in the violations articulated above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

46

210.    The interrelated pattern and practices alleged above were or should have been well-known within the CPD, both before and after Plaintiff was interrogated and wrongfully convicted, as well as by successive mayors, police superintendents and Office of Professional Standards directors, and by the Chicago City Council and Police Board, and other policymaking, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

211.    The interrelated policies, practices, customs, and failure to train set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; the conducting of suggestive lineups and arrays; the fabrication of evidence; the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices, customs, and failure to train set forth above were, separately and together, a moving force behind the unconstitutional acts and perjury committed by the Defendants and their co-conspirators, and the injuries suffered by Plaintiff, including his wrongful conviction and imprisonment.

212.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City had notice of widespread practices by officers and agents of the CPD, CFD, and the City, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; (5) officers engaged in unduly suggestive identifications, including lineups and arrays; and/or (6) pursued wrongful convictions through profoundly flawed investigations. This included system-wide use of bogus arson science to manufacture false, inculpatory evidence, such as relying on "alligatoring," which was debunked well before the fire for which Plaintiff was wrongfully convicted.

213.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City directly encouraged and were the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

48

214.    The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

215.    As a result of the policies and practices of the City and the CPD, numerous individuals have been wrongly convicted of crimes that they did not commit.

216.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

217.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII—State Law Claim
## Intentional Infliction of Emotional Distress

218.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

219.    The actions, omissions, and conduct of the Police Officer Defendants, Defendant Brown, Defendant Gruszka, and Defendant Martinez, acting as investigators and as set forth above, were extreme and outrageous.

49

220. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

221. As a result of these Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII—State Law Claim
### Malicious Prosecution

222. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

223. In the manner described above, the Police Officer Defendants, Defendant Gruszka, and Defendant Martinez, individually, jointly, or in conspiracy with each other, and others, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

224. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause.

225. These judicial proceedings were instituted and continued maliciously, resulting in injury.

226. The judicial proceedings against Plaintiff were terminated in his favor when the charges against him were dismissed.

227.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

228.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX—State Law Claim
### Civil Conspiracy

229.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

230.    As described more fully in the preceding paragraphs, the Police Officer Defendants, Defendant Gruszka, and Defendant Martinez, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish and unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

231.    The violations of Illinois law described in this Complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

232.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

233.   As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X—State Law Claim
## Indemnification

234.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

235.   Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

236.   The Police Officer Defendants and Defendant Martinez are or were employees of the CPD, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

237.   Defendant Gruszka is or was an employee of the CFD, an agency of the City of Chicago, who acted within the scope of his employment in committing the misconduct described above.

238.   The City is liable to indemnify any compensatory judgment awarded against the Police Officer Defendants, Defendant Martinez, or Defendant Gruszka.

239.    Defendant Cook County is responsible for any judgment entered against Defendant Brown.

## COUNT XI—State Law Claim
### *Respondeat Superior*

240.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

241.    In committing the acts alleged in the preceding paragraphs, the Police Officer Defendants, Defendant Gruszka, and Defendant Martinez were employees of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

242.    Defendant City of Chicago is liable as a principal for all torts committed by its agents.

WHEREFORE, Plaintiff, ADAM GRAY, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CHICAGO, Special Representative of the Estate of former Chicago Police Detective NICHOLAS C. CRESCENZO, JR., deceased, Special Representative of the Estate of former Chicago Police Detective GEORGE JENKINS, deceased, Special Representative of the Estate of former Chicago Police Detective MICHAEL A. POCHORDO, deceased, Special Representative of the Estate of former Chicago Police Detective CRAIG CEGIELSKI, deceased, ERNEST R. ROKOSIK, Executor of the Estate of former Chicago Police Detective ERNEST W. ROKOSIK, deceased, former Chicago Police Detective DANIEL MCINERNEY, former Chicago Police Youth Officer PERCY DAVIS, former Chicago Police Detective ROBERT FITZPATRICK, former Chicago

Police Officer L. MARTINEZ, former Chicago Fire Marshal JOSEPH GRUSZKA, former Assistant State's Attorney JAMES R. BROWN, COOK COUNTY, ILLINOIS, and AS-YET UNKNOWN CHICAGO POLICE DETECTIVES, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff ADAM GRAY hereby demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang
*One of Plaintiff's Attorneys*

Jon Loevy
Tara Thompson
Cindy Tsai
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
O: 312.243.5900
F: 312.243.5902
jon@loevy.com
tara@loevy.com
cindy@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80305
O: 720.328.5642
F: 312.243.5902
elizabethw@loevy.com