## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ADAM GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 2624 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| CITY OF CHICAGO; NICHOLAS | ) | |
| CRESCENZO, JR.; GEORGE JENKINS; | ) | |
| MICHAEL POCHORDO; CRAIG | ) | |
| CEGIELSKI; ERNEST ROKOSIK; | ) | |
| DANIEL MCINERNEY; PERCY DAVIS; | ) | |
| ROBERT FITZPATRICK; JOSEPH | ) | |
| GRUSZKA; JAMES R. BROWN; COOK | ) | |
| COUNTY; L. MARTINEZ; AND | ) | |
| ELIZABETH BARTON,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adam Gray was fourteen years old when he was arrested in 1993 for arson and the murder of two individuals who died in the resulting fire. To this day, he maintains his innocence. After twenty-four years in prison, he was released and granted a certificate of innocence by the state. He brings the instant suit under 42 U.S.C. § 1983 against the City of Chicago; Chicago Police Officers Daniel McInerny, Percy Davis, Nicholas Crescenzo, Michael Pochordo, Craig Cegielski, Ernest Rokosik, and George Jenkins, and Chicago Fire Department Investigator Joseph Gruszka

---

[1] The parties stipulated to the dismissal of Linda Martinez as a defendant on February 13, 2019. *See* ECF No. 99. Additionally, Defendants Nicholas Crescenzo, Michael Pochordo, Craig Cegielski, Ernest Rokosik, George Jenkins, and Joseph Gruszka are deceased. Their estates were previously represented by Elizabeth Barton but as of April 15, 2021, are represented by Geri Lynn Yanow. *See* ECF No. 247. The Court refers to the actions of each defendant, rather than to his estate, throughout this opinion for the sake of clarity.

("Individual Defendants"); Cook County State's Attorney James Brown; and Cook County.

In brief, Gray alleges that the Individual Defendants and Brown, individually and in concert with each other, violated his constitutional rights by coercing him to give a false confession, fabricating evidence against him for use at trial, suppressing exonerating evidence, and depriving him of liberty without due process of law. Both the Individual Defendants and Brown and Cook County have filed motions for summary judgment. For the following reasons, the Individual Defendants' motion is granted in part and denied in part, and Brown and Cook County's motion is denied.

## I.  Background[2]

### A.  The fire at 4139 S. Albany

In the early hours of March 25, 1993, a fire began in an apartment building at 4139 S. Albany, on Chicago's West Side. County Defs.' LR 56.1 Statement of Material Fact ("CDSOF") ¶ 5, ECF No. 251. Two residents of the building died in the fire. *Id.*

Gray was fourteen years old at the time, and was an on-again, off-again friend of Kasey Paris, one of the surviving residents. *Id.* ¶ 7; Individual Defs.' Statement of Additional Fact ("IDSOF") ¶ 88, ECF No. 259. At the scene of the fire, Paris's older brother suggested that Gray could be responsible for the fire, in light of Gray's ongoing feud with Paris and the threats Gray had made against her in the past. IDSOF ¶ 8–11.

---

[2]      The following facts are undisputed or deemed admitted, unless otherwise noted.

Having witnessed the fire, Gray's mother, Gertraud Gray, and his older brother, Michael Gray, went to find Gray at his best friend Mel's house, where Gray had slept the night before. Pl.'s Statement of Additional Fact ("PSOAF") ¶ 22, ECF No. 268. Michael found Gray, Mel, and Mel's younger brother asleep in Mel's living room. *Id.* ¶ 24. Michael remembers that Gray had the impression of a knitted blanket on his face because he had slept on the couch. *Id.* ¶ 25. Gray was wearing what he had worn the night before—a white t-shirt and blue jeans. *Id.* ¶ 26. Michael took Gray to Michael's apartment. *Id.* ¶ 24.

## B.    The on-site investigation

Meanwhile, in the wake of the fire, Chicago Police ("CPD") and Fire Department ("CFD") officers arrived to investigate. CFD Marshal Joseph Gruzka was among the officers assigned to the case. IDSOF ¶ 16. At least two people reported that they had smelled gasoline at the scene of the fire, *id.* ¶ 17, and Gruzka noted that the majority of the damage was located in the "enclosed rear porch area, extending from grade level vertically to the roof." *Id.* ¶ 18.

To determine the cause of the fire, Gruzka used an instrument called a hydrocarbon detector to determine which areas of the porch should be sampled for laboratory testing. *Id.* ¶ 107. He noted "heavy alligatoring and shiny, smooth blisters on exposed wood surfaces."[3] *Id.* ¶¶ 18–20. Roughly an hour after Gruzka had begun

---

[3]      "Alligatoring" refers to a pattern that forms on wood that has been heavily burned, named because it looks like the back of an alligator. IDSOF ¶ 105. At the time of the fire, there was a split amongst authorities as to whether alligatoring was suggestive of the use of an accelerant, or whether it just indicated that the wood had burned for a long time. IDSOF, Ex. 58, Dep. John Lentini, ("Lentini Dep.") at 162, ECF No. 259-58.

his investigation, Officer Ernest Rokosik from CPD's Bomb and Arson unit arrived. *Id*. ¶ 21. Rokosik observed "heavy charring through the floor, the decking of the first-floor rear porch." *Id*. ¶ 22.

While Rokosik was conducting his investigation, CPD Officers, including Nicholas Crescenzo and Thomas Donegan, were interviewing individuals at the scene of the fire. *Id*. ¶¶ 25–26. Twenty-three-year-old Karrie Kelly was present during the fire and told investigators that she had seen a young white man, wearing a "black knit cap, black turtleneck, black pants, [and] black shoes," running from the vicinity of the fire sometime before 3 a.m. that morning. *Id*. ¶¶ 30; 32. During that initial interview, Kelly did not tell the officers that she recognized the person who had run past her or that he looked familiar. IDSOF, Ex. 4, 4139 S. Albany Fire Incident Report at 0157-28, ECF No. 259-4. (Later that day, Kelly would pick Gray out of a lineup at the police station, telling officers she was sure he was the right person because she had met Gray before. Kelly once had given Gray and Kasey a ride to a Fourth of July party in Indiana. IDSOF ¶¶ 53–54.)

By 5 a.m., roughly two hours after the fire was reported, Rokosik and CPD Detective McInerny were headed to Gray's home, where they told his mother they wanted to speak to him. *Id*. ¶ 35. She told them Gray was at his brother's apartment, gave them the address, and went to work. *Id*. She did not accompany the officers to find Gray because "they only wanted to talk to him." *Id*.

The Officers found Gray at Michael's apartment. *Id*. ¶ 37. According to Rokosik, they arrived at Michael's apartment at 6 a.m.; Michael testified that it was

4

closer to 5 a.m.  *Compare* IDSOF, Ex 18, Direct Examination of Ernest Rokosik ("Rokosik Direct") at J 174, ECF No. 259-18, *with* PSOAF, Ex. 18, Deposition of Michael Gray ("M. Gray Dep.") at 186, ECF No. 266-19.  Both parties agree, however, that the officers took Gray from Michael's apartment to the station for questioning. IDSOF ¶¶ 37–38.  As Michael recalls, the officers told him that they would only need Gray for approximately two hours for questioning and that Gertraud was aware they were taking Gray to the station.  PSOAF, Ex. 20, Direct Examination of Michael Gray ("M. Gray Direct") at B-24–25, ECF No. 266-21.

At around 6 a.m., two police officers came to search Mel's home, where Gray had stayed the night before.  PSOAF ¶ 50.[4]  Mel's mother claims that two officers searched her home, telling her that they were looking for something that could contain gasoline.  *Id.*  They also asked her if she was missing a milk carton.  *Id.*  The Individual Defendants contest this.

## C.   **At the police station**

Meanwhile, at the police station, Gray was placed in an unlocked room; he was not handcuffed.  IDSOF ¶ 40.  At one point, Crescenzo entered the room, searched Gray's bag, and found a knife.  *Id.* ¶ 41.  Gray explained he had the knife for protection.  *Id.*  Gray tried to sleep while he was in the room, but one of the officers told him he was not allowed to sleep.  PSOAF ¶ 28.

---

[4]      Although PSOAF ¶ 50 actually suggests that this took place at around 5:20 a.m., the underlying deposition places this at roughly 6:00 a.m.  *See* PSOAF, Ex. 29, Deposition of Lita Gonzalez ("Lita Gonzalez Dep.") at 26:21–24, ECF No. 266-30.  Because Defendants site the same deposition testimony in their response to PSOAF ¶ 50, the Court considers the 6:00 a.m. timing undisputed.

### 1. Gray is interrogated for the first time

Gray believes that he sat in this first room for about an hour. IDSOF ¶ 46. Between 6 a.m. and 7 a.m.,[5] either Brown or Crescenzo moved Gray to a room containing eight to ten officers. *Id.* This larger room is where Gray's first interrogation took place.

Once the door closed, Brown introduced Gray to Youth Officer Davis and said "[H]e's here to protect your juvenile rights." DSOF ¶ 48. Brown read Gray his *Miranda* rights, and Gray stated that he understood. That said, Gray now maintains that he did not actually understand what was being said, because he had not been Mirandized before. He thought the police only wanted to ask him questions as a witness. DSOF ¶ 48; Pl.'s Resp. IDSOF ¶ 48, ECF No. 270.

In response to the officers' questions, Gray told the officers that he had slept at his friend's house all night until his mother and brother came to get him at 4:00 a.m. The officers did not believe him and asked him, "When did you leave before [4:00 a.m.]?" IDSOF ¶ 49. This interrogation was twenty to thirty minutes long and ended with Gray in tears. *Id.*

### 2. Gray is interrogated for the second time

Defendants gave Gray a 30-minute break before beginning the next interrogation. *Id.* ¶ 50. This seems to have taken place between 7 a.m. and 8 a.m. During this interrogation, Gray again denied any involvement in the fire. *Id.* ¶ 52.

---

[5]     This is based on Michael's testimony about when Gray was taken to the police station and the timeline laid out in IDSOF. That being said, the timelines in both statements of fact are inexact, and so the Court is only able to give estimates throughout the opinion.

Gray asked for his mother and his brother but was not allowed to see them. In fact, the officers lied to him, telling him that they had "called your mom, and she said she was tired of your shit and didn't care what happened to you." *Id.* ¶¶ 50–51. The officers also told Gray that Mel "was saying that he went to sleep before [Gray] and . . . did not remember watching Family Feud before going to bed that night like [Gray] had previously told the police." *Id.* ¶ 50. This second interrogation lasted twenty to thirty minutes, *id.* ¶ 51, and Gray claims it also ended with him crying. PSOAF ¶ 37.

It is undisputed that, to this point, Gray had consistently denied any involvement in the fire. Yet, his arrest report, a copy of which Davis obtained before entering the first interrogation,[6] PSOAF ¶ 52, read, in relevant part:

> The [Plaintiff] arrested on the aforementioned charges in that on 25 March 1993 at approx. 4139 S. Albany he went to the rear of the building and splashed one gallon of gasoline down the rear porch and ignited it causing a fire which killed the victim Mr. MCGINNIS and injuring his sister Ms. Margaret MESA[.]

PSOAF ¶ 52. The only thing missing from the arrest report was the date for the next court hearing. PSOAF, Ex. 44, Dep. of Percy Davis ("Davis Dep.") at 159:17–160:24, ECF No. 266-46.

As this was happening, Michael waited until roughly 7 a.m. before going to the police station to retrieve Gray so that he could go to school. IDSOF ¶ 42. When he arrived at the police station, Gertraud was not there. *Id.* ¶ 42. Defendants claim that Michael left immediately, frustrated with his mother's absence. *Id.* ¶ 42. By

---

[6]    Gray places this timing somewhere before 8 a.m. PSOAF ¶ 52. But in light of Davis's presence at Gray's first interrogation, Davis must have received the arrest report before 7 a.m.

contrast, Michael states that he asked to see Gray, PSOAF ¶ 85, and that Crescenzo let him see Gray through a window but would not allow him to speak to Gray or sit with Gray during questioning. *Id*. ¶¶ 86–87. Michael thought Gray looked "upset and aggravated" in the interrogation room. *Id*. ¶ 87. Michael recounts that, after trying unsuccessfully for hours to see Gray in person at the station, he went home to call his mother. M. Gray Dep. at 121:21–122:21.

Sometime after 9 a.m., Michael was able to contact his mother at work. M. Gray Dep. at 123:10–12. Gertraud left work, collected Michael and her adult daughter, and went to the police station. IDSOF ¶ 44. They may have arrived as early as 9:30 a.m.[7]

Once there, Gertraud spoke to an African American police officer, who was dressed in plain clothes. He informed her that she could not see Gray. PSOAF ¶ 90. She asked to see him four times to no avail. *Id*. ¶ 90.

At approximately 9:15 a.m., between the two early-morning interrogations, Gray was placed in a lineup in front of Kelly. Crescenzo and Pochordo conducted the lineup, and Brown and Davis were present. PSOAF ¶ 68; IDSOF ¶ 21. The lineup also included Mel[8] and two of Paris's friends—Eddie Walczak and Donnie Dugard.

---

[7]     The Individual Defendants assert that Gertraud and Michael did not arrive until noon. However, their citation to Michael's deposition is misleading—Michael states that during his second visit to the police station, he left at some point to go to the McDonald's across the street and *returned* from McDonald's at noon. M. Gray Dep. 190:1. However, Gray's insistence that Michael and Gertraud arrived at 9:30 a.m. cites to Michael Gray's testimony at a suppression hearing in the underlying criminal case, in which Michael gave a slightly different account of how and when his mother arrived at the police station. *See* M. Gray Direct at B-36. Accordingly, the Court considers this fact disputed.

[8]     In Kelly's eyes, Mel looked possibly Hispanic, not white like Gray. PSOAF ¶ 72.

Walczak and Dugard had been at the scene of the fire to comfort Paris. PSOAF ¶¶ 70–72. They were wearing the same jackets they had worn earlier that morning. *Id.* ¶ 71.

Kelly identified Gray from the lineup as the person she had witnessed running away from the area of the fire. But prior to viewing the lineup, Kelly had ingested an unspecified dose of a muscle relaxant to ease the pain from a preexisting back injury and had recently discovered that her mother had been a victim of a violent crime. PSOAF ¶ 73; IDSOF ¶ 55.

### 3. Gray is interrogated for the third time

After the lineup, Gray asked Brown if he could use the restroom. CDSOF ¶ 24. Crescenzo immediately took Gray to the bathroom; it was around 9:30 a.m. *id.* ¶ 23. Gray claims that, on the way back, Crescenzo stopped at the copy machine and ordered Gray to place his hands on the screen. IDSOF ¶ 58. According to Gray, Crescenzo told him that if he had committed the arson, the copy machine would be able to scan the lead from his hands. When the machine produced a copy of Gray's hands, Crescenzo said, "Aha, see, it's not nice to lie to the police," and suggested that this was proof of Gray's guilt. *Id.* Defendants insist that Gray understood that this was just a "ploy," *id.*, but Gray states that he was confused by this incident and "start[ed] to question [his] own sanity." CDSOF, Ex. B, Dep. of Adam Gray ("A. Gray Dep.") at 334:5–12, ECF No. 251-2.

The parties also dispute whether the Xerox incident came before or after Gray's third interrogation. *Compare* IDSOF ¶ 57 *with* Pl.'s Resp. to County Defs.' LR 56.1

Statement of Fact ("CDSOF") ("Pl.'s Resp CDSOF") ¶ 15, ECF No. 269 (laying out Gray's claimed timeline for the interrogations). But, in any event, everyone agrees that Gray's third interrogation occurred after Kelly had identified him in the lineup. IDSOF ¶ 57.

At this point, Brown told Gray that he had been identified in the lineup by a little old lady, and he "might as well come clean." *Id*. Gray claims that Defendants "verbally bludgeon[ed]" him during this interrogation, asking "why would a little old lady lie?" A. Gray Dep. at 349:19–22; 323:4–9. The interrogation ended as the last two had, with Gray denying involvement in the fire and crying in the interrogation room. IDSOF ¶ 57; A. Gray Dep. at 352:18–19.

### 4. Gray is interrogated for the fourth time

After the third interrogation, Gray states, he was left alone in the interrogation room with Crescenzo. IDSOF ¶ 59. At this time, Gray also may have seen Brown watching them from the other side of the one-way mirror. *Id*. According to Gray, Crescenzo said, "[A]ll you gotta do is admit it, and we'll take you to a place where little firebugs like you go." *Id*. ¶ 59; A. Gray Dep. at 356:1–3. When Gray again denied having set the fire, Crescenzo responded, "I believe you" but "the only way you're going to get out of here is if you say that you did." *Id*. ¶ 60; A. Gray Dep. at 340:11–19. Crescenzo also said he would take Gray to school if he would just admit to setting the fire. IDSOF ¶ 60.

After hearing this, Gray replied, "Okay, I did it." *Id*. Crescenzo then went to get Brown to hear Gray's confession. A. Gray Dep. 359:2–23. This led to a fourth

10

round of questioning by Brown, Crescenzo, and several other officers. A. Gray Dep. at 359:15–23.

It was during this interrogation that Gray gave his confession. IDSOF ¶ 60–61. Gray has characterized the process of giving a confession as "ad-libbing." *Id.* ¶ 60. According to Gray, the question-and-answer session was like follow-the-leader: "they asked [him] a question, left or right," and he would choose one of their options. A. Gray Dep. at 378:19–21. At times, Gray "just used their own answers," IDSOF, Ex C, Dep. of Adam Gray ("A. Gray Dep. II") at 81:20–24, ECF No. 251-3. But sometimes, he included facts from his own imagination, and some details were "generated by [him]". IDSOF ¶ 62; 63. At the end, Gray says, he and the officers "talked through how they wanted [Gray] to say that [he] did it." A. Gray Dep. at 359:21–23. A court reporter then recorded Gray's confession in front of Brown and Davis. IDSOF ¶ 64.

The recorded confession went as follows. Gray was sleeping at Mel Gonzalez's house the night of the fire, when he left in the middle of the night "with an empty gallon of milk." *Id.* ¶ 65. He took it to the Clark gas station at 41st and Kenzie and paid two dollars for gasoline and filled the container "three-fourths filled." *Id.* He then went to 4139 S. Albany and poured the gasoline on the back porch, lit it on fire with a lighter, and "ran out of the yard and started running down the alley." *Id.* As he was running, he threw the milk container away in a nearby alley. *Id.* Gray saw a man in the alley, and he ran back to Mel's house. *Id.* Once there, he washed his hands, crushed the lighter, and flushed it down the toilet. *Id.*

11

For his part, Gray acknowledges that he made these statements to the court reporter but denies that they are true. He insists that he was forced to say these things by the Individual Defendants. Pl.'s Resp. IDSOF ¶ 65.

### 5. Post-confession investigation

After Gray's confession, Crescenzo and Pochordo went to the alley and found a flattened milk carton, which was later admitted as evidence at Gray's trial. IDSOF ¶ 67. Defendants claim they found it in an alley less than half a block from the burned building. *Id.* Gray contests this and insists that he had never seen it before. Pl.'s Resp. IDSOF ¶ 67. The CPD lab analyzed swabs from the milk container, along with samples taken from the porch. IDSOF ¶ 110. The lab did not identify gasoline in any of the samples—neither in the milk carton nor on the porch at 4139 S. Albany. *Id.* ¶¶ 111–112.

The day after interrogating Gray, Crescenzo went to speak to Brenda Thomas, the overnight clerk at the Clark gas station where, Crescenzo believed, Gray had purchased the gasoline. *Id.* ¶ 70. As the Individual Defendants tell it, Crescenzo showed Thomas four photographs, including one of Gray. *Id.* ¶ 71. She selected Gray's photo and said she had sold the boy in the photo gasoline on the night of the fire sometime after 2 a.m. IDSOF ¶ 71. She testified to the same at Gray's criminal trial. IDSOF ¶ 71.

Gray, on the other hand, contends that Crescenzo pressured Thomas into identifying Gray from the photo array. Pl.'s Resp. IDSOF ¶ 71. When Thomas told Crescenzo that she could not identify any of the boys in the photo array, the detective

"became aggressive," and told her to "keep looking." *Id*. Gray further claims that Thomas initially selected a photograph of another boy, but Crescenzo and another detective "indirectly and non-verbally made it clear that they wanted her to pick a different photo" and "told her that they knew [Gray] lit the home on fire because the girl living there would no longer date him." *Id*. According to Gray, this pressure and Thomas's fear of being detained by the officers caused Thomas to select him and testify accordingly at trial. *Id*.

### 6. Gray's trial

Gray was tried for arson and murder in April 1996. IDSOF ¶ 115. The prosecution presented Gray's confession, the identifications by Kelly and Thomas, as well as forensic testimony regarding the scene of the fire, the milk jug, and the associated analysis. A jury convicted Gray, and he was sentenced to life in prison. *Id*. ¶ 115.

In March 2017, Gray and the State's Attorney's Office filed a joint motion to vacate his conviction. *Id*. ¶ 148. The State's Attorney's Office declined to retry Gray "in the interests of justice" and voluntarily dismissed his indictment. *Id*. ¶ 148. Gray was granted a certificate of innocence on February 21, 2018. *Id*. ¶ 150. He filed this suit that same year.

## II.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forth with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)).

To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury

14

could return a verdict for the nonmoving party.").

### III.    Analysis

The Individual Defendants and Brown have filed motions for summary judgment as to Gray's various claims.  The Court reviews each in turn.

### A.    The Individual Defendants

Gray's § 1983 claims allege that the Individual Defendants violated his Fifth Amendment rights by coercing a confession that was used against him at his trial, violated his Fourth Amendment rights by detaining him pre-trial without probable cause, and violated his right to due process by fabricating inculpatory evidence against him while suppressing exonerating evidence.  Gray also brings state law claims of malicious prosecution and intentional infliction of emotional distress. Lastly, he asserts that the Individual Defendants conspired against him to violate his constitutional rights and failed to intervene when others did so.

#### i.    Coerced Confession

Gray first claims that the Individual Defendants coerced his confession, which was later used against him at trial, in violation of his Fifth Amendment right against self-incrimination.  To bring a successful claim of coerced confession, a plaintiff must show that he "has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003).  In other words, he must prove (1) that he was coerced into confessing, and (2) that the confession was used against him in his criminal trial.  This analysis considers the totality of the circumstances and asks

whether a defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991).

The Individual Defendants argue that Gray's coerced confession claim is time-barred under *McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149 (2019). In *McDonough*, the Supreme Court held that the statute of limitations for a § 1983 fabrication of evidence claim did not begin until the underlying criminal proceedings had been terminated in the plaintiff's favor. *Id.* at 2154–55. Gray argues that his coerced confession claim, like the fabrication of evidence claim in *McDonough*, is analogous to a state malicious prosecution claim and, accordingly, the statute of limitations did not begin to run until he received his certificate of innocence. For their part, the Individual Defendants contend that *McDonough* controls only insofar as it requires a fact-specific analysis, which in this case, shows that Gray's claims are time-barred. Both parties agree, however, that *McDonough* presents the proper framework for determining whether Gray's claims are timely.

*McDonough* employs two lines of reasoning to determine when a § 1983 cause of action accrues: analogy to common law causes of action, and analysis of the practical considerations raised by *Heck v. Humphrey*, 512 U.S. 477 (1994), which prohibits a federal court from entertaining a collateral attack on a state court criminal judgment under § 1983. *See McDonough*, 139 S. Ct. at 2155 ("This conclusion follows both from the rule for the most natural common-law analogy (the tort of malicious prosecution) and from the practical considerations that have

16

previously led this Court to defer accrual of claims that would otherwise constitute an untenable collateral attack on a criminal judgment."). This Court will do the same.

First, Gray's Fifth Amendment claim is closely analogous to common law malicious prosecution claims. As the Seventh Circuit has explained, malicious prosecution is a tort that "allows damages for confinement imposed pursuant to legal process, including compensation for arrest and imprisonment, discomfort or injury to health, and loss of time and deprivation of society." *Savory v. Cannon*, 947 F.3d 409, 414 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 251 (2020). In much the same way, Gray's Fifth Amendment claim is a challenge to the use of his coerced confession in his criminal trial (a form of legal process) and he seeks compensatory damages for the emotional and physical trauma he experienced during his resulting imprisonment. Tellingly, the Individual Defendants offer no more analogous tort. Accordingly, the Supreme Court's longstanding application of common law tort principles to § 1983 claims, *see Wallace v. Kato*, 549 U.S. 384, 388 (2007), supports a finding that these claims are timely. Other courts in this district have agreed. *See*, *e.g.*, *Savory v. Cannon*, 532 F. Supp. 3d 628, 635 (N.D. Ill. 2021); *Walker v. City of Chi.*, No. 20 C 7209, 2021 WL 4080770, at *2 (N.D. Ill. Sept. 8, 2021).

Second, applying the practical considerations under *Heck*, 512 U.S. 477, supports this result. The question under *Heck* is whether § 1983 "claims 'would necessarily imply the invalidity of [a plaintiff's] conviction or sentence,'" *Savory*, 947 F.3d at 409 (quoting *Heck*, 512 U.S. at 487). If so, the claim does not accrue until after a plaintiff's criminal proceedings are terminated in his favor.

Defendants argue that Gray's coerced confession claim does not imply the invalidity of his conviction. As Defendants see it, even if Gray's confession had been invalidated in 1996, his conviction would still be supported by other evidence, such as the eyewitness testimony from Kelly, Kasey Paris's account of her volatile relationship with Gray, and Barbara Paris's testimony that she had heard footsteps on the porch and smelled gasoline before the fire. But of the evidence presented at trial—the eyewitness testimony, the motive testimony, the potential presence of gasoline, and the allegedly coerced confession—the only one that definitely places Gray at 4139 S. Albany at the time of the fire is his confession. As such, the Court concludes that Gray's coerced confession claim does imply the invalidity of his conviction. At a minimum, a factual dispute exists as to whether the jury would have convicted Gray if the prosecution did not have the benefit of the confession. Accordingly, summary judgment on these grounds is denied.[9]

### ii. Deprivation of liberty claim

Gray's next claim is that the Individual Defendants unlawfully detained him without probable cause in violation of the Fourth Amendment. *See Manuel v. City of Joliet*, ___ U.S. ___, 137 S. Ct. 911, 918 (2017) ("[T]hose objecting to a pretrial deprivation of liberty may invoke the Fourth Amendment when (as here) that deprivation occurs after legal process commences."); *see also Lewis v. City of Chi.*, 914 F.3d 472, 476–77 (7th Cir. 2019) (clarifying that the Fourth Amendment governs

---

[9] Individual Defendants also make a passing argument that Gray's testimony does not establish any interrogation behavior that "shocks the conscience." However, Gray's response makes clear that he is not alleging a due process violation under this theory.

claims of pretrial detention both before and after the initiation of judicial process). The Individual Defendants first contend that this claim also is untimely. Alternatively, they argue that no genuine dispute of material fact exists as to whether there was probable cause to detain Gray.

### 1.    Timeliness

Citing *Lewis*, Defendants insist that Gray's pretrial detention claim accrued upon conviction. But this is unpersuasive. First, like a coerced confession claim, wrongful pretrial detention is akin to malicious prosecution in that it "allows damages for confinement imposed pursuant to legal process." *Savory*, 947 F.3d at 414. And second, Gray's claim asserts that his confession was coerced, the eye-witness testimony against him was fabricated, and there was no scientific evidence of arson at the scene of the fire. If Gray had brought a pretrial detention claim on those grounds at the time of his conviction, it surely would have invalidated his underlying conviction—after all, it aims to discredit every piece of evidence against him but Kasey Paris's motive testimony. Thus, the Court concludes that this claim did not accrue until the favorable termination of Gray's criminal case. *See Savory v. Cannon*, 532 F. Supp. 3d 628, 636 (N.D. Ill. 2021); *Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 838 (N.D. Ill. 2020); *Culp v. Flores*, 454 F. Supp. 3d 764, 768 (N.D. Ill. 2020).

### 2.    Merits of the claim

As to the merits of Gray's wrongful pretrial detention claim, the Individual Defendants argue that, because there was probable cause to detain Gray, his claim must fail. And as they correctly point out, probable cause is a low bar, "requiring only

a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young v. City of Chi.*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). But "an officer may not close his eyes to facts that would clarify the situation and defeat probable cause." *Young*, 987 F.3d at 645 (cleaned up). It is an objective inquiry, accounting for all the information available to an officer at the time, *id.* at 644, and the touchstone of that inquiry is reliability. *See Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018) ("Reliability . . . is the gravamen of probable cause."), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019).

The Individual Defendants maintain that, even without Gray's confession, Kelly's identification of him near the scene, the testimony provided by Kasey Paris and her brother, the fact that witnesses smelled gasoline at the fire, and the lack of evidence of an accidental cause collectively gave them probable cause to arrest Gray. They cite to the facts in *Young*, where the police had probable cause to believe that the Gray was in possession of a firearm because he was found in his car with a firearm sitting next to him on the console in plain view. *Young*, 987 F.3d at 644–645. There, the Seventh Circuit held that probable cause existed to detain Young based on these facts, even if police had later fabricated additional evidence against him as Young claimed. *See id.* at 645.

But in *Young*, those facts were undisputed. Here, the Individual Defendants' probable cause argument rests almost entirely on disputed facts. First, while Kelly

picked Gray out of a lineup the day of the fire, the validity of that lineup is in question. For example, Gray has provided evidence that the lineup had fewer people than what the CPD, FBI, and nationally-recognized policing guidelines recommended at the time. PSOAF ¶ 82. Two of the participants were present at the scene of the fire and could be seen comforting the victim. *Id.* ¶ 71. And that the fourth boy in the lineup looked Hispanic to Kelly, who had described the boy she saw fleeing the fire as being white. *Id.* ¶ 72. Taking the evidence in the light most favorable to Gray, a reasonable jury could conclude that the officers would have been aware that Kelly's identification of Gray was not reasonably reliable. *See Hurt*, 880 F.3d at 841.

Without Kelly's identification, Individual Defendants are left with the Parises' motive testimony on one hand, and Mel's alibi testimony on the other. Whether those facts are sufficient to constitute probable cause is a question better left to a jury. *See*, *e.g.*, *Camm v. Faith*, 937 F.3d 1096, 1106 (7th Cir. 2019) (denying summary judgment where the plaintiff pointed to evidence invalidating the portions of the warrant application specific to him, even while other evidence about the crime scene remained reliable). Accordingly, the Individual Defendants' motion for summary judgment as to Gray's wrongful pretrial detention claim is denied.

### 3. Due process claims

Gray believes that the Individual Defendants violated his due process rights in two principal ways. First, he argues that they fabricated inculpatory evidence while suppressing exculpatory evidence. Second, Gray contends that the Individual Defendants violated his due process rights by using his false confession at trial.

### i.    Fabrication claims

A plaintiff can bring a due process claim for two different types of fabricated evidence: physical evidence and witness testimony.  Fabricated physical evidence is necessarily false, because it is entirely created by the state actor offering it at trial. *See Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017).  By contrast, witness testimony can be *coerced* without being *fabricated*.  As the Seventh Circuit explains:

> A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures used.  Fabricated testimony [like fabricated physical evidence], meanwhile, is invariably false because it is made up by the officer, who knows he is making it up.[10]

*Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019).

Only the use of false, fabricated testimony violates the due process rights of a defendant.  To prevail on this claim, a plaintiff must show that the officers (1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his criminal trial, and (4) it was material to his conviction.  *See Coleman*, 925 F.3d 336; *Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020).

Gray bases his fabrication of evidence claims on the following evidence: his confession, eyewitness testimony by Thomas and Kelly, the milk jug, and the evidence indicating that the fire was caused by arson.  There is little question that Gray has

---

[10]    The Individual Defendants' motion for summary judgment suggests that fabricated testimony can *never* support a due process claim.  But this is incorrect, as the following discussion shows.

the facts to survive summary judgment as to prongs (2) through (4). Gray's confession, the eyewitness testimony, the milk jug, and arson evidence were all offered as evidence at his criminal trial. And a reasonable jury could find that these pieces of evidence were material to the verdict. *See Patrick*, 974 F.3d at 835 (materiality requires only "a reasonable likelihood the evidence affected the judgment of the jury"). Furthermore, if Gray's account of the facts is believed—*i.e.*, Gray was at Mel's house all night, Pl.'s Resp IDSOF ¶ 102; there was no milk jug filled with gasoline, Pl.'s Resp. IDSOF ¶ 67; and Gray did not start the fire, PSOAF ¶ 1—a reasonable jury could find that the evidentiary items were false.[11]

The remaining question, then, is whether a reasonable jury could find that the officers *knew* that this evidence was false. As the Seventh Circuit has explained, "[t]his is a high bar to clear." *Coleman*, 925 F.3d at 344. But Gray need not have a smoking gun or an admission to prove knowledge. At summary judgment, he only needs to offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false. In all but one instance, Gray has satisfied this burden. *See Anderson v. City of Rockford*, 932 F.3d 494, 511 (7th Cir. 2019) (citing the relevant time frame for a plaintiff to show evidence of knowing fabrication by an officer as the time of trial).

---

[11]    The Individual Defendants argue that no fabrication claim can survive based on the use of the milk container at trial because "it is beyond dispute that the milk container actually existed," Indiv. Defs.' Mem. at 29. But all physical evidence offered at a trial "actually exist[s]"—that is what makes it physical evidence. That does not mean it was not knowingly fabricated.

23

### a.    Gray's confession

Gray has offered his own sworn testimony that he did not commit the crime and that he had no reason to believe a milk jug full of gasoline was involved in the fire at 4139 S. Albany.  Pl.'s Resp. IDSOF ¶ 67.  Although the source of the milk jug in his confession is disputed, Pl.'s Resp. IDSOF ¶ 63, Gray states that Defendants proposed the concept of gasoline to him.  A. Gray Dep. at 388:22–389:10.  By the time the case went to trial two years later, the Individual Officers were aware that the analysis of the milk jug and of the porch showed no evidence of gasoline.  PSOAF ¶ 4. If a jury were to credit Gray's testimony over the Individual Defendants', they could reasonably find that the Individual Defendants must have known by the time of trial that the confession was false.

### b.    Thomas's photo identification[12]

Similarly, if Gray's evidence is taken as true (as it must be at this stage), a reasonable jury could find as follows.  The Individual Defendants knew there was no gasoline in the milk jug or at the scene of the fire.  PSOAF ¶ 4.  They knew that Thomas had started to select a photo of a different teen, before Crescenzo and another detective suggested that she should pick Gray's photo.  Pl.'s Resp. IDSOF ¶ 71.  This evidence, taken together, could lead a reasonable jury to believe that Crescenzo and

---

[12]    Defendants argue that any evidence from Brenda Thomas's affidavit must be disregarded at summary judgment because she was not available for deposition and her affidavit would not be admissible at trial.  But "[t]o be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'"  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (citations omitted). And while Thomas's affidavit would not be admissible at trial, her sworn testimony would be.  Accordingly, the Court will consider her affidavit at this juncture.

Pochordo knew by the time of trial that Thomas's testimony identifying Gray was false.

### c.   Kelly's lineup identification

Kelly's testimony is a closer call, but there is sufficient evidence on the record to create a genuine factual question as to this issue.  As explained above, there are facts from which a reasonable jury could find that the lineup procedures were woefully defective and that the Individual Defendants were aware of this.  Based on this, a reasonable jury also could decide that the Individual Defendants knew that Kelly's identification was completely unreliable and fanciful, despite Kelly's insistence that her statement was accurate.

### d.   Milk container

As for the milk container, the Individual Defendants argue that there is no evidence that they knowingly fabricated evidence by using the milk jug at Gray's trial.  They insist that just because there was no proof of gasoline in the milk container at the time it was tested does not mean it never contained gasoline.  But the lack of gasoline residue in the container is certainly circumstantial evidence from which a jury could infer that the jug never contained gasoline.  Indeed, this is supported by Gray's expert witness John Lentini, who opines that the material found in the milk jug not only was not gasoline, but did not match the material found at the scene of the fire.  IDSOF ¶ 136.  Taken in the light most favorable to the Gray, a reasonable jury could find that the officers knew they were offering physical evidence against Gray that had nothing to do with the crime.

### e. Arson evidence

The Individual Defendants are correct as to the arson evidence. Gray claims that Rokosik and Gruszka knowingly placed false information in their reports about the fire at 4139 S. Albany, suggesting that some evidence (like alligatoring of wood) was indicative of arson when it was not. To support this theory, Gray argues that: Gruszka had taken a class from a Fire Marshal who knew that blistering and alligatoring were not signs of accelerant as early as 1984, well before Gray's arrest; Pl.'s Resp. at 38; Gruszka determined the fire was started with accelerant before any laboratory testing had been performed; and Rokosik had access to a guide called the NFPA 921, which warned that alligatoring was not indicative of accelerant. *Id.* But the record contains no evidence of what Gruzka learned in his course. And even Gray's own expert witness acknowledges that the NFPA 921's guidance on alligatoring and blistering of wood was not widely accepted in the fire investigation community at the time of Gray's arrest or conviction. Lentini Dep. at 162, ECF No. 259-58. No reasonable jury could find from this evidence that the Individual Defendants knowingly fabricated the arson evidence. As such, summary judgment as to this claim is granted in favor of Gruszka and Rokosik.

### ii. Suppression of exculpatory evidence

Gray further makes a due process claim based on the suppression of exculpatory evidence surrounding the Brenda Thomas photo identification. Gray argues that the coercive nature of Thomas's identification is exculpatory and should have been disclosed to him before his criminal trial. To make out a suppression claim,

a plaintiff must point to suppressed evidence and show that it is "(1) . . . either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice." *Petty v. City of Chi.*, 754 F.3d 416, 423 (7th Cir. 2014). In the context of coerced witness statements, disclosure of the coercive police tactics used would defeat the due process claim, because "[a]rmed with the . . . disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017).

Gray has offered sufficient evidence from which a reasonable jury could find that Defendants suppressed exculpatory evidence related to Thomas's testimony. Gray points to an affidavit in which Thomas swears that she tried to pick another photograph from the lineup, but Crescenzo and Pochordo made clear she needed to pick Gray's picture. Pl.'s Resp. IDSOF ¶ 71. Gray insists that his criminal defense counsel was never made aware of the suggestive nature of this photo identification, which constitutes impeachment evidence. *See Avery*, 847 F.3d at 437.

Defendants respond that this claim fails because Gray could have obtained the same information through reasonable diligence—all his counsel had to do was interview Thomas. But if Thomas's affidavit is believed, she was pressured to lie by police officers and she testified only out of fear of going to jail. Pl.'s Resp. IDSOF ¶ 71. Defendants offer no reason to believe that, under these intimidating

circumstances, Thomas would have disclosed this information to Gray's counsel, even if she had been asked. Accordingly, summary judgment is denied as to this claim.[13]

### iii. Unduly suggestive identification

For his final due process claim, Gray contends that the Individual Defendants used Thomas's testimony even though they knew that the methods used to obtain that testimony were unconstitutionally suggestive. The Individual Defendants argue that such a claim can never constitute a violation of due process. This is incorrect. *See Coleman*, 925 F.3d at 347 ("[T]he Fourteenth Amendment's Due Process Clause requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are so egregious as to taint the entire trial."); *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002); *Bolden v. City of Chi.*, No. 17 CV 417, 2019 WL 3766104, at *20 (N.D. Ill. Aug. 9, 2019).

Whether an identification was unduly suggestive is evaluated under a totality of the circumstances test. *See Coleman*, 925 F.3d at 374; *Traeger*, 289 F.3d at 474. The relevant factors include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the

---

[13] The Individual Defendants' reliance on *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011), is misplaced. In *Holland*, the court found no due process violation from the failure to disclose information about the victim's identification of the defendant, not because the defense could have accessed the information through reasonable diligence, but because there was no evidence to support the existence of any coercive tactics being used in the first place. *See Holland*, 643 F.3d at 256. ("[T]here is no evidence that either officer[] . . . coerced [the victim] to lie or were otherwise withholding exculpatory evidence on this point from the defense."). Here, whether Thomas was coerced into identifying Gray from the photographs is a question of fact for trial. *See Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 447 (N.D. Ill. 2011).

> confrontation, and the length of time between the crime
> and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

Applying these factors, there is a triable issue as to whether the detectives used unduly suggestive procedures when questioning Thomas. Specifically, according to Thomas, when questioned by the detectives, she tried to choose another photo (suggesting very little certainty) before the police convinced her to select the photo of Gray. Defendants do not deal with any of these issues in their motion for summary judgment, and it is denied.

### 4. Malicious prosecution

Gray's next claim is a state law claim for malicious prosecution. Under Illinois law, a malicious prosecution claim has five requirements: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Johnson v. City of Chi.*, No. 20 C 7222, 2021 WL 4438414, at *3 (N.D. Ill. Sept. 28, 2021). Here, the Individual Defendants argue that they are entitled to summary judgment because there was probable cause to commence a criminal proceeding against Gray and because they did not act with malice.

First, the Individual Defendants are correct that probable cause defeats a malicious prosecution claim. *See Coleman*, 925 F.3d at 350. But as explained *supra*, a reasonable jury could find that the Individual Defendants lacked probable cause to believe that Gray committed a crime.

29

Second, the Individual Defendants insist that they did not act with malice because they did not act with "any improper motive or purpose." Indiv. Defs.' Mem. at 37. But Illinois law does not define malice so narrowly. The Supreme Court of Illinois has recently held that malice includes "any reason other than to bring the responsible party to justice. . . . [and] may be inferred from a lack of probable cause when the circumstances are inconsistent with good faith by the prosecutorial team and lack of probable cause has been clearly proved." *Beaman v. Freesmeyer*, ___ N.E.3d ___, 2021 WL 3204481, at *19 (Ill. July 29, 2021), *reh'g denied* (Sept. 27, 2021). In this case, not only could a jury infer malice from a lack of probable cause, but a reasonable jury could find that the Individual Defendants *knew* that there was no evidence that Gray had started the fire. The Individual Defendants' motion is denied as to this claim as well.

### 5. State and Federal Conspiracy

The Court turns next to Gray's claims of state and federal conspiracy. "A civil conspiracy claim under Illinois law requires . . . '(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.'" *Fulton v. Bartik*, No. 20 C 3118, 2021 WL 2712060, at *16 (N.D. Ill. July 1, 2021) (quoting *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053–1054 (Ill. 2020)). Similarly, "[t]o prevail on a [federal] conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement to deprive him of his

constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights.'" *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy." *Beaman*, 776 F.3d at 511.

The Individual Defendants insist that Gray has provided no evidence of an agreement and, therefore, both the federal and state conspiracy claims fail. But Gray points to ample circumstantial evidence that the Individual Defendants were acting in concert to violate his rights. For example, there is evidence in the record that the arrest report, which stated that Gray had started the fire at 4139 S. Albany, had been completed before the police had obtained his confession. Davis Dep. at 159:17–160:24. Additionally, there is evidence that police officers were looking for a milk jug—a detail that Individual Defendants claim was supplied by Gray in his confession— hours before he confessed. *See* PSOAF ¶ 50; IDSOF ¶ 65. Furthermore, Gray's testimony indicates that the Individual Defendants worked together to aggressively interrogate him. A. Gray Dep. at 349:19–350:1. Taken together, a reasonable jury could find that the Individual Defendants had agreed to work toward the common purpose of coercing Gray into confessing to a crime he did not commit. This is sufficient to survive summary judgment as to the conspiracy claims.

As to the state conspiracy claim in particular, the Individual Defendants argue that, because the unlawful purpose of the conspiracy was a tort (malicious prosecution), the conspiracy claim is duplicative as a matter of state law. But a

conspiracy claim "alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort." *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 925–26 (N.D. Ill. 2019) (quoting *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 725–26 (N.D. Ill. 2017)).

Next, the Individual Defendants argue that the intra-corporate conspiracy doctrine precludes Gray's conspiracy claims as a matter of law. This doctrine "holds that 'a conspiracy cannot exist solely between the members of the same entity.'" *Stone v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 3d 935, 949 (N.D. Ill. 2014) (quoting *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999)). It bears noting that the Individual Defendants have cited no caselaw applying this doctrine to police officers who conspire to violate an individual's constitutional rights. At any rate, "[t]he doctrine applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's *lawful* business." *Harris v. City of Chi.*, No. 20 CV 4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020) (emphasis added). Thus, for the same reason a reasonable jury could find that an *unlawful* agreement existed between Defendants, the intra-corporate conspiracy doctrine does not apply. Here, too, summary judgment is denied.

### 6.    Failure to intervene

Gray also brings a claim of failure to intervene, relying on the same facts as above. "To succeed on this claim, [Gray] must demonstrate that the Defendants

(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

According to the Individual Defendants, other than Crescenzo and Brown, no one else had an opportunity to intervene and prevent the purported violations of Gray's constitutional rights. But Gray's testimony paints a very different picture— he describes each of the Individual Defendants participating in four interrogations of a minor without a guardian present, which ultimately culminated in a forced, involuntary confession. As each Defendant witnessed and participated in these interrogation practices, they each would have had an opportunity to intervene. Summary judgment also is denied at to this claim.

### 7. Intentional Infliction of Emotional Distress, Failure to intervene, *Respondeat Superior*, and Indemnification

The remainder of Gray's claims against the Individual Defendants need little discussion. First, Gray's claims of intentional infliction of emotional distress against Individual Defendants are dismissed as time-barred. Gray does not contest that these claims are untimely.

Second, the Individual Defendants argue that the claims of failure to intervene, *respondeat superior*, and indemnification should be dismissed because the underlying constitutional claims are not viable. But as the Court has already addressed, many of Gray's constitutional claims survive summary judgment, and so summary judgment on these grounds is inappropriate.

### 8.    Individual involvement

The Individual Defendants conclude their motion for summary judgment by arguing that many of them cannot be subject to § 1983 liability because they were not personally involved in the alleged constitutional violations.  *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018).  Gray agrees to the dismissal of Cegielski on these grounds.

As for the rest, a reasonable jury could find from this record that they each were involved personally in the conduct in question.  For example, Gray has offered evidence that McInerny and Rokosik were among the officers participating in his interrogations.  PSOAF ¶ 36.  Similarly, Gray states that Gruszka and Jenkins were present for the first of his four interrogations, which is corroborated by testimony from Gray's criminal trial.  Pl.'s Resp. IDSOF ¶ 41.  Finally, Pochordo and Davis were not only present during the interrogations, but the lineup as well.  PSOAF ¶ 68; IDSOF ¶ 74; Pl.'s Resp. IDSOF ¶ 46.  Thus, summary judgment based on lack of personal involvement is granted as to Cegielski but denied as to the remaining Individual Defendants.[14]

### 9.    Qualified immunity

Finally, the Individual Defendants invoke the doctrine of qualified immunity with respect to two sets of actions.  First, they argue that Gruszka and Rokosik

---

[14]    Each of the listed Individual Defendants is also alleged to have participated in other ways, but the Court finds it unnecessary to cite each instance, as participation in the interrogations alone is enough to reject Defendants' argument.

followed widely-accepted arson investigation practices. Second, they contend that the officers cannot be held liable for overseeing the lineup.

As for the former, the Court has already dismissed the fabrication claims against Gruszka and Rokosik on these grounds. As for the latter, the Individual Defendants mischaracterize Gray's claims. Gray does not argue that the officers should be held liable based on *changes* to lineup procedures over time. Rather, he argues that Individual Defendants intentionally violated *existing* CPD lineup procedures in order to ensure that Kelly and Thomas chose Gray from their respective lineups. *See* Pl.'s Resp. at 55. As such, the Individual Defendants' arguments are unavailing.

## B.    Brown

The Court turns next to the arguments for summary judgment by Assistant State's Attorney Brown,[15] who prosecuted Gray's case. He argues that, as a prosecutor, he is entitled to absolute or qualified immunity. Brown also contends that the claim is substantively meritless.

### 1.    Absolute Immunity

"A prosecutor . . . enjoys absolute immunity insofar as he is 'act[ing] within the scope of his prosecutorial duties.'" *Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 420 (1976)). Whether he is acting within the scope of his prosecutorial duties is a functional inquiry—"[t]hat is, [courts] 'look to the nature of the function performed.'" *Bianchi*, 818 F.3d at 318 (quoting

---

[15]    The County's liability is predicated on Brown's, and so to the extent that his motion for summary judgment is denied, so is the County's.

*Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  As relevant here, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative . . . tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n. 33).

Brown argues that he was acting within his prosecutorial duties in each of his interactions with Gray because he served only two purposes while he was there: deciding whether to charge Gray with a crime and taking Gray's statement.  But there are facts in the record indicating that Brown's involvement extended beyond the prosecutorial realm and into the investigative realm.

First and foremost, Brown was present in all four interrogations.  PSOAF ¶¶ 34–38.  Indeed, Brown acknowledges that he was the "primary interrogator." *Id.* ¶ 38.  He further admitted that he "[r]an that interrogation room," and "was in charge when [he] was in that room with the defendant." *Id.* ¶ 66.  This behavior is not "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, but could reasonably be viewed as investigatory in nature. *See Kitchen v. Burge*, 781 F. Supp. 2d 721, 731 (N.D. Ill. 2011) (differentiating between a prosecutor who takes a statement and one who feeds answers to the suspect); *Hill v. City of Chi.*, No. 06 C 6772, 2009 WL 174994, at *11 (N.D. Ill. Jan. 26, 2009) ("Because there is a genuine issue of material fact for trial that Rogers was involved in coercing Hill's confession, he is not entitled to summary judgment on the basis of absolute prosecutorial immunity for his conduct."); *Orange v. Burge*, No. 04 C 0168, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008) (finding that a prosecutor who "actively

assisted in gathering the evidence that would later form the basis of the charges against [the defendant]" was acting in an investigative capacity, rather than a prosecutorial one); *Smith v. Burge*, 222 F. Supp. 3d 669, 694 (N.D. Ill. 2016). Thus, Brown's motion for summary judgment based on absolute prosecutorial immunity is denied.

### 2.    Qualified Immunity

Alternatively, Brown argues that he is entitled to qualified immunity as to Gray's claims. "Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the 'facts, taken in the light most favorable to [him], make out a violation of a constitutional right,' and (2) that right was 'clearly established at the time of the alleged violation.'"    *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Gill*, 850 F.3d at 340). This requirement that the right be clearly established at the time of the alleged violation "does not go so far as to mandate a mirror-image precedent from the Supreme Court or this court." *Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018). But it does require "existing precedent [to] have placed the statutory or constitutional question beyond debate." *Gill*, 850 F.3d at 340 (cleaned up).

As noted above, Gray offers sufficient facts to forestall summary judgment as to his claims premised on his interrogations and resulting confession. Brown states that he controlled those interrogations. Thus, the only remaining question is whether Gray's right to be free from a coerced false confession was clearly established at the time of his interrogations and at the time his confession was entered at trial. The

Supreme Court's decision in *Haley v. Ohio*, 332 U.S. 596 (1948), answers this in the affirmative.

In that case, Haley, a 15-year-old boy, was interrogated by the police from midnight to 5 a.m. He was not provided access to counsel or a legal guardian. *Id.* at 597–598. Although Haley did not allege that he was physically abused as part of the interrogation process, he did say that police officers questioned him continuously throughout the night in teams of two. *Id.* at 598. Haley eventually signed a confession, which included a statement that he acknowledged his rights and chose to waive them. *Id.* The Supreme Court had little trouble holding that the interrogation was so coercive as to violate Haley's rights to due process. Forty-five years passed between *Haley* and Gray's interrogation. This Court sees no viable argument that Gray's rights to be free from being coerced to give a false confession were not well-established by that time.

### 3.  Failure to intervene

Brown next argues that he is entitled to summary judgment on Gray's claim of failure to intervene. To succeed on a claim of failure to intervene, a plaintiff "must demonstrate that the Defendant[] (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Brown argues that Gray has failed to show a genuine dispute of material fact as to whether his constitutional rights were violated. He contends in the alternative that, if Gray's rights were violated and he

was coerced into giving a false confession, Brown had no way of *knowing* that the confession was false.

The first argument is easily rejected. Gray has shown a genuine dispute of material fact as to whether his false confession was coerced.

The second argument fares no better. Gray testified that, after his third interrogation, he was alone with Crescenzo in the interrogation room when he denied involvement in the fire yet again. IDSOF ¶ 59. He further testified that Crescenzo said he believed him but advised him that he would only be allowed to leave the police station if he confessed to the crime; he promised to take Gray to school if he just confessed. IDSOF ¶ 59. Most importantly, Gray testified that he could see Brown's "physique" on the other side of the two-way mirror. A reasonable jury could conclude from this that Brown knew that Gray's confession was false—indeed, he questioned Gray three times, each time with Gray denying that he had started the fire. If Gray's testimony is believed, Brown watched as a 14-year-old boy was promised he could leave if he simply changed his story. And then he was called into the interrogation room to hear that changed story. These facts, taken together, are enough for a reasonable jury to find that Brown knew Gray's confession was false. *See Hill*, 2009 WL 174994, at *10 (allowing a failure to intervene claim to survive summary judgment where defendants were present for the plaintiff's interrogations). Here, too, Brown's motion for summary judgment is denied.

### 4. Intentional infliction of emotional distress

Finally, the Court turns to Brown's arguments regarding Gray's state law intentional infliction of emotional distress (IIED) claim. In Illinois, an IIED claim requires:

> (1) [T]hat the defendant's conduct was truly extreme and outrageous, (2) that the defendant either intended that his conduct would cause severe emotional distress or knew that there was a high probability that his conduct would do so, and (3) that the defendant's conduct did in fact cause severe emotional distress.

*Taliani v. Resurreccion*, 115 N.E.3d 1245, 1254 (Ill. App. Ct. 2018). Brown argues that Gray has failed to establish a genuine dispute of material fact as to any of these elements and, thus, summary judgment is warranted in his favor.

At the outset, the Court must consider whether Brown's behavior was truly extreme or outrageous. Conduct is only outrageous when it is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Heidelberg v. Manias*, 503 F. Supp. 3d 758, 792 (C.D. Ill. 2020) (quoting *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. App. Ct. 1992). Psychologically forcing a child to confess to a crime that the defendant knows the child did not commit meets this high bar. Taking the facts as Gray presents them, Brown repeatedly questioned a child without his mother present, fed him details about the crime, watched as a police officer promised that child freedom if he only changed his story and confessed to the crime, and took down a confession that parroted the details to him. A reasonable jury could find that this meets the extreme and outrageous requirement for an IIED claim. Numerous other courts have agreed.

*See, e.g., Hill v. City of Chi.*, No. 19 C 6080, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020), *on reconsideration*, 2020 WL 4226672 (N.D. Ill. July 23, 2020) (holding that "the complaint's allegations that Defendants fabricated evidence of Plaintiffs' guilt and withheld exculpatory evidence is enough to support" a claim for IIED); *see also Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("If, as alleged, defendants fabricated false or misleading evidence of Carroccia's guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently 'outrageous' to support a claim for intentional infliction of emotional distress.").

As for the second element of Gray's IIED claim, Brown argues that he "had no intention to cause [Gray] any emotional distress." County Defs.' Mem. Supp. Summ. J. ("County Defs.' Mem.") at 15, ECF No. 256. But under Illinois law, Brown need not have *intended* to cause Gray severe emotional distress, so long as he knew there was a high probability that his conduct would do so. It is reasonable to conclude that, as a prosecutor, Brown knew that coercing a false confession from a child and using that confession to convict the child of arson and double murder created a high probability that that child would suffer extreme emotional distress.

Finally, the Court considers whether there are facts from which a reasonable jury could find that Brown's actions actually caused Gray's emotional distress. Brown argues that "there is not one shred of evidence to show that [he] caused [Gray]'s purported emotional distress." *Id.* at 16. This is simply inaccurate. For the reasons described above, a reasonable jury could find that Brown participated in coercing a false confession from Gray. That confession was used against Gray in his criminal

41

trial, which led to his conviction and a 24-year prison term. That chain of causation is clearly established.

For these reasons, Brown's motion for summary judgment is denied. Furthermore, because the County's indemnification is premised on Brown's liability, the County's motion for summary judgment also is denied.

### IV.    Conclusion

The Individual Defendants' motion for summary judgment is granted as to all claims against Cegielski and the fabrication of evidence claims against Gruszka and Rokosik. In all other respects, it is denied. Brown and the County's motion for summary judgment is denied in its entirety.

**IT IS SO ORDERED.**                    **ENTERED:  3/29/22**

_____
**John Z. Lee**
**United States District Judge**