# EXHIBIT 1

**Melissa B. Russano, Ph.D.**
94 Reed Avenue
North Attleboro, MA 02760
Email: mrussano119@gmail.com

October 2, 2020

**Report for *Adam Gray vs. City of Chicago, et al.***

## I. Introduction

I have been retained by Loevy & Loevy as an expert consultant on the psychology of interviewing, interrogation, and confessions in reference to a case involving Mr. Adam Gray. On April 26, 1996, Adam Gray was convicted of two counts of first-degree murder and one count of aggravated arson for his purported involvement in a 1993 incident involving a fire at a Chicago residence that resulted in the death of Ms. Margaret Mesa and Mr. Peter McGuinness. Adam was sentenced to natural life without the possibility of parole.[1] Incarcerated since the time of his arrest, Adam spent 24 years in custody before his conviction was vacated on May 3, 2017. He was granted a Certificate of Innocence on February 21, 2018.[2] I was asked to provide a written opinion and possible expert testimony in relation to the interrogation and signed confession of Adam Gray.

## II. Professional Qualifications

I am currently a Professor of Criminal Justice at Roger Williams University. I received my Bachelor of Arts degree in Psychology from the University of Virginia (1999), and my Masters (2001) and Ph.D. in Psychology (with a legal psychology specialization) from Florida International University (2004). I am an experimental psychologist with an emphasis in social and cognitive psychology. My primary areas of research and expertise are investigative interviewing, interrogations, and confessions, in the law enforcement, military, and human intelligence domains, although I also have expertise in other psych-law areas, such as eyewitness identifications. I have been conducting research in the area of investigative interviewing, interrogations, and confessions since 2002, have published numerous scholarly peer-reviewed articles and chapters on these topics, and I created one of the most oft used and influential laboratory paradigms for studying true and false confessions.[3] I regularly give presentations to academic and practitioner audiences, and I have participated in science-based interrogation training of law enforcement officers. Since 2007, I have received continuous funding (to date, over $2.4 million) for my research on investigative interviewing, interrogations, and confessions from the U.S. Department of Defense and the U.S. Department of Justice via the High-Value Detainee Interrogation Group (see Appendix A for a copy of my curriculum vitae). I am being compensated $295 per hour for my work on this case (with the exception of deposition testimony, which is charged at $590/hour or no more than $3,245/day).

---

[1] Clemency Petition Version #2
[2] Joint Motion to Vacate; Second Amended Complaint
[3] Russano, Narchet, Meissner & Kassin (2005)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

## III. Materials Reviewed

I have reviewed the following materials pertaining to this case:

Second Amended Complaint
Joint Motion to Vacate
Plaintiff 003987-003989.2017-05-03 Order Vacating Convictions_OCR
Adam Gray Custody Photograph
Lineup Photograph
Adam Gray Photograph Post-Statement
Clemency Petition Version #1
Clemency Petition Version #2
Adam Gray's Original Court-Reported Statement
State's Version of 3.25.13 Adam Gray Interview
State's Version of 10.21.13 Adam Gray Interview
The Indisputable Truth
Rebecca George Post-Conviction Deposition
Bill Rogers Affidavit
Brenda Thomas Affidavit
Calvin Pittman Affidavit
Denise Chavez Affidavit
Graciela Fernandez Affidavit
Hope Rogers Affidavit
Karrie Kelly Affidavit
Kasey Paris Affidavit
Natalia Zamecka Affidavit
Raylene Whitmer Affidavit
Scott Sondelski Affidavit
State Investigative Report – Amber Pozniak-Gonzales
State Investigative Report – Brenda Thomas 2-7-13
State Investigative Report – Brenda Thomas 8-14-13
State Investigative Report – Eric Gonzalez 10-28-13
State Investigative Report – Graciela Fernandez 9-19-13
State Investigative Report – Hope Rogers 10-4-13
State Investigative Report – Karrie Kelly 11-6-12
State Investigative Report – Kassandra Paris 8-14-13
State Investigative Report – Kassandra Paris 1-11-13
State Investigative Report – Kassandra Paris 9-19-13
State Investigative Report – Lita Gonzalez 10-28-13
State Investigative Report – Rosemary Gonzalez 11-7-13
State Investigative Report – William Rogers 9-13-13
State's Attorney Rosemarie Gonzalez Interview Notes 4.20.96
State's Attorney Maria Gonzalez Interview Report 4.13.96
State's Attorney Michael and Gertraud Gray Interview Notes 4.21.96
Deposition of Adam Gray (1st)
Deposition of Adam Gray (2nd)
Deposition of David Gray

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Deposition of Gertraud Gray
Deposition of Michael Gray
Deposition of Richard Wolfe
Deposition of Robert Fitzpatrick
Deposition of Thomas Donegan
Deposition of Daniel McInerney
Deposition of James Brown
Deposition of Janet Lupa
Deposition of Percy Davis
Deposition of Donald Dugard
Deposition of Erik Anthony Gonzalez
Deposition of Lita Marie Gonzalez
Deposition of Rosemarie Gonzalez
Deposition of Karrie Kelly
Deposition of Kassandra Paris
Deposition of Rebecca George
Deposition of Scott Sondelski
Full OCRd Pretrial and Trial Transcripts
    Adam Gray Motion to Suppress Testimony
    Daniel McInerney Motion to Suppress Testimony
    Ernest Rokosik Motion to Suppress Testimony
    Gertraud Gray Motion to Suppress Testimony
    James Brown Motion to Suppress Testimony
    James Brown Rebuttal Motion to Suppress Stipulation
    Michael Gray Motion to Suppress Testimony
    Michael Pochordo Motion to Suppress Testimony
    Nicholas Crescenzo Motion to Suppress Testimony
    Nicholas Crescenzo Motion to Suppress Rebuttal Testimony
    Antonio Knezevich Trial Testimony
    Barbara Paris Trial Testimony
    Brenda Thomas Trial Testimony
    Debra Krick Trial Testimony
    Donald Dugard Trial Testimony
    Ernest Rokosik Trial Testimony
    Gertraud Gray Trial Testimony
    James Brown Trial Testimony
    John Collins Trial Testimony
    Joseph Gruszka Trial Testimony
    Karrie Kelly Trial Testimony
    Kasey Paris Trial Testimony
    Lita Gonzalez Trial Testimony
    Melchor Gonzalez Trial Testimony
    Michael Gray Trial Testimony
    Murray Shambee Trial Testimony
    Nancy Jones Trial Testimony
    Nicholas Crescenzo Trial Testimony

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

      Nicholas Crescenzo Trial Rebuttal Testimony
      Richard Wolfe Trial Testimony
      Robert Kirschner Trial Testimony
      Rosemarie Gonzalez Trial Testimony
      Russell Nowak Trial Testimony
      William Davey Trial Testimony
      Milk Jug Stipulation
11.7.95 MOTION TO SUPPRESS Transcript Date from PD Subpoena Production
James Brown Notes from Felony Review File from PD File
Full Juvenile Transfer Hearing Transcript
      Dianne Bufano Transfer Hearing Testimony
      Gertraud Gray Transfer Hearing Testimony
      Janet Lupa Transfer Hearing Testimony
      Joseph Gruszka Transfer Hearing Testimony
      Nicholas Crescenzo Transfer Hearing Testimony
5.18.93 Catherine Wilson Assessment
9.25.93 Discharge Summary
10.25.93 Social Assessment
11.24.93 Treatment Plan
Marty Beyer Report
Dianne Buffano Notes
Marchlewski Notes
Marchlewski Report
Final Supplementary Report
GPR Notes Gray
Police and Fire Reports, including but not limited to:
      Supplementary Report March 26 1000
      Supplementary Report March 29, 1993
      Supplementary Report March 25, 1993 0245hr
      Supplementary Report March 25 1993 1430
      Report dated March 28 1993
      GPR dated March 25 1993
Saul Kassin Report
Media Footage (DEF_CCJB16091 Albany Fire Dub DEF_CCJB16091)
Denny Smith Report
John Lentiti Affidavit
Gerald Hurst Affidavit

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

### IV. Background on Interrogations and False Confessions and False Witness Statements[4]

Making a false confession is inherently counterintuitive in that being held criminally responsible for a crime you did not commit is fundamentally counter to one's self-interest. Most people cannot possibly imagine themselves confessing to a crime they did not commit (absent perhaps torture or a desire to protect a loved one), and therefore, the phenomenon of false confessions is quite difficult for the majority of people (including police officers, jurors, attorneys, and laypersons) to understand. However, the existence of false confessions within the American and international legal systems is quite well-documented.[5] The growing number of DNA exonerations in this country affords us the ability to examine the contributing factors to wrongful convictions. To date, in 365 DNA exoneration cases that have been documented by the Innocence Project, false confessions or admissions were given in approximately one out of every four cases (29%), making false confessions a leading cause of wrongful conviction in this country.[6] Out of the 2,668 exonerations documented by the National Registry of Exonerations, false confessions played a role in 12% of those cases. Although counterintuitive, the data demonstrate that false confessions are more likely to occur in homicide cases than other types of cases. False confessions occurred in 22% of exonerations involving homicide cases in the National Registry of Exoneration database,[7] and a whopping 62% of DNA exonerees convicted of murder had falsely confessed.[8] Moreover, the false confession phenomenon appears to be a particular problem in Chicago (Cook County). False confessions played in role in 33% of *all* Chicago exoneration cases, and in 54% of cases involving exonerees convicted of murder. Moreover, 22% of all known documented false confessions nationwide (64/292) involve Chicago

---

[4] Understanding the psychology of interrogation and false statements (whether they be false confessions or false witness statements) draws not only on empirical research specifically on each of these topics, but on the larger literature that encompasses the scientific study of human behavior, which includes but is not limited to basic principles of social psychology (e.g., persuasion, influence, and compliance), cognitive psychology (e.g., principles of memory, perception, and metacognition), developmental psychology (e.g., brain development, age differences in cognition and decision-making), and clinical and abnormal psychology (e.g., overcoming resistance, how mental illness or intellectual disability affects decision-making and suggestibility). In this case, there are two different types of potential false statements at issue– a primary false confession (Adam Gray) and a possible false witness statement (Mr. Melchor Gonzalez). The majority of this section of this report is focused on discussing the literature on interrogations and primary false confessions; however, as discussed later in this section, the research on suspect interrogations and primary false confessions is directly relevant and applicable to the elicitation of false witness statements.

[5] Bedau & Radelet (1987); Drizin & Leo (2004); Kassin, Drizin, Grisso, Gudjonsson, Leo & Redlich (2010)

[6] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[7] http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx#

[8] As of July 24, 2018. See https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; One explanation for the counter-intuitive statistic that false confession rates are high in the most serious of cases is that it is in precisely those cases that investigators may be more likely to use problematic interrogation techniques. The pressure to close a case involving a serious violent crime, coupled with media attention that may accompany such crimes, likely increases investigators' motivation to be more aggressive in pursuing incriminating statements.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

cases in which individuals false confessed to homicide.[9] Another way to examine the prevalence level of false confessions is to ask people to self-report whether they have ever provided a false confession. Self-reported confession rates in community samples range from 1.2% to 13.8%, and from 0% to 28% in samples of prisoners and those with serious mental illness.[10] Even police officers recognize the problem of false confessions; in one study, North American police investigators estimated that nearly 5% of innocent suspects provide false confessions.[11]

Although not *the* leading cause of wrongful conviction, false confessions are particularly pernicious because of the power and nature of confession evidence. Confession evidence is widely considered to be one of the most powerful forms of evidence against a defendant, superseding damaging character evidence, eyewitness testimony/identifications, and even exculpatory DNA evidence (when that DNA evidence can be 'explained away' by the prosecution).[12] As such, when a false confession becomes evidence in a criminal trial, it arguably becomes the most damning evidence against a defendant possible, and it is highly likely to lead to wrongful conviction. In an examination of 125 documented cases of proven false confessions, of those cases that went to trial, false confessions led to wrongful convictions in 81% of the cases.[13] This phenomenon is due in large part to the fact that legal decision-makers (including jurors and police officers) are not able to reliably distinguish between true and false confessions.[14] This is because false confessions typically look quite similar to true confessions – compelling detailed narratives that often contain non-public facts about the crime that only the true perpetrator should or could know.[15]

To understand the phenomenon of false confessions/statements and interrogations, researchers rely on three primary bodies of literature: 1) case studies of documented wrongful conviction cases involving false confessions or admissions, 2) fundamental principles of developmental, social, cognitive, abnormal, and clinical psychology drawn from over 100 years of research on such topics as memory and communication, persuasion and compliance, suggestibility, decision-making, and learning and reinforcement principles, and 3) specific studies relevant to the topics of interviewing, interrogation and confessions in the forensic context, including observational studies, survey research, field research, content analyses, and laboratory studies.[16] Taken together, these bodies of literature have sufficiently advanced our knowledge about this field to the extent that in 2010 the American Psychology-Law Society (a division of the American Psychological Association) published a White Paper which

---

[9] https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_Convicting_the_Innocent.pdf
[10] See Gudjonsson (2010) for a review; Redlich, Summers & Hoover (2010)
[11] Kassin et al. (2007)
[12] Appleby & Kassin (2016); Kassin & Neumann (1997); It is not uncommon in cases of wrongful conviction for confession evidence to "trump" DNA evidence. For example, in the case of Mr. Jeffrey Deskovic, who served nearly 16 years for a rape and murder he did not commit, it was known at the time of trial that the semen found on the victim did not match Mr. Deskovic. Because of Mr. Deskovic's confession, the prosecution forged ahead with the criminal trial and 'explained away' the semen by suggesting that the victim must have had consensual sex with someone else prior to her rape and murder (see Leo & Drizin, 2010, also see
http://www.westchesterda.net/Jeffrey%20Deskovic%20Comm%20Rpt.pdf).
[13] Drizin & Leo (2004)
[14] Kassin, Meissner & Norwick (2005)
[15] Appleby, Hasel & Kassin (2012); Garrett (2010)
[16] Kassin (2007)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

summarized the state of the knowledge at that time and represents generally accepted views and findings in the field,[17] and the American Psychological Association has submitted at least eight amicus curiae briefs in various cases presenting generally accepted research findings related to interrogation and confessions.[18]

Most confessions or admissions, whether true or false, are a product of an interrogation.[19] Police officers (and most other members of the criminal justice system) have two related goals: obtain true confessions from the guilty[20] while minimizing the number of false confessions procured from the innocent.[21] Researchers generally distinguish between three types of false confessions.[22] A *voluntary* false confession is one in which an innocent person confesses to something he or she did not due absent any external pressures.[23] *Compliant* false confessions are ones in which innocent people confess to crimes they did not commit because they are acquiescing to the pressures of an external situation (e.g., they may want to escape an unpleasant interrogation or they believe that by confessing they will receive some benefit or avoid some threatened harm). Finally, an *internalized* false confession is one in which an actually innocent person confesses to a crime because he or she actually starts to question his or her own innocence.[24]

Prior to the 1930s, the so-called "third degree" (i.e., the infliction of physical and mental pain) was commonplace in American interrogation rooms, as documented by the 1931 Wickersham Commission report.[25] Criticisms of these techniques centered not only on the concern that confessions procured via the "third degree" might be involuntary but also *unreliable* (i.e., could not be relied upon as truthful), and court rulings began limiting police officers' abilities to rely on such practices.[26] Modern-day interrogations are now designed to be psychologically-based in nature. Although the type and amount of interrogation training

---

[17] Kassin et al. (2010)

[18] https://www.apa.org/about/offices/ogc/amicus/index-issues

[19] I generally use the term 'interrogation' to refer to the interview of a suspect, as opposed to a witness or victim. Moreover, I use the term interrogation regardless of whether the suspect is in police custody (custodial interrogation) or not (non-custodial interrogation).

[20] Confessions speed the process of justice in a number of ways. First, confessions are considered to be powerful evidence of guilt. Second, confessions encourage guilty pleas, thereby reducing the amount of time and resources that need to be dedicated to a case. Finally, as discussed, confessions admitted at trial are highly likely to lead to convictions.

[21] Not only can false confessions have potentially tragic consequences for an innocent suspect (i.e., wrongful conviction), but when a false confession is believed, the actual perpetrator remains at large.

[22] Kassin & Wrightsman (1985)

[23] The most commonly cited reason for providing a voluntary false confession is to protect someone else (see Gudjonsson, 2003; 2010).

[24] Internalized false confessions are almost always a product of highly suggestive interrogations, in which a suspect becomes convinced that his or her memory of not committing the offense is untrustworthy (e.g., due to the passage of time, alcohol/drug use, repression), and the suspect is also confronted with false evidence of his or her guilt (Gudjonsson, 2003; Kassin et al., 2010). Examples of documented cases of internalized false confessions include those of Michael Crowe, Marty Tankleff, and Peter Reilly.

[25] Leo (2004)

[26] Sheridan (2011)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

investigators receive can vary considerably,[27] the *Reid Technique of Interviewing and Interrogation* (heretofore 'the Reid technique') has made an indelible impact on the process of interrogation in this country and reflects the manner in which modern interrogation in the United States has been almost uniformly been conducted, at least until very recently.[28] The shift away from third-degree tactics to modern-day interrogation (which has remained fairly consistent since the 1970s) can be attributed in large part to the pioneering and well-intentioned work of Mr. Fred Inbau, who first published his training manual, *Lie Detection and Criminal Interrogation,* in 1942.[29] This work formed the foundation for the first edition of the Reid manual, *Criminal Interrogation and Confessions*, published in 1962.[30] Interrogation manuals became a critically important, and perhaps the most influential way, of formally training investigators to conduct interrogations, and historically there have been relatively few documented alternatives to the Reid technique in North America.[31] Those alternatives that do or did exist tend to teach either Reid directly, or a program that is essentially a reformulated version of a Reid-style approach.[32] Headquartered in Chicago, Reid and associates began offering courses in 1974, and they claim to have trained more than 500,000 investigators to date.[33] The Reid technique is the most widely used and influential questioning technique in the world (and certainly in North America), and their manual has been cited by the U.S. Supreme Court.[34] Many investigators who have not directly been Reid trained have likely been influenced by the method, given that interrogation skills are handed down from investigator to investigator via on-the-job training and observation.[35] Finally, Reid's reach extends beyond law enforcement; Reid markets and trains various stakeholders from the private and public sector, including offering training courses specifically for attorneys on how to elicit information from hostile and/or reluctant witnesses.[36]

Although the technique has evolved somewhat over time,[37] the basic Reid technique is generally divided into two phases: a non-accusatorial pre-interrogation interview and an accusatorial interrogation.[38] The primary purpose of the non-accusatorial pre-interrogation interview is for the investigator to decide whether the suspect is being truthful or deceptive. Reid and associates teach investigators to look for specific verbal and non-verbal indicators of deception. The ability of investigators to reliably distinguish between true and false denials is of critical importance to the Reid technique because Reid advises that only suspects who an

---

[27] Kassin et al. (2007); Kostelnik & Reppucci (2009). Many detectives report not having received any formal training at all on how to conduct interrogations; rather, many report learning on-the-job, often by observing more seasoned investigators who pass along their skill set (Cleary & Warner, 2016).
[28] See generally Leo (2008). Very recently, some agencies have started to move away from interrogation techniques based upon the Reid approach—and its core tenets of guilt-presumptive questioning and confrontation — in part because of concerns about the Reid technique leading to false and/or unreliable confession statements (e.g., Clarke, 2018).
[29] Inbau (1942); Leo (2004)
[30] http://www.reid.com/faq/
[31] Leo (2004)
[32] For example, in 1984, another successful training firm, Wicklander-Zulawski & Associates, began training the Reid Method of Interview and Interrogation (https://www.wzacademy.com/content/about-us).
[33] http://www.reid.com/training_programs/r_training.html
[34] Inbau, Reid, Buckley & Jayne (2013); Kozinski 2018); Stansbury v. California (1994)
[35] Cleary & Warner (2016)
[36] http://www.reid.com/training_programs/mullenixbrochure.pdf
[37] Leo (2004)
[38] Inbau et al. (2013)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

investigator believes to be deceptive (i.e., guilty) should be subjected to accusatorial interrogation techniques. In other words, Reid assumes that investigators can systematically and reliably identify innocent persons during the pre-interrogation interview (via a pattern of verbal and non-verbal responses) and weed them out of the process – therefore, few, if any, innocent persons should be subjected to an accusatorial interrogation. However, this assumption is fundamentally flawed.

A wealth of scientific research indicates that people, including police officers, are *no better than chance* at detecting deceit (with an average accuracy rate of 53%).[39] Counterintuitively, investigators with more experience and more training in detecting deception tend to be *less* accurate at distinguishing between truth-tellers and liars. Despite low accuracy rates, police officers tend to exhibit over-confidence in their ability to detect deceit.[40] Poor performance at detecting deceit (and the accompanying over-confidence effect) is not particularly surprising from a research perspective. By and large, the cues that investigators are taught are indicators of deceit are in fact *not* reliable cues to deception. For example, Reid and associates (as well as other interrogation schools/manuals)[41] teach that certain non-verbal (e.g., lack of eye contact, grooming behaviors, closed posture, shifting in a chair) and verbal (e.g., offering specific denials, using qualifying phrases such as 'generally' or 'not often' or 'to the best of my knowledge', using indicators of so-called rehearsed language such as noncontracted denials, 'I did not kill her') responses are cues that a person is lying.[42] Unfortunately, such cues are *not* reliable indicators of deceit[43] – and relying on them can not only confuse investigators, but may in fact lead them to the incorrect conclusion. In one study examining the effectiveness of Reid cues to deceit, truth-tellers exhibited more Reid indicators of deceit than liars, suggesting reliance on such cues may lead real-world investigators to not only identify truth-tellers as liars, but vice versa.[44] Taken together, this creates a potentially dangerous situation in which confident investigators use non-diagnostic cues to identify liars and proceed to an accusatorial phase comforted by the notion that the suspects they are interrogating are most likely or definitely guilty.

Given the mindset that only guilty persons are subjected to an accusatorial interrogation, most interrogation researchers agree that the fundamental goal of a U.S. law enforcement interrogation is to secure incriminating statements, an admission, or a full confession.[45] An accusatorial interrogation typically begins by isolating the suspect in small room, an environment that is designed to prime feelings of hopelessness and anxiety and keep the suspect isolated from

---

[39] Aamodt & Custer (2006); Granhag & Stromwall (2004); Memon, Vrij, & Bull (2003); Vrij (2008)
[40] Meissner & Kassin (2002, 2004)
[41] Narchet, Coffman, Russano & Meissner (2004)
[42] Inbau et al. (2013)
[43] DePaulo, Lindsay, Malone, Muhlenbruck, Charlton & Cooper (2003)
[44] Vrij, Mann, & Fisher (2006)
[45] Kassin et al. (2010). One section of the current version of the Reid manual does give token acknowledgement to the idea that the primary purpose of an interrogation is to learn the truth, and it acknowledges that innocent persons may occasionally be interrogated. However, elsewhere in the manual, it states "the purpose for interrogation is to persuade a suspect who the investigator believes to be lying about involvement in a crime to tell the truth" (Inbau, Reid, Buckley & Jayne, 2001, p. 419). Given that the investigator believes the suspect is lying, the "truth" in this instance means a confession. In practice, most interrogation researchers agree that, in light of the process and flow of an interrogation itself (e.g., shutting down of denials, overcoming suspect objections), the practical goal of an interrogation is the elicitation of incriminating statements.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

social support (such as family and friends). The process of interrogation ultimately involves trying to convince a suspect that it is in his or her best interest to cooperate by confessing – in other words that the benefits of confessing outweigh the benefits of continued denial. In practice, this often means convincing suspects that the only reasonable way out of the situation they currently find themselves in is to admit wrongdoing. The modern-day Reid technique involves a nine-step process[46] which includes firmly and directly accusing a suspect of having committed the crime and convincing him/her of the futility of denying it,[47] shutting down denials and overcoming suspect objections, offering sympathy and developing and suggesting 'themes' that make it easier for the suspect to confess, keeping the suspect focused on the interrogator and handling any signs of psychological withdrawal, presenting an 'alternative question' (in which two incriminating options are presented to the suspect, but one is face-saving), and finally securing an oral and then written confession statement.[48] This nine-step process is not necessarily linear nor is every step necessarily implemented in a given interrogation (i.e., steps may not always occur in order, and certain steps may be emphasized more than others, occur more than once, or not occur at all, depending on the nature of the particular interview).

The 'theming' aspect of the interrogation process is particularly important. Theming typically involves providing face-saving excuses, rationalizations, or justifications for committing the crime that map on to the suspect's supposed preexisting rationalizations for committing the crime. These excuses, rationalizations, and justifications - which can be operationalized in many forms, from explicit statements to implied suggestions via leading questions or innuendo - usually involve *minimization* strategies in which the interrogator downplays the moral seriousness of the crime (e.g., his behavior is common; his actions could have been much worse) or provides moral justifications for the suspect's behavior (e.g., he was provoked by the victim; he needed the money; minimizing the suspect's role by blaming an alleged co-conspirator). Other themes may involve the use of *maximization* tactics, which are techniques/themes that tend to play up the seriousness of the situation (e.g., exaggerate the seriousness of the crime, the potential charges, or the seriousness of the suspect's intent). Of interest is the relationship of common theming approaches to the willingness of a suspect to confess. Reid and associates acknowledge that "every successful interrogation technique must offer the guilty person a real or perceived benefit to telling the truth."[49] The interrogation process is often portrayed as an opportunity for the suspect to tell 'his side of the story.' Reid and associates note that legally investigators are not permitted to tell a suspect that s/he will receive more lenient treatment by the criminal justice system if s/he confesses, however, they state that investigators hope that the suspect draws this conclusion on his or her own (and the themes are designed to encourage this).[50] In fact, Reid and colleagues are correct in their assumption that

---

[46] The nine-step process was codified in the third edition of *Criminal Interrogation and Confessions* (Inbau, Reid & Buckley, 1986). However, previous editions advocated use of most of the same techniques, including the theming aspects of the interrogation.

[47] In order to accomplish this, investigators may confront a suspect with true evidence of guilt, lie about having evidence of guilt, or investigators may bluff about evidence.

[48] Inbau et al. (2013)

[49] Inbau et al. (2013, p. 368)

[50] The logic here is that the suspect will grasp on to the moral justification or excuse presented by the theme (e.g., My child is unruly and this is just a case of parental discipline taken too far), and the suspect will come to believe that since the investigator understands why s/he behaved the way s/he did, other people will similarly understand, and therefore, s/he will be treated more leniently (Inbau et al., 2013).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

certain themes communicate information to suspects about their likely treatment within the criminal justice system. Research supports the notion that certain common minimization tactics are the functional equivalent of direct promises of leniency whereas certain common maximization tactics are the functional equivalent of direct threats of harsher punishment; in other words, minimization and maximization techniques that manipulate a suspect's perceptions of the consequences of confessing pragmatically imply leniency in exchange for a confession and harsher punishment in response to continued denial.[51] Moreover, minimization and maximization techniques that manipulate a suspect's perception of the consequences of confessing have been shown in experimental laboratory research to *increase the likelihood of false confessions* from the innocent and *decrease the likelihood of true confessions* from the guilty in comparison to minimization and maximization techniques that do not manipulate perception of consequences.[52]

Case studies, surveys of experienced investigators, and experimental laboratory research supports the notion that many Reid technique tactics are successful at eliciting admissions and confessions from guilty people; however, it is also true, that that same body of literature suggests that certain elements of the Reid technique are successful at eliciting admissions and confessions from *innocent* people.[53] For example, techniques such as direct positive confrontation, and the presentation of false evidence, particularly when coupled with minimization and maximization tactics that manipulate a suspect's perceptions of the consequences of denying or confessing, have been shown in laboratory experiments to elevate the risk of false confessions[54] – and these techniques are frequently present in documented cases of false confessions.[55] Reid and associates have long claimed the properly executed Reid technique will not cause an innocent person to confess, and that documented false confession cases attributed to the Reid technique are actually instances in which the technique was improperly performed or applied.[56] However, in a high-profile false confession case, a Reid employee at Reid headquarters participated in the interrogation and procurement of a false confession to the rape and murder of an 11-year-old girl from a Mr. Juan Rivera. Mr. Rivera was later exonerated and filed a civil suit for false arrest and malicious prosecution, against a number of entities, including John E. Reid and Associates. In March 2015, a 20 million dollar settlement was reached, of which Reid and Associates were ordered to pay two million.[57] Although Reid likely still remains the most dominant and widely trained interrogation protocol, the tides, however slowly, appear to be turning to a more information-gathering, science-based approach to interviewing and interrogation. New training models in science-based practices are growing in popularity, and as of March 2017, Wicklander-Zulawski & Associates, a large private firm that previously trained investigators in the Reid

---

[51] Horgan, Russano, Meissner & Evans (2012); Kassin & McNall (1991); Russano et al. (2005)
[52] Horgan et al. (2012)
[53] For example, see Bedau & Radelet (1987); Drizin & Leo (2004); Horgan et al. (2012); Kassin et al. (2007); Kassin & Kiechel (1996); Klaver, Lee & Rose (2008); Narchet, Meissner & Russano (2011); Ofshe & Leo (1997a, 1997b); Perillo & Kassin (2011); Russano et al. (2005)
[54] Kassin & Kiechel (1996); Horgan et al. (2012); Narchet et al. (2011); Russano et al. (2005)
[55] Ofshe & Leo (1997a, 1997b)
[56] http://www.newyorker.com/magazine/2013/12/09/the-interview; https://wrongfulconvictionsblog.org/2012/09/11/canadian-judge-blasts-reid-interrogation-method-for-inducing-false-confessions/
[57] http://www.newyorker.com/news/news-desk/juan-rivera-and-the-dangers-of-coercive-interrogation

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

method, announced that they would cease training Reid because of a growing recognition that it can produce false confessions.[58]

It is the opinion of this interrogation researcher that the goal for the criminal justice system ought to be to identify and use evidence-based, *diagnostic* interrogation approaches;[59] in other words, we should strive to identify and use techniques that increase the likelihood of true confessions/admissions while minimizing the likelihood of false confessions/admissions. Researchers have long been studying the factors associated with false confessions, and there is a growing body of literature identifying *diagnostic* approaches that maximize the ratio of true to false confessions as well as those techniques that heighten the risk of false confession.[60] The research on interrogations and confessions have allowed us to identify three major categories of risk for false confessions: 1) 'tunnel vision', 2) individual vulnerabilities, and 3) situational risk factors associated with the nature of the interrogation itself.[61] 'Tunnel vision' is the phenomenon in which investigators fall prey to *confirmation bias*[62] – that is, in the case of a suspect investigation, they hone in on a particular suspect, become convinced that s/he is guilty, focus in and attend to information that appears to support their belief in the suspect's guilt, and tend to ignore evidence to the contrary.[63] Individual vulnerabilities refer to characteristics pertaining to the person that make them more vulnerable to providing a false confession, such as age, mental capacity, and psychological state at the time of the interrogation. Situational risk factors associated with the nature of the interrogation itself include such things as the specific interrogation tactics used and the conditions of the interrogation.

The extant literature review provided thus far is relevant not only to suspect interviewing and primary false confessions (i.e., admissions made directly by an innocent person), but also to interviewing that results in false witness statements (i.e., testimony from third parties that provide false incriminating information but which does not include details of a primary confession). This is because any person, regardless of whether they are ultimately deemed a perpetrator, accomplice witness, or non-involved but cooperating witness, who is subjected to an interview process that looks and feels like an accusatorial interrogation is at risk for providing a false statement. The semantics of how we talk about investigative interviewing is important in understanding how suspect interviewing and witness interviewing are related. When a distinction is made between interviewing and interrogating, the term interrogation is typically reserved for interviews with suspects, whereas the term interview is typically used to refer to interviews with witnesses, sources, or victims. In my experience it is not uncommon for law enforcement officers to reject the term interrogation (likely because they believe it is negatively valanced), opting instead to use the term interview with all types of interviewees, including suspects. However, *the*

[58] Brandon et al. (2019); Brandon, Wells & Seale (2018); https://olis.leg.state.or.us/liz/2017R1/Downloads/CommitteeMeetingDocument/110332
[59] Meissner, Hartwig & Russano (2010)
[60] Russano et al. (2005); Narchet et al. (2011); Horgan et al. (2012); Evans, Meissner, Ross, Houston, Russano & Horgan (2013); Meissner et al. (2014)
[61] Meissner & Russano (2003)
[62] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Nickerson (1998) and Trope & Liberman (1996)
[63] A belief in a suspect's guilt can also lead investigators to behave in ways that elicit what they interpret to be deceptive behavior from suspects, thereby confirming the investigator's belief in the suspect's guilt (Kassin, Goldstein & Savitsky, 2003; Narchet et al., 2011).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*label used to describe a particular interaction is far less important than the substance, tenor, and techniques utilized during that interaction.*

    Witnesses (and even victims) are sometimes subjected to an accusatorial-style interview, with the same problematic techniques being used that are commonly employed with suspects. In fact, the Reid manual specifically advises investigators to treat reluctant witnesses and informants as suspects, and to interview them using the same methods used with suspects. Reid advises reassuring the witness or informant that that police will help protect the person from retaliation, and if all else fails, they should capitalize on the person's desire to protect himself by accusing "…the subject of committing the crime (or of being implicated in some way) and proceed with an interrogation as though the person was, in fact, considered to have involvement in the crime."[64] Reid asserts that this false accusation should motivate the offender to cooperate with police by providing evidence against the actual suspect(s).[65] As such, it is clear that the accusatorial interviewing experience is not reserved solely for suspects, and all of the risk factor categories associated with primary false confessions (i.e., confirmation bias, individual vulnerabilities, and situational risk factors) are similarly risk factors for providing false witness statements. In fact, it has been argued that false witness statements may be easier to procure than primary false confessions. When suspects incriminate themselves, they are likely to face severe consequences, and therefore they should be highly motivated to withstand a coercive interrogation to the extent possible. In contrast, witnesses should be less motivated to withstand a coercive interrogation since the act of providing a false witness statement incriminates someone else rather than themselves. This trend is likely exacerbated in situations where witnesses are led to believe that a failure to incriminate the other person would mean they themselves might face legal consequences. In essence, when considering the likely reliability of a coerced witness' statement versus a coerced suspect's statement, a coerced witness' statement is even more likely to be unreliable than a coerced suspect's statement.[66] Like primary false confessions, secondary false confessions (i.e., statements made by a third party alleging that someone confessed to them or in front of them)[67] and false witness statements (given by jailhouse informants, accomplice witnesses, or cooperating witnesses) are a known contributing factor to wrongful convictions. Data from the Innocence Project indicate that these types of false statements played a role in approximately 17% of DNA exoneration cases, and 21% of cases involving people who were exonerated from death row between 1973 and 2004.[68]

    In the remainder of this report, I will provide background information about Adam Gray's case, with a specific focus on the interrogation of Adam.[69] I will then 1) analyze Adam's interrogation and the signed statement provided by Adam with respect to the presence of known risk factors associated with false confessions, and 2) discuss the implications for the reliability of that statement.

---

[64] Inbau et al., 2013, p. 337
[65] Inbau et al. (2013)
[66] Sheridan (2011)
[67] Neuschatz, Wilkinson, Goodsell, Wetmore, Quinlivan & Jones (2012); Wetmore, Neuschatz & Gronlund (2014)
[68] Warden (2004); Wetmore et al. (2014); https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; https://www.innocenceproject.org/informing-injustice/
[69] I also briefly address the interview of Melchor Gonzalez, who investigators say made a statement that was subsequently portrayed as incriminating Adam (*See infra* note 138).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

## V. Case Background and the Interrogation of Mr. Adam Gray

*Case Background*

 Shortly before 3:00am on March 25, 1993, a fire broke out at 4139 South Albany, a two-flat multi-story apartment, in Chicago, Illinois.[70] Three of the residents of the first apartment were home at the time – Ms. Barbara Paris, her husband Mr. Timothy Paris, and their 14 year old daughter Ms. Kassandra ("Kasey") Paris. Barbara testified that sometime around 2:30am she heard footsteps on the back porch and then the dog start barking, and she smelled gasoline. Timothy felt the doorknob of the back door,[71] yelled there was a fire, and the Paris family members were able to escape their home without injury (and prior to police and fire personnel arriving at the scene).[72] The residents of the second-floor apartment, Mr. Peter McGuinnes and Ms. Margaret Mesa, were not as fortunate. Although firefighters entered the apartment and were able to remove both residents while battling the fire, Mr. McGuinnes was pronounced dead at the scene, and Ms. Mesa succumbed to her injuries and died three days later.[73]

 Numerous fire and police personnel responded to the location of the fire, including Chicago Police Department (CPD) patrol officers (e.g., Officer Wolfe and Officer Thomas Donegan), members of the CPD Bomb and Arson unit (e.g., Detective Ernest Rokosik, Detective Daniel McInerney and Detective George Jenkins), and a CPD Area 1 Violent Crimes detective (Detective Nicholas Crescenzo).[74] One of the responding fire personnel was Chicago Fire Department Marshall Joseph Gruszka; he arrived at 3:20am and began his examination of the scene. He testified at Adam's criminal trial that, based on his years of experience, he determined at the scene that the fire had been deliberately set. According to Fire Marshall Gruszka, he believed that someone had poured a liquid accelerant on the staircase of the enclosed rear porch and on the first and second floor decks, and then ignited the accelerant. He based this key conclusion - that the fire was deliberately set and that a liquid accelerant was used - on his visual observation of burn patterns on the wooden structures (i.e., heavy charring/blackening, 'alligatoring' (a specific pattern that appears on burned wood), and shiny blistering, as well as his use of a hydro-carbon detector (which is a device he claimed can indicate the presence of a liquid accelerant).[75] Fire Marshall Gruszka communicated to law enforcement on scene (including Detective Crescenzo) that the fire would be listed as arson based on the observed burn patterns and the heavy traces of a liquid accelerant detected with the hydro-carbon detector. He also told them that he determined that the origin of the fire was the rear porch area.[76] The CPD Bomb and Arson investigators on scene also concluded that the fire was deliberately set and communicated that belief to Detective Crescenzo. Detectives Jenkins, Rokosik and McInerney

---

[70] Antonio Knezevich Trial Testimony; Second Amended Complaint; Supplementary Report March 26 1000; William Davey Trial Testimony

[71] Both Timothy Paris and Barbara Paris were legally blind (Kasey Paris Trial Testimony; Supplementary Report March 26 1000).

[72] Barbara Paris Trial Testimony; Donald Dugard Deposition; Supplementary Report March 26 1000

[73] Supplementary Report March 29, 1993; Antonio Knezevich Trial Testimony; John Collins Trial Testimony

[74] Full OCRd Pretrial and Trial Transcripts; Deposition of Thomas Donegan; Deposition of Gertraud Gray; Karrie Kelly Trial Testimony; Media Footage

[75] Incident Report, Chicago Fire Department; Joseph Gruszka Trial Testimony

[76] Full Juvenile Transfer Hearing Transcript (November 16, 1993); Nicholas Crescenzo Trial Testimony

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

told Detective Crescenzo that their investigation revealed that the fire was arson, the origin of the fire was the rear back porch, and an accelerant was used.[77] Two debris samples were collected by Detective Rokosik for analysis. Subsequent chromatograph analysis revealed that one of the samples was negative for hydrocarbon residue (and therefore the presence of an accelerant); the second sample contained heavy petroleum distillate (HPD) and/or the possible presence of a medium petroleum distillate (MPD). Of critical significance, gasoline is neither an HPD or an MPD,[78] and there was no gasoline found in either debris sample.[79]

Many civilians gathered outside the scene of the fire, including members of the Paris family (e.g., Barbara Paris, Timothy Paris, Kasey Paris, Mr. Scott Sondelski), friends of the Paris family (e.g., Ms. Karrie Kelly, Mr. Eddie Walczak, Mr. Donald Dugard), and neighbors (e.g., Mr. Chester Pierzchala, Mr. Michael Gray, Ms. Gertraud Gray, Ms. Graciela Fernandez, Ms. Hope Rogers, Mr. William Rogers).[80] Interviews of potential witnesses ensued. According to police reports, Karrie Kelly told Officers Donegan and Wolfe that around 2:45am she left her fiance's (Chester Pierzchala) home at 3043 West 41st Place, and as she was crossing the street, she heard someone running behind her. When she turned around, she saw someone near her friend's house (Scott Sondelski, Barbara Paris' son) running towards her and eventually past her. She described the person as a White male, approximately 15 years old, wearing a black hat, black shirt/sweater and black pants, and carrying a white bag.[81] She did not tell police that she recognized him nor did she identify the person she saw by name.[82]

In the immediate aftermath of the fire, Kasey and other members of the Paris family, quickly pointed the finger at Adam Gray as the likely arsonist, both to civilians and to Officer Wolfe, who in turn relayed this information to detectives on scene.[83] Then 14-year old Adam and 14-year old Kasey were neighbors and met when they were young children; both characterized their friendship as extremely close growing up. Kasey testified that up until at least the Summer of 1992, Adam and Kasey saw each other nearly every day, frequently spending time at each other's homes and around the neighborhood.[84] According to Adam, he and Kasey briefly dated (for about a week) a year before the fire, but then reverted to being just friends.[85] Adam and Kasey's friendship began to fracture around September 1992, when Adam started dating another girl, Ms. Natalie Zamecka, and Kasey started dating a mutual close friend of Adam and Kasey,

---

[77] Supplementary Report March 25, 1993 0245hr; Deposition of David McInerney; Ernest Rokosik Trial Testimony
[78] Murray Shambee Trial Testimony; Ernest Rokosik Trial Testimony; Three independent experts reviewed the fire science evidence in this case. All three agreed that 1) gasoline is neither an HPD or and MPD, and that 2) gasoline was not present in either of the debris samples (John Lentini Affidavit; Gerald Hurst Affidavit; Denny Smith Report). In addition, Dr. Gerald Hurst and Mr. Denny Smith confirmed that the presence of an HPD or MPD is not necessarily indicative of the presence of a liquid accelerant because HPDs and MPDs are commonly found in wooden structures. They also both noted that HPDs that due to the nature of HPDs, they did not make good liquid accelerants.
[79] Murray Shambee Trial Testimony; Ernest Rokosik Trial Testimony; John Lentini Affidavit; Gerald Hurst Affidavit; Denny Smith Report
[80] Full OCRd Pretrial and Trial Transcripts; Deposition of Thomas Donegan; Deposition of Gertraud Gray; Karrie Kelly Trial Testimony; Media Footage
[81] Deposition of Thomas Donegan; Police and Fire Reports; Karrie Kelly Trial Testimony
[82] Karrie Kelly Trial Testimony; Deposition of Thomas Donegan
[83] Hope Rogers Affidavit; Incident Report, Chicago Fire Department;
[84] Kasey Paris Trial Testimony
[85] Clemency Petition Version #2

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Mr. Melchor ('Mel') Gonzalez.[86] Mel was one of Adam's best friends, and they spent a considerable amount of time together, which included Adam frequently spending the night at Mel's home.[87] Adam believes that Kasey became jealous that Adam and Mel had been spending less time with her (in part because they were spending more time with Natalie), and as a result, Kasey wanted to date Mel to make Adam jealous and to prompt that pair to spend more time with her. If that was Kasey's intent, she was partially successful; Adam became jealous and disapproving of Mel and Kasey's relationship. Adam asked Mel to choose between Adam and Mel's friendship and his boyfriend-girlfriend relationship with Kasey. He asked Mel to break up with Kasey, which Mel did.[88] In November of 1992, Adam found out that, unbeknownst to him, Mel and Kasey had been seeing each other again; Adam confronted Mel, and Mel broke things off with Kasey a final time.[89]

Kasey blamed Adam for Mel breaking up with her, and she was angry.[90] At that point, the friendship between Adam and Kasey completely deteriorated, and they became overtly hostile toward one another. When they would encounter each other in the neighborhood, they would routinely harass one another with taunts and call each other foul names.[91] These interactions continued for a couple of months, although Adam stated that he and Kasey did not interact much in the month or two prior to the fire because Adam's older brother Michael had told him to leave Kasey alone.[92] Both Adam and Kasey stated that the last time they saw each other was around 7:00pm on the evening of March 24, 1993, about 8 hours before the fire.[93] At the scene of the fire, Kasey told police (and Detective Crescenzo in particular) that Adam was very upset that she was dating his friend Mel, and that Adam had threatened her life multiple times over the preceding year, including when they saw each other from a distance on the evening of March 24th.[94] She also told Detective Crescenzo in a 7:00am interview at Area 1 on March 25th that she had confronted Adam about a week prior to the fire because she believed that

---

[86] Kasey Paris Trial Testimony; The Indisputable Truth; Clemency Petition Version #2; Natalia Zamecka Affidavit

[87] Clemency Petition Version #2; Deposition of Rosemarie Gonzalez; State's Version of 3.25.13 Adam Gray Interview

[88] State's Version of 3.25.13 Adam Gray Interview; Clemency Petition Version #2; Kasey Paris Affidavit; Adam describes the nature of his and Kasey's dating entanglement – and the drama associated with its aftermath as juvenile in nature. In his words, "kid shit" (Deposition of Adam Gray (9/5/2019).

[89] Clemency Petition Version #2; At Adam's trial, Kasey offered a different timeline, suggesting that the final dissolution of her relationship with Mel occurred on February 2, 1993 (Kasey Paris Trial Testimony).

[90] Kasey Paris Affidavit

[91] Kasey Paris Trial Testimony; Clemency Petition Version #2; Deposition of Kasey Paris

[92] Deposition of Adam Gray (9/5/2019)

[93] Deposition of Adam Gray (9/5/2019); The Indisputable Truth; Kasey Paris Trial Testimony

[94] Report dated March 28 1993 (CITY GRAY 000011-00022); At the criminal trial, Kasey testified that Adam said to her to her "you better watch your back" when they saw each other the evening before the fire, but that she didn't remember telling police that Adam had been threatening to kill her for the past year (Kasey Paris Trial Testimony). Adam's recollection of that night was that Kasey started yelling at Adam and Mel, and Mel responded back – but Adam did not engage with Kasey at all (Deposition of Adam Gray [9/4/2019]).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

he had placed a dead pigeon in her back porch, and that Adam liked to play with fire and make firebombs.[95]

Police reports indicate that members of the Paris family mentioned Adam as a person who might have wanted to harm the Paris family, and they also reported to detectives, including Detective Crescenzo, that Adam had threatened Kasey's life in the past.[96] It is also clear from the record that Adam's name was discussed and mentioned openly amongst the civilians at the scene. In a sworn affidavit, Hope Rogers (a neighbor) said she heard Kasey loudly say that she thought Adam has deliberately set the fire, and she heard others in the crowd talking about Adam.[97] Gertraud Gray, Adam's mother, also heard Adam's name mentioned at the scene. After being awakened by the smell of smoke, Gertraud went outside and spoke with Mr. and Mrs. Rogers. She then saw Scott Sondelski, Kasey's brother, arrive at the scene, and when Scott looked at Ms. Gray, he said "I hope to fucking God Adam didn't do this." Ms. Gray testified that this made her scared for her son Adam, so she returned home, woke her daughter Lisa up, and called her son Michael (who was living with a friend).[98] Michael came over, went to the scene of the fire, and asked Scott if he was harassing his mother and yelling that Adam had set the fire. Before Scott had a chance to respond, another person who was with Scott began shoving Michael; the pair had a brief physical altercation before it was broken up by police.[99]

At that point, Michael returned to his mother's home, and he and his mother went to pick Adam up from Mel's house, where Adam was spending the night. Prior to leaving to pick him up, Michael called the Gonzalez home.[100] He spoke to Ms. Rosemarie Gonzalez, Mel's sister, and asked her to wake up Adam, who was asleep on a couch in the living room.[101] Rosemarie was unable to wake him because he was sound asleep.[102] Michael and Gertraud arrived at the Gonzalez home around 4:00am to pick Adam up. Both recalled that Adam was asleep on the couch when they arrived. After being informed about the fire, Adam gathered his belongings and left with his mother and brother. Michael dropped his mother off at her home, but took Adam back to his residence because he feared for Adam's safety given that his concern that Adam was being wrongfully accused of setting the fire.[103] Adam went to sleep on a couch at Michael's home until Detectives Rokosik and McInerney knocked on the door around 5:30am. They told Michael that they wanted to question Adam about the fire, and Michael told Adam to gather his belongings and go with the police. According to Michael, the police officers told him that they were taking Adam to the station at 51st and Wentworth (Area 1), that the questioning would take a couple of hours, and that his mother had been notified and would be at the station.[104]

---

[95] GPR dated March 25 1993; In a 2007 affidavit, Kasey stated that she had exaggerated the significance of Adam's interest in fire, and she said that she had actually never heard Adam threaten to kill her (Kasey Paris Affidavit).

[96] Supplementary Report March 26 1000

[97] Hope Rogers Affidavit

[98] Gertraud Gray Trial Testimony

[99] Michael Gray Trial Testimony;

[100] Michael Gray Trial Testimony; Rosemarie Gonzalez Trial Testimony

[101] Deposition of Erik Gonzalez; State's Attorney Maria Gonzales Interview Report 4.13.96; Deposition of Rosemarie Gonzalez

[102] Rosemarie Gonzalez Trial Testimony

[103] Michael Gray Trial Testimony; Gertraud Gray Trial Testimony

[104] Michael Gray Trial Testimony; Deposition of Adam Gray (9/5/2019); At approximately 5:00am, Detective Rokosik and Detective McInerney first went to the Gray family home at 4208 South Albany in search of Adam. Gertraud Gray told them that Adam had been spending the night at his friend Mel's but

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*The Interrogation of Mr. Adam Gray*

Detective Crescenzo returned to Area 1 around 6:30 or 6:45am, and he said he first saw Adam sitting in a main conference room on the 2nd floor. He said that when he went in to speak with Adam, he introduced himself, told him he was investigating a fire and a death, informed him of his Miranda rights and his juvenile rights, but did not question him at that time.[105] According to Assistant State's Attorney (ASA) James Brown, he and Detective Crescenzo spoke with Adam around 7:30am, during which time he introduced himself to Adam, advised him of his rights, but did not question him about the fire because neither a parent nor a Youth Officer (YO) was present. By 8:30am, YO Percy Davis had arrived, and ASA Brown and Detective Crescenzo questioned Adam about the fire.[106] Adam told the investigators that he had spent the night at Mel's house, from about 7:00pm until his mother and brother picked him up. He told police that he never left the Gonzalez home during that time frame, and he denied any involvement in or knowledge of the fire.[107] At 9:15am, Adam participated in a live lineup, which Karrie Kelly viewed through the one-way mirror.[108] Detective Crescenzo and Detective Michael Porchado conducted the lineup. In addition to Adam (who was placed in position #4 of the lineup), the other lineup members were Mel Gonzalez (position #1), Eddie Walczak (position #2), and Donald Dugard (position #3). Karrie positively identified Adam as the person she saw running down the street.[109]

---

was not at her son Michael's home (Ernest Rokosik Trial Testimony; Deposition of David McInerney). Gertraud denied being told that Michael was going to be taken to Area 1 (Deposition of Gertraud Gray).
[105] Nicholas Crescenzo Trial Testimony
[106] James Brown Trial Testimony
[107] James Brown Motion to Suppress Testimony
[108] Nicholas Crescenzo Trial Testimony
[109] Supplementary Report March 25 1993 1430; Supplementary Report March 26 1000; I also have expertise in the area of eyewitness identification research, and therefore I will address the suggestive and wholly undiagnostic nature of the lineup conducted with Karrie Kelly. First, the lineup was not properly constructed; there were only four people in the lineup (a smaller than typical number for a simultaneous lineup), and the lineup fillers were not chosen properly (based on their similarity to Adam [i.e., possessing physical characteristics that matched the suspect] or because they possessed characteristics that matched the description provided by Karrie (see the National Institute of Justice's recommendations on science-based construction of lineups; https://www.ncjrs.gov/pdffiles1/nij/178240.pdf). Instead, the three 'known innocents' in the lineup were selected because they were young adolescents who just happened to be at the police station. The reason Eddie and Donnie were at the station is because they were providing moral support to their friend Kasey, who was also at the police station (Deposition of Donald Dugard). Mel was there because police wanted to question him about Adam and/or his knowledge of the fire (Melchor Gonzalez Trial Testimony). Police investigators needed juveniles to serve as fillers in the lineup, and the boys conveniently agreed to participate (Deposition of Donald Dugard). The boys arguably varied quite a bit in terms of physical appearance on numerous characteristics (for example, Adam was the only boy with shoulder-length reddish-brown hair), calling into question the fairness of the lineup itself based purely on the selection of the fillers (Lineup Photograph), However, this was only the tip of the iceberg in terms of the problematic nature of the lineup, and that is because Karrie Kelly not only knew Adam personally prior to the lineup, but she also knew at least two of the other lineup members from the neighborhood. In terms of Adam, recall that Karrie was a friend of Kasey's brother Scott (who she had dated in the past; Clemency Petition Version #2). Just 8 months prior to the fire, Karrie drove Scott, Kasey and Adam to visit Scott's father in Indiana, a day trip during which Karrie and Adam spent a total of 5 to 6 hours together, including approximately 90 minutes in a car (Kasey Paris Trial Testimony).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

According to police, subsequent to the lineup (~9:30am), ASA Brown, Detective Crescenzo and YO Davis spoke with Adam for a third time.[110] ASA Brown testified that he "confronted him [Adam] with the fact that he had been identified having been near the scene, running from the scene, and again he denied his involvement."[111] Adam told his interrogators that he was asleep at Mel's house from 10:00pm to 4:00am, at which point he was awakened and picked up by his mother and brother. After interviewing Mel,[112] ASA Brown, Detective Porchado, YO Davis and Detective Crescenzo (who was reportedly in and out of the room for

---

Karrie testified that although she did not recognize lineup member #1 (Mel), she did recognize lineup members #2 (Eddie) and # 3 (Donald) from the neighborhood, and she remembered that at least one of them, but possibly both, were at the scene of the fire the night before with Kasey (Karrie Kelly Trial Testimony). Both Eddie and Donald were in fact present at the scene of the fire, actively comforting Kasey (Media Footage; Donald Dugard Trial Testimony). Given that Karrie was at the scene of the fire (and both Karrie and Scott indicated that they interacted with each other at the scene of the fire; see Deposition of Scott Sondelski and Karrie Kelly Affidavit), and Adam was being discussed openly as the suspected arsonist by Kasey and the Paris family, it is reasonable to assume that Karrie likely knew Adam was the suspect by the time she viewed the lineup. It is worth noting again that at the time she gave her initial description to police, Karrie did not name Adam as the person she saw running that night, nor did she even mention that the person she saw looked familiar to her. Assuming she knew that Adam was the suspect by the time she viewed the lineup, and she was familiar with Adam prior to the lineup, the lineup would have become wholly suggestive and non-probative; it would have no longer functioned as a memory test as to whether Karrie recognized the person she saw, but rather a test of whether she could recognize the boy she knew to be Adam.

Moreover, even if we generously assume that Karrie did not know at the time of the lineup that Adam was the suspect, Karrie almost certainly knew that neither Eddie nor Donald were suspects (since she knew them and knew that they were friends of Kasey's who she had seen at the fire scene the night before). As such, the lineup became a choice between just two people – Adam and Mel. Mel and Adam differ quite substantially in appearance (e.g., Mel is Hispanic, Adam is White). In her deposition, Karrie herself admitted that none of the lineup members, including Mel, looked like Adam, and that Mel looked Hispanic in appearance (Deposition of Karrie Kelly). Furthermore, in a sworn affidavit given in 2006, Karrie Kelley said that at the time she was interviewed by police and viewed the lineup, she was exhausted, stressed, and had just taken a muscle relaxant to help with pain from an injury. The police told her she was the 'star witness' and told her that without her, the person responsible for burning down her friend's family home might escape punishment (Karrie Kelly Affidavit). Taken together, in my opinion, Karrie's identification of Adam from the 'lineup' is non-probative due the egregiously problematic nature of the circumstances surrounding the identification task as well as the construction of the lineup. Mistaken eyewitness identifications is the leading cause of wrongful convictions in this country, playing a role in an estimated 69% of DNA exonerations (https://www.innocenceproject.org/eyewitness-identification-reform/) and 28% of all exonerations since 1989 (https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx). In addition, misidentification of an innocent suspect by multiple witnesses in a single case is commonplace, occurring in more than a third of DNA exoneration cases (https://www.innocenceproject.org/reevaluating-lineups-why-witnesses-make-mistakes-and-how-to-reduce-the-chance-of-a-misidentification/).

[110] Report dated March 28 1993 (CITY GRAY 000011-000022); James Brown Trial Testimony
[111] James Brown Trial Testimony (Plaintiff 000853-000854)
[112] The police report dated March 28, 1993 (CITY GRAY 000011-000022) implied that police brought Mel to the station as a result of Adam saying during the 9:30am interrogation session that he had spent the night at Mel's house; however, this is clearly inaccurate (or at least poorly or imprecisely worded), since Mel served as a 'filler' in the 9:15am lineup.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

this session) commenced another interrogation of Adam between 11:00 and 11:30am.[113] ASA Brown testified that he told Adam that he had spoken to Mel.[114] And after initially denying his involvement again, Adam admitted that he was the one who set the fire after being told by ASA Brown that Mel said that Adam was angry with Kasey and had threatened to throw a bomb through Kasey's window.[115] ASA Brown testified that at that point Adam told them that he went to sleep at Mel's at 10:00pm, but left Mel's house at approximately 2:00am after locating an empty, plastic gallon milk container.[116] He walked to the Clark gas station on 41st and Kedzie and bought gas from a black female gas station attendant. He filled the container ¾ of the way full, and then proceeded to the Paris family home. He said that he entered through the enclosed rear porch (the lock to the door was broken), climbed the stairs to the second floor, poured the gasoline down the stairs, and lit the gasoline on fire at the bottom of the stairs with a cigarette lighter. He then ran down the alley with the milk container in his hand and discarded the container in the alley between 41st Place and 41st Street near a slab or garage.[117] Adam returned to Mel's house, broke the lighter he used up into pieces, flushed the pieces down the toilet at Mel's house, washed his hands, and went back to bed. ASA Brown said that Adam told him he set the fire because he wanted to kill Kasey Paris.[118]

After Adam's admission, ASA Brown said that he offered Adam two options for memorializing his statement, and Adam chose a court-reported statement. While they waited for a court reporter to arrive, ASA Brown said that he met with Adam alone, and Adam purportedly indicated that he had been treated well while in custody and that no threats or promises were made to him. At 12:05pm, court-reported statement in question-and-answer form was taken from Adam by court reporter Ms. Janet Lupa in the presence of ASA James Brown and YO Davis.[119] In addition to the details just discussed, the typed statement included that Adam had three dollars on him that night and that he gave the clerk two dollars. In contrast to ASA Brown's testimony, the written statement does not include a detailed description of where Adam had purportedly discarded the milk container, referencing only an "alley", with no mention of a cement slab or garage. At approximately 1:00-1:30pm, ASA Brown returned to the room and had Adam read the entire statement out loud.[120] ASA Brown then realized he had forgotten to ask Adam about what he did with the lighter, at which point Adam wrote out a handwritten statement at the bottom of the typed statement detailing his smashing of the lighter and flushing the pieces down the toilet at Mel's house. Various handwritten corrections were made throughout the document, which ASA Brown claimed was initiated by Adam. Adam signature appears at the end of the

---

[113] Nicholas Crescenzo Trial Testimony; James Brown Motion to Suppress Testimony

[114] James Brown Trial Testimony

[115] James Brown Trial Testimony

[116] Lita Gonzalez testified that they were missing any milk containers from their home (Deposition of Lita Marie Gonzalez; Lita Gonzalez Trial Testimony).

[117] The police reported dated March 28, 1993 also indicates that Adam provided specific details about exactly which alley he discarded the container in and that he tossed it near a cement slab or garage (CITY GRAY 000011-000022). However, these details were not included in Adam's court-reported statement, and no contemporaneous notes or recording were made of what Adam actually told investigators.

[118] James Brown Trial Testimony

[119] James Brown Trial Testimony; Adam Gray's Original Court-Reported Statement

[120] Although ASA Brown indicated Detective Porchado was not present when the court-reported statement was given, he was present when the statement was reviewed, initialed and signed by Adam.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

typed statement.[121] ASA Brown then charged Adam with felony murder, attempted murder, and aggravated arson.

When Adam purportedly told investigators during the ~11:30am interrogation session that he had discarded the milk container in an alley, Detective Crescenzo left Area 1 to search for the milk container. According to the March 28, 1993 police report, he found a container "exactly where Adam Gray had stated that he had thrown", near a cement garage apron in the alley between 41st Place and 41st Street.[122] The milk carton was flattened, very dirty, and had tire tracks on it.[123] Detective Crescenzo testified that when he picked the container up, he noticed a strong odor of gasoline.[124] On March 26th at approximately 2:20am, Detective Crescenzo interviewed Ms. Brenda Thomas, a clerk at the Clark gas station. Brenda indicated she had worked the early morning hours of March 25, 1993.[125] She testified at Adam's criminal trial that around 2:15 or 2:20am on March 25th, a gentleman purchased two dollars of gas, headed north on Kedzie, and about 20-25 minutes later she heard sirens. On her next shift, detectives showed her four photos and asked her if she could identify the man she saw,[126] and she identified Adam from the photos. During the trial, she estimated the person she saw as being 5'5", with possibly shoulder length blond hair combed back. While she could not recall anything about the man's clothing, she remembered that he was carrying a gas can, but notably, not a white bag.[127]

---

[121] Adam Gray's Original Court-Reported Statement; James Brown Trial Testimony
[122] CITY GRAY 000011-000022; However, see supra note 117.
[123] CITY GRAY 000101; Nicholas Crescenzo Trial Testimony
[124] Nicholas Crescenzo Trial Testimony; Interestingly, the March 28, 1993 police report indicates that Officer Martinez protected the container where it was found until it could be properly processed and inventoried by Detective Jenkins from the Bomb and Arson squad. It is unclear when Detective Crescenzo would have picked up the container in order to smell it. Furthermore, it is important to note that the milk jug was positive for the presence of a high petroleum distillate (HPD), but negative for gasoline (Murray Shambee Trial Testimony; Denny Smith Report; John Lentini Affidavit; Gerald Hurst Affidavit), and the HPD found in the milk container did not match the HPD found in the debris sample taken from the Paris home (Denny Smith Report; John Lentini Affidavit; Gerald Hurst Affidavit).
[125] Detective Porchado or Detective Craig Cegielski may have also been present at the interview and lineup conducted with Brenda (Report dated March 28 1993 CITY GRAY 000011-000022).
[126] A wealth of social science research has been conducted on lineup instructions. This body of research demonstrates that when biased instructions are provided to the witness (i.e., instructions that imply that the perpetrator is in the lineup and the job of the witness is to see if s/he can identify that person), it dramatically increases the likelihood that the witness will identify someone from the lineup. An example of biased instructions is "do you see the recognize the person you saw that night?" The tendency to choose in response to biased instructions is problematic because it increases the rate of false identifications from perpetrator-absent lineups (lineups in which the suspect is not the actually guilty perpetrator). Good practice guidelines for lineup administration include providing the witnesses with unbiased instructions – that is, a witness should be explicitly told that the actual perpetrator may or may not be present in the lineup (see Steblay, 1997). The description of the instructions given to Brenda by both Brenda and Detective Crescenzo suggest that the instructions were biased in that they suggested the perpetrator was in the lineup (Brenda Thomas Trial Testimony; Nicholas Crescenzo Trial Testimony).
[127] Brenda Thomas Trial Testimony; In a 2006 sworn affidavit, Brenda Thomas said that the man she saw that night was approximately 17 years old and seemed to be under the influence of drugs (he had red watery eyes). She said that when the detectives showed her the photos the next night, she told them that she did not recognize anyone, and they angrily told her to keep looking. At that point, she indicated that the thought she recognized someone (who was not Adam Gray), but the detectives made clear non-verbally which of the photos they wanted her to pick. She said that she identified Adam's photo not

Adam's account of his time in custody varies quite dramatically from the accounts provided by ASA Brown and law enforcement officials.[128] According to Adam, over the course of nearly 8 hours of isolation and detention, he was interrogated multiple times by numerous teams of investigators. He stated that when he was brought to Area 1, he was initially placed in a small, dark room on the second floor that had a bench and a desk. He put the bag he had brought with him on the desk and laid down on the bench. He was feeling cold, nauseous, and tired. About 10 minutes later, a man with an angry voice came in and yelled at him to get up. The man proceeded to open Adam's bag and examine each of his belongings. He eventually came across a knife Adam had with him. The man briefly left, and then returned and patted Adam down. He asked Adam to remove his shoes and proceeded to smell the soles of his shoes.[129] When the man asked why Adam carried a knife, Adam said it was for protection from gangbangers.[130] The man then sniffed Adam's hands before leaving the room. Another man subsequently entered the room and refiled through the bag and Adam's belongs, and then ASA Brown entered the room a short time later and introduced himself to Adam. Soon thereafter, Detective Crescenzo entered the room, removed a bottle of cologne from Adam's bag, sniffed it, and told ASA Brown that Adam "could have used this." They then moved moved Adam into a bigger room,[131] which had a one-way mirror.[132]

---

because she recognized him as the man she sold gasoline to, but because of non-verbal pressure and suggestion from police. She stated that she testified to the account she gave in court because she thought police knew better than her about whether Adam was guilty and because she was told that she would go to jail if she did not honor her subpoena and testify in court (Brenda Thomas Affidavit). If the detectives communicated to Brenda who the suspect was, this would dramatically increase the likelihood of a suspect identification (for a review of the research on investigator bias in the administration of lineups, see Kovera & Evelo, 2017). Unintentional investigator bias (i.e., when the lineup administrator unknowingly communicates to the witness who the suspect is) can increase the likelihood of a false identification (see Wells et al., 2020, for a review of research-based recommendations on the administration of lineup procedures, including the importance of blinding the investigator to who the suspect is), as can intentional administrator influence. Tainted identifications (i.e., when an investigator purposefully communicates who the witness should choose either directly or indirectly) is estimated to have occurred in 6% of exonerations documented by the National Registry of Exonerations, and approximately 75% of those cases involved sexual assault or murder. This suggest that tainted identifications may be more likely to occur in more serious cases (https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_Convicting_the_Innocent.pdf). In addition, if it is true that Brenda was threatened with jail time if she did not testify against Adam, this threat would have incentivized Brenda into providing a false witness statement/false testimony (see Sheridan, 2011).

[128] None of Adam's approximately 8 hours of custody, isolation, and interrogation was audio or videorecorded. The decision of investigators not to record (or take detailed contemporaneous notes) deprives fact-finders of an objective record of what actually occurred and what Adam said (and when).

[129] The Indisputable Truth

[130] Adam said that he thought he was going to be in trouble for having the knife, so he felt as if he had to give police a plausible reason for having it, but in reality he carried the knife simply because he liked carrying a knife (The Indisputable Truth).

[131] ASA Brown claimed that Adam remained in the same room throughout the entire day, except when the needed to use the bathroom (James Brown Motion to Suppress Testimony).

[132] Adam said that Detective Crescenzo gripped Adam's shoulders as he was leaving the room and said "don't want you running anywhere." This made Adam uncomfortable. (The Indisputable Truth)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Once in the larger room, Adam estimated approximately eight to ten men entered the room (including the Detectives McInerney and Rokosik), all of whom were White men, with the exception of one Black man.[133] That Black man was introduced as YO Davis, and Adam was told he was there to protect Adam's juvenile rights. Adam was given his rights and he waived them, but he stated that he did not actually understand what his rights were. He believed he had nothing to hide, did not believe he was under arrest, and was willing to talk to them so that he could go home.[134] Adam described being asked a variety of personal background questions (e.g., his age, grade, who he lived with, about his incarcerated father), and when he was asked where he was the night before, he told investigators he was at Mel's house, and had been asleep in Mel's living room from 10:00pm to ~4:00pm when his mother and brother came to pick him up. At that point, Adam describes being subjected to an increasingly accusatorial interaction in which numerous individuals (including ASA Brown and various police investigators) asked leading/suggestive questions which implied that Adam had snuck out of Mel's house and had set the fire. Adam maintained his innocence and denied knowing anything about the fire, but his denials were rebuffed, and he was repeatedly accused of lying. ASA Brown told him that they knew he was involved in the fire, and that things would go easier for Adam if he told them what happened. Adam described a variety of implied and direct threats (e.g., he would be headed to juvie if he kept lying; asking him if he wanted to end up like his father), and leading questions that leaked details about their theory of the crime (e.g., did you sneak out after Mel went to sleep?) and the crime itself (e.g., where did you buy the gasoline?). Adam described ASA Brown as getting increasingly angry, screaming at him and getting inches from his face. The interrogation ended when Adam broke down and began to cry, and Adam was left alone in the room.[135]

ASA Brown returned with a cup of coffee for Adam, and he inquired whether there was anything Adam wanted to tell him. Adam reiterated that he was innocent, and ASA Brown told Adam that they were going to talk to Mel. He asked Adam whether Mel would verify Adam's story as well as whether Mel set the fire with Adam. ASA Brown left the room, and Adam dozed off. He jerked awake when ASA Brown smacked a metal hanger on the table. Adam described ASA Brown as being furious as he accused Adam of lying to them. Other officers entered the room including YO Davis and Detective Crescenzo; Detective Crescenzo told Adam it was not nice to lie to the police.[136] After being advised of his rights again, Adam was told amongst other things that they knew from Mel and Kasey that Adam had been threatening Kasey, that he liked to play with fire (e.g., he had lit his hand on fire once in the past) and make Molotov cocktails and black powder bombs.[137] Detective Crescenzo said that Mel told them that Adam and Mel were talking about different ways of killing Kasey and that Mel did not know what time Adam went to sleep because Mel fell asleep first.[138] Although Adam kept denying involvement in the

---

[133] Deposition of Adam Gray (9/5/2019); The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview
[134] The Indisputable Truth
[135] Deposition of Adam Gray (9/5/2019); The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview
[136] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview
[137] The Indisputable Truth
[138] According to the March 28, 1993 police report, Mel confirmed that Adam slept over his house the night before, and Mel said he went to sleep at 10:00pm. The report indicates that Mel said that he could not be sure that Adam did not leave and subsequently return to his house in the middle of the night, and

24

fire, he was repeatedly accused of lying. At one point, Adam said he wanted to go home, and Detective Crescenzo responded by expressing incredulity at Adam's request, saying that someone had died and that in Illinois you can get the death penalty for that. Adam began to cry, the interrogation was briefly paused again, and Adam was left alone in the room.[139]

When ASA Brown, Detective Crescenzo, and YO Davis returned, they told Adam that a little old lady said she saw Adam, and then they asked him if he would participate in a lineup.[140] Since he believed he had nothing to hide, Adam agreed, and the live lineup described previously occurred. Afterwards, Adam was left alone in the room with YO Davis (who he asked for a cigarette but was told no). Adam worked on some schoolwork, then put his head down on the desk and dozed off. He awoke when ASA Brown smacked a hanger on the table again. ASA Brown informed him that he had been identified from the lineup and that he was under arrest, at which point YO Davis handcuffed him. Adam then asked to talk to his mom, and ASA Brown told Adam that his mother never came to the station, and that his brother had come to the station briefly but then left. Detective Crescenzo added that he had spoken to Adam's mother and asked her to come pick Adam up, but she said that she had "had enough" and did not care what happened to Adam. The interrogation continued, with ASA Brown telling Adam he was in serious trouble, and he, Crescenzo, and other officers repeatedly hammering Adam with suggestive and guilt-presumptive questions. Adam felt sick to his stomach, was emotionally distraught and crying, and he was eventually left alone again.[141] When Detective Crescenzo returned, Adam asked to use the bathroom. Detective Crescenzo escorted him to the bathroom (where Adam was forced to urinate while handcuffed and with Detective Crescenzo watching

---

that Adam and Kasey did not get along. Mel also said that a few months ago Adam told some people he was going to throw a bomb through Kasey's window (CITY GRAY 000011-000022). At Adam's trial, Mel testified that he, Adam, and Mel's brother Erik all slept in the living room that night, and that when he was woken up by Adam's mother and brother arriving, Adam was asleep on the couch, exactly where he went to sleep earlier that evening. He testified that he never heard any noises that would indicate that Adam left and returned to the house while Mel was asleep. Mel described being at the station for several hours, and he said that he was interviewed 7 to 9 times outside the presence of his parents (Mel's mother confirmed in her deposition that she was never informed that Mel was taken to the police station; see Deposition of Lita Marie Gonzalez). Mel said that he was asked the same questions over and over, and that investigators attempted to get him to implicate Adam by telling him that if he loved his parents he would tell investigators what they wanted to hear or otherwise they would put him in jail for the rest of his life. This account was corroborated by Kasey Paris in a 2007 affidavit; she said that she overheard investigators threaten Mel that he would go to jail and his parents would lose another child (his sister had been killed previously) if he did not implicate Adam (Kasey Paris Affidavit). Mel acknowledged that he told investigators that Adam talked about throwing a bomb through Kasey's window, but he testified that he never believed Adam was serious about that. Moreover, he denied telling police that he had no idea whether Adam snuck out of the house that night (Melchor Gonzalez Trial Testimony). If in fact Mel did tell police that it was possible that Adam snuck out of the house in the middle of the night without him realizing it, the reliability of this statement should be considered in the context of the interview during which it was purportedly made. Mel described a prolonged accusatorial interaction in which he was personally threatened with punishment if he did not implicate or incriminate Adam in some way. This, coupled with the individual vulnerability of being a very young adolescent (see section of this report that discusses age as a risk factor), would have placed Mel at risk for providing a false witness statement (see Section IV of this report).

[139] The Indisputable Truth
[140] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview
[141] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

him), and when he was finished, Detective Crescenzo painfully squeezed Adam's shoulder. On the way back to the interrogation room, Detective Crescenzo stopped them at a xerox machine. He told Adam that the machine could detect lead on his hands, and that if Adam touched gasoline, it would show on his hands. However, if Adam was telling the truth, his hands would not show up on the paper. Adam responded by saying that he had pencil lead on his hands from drawing, and Detective Crescenzo assured him that the machine would only pick up gasoline lead. He uncuffed Adam, told him to place his hands under the hinged lid, and turned on the machine. He then held up the paper with the copy of Adam's hands, and declared that this proved that Adam had gasoline on his hands. Adam was then escorted back to the room.[142]

Adam next recalled being questioned alone by ASA Brown, who told Adam that he was a smart kid, that they knew he did it, and that he would feel a lot better if he confessed. He then asked if Adam was just trying to scare Kasey.[143] When Adam again denied having set the fire, ASA Brown angrily left the room. Detective Crescenzo entered and began questioning Adam, and according to Adam, Detective Crescenzo made a variety of explicit and implied threats if Adam did not confess (e.g., he was looking at the electric chair; telling him that denying that he did it was only making things worse) and explicit and implied promises of leniency if he did confess (e.g., if he confessed he would go to an institution where firebugs go; he would do a few years and get out in his twenties; that for Detective Crescenzo to help Adam, he had to cooperate; that if he said he did it, Detective Crescenzo would drop him off at school). Adam told Detective Crescenzo again that he did not set the fire; Adam said that Detective Crescenzo then said that he believed him, but that ASA Brown did not, and all that Adam had to do was to say that he did it. It was at that point that Adam said he decided to admit that he started the fire. Detective Crescenzo wanted details, so Adam said he used gasoline when asked what he used to set the fire. Detective Crescenzo then went to get ASA Brown so that Adam could tell him what he had just admitted to. According to Adam, what followed was continued interrogation in which ASA Brown helped create a detailed admission by asking leading and suggestive questions and demanding that Adam produce details.[144] Since Adam did not actually know any details, he said that he either guessed based on the suggestive questions he was being asked or he made up answers at random to satisfy his interrogators. When Adam said he had discarded the milk carton in an alley, Detective Crescenzo left for a period of time. When he returned, he told Adam that he found the container right where Adam said it was. Adam said this confused him since he knew he had not actually discarded a container, and he even momentarily wondered if he could have done it without realizing it.[145] Adam said he was tired and just wanted to go home.[146]

Adam said he was then moved into the smaller room on the other side of the one-way mirror, and ASA Brown made him go over the story again and again, each time pressing for

---

[142] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview

[143] The Indisputable Truth

[144] Adam said that at some point during this time frame YO Davis returned to the room, as well as some of the other officers (The Indisputable Truth).

[145] See footnote 125; Although ultimately Adam provided what he asserts to have been a compliant false confession (i.e., he knew at the time that he gave the confession that he was actually innocent, but he confessed for a perceived benefit), Adam's description of becoming momentarily confused after being confronted with what appeared to be evidence against him (i.e., the discovery of a milk jug supposedly in the vicinity where Adam described) and questioning the reliability of his own memory rings of the early stages of a path that can sometimes lead to an internalized false confession.

[146] The Indisputable Truth

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

more details.[147] Once ASA Brown was satisfied, Adam said the court reporter came in and the statement was taken. Only then was Adam provided with food for the first time (i.e., a meal from McDonalds). Once the statement had been transcribed, they reviewed the statement, ASA Brown asked Adam to sign and initial each page. Adam said that all of the corrections made on the statement were initiated by ASA Brown.[148] Afterwards, he was alone with ASA Brown, and Adam asked if he could smoke. When Adam pulled his cigarettes and lighter out, ASA Brown requested to see the lighter and asked Adam if it was the lighter Adam used to set the fire. Adam said no, and ASA Brown asked him what he did with the lighter he used to set the fire. Adam said that he made up a lie that he smashed the lighter into pieces and flushed it down the toilet at Mel's house. ASA Borwn asked him to handwrite that account at the end of the typed statement. YO Davis then escorted Adam downstairs, and Adam asked if he could call his mom to come pick him up. According to Adam, YO Davis pretended to call his mother and told Adam that since no one answered, Adam would have to spend the night at the Audi Home. YO Davis refused to let Adam call his mother himself.[149]

In all of the statements/accounts provided by Adam subsequent to the typed statement he signed while in police custody, Adam recanted his confession and steadfastly maintained his innocence.[150] He categorically denies setting the fire or having knowledge of who set the fire, and he maintained that he never left Mel's house between 10:00pm and 4:00am on the night in question. In a petition for clemency, Adam expressed that during his interrogations he experienced unrelenting mental and emotional abuse, and that the investigators were not interested in the truth. He said that he was repeatedly told he was lying when he declared his innocence, was denied access to his family, and that he believed investigators when they promised he would be able to go home to his family once he told them what they wanted to hear.[151] He felt "broken" and "overwhelmed," and could not take it anymore.[152] In short, Adam has always asserted that his confession was the product of a coercive interrogation that resulted in a false confession.[153]

## VI. Analysis of Interrogation and Confession

### A) Overview

Adam spent three years incarcerated in a juvenile facility before he was convicted in a 1996 jury trial. Twenty-one years after that, Adam's convictions were vacated following an independent investigation which led to the Cook County State's Attorney's Office to file a joint motion with Adam's defense team to vacate, enter an order of nolle prosequi, and order Adam released. In the joint motion, the State agreed that Adam had been convicted on the basis of

---

[147] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview; Deposition of Adam Gray (9/5/19)

[148] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview; Deposition of Adam Gray (1/15/20)

[149] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview

[150] The Indisputable Truth; Clemency Petition Version #1; Clemency Petition Version #2; State's Version of 3.25.13 Adam Gray Interview; State's Version of 10.21.13 Adam Gray Interview; Deposition of Adam Gray (9/5/19); Deposition of Adam Gray (1/15/20)

[151] Clemency Petition Version #2

[152] State's Version of 10.21.13 Adam Gray Interview

[153] The Indisputable Truth; Clemency Petition Version #1; Clemency Petition Version #2

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

unreliable testimony about the cause of the fire.[154] I was asked to undergo an analysis of this case with respect to the interrogation and resulting signed confession. The first part of this analysis will entail analyzing the extent to which known risk factors associated with false confessions were present in this case, including investigative bias or 'tunnel vision', individual vulnerabilities, and risk factors associated with the interrogation process itself. The second part will involve an analysis of the post-admission narrative provided by Adam Gray in his signed statement. In order to evaluate the likelihood that any given confession, admission, or statement is reliable, researchers analyze the extent to whether the details contained in the post-admission narrative are 1) consistent (or inconsistent) with the facts of the case as well as the completeness of the statement, 2) whether the post-admission narrative contained any non-public details about the crime[155] that were not potentially leaked to the interviewee,[156] and 3) whether the post-admission narrative contained details not known to police at the time the statement was taken but were later corroborated with independent evidence.[157]

### B) Presence of Known Risk Factors for False Confessions

    a. **Confirmation Bias or 'Tunnel Vision'.** 'Tunnel vision' or *confirmation bias* occurs when a person forms an initial opinion, and subsequently processes new information in a way that confirms his or her initial opinion. This occurs when information that is consistent with the initial opinion is given significant attention or weight, information that is inconsistent with that opinion is dismissed, ignored, or given little weight, and ambiguous information is interpreted in a way that supports the initial opinion. Tunnel vision is also related to the concept of *belief perseverance* – the phenomenon that people tend to have difficulty changing their beliefs despite being exposed to evidence that directly contradicts or refutes those beliefs.[158]

    Investigator tunnel vision is a well-established phenomenon in social science research, and the consequence of police and prosecutors honing in on a particular suspect, and ignoring or giving less weight to potentially exculpatory evidence, can be grave for an innocent suspect. In order to guard against the process of confirmation bias, investigators need to make a concerted effort to attend to information that may *not* confirm their hypothesis that the suspect actually committed the crime, rather than simply seek out and attend to confirming, inculpatory information.[159] Furthermore, investigators should actively adopt a *hypothesis-testing* frame-of-mind (e.g., Is my

---

[154] Joint Motion to Vacate

[155] Non-public details of the crime generally refer to details about the crime that are known to police at the time of the interrogation, but which the police intentionally withhold from the public and the suspect in order to test the reliability of a confession (Garrett, 2010).

[156] Reid and associates specifically train investigators to withhold certain evidence from the public and the suspect, and they stress that investigators must be careful not to reveal these details during the questioning process (Inbau et al., 2001, 2013).

[157] Inbau et al. (2001, 2013); This criterion is the gold-standard for assessing the reliability of a post-admission narrative. The classic example is when a suspect tells police where to find the yet undiscovered murder weapon and the police were able to locate the weapon.

[158] Burke (2006); Ross & Lepper (1980); Nickerson (1998); Trope & Liberman (1996)

[159] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); For an overview, see Trope & Liberman (1996).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

theory of the case actually correct? Is this person actually guilty?), as opposed to a *hypothesis-confirming* frame of mind (e.g., How can I prove this this person is the perpetrator? How can I make this piece of evidence fit in with my theory of the case?). One of the best ways to accomplish this is to make an active effort to generate *alternative explanations* for a given piece of evidence, information, or belief – in other words, investigators should routinely play devil's advocate.[160] For example, they should challenge themselves to generate alternate explanations for how a particular piece of evidence might be accounted for, who else might have committed the crime, and how they might prove that a particular suspect is innocent. The more they engage in this hypothesis-testing process (which includes ruling out alternative explanations), the less likely they will be to fall prey to confirmation bias.

There are numerous examples to suggest that investigator tunnel vision played a role in this case. It is clear from the record that both Fire Chief Gruszka and the Bomb and Arson investigators on scene quickly determined that the fire had been deliberately set.[161] In addition, Adam Gray became an immediate suspect in this case

---

[160] It is important for all investigators to do this in their own minds, but it can also be useful to ask another person (who is perhaps not as intimately involved in the investigation) to engage in this process as well, since it can be difficult, even with effort, to set aside our preexisting beliefs.

[161] It is beyond the scope of my expertise and this report to engage in an in-depth discussion of the relevant fire science that undermines the immediate on-scene conclusion made by investigators that the fire was set deliberately. However, three independent fire science experts are definitive in their conclusion that the assumptions that were used to make the arson determination were not evidence-based, and it was the debunking of those assumptions that largely contributed to Adam's eventual exoneration (John Lentini Affidavit; Gerald Hurst Affidavit; Denny Smith Report; Joint Motion to Vacate).

Of relevance, the 1992 publication of the National Fire Protection Association's (NFPA) 921 guidelines for fire and explosion investigators was a watershed moment in the advancement of arson investigation and fire science, and the NFPA 921 directly debunked the notion that the presence of alligatoring, shiny blistering, or charring can used to reliably determine whether an accelerant was used, and by extension, whether a fire was deliberately set (https://www.robsonforensic.com/articles/dispelling-myths-of-origin-cause-investigations-expert-article/; https://studylib.net/doc/18648668/national-fire-protection-association--nfpa-921--guide-for)). Recall that it was these characteristics that Bomb and Arson Detectives Jenkins, Rokosik and McInerney, and Fire Chief Gruszka, cited as a major contributing factor to their determination that a liquid accelerant was used and that the fire was arson. Mr. Smith and Dr. Hurst both confirmed that the appearance of charred wood, blistering, alligatoring, or shininess is not indicative of the use of an accelerant (Gerald Hurst Affidavit; Denny Smith Report). In addition, Fire Chief Gruszka based his determination that a liquid accelerant was used on the basis of his hydro-carbon detector alerting for the possible presence of hydro-carbons. However, Mr. Smith said in his report that a hydro-carbon detector should only be used to help determine where samples should be taken for analysis, but in order to confirm the use of a liquid accelerant, further analysis must be conducted. In short, the alerting by a hydro-carbon detector cannot be used to conclude an accelerant was used and therefore the fire was arson (Denny Smith Report). Both Mr. Smith and Dr. Hurst concluded that the investigators at the scene of the crime should have classified the cause of the fire as undetermined (Gerald Hurst Affidavit; Denny Smith Report).

Unreliable forensic science is another known contributing factor to wrongful convictions. Improper forensic science is a known contributing factor to wrongful convictions; it is estimated to have played a role in 24% of all exoneration cases documented by the National Registry of Exoneration (https://www.ncjrs.gov/pdffiles1/nij/250705.pdf), and approximately 45% of DNA exonerations (https://www.innocenceproject.org/overturning-wrongful-convictions-involving-flawed-forensics/).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

based on the interviews conducted at the scene of the crime. There is little in the case record to suggest that investigators ever fully considered or explored the possibility the fire was accidental[162] or that someone else may have started the fire, despite having several reasons to do so. First, Adam's alibi (that he was asleep at Mel's house from ~10:00pm to ~4:00am in the same room as Mel and Mel's brother Erik) was corroborated my multiple members of the Gonzalez family.[163] However, the corroboration of Adam's alibi did not appear to be given any significant weight by investigators.[164]

Second, there were at least two potential witnesses/ neighbors who were present at the scene of the fire but were never interviewed by investigators, despite potentially possessing information pertinent to the investigation. In a 2006 signed affidavit, Graciela Fernandez said that after she came outside, she saw a teenage boy wearing a shiny blue jacket walk into her yard. When she saw him again a short time later, the jacket was gone, and he was wearing a t-shirt. She thought the boy looked familiar from the neighborhood, but she was not sure who he was.[165] In her own signed affidavit, Hope Rogers indicated that when she was outside, she saw a boy jump the fence adjacent to the building. She stated that as he walked on Albany Avenue, he pulled off a dark-colored shirt and changed into another shirt and then used the dark-colored shirt to wipe his hands. Walking southbound on Albany, he stopped in a yard about three houses away from where Hope was standing and wiped his hands on the grass. She described the person she saw to be a male between 16 and 18 years old, skinny build, medium height and brownish hair. A few minutes later she saw the boy rolling around in the grass and sitting up to wipe his hands on the grass.[166] She assumed the boy was under the influence of drugs, and she was frightened by his behavior, so she walked in the opposite direction so as not to encounter him. She said she had seen the young man before hanging around with Kasey Paris, but also stated

---

[162] Gerald Hurst Affidavit; Denny Smith Report

[163] Mel Gonzalez, Rosemarie Gonzalez and Ms. Lita Gonzalez all testified at Adam's trial that during the evening and hours in question, they never heard anyone leave or enter their home. Moreover, they were confident they would have heard him because both the front and back doors made loud noises when opened. They also denied hearing any noises that sounded like the breaking of a lighter, the faucet running, or a toilet flushing (Melchor Gonzalez Trial Testimony; Lita Gonzalez Trial Testimony; Rosemarie Gonzalez Trial Testimony; State Investigative Report – Leta Gonzalez 10-28-13). Furthermore, Rosemarie testified that when Michael Gray called their home and she tried to wake Adam, he was so deep asleep that she could not rouse him (Rosemarie Gonzalez Trial Testimony).

[164] Not only does it appear that the corroboration of Adam's alibi by the Gonzalez family was dismissed, but if one assumes that Mel's description of his interview is accurate (*see supra* note 138), investigators belief that Adam was the suspect may have led to them to elicit a false statement from Mel (i.e., that he was not sure if Adam had snuck out of the house while the family slept).

[165] Graciela Fernandez Affidavit

[166] William Rogers, Hope's husband, was an off-duty City of Chicago firefighter who was first on scene. In an affidavit, he verified that his wife told him that she saw a young man acting strangely by changing clothes, rolling around in the grass, and wiping his hands in the grass. He also said that he knows from professional experience that when gasoline gets on your skin it feels cold, and it is very difficult to remove by wiping. He thought that the young man his wife saw might have been trying to wipe gasoline from his hands (Bill Rogers Affidavit).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

unequivocally that the young man was not Adam.[167] If the police had been privy to this information, this lead could have been thoroughly investigated (e.g., by interviewing others that Kasey associated with who met the general description provided by Hope[168] or via a search of the neighborhood for discarded clothing). However, we are left to wonder whether a potentially premature and virtually exclusive focus on Adam led to tunnel vision which manifested itself in the investigators failing to conduct as vigorous of an investigation as they should have (by for example interviewing any and all potential eyewitnesses).

Finally, it seems as investigators may have failed to give appropriate weight to information that was inconsistent to their theory that Adam was the perpetrator. For example, despite the fact that in her initial police interview Karrie Kelly never mentioned that she recognized Adam Gray as the person she saw running that night (even though Adam and Karrie knew one another prior to the night of the fire) or even that the person looked familiar to her, and then she later identified Adam from the lineup, it appears that this did not cause the investigators to question the reliability of her identification. Similarly, Brenda Thomas' initially described the man who bought gas from her as having blond hair, possibly combed back, and carrying what she definitively described as a gas can – and not a white bag or white plastic milk container. The fact that there was a mismatch between that Brenda Thomas' description and Adam's physical appearance, as well as inconsistencies between what Brenda Thomas described the alleged perpetrator carrying, what Karrie Kelly said he was carrying, and what Adam ultimately said he was carrying appears not to have been given substantial weight. Given that Adam's case proceeded to trial, we can surmise that not even learning that the fire debris and the milk container tested negative for gasoline,[169] making Adam's confession clearly inconsistent with the case facts, was enough to give police or prosecutors serious pause about their theory of the case.

  b. ***Individual Vulnerabilities.*** It is well-documented in the literature that certain characteristics make people more vulnerable to providing false confessions, due to in part to heightened suggestibility and lesser ability to cope with stress. These vulnerabilities include younger age, cognitive disabilities, and mental illness.[170] In

---

[167] Hope Rogers Affidavit

[168] In her deposition, Kasey indicated that she did not recall being asked any questions by investigators that did not involve Adam (Deposition of Kassandra Paris). A 2007 affidavit signed by Kasey suggests that investigators might have missed crucial leads by failing to ask Kasey about other possible suspects, as Kasey named several other boys in her affidavit who she had treated poorly and might have had reason to set the fire (e.g., Thomas Gawlinski, Thomas Seabolt, Mike Mazurek, Luis Lopez) (Kasey Paris Affidavit).

[169] Murray Shambee Trial Testimony; Gerald Hurst Affidavit; Denny Smith Report; John Lentini Affidavit; The milk jug also tested negative for fingerprints (Milk Jug Stipulation). This arguably could or should have served as a red flag for detectives since Adam never mentioned wearing gloves, and he told investigators he washed his hands (suggesting that his hands were bare when he allegedly handled the container).

[170] Drizin & Leo (2004); Garrett (2011); Gudjonsson (2003; 2018); Inbau et al. (2013); Kassin & Gudjonsson (2004); Kassin et al. (2010); Schatz (2018); There is also good reason to believe that these

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

this case, one of the most impactful individual vulnerabilities was present – youthful status.

**Age.** The younger a person is, the more at risk they are for providing a false confession or statement.[171] Juveniles are overrepresented in false confession cases. In Drizin and Leo's (2004) study of false confessors, 35% of false confessors were under the age of 18, and 55% of those juvenile false confessors were under the age of 15. Similarly, out of the 29% of DNA exonerations cases in which there was a false confession, 31% of those confessions were provided by juveniles.[172] When examining the first 2,400 exonerations documented by the National Registry of Exonerations since 1989, juveniles are 3.5 times more likely to provide a false confession than adults. Moreover, the younger the adolescent, the more likely they were to have provided a false confession.[173]

A wealth of self-report data also supports the notion that youth is a risk factor for false confessions in the interrogation room; younger people self-report providing false confessions and waiving their rights at a higher rate than older persons.[174] In a survey of nearly 25,000 European juveniles, 14% reported having falsely confessed to authorities.[175] Gudjonsson et al. (2016) found that in a sample of over 21,000 Icelandic youth, 14.7% reported having made a false confession, with younger adolescents (aged 14 to 16) nearly twice as likely to report having falsely confessed (20%) than 17 to 24 year olds (10.3%).[176] Finally, in a study of incarcerated youth in California, 17.1% of juveniles claimed to have made a false confession to authorities, and self-reported self-confessions were associated with longer interrogation duration (greater than two hours).[177] A number of studies have also found that younger juveniles are more likely to say they would falsely confess in response to hypothetical interrogation scenarios, with younger adolescents saying that they would falsely confess at a higher rate than older juveniles.[178] Finally, laboratory research supports the finding that juveniles are more likely to falsely confess than older persons. Redlich and Goodman (2003) found that youths were more likely to falsely confess than adults to crashing a

---

same vulnerabilities make one susceptible to providing false witness statements, especially if subjected to accusatorial interview tactics typically associated with suspect interviews.

[171] See Kassin et al. (2010) and Gudjonsson (2018) for a review of the relevant literature

[172] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[173] Out of all exonerees under the age of 18, 36% (76/211) provided a false confession, compared to 10% (216/2,189) of individuals aged 18 years or old. Fourteen and fifteen year olds were even more likely to have provided a false confession; 57% (24/42) of exonerees in this age range falsely confessed (https://www.law.umich.edu/special/exoneration/Documents/Age%20and%20Mental%20Status%20of%20Exonerated%20Defendants%20Who%20Falsely%20Confess%20Table.pdf).

[174] For example, see Gudjonsson, Sigurdsson, Asgeirsdottir & Sigfusdottir (2006); Gudjonssson, Sigurdsson & Sigfusdottir (2009a); Gudjonsson et al. (2016); Haney-Caron, Goldstein & Mesiarik (2018); Malloy, Shulman & Cauffman (2014); Viljoen, Klaver & Roesch (2005)

[175] Gudjonssson, Sigurdsson & Sigfusdottir (2009a)

[176] Gudjonsson et al. (2016)

[177] Malloy et al. (2014)

[178] For example, see Goldstein, Condie, Kalbeitzer, Osman & Geier (2003); Grisso et al. (2003); Haney-Caron et al. (2018)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

computer during a laboratory study, and younger children were more likely to confess than older children, particularly when confronted with false evidence of their guilt. In a more recent study, adolescents (ages 14 to 17) were more likely to falsely confess to cheating during an academic task than college students.[179]

Juveniles are also more likely to waive their Miranda rights than adults, which by definition means they are more likely to land up in an interrogation that puts them at greater risk for providing a false confession.[180] One of the reasons that juveniles may waive their rights at a higher rate than adults is poor comprehension of those rights. Numerous studies have documented the very stable finding that adolescents are less likely to understand their Miranda rights than adults.[181] Moreover, the younger the adolescent, the greater the deficit in comprehension, with children under the age of 15 demonstrating particularly poor understanding.[182] Even when adolescents seem to have a basic factual understanding of their rights (e.g., they understand that they literally have the right to have an attorney present), they tend to not understand what the practical implications of those rights are and how exercising those rights might serve a protective function (e.g., they do not understand what an attorney would actually do for them). They are also more likely to focus on the perceived short-term benefits of waiving their rights (e.g., that they will tell their story and be allowed to go home) as opposed to the possible long-term consequences of doing so (e.g., providing an incriminating statement). The younger the adolescent, the more pronounced these effects.[183]

Although our legal system generally considers an 18 year old a legal adult, from a scientific perspective, there is ample evidence that even individuals in their late teens and early twenties are not the biological, psychological, or emotional equivalent of older adults. Brain development can help us understand why this is so; for example, the process by which different regions of the brain communicate and the parts of the brain (e.g., the prefrontal cortex) that control decision-making, impulse control, judgement, memory, and attention do not fully develop until the early twenties or beyond.[184] These biological realities can disadvantage adolescents within the interrogation room, and the younger a person is, the more vulnerable the person. Compared to older adults, younger people are more susceptible to suggestion, are more likely to acquiesce to pressure from authority, are more likely to engage in risk-prone behavior, and are more likely to prioritize short-term benefits over long-term consequences.[185] As such, particularly when subjected to an accusatorial interview, adolescents are more likely to provide false confessions/statements than adults, and younger adolescents are more likely to falsely confess than older adolescents. Unfortunately, research indicates that the majority of law enforcement officers are generally insensitive to developmental

[179] Pimental, Arndorfer & Malloy (2015)
[180] For example, see Viljoen et al. (2005)
[181] See Kassin et al. (2010) for a review of the literature
[182] Goldstein & Goldstein (2010)
[183] Zelle, Riggs Romaine & Goldstein (2014); See also Kassin et al. (2010)
[184] Johnson, Blum & Giedd (2009)
[185] See Woody & Forest (2020) and Kassin et al. (2010) for reviews of the relevant literature

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

maturity issues, and adolescents are routinely subjected to the same types of interrogation techniques as adults.[186] At least on paper, Reid acknowledges that youths are more at risk for providing a false confession than adults; yet, at the same time they endorse the use of a "confrontational approach" that includes theming with children ages 10 and up.[187]

In this case, one of the biggest risk factors for a false confession was Adam's tender age. He had turned 14 just a month before he was taken into custody by police; he attended the 8th grade at Davis Elementary School.[188] Consistent with the literature on juvenile rights comprehension, Adam stated that even though he was advised of his rights multiple times (and he waived those rights), he did not truly understand the meaning and significance of those rights or the implications of waiving them.[189] The investigators in this case knew that special caution was warranted when interrogating juveniles, which is presumably why ASA Brown said he would not and did not question Adam without a Youth Officer or parent present.[190] YO Davis said in his deposition that his job was to protect a juvenile's rights (and be a stand in for a parent). According to him, this included making sure that juveniles were advised of their juvenile rights (i.e., that they could be tried as an adult) and that the investigators did not physically or psychologically intimidate the juvenile. However, it is does not appear that YO Davis took any proactive steps toward making sure that Adam understood his rights nor protected from psychologically coercive techniques. According to YO Davis, in his entire career, he never remembered having to interfere with or a put a stop to an interrogation, and he never once instructed a juvenile that s/he was not required to answer a question. YO Davis claimed that he would have spoken up if investigators were asking Adam questions over and over or if Adam was crying, and yet if you believe Adam's account, YO Davis failed to intervene when investigators used numerous highly accusatorial tactics which YO Davis himself acknowledged would be inappropriate with a juvenile (e.g., threatening Adam with the electric chair, repetitive questioning).[191] Taken together, Adam's status as a young adolescent would have greatly heightened his risk of providing a false confession.

---

[186] Cleary & Warner (2016); Feld (2006); Kostelnik & Reppucci (2009); Malloy et al. (2014); Meyer & Reppucci, 2007; Reppucci, Meyer & Kostelnik, 2010

[187] http://www.reid.com/pdfs/MarchApril2018InvTip.pdf; Inbau et al. (2003); In written documentation, Reid suggests caution with the presentation of false evidence, and other forms of trickery and deceit, for youthful suspects *with low social maturity or cognitive challenges*, leaving the door open for its use on adolescents investigators perceive not to fit into these vulnerable categories (http://www.reid.com/pdfs/MarchApril2018InvTip.pdf, pg. 19). When I personally completed the Reid course, my instructor Mr. Michael Masokas (who happened to be the interrogator who years prior elicited a false confession from 16-year-old Juan Rivera) made no mention of treating juveniles different than adults. When I found an opportunity to ask whether the technique should be altered for juveniles, Mr. Masokas responded by suggesting that the two things investigators should avoid with youthful subjects was prolonged interrogation and the presentation of false evidence (both of which were used with Adam).

[188] Deposition of Adam Gray (9/5/19); Deposition of Gertraud Gray

[189] Deposition of Adam Gray (9/5/19); The Indisputable Truth

[190] Deposition of James Brown

[191] Deposition of Percy Davis

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

c. *Situational Risk Factors.* Situational risk factors are factors associated with the interrogation/interview itself that increase the likelihood of a false confession or false statement. A number of known situational risk factors were present in Adam's interrogation.

**Prolonged Custody, Isolation, and Interrogation.** Most police interrogations last between 30 minutes and 2 hours,[192] with law enforcement officers in the U.S. citing the mean interrogation length as 1.6 hours.[193] Law enforcement manuals, including the Reid manual, caution against prolonged interrogation, particularly in any cases involving physical coercion, citing it as a risk factor for coerced and/or false confessions.[194] At least one Reid-trained former investigator considers any interrogation lasting over 6 hours de facto coercive.[195] Lengthy, prolonged detention and interrogation is commonplace in false confession cases, and therefore it is a known risk factor for false confessions.[196] Prolonged detention and questioning is usually accompanied by isolation of the interviewee from social support and contact with the outside world (e.g., friends, family members). It is standard practice in the U.S. to interrogate suspects in a small, barely furnished room, with nothing adorning the walls, and with minimal noise coming from the outside.[197] This environment helps heighten a person's sense of isolation and anxiety. Prolonged incommunicado custody and isolation deprives people of their fundamental needs for affiliation and social support,[198] which are particularly critical in times of stress, (such as during a prolonged accusatorial interview). Cumulatively, as time elapses, a person's need and desire to escape the aversive situation intensifies, and many individuals will give in to the short-term benefit of escaping the immediate situation by cooperating with investigators.[199] There is every reason to believe that the effects of prolonged custody, isolation, and interrogation would be more pronounced with juveniles than adults. In one study, juveniles were more likely to report having falsely confessed when their interrogations exceeded 2 hours as compared to shorter interrogations.[200]

Adam experienced ~8 hours of custody, isolation, and interrogation before signing the typed confession statement,[201] which would have placed him well

---

[192] Baldwin (1993); Irving (1980); Leo (1996b); Wald et al. (1967)
[193] Kassin et al. (2007)
[194] Inbau et al. (2001, 2013)
[195] Blair (2005)
[196] Drizin & Leo (2004)
[197] Inbau et al. (2001, 2013); The *Reid* manual explicitly recommends that investigators to create this type of physical environment.
[198] Baumeister & Leary (1996)
[199] Leo (2004); Leo (2008); Woody & Forest (2020)
[200] Malloy et al. (2014)
[201] Adam taken into custody at between 5:00 and 5:30am (Michael Gray Trial Testimony; Clemency Petition Version #2), and the confession was signed at 1:30pm (Adam Gray's Original Court-Reported Statement).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

within the danger zone of providing a false confession based on time alone. However, it is important to keep in mind that when factoring in the extent to which prolonged custody and detention increases the likelihood of procuring a false confession or statement, one needs to consider not only the sheer length of the custody and questioning, but also the conditions under which the person was held. As detailed elsewhere in this report, Adam described feeling physically ill, cold, being handcuffed for at least some portion of time, being given nothing to eat until after the court-reported statement was taken, and being subjected to highly accusatorial interrogation techniques. Moreover, 14 year old Adam was deprived of social support; Adam said that he asked to call his mother and brother, and he was not permitted to do so[202] - this is especially egregious given that Adam's family say they were present at the station while Adam was being interrogated and actively sought access to him.[203] Even more disturbingly, Adam said that he was told that his brother Michael had come to the station briefly, but left, and that his mother refused to come down to the station to pick Adam up because she had 'had enough' and did not care what happened to him.[204] Telling a vulnerable juvenile that his family had essentially abandoned him would have very likely exacerbated the effects of social isolation in the interrogative context, thereby intensifying Adam's desire to escape the aversive interrogation situation. Coupled with his prolonged detention and questioning, these conditions likely compounded the risk of Adam providing a false confession.

**Sleep deprivation.** Sleep deprivation is a known risk factor for false confessions. Research has shown in a variety of contexts that being deprived of sleep depletes

---

[202] The Indisputable Truth; State's Version of 10.21.13 Adam Gray Interview; ASA Brown and various detectives dispute that Adam asked to speak to or call his family (11.7.95 MTS Transcript Date from PD Subpoena Production; James Brown Trial Testimony; Percy Davis Deposition February 7, 2019; Ernest Rokosik Motion to Suppress Testimony).

[203] Michael Gray stated that when Adam was taken into custody, he was told by detectives that they should be done questioning Adam in a couple of hours. Consequently, Michael went to the station at approximately 7:30am with the intention of picking Adam up (Michael Gray Motion to Suppress Testimony). Throughout the morning, he repeatedly asked to see Adam (he estimated he asked between 8 and 10 times), but was repeatedly told that the investigators were not done with him yet. At one point early on, Michael said he spoke to ASA Brown, who referred him to Detective Crescenzo. Detective Crescenzo allowed him to view Adam through a one-way mirror, but refused to let Michael go into the room or communicate with Adam. At approximately 9:30am, Adam's mother and sister Lisa also came down to Area 1 and also spent hours asking to see and speak to Adam; they say that they too were denied access to him. Adam's other older brother David (who was stationed in California) called the station and tried to get information about Adam, as did a family lawyer, Mr. John Klunk. Sometime after noon, the family was informed that Adam was no longer at the station (Michael Gray Motion to Suppress Testimony; Michael Gray Trial Testimony; Gertraud Gray Motion to Suppress Testimony; Gertraud Gray Trial Testimony; Deposition of Michael Gray; Deposition of David Gray; Deposition of Gertraud Gray). ASA Brown and Detective Crescenzo denied interacting with any of Adam's family members and claimed they were unaware of their presence at Area 1 (Nicholas Crescenzo Motion to Suppress Testimony; Nicolas Crescenzo Motion to Suppress Rebuttal Testimony; James Brown Rebuttal Motion to Suppress Stipulation; Deposition of James Brown).

[204] The Indisputable Truth

a person's cognitive resources to the point that people become error-prone, decision-making abilities become impaired, suggestibility to outside influence is heightened, and the ability to maintain focus and attention suffers.[205] In the interrogation/interview context, sleep deprivation has long been considered a powerful yet coercive technique (and historically a common tactic reported by victims of torture),[206] and it has been demonstrated in the laboratory to be a risk factor for false confessions.[207]

Sleep deprivation was likely a factor in Adam's case. Adam said he want to sleep at Mel's house the night before at 10:00pm and was awakened around 4:00am. He said he briefly dozed off at Michael's home before being awakened by police around 5:30am. Adam described being tired during the interrogation and dozing off several times between interrogation sessions.[208] The fatigue Adam reported experiencing likely depleted his emotional and cognitive resources to the point that it would have reduced his ability to continue maintaining his innocence, thereby making him more susceptible to external pressure to make a false statement.

**<u>Multiple Interrogators</u>.** According to the official police record, the investigators involved in questioning Adam consisted primarily of ASA Brown, Detective Crescenzo, YO Davis, and Detective Porchado.[209] However, Adam described many more investigators participating in the interrogation; he estimated that in most interrogation sessions there were 8 to 10 people in the room. In addition to ASA Brown, Detectives Crescenzo and Porchado, and YO Davis, Adam recalls Detectives Rokosik and McInerney being present, as well as other officers he did not recognize and could not identify by name. According to Adam, these officers were not simply bystanders. He said questions were being asked of him by multiple detectives, and not just the four reflected in the official record.[210]

The use of multiple interrogators over time can be problematic in an interrogation room. According to Reid, "duress may be alleged if a tag-team approach is used during an interrogation, where one investigator questions the suspect for hours and is then relieved by a second 'fresh' investigator,"[211] thereby acknowledging that interrogation by multiple interrogators over a lengthy period of time is a form of coercion. A fatigued suspect depleted of emotional and cognitive resources, faced with external pressure from multiple investigators, is at marked disadvantage in his or her ability to maintain his or her innocence over time - and is therefore at a heightened risk for providing a false confession.

---

[205] Blagrove (1996); Harrison & Horne (2000); Pilcher & Huffcut (1996)
[206] Suedfeld (1990)
[207] Frenda, Berkowitz, Loftus & Fenn (2016)
[208] Deposition of Adam Gray (9/5/19); The Indisputable Truth
[209] Report dated March 28 1993 (CITY GRAY 000011-00022); Deposition of James Brown; Deposition of Nicholas Crescenzo; Deposition of Percy Davis; James Brown Trial Testimony; Nicholas Crescenzo Trial Testimony
[210] The Indisputable Truth; Deposition of Adam Gray (9/5/19)
[211] Inbau et al. (2001, pgs. 422-423).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

**Interrogation Tactics.** In addition to the situational risk factors addressed above, a number of interrogation tactics/approaches can increase the likelihood of false confessions. Unfortunately, neither the detectives nor ASA Brown chose to electronically record any of the interrogation sessions, nor did anyone choose to take detailed contemporaneous notes. As such, there is no objective and comprehensive record of the hours of questioning and persuasion techniques that ultimately led to Adam's confession. However, based on Adam's description of what occurred, the investigators involved in questioning Adam seemed to utilize a classic guilt-presumptive and accusatorial approach. More specifically, it appears that Adam was subjected to highly accusatorial interrogation sessions rife with poor questioning techniques during which investigators asserted confidence in their belief that Adam was guilty, refused to believe denials to the contrary, and led Adam to believe that it was in his best interest to provide an inculpatory confession.

*Guilt-presumptive approach: Direct positive confrontation, shutting down denials, and poor questioning techniques.* One of the hallmark features of a classic accusatorial approach is the use of direct positive confrontation, where an investigator directly accuses a person of being guilty with a strong degree of certainty, is a common component of modern-day interrogation. It serves to ramp up the person's anxiety level, and coupled with the ignoring or shutting down of repeated assertions of innocence, it communicates the message that there is no point in trying to maintain one's innocence. For guilty persons, the hope is that they will see the futility in continuing to lie to the investigators. For innocent persons, however, it creates feelings of hopelessness and the feeling that protestations of their *actual* innocence are futile.[212] It also is designed to make these individuals believe that the *only* viable path to escape is to provide an inculpatory statement; in other words, that confessing or false incriminating someone else is their only way out of the situation they find themselves in. Adam said he was repeatedly directly accused of setting the fire (e.g., "we know you did it"), and when he denied being involved or knowing anything about the fire, those denials were repeatedly shut down with accusations of lying. Adam said that virtually every time he would say he did not set the fire, ASA Brown would respond with "Yes, you did," in an aggressive and confrontational manner.[213] In a petition for clemency, Adam wrote that he was told "hundreds of times" that he was lying, and that he believed investigators were not interested in the truth.[214]

Another feature common to accusatorial interrogations is poor questioning techniques, with a particular overreliance on suggestive and leading questions. The research literature on questioning techniques (for witnesses, victims, and suspects alike) is clear that responses to open-ended questions are more likely to be accurate (e.g., "What happened?") than specific questions ("Did you light the fire?"). Moreover, leading/suggestive questions (i.e., those that communicate

---

[212] Inbau et al. (2001, 2013)
[213] The Indisputable Truth; Deposition of Adam Gray (1/15/20); State's Version of 10.21.13 Adam Gray Interview
[214] Clemency Petition Version #2

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

what the answer might be to the person who is being asked the question), forced-choice questions (e.g., yes-no questions; asking a person to choose between a few provided options), and repetitive questioning[215] increase the risk of eliciting inaccurate details and reports, particularly from vulnerable individuals.[216] Adam's description of his interrogation suggests these poor questioning techniques were omnipresent. Adam provides numerous examples of repetitive, leading/suggestive questions (e.g., "So what time did you go out again?"; "When did you sneak out?"; "What time did you go to Kasey's?"; "So you admit that you saw her and threatened her?"; "Were you going to stab her?"; "Where did you buy the gasoline?"; "Why did you burn down Kasey's house?"; "Did you sneak out after Mel went to sleep?";  "How do you know Mel didn't light the fire?" "Did get it [gasoline] at the gas station?"; "You got it [milk container] from somewhere, did you get it out of the trash?"; "Did you see anyone?"; "Did you go up to the second floor?").[217] One of the primary concerns surrounding the use of leading/suggestive questions is that (either intentionally or unwittingly) investigators may communicate details about the crime to the suspect, details that will likely be consistent with the investigator's theory of the crime and the facts known to investigators at the time of the interrogation. In Adam's case, the line of suggestive questioning the investigators used clearly outlined the story he would eventually tell – that he snuck out of Mel's house after Mel fell asleep, got gasoline from a gas station, and used gasoline to light the fire. The use of these problematic techniques muddies the waters for later fact-finders, who cannot be sure whether Adam's confession contained those details because he possessed actual guilty knowledge or because those details were suggested to him via the questioning process.[218]

*Presentation of false evidence/trickery and deception.* The presentation of false evidence of guilt (a form of trickery and deception) is also a known, demonstrable risk factor for false confessions. Analyses of documented false confession cases in the U.S. indicate that the presentation of false evidence occurred in a large majority of these cases and contributed to the wrongful convictions of innocent suspects.[219] In addition, a wealth of research demonstrates that people are susceptible and vulnerable to false feedback in terms of their emotional state, judgment, memory, and decision-making processes.[220] Finally,

---

[215] Repetitive questioning not only causes mental fatigue and frustration, but it communicates to the person being questioned that the answer they gave previously was incorrect or unsatisfactory.

[216] Mitchell & Johnson, 2000; Toglia, Read, Ross & Lindsay, 2006; The danger of some of these techniques was acknowledged by at least one person involved in this case. During his deposition, YO Davis indicated that he would consider it to be a form of intimidation to repeatedly asking a juvenile the same question over and over, and he agreed that you should ask non-leading questions and avoid leaking details to a suspect (Deposition of Percy Davis).

[217] The Indisputable Truth

[218] See "Overview of Reliability Analysis" section of report re: contamination.

[219] Drizin & Leo (2004); Leo & Ofshe (1998)

[220] Gudjonsson & Sigurdsson (1999); Kassin et al. (2007)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

laboratory studies of interrogation and confessions indicate that the presentation of false evidence increases the likelihood of false confession.[221]

According to Adam's account, investigators confronted Adam with at least two different pieces of false evidence.[222] First, according to Adam, Detective Crescenzo told him that a little old lady saw him commit the crime; there was no witness in this case that fits that description.[223] Second, Adam's description of Detective Crescenzo pretending that the xerox machine could detect lead from gasoline on Adam's hands would have served as a powerful and elaborate form of trickery and deception, culminating with the image of his photocopied hand being presented as (false) 'scientific' proof of Adam's guilt.[224] These instances likely altered Adam's perceptions of the evidence against him, and as such, would have increased the likelihood of Adam providing a false confession if he saw no other viable way out of the situation.

*Threats and promises (explicit and implied).* Confessions elicited as a result of explicit threats of negative consequences (e.g., having your children taken away)[225] or more severe punishment (e.g., receiving the death penalty instead of life in prison) if one does not confess or via explicit promises of some benefit or leniency (e.g., being allowed to go home; getting a lighter sentence) are generally considered inherently coercive (i.e., not voluntary), and therefore should not be admitted at trial. That is not only because of their coercive nature, but also because coerced confessions are more likely to be unreliable (i.e., false).[226] Implied threats and promises, which often come in the form of minimization (e.g., downplaying the role that the individual played in the crime, suggesting that the crime wasn't premeditated, minimizing the seriousness of the offense, suggesting the offense is common, implied leniency in the form of suggesting the person will be 'better off' if they confess or suggesting that this is the person's opportunity to "help himself out" or "tell his side of the story") and maximization techniques (e.g., exaggerating the seriousness of the offense, exaggerating the consequences of the offense or type of charge that might be used) have the same functional

---

[221] Kassin & Kiechel (1996); Horselenberg, Merckelbach, & Josephs (2003); Horselenberg et al. (2006); Perillo & Kassin (2011); Redlich & Goodman (2003); Russano et al. (2005); Meyer & Youngjohn (1991); Nash & Wade (2009)

[222] A possible third presentation of false evidence came in the form of investigators implying that Mel had failed to support Adam's alibi and had suggested that Adam might have snuck out of the house. Mel denies ever telling investigators this (Melchor Gonzalez Trial Testimony). In his testimony at the 1993 Juvenile Transfer Hearing, Detective Crescenzo suggested that they blatantly lied to Adam. Detective Crescenzo testified that during the ~11:00am interrogation session, he and ASA Brown told Adam that Mel said that Adam was not at his house the night before (Full Juvenile Transfer Hearing Transcript), which would constitute a clear presentation of false evidence. The impact of being told this likely exacerbated Adam's feelings of hopelessness and despair and the mounting sense that there was no way out of the situation other than to confess.

[223] The Indisputable Truth; Deposition of Adam Gray (9/5/19); State's Version of 3.25.13 Adam Gray Interview

[224] The Indisputable Truth; Deposition of Adam Gray (9/5/19)

[225] Lynumn v. Illinois (1963)

[226] Brown v. Mississippi (1936); Leo (2004); Horgan et al. (2012); Sheridan (2011)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

effect.[227] Research demonstrates that certain minimization and maximization techniques (and associated themes) *imply* leniency in exchange for confessing and *imply* harsher punishment if the person continues to deny; in essence, they are the functional equivalent of direct threats and direct promises in the mind of the person being subjected to these techniques. Moreover, research demonstrates that techniques that communicate leniency in exchange for a statement and harsher punishment in light of continued denial, whether that communication is explicit or implied, increase the risk of false confessions.[228]

Adam reported the use of threats and promises, both explicit and implied, although the line between an explicit and implied threat/promise is often blurry. Sometimes the threats were quite clear; for example, Adam stated that Detective Crescenzo said that Adam was facing the electric chair if he did not confess, and that they way the system handles murderers was to "lock them up and throw away the key."[229] Adam said another detective threatened him with going to "juvie" if he did not confess, and someone suggested that he did not want to "end up like [his] dad" (who was incarcerated for murder).[230]

Other times the threats were somewhat less explicit or came in the form of maximization techniques, and yet via pragmatic implication, are likely to have had the same psychological effect as direct threats. For instance, Adam said ASA Brown told him that he was in "serious trouble" and that Adam needed to start talking to them and taking the situation seriously. Another time Adam said that Detective Crescenzo said that Adam repeatedly asserting his innocence was only making things worse.[231] Other examples of maximization described by Adam include ASA Brown expressing anger and frustration. For example, Adam described ASA Brown twice slamming a hanger on the table where Adam was resting his head. He said that ASA Brown at various times was confrontational and looked and sounded angry; for example, Adam said ASA Brown would invade Adam's personal space by getting inches from his face and yelling at him.[232] These sorts of scare tactics serve to heighten a subject's anxiety and convince them of the gravity of their situation – and the futility of maintaining their innocence.

Likewise, there is evidence that investigators made both explicit and implicit promises of benefits and leniency in exchange for Adam's confession. Adam said that ASA Brown told him multiple times that things would "go a whole lot easier" if Adam told them what happened (implied leniency in exchange for confession). According to Adam, Detective Crescenzo was more direct, telling Adam that if he confessed, he would be sent to an institution for "firebugs like [him] learn to live" and that he would serve a few years and be out in his twenties (explicit offer of leniency). He also told Adam that in order for Detective Crescenzo to "help him," Adam needed to cooperate (implied leniency). Later in

---

[227] Leo (2004); Sheridan (2011)
[228] Horgan et al. (2012); Klaver et al. (2008); Russano et al. (2005); Narchet, Meissner & Russano (2011)
[229] The Indisputable Truth; State's Version of 3.25.13 Adam Gray Interview
[230] The Indisputable Truth
[231] The Indisputable Truth
[232] The Indisputable Truth; Deposition of Adam Gray (9/5/19)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

the interrogation, Adam said Detective Crescenzo promised to personally drop Adam off at school if he confessed (explicit promise of a benefit).[233] Adam's description of his interrogation also includes numerous examples of the use of a minimization theme that manipulates a suspect's perceptions of the consequences of confessing by implying leniency in exchange for a confession. Specifically, more than once ASA Brown (and at least one other person) downplayed the seriousness of Adam's alleged actions by providing a face-saving excuse in the form of suggesting that Adam only wanted to scare Kasey, and that the crime was an accident.[234]

       Compliant false confessions and statements are generally provided for some sort of instrumental gain or benefit. That gain or benefit can come in the form of wanting or needing to escape an aversive situation (e.g., prolonged custody and interrogation that involves multiple interrogators, sleep deprivation, and external pressure) or the belief that you will receive some a reward or benefit (e.g., not being charged, being charged with a lesser offense, receiving a lighter sentence). Having been subjected to highly accusatorial interrogations, Adam would have been very likely to provide a statement for the instrumental benefit of escaping the interrogation situation he found himself in, and because he came to believe he would be allowed to go school and back to his family if he cooperated. Communicating to an innocent person that the quickest way to end an aversive interrogation and avoid harsher punishment is to cooperate with law enforcement and confess significantly increases the risk of a false confession.[235]

       In sum, known risk factors for false confessions were present in this case. Investigators quickly zeroed in on Adam as a suspect based on the Paris family's statements at the scene. Armed with a potentially faulty assumption that the fire was deliberately set, and that Adam was the perpetrator, tunnel vision likely clouded investigator's perceptions and led them to conduct highly accusatorial, coercive interrogation sessions with Adam. Adam's tender age represented a major dispositional risk factor that made him more vulnerable to police coercion and providing a false confession. In addition, numerous situational risk factors were present, including prolonged isolation, detention, and interrogation, sleep deprivation, multiple interrogators, and the use of problematic interrogation techniques (e.g., suggestive questioning, threats and promises). It is important to keep in mind that each risk factor does not exist in a vacuum; rather, the effects of the risk factors are cumulative and perhaps multiplicative, and they must be considered as a whole. When considering the totality of the circumstances, it is my opinion to a reasonable degree of scientific certainty in the field of psychology that investigators created a perfect storm of conditions to generate a false confession from a very vulnerable Adam Gray. The presence of these conditions individually and taken together as a whole, render Adam's confession at great risk of being unreliable.

---

[233] The Indisputable Truth; Deposition of Adam Gray (9/5/19)
[234] The Indisputable Truth; Suggesting that a crime was an accident is designed to capitalize on the hope that suspects will assume that a lack of intent will translate to less serious punishment.
[235] Horgan et al. (2012); Kassin et al. (2010); Kassin & McNall (1991); Russano et al. (2005)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*C) Analysis of the Post-Admission Narratives*

a. ***Overview of Reliability Analysis.*** One would hope that if a false confession is elicited from a suspect, various legal decision-makers examining the veracity and reliability of the statement (i.e., prosecutors, judges, jurors) would be able to recognize it as such and prevent that false confession from leading to a wrongful conviction. Unfortunately, research indicates that people cannot reliably distinguish between true and false confessions, including juvenile confessions, just by observing, reading, or viewing the statement.[236] Why might that be? In addition to our generally dismal performance at detecting deception using non-science-based cues, the reason why it is so difficult to recognize a false confession when we see one is because false confessions typically *look* and *feel* like true confessions. That is, they typically consist of post-admission narratives that are chock full of specific details that mirror the type of detail provided in true confessions. In one content analysis of proven false confession cases, 100% of the false confession cases included details about the time and place of the crime, visual details about the crime, and details about the victim's behavior. A large majority contained details about what the victim allegedly said and what the victim looked like, as well as reflections on what the suspect was thinking and the motive for the crime. Approximately 60% contained references to minimization themes, such as blaming the victim for provoking the suspect's behavior.[237] Not surprisingly, detailed false confessions are compelling to jurors and other legal decision-makers (precisely because they contain the type of detail we would expect from true confessions),[238] and most false confessors who go to trial are convicted.[239]

Therefore, unfortunately, we cannot simply read or listen to a confession and make a judgment call about its veracity or reliability; instead we must engage in a systematic, in-depth analysis when considering its likely reliability.[240] When conducting an analysis of the likely reliability of a post-admission narrative (i.e., the details provided by the suspect beyond an admission that the person was involved), there are three key conceptually overlapping questions to consider: 1) to what extent is the post-admission narrative consistent with, or inconsistent with, the objective evidence/facts of the case, and to what extent is that narrative complete?; 2) did the post-admission narrative contain non-public details (i.e., details that were withheld from the public by the police) that only the true perpetrator would know, *but which*

---

[236] Aamodt & Custer (2006); Granhag & Stromwall (2004); Honts, Kassin & Craig (2014); Kassin et al. (2005); Memon et al. (2003); Vrij (2008); Much of the research that is germane to people's poor performance at distinguishing between true and false confessions is specific to viewing confession statements – not the entire interrogation process leading up to the confession statement, and it does not concern an interrogators' own observations that evidence is unreliable based upon what they know about the case and interrogations they have conducted.

[237] Appleby et al. (2012)

[238] Appleby et al. (2012); also see Kassin (2012)

[239] Drizin & Leo (2004)

[240] Even with this process, there is no way to know with 100% certainty whether a statement is true or false without other independent evidence that clearly exonerates or implicates the suspect. There is simply no "crystal-ball" method of merely examining a statement and determining its veracity.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*were not or could not have been unintentionally or intentionally leaked by investigators?*; and 3) did the post-admission narrative lead to independent corroborating evidence (i.e., did the person provide details not known to the police at the time of the confession but that were later corroborated)? The more consistent and complete the post-admission narrative, the more non-public details provided (that could not be or were not the product of contamination), and the more independent corroborating evidence the statement led to, the greater the likelihood that the statement is reliable.

One thing to keep in mind is that false confessions can trigger a process that leads to an **illusion of corroboration**. This is because once a false confession is taken, it has the power to influence and corrupt other evidence. This phenomenon leads to *corroboration inflation*, which refers to "a tendency for confessions to produce an illusion of support from other evidence."[241] Research demonstrates that knowledge that a suspect has confessed can shape both lay witnesses' memories for the crime/perpetrator as well as the forensic examiners' evaluations of trace evidence and polygraph examiners' interpretation of a suspect's veracity.[242] In one analysis, the vast majority (78%) of DNA exoneration cases involving false confessions contained other errors that contributed to the wrongful conviction (e.g., invalid forensic science, mistaken eyewitness identification). In 65% of the cases that contained multiple errors, the false confession **preceded** the collection of the other evidence (allowing for the confession to corrupt the other evidence and provide an illusion of corroboration).[243] This domino effect can feed a the dangerous cycle of confirmation bias, in which decision-makers push forward with a case by focusing on possibly tainted evidence that is consistent with their theory of the case, and downplaying the significance of information that is inconsistent with their theory.

For example, in this case, arguably the most potent evidence presented against Adam at trial beyond his own confession statement were the identifications made by Karrie Kelly and Brenda Thomas, as well as testimony from Kasey (and family and friends of Kasey) that Adam had threatened her life. Brenda Thomas' identification is an excellent illustration of potential corroboration inflation. Adam confessed prior to Brenda's identification from the photo array administered by Detective Crescenzo. Even under the best of circumstances, when the person who administers a lineup knows who the suspect is, the administrator can unintentionally cue the witness as to who to choose from the lineup[244] - and simply put, these were not the best of circumstances. Not only was the photo array too small (i.e., 4 lineup members),[245] but Brenda described the use of biased instructions that implied that the perpetrator was in the lineup, which we know increases the risk of false identifications.[246] Even more disturbingly, Brenda stated that when she was unsure of who to pick, the detectives

---

[241] Kassin (2012), p. 440

[242] Dror & Charlton (2006); Elaad, Ginton & Ben-Shakhar (1994); Hasel & Kassin (2009)

[243] Kassin, Bogart & Kerner (2012)

[244] *See supra* note 126.

[245] None of the case files provided to me include details about the fillers in this photo array, so I cannot address lineup construction issues other than to note that it is generally recommended that at least 5 fillers be used so as to spread out selection errors (see Wells et al., 2020).

[246] Karrie Kelly Trial Testimony

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

were "nasty" and told her to "keep looking," and in a sworn affidavit, she stated that she originally chose someone else before detectives called her non-verbally to select Adam.[247] If this is true, not only would it constitute an egregiously bad lineup identification task that should be considered non-probative on its face, but it should be recognized for the damage it did in terms of providing what appeared to be corroboration of Adam's confession. However, the alternative explanation to Adam being guilty is that investigators' belief that Adam was the perpetrator led them to conduct a highly suggestive interview and lineup which elicited "evidence" that confirmed their theory.[248]

The problems associated with Karrie Kelly's pre-confession identification are detailed elsewhere in this report.[249] However, another example of how a confession has the power to corrupt other evidence (and in this instance, specifically a witness' memory) is present in Karrie Kelly's testimony at trial. At the time of her initial report at the scene of the fire, Karrie was only able to provide a very general description: a White male, ~15 years old, carrying a white bag, and wearing black top, pants, and hat. Of critical note, she never told police that she recognized the person as someone she had seen before. However, by the time she testified at the criminal trial three years later, Karrie said that when she saw the teenager that night, she knew she knew him from the neighborhood but could not place his name. Moreover, she provided a critical detail at trial that she never provided in her original statement, namely that the person she saw had red, shoulder-length hair (a description consistent with Adam's appearance at that time). It is highly likely that finding out that Adam had confessed (as well as likely having the opportunity to speak with other people involved in the case over the years – recall that she was a family friend) served as post-event information that shaped and contaminated Karrie's memory over time in such a way that her testimony at trial appeared to strongly corroborate Adam's confession.[250]

I will now discuss each of the three facets of a reliability analysis, and then conduct a reliability analysis on the confession signed by Adam Gray.

---

[247] *See supra* note 126; Brenda Thomas Affidavit; State Investigative Report - Brenda Thomas 8-14-13
[248] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Nickerson (1998) and Trope & Liberman (1996)
[249] *See supra* note 109.
[250] The malleability of memory, particularly with respect to post-event feedback, is well documented (see Brown, Kouri & Hirst, 2012; Loftus, 2005; Schacter, 2001). A confession is a powerful form of post-event feedback; once witnesses and victims find out that a person has confessed, it is highly likely that their memories will be filtered through the lens of knowing the person has confessed. More specifically, their memories are likely to be reconstructed in such a way as to become more consistent with the narrative that that particular person is guilty. It is important to note that this can happen absent any awareness or malicious intent on the part of the witness/victim – and yet, the effect can be damaging. In this case, from a memory perspective, there is every reason to be concerned that other witness'(e.g., Donald Dugard) memories of Adam and the events leading up to the fire (e.g., Adam's interactions with Kasey) might have been shaped or influenced by the knowledge that he confessed to the crime.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

b. *Facets of a Reliability Analysis.*

<u>**Accuracy and Completeness of the Narrative.**</u> In general, the more consistent the details of a statement are with the known, objective facts/evidence in a case, and the more complete the statement is, the more likely it is that the statement is reliable. When examining consistency, one should consider the extent to which the subject provided accurate details, keeping in mind how accurate details are defined. For the purpose of a reliability analysis, accurate details are those that are corroborated by other objective evidence. Providing details that cannot be corroborated[251] or can only be corroborated by another source that may also be inaccurate[252] is not nearly as informative for the purpose of a reliability analysis as details that can be or has been verified via more objective or reliable evidence. It is also important to recognize that the presence of accurate details is not in and of itself a reliable indicator of veracity because the accurate details may have been learned via various sources, such as other witnesses, media reports, or from investigators during the questioning process (see "Dependent Corroboration: Presence of Non-Public Details" for an in-depth discussion of this issue). It is also informative to consider the extent to which the subject provided *inaccurate* or *inconsistent* details, as this weighs against the likely reliability of the statement. Finally, one should consider the *completeness* of the narrative. In other words, are there any noticeable gaps in the person's story? To what extent did they fail to account for known evidence/facts?

<u>***Dependent Corroboration: Presence of Non-Public Details.***</u> One of the features that make false confessions so compelling is that they often contain details about the crime that police have withheld from the public that only the true perpetrator would know (aka 'inside information').[253] If police and prosecutors withhold certain details from the public/media **as well as from the suspect during**

---

[251] Examples of details that cannot be verified are statements made by the victim or perpetrator prior to the victim's death (assuming they were the only ones present and there is no recording of the event), details of what the victim or perpetrator did (that cannot be verified by forensic evidence), or the thoughts, feelings, or motives of the perpetrator. Reid refers to these types of the details as *rational corroboration* (Inbau et al., 2013), an odd name choice given that they do not really corroborate anything because there is no way to objectively verify the accuracy of these details. Inbau et al. acknowledge that this type of "corroboration" is far weaker than dependent or independent corroboration. From a reliability analysis standpoint, my opinion is that these types of details are essentially useless.

[252] For example, in a situation that involves two alleged co-conspirators, if one of the suspects provides a statement containing details about what the victim said or did before he died, and those statements are corroborated by the other co-conspirator, that sort of corroboration has limited utility if you cannot eliminate the possibility that the second co-conspirator's statement is a product of contamination (i.e., from being exposed to the details that the first co-conspirator provided). It is tempting to view the statements made by the two alleged co-conspirators as corroborating one another and therefore an indicium of reliability. However, assuming there was no objective recording of the victim's words, if contamination occurred, then all that the statements do is provide an illusion of corroboration because there is no way to establish through objective, untainted evidence that the statements attributed to the victim are accurate.

[253] DeClue & Rogers (2015); Garrett (2010; 2015)

**interrogation** (and knowledge of those details cannot be attributed to another source), and a suspect is able to provide those details, this is a strong indicia of reliability; in other words, it is an indication that the person has guilty knowledge of the crime and is very likely the true perpetrator. Withholding certain details about the crime so that investigators can test the credibility of a subject is standard police practice,[254] and when 'inside information' is present in a person's statement or confession, it should rightfully increase an investigator's confidence that the statement being provided is true. When a person provides non-public details, that is generally referred to as *dependent corroboration*.[255] However, non-public details in a statement are only an indicium of reliability ***if the details were not intentionally or unintentionally leaked to the subject by investigators***. If non-public details about the crime are leaked to a suspect, researchers refer to this as *contamination*.[256] Contamination can be intentional (e.g., purposefully telling a suspect 'we found a black rope around the victim's neck so we know she was strangled') or unintentional (e.g., unwittingly asking leading or suggestive questions). The process of contamination (i.e., the communication of non-public details) can be overt (i.e., information communicated directly via words) or subtle (e.g., via intonation, tone, facial responses, and other non-verbal behavior while asking questions or reacting to suspect's response). Contamination can also occur in other ways such as overhearing other knowledgeable parties talking (e.g., victims, witnesses, investigators) or by being exposed to crime scene photos or other evidence.

The fundamental problem when contamination occurs is that non-public details that have been leaked that appear in a statement **are no longer probative**, in that there is no way to tell after the fact whether the person knew those details because s/he possessed actual guilty knowledge or because those details were leaked to him/her. Therefore, the presence of non-public details consistent with objective facts/evidence are only probative if we can eliminate contamination as a possible source of the information. When investigators choose to memorialize an interview/interrogation by recording it, we have an objective record of what actually occurred during the interaction, and we can determine with certainty whether investigators contaminated the statement. However, when investigators choose *not* to record, we cannot eliminate the possibility of contamination.

It is particularly problematic when non-public details appear in false confession cases precisely because the non-public details are often pointed to as strong indicators that the statement is true (in fact, investigators are trained to make sure to include non-public details in confession statements because it makes the statements more compelling to judges/juries).[257] Contamination is a known and recognized problem in proven false confession cases. An examination of 66 DNA exoneration cases between 1989 and 2014 involving false confessions indicates that contamination occurred in 94% of those cases. The non-public

---

[254] Inbau et al. (2013); YO Davis acknowledged in his deposition that when questioning a suspect, the investigator should avoid providing the suspect with non-public details (Deposition of Percy Davis).
[255] Inbau et al. (2013)
[256] See Leo (2008) and Leo & Drizin (2010) for an overview of the contamination error
[257] Inbau et al. (2001, 2013); Leo (2008)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

details in the confessions were used as evidence of the reliability of the suspects' confessions, and of those cases that went to trial, in all but one, police officers denied having revealed any of the non-public details to the suspects.[258] Although it is possible that investigators may deliberately lie at trial about not having revealed non-public details to subjects, it is also quite likely that investigators are often unaware of the fact that they leaked those non-public details (e.g., in the form of leading questions, reinforcement of certain responses, etc.). Therefore, investigators may truly believe they did not contaminate a person's statement or confession.

**Independent Corroboration: Details Unknown to Police but Later Corroborated.** The gold standard for establishing the reliability of a statement is to see if the statement led to *independent corroboration*. This occurs when a person provides details in his/her statement *that were not known to investigators at the time of the statement* and *those details could later be independently verified via objective evidence*. Examples of independent corroboration would be if a suspect told investigators where he disposed of the murder weapon or victim's possessions (and investigators then found those items where the suspect indicated they would be) or if the suspect provided information about a location where (unbeknownst to police) part of the crime occurred, and forensic investigators were able to recover forensic evidence that verified the details of what occurred in that location (e.g., bullets recovered, DNA from the victim, etc.).

c.  *Reliability Analysis of Adam Gray's Confession Statement*

**Accuracy and Completeness of the Confession Statement.** Adam's signed confession statement included the following details that were consistent with the **objective** evidence in the case: there was a fire at the Paris family home in the early morning hours of March 25, 1993, the fire started in the rear of the building, and the lock on the door to the rear porch was broken. Importantly, however, these details were either known to Adam prior to his interrogation (i.e., the occurrence and timing of the fire;[259] the broken lock[260]) or were known to the investigators at the time of Adam's interrogation (i.e., the fire started in the rear of the building; the occurrence and timing of the fire; the broken lock). The information that was known to police at the time of his interrogation therefore could have been leaked to Adam via the process of contamination. According to

---

[258] DeClue & Rogers (2015); Garrett (2010; 2015)
[259] When Michael and Gertraud Gray picked Adam up from Mel's house, Michael told Adam that there was a fire at Kasey's home (Michael Gray Trial Testimony; Deposition of Michael Gray; The Indisputable Truth)
[260] The lock on the back door of the Paris family home had been broken for a long time (Barbara Paris Trial Testimony; Kasey Paris Trial Testimony; Report dated March 28 1993 [CITY GRAY 000011-000022]). Because Adam and Kasey had been close friends in the past, and Adam frequently spent time at Kasey's home, he knew the back lock was broken from previous experience (The Indisputable Truth; Deposition of Adam Gray [9/5/19]; State's Version of 3.25.13 Adam Gray Interview).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Adam, investigators asked leading questions that likely suggested to Adam that the fire started in the rear of the building.[261]

Adam also provided a number of details that *seemed* consistent with other (albeit less objective) evidence, namely that he fled from the scene on foot holding a white item (which was consistent with Karrie Kelly's eyewitness report and identification), bought $2 worth of gasoline from the Clark gas station from a Black clerk,[262] climbed to the second floor rear landing of the Paris home, poured the gasoline down the stairs, and ignited the fire at the bottom of the stairs. These details were generally consistent with Brenda Thomas' identification and testimony from Fire Chief Gruszka and other detectives that the fire was deliberately set using an accelerant that had been poured down the stairs from the second floor and ignited at the base of the stairs. However, relying on these details as an indicium of reliability is problematic for two reasons: 1) contamination may have been responsible for the incorporation of some of these details into Adam's statement, and 2) it is not clear that the corroborating evidence is reliable. At the time of Adam's interrogation, police were aware of Karrie's eyewitness account, and they had reason to believe that gasoline was poured down the stairs from the second floor landing.[263] Given the highly suggestive questioning process Adam described, contamination cannot be eliminated as the mechanism for how these details came to appear in Adam's confession. As to the second concern, the questionable reliability of Karrie's and Brenda's identifications has been detailed elsewhere in this report; what seemed to be corroboration in the form of their identifications was highly likely to be just illusory corroboration. Similarly, the narrative elicited from Brenda Thomas (i.e., that a young man bought $2 worth of gas from her shortly before the fire) came *after* Adam's confession. It is certainly reasonable to ask the question of whether in their effort to corroborate Adam's statement investigators inadvertently contaminated Brenda's statement via the use of leading/suggestive questions, thereby rendering her statement unreliable. Finally, the methods that investigators used to make a determination of arson and that an accelerant was used (e.g., visual burn patterns, the hydrocarbon detector) lacked scientific support.[264]

In fact, what appeared to be a key consistency in Adam's account actually turned out to be a major *inconsistency* between the objective evidence and

---

[261] For example, ""Did you go up to the second floor?" (The Indisputable Truth)

[262] Adam said that he simply made up that he bought $2 worth of gas because he had $2 in his pocket at the time of his interrogation, and he felt pressured by ASA Brown to make up details about the crime (State's Version of 10.21.13 Adam Gray Interview; The Indisputable Truth; Deposition of Adam Gray [9/15/19]).

[263] The belief that gasoline was used as an accelerant and that it was poured down the stairs from the second floor landing was presumably based both on Fire Chief Gruszka's and the Bomb and Arson Detectives Jenkins, Rokosik and McInerney's visual inspection of the scene, as well as various individuals reporting having smelled gasoline (Report dated March 28 1993 [CITY GRAY 000011-000022]; Barbara Paris Trial Testimony; Deposition of Scoot Sondelski; Deposition of David McInerney). In addition, Barbara Paris stated that shortly before she smelled gasoline, she heard what she thought were footsteps going up and then down the rear stairs (Barbara Paris Trial Testimony).

[264] *See supra* note 161.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Adam's signed confession. Adam stated in his confession that he used gasoline to start the fire, which he bought at the Clark gas station from the Black female attendant, and he used a white plastic milk container to carry the gas.[265] A crushed milk container was subsequently retrieved from a nearby alley that was presumed to be the milk container Adam used. Despite the fact that investigators believed gasoline was used to start the fire, it turns out that that detail was objectively false. There is absolutely no evidence that gasoline was used to start the fire (both debris samples tested negative for the presence of gasoline), and the milk container recovered in the alley did not contain any trace of gasoline (nor was there any forensic evidence connecting it to the fire at the Paris home).[266]  The importance of the inclusion of the detail that Adam used gasoline in the confession cannot be understated. That is because it represents the inclusion of a *false fact* – a detail that investigators believed to be true at the time of the interview but later proved to be false. The fact that Adam included a detail that was *consistent* with ASA Brown's and the other investigators' mistaken belief,[267] but that was *inconsistent* with the objective evidence is not only a red flag that Adam's confession may be unreliable, but also that contamination likely occurred in this interrogation. In other words, odds are that Adam's confession contained this inaccurate detail because ASA Brown (or Detective Crescenzo or one of the other investigators) intentionally or unintentionally exposed Adam to this misinformation, and Adam in turn incorporated it into his statement in an effort to satisfy his interrogators.

Finally, Adam's confession was incomplete in that it did not account for him supposedly running directly by Karrie Kelly in the alley,[268] and it was generally lacking in other details that might have been informative. For example, Karrie Kelly described Adam as wearing all black that night (hat, top, and pants).

---

[265] Adam was familiar with and had frequented the Clark gas station numerous times, having bought cigarettes from there on multiple occasions. Of particular note, in the summer of 1992, Adam said that he and Mel bought gas from that station, which they transported in a plastic milk jug (they bought the gas because they were attempting to convert a lawn mower into a go kart). Adam said that he always saw Black women working as attendants at the gas station. According to Adam, these unrelated experiences served as the basis for the details that Adam made up in order to satisfy ASA Brown's demand for details (i.e., that he bought gas from a Black female attendant and used a milk jug to transport it) (Deposition of Adam Gray [9/15/19]; The Indisputable Truth).

[266] Murray Shambee Trial Testimony; Gerald Hurst Affidavit; Denny Smith Report; John Lentini Affidavit; At the time of the trial, it was known that no gasoline was found in the debris samples or the milk jug (which in and of itself made Adam's confession inconsistent with the known objective evidence in the case). It was also known that an HPD was found in one of the debris samples and the milk jug, leaving open the suggestion perhaps that the HPD in the debris sample came from the HPD in the milk jug. However, in sworn affidavits, experts Mr. Lentini and Dr. Hurst wrote that more recent scientific advances allowed them to determine that the HPD in the milk jug was different than the HPD in the debris sample – eliminating the possibility that milk jug was the source of the HPD found in the fire debris (John Lentini Affidavit; Gerald Hurst Affidavit).

[267] ASA Brown confirmed in his testimony that he was not aware of the milk container testing results at the time he interrogated Adam (James Brown Trial Testimony).

[268] When asked by investigators if Adam saw anyone that night, he made up that he saw a man walking a dog, but there was no mention of passing by a dog-less woman (The Indisputable Truth).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

However, the clothing that Adam was wearing when he was taken into custody did not match this description,[269] and Adam's confession did not include any details about what he was wearing when he purportedly set the fire or a suggestion that he changed out of or disposed of clothes that matched the description given by Karrie prior being taken in custody.

In sum, although Adam provided some details that were consistent with other evidence in the case, we cannot eliminate the possibility that that consistency was a function of Adam's pre-existing knowledge about the Paris home and the fire (based on his past experiences and/or being provided information by his brother and mother), contamination by investigators, and and/or corroboration inflation. In contrast, the inclusion of a significant false fact creates serious doubt about the veracity of Adam's statement. Finally, Adam's confession was generally lacking in details that might have provided leads that could corroborate his statement.

**Dependent Corroboration: Presence of Non-Public Details.** Exposure to details about the crime via the media was a non-issue at the time of Adam's confession since he was taken into custody only a couple of hours after the fire. However, Adam was exposed to some details about the fire via his interactions with his mother and brother (e.g., that there was a fire, the general timing of the fire), and so those details should be considered public and therefore not relevant when it comes to establishing whether Adam provided dependent corroboration. The only *arguably* non-public details that were known to police at the time of interrogation and that Adam included in his confession statement were that he fled the scene of the fire carrying something white in his hand, that he started the fire in the rear porch area of the home, and that he went up the rear stairs.[270] However, as discussed previously, *all* of these details were known to investigators at the time of Adam's interrogations and resulting confession, and therefore, the inclusion of these details in his statement become less informative because we cannot eliminate the possibility that contamination occurred, especially given the suggestive nature of the questioning that Adam described.

**Independent Corroboration: Details Unknown to Police but Later Corroborated.** The details that Adam provided that *appeared* to lead to independent corroborating evidence were that he bought $2 worth of gasoline from a Black female attendant at Clark gas station and transported the gasoline in a white plastic milk jug that he later discarded in the alley. The seemingly independent corroboration came in the form of Brenda Thomas' eyewitness account and identification, as well as the discovery of a dirty, crushed white plastic milk jug in the vicinity of where Adam purportedly said he discarded it. I

---

[269] An examination of a photographs taken of Adam while he was at Area 1 reveals that at the time he was taken into custody, Adam was wearing light blue jeans, a white t-shirt with an image on the front, and a black or dark blue peacoat (Lineup Photograph; Adam Gray Custody Photograph Adam Gray Photograph Post-Statement).

[270] Although at first glance it might seem like the detail about the broken back door lock was non-public, we know that Adam was privy to this information prior to his interrogation (*see supra* note 259).

have already addressed why Brenda Thomas' account and identification should be viewed with extreme caution; for the reasons I have outlined, I do not believe that it meets the standard of providing objective independent corroboration. Similarly, the discovery of the item that appeared at first glance to be damning evidence against Adam – the milk jug – turned out to be non-probative. There is no evidence that the milk jug was related to the fire.[271] It appears that Adam's fabrication that he used and discarded a milk jug - and the subsequent discovery of a milk jug - was likely pure unlucky coincidence.[272]

There is a startling absence of any details in Adam's confession statement that led to any **objective** independent corroborating evidence. No trace of DNA or fingerprints on the milk jug, no recovery of the remnants of the lighter Adam purportedly crushed and flushed down Mel's toilet bowl, no testimony from a man verifying he had been out walking his dog in that area in those early morning hours, no traces of gasoline on Adam's clothing. Either the detectives and ASA Brown made no effort to solicit and verify such potential corroborating evidence,[273] and/or no such corroborating evidence could be found *because it did not exist.* All of the other details provided by Adam in his statement (e.g., why Adam committed the crime; that he washed his hands when he got back to Mel's house; that he retrieved the milk container from Mel's house) could not or were not independently corroborated, and therefore are not informative with respect to the reliability of Adam's confession.

Taken together, a reliability analysis of the confession provided by Adam Gray reveals an absence of reliability indicators and instead suggests a fundamental lack of reliability. Any and all of the details Adam provided that were consistent with the known objective facts/evidence in this case were either known to Adam prior to his interrogation or were known to police at the time of questioning. Adam described questioning sessions where contamination was rampant. As such, it is not surprising that Adam's confession

---

[271] In viewing the photographs of the milk jug, based on the condition of the container, I think it is reasonable to question how long the container had been at the location where it was found. The milk jug appeared quite filthy (with dirt all over the outside, and perhaps inside, as well), and it was crushed/flattened (tire tracks suggest that it was run over by a vehicle) (Police and Fire Reports [CITY GRAY 000094-000096]). Only 8 hours transpired between the time that Adam allegedly discarded the container and when it was discovered by Detective Crescenzo; it seems unlikely to me that in this short amount of time the container became so damaged and dirty.

[272] Although Adam testified in his deposition that he thinks he was the one who generated the detail about using a gallon milk container, he also said that it was possible that investigators suggested that detail to him (Deposition of Adam Gray [9/5/19]). The idea that police might have suggested that Adam used a milk container is supported by Lita Gonzalez' deposition testimony, in which she said that the during a 6:00am search of her home on March 25th (before Adam's interrogation), police told her that they were looking for something that contained gasoline and asked her if he was missing a "milk carton or something" (Deposition of Lita Marie Gonzalez). This exchange suggests that police may have formed a hypothesis prior to questioning Adam about what he might have used to transport the gasoline (perhaps based on Karrie Kelly's account of seeing a white bag), and therefore, it is possible that they intentionally or unintentionally leaked that theory to Adam via suggestive questioning.

[273] Inbau et al. (2013); A lack of vigorous pursuit of independent corroboration is one example of how tunnel vision may lead to confirmatory behavior and decision-making on behalf of investigators.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

was consistent with police knowledge at the time that the confession was elicited, *even when that knowledge was factually incorrect*. Moreover, Adam did not provide a single detail that led to any clearly reliable independent corroborating evidence (a pattern symptomatic of false confession cases).

Another issue of note with respect to the analysis of signed written statements is the presence of error corrections. There are multiple instances in Adam's statement where something is crossed out and corrected, and the people present initialed next to the correction. Investigators are often taught to intentionally insert mistakes into a written statement so that the person providing the statement can point out the error and make a correction. These corrections become a compelling argument to judges and juries that the subject was an engaged, active participant in providing the statement.[274] In essence, intentional insertion of errors is a psychological ploy to make a statement appear voluntary and reliable. Adam said that ASA Brown initiated all of the error corrections;[275] ASA Brown claims the opposite.[276] Whether the error corrections in this case constituted intentional error insertion and correction is unclear;[277] however, given this insidious practice, fact-finders should proceed with caution when interpreting error corrections as a indicium of reliability and/or voluntariness.

Finally, at the end of Adam's confession, there are a series of questions and answers in which Adam said that he had been treated well by the CPD and ASA Brown, that he had not been forced to give the statement or promised anything in exchange for the statement, and that he had been provided soda and coffee and access to the bathroom. On its face, it might appear that the inclusion of such statements increases the likelihood that Adam's statement is reliable. However, once again, caution is warranted here. It is not uncommon for this type of language to be deliberately included in recorded statements as a way to sanitize the interrogation process after the fact in order to make the statement appear more compelling and voluntary to outside observers. It is important to note, at least in false confession cases, that these questions are typically asked only at the end stages of an interrogation, at which point the suspect has already agreed to confess because s/he has come to believe that confession is in his or her own best interest.[278]

## VII. Conclusion

When Adam was named as the likely culprit by members of the Paris family in the immediate aftermath of the fire, it appears he quickly became the sole suspect in what was believed to be a fire by arson. Armed with the belief in Adam's likely guilt, it seems investigators quickly fell prey to confirmation bias/tunnel vision. Potential witnesses were never interviewed, and police subjected Adam Gray, a boy of just 14 years old, to a prolonged period

---

[274] Inbau et al. (2001, 2013)
[275] Deposition of Adam Gray (1/15/20)
[276] In his testimony at Adam's criminal trial, ASA Brown said that although he physically made the corrections, they were all initiated by Adam (James Brown Trial Testimony); however, in this deposition, ASA Brown acknowledged that the corrections would have been initiated by either him or Adam (Deposition of James Brown).
[277] ASA Brown denied both using strategic error correction in this case and ever being taught to do so (Deposition of James Brown).
[278] Leo (2008)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

of detention and interrogation that was highly accusatorial in nature. According to Adam, his repeated protestations of his innocence were ignored, he was confronted with false evidence of his guilt (including an elaborate from of trickery and deception which was especially manipulative given Adam's age), threatened with the death penalty if he did not confess, and promised he would be released if he told investigators what they wanted to hear. All the while, Adam's family said they were at the station actively trying to get access to Adam to no avail. In light of these circumstances, Adam eventually acquiesced and provided a well-rehearsed court-reported confession to police because he became convinced that benefits of confessing outweighed the costs of continued denial. Once Adam's confession was secured, it appears police conducted a highly suggestive interview and identification procedure with Brenda Thomas which produced what seemed to be corroborating evidence, but likely was just an illusion of corroboration.

In sum, in my opinion, numerous known risk factors for false confessions, supported by years of social science research, were present in this case, including evidence of confirmation bias/tunnel vision, a key individual vulnerability, and numerous situational risk factors in the form of problematic interrogation conditions and techniques. The investigators in this case appeared to engage in a pattern of disturbing and egregious behavior, which included (but was not limited to) the use of prolonged custody and interrogation of a minor, depriving young Adam access to his family, contamination, and the use of direct and implied threats of harsher consequences for continued denial (including threat of the death penalty) paired with direct and implied promises of benefit in exchange for a confession (both in terms of implied leniency and being allowed to escape the interrogation room and return to his school and/or family). The resulting confession not only lacked indicators of reliability, but it was elicited under conditions and possessed characteristics that should have caused investigators to question its reliability. Adam's confession did not include a single detail about the crime that investigators did not already know or that could be independently corroborated with objectively reliable evidence. In addition, the inclusion of a false fact that was believed to be true by investigators (e.g., that gasoline was used as an accelerant) is a major red flag that the confession was likely unreliable, and by extension, that contamination was likely omnipresent throughout the interrogations of Adam conducted by the Defendants in this case. However, it seems that not even learning that the milk container did not contain gasoline was enough to cause the Defendants in this case to second-guess their theory of the crime – a testament to the power of belief perseverance and investigator tunnel vision.

The opinions expressed in this report are based in part on the case specific materials I have reviewed. Should any new or additional information become available, my opinions about this case may change.

Thank you,

*Melissa Russano*

Melissa B. Russano, Ph.D.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

## VIII. References

Aamodt, M. G., & Custer, H. (2006). Who can best catch a liar? A meta-analysis of individual differences in detecting deception. *Forensic Examiner*, *15,* 6-11.

Appleby, S. C., Hasel, L. E., & Kassin, S. M. (2011). Police-induced confessions: An empirical analysis of their content and impact. *Psychology, Crime & Law, 19,* 111-128.

Appleby, S. C., & Kassin, S. M. (2016). When self-report trumps science: Effects of confessions, DNA, and prosecutorial theories on perceptions of guilt. *Psychology, Public Policy, and Law, 22,* 127-140.

Bedau, H. A., & Radelet, M. L. (1987) Miscarriages of justice in potentially capital cases. *Stanford Law Review, 40,* 21-179.

Brandon, S. E., Arthur, J. C., Ray, D. G., Meissner, C. A., Kleinman, S. M., Russano, M. B., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational psychology: A new field to support national security and public safety* (pp. 263-285). Santa Barbara, CA: ACB-CLIO.

Brandon, S. E., Wells, S., & Seale, C. (2018). Science-based interviewing: Information elicitation. *Journal of Investigative Psychology and Offender Profiling, 15,* 133-148.

Brown, A. D., Kouri, N., & Hirst, W. (2012). Memory's malleability: Its role in shaping collective memory and social identity. *Frontiers in Psychology, 3,* 257.

Brown v. Mississippi, 297 U.S. 278 (1936).

Burke, A. S. (2006). Improving prosecutorial decision making: Some lessons of cognitive science. *William and Mary Law Review, 47,* 1587-1633.

Clark, M. (2018, April 19). *Controversial police interrogation technique that often results in false confessions abandoned by influential training consultant*. Retrieved from https://www.criminallegalnews.org/news/2018/apr/19/controversial-police-interrogation-technique-often-results-false-confessions-abandoned-influential-training-consultant/

Cleary, H. M. D., & Warner, T. C. (2016). Police training in interviewing and interrogation methods: A comparison of techniques used with adult and juvenile suspects. *Law and Human Behavior, 40,* 270-284.

DeClue, G., & Rogers, C. S. (2015). The Inside Information Checklist (IIC). *The Police Chief*, *82,* 50-56.

DePaulo, B. M., Lindsay, J. L., Malone, B. E., Muhlenbruck, L., Charlton, K. & Cooper, H.

(2003). Cues to deception. *Psychological Bulletin, 129,* 74–118.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review, 82,* 891-1007.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification, 56,* 600–616.

Elaad, E., Ginton, A., & Ben-Shakhar, G. (1994). The effects of prior expectations and outcome knowledge on polygraph examiners' decisions. *Journal of Behavioral Decision Making, 7,* 279–292.

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88.

Feld, B. C. (2006). Police interrogation of juveniles: An empirical study of policy and practice. *Journal of Criminal Law & Criminology, 97,* 219-316.

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review, 62,* 1051-1119.

Garrett, B. L. (2011). *Convicting the innocent: Where criminal convictions go wrong.* London: Harvard University Press.

Garrett, B. L. (2015). Contaminated confessions revisited. *Virginia Law Review Association*, *101*, 395-454.

Goldstein, N., Condie, L., Kalbeitzer, R., Osman, D., & Geier, J. (2003). Juvenile offenders' Miranda rights comprehension and self-reported likelihood of false confessions. *Assessment, 10,* 359–369.

Goldstein, A. M., & Goldstein, N. E. S. (2010). *Evaluating capacity to waive Miranda rights*. New York, NY: Oxford University Press. http://dx.doi.org/10.1093/med/9780195366174.001.0001

Granhag, P. A., & Strömwall, L. A. (2004). *The detection of deception in forensic contexts.* Cambridge, Cambridge University Press.

Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., Lexcen, F., Reppucci, N. D., & Schwartz, R. (2003). Juveniles' competence to stand trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior, 27,* 333–363.

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook.* Chichester, England: Wiley.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Gudjonsson, G. H. (1990). One hundred alleged false confession cases: Some normative data. *British Journal of Clinical Psychology, 29,* 249-250.

Gudjonsson, G. H. (2010). The psychology of false confessions: A review of the current evidence. In G. D. Lassiter & C. A. Meissner (Eds.) *Police Interrogations and False confessions: Current Research, Practice and Policy Recommendations* (pp. 31-47). Washington, DC: American Psychological Association.

Gudjonsson, G. H. (2018). *The psychology of false confessions: Forty years of science and practice.* Hoboken, New Jersey: John Wiley & Sons, Inc.

Gudjonsson, G. H., & Sigurdsson, J. F. (1999). The Gudjonsson Confession Questionnaire Revised: Factor structure and its relationship with personality. *Personality and Individual Differences, 27*, 953-968.

Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (2006). Custodial interrogation, false confession, and individual differences: A national study among Icelandic youth. *Personality and Individual Differences, 41,* 49-59.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009a). Interrogations and false confessions among adolescents in seven countries in Europe: What background and psychological factors best discriminate between false confessors and non-false confessors? *Psychology, Crime and Law, 15,* 711-728.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009b). False confession among 15- and 16-year olds in compulsory education and their relationship with adverse life events. *Journal of Forensic Psychiatry and Psychology, 20,* 950-963.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D., Asgeirsdottir, B. B., Gonzalez, R. A., & Young, S. (2016). A national epidemiological study investigating risk factors for police interrogation and false confession among juveniles and young persons. *Social Psychiatry and Psychiatric Epidemiology, 51,* 359-367.

Haney-Caron, E., Goldstein, N. E., & Mesiarik, C. (2018). Self-perceived likelihood of false confession: A comparison of justice-involved juveniles and adults. *Criminal Justice and Behavior, 45,*

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science, 20,* 122–126.

Honts, C. R., Kassin, S. M., & Craig, R. A. (2014). 'I'd know a false confession if I saw one': A constructive replication with juveniles. *Psychology, Crime & Law, 20,* 695-704.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime and Law, 9,* 1-18.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Ygram Peters, G-J., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime and Law, 12,* 61-75.

Inbau, F. E. (1942). Lie detection and criminal interrogation. Baltimore: Williams & Wilkins.

Inbau, F. E., Reid, J., & Buckley J. P. (1986). *Criminal interrogation and confessions* (3rd ed.). Baltimore: Williams & Wilkins.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal interrogation and confessions* (4th ed.). Gaithersberg, MD: Aspen.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Criminal interrogation and confessions* (5th ed.). Burlington, MA: Jones & Bartlett.

Irving, B. (1980). *Police interrogation. A case study of current practice. Research Studies No 2.* London: HMSO.

Johnson, S. B., Blum, R. W., & Giedd, J. N. Adolescent maturity and the brain: The promise and pitfalls of neuroscience research in adolescent health policy. *Journal of Adolescent Health, 45,* 216-221.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist, 60,* 215–228.

Kassin, S. M. (2007). Expert testimony on the psychology of confessions: A pyramidal model of the relevant science. In E. Borgida & S. Fiske (Eds.), *Psychological Science in Court: Beyond Common Knowledge* (pp. 195-218). Oxford, England: Blackwell Publishing.

Kassin, S. M. (2012). Why confessions trump innocence. *American Psychologist, 67,* 431-445.

Kassin, S. M., Bogart, D., & Kerner, J. (2012). Confessions that corrupt: Evidence from the DNA exoneration case files. *Psychological Science, 23,* 41–45.

Kassin, S. M., Drizin, S., Grisso, T., Gudjonsson, G., Leo, R., & Redlich, A. (2010). Police induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34,* 3-38.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27,* 187–203.

Kassin, S. M., & Gudjonsson, G. H. (2004). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5,* 35–69.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science, 7,* 125–128.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A-M., & La Fon, D. (2007). Police interviewing and interrogation: A Self-report survey of police practices and beliefs. *Law and Human Behavior, 31,* 381-400.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29,* 211-227.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15,* 233–251.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the ''fundamental difference'' hypothesis. *Law and Human Behavior, 21,* 469–484.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67–94). Beverly Hills, CA: Sage.

Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13,* 71–88.

Kostelnik, J. O., & Reppucci, N. D. (2009). Reid training and sensitivity to developmental maturity in interrogation: Results from a national survey of police. *Behavioral Sciences & the Law, 27,* 361–379.

Kovera, M. B., & Evelo, A. J. (2017). The case for double-blind lineup administration. *Psychology, Public Policy, and Law, 23,* 421–437. https://doi.org/10.1037/law0000139

Kozinski, W. (2018) The Reid interrogation technique and false confessions: A time for change. *Seattle Journal for Social Justice, 16,* 301-345.

Leo, R. A. (2004). The third degree and the origins of psychological interrogation in the United States. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 37-84). New York: Kluwer Academic.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Leo, R. A. (2008). *Police Interrogation and American Justice*. Cambridge, MA: Harvard University Press.

Leo, R. A., & Drizin, S. A. (2010). The three errors: Pathways to false confession and wrongful conviction. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 9-30). Washington, DC: APA.

Leo, R. A., & Ofshe, R. J. (1998). The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation. *Journal of Criminal Law and Criminology, 88*, 429-496.

Loftus, E. F. (2005). Memories of things unseen. *Current Directions in Psychological Science, 13,* 145-147.

Lynumn v. Illinois, 372 U.S. 528 (1963).

Malloy, L. C., Shulman, E. P., & Cauffman, E. (2014). Interrogations, confessions, and guilty pleas among serious adolescent offenders. *Law and Human Behavior, 38*, 181-193.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45.

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!" Investigator bias in judgments of truth and deception. *Law and Human Behavior, 26,* 469–480.

Meissner, C. A., & Kassin, S. M. (2004). "You're guilty, so just confess!" Cognitive and confirmational biases in the interrogation room. In G. D. Lassiter. (Ed.), *Interrogations, confessions, and entrapment* (pp. 85–106). New York: Kluwer Academic.

Meissner, C. A., Redlich, A. D., Michael, S. W., Evans, J. R., Camilletti, C. R., Bhatt, S., & Brandon, S. (2014). Accusatorial and information-gathering interrogation methods and their effects on true and false confessions: A meta-analytic review. *Journal of Experimental Criminology, 10*, 459-486.

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Memon, A., Vrij, A., & Bull, R. (2003). Psychology and law: Truthfulness, accuracy and credibility (2nd ed.). Chichester: Wiley.

Meyer, J. R., & Reppucci, N. D. (2007). Police practices and perceptions regarding juvenile interrogation and interrogative suggestibility. *Behavioral Sciences & the Law, 25,* 757–780.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Meyer, R. G., & Youngjohn, J.R. (1991). Effects of feedback and validity expectancy on response in a lie detector interview. *Forensic Reports, 4*, 235-244.

Mitchell, K. J., & Johnson, M. K. (2000). Source monitoring: Attributing mental experiences. In E. Tulving & F. I. M. Craik (Eds.), *The Oxford handbook of memory* (pp. 179–195). New York, NY: Oxford University Press.

Mortimer, A., & Shepherd, E. (1999). Frames of mind: Schemata guiding cognition and conduct in the interviewing of suspected offenders. In A. Memon and R. Bull (Eds), *Handbook of the psychology of interviewing* (p. 293-315). Chichester: Wiley.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Nash, R.A., & Wade, K.A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology, 23,* 624-637.

Neuschatz, J. S., Wilkinson, M. L., Goodsell, C. A., Wetmore, S. A., Quinlivan, D. S., & Jones, N. J. (2012). Secondary confessions, expert testimony, and unreliable testimony. *Journal of Police and Criminal Psychology, 27*, 179–192.

Nickerson, R. S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology*, 2, 175–220.

Ofshe, R. J., & Leo, R. A. (1997a). The social psychology of police interrogation: The theory and classification of true and false confessions. *Studies in Law, Politics, and Society, 16,* 189–251.

Ofshe, R. J., & Leo, R. A. (1997b). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review, 74,* 979–1122

Perillo, J. T., & Kassin, S. M. (2011). Inside interrogation: The lie, the bluff, and false confessions. *Law and Human Behavior, 35*, 327-337.

Pimental, P. S., Arndorfer, A., & Malloy, L. C. (2015). Take the blame for someone else's wrongdoing: The effects of age and reciprocity. *Law and Human Behavior, 39,* 219-231.

Redlich, A. D., & Goodman, G. S. (2003). Taking responsibility for an act not committed: The influence of age and suggestibility. *Law and Human Behavior*, *27*, 141-156.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Redlich, A. D., Summers, A., & Hoover, S. Self-reported false confession and false gulty pleas among offenders with mental illness. *Law and Human Behavior, 34,* 79-90.

Reppucci, N. D., Meyer, J., & Kostelnik, J. (2010). Custodial interrogation of juveniles: Results of a national survey of police. In G. D. Lassiter & C. A. Meissner (Eds.), *Decade of behavior/Science conference grant. Police interrogations and false confessions: Current research, practice, and policy recommendations* (p. 67–80). American Psychological Association.

Ross, L., & Lepper, M. R. (1980). The perseverance of beliefs: Empirical and normative considerations. In R. Shweder & D. Fiske (Eds.), *New directions for methodology of social and behavioral science: Fallible judgement in behavioral research, Vol. 4* (pp. 17-36). San Francisco: Jossey-Bass.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486.

Schacter, D. L. (2001). *Seven sins of memory: How the mind forgets and remembers.* New York, NY: Houghton Mifflin Company.

Schatz, S. J. (2018). Interrogated with intellectual disabilities: The risks of false confessions. *Stanford Law Review, 70,* 643-690.

Sheridan, S. (2011). Excluding coerced witness testimony to protect a criminal defendant's right to due process of law and adequately deter police misconduct. *Fordham Urban Law Journal, 38,* 1221-1226.

Sigurdsson, J. F., & Gudjonsson, G. H. (2001). False confessions: The relative importance of psychological, criminological and substance abuse variables. *Psychology, Crime and Law, 7,* 275–289.

Stansbury v. California, 511 U.S. 318 (1994).

Steblay, N. M. (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283-297.

Tavris, C., & Aronson, E. (2007). *Mistakes were made (but not by me): Why we justify foolish beliefs, bad decisions and hurtful acts.* New York: Harcourt.

Toglia, M. P., Read, J. D., Ross, D. F., & Lindsay, R. C. L. (2006). *The Handbook of Eyewitness Psychology: Volume I, Memory for Events.* Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers.

Trope, Y. & Liberman, A. (1996). Social hypothesis testing: Cognitive and motivational

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

mechanisms. In E. Higgins & A. Kruglanski (Eds.) *Social psychology: Handbook of basic principles* (p. 239-270). Guilford Press: New York, NY.

Viljoen, J., Klaver, J., & Roesch, R. (2005). Legal decisions of preadolescent and adolescent defendants: Predictors of confessions, pleas, communication with attorneys, and appeals. Law and Human Behavior, 29, 253–278.

Vrij, Mann, & Fisher (2006). An empirical test of the Behaviour Analysis Interview. *Law & Human Behavior, 30,* 329-345.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities* (2nd ed.). Chichester: John Wiley and Sons.

Warden, R. (2004). The snitch system: How incentivized witnesses put 38 innocent Americans on death row. Chicago, IL: Northwestern University School of Law, Center on Wrongful Convictions.

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C. A., & Wixted, J. T. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44*, 3-36.

Wetmore, S. A.,  Neuschatz, J. S., & Gronlund, S. D. (2014) On the power of secondary confession evidence. *Psychology, Crime & Law, 20,* 339-357.

Woody, W. D., & Forrest, K. D. (2020). *Understanding police interrogation*. New York, NY: New York University Press.

Zelle, H., Riggs Roamine, C. L., & Goldstein, N. E. S. (2014). Juveniles' Miranda comprehension: Understanding, appreciation, and totality of circumstances factors. *Law and Human Behavior, 39,* 281-293.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

**IX. Appendix**

A. Curriculum vita

B. List of publications

C. Testimony Provided

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Appendix A

CURRICULUM VITAE
MELISSA BETH RUSSANO

CONTACT INFORMATION

Roger Williams University                    Telephone:  401-254-3878
School of Justice Studies                         Fax:  401-254-3431
One Old Ferry Road                           Email: mrussano@rwu.edu
Bristol, RI 02809

EDUCATION

| | |
|---|---|
| 2004 | Ph.D. in Psychology<br>Florida International University<br>Dissertation Topic: *True and False Confessions to an Intentional Act: A Novel Experimental Paradigm* |
| 2001 | M.S. in Psychology<br>Florida International University<br>Thesis Topic: *Close Relationships, Equity Theory, and Forgiveness* |
| 1999 | B.A. in Psychology, Minor in Spanish<br>University of Virginia<br>Graduated with Highest Distinction<br>Distinguished Majors Thesis Topic: *Maternal versus Fetal Rights: Substance Use during Pregnancy* |

PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2016 – Present | Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2010 – 2016 | Associate Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2004 – 2010 | Assistant Professor of Criminal Justice<br>School of Justice Studies, Roger Williams University |
| 2002 – 2004 | Instructor/Lecturer<br>Department of Psychology, Florida International University |
| 2000 - 2002 | Graduate Research Assistant, Psychology & Law Laboratory, Department of Psychology, Florida International University; NSF Grant: *Investigator bias in identification procedures: Mechanisms and safeguards*; PIs: Margaret Bull Kovera, Ph.D., & Brian L. Cutler, Ph.D. |

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

1999 – 2000    Teaching Assistant; Department of Psychology; Florida International University; Courses: Abnormal Psychology; Attitudes and Social Behavior

## GRANTS, AWARDS, & HONORS

2019-Present    U.S. Department of Justice, Federal Bureau of Investigation ($62,229). *Improving Intelligence Interviewing: A Quasi-Experimental Study with Correctional Investigators* (PI with C. Kelly at St. Joseph's University).

2018-Present    U.S. Department of Justice, Federal Bureau of Investigation ($335,713). *Are Some Law Enforcement Interrogation Techniques More Diagnostic than Others?: An Experimental Investigation with a Community Sample* (co-PI with K. Houston at Texas A&M International University).

2017-Present    U.S. Department of Justice, Federal Bureau of Investigation ($594,763). *Training Assessment and Field Validation of Science-Based Interrogation Techniques with Law Enforcement Agencies* (PI with C. Meissner at Iowa State University).

2015-2017    U.S. Department of Justice, Federal Bureau of Investigation ($223,445). *Training of Science-Based Methods of Interrogation: A Follow-Up Analysis* (PI with C. Meissner at Iowa State University).

2015-2017    U.S. Department of Justice, Federal Bureau of Investigation ($108,170). *Interpreter-Facilitated Interrogations: Identifying Strategies for Maximizing Success* (co-PI with K. Houston at Texas A&M International University).

2014-2015    U.S. Department of Justice, Federal Bureau of Investigation ($104,178). *Assessing Accusatorial vs. Informational-Gathering Approaches to HUMINT Collection via an Interpreter* (PI with K. Houston at Texas A&M International University).

2013-2014    U.S. Department of Justice, Federal Bureau of Investigation ($116,240). *Investigating Interpreter-Target Rapport and Interpreter Placement in the HUMINT Context* (co-PI with K. Houston at the University of Texas at El Paso).

2012-2013    U.S. Department of Justice, Federal Bureau of Investigation ($82,279). *Structured Interviews of Experienced Analysts and Linguists* (Principal Investigator).

2011-2012    U.S. Department of Justice, Federal Bureau of Investigation ($55,840). *Structured Interviews of High-Value Detainee Interrogators* (Principal Investigator).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

| 2010 - 2011 | U.S. Department of Justice, Federal Bureau of Investigation ($187,776). *Structured Interviews on Interrogative Practices/Efficacy Involving Interrogators across U.S. Military and Federal Agencies* (Principal Investigator). |
|---|---|
| 2008 – 2011 | U.S. Department of Defense ($413,359). *Phase 2: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2007 – 2009 | U.S. Department of Defense ($191,390). *Phase 1: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso). |
| 2006 | Roger Williams University Outstanding Woman on Campus |
| 2005 | Roger Williams University Justice System Training & Research Institute ($8,536). *Police interrogation practices: A survey of law enforcement* (co-PI with F. Narchet at the University of New Haven). |
| 2001 | American-Psychology Law Society (Division 41 of APA) Grant-in-Aid ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys, prosecutors, and jurors.* |
| 2001 | Florida International University Graduate Student Association Grant ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys.* |

PUBLICATIONS

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., & Stocks, E. L. (2020).  Juror perceptions of intoxicated suspects' interrogation-related behaviors.  *Criminal Justice & Behavior, 47,* 222-246. doi: 10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2019). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B**.**, Miller, J. C., & Redlich, A. D. (2019). On the road (to admission): Engaging suspects with minimization. *Psychology, Public Policy, and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology: A New Field to Support National Security and Public Safety* (pp. 263-285). Santa Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woesthoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi: 10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend of mine": Investigating the utilization of an interpreter in an investigative interview. *Psychology, Crime and Law, 23,* 413-426. doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

(2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31(3),* 7.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

<u>Conference Presentations</u>

Houston, K. A., & Russano, M. B. (2020, March). *Modeling and understanding confession decisions in interpreter-facilitated interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Lowder, B., Russano, M. B., Meissner, C. A., & Atkinson, D. (2020, March). *Disparate effects of accusatorial techniques during real-world interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Atkinson, D., Russano, M. B., Miessner, C. A. (2020, March). *Evaluating a science-based interrogation training program using a between-participants design.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B. (2019, November). *Researcher and practitioner collaborations: Lessons learned.* Panel discussion at the 9th Annual High-Value Detainee Interrogation Group Research Symposium, McLean, VA.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2019, March). *Training science-based methods of interrogation: Do training effects persist over time?.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Houston, K. A., & Russano, M. B. (2019, March). *Interpreter-facilitated interrogations: Identifying strategies for maximizing success.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Perez, G., Mindthoff, A., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E.L., Vallano, J. P., & Woody, W. D. (2019, March). *Examining juror demographics and beliefs as predictors of interrogations and confessions perceptions.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B. (2018, October). *What Works Reviews: The Cognitive Interview.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, October). *Does it work? Evaluating a science-based interrogation training program.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., & Russano, M. B. (2018, October). *Interpreter-facilitated interrogations: Strategies for maximizing success.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, March). *Training science-*

*based methods of interrogation to state and local law-enforcement officers: A training evaluation and field validation study.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2018, March). *Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Houston, K. A., & Russano, M. B. (2018, March). *Evaluating advanced methods of interpreter utilization.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Mindthoff, A., Perez, G., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018, March). *Examining jurors' perceptions of interrogations and confessions: Are jurors finally starting to believe that false confessions exist?* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Phillips, E., Meissner, C. A., & Russano, M. B. (2017, July). *What Works? A systematic review of interview and interrogation practices.* Paper presented at the International Investigative Interviewing Research Group Conference, Monterey, CA.

Russano, M. B., Meissner, C. A., Atkinson, D., & Dianiska, R. E. (2017, March). *Training science-based methods of interrogation with Air Force Office of Special Investigations.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Houston, K. A., Russano, M. B., & Alexander, J. A. (2017, March). *Comparing the effects of an interpreter during accusatorial vs. rapport-based, information gathering interviews.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Meissner, C. A., Russano, M. B., & Atkinson, D. (2017, Jan). *Science- based methods of interrogation: A training evaluation and field assessment.* Paper presented at the Society for Applied Research in Memory & Cognition Conference, Sydney, Australia.

Russano, M. B. (2016, October). *What Works: The Cognitive Interview.* Paper presented at the 6th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Meissner, C. M., & Russano, M. B. (2016, May). *A field validation of the cognitive interview as a science-based approach to suspect interrogations.* Paper presented at the Fishschrift ~ Applied Cognition and the Cognitive Interview: A Conference in Honor of Dr. Ron Fisher, Miami, FL.

Houston, K. A., Russano, M. B., Alexander, J., & Garcia, S. (2016, March). *Assessing*

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*accusatorial vs. information-gathering approaches to HUMINT collection via an interpreter.* Paper presented at the American Psychology-Law Society Conference, Atlanta, GA.

Narchet, F. M., Russano, M. B., Yasuhara, K., Newcity, L., & Axelrod, R. (2015, November). *An analysis of modern-day police interrogation manuals.* Paper presented at the American Society of Criminology 2015 Annual Conference, Washington, D.C.

Meissner, C. A., & Russano, M. B. (2015, October). *A training validation and field assessment of science-based methods of interrogation.* Paper presented at the 5th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., Russano, M. B., & Ricks, P. (June, 2015). *What is rapport? Questions of measurement and definition.* Paper presented at the 2015 conference of the Society for Applied Research in Memory and Cognition, Victoria, Canada.

Houston, K. A., Russano, M. B., & Ricks, P. (2015, March). *Interpreter facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the American Psychology-Law Society Conference, San Diego, CA.

Sneyd, D., & Russano, M. B. (2015, March). *Perceptions of revenge porn: The effect of gender, method of transmission, and revenge motivation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. A. (2015, March). *A 360° degree perspective of the interrogative process: Factors associated with a successful interrogation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Houston, K. A., Russano, M. B., & Ricks, E. (2014, October). *Interpreter-facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the 4th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. A. (2014, September). *Effectiveness of interrogation techniques: Perceptions of experienced interrogators, analysts and interpreters.* Poster presented at the 14th Annual Conference of the European Society of Criminology, Prague, Czech Republic.

Russano, M. B., & Narchet, F. M. (2014, March). *Letting them speak: Analyst and interpreter insights on the interview process.* Paper presented at the HIG Research Symposium, *Intelligence Interviewing: From Science to Practice*, Washington, D.C.

Russano, M. B., & Narchet, F. M. (2014, March). *Analysts and HUMINT interrogations: Role and perceptions.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., & Narchet, F. M. (2014, March). *Interpreters and HUMINT*

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*interrogations: Perceptions and insights.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., and Narchet, F. M. (2013, October). *Analysts and HUMINT Interrogations: Role and Perceptions.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, October). *Interpreters during HUMINT Interrogations: Perceptions and Insights.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, March). *Interrogation practices and beliefs: Does high-value target experience matter?* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B., Narchet, F. M., Meissner, C., & Kleinman, S. M. (2012, March). *Structured interviews of expert military and intelligence interrogators: Training, rapport & lie detection.* Paper presented at the American Psychology-Law Society Conference, San Juan, Puerto Rico.

Russano, M. B., Narchet, F. M., Meissner, C. & Kleinman, S. M. (2011, November). *systematic study of interrogative practices across U.S. military and federal agencies.* Paper presented at the American Society of Criminology 2011 Annual Conference, Washington, D.C.

Russano, M. B., Narchet, F. M., & Correira, B. (2011, March). *Effect of crime type, citizenship status, ethnicity and location of interrogation on perceptions of enhanced interrogation.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Fountain, E. N., Schreiber Compo, N., Carlucci, M., & Russano, M. B. (2011, March). *Training to detect deception: Identifying physical signs of cognitive load.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., Russano, M. B. & Horgan, A. J. (2011, March). *The elicitation of guilty knowledge in intelligence interrogation settings: A novel experimental paradigm.* Paper presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., & Russano, M. B. (2010, June). *The effectiveness of inquisitorial and accusatorial interrogation techniques at obtaining true and false confessions and information.* Paper presented at the European Association of Psychology and Law Conference, Gothenburg, Sweden.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2010, March). *"Should I just confess?": The perceived consequences of confessing and confession diagnosticity.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Meissner, C.A., Russano, M. B., & Horgan, A. J. (2010, March). *The diagnostic efficacy*

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*of inquisitorial interrogative methods and their corollary benefit for credibility assessment.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Narchet, F. M., & Russano, M. B. (2009, November). *The effect of crime type and citizenship on perceptions of torture.* Paper presented at the American Society of Criminology 2009 Annual Conference, Philadelphia, Pennsylvania.

Horgan, A. J., Russano, M. B., Meissner, C. A., Evans, J. R., & Michael, S. W. (2009, March). *The ironic effects of the perception of consequences on beliefs about confession.* Poster presented at the 2009 American Psychology-Law Society Conference, San Antonio, TX.

Russano, M. B., & Narchet, F. M. (2008, March). *Police officers' beliefs about the interrogation process.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Narchet, F. M., Russano, M. B., & Griffin, J. (2008, March). *The effect of crime type on perceptions of "enhanced" interrogation techniques.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Peterson, E., & Russano, M. B. (2008, March). *The effect of false confession type of juror decision-making.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Russano, M. B., & Narchet, F. M. (2007, September). *The future of research on interrogations and confessions.* Paper presented at Interrogations & Confessions: A Conference Exploring Current Research, Practice and Policy, El Paso, TX.

Russano, M. B. (2007, June). *The psychology of police interrogations.* Paper presented at the 2007 Rhode Island Bar Association's Annual Meeting, Providence, RI.

Russano, M. B., & Narchet, F. M. (2007, March). Police officers' self-reported use of interrogation techniques. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Narchet, F. M., & Russano, M. B. (2007, March). Police officer training and perceptions of false confessions. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Russano, M. B., & Narchet, F. M. (2006, November). *Who's telling the truth? Police officers' perceptions of lying and truth-telling.* Paper presented at the American Society of Criminology 2006 Annual Conference, Los Angeles, CA.

Narchet, F. M., & Russano, M. B. (2006, June). *"Okay, I did it!": Theories of confession.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2006 Annual Conference, Bristol, RI.

Russano, M. B., Shpurik, M., Kassin, S. M., & Berman, G. (2006, March). *An*

*experimental study of defense attorneys' perceptions of interrogations and confessions.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Mitchell, T. L., Russano, M. B., & Narchet, F. M. (2006, March). *The influence of race and crime on legal decision-making.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2006, March). From the hot seat: An interrogation from the perspective of the suspect. Paper presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Russano, M. B., & Narchet, F. M. (2005, June). *The psychology of police interrogations and confessions.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2005 Annual Conference, Bristol, RI.

Russano, M. B., Narchet, F. M., & Meissner, C. A. (2005, March). *Investigating the effects of presenting false evidence on true and false confessions.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. A. (2005, March). *A qualitative analysis of modern day police interrogation manuals.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2005, March). *Modeling the role of investigator bias and interrogation techniques on the likelihood of confession.* Paper presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Russano, M. B., Narchet, F. M., & Meissner, C. M. (2004, November). *The effectiveness of three police interrogation techniques within a novel experimental paradigm.* Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Russano, M. B., Meissner, C.A., & Kassin, S. M. (2004, March). *True and false confessions to an intentional act: The effects of two common police tactics.* Paper presented at the American Psychology-Law Society 2004 Biennial Conference, Scottsdale, Arizona.

Russano, M. B., Meissner, C. A., & Kassin, S. M. (2003, July). *True and false confessions to an intentional act: Preliminary results from a novel paradigm.* Poster presented at the 2003 International Psychology & Law Conference, Edinburgh, Scotland.

Russano, M. B., Dickinson, J. J., Cass, S., Kovera, M. B., & Culter, B. (2002, March).

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*Testing the effects of lineup administrator knowledge in simultaneous and sequential lineups.* Poster presented at the American Psychology-Law Society 2002 Biennial Conference, Austin, Texas.

Russano, M. B., & Kovera, M. B. (2001, August). *Psychologists' evaluations of valid and flawed psychological science.* Poster presented at the 109th Annual Convention of the American Psychological Association, San Francisco.

Russano, M. B., & Land, D. J. (2000, March). *Maternal versus fetal rights: Substance use by pregnant women.* Poster presented at the 108th Annual Convention of the American Psychological Association, Washington, D.C.

## INVITED TALKS/COLLOQUIA

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2019). Washington, DC.

Roger Williams University School of Law, Roundtable Presentation (March, 2019). Bristol, RI.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2018). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2017). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2016). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2015). Washington, DC.

Federal Bureau of Investigation, Language Services Division (July, 2014). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2012). Washington, DC.

High-Value Detainee Interrogation Group Research Committee, Federal Bureau of Investigation (February, 2012). Washington, DC.

Rhode Island's Working Group on Electronic Recording of Custodial Interrogations (September, 2011). Providence, RI.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2011). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (March, 2011). Miami, FL.

Rhode Island Senate Judiciary Committee (March, 2007). Providence, RI.

Rhode Island House of Representatives Judiciary Committee (March, 2007). Providence, RI.

Rhode Island Public Defender Conference on False Confessions: Confessions – False

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

& Otherwise: How to Spot and Deal with Them (June, 2006). Providence, RI

Rhode Island House of Representatives Judiciary Committee (March, 2006). Providence, RI.

Rhode Island Senate Judiciary Committee (April, 2006). Providence, RI.

Rhode Island Continuing Legal Education Program for Criminal Defense Attorneys (October, 2005). Providence, RI.

Purchase College (March, 2004)

Westfield State College (March, 2004)

San Francisco State University (February, 2004)

Penn State McKeesport (February, 2004)

TEACHING EXPERIENCE

Introduction to Psychology
Introduction to Criminal Justice
Research Methods in Psychology
Research in Criminal Justice
Research Methods in Criminal Justice
Legal Psychology
Social Psychology
Human Behavior in Perspective
Drugs, Society & Behavior
Psychology and the Law
Witnesses, Suspects and Investigative Interviewing [graduate level]
Psychology and the Legal System [graduate level]
Survey of Research Methods [graduate level]
Critical Issues in Criminal Justice [graduate level - team-taught]
Criminal Justice System Overview [graduate level - team-taught]

DEPARTMENTAL AND UNIVERSITY SERVICE

Criminal Justice Living Learning Community Faculty Mentor (Fall 2014-Spring 2019)
Co-Advisor to the John Jay Society (Fall 2014-Spring 2019)
RWU Sabbatical Committee (Fall 2020)
RWUFA Contract Committee (October 2018-October 2019)
RWU Testing and Tracing Committee (Spring 2020-Summer 2020)
RWU Human Subjects Review Board (June 2014-June 2018)
RWUFA Elections Committee (October 2017-October 2018)
RWU Faculty Association Secretary (October 2015-October 2017)
RWUFA Executive Committee (October 2015-October 2017)
RWU External Grants Policy Committee (Fall 2013-Spring 2016)

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

RWU Healthcare Advisory Committee (Fall 2012-Spring 2013)
Advisor to the RWU Paintball Club (Fall 2014-Spring 2015)
Honors Advisory Council (Fall 2012 – Spring 2013)
School of Justice Studies Curriculum Committee (Fall 2004 – Spring 2019; Chair – Fall 2007 – Fall 2010)
School of Justice Studies Academic Standards Committee (Fall 2004 – Present; Chair: Fall 2009 - Spring 2011 & Fall 2017 - Present)
School of Justice Studies Assistant Dean Search Committee (2017-2018)
School of Justice Studies Dean Search Committee (2016-2017)
School of Justice Studies School Faculty Review Committee (2015-2016; 2016-2017; 2019-2020)
Faculty Senate Steering Committee (Fall 2012 – Spring 2013)
University Academics Appeals Committee (Fall 2008)
School of Justice Studies Faculty Search Committee (Co-Chair; Fall 2008 – Spring 2009)
RWU Associate Provost Search Committee (Fall 2008)
RWU Student Evaluation of Teaching Ad-Hoc Committee (Spring 2008 – Fall 2008)
Roger Williams 2020: Strategic Planning Taskforce 1 (May 2007 – November 2007)
School of Justice Studies Faculty Search Committee (Fall 2006 – Spring 2007)
Faculty Senate (Fall 2005 – Fall 2008)
Faculty Senate Academic Standards and Polices (August 2008 – Spring 2011)
Faculty Senate Curriculum Committee (Fall 2005 – May 2008)
RWU Academic Technology Committee (Fall 2004 – Spring 2005)

PROFESSIONAL SERVICE

*Law and Human Behavior* Editorial Board (September 2017 – Present)
*Behavioral Sciences and the Law* Editorial Board (March 2017 – November 2019)
Student Editorial Board, *Law & Human Behavior* (2001-2002)
Ad-hoc reviewer for *Applied Cognitive Psychology, Applied Psychology in Criminal Justice, Criminal Justice and Behavior, Journal of Applied Research in Memory & Cognition, Journal of Experimental Criminology, Journal of Experimental Psychology: Applied, Law & Human Behavior, Psychological Reports: Perceptual and Motor Skills, Psychology, Crime and Law, Journal of Criminal Justice & Popular Culture, International Journal of Police Science and Management,* Worth Publishers (textbook reviews), SAGE Publications (textbook reviews), *National Science Foundation, Centre for Research and Evidence on Security Threats, Netherlands Foundation for Scientific Research, American Psychology-Law Society Early Career Professional Grants-in-Aid Program*
Program Chair for Interrogations, Confessions and Deception for the 2013 American-Psychology-Law Society Conference in Portland, OR
Ad-hoc reviewer for the American Psychology-Law Society 2002, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012 & 2014 conferences
Ad-hoc reviewer for the American Psychological Association 2004 and 2007 Conferences

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

<u>PROFESSIONAL AFFILIATIONS</u>

American Psychology–Law Society
Association for Psychological Science

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Appendix B

**List of Publications**

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J.
    Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E.,
    Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., &
    Stocks, E. L. (2020). Juror perceptions of intoxicated suspects'
    interrogation-related behaviors. *Criminal Justice & Behavior, 47,* 222-246. doi:
    10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2019). From the ivory tower to the
    interrogation room: Training and field evaluation research on suspect
    interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *Handbook of Legal and
    Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B., Miller, J. C., & Redlich, A. D. (2019). On the road
    (to admission): Engaging suspects with minimization. *Psychology, Public Policy,
    and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019).
    Does recording inhibit crime suspects?: Evidence from a fully randomized
    field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S.
    (2019). The High-Value Detainee Interrogation Group (HIG): Inception,
    evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology:
    A New Field to Support National Security and Public Safety* (pp. 263-285). Santa
    Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J.
    Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A.,
    Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D.
    (2018). A survey of potential jurors' perceptions of interrogations and
    confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi:
    10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend
    of mine": Investigating the utilization of an interpreter in an investigative interview.
    *Psychology, Crime and Law, 23,* 413-426. doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A
    (nearly) 360° perspective of the interrogation process: Communicating with high-
    value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) ,
    *Communication in Investigative and Legal Contexts: Integrated Approaches from*

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

*Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31(3)*, 7.

CONFIDENTIAL —SUBJECT TO PROTECTIVE ORDER

Appendix C

**Testimony Provided**

*State of New York vs. Claude Bird* (2014) – Trial Testimony
*Carl Chatman vs. City of Chicago, et al.* (2016) – Deposition Testimony
*Commonwealth of Massachusetts v. Gabriel Burgos* (2017) – Pretrial Hearing Testimony
*People of the State of Illinois vs. Dannie Kendrick* (2019) – Trial Testimony
*Cathy Woods vs. City of Reno, et al.* (2019) – Deposition Testimony
*Commonwealth of Massachusetts vs. Ralph Wilson* (2020) – Pretrial Hearing Testimony

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER