IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ADAM GRAY ) | |
| ) | |
| Plaintiff, ) | Case No. 18 CV 2624 |
| v. ) | |
| ) | |
| CITY OF CHICAGO, et al. ) | Judge John Z. Lee |
| ) | |
| Defendants. ) | Magistrate Judge Beth W. Jantz |

**PLAINTIFF'S RESPONSE TO INDIVIDUAL CITY DEFENDANTS'
MOTION TO BAR OPINION TESTIMONY OF MELISSA RUSSANO**

Now comes Plaintiff, Adam Gray, through his counsel, and respectfully submits this response to the Individual Defendants' Motion to Bar Opinion Testimony of Melissa Russano [Dkt. 319]:

**INTRODUCTION**

In support of his wrongful conviction claim, Plaintiff offers the expert testimony of Dr. Melissa Russano Rodriguez, an experimental psychologist with extensive training in social and cognitive psychology, to assist the jury in evaluating whether Plaintiff's statement was fabricated and coerced through police interrogation. Dr. Russano will testify about the reasons why individuals may falsely confess to a crime that they did not commit, the situational and personal risk factors that make a false confession more or less likely, the interrogation methods that increase the risk of false confessions, whether any of these factors or methods existed in this case, and what factors indicate the reliability or unreliability of the written confession in this case. *See* Dkt. 319-1 (Russano Report with appendices).

There is no dispute that Dr. Russano is qualified to share her specialized knowledge. Dr. Russano is a social scientist whose primary areas of research and expertise are "investigative

1

interviewing, interrogations, and confessions, in the law enforcement, military and human intelligence domains." *Id*. at 2.[1] She has been conducting research in this area for 20 years, has "published numerous scholarly peer-reviewed articles and chapters on these topics," and "created one of the most oft-used and influential laboratory paradigms for studying true and false confessions." *Id*.; *see also id*. (CV and List of Publications) at 65-82. In fact, she has received over $2.4 million in funding from the Departments of Justice and Defense for her research on interrogations and confessions via the High-Value Detainee Interrogation Group. *Id*. at 2.

This Court previously admitted Dr. Russano's testimony in a similar wrongful conviction case involving a fabricated and coerced confession. Ex. 1 (Order denying motion to bar Russano in *Chatman v. City of Chicago*). There, this Court found that false-confession research was an adequately developed field; Dr. Russano's testimony was based on sound methodology; her testimony could not be excluded based on factual assumptions; and her testimony would assist the jury. *Id.* at 4-8. Moreover, every court in this district addressing the admissibility of testimony similar to Dr. Russano's regarding false confessions in Section 1983 cases has found that the testimony is admissible. *Harris v. City of Chicago*, 2017 WL 2436316 (N.D. Ill. June 5, 2017) (denying, in significant part, defendants' motion to bar the opinions of false confession expert Dr. Richard Leo); *Caine v. Burge*, 2013 WL 1966381 (N.D. Ill. May 10, 2013) (same); *Kluppelberg v. Burge*, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016) (denying, in significant part, defendants' motion to bar the opinions of false confession expert Dr. Richard Ofshe); *Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) (same). In *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996), the Seventh Circuit held that it was error for the district court to exclude the testimony of Dr. Ofshe because "Dr. Ofshe's testimony, assuming its scientific

---

[1] Pages cited refer to the page numbers of the docket entry.

validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." On remand, the district court in *Hall* held that the scientific validity of Dr. Ofshe's testimony was "sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702." *United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999). It has been established in this district since at least 1997 that the methodology behind Dr. Russano's opinions, and others like it, is sufficiently reliable to satisfy Rule 702 and *Daubert*.

Dr. Russano's opinions in this case include the following: innocent people may confess falsely to a crime that they did not commit; certain interrogation techniques, such as minimization, direct positive confrontation, investigative bias or tunnel vision, increase the risk of false confessions; individual suspect vulnerabilities, such as young age, increase the risk of false confessions; and situational risk factors, such as prolonged custody, isolation, and interrogation, sleep deprivation, physical discomfort, and the use of multiple interrogators, increase the risk of false confessions. Dkt. 319-1 at 6-14. She opines that certain risk factors (interrogation techniques and individual suspect vulnerabilities) existed here. *Id.* at 27-42. In addition, Dr. Russano presents an analysis of the post-admission narrative (*e.g.*, the court-reported confession) in order to assist the jury in determining its reliability. *Id.* at 43-53; Dkt. 319-2 (Russano Dep.) at 27:5-7. She determined that "there should be great concern about the reliability of the confession." Dkt. 319-2 at 27:8-10.

## ARGUMENT

### Legal Standard

Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one"

focusing on an expert's principles and methodology, not her conclusions. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). Factual questions about an expert's opinions are for the jury because they go to the weight of testimony—the credibility of the expert—not admissibility. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). Thus, rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

I.  **Dr. Russano Does Not Opine on the Cause of the Albany Fire**

Defendants hinge their first argument on Dr. Russano's factual assumptions about the cause of the fire. *See* Dkt. 319 at 3-6. But, as Dr. Russano herself states, she is not rendering an opinion on the cause of the fire. Dkt. 319-1 at 29 n.161. Plaintiff has retained John Lentini and Denny Smith to opine on the cause of the fire and the chemical analysis of the fire debris.

Instead, Dr. Russano merely relies on the evidence in the record (including the opinions of Lentini and Smith) to provide the opinions she is qualified to provide about the presence of known risk factors for false confessions (and how tunnel vision or confirmation bias may have played a role in that). *Id.* at 28-29. Dr. Russano references Gruszka's and Rokosik's fire investigation not to test their scientific conclusions, but to assess whether they pursued leads and evidence with tunnel vision. *Id.* at 28-31. That the investigators never explored whether the fire was accidental or started by someone else, failed to interview at least two witnesses with relevant information, and brushed aside inconsistent information all underscores their fixation on Plaintiff's guilt—which in turn is a risk factor for a false confession. The risk factors for false confessions are squarely within Dr. Russano's area of expertise.[2] This Court held in *Chatman*

---

[2] Defendants do not challenge Dr. Russano's qualifications to opine on risk factors for false confession or analyze the confession for reliability, and for good reason. She is eminently qualified. Dr. Russano is an experimental

4

that Dr. Russano may testify about "the factors that are indicative of a false confession and whether those factors are present …." Ex. 1 at 7.

Likewise, when Dr. Russano concludes that "the inclusion of a false fact that was believed to be true by investigators (e.g. that gasoline was used as an accelerant) is a major red flag that the confession was likely unreliable, and by extension, that contamination was likely omnipresent throughout the interrogations of Adam conducted by the Defendants in this case," Dkt. 319-1 at 54, she is merely assuming certain facts (that gasoline was not used as an accelerant).[3] Dkt. 319-2 at 47:4-7 ("the experts that I'm relying upon in this case, with respect to this issue, concluded that there was no gasoline in the milk jug, nor was there any gasoline used at the fire as an accelerant."). "[A]n expert may rely on disputed facts in rendering an opinion." Ex. 1 at 6-7 (citing supporting cases). Dr. Russano may base her opinions on assumptions. *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006) ("Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence."). As this Court explained in rejecting a similar argument in *Chatman*, "The Officer Defendants are free to question Dr. Russano about her factual assumptions on cross-examination, but the Court will not exclude her testimony on that basis." Ex. 1 at 7.

## II. Dr. Russano's Analysis of the Interrogation and Confession and the Factors that Indicate the Reliability or Unreliability of the Confession Are Based on a Sound Methodology and Proper Factual Assumptions

---

psychologist whose primary area of research is interrogations and confessions. *See* Dkt. 319-1 at 2, 65-82. This Court previously held that Dr. Russano's research expounds a field of science that "passes muster under *Daubert*," and that her general research methodology is sufficiently reliable to put before the jury. Ex. 1 at 4-6. Other courts have confirmed that social psychology research like that conducted by Dr. Russano on the subjects of police interrogation tactics, psychological coercion, and false confessions is methodologically reliable. *See Harris*, 2017 WL 2436316, at *7-*9; *Caine*, 2013 WL 1966381, at *3; *Kluppelberg*, 2016 WL 6821138, at *4; *Scott*, 2010 WL 3034254, at *5; *Harris v. Thompson*, 698 F.3d 609, 632, 632 n.12 (7th Cir. 2012).
[3] It is undisputed that gasoline was not found in the laboratory testing.

5

Defendants' second argument is a repackaged version of their first. Dkt. 319 at 6-7. They argue that because Dr. Russano assumed that gasoline was not used to start the fire, her opinion that this false fact in Plaintiff's confession was a "major red flag" is unsound. *Id.* But as this Court held in *Chatman*, Dr. Russano is permitted to assume certain facts in reaching her opinions about the risk factors for false confession and the factors that indicate the reliability or unreliability of a confession.

"When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." Fed. R. Evid. 702, advisory committee's note (2000 amends.). The fact that gasoline was not used to start the fire is just that—a fact. Dr. Russano is permitted to make and rely on factual assumptions, as supported by the record, to form her opinions. *Harris*, 2017 WL 2436316 at *12 ("It is well-settled that experts can base their opinions on disputed facts …"); *Hall*, 93 F.3d at 1345-46 ("It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place."); *Andersen v. City of Chicago*, 467 F. Supp. 3d 619, 629-30 (N.D. Ill. 2020) ("[S]he renders conclusions based on certain possible assumptions."); *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013) ("The law does not support exclusion on this basis" of relying "on a client's version of disputed facts"). Here, the record adequately supports Dr. Russano's factual assumption about absence of gasoline. *See* Dkt. 319-1 at 29 n.161 ("[T]hree independent fire science experts are definitive in their conclusion that the assumptions that were used to make the arson determination were not evidence-based, and it was the debunking of those assumptions that largely contributed to Adam's eventual exoneration."); *Wilbern v. Culver Franchising System, Inc.*, 2015 WL 5722825, at *14-15 (holding that an expert may rely on another expert's opinion in addition to the record to make a factual assumption).

6

Instead, any weaknesses in this factual assumption are a topic for cross-examination and for the jury to weigh. When expert testimony has been admitted under *Daubert,* the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015), quoting *Stollings v. Ryobi Tech., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013). Here, Dr. Russano is not "vouching" for Plaintiff's version of the facts. She testified at her deposition that she is not opining that Plaintiff provided a false confession; she acknowledged that that is for the jury to decide. Dkt. 319-2 at 138:11-19. "Cross-examination, rather than exclusion, is the appropriate course." *Andersen*, 467 F. Supp. 3d at 626.

Moreover, Dr. Russano pointed to many other factors that bear on the reliability or unreliability of the confession, in addition to the false fact about gasoline. Dkt. 319-1 at 43-53 (discussing witness statements, possible contamination, lack of corroboration of the confession, lack of details in the confession that led to any objective independent corroborating evidence). She analyzed Plaintiff's confession using the methodology she describes. *Id.* Defendants' bare assertion otherwise is completely unsupported.

### III. Dr. Russano's Opinions Are Based on Sufficient Facts or Data

Defendants' argument that Dr. Russano's opinions are not based on sufficient facts or data is difficult to even comprehend. Dkt. 319 at 7. Dr. Russano was provided every piece of evidence that could even conceivably relate to the confession. *See* Dkt. 319 at 3-5 (list of materials reviewed). And, she clearly reviewed this long list of materials, as demonstrated in her extensive discussion of the facts. *Id.* at 15-27 (section of her report titled, "Case Background and the Interrogation of Mr. Adam Gray"). Defendants might disagree with what the record shows and

7

the facts. But that disagreement with the facts is not a basis to argue that Dr. Russano did not have sufficient facts or data on which to base her opinions. Plaintiff dissects each of Defendants' specific criticisms below.

First, Defendants complain that Dr. Russano cannot calculate the incidence rate of false confessions in the United States. Dkt. 319 at 8. Not only have they not explained why this is even relevant, but it has been rejected as a reason to bar testimony like Dr. Russano's. *See, e.g.*, *Kluppelberg*, 2016 WL 6821138, at *4 ("Defendants' specific arguments—that since Ofshe did not include non-coerced confessions in his study he cannot opine on the rate of coerced confessions or that there is a causal link between certain police tactics and false confessions— merely identify limitations of Ofshe's methodology, not that it is unreliable. Other than citations to state-court cases in which Ofshe has not been permitted to testify, defendants have not offered a reason why Ofshe's opinion is rendered unreliable by his inability to identify the rate at which coerced confessions occur."); *accord Harris*, 2017 WL2436316, at *9 (rejecting similar attack on Dr. Leo's methodology). As Judge Lefkow observed in *Kluppelberg*, "Ofshe ably responded to defendants' critique during his deposition, explaining that his methodology seeks to determine why false confessions happen and to determine if specific confessions may have been affected by coercive techniques, not to serve as a predictor of the frequency of false confessions." 2016 WL 6821138, at *4 n.3. The same applies here. Dr. Russano agreed that she could not calculate incidence rate of false confessions without a "crystal ball." Dkt. 319-2 at 92:11-15. Incidence is irrelevant to why false confessions happen. As Judge Lefkow observed, "academic literature posits that there are limitations that prevent scholars from identifying an incidence rate." *Kluppelberg*, 2016 WL 6821138, at *4; *see also Caine*, 2013 WL1966381, at *3. The incident rate (whatever it is) does not change whether something is a risk factor for a false confession.

8

"A litigant that wants a court of appeals to set aside a district judge's decision to admit expert testimony has to do more than appeal to a lawyer's sense of how science should be done." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). Defendants fail to demonstrate that Dr. Russano has committed any scientific error from the perspective of social science. The incidence rate of false confessions and what constitutes a risk factor for a false confession are two separate, unrelated things, and Defendants have not made any argument or cited any authority to the contrary.[4]

What really matters is that an expert's methods are generally accepted in the relevant scientific community. *See Lapsley v. Xtek, Inc*., 689 F.3d 802, 805 (7th Cir. 2012). That standard is easily met here: in 2010, the American Psychology Association (APA) published a White Paper presenting a "consensus-based statement on confessions," that "review[ed] the state of the science on interviewing and interrogation." Ex. 2 (Kassin, *et al*., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & HUM. BEHAV. 3, 4 (2010)). That paper "draws on core psychological principles of influence as well as relevant forensic psychology studies," and identified "various risk factors for false confessions," all despite an acknowledgement that "an incidence rate [of false confessions] cannot be determined." *Id.* at 4-5.

Second, Defendants seek to bar Dr. Russano's testimony about the risk factors for false confession because some of those risk factors (individual vulnerabilities and interrogation techniques) can also cause true confessions. Dkt. 319 at 8. This is not a Rule 702 or *Daubert*-based argument, or other argument about Dr. Russano's methodology. This is merely fodder for

---

[4] Defendants argue that without knowing the incidence rate of false confessions, Dr. Russano cannot testify that false confessions are a leading cause of wrongful convictions in this country. Dkt. 219 at 8. But they are again confusing two different things. What Dr. Russano says in her report is, "To date, in 365 DNA exoneration cases that have been documented by the Innocence Project, false confessions or admissions were given in approximately one out of every four cases (295), making false confessions a leading cause of wrongful conviction in this country." Dkt. 319-1 at 6.

9

cross-examination, not exclusion. Nevertheless, Dr. Russano explained what she was talking about in her deposition:

> So it is true that some of the techniques that are associated with a higher likelihood of false confessions are also associated with a higher likelihood of … true confessions. So what we do in particular studies, so for example, in experimental studies where we're actually manipulating the type of technique that's being used and looking at the effect that technique has on true and false confessions, we can look at the overall diagnosticity of any particular technique. And by "overall diagnosticity," I mean the ratio of true to false confessions, so what we want, a diagnostic technique, is one that elicits true confessions or information from actually guilty people, but minimizes false confessions or information from … innocent persons, right? So the overall diagnosticity, a diagnostic technique, gets confessions from guilty people, doesn't get confessions from … innocent people. A less diagnostic technique is one that increases the true and false confession rate, right? So ultimately, what we're looking for are those techniques, sort of you can think of them as surgically precise, right? So we want to use techniques that basically get the true confessions, don't get the false confessions. … *the problem with ... many of the risk factors that I've pointed out, they are not diagnostic, and so yes, you can get confessions, but the problem is that once we get the confession, we can't be sure that it's a true confession or a false confession because it's a poor technique to start with in that it's not diagnostic.* And so the resulting evidence, the confession, becomes essentially non-probative, not particularly informative, because while it could be a true confession, there's a high likelihood … it's also a false confession, which is why we want police using those better, science-based, evidenced-based diagnostic techniques.

Dkt. 319-2 at 180:4-181:16 (emphasis added).

Third, Defendants argue that Dr. Russano has not provided any science that supports that any of the individual vulnerabilities are a risk factor that could lead to a false confession. Dkt. 319 at 8. They first discuss prolonged custody. *Id.*[5] But Dr. Russano did cite studies supporting that prolonged custody is a known risk factor for false confessions. Dkt. 319-1 at 35 (see studies cited in footnotes). Dr. Russano even notes that law enforcement manuals, including the Reid manual, caution against prolonged interrogation, citing it as a risk factor for false confessions. *Id.*

---

[5] Dr. Russano also cites studies and research supporting her opinions about the other known risk factors. Dkt. 319-1 at 28-29 (discussing studies on tunnel vision and confirmation bias), 31-34 (discussing studies on young age), 36-37 (discussing studies on sleep deprivation), 37-38 (discussing studies on multiple interrogators), 39-42 (discussing studies on interrogation tactics such as guilt-presumptive approach, presentation of false evidence/trickery and deception, threats and promises). Dr. Russano also included an exhaustive list of references for her report. Dkt. 319-1 at 55-63.

At her deposition, Defendants asked her if she could give a specific number of hours where it would make it more likely to cause a false confession. Dkt. 319-2 at 132:24-133:1. Dr. Russano answered:

> the longer an interrogation, the higher the risk for false confessions. There isn't some magic cutoff that if it you do it under a certain amount, you won't get a false confession and if you do it over a certain amount, the … confession will necessarily be false. So it does not work that way, and I can't give you specific numbers, but we know that as length of time increases, risk increases. We know that juveniles who have reported falsely confession, that the lion's share of that happens with – with two hours or more interrogation, but there is no singular answer to your question. … there is no line that … anyone can draw for you that says, "under this, you're not in any danger, and over this, you … absolutely will get a false confession," because it's related to everything that is happening in the context of that interrogation.

Dkt. 319-1 at 133:3-25. The fact that there is no "magic cutoff" does not render Dr. Russano's opinion about this risk factor inadmissible.

Defendants' same argument about sleep deprivation, Dkt. 319 at 8-9, should be rejected. There is no magic number of hours of sleep that says, if you get X number of hours of sleep, you won't get a false confession, and if you get under that number, you will. *See* Dkt. 319-2 at 135:6-136:5. Dr. Russano has cited research and studies about the effects of sleep deprivation, and how it is a known risk factor for false confessions. Dkt. 319-1 at 36-37. She applied the research to her analysis of the facts here and concludes that "[s]leep deprivation was likely a factor in Adam's case." *Id.* at 37. Her methodology is reliable and her testimony is admissible.

Likewise, Defendants' argument that the inability to provide a "numerical calculation of how much the use of false evidence could increase the risk of false confession" should also be rejected. Dkt. 319 at 9. Dr. Russano was asked about the false evidence ploy used by Detective Crescenzo on Adam involving the Xerox machine and whether she could quantify the probability of Adam giving a false confession. Dkt. 319-2 at 137:19-2. She explained, "I can say that … the presentation of false evidence in that form increases the likelihood of him providing a false

11

confession, but I can't give you some numerical calculation of how much it increases his risk by." *Id.* at 138:6-10. Simply because she cannot give a numerical calculation does not render her opinion unreliable or methodologically unsound. Defendants have cited no legal or other authority to the contrary.

And finally, Defendants object to Dr. Russano's opinion about Plaintiff's young age (14) at the time of the interrogation and whether that was a risk factor because she did not perform a psychiatric or psychological examination of Plaintiff. Dkt. 319 at 9. But there is no reason that she needed to perform any such examination of Plaintiff in order to have a basis for testifying that Plaintiff's age is a risk factor for false confession. She doesn't need to do a psychiatric or psychological examination of Plaintiff to know his age. Dr. Russano cited a plethora of research and studies that support her opinion that Plaintiff's age was a risk factor for false confession. Dkt. 319-1 at 32-34. Furthermore, Dr. Russano's use of the phrase "tender age" is not inflammatory and is not inadmissible under Rule 403. Defendants have not cited anything supporting their arguments.

**IV.     Dr. Russano's Opinions Will Help the Jury, Rather than Usurp Its Role**

In contending that Dr. Russano's opinions will not be helpful to the jury, Defendants assert that she opines on fire science and the credibility of Karrie Kelly. Dkt. 319 at 10-11. As discussed above, she does not offer an opinion on fire science. Nor does she opine on the credibility of Karrie Kelly—she merely identifies potential problems with the circumstances surrounding the identification and the construction of the lineup procedure. Dkt. 319-1 at 19 n.109. These are not grounds for barring Dr. Russano's opinion.

And, again, Defendants fail to cite the well-established authority in this Circuit that testimony like Dr. Russano's—which explains how innocent people may confess to crimes they

12

did not commit, as well as the interrogation tactics and personal and situational risk factors that make it more likely that someone will falsely confess—is helpful to the jury. Ex. 1 at 7-8; *Hall*, 93 F.3d at 1345 (the district court's decision to exclude opinion testimony on the subject of false confessions "overlooked the utility of valid social science"); *see also United States v. West*, 813 F.3d 619, 624 (7th Cir. 2015) ("Evidence bearing on the trustworthiness of a confession is generally relevant and admissible absent some specific reason to exclude it, such as unfair prejudice or juror confusion."). This goes for expert testimony on eyewitness identification as well. *See, e.g., Sanders v. City of Chicago Heights*, 2016 WL 4398011, at *6 (N.D. Ill. Aug. 18, 2016) (collecting cases) ("[N]othing is obvious about the psychology of eyewitness identification…").

The mechanics and risks of false confessions belie many lay juror's assumptions. *Andersen*, 2020 WL 1848081, at *3 ("[T]he average person may find it incredible that someone would confess to a murder they did not commit."); *Caine*, 2013 WL1966381, at *2 ("Although jurors' common sense may suggest to them that someone would never falsely confess to committing murder, Dr. Leo's testimony will educate jurors that false confessions sometimes *do* occur. As a result, the Court believes it will be helpful for the jury to hear expert testimony on this issue."); *Scott*, 2010 WL 3034254, at *5 (referring to Dr. Ofshe's testimony on false confessions as "obvious[ly] relevan[t]"); *Harris*, 2017 WL 2436316, at *16 (holding that Dr. Leo's testimony on false confessions is helpful to the jury); *Kluppelberg*, 2016 WL 6821138, at *5. As the Seventh Circuit explained in *Hall*:

> Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly help beliefs are in error. Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried.

13

93 F.3d at 1345.

Dr. Russano explained why these risk factors for false confession were present in this case. Dkt. 319-1. Her opinions are helpful to the jury because they help it determine a fact in issue—pertinent factors to consider when determining the reliability and voluntariness of Plaintiff's confession. *See Harris*, 2017 WL 2436316 ("in forming his opinion about indicia of reliability, [Dr. Leo] applied an approach common in his field in which he compared indicia of reliability and unreliability to Plaintiff's confession. He further testified that he is not opining that Harris gave a false confession, but that her confession contained indicia of unreliability."); *Caine*, 2013 WL 1966381, at *4 ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case. Dr. Leo will also be permitted to generally testify that, based on his knowledge, experience, and study of confessions and police interrogations, false confessions frequently do not contain the type of crime scene knowledge that only a true perpetrator would have, and that some false confessions contain such detail because of police contamination."); *Andersen,* 2020 WL 1848081, at *3 ("Dr. Kassin has appropriately bridged the science surrounding false confessions to the facts of Andersen's case, first laying out risk factors an then pointing to such risk factors present in the facts here."); *see also Kluppelberg*, 2016 WL 6821138, at *5.

Even when jurors might be aware that false confessions occur, the reasons why they occur and when they are likely to happen is beyond the common knowledge of laypersons. *See* Ex. 3 (Kassin, *Why Confessions Trump Innocence*, 67 AM. PSYCHOL. 431 (2012)); Ex. 4 (Costanzo, *et al.*, *Juror Beliefs About Police Interrogations, False Confessions, and Expert Testimony*, 7 J. EMPIRICAL LEGAL STUDS. 231 (2010)); Ex. 5 (Kassin, *et al.*, *I'd Know a False Confession If I Saw One: A Comparative Study of College Students and Police Investigators*, 29

14

L. & HUM. BEHAV. 211-227 (2005)); Ex. 6 (Leo, Liu, *What Do Potential Jurors Know about Police Interrogation Techniques & False Confessions?*, 27 BEHAV. SCIS. & L. 381-399 (2009)); Ex. 7 (Chojnacki, *et al.*, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 AZ. S. L.J. 1, 26-36 (2008)); Ex. 8 (Henkel, *et al.*, *A Survey of People's Attitudes and Beliefs About False Confessions*, BEHAV. SCIS. & L. 26, 555-584); Ex. 9 (Brandon, *et al.*, *Perceptions of Confessions and Expert Testimony*, PSYCHOLOGY OF CRIME & L.). Dr. Russano's testimony will, therefore, assist the jurors in overcoming any commonly held misbeliefs.

In sum, Dr. Russano's opinions assist the jury resolving the issues by identifying the factors that increase the likelihood of false confession and identifying those factors present here that will help the jury determine if Plaintiff's confession was reliable.

## CONCLUSION

For the foregoing reasons, Defendants' motion to bar Dr. Russano should be denied.

                                            Respectfully submitted,

                                            /s/ Elizabeth Wang
                                            Counsel for Plaintiff Adam Gray

| | |
|---|---|
| Elizabeth Wang | Jon Loevy |
| Loevy & Loevy | Loevy & Loevy |
| 2060 Broadway, Ste. 460 | 311 N. Aberdeen St., 3rd Fl. |
| Boulder, CO 80302 | Chicago, IL 60607 |
| O: 720.328.5642 | O: 312.243.5900 |
| elizabethw@loevy.com | jon@loevy.com |

**CERTIFICATE OF SERVICE**

      I, Elizabeth Wang, an attorney, on July 12, 2022, filed the foregoing Response, via CM/ECF, causing a copy of it be delivered to all counsel of record via electronic service.

                                          /s/ Elizabeth Wang
                                          Counsel for Plaintiff