## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ADAM GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-CV-02624 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The Court issues the following decisions on the motions in limine filed by the Plaintiff and on the certificate of innocence. Another order will address the City Defendants' motions. Also, although the Plaintiff has settled with the County Defendants, those motions are still addressed because some of them are still relevant and helpful for the trial.

## Gray's Motions in Limine

**Plaintiff's Motion in Limine 1 (strike 51-person witness list).** The Court addressed this motion in Docket Entry 454 and the motion is entered and continued.

**Plaintiff's Motion in Limine 2 (bar certain other bad acts or character evidence).** The Court addresses in turn several categories of other-act and character evidence that Gray seeks to bar. *See* Fed. R. Evid. 404(a)(1), (b)(1).

### *Alleged physical and sexual abuse of Gray by family members.*
The Defendants argue that information about Gray's childhood abuse is relevant as a potential cause of the emotional distress that he has allegedly experienced. R. 396, Defs.' Resp. MIL 2 at 10–12. Their argument is based on (generously described) out-of-context dictum in *Barber v. Chicago,* 725 F. 3d 702 (7th Cir. 2013), specifically that "the larger chunk of one's life that is claimed to have been negatively impacted by emotional distress, the more important it is to explore other events that may have

contributed to the individual's loss." *Id.* at 713. But "Barber *did not* claim a generally disabling long-term trauma," *id.* (emphasis added), so the opinion did not have occasion to elaborate on any standard on when other stressors should (or should not) be allowed into evidence.

In contrast, here Gray was allegedly coerced to confess and allegedly was subjected to fabricated evidence, and then was incarcerated for over *two decades*. If the jury finds liability, then it is plain that the prior abuse would be greatly eclipsed by the alleged violations. This is unlike, for example, an excessive-force case that involved a one-day event and for which the defense could persuasively argue that other stressors added to (or even made up the bulk of) the damages arising from the single event. Simply put, in light of what the jury would had to have found if it decides in Gray's favor for liability, the alleged family abuse is so remote both in time and in cause and effect that the abuse's probative value would be substantially outweighed by the waste of time and distraction prohibited by Evidence Rule 403. Worse, even in deciding *liability*, the jury might speculate that the family abuse caused Gray to commit crimes, including arson. So there is a significant risk of unfair prejudice as well. This motion is granted as to evidence of Gray's alleged childhood abuse.

**Gang membership and prior criminal history.** The Defendants argue that Gray's prior arrests and alleged gang affiliation are relevant because they demonstrate that he has familiarity with interrogations and being processed through the criminal justice system. Defs.' MIL 2 at 12–15, 17. But the Defendants fail to explain how the prior arrests or encounters with the criminal justice system are similar in any way to the investigation into the arson. Even if somehow relevant, the probative value is readily and substantially outweighed by unfair prejudice under Rule 403, because the jury might make liability or damages (or both) findings based on general bad character instead of the evidence.

The Defendants also argue that their knowledge of Gray's prior arrests factored into their probable-cause analysis. But the information can only form part of the probable-cause assessment if it was known to the Defendants at the time of Gray's arrest and interrogation. To show that purported knowledge, the Defendants point to state court proceedings, but the transcript shows that Pochordo testified only about Gray's confession. R. 430, Pl. Reply at 10. There is no mention of the Defendants' pre-arrest knowledge of the prior criminal history or gang affiliation. So this relevancy theory is missing the premise of knowledge.

The Defendants also argue that gang membership shows an already-troubled and difficult childhood, which then should tamp down damages. But that type of generalized attack is, at bottom, premised on the notion that a gang member suffers less from wrongful incarceration than others. Even if that somehow had probative force, it would be very, very weak and readily outweighed by unfair prejudice and waste of time. The motion is granted as to barring any evidence related to Gray's gang membership and prior criminal history.

***"Broken lock incident."*** At Paris's deposition, she testified that before the fire, she tried to use her key to lock her front door, but the lock would not work and her mother's key broke in the lock. When someone came to fix the lock, they were told that something had been stuffed into the lock. R. 375-5, MIL 2 Exh. 5 at 112–16. Sondelski testified at his deposition that his friend, Jimmy Pyle, told Sondelski that he had seen Gray snap a key off in the front door earlier that day. R. 375-4, MIL 2 Exh. 4 at 21–22.

As if it were the title of a bad Sherlock Holmes story, the parties call this the "broken lock incident." To the extent that the Defendants are offering Pyle's statement to prove outright that Gray did commit the arson, it appears that they may do so depending on whether they can lay the foundation for the present-sense impression exception to the hearsay rule. Fed. R. Evid. 803(1); *see United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001). Sondelski claims that Pyle made the statement "right after it happened essentially." R. 396-3, Defs. Resp. MIL 2 Exh. 3 at 22–23. There is some vagueness to that way of explaining the timing, so how this comes out at trial will be important.

But that analysis applies to offering the testimony to show that Gray purportedly did commit the arson. What does not appear to be establishes is whether Pyle or Sondelski ever told the police about the broken-lock incident. If the defense cannot establish that the Defendants knew about the incident when making the probable-cause assessment, then the incident cannot be offered to show probable cause at the time of the arrest.

***Alleged threats against Paris.*** Paris testified at her deposition that Gray made "threats" to Paris regularly and that she had been told by someone that he had a plot to rape her. Pl. MIL 2 at 12. She also testified that she and Gray regularly threatened to fight each other and there was nothing unusual about the arguments made in the months leading to the fire. *Id.* Paris's mother also recounted some

threats, as memorialized in the police report. R. 396-4, Defs.' MIL 2 Resp. Exh. 4, March 28, 1993 Police Report at 10. The Defendants recount a somewhat different atmosphere around these threats, arguing that many were death threats due to Paris's continued relationship with Mel Gonzalez as recounted during the criminal trial. The Defendants argue all this evidence is admissible because it formed a key part of the investigation and was relevant to the officers' probable-cause analysis. Defs.' MIL 2 Resp. at 2.

As a threshold matter, the statements recounted by Paris (and her mother) about what Gray himself said to the Parises qualify as party-admissions and can be offered for their truth—that is, that Gray intended to harm Paris and thus (the argument goes) have a motive to commit the arson. But the second-hand statements—that is, what *others* told Paris (and her mother)—are *not* covered by an applicable hearsay exemption or exception. So those second-hand statements cannot be offered for the truth, that is, that Gray actually had a motive to harm Paris.

Having said that, any alleged threats made by Gray, whether made directly to Paris or *even* relayed to her (and her mother) by others, may be considered not for their truth but for their *effect* on the officers—specifically, for their probable-cause analysis. To the extent that the Defendants actually knew of alleged threats, even second-hand from someone else through Paris, the Defendants could consider those threats in determining probable cause. Yes, Gray may argue to the *jury* that those second-hand statements should not have been considered as reliable in evaluating probable cause, but the statements satisfy the relevancy standard. Based on the draft police report, there is at least sufficient foundation to show that the officers knew that Gray allegedly "has been threatening to kill her for the past year, and, as early as two weeks prior to the fire at her home, she confronted this youth about putting a dead decaying pigeon on her back porch." 03/28/1993 Police Report at 10. The report goes on to say:

> Due to the fact that Kasandra Paris stated that she has been threatened numerous times by Adam Gray, with the most recent threat perpetrated on 24 March 1993, just hours before her home was set on fire, and, further, due to the fact that Kasandra stated Adam Gray had a fascination for fire, Adam Gray was brought into Area #1 Violent Crimes for questioning.

*Id.* This is enough foundation that the officers relied on these threats in assessing probable cause. For the remaining threats, because Defendants have not demonstrated that the officers had knowledge of those threats at the time of their

4

investigation, the statements necessarily could not form part of their probable-cause analysis. For those remaining statements, the only basis to admit it is for the question of whether Gray *actually* committed the arson (or to undermine Gray's argument that he did not). This goes to damages, insofar is Gray's culpability (or not) does affect the emotional distress that he would experience from being in custody.

In the interest of jury comprehension, the Court orders that Defendants should structure their examination of Paris as much as possible to distinguish between (1) those threats Defendants claims that detectives knew at the time of charge and (2) those they did not know but still are introducing to undermine Gray's damages argument.

**"*Dead Pigeon Incident.*"** Barbara Paris asserts that around one week before the fire happened, a dead pigeon was found on Paris's back porch. Defs.' MIL 2 Resp. at 5–6. Other children in the neighborhood claimed that Gray had told them that it meant someone in Paris's house was going to die, an (at least arguably) implied threat, which they relayed to Paris. Paris then relayed this information to officers. The police report notes "as early as two weeks prior to the fire at her home, she confronted this youth [Adam Gray] about putting a dead decaying pigeon on her back porch." March 28, 1993 Police Report at 10.

Similar to the analysis on the other-threat evidence, those statements face a double hearsay problem: first, others relaying this implied threat to Barbara Paris, and Paris then relaying this information to officers. Perhaps the first step arguably is attributable to Gray himself as a party-admission, but the second step is not. But the statements were reported to the officers, so again the statements may be used for the effect on the officers, specifically, for the officers' probable-cause assessment. Officers may rely on reasonably trustworthy information, including hearsay statements, in making probable-cause determinations. *United States v. McKay*, 283 F.2d 399, 402 (7th Cir. 1960) ("Even though the information that Tucker gave to the officers and Wilkie was hearsay, they were legally entitled to consider it in determining whether there was probable cause."); *see Woods v. City of Chicago*, 234 F.3d 979, 986–87 (7th Cir. 2000); *Haywood v. City of Chicago*, 2002 WL 31118325, at *6 (N.D. Ill. Sept. 25, 2002) (noting that "a finding of probable cause may be based on hearsay"). The motion is thus denied as to the dead pigeon incident.

**_Fascination with Fire._** The Police Report notes that Paris recounted information about Gray's fascination with fire and that he played with fire:

> Kasandra went on to relate that Adam Gray likes to watch things burn, and told her that, "Fires are cool, I love them." She stated that one day he put alcohol on his hand and set it on fire and chased her down the street with his hand on fire. She stated that approximately three years ago, Adam Gray was making molotov cocktails and throwing them in the alley to watch them burn. She stated that Adam Gray would make all kinds of concoctions and burn them in his house. Kasandra related that Adam Gray would make black powder bombs, both before and after the 4th of July and put the black powder in clay and set the bombs off. She stated that he used to burn cellophane and paper in ash trays. Due to [the threats Paris faced] and, further, due to the fact that Kasandra stated Adam Gray had a fascination for fire, Adam Gray was brought into Area #1 Violent Crimes for questioning.

March 28, 1993 Police Report at 10. These statements are admissible for two purposes. First, Kasey Paris reported this information to the officers during their investigation, so they may be admitted for their effect on the officers in making their probable-cause determination. There is no basis to exclude Gray's alleged familiarity with setting fires in a variety of contexts as part of the probable-cause assessment.

Second, the party-admissions of Gray about his fascination with fire and the examples for which Kasey Paris has personal knowledge (which appears to be all of them) also are admissible to show Gray's knowledge on how to set fires and experience with using fire in a variety of settings. It is true that Rule 404(b) forbids propensity-based reasoning in offering other-acts evidence, and Rule 403 serves as an additional safeguard against even non-propensity-based evidence. But it is not as if the defense is offering a bad-character flaw or a prior arson. Instead, it is highly relevant that Gray *knew* how to set fires in a variety of settings and outright (according to Paris) said that he "loved them." It is highly probative that Gray had prior knowledge and experience with fire, all the way to the point of setting fire to his hand and burning Molotov cocktails, because otherwise the jury is left to wonder how a 14-year-old even thinks of committing arson, which is an otherwise dangerous act to commit. To be sure, Gray will have plentiful arguments to the jury against drawing this inference, but the evidence does satisfy Rule 404(b) and Rule 403.

**Watson Gray's Conviction.** Gray's father, Watson Gray, was convicted of first-degree murder and died in custody in 2020. The Plaintiff posits that Watson Gray's imprisonment might come up in the Plaintiff's testimony about the interrogation (for example, that the Defendants allegedly taunted Gray about ending up like his father, or the fact that Gray was transferred to his father's prison for some time).

6

Gray seeks to bar evidence on the nature of Watson Gray's crimes, arguing that it is not relevant to any issue in this case, could only serve to go to propensity (presumably generational propensity), and should be barred under Rule 403 even if relevant. R. 370, Pl. MIL 2 at 11. The Defendants offer no response. The motion is granted: the nature of Watson Gray's conviction is excluded.

*Other bad-acts evidence and family-related bad-acts evidence.* The Plaintiff identifies an additional list of alleged bad acts, such as underage drinking, smoking marijuana, participation in fights, vandalizing buildings, as well as his brother Michael Gray's prior convictions and bad acts, including a dishonorable discharge from the Marines. Pl. MIL 2 at 6. The Defendants argue that they must be allowed to impeach or rebut any evidence of good character with examples.

The motion to exclude is granted as to these other bad acts. As noted earlier, because neither side may introduce evidence of Gray's good character writ large, the Defendants have no need for this evidence, which they concede is character evidence. These other bad acts allegedly committed by Adam Gray do not survive Rule 404(b). And the long-ago prior conviction, drug use, and dishonorable discharge of Michael Gray does not survive Rule 403, because the bad-character specter of that evidence substantially outweighs any probative value for impeachment against Michael Gray.

**Plaintiff's Motion in Limine 3 (bar undisclosed expert testimony).** The Court addresses in turn several witnesses which Gray argues were never disclosed as exert witnesses and therefore should not be admitted. R. 371, Pl. MIL 3. Defendants for their part concede that although they did not disclose these witnesses under Federal Rule of Civil Procedure 26(a)(2)(B), they are not experts under that Rule. In the alternative, the defense argues that the error was harmless because the defense disclosed at least William Rogers and Ernest Rokosik under their mandatory initial disclosures per Civil Rule 26(a)(1), and Gray was aware the others were to testify as previously documented. R. 397, Defs. MIL 3 Resp.

*William Rogers.* The Defendants argue that Rogers will testify to the fact that he smelled gasoline at the scene of the fire. Though Rogers should have been disclosed under Rule 26(a)(2)(C), the Court agrees that this error is harmless—given Roger's initial disclosure and the fact that Gray had an opportunity to depose him on this very issue.

Having said that, because he was disclosed only as a lay-opinion witness, he is limited to that opinion: his lay opinion that he smelled gasoline. So he must rely on ordinary experience that any person might have with gasoline (such as from using a

lawnmower, filling a car, or other common life experiences). He may not testify to any specialized knowledge or training that he may have received as a firefighter or otherwise. Nor may he testify on whether smelling gasoline is typically an indicator of arson.

**Ernest Rokosik.** The Defendants point out that of course Rokosik was assigned to investigate the fire at issue in this case, observed heavy damage and charring, and later testified that such charring was "characteristic of the application of an ignition of a flammable liquid." Defs. MIL 3 Resp. at 4. They argue that any failure to disclose Rokosik was harmless because he was not retained, and his prior trial testimony was disclosed, which Gray reasonably should have known would be relied on. Also, he passed away before this case was filed, so Gray would not have been able to depose him or otherwise act on this information anyway. The Court agrees. Under these circumstances, it was crystal clear how Rokosik's testimony would be relied on. Having said that, the testimony is limited to the narrow issues described by the Defendants in their Response. *Id.* at 4.

**Anthony Marchlewski.** During Gray's criminal proceedings, Marchlewski provided a psychiatric assessment to the state court before trial, evaluating whether Gray was dangerous to himself, the source of his anger, and whether he required services unique to the juvenile court system. Gray argues that these opinions are not relevant and would confuse the jury. The Defendants offer no response other than asserting that this evidence is required to give jurors a "full contextual background of Plaintiff's criminal prosecution." Defs. MIL 3 Resp. at 10. That is an insufficiently developed basis. The motion is granted as to Anthony Marchlewski.

In any event, as discussed during the first day of trial, Marchlewski is outside the subpoena power of the Court and refuses to voluntarily travel to Chicago. The defense did not designate his testimony until May 2, 2023, well after designations were due, and there is no good cause for extending the deadline. So the testimony would not have been allowed anyway.

**Marty Beyer.** Beyer is a developmental psychologist who offered a post-conviction developmental assessment of Gray at the request of Rebecca Gray (nee George). Gray anticipates that the Defendants will seek to elicit testimony about his childhood and childhood traumas. As previously explained earlier in this Order, however, that evidence is not relevant to this case, or even if relevant, would not survive Rule 403 given the risk of unfair bad-character inferences. *See supra* Pl.'s MIL 2

(discussing exclusion of childhood abuse). In any event, similar to the previously discussed witness (Anthony Marchlewski), Beyer too is outside the subpoena power of the Court and refuses to voluntarily travel to Chicago, and the defense untimely designated her testimony. So the testimony would not have been allowed anyway.

**Plaintiff's Motion in Limine 4 (bar testimony from hearings, criminal trial).** The Court addresses categories of designations opposed by Gray in turn.

*Criminal trial and motion to suppress testimony of Crescenzo and Rokosik.* Gray argues that prior trial and hearing testimony of Crescenzo and Rokosik (both of who are deceased) is hearsay and that Evidence Rule 804(b)(1) is not satisfied because he supposedly did not have an adequate opportunity to cross-examine them. Specifically, Gray argues, he was unaware of their alleged misconduct at the time of the prior testimony, so he had no adequate opportunity to cross-examine them. Gray also points to the lack of gas chromatograph information at the time, and the fact that it was only later discovered that the test showed a lack of gasoline present in the fire. R. 372, Pl. MIL 4. The Defendants respond that there was a sufficient opportunity and motive for Gray to cross-examine Crescenzo and Rokosik.

The Court agrees that Rule 804(b)(1) is satisfied. There is no need to show an identical motive to satisfy the adequacy of the prior cross-examination; a "similar" motive suffices. *See Volland-Golden v. City of Chicago*, 89 F. Supp. 3d 983, 988 (N.D. Ill. 2015). Gray had every reason back then to cast doubt on the officers' testimony during the state criminal trial and the suppression hearing; he was fighting for his liberty. At bottom, Gray is arguing that had he known about the fabrications during the investigation, he would have approached the cross examinations differently. But that argument impermissibly *assumes* the premise, that is, that those deceased Defendants fabricated evidence. In any event, there was a substantially similar enough motive and opportunity to cross-examine the witnesses, including crossing Thomas on the fact that she did not initially identify Gray in a photo array. And the gas chromatographs would not have been used to cross-examine the detectives; instead, they would have been used with other experts. Rule 804(b)(1) is satisfied, and the prior under-oath testimony is admissible for its truth.

*Juvenile probable-cause hearing testimony of Pochordo.* The parties offer the same arguments for this testimony as the three discussed above. However, there is a key difference—at the time of the probable cause hearing, full discovery for the criminal case had *not* yet happened. This is a crucial distinction for Rule

9

804(b)(1) purposes, because Gray lacked a full, robust opportunity to cross-examine witnesses at this much earlier proceeding. So the motion is granted as to Pochordo's juvenile probable-cause hearing testimony.

**Criminal trial testimony of Kasey Paris**. Gray objects to the Defendants' designation of the criminal trial testimony of Kasey Paris because she is not unavailable. Her residence—Lake Station, Indiana—falls within the 100-mile subpoena power of the Court, and Gray argues that it has not been otherwise demonstrated that she is unavailable under Evidence Rule 804(a)(5). For their part, the Defendants agree, stating that they will attempt to secure her presence at trial. As discussed during the first trial day, Paris is under a trial subpoena and must appear live in Court.

**Criminal trial testimony of Karrie Kelly.** The Defendants wish to designate her criminal-trial testimony, as well as part of her deposition testimony, pointing out that Kelley cannot be required to travel to Chicago because she lives in Arizona. That is true, but Civil Rule 45(c)(1)(A) does authorize a Court to issue a subpoena that compel *attendance* of the trial within 100 miles of where they live or work. The key question of law is how the 100-mile limit in Civil Rule 45(c) applies to remote-transmission testimony. The district courts are split on whether live remote testimony, as permitted by Rule 43, violates Rule 45(c)'s geographic limits if the trial is over 100 miles from the location of the witness. *See, e.g.*, *Broumand v. Joseph*, 522 F. Supp. 3d 8, 23 (S.D.N.Y. 2021) (violates limit); *In re Newbrook Shipping Corp.*, 498 F. Supp. 3d 807, 815 (D. Md. 2020) (does not violate limit), *vacated on other grounds by In re Newbrook Shipping Corp.*, 31 F.4th 889, 898 (4th Cir. 2022); *In re Xarelto (Rivaroxaban) Products Lia. Litig.*, 2017 WL 2311719, at *4 (E.D. La. May 26, 2017) (does not violate limit); *Black Card LLC v. Visa USA Inc.*, 2020 WL 9812009, at *3 (D. Wyo. Dec. 2, 2020) (violates limit); *Int'l Seaway Trading Corp.* v. Target Corp., 2021 WL 672990, at *5 (D. Minn. Feb. 22, 2021) (does not violate limit).

In ascertaining a statute's plain meaning, courts "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Words should "be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (cleaned up).[1] Not surprisingly, "these

---

[1] This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

principles of statutory interpretation apply also to federal rules." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) (cleaned up); *see also Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123 (1989) (applying principles of statutory interpretation to the Federal Rules of Civil Procedure). Simply put, when analyzing a Federal Rule of Civil Procedure, textual interpretation should adhere to the rule's plain language.

Rule 45 specifies that a "subpoena may command a person to *attend* a trial … within 100 miles" of where they reside or work. Fed. R. Civ. P. 45(c)(1)(A) (emphasis added). When a witness is testifying via video from their home city, they are *attending* the trial from exactly where they sit, which would be within 100 miles of where they reside. If the operative subpoena authority tied the attendance directly to the physical location of the trial—for instance, if a subpoena could only command witnesses to attend *at the location* of a trial if the witnesses lived or worked within 100 miles of the trial's location—then the witnesses' attendance could not be commanded. But the text is different: the witness' *attendance* of the trial is happening within 100 miles of the witness' residence or workplace.[2]

The Advisory Committee's notes to the 2013 amendment of Rule 45 support this interpretation because the notes focus on the burdens of *travel*. The notes specify that "Rule 45(c)(1)(A) does not authorize a subpoena for trial to require a party or party officer *to travel* more than 100 miles unless the party or party officer resides, is employed, or regularly transacts business in person in the state." Fed. R. Civ. P. 45, 2013 Advisory Committee Notes (emphasis added). The reference to *travel* to a physical location confirms that the Advisory Committee's concern when amending Rule 45 in 2013 was on limiting the actual movement required of an individual who was subpoenaed to testify at a trial (or other proceeding). So the purpose of the 100-mile geographic limitation is to prevent the burden imposed by physical movement on non-party witnesses who would otherwise be compelled to traverse a long distance to appear for proceedings. These burdens do not apply with remote testimony.

Indeed, the Advisory Committee's notes explaining the similar measurement point for the 100-mile rule as applied to parties and in-state residents in Rule

---

[2] Dictionary definitions do not seem to illuminate the answer one way or the other, because they are consistent with both physical and remote presence. *Merriam-Webster's Collegiate Dictionary* (11th ed. 2009 imprint) at 79 ("to be present at"); *Webster's Third New Int'l Dictionary* (2002 ed.) at 140 ("to be present at").

45(c)(1)(B) confirms this intent. Rule 45(c)(1)(B) says that a subpoena may command witnesses to attend a proceeding in the state in which they reside, are employed, or transact business if the witnesses "would not incur substantial expense." The notes then explain that "party witnesses can be required to *travel* more than 100 miles within the state where they reside, are employed, or regularly transact business in person only *if they would not, as a result, incur 'substantial expense,'*" but that even enforcement of a longer distance can be conditioned on payment of the expense by the subpoena-serving party. Fed. R. Civ. P. 45, 2013 Advisory Committee Notes (emphases added). Here again the Committee's concern is physical "travel," and the burdens associated with it.

It is true that, in addressing Rule 45 in the context of arbitral-subpoena enforcement, the district court in *Broumand v. Joseph* held that remote testimony violates the 100-mile limit even if the testimony happens in the city in which the witness lives. 522 F. Supp. 3d 8, 23 (S.D.N.Y. 2021). The district court concluded that those remote-testimony subpoenas "are unenforceable under Rule 45(c) because they would require respondents to 'attend' an evidentiary hearing beyond 100 miles of where they are employed or regularly transact business in person." *Broumand v. Joseph*, 522 F. Supp. 3d 8, 23 (S.D.N.Y. 2021). Otherwise, *Broumand* reasoned, courts "would have to conclude that testimony via teleconference somehow moves a trial to the physical location of the testifying person." *Id.* (cleaned up). That result, in turn, would serve to "bestow upon any arbitrator sitting anywhere in the country the unbounded power to compel remote testimony from any person residing anywhere in the country." *Id.* at 23–24.

Although that result has its practical downsides, the text of Rule 45(c)(1), supported by its purpose, controls—whether the result is ideal or not. As explained earlier, as a matter of plain language, the witness is *attending* the proceeding within 100 miles of their residence or workplace when the witness testifies remotely. In common parlance, it is natural to speak of "attending" an event remotely. And the purpose of the geographic limit—to avoid *travel* burdens—also supports interpreting Rule 45(c)(1) to authorize subpoenas for remote testimony so long as the witnesses need not ravel more than 100 miles from where they live or work. *See* Fed. R. Civ. P. 45, 2013 Advisory Committee Notes (explaining that subpoena authority would not "require a party or party officer to *travel* more than 100 miles") (emphasis added); *see also United States v. $110,000 in United States Currency*, 2021 WL 2376019, at *3 (N.D. Ill. June 10, 2021) (holding that "Rule 45(c) does not limit the reach of a subpoena to only those residing within 100 miles of the pending litigation. Instead, Rule

45(c)'s geographic limits were crafted to protect third parties from the undue burden of traveling more than 100 miles to provide testimony …."').

What's more, there are guardrails against willy-nilly compulsion of nationwide remote testimony. In the trial setting specifically, Civil Rule 43 commands that "[a]t trial, the witnesses' testimony *must* be taken in open court" and only for "good cause *in compelling circumstances with appropriate safeguards*" may the court permit testimony by remote transmission. Fed. R. Civ. P. 43(a) (emphases added). The general rule is that trial testimony must be in person in the trial courtroom. So, even when authorized by a subpoena, remote testimony is the exception. Ordinarily, then, remote testimony is disallowed absent compelling reasons and witnesses whose *in person* attendance would require more 100 miles of travel usually must be presented by reading deposition testimony under Civil Rule 32(a)(4)(B) or (D). On top of that limit on remote testimony, Rule 45(d)(3)(A)(iv) always protects witnesses against "undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). Nationwide remote testimony will be neither the norm nor unbounded in application.

With the subpoena authority in place as a matter of law, the next question is whether there is good cause and compelling reasons for remote testimony under Civil Rule 43(a). The answer is yes. Both sides acknowledge that Kelly is an absolutely crucial witness because Kelly asserts that she saw Gray running in the alley behind 4139 South Albany on the night of the fire. That identification was crucial back at the time of the prosecution and it is just as crucial now. The jury would benefit significantly from viewing her live testimony via video. Having said that, to avoid undue burden on the witness, and given that the parties should be able to sharpen their questioning based on her two-times prior testimony, the Plaintiff and the defense will be given no more than 45 minutes of exam time each, so she will not be occupied more than 90 minutes total. Also, the parties will make reasonable accommodations for the timing as well, taking the time-zone difference into account. Finally, the parties shall work with Kelly on ensuring that the video-conferencing technology runs smoothly.

**Brenda Thomas.** As discussed previously, both sides will be designating parts of her video deposition to be played in court.

**Plaintiff's Motion in Limine 5 and 6 (bar state court decisions and testimony of state prosecutors).** Gray moves to bar the state court's decision on the original motion to suppress, the decision at the juvenile transfer hearing, and other

material arising from the criminal case, arguing that the evidence is not relevant and is unfairly prejudicial. Gray also is wary that the Defendants might use the juvenile-transfer hearing to shift blame from themselves to other decisionmakers. R. 376, 377, Pl. MIL 5, 6. Gray argues that the Seventh Circuit has made especially clear that state court decisions to deny motions to suppress are not relevant in later cases raising Fifth Amendment claims. *See Sornberger v. City of Knoxville,* 434 F.3d 1006, 1022–23 (7th Cir. 2006). Gray makes the same blame-shifting argument against the proposed testimony of state prosecutors Michael O'Brien, James Sarros, and James Sanford.

In response, the Defendants argue that the evidence is relevant to the *Brady* claim because the jury must make a materiality assessment for that claim. The Defendants also argue that juvenile-transcript hearings are relevant to the question of damages because the Defendants are supposedly not responsible for the ultimate life sentence imposed in the treated-as-adult prosecution.

Starting with the latter argument (the prosecution of Gray as an adult), it is generally true that the Defendants may try to break the causal connection. But in this particular case, it is difficult to conceive of a legally sound argument for breaking the causal connection if Gray does convince the jury (and it is his burden to do so) that the Defendants fabricated evidence and coerced the confession. The state prosecutors almost surely will testify that they made the decisions to seek adult treatment based on the allegedly unconstitutional evidence. It is not as if the Defendants are arguing that the state prosecutors themselves suppressed evidence or fabricated evidence.

Having said all that, wholesale exclusion of the state prosecutors is not appropriate because, at the very least, they (or one of them) can testify as the defense's sponsoring witness for the summary of evidence for the *Brady* materiality element. As noted during the pretrial conference and on the first trial day, rather than *en masse* introduction of the criminal trial transcripts (which are riddled with irrelevant statements, objections, and arguments), the proper way to efficiently present the state trial testimony and evidence to the jury in this case is via a summary of the criminal trial transcript. The parties will be conferring on the summary. If a state prosecutor testifies for the defense in presenting the summary, then the defense also can attempt to elicit other causation-breaking testimony, and the Court will consider the objections (if any) at that point.

**Plaintiff's Motion in Limine 7 (bar introduction of financial evidence).** This motion appears to be moot at this point. First, the only living Defendants who might introduce financial-condition evidence are Davis and McInerney. But Davis is now dismissed from the case via settlement and McInerney might also be dismissed soon via a separate settlement. Second, the deadline for follow-up discovery on financial condition was April 19, 2023, R. 455, and it is not clear whether that happened or instead the defense decided not to introduce the evidence. If disclosed on time, then the motion is denied; if not, then the motion is moot.

**Plaintiff's Motion in Limine 9 (bar arguments that gasoline was in fire debris or milk jug).** As previously noted, R. 489, the Court has excluded the testimony of defense experts Court Sandau and Miriam Rafilovich. The written order that will be posted to explain the Rule 702 challenges is forthcoming, but given this exclusion of the experts, the gasoline evidence will be limited to the testimony of William Rogers to the effect that he smelled gasoline on the scene, and any other non-Sandau, non-Rafilovich evidence on that point (if any). So the motion is granted in part and denied in limited part.

**Plaintiff's Motion in Limine 10 (bar testimony related to collateral-source payments).** Gray seeks to bar evidence of the payment that he received under Illinois law based on his receipt of a certificate of innocence. 735 ILCS 5/2-702(a); 705 ILCS 505/8(c). R. 381, Pl. MIL 10. The defense argues that the certificate should not be allowed at all, R. 403, Defs. MIL 10 Resp at 2–4, but this argument is rejected (as explained below) and, in any event, the receipt of the certificate is not an independent basis to exclude the collateral payment. Co-defendants are not entitled to introduce evidence of collateral-source payments. *See Halek v. United States,* 178 F.3d 481 (7th Cir. 1999) (in dictum, explaining collateral-source doctrine). This motion is granted.

**Plaintiff's Motion in Limine 11 (bar evidence of Defendants' good character).** This motion is granted: good-character evidence is generally not admissible to show action in conformity with the supposedly good character. So the defense cannot elicit testimony or introduce evidence of commendations, awards, and performance reviews. Routine job information, such as promotions from role to role, are allowed just to give the jury a background sense of the witness' career path. But no inference may be argued from the promotions. The motion is granted in most part.

**Plaintiff's Motion in Limine 12 (bar references to Brown as "judge").** This motion is granted. Although the defense may elicit that Brown served as a state judge in offering background information about his career, the parties shall not refer to him as "judge" at the trial. That honorific presents an unfairly prejudicial substantive effect on the evaluation of his credibility and the evaluation of evidence against him. Relatedly, the Court refers to witnesses as "Mr." or "Ms.," including public officials or those with doctoral degrees. The lawyers may use "Dr." as appropriate, but the Court itself will not.

**Plaintiff's Motion in Limine 13 (bar reference to Gray's exercise of Fifth Amendment rights).** Gray moves to bar reference to the fact that he made the decision to not testify at his criminal trial, which the Fifth Amendment entitled him to do. Gray fears that the jury will draw conclusions based on this decision and infer guilt. R. 384, Pl. MIL 13 at 1–2.

The motion is granted. Whether Gray testified or not at his criminal trial is not relevant. Obviously the jury will learn, by implication, that Gray did not testify, because the summary of the criminal trial will not mention any testimony from him. But that does not mean that any reasonable inference against Gray can be drawn from the decision not to testify. All sorts of factors go into a decision not to testify, not least of which is the promise from courts that the criminal-trial jury must not infer anything from the decision. Also, almost by the definition, examination on the decision not to testify will intrude into attorney-client privileged information, because no doubt Gray conferred with his defense attorney about the decision. To the extent there is any probative value, it is substantially outweighed by the risk of the jury unfairly putting too much stock in the decision. The motion is granted.

**City Defs.' Motion in Limine against Certificate of Innocence.** The Defendants object to the introduction of Gray's Certificate of Innocence, which was issued in 2018 under 735 ILCS 5/2-702. R. 375, COI MIL at 1–3. In offering the certificate, Gray cites district-court case law supporting the admissibility of COIs. *See. e.g., Chatman v. City of Chicago*, 2018 WL 11426432, at *3–6 (N.D. Ill. Oct. 11, 2018); *Harris v. City of Chicago*, 2018 WL 2183992, at *4 (N.D. Ill. May 11, 2018); *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 748 (N.D. Ill. 2015). Most importantly, Gray cites the Seventh Circuit's decision in *Patrick v. City of Chicago*, 974 F.3d 824, 832–33 (7th Cir. 2020), which held that the "certificate of innocence was directly relevant to an element on which he bore the burden of proof: that the prosecution against him was

terminated in a manner indicative of innocence." *Id.* The indicative-of-innocence element is an element of the malicious-prosecution claim.

The defense argues that the certificate's probative value is limited because the certificate's only legal effect, in the defense's view, is to obtain monetary relief. Any additional probative value, the defense contends, is nullified here because the issuance of the certificate was based on an allegedly incomplete review of fire science, distinguishing it from *Patrick*. R. 375 at 4–5. The defense also offers to stipulate to the indicative-of-innocence element, and points out that another district court recently held that a stipulation or concession of that element justified (in that case) exclusion of the certificate. R. 456. In the alternative, the Defendants request a limiting instruction if the certificate is introduced.

*Patrick* is controlling on the relevancy of the certificate in malicious-prosecution claims: the certificate is "directly relevant" to the indicative-of-innocence element. 974 F.3d at 832–33. It is true, however, that *Patrick* warns of the Rule 403 dangers of the certificate, particularly where the state court petition is light on facts and the state court litigation does not generate "a factual finding arising from the crucible of the adversarial process." *Id.* at 833. And the state-court certificate finding is narrower than all the elements need to prove a federal civil-rights violation (be it due process, Fourth Amendment, or coerced-confession) or a state law malicious prosecution claim.

Here, on balance, the certificate is admissible against Rule 403 concerns. Gray's petition and the State response arguably were more detailed than what appears to be bare-bones filings in *Patrick*, thus enhancing the probative force of the resulting certificate. Also, a proper limiting instruction will safeguard against the jury reading too much into the certificate without independently considering all the evidence. The Seventh Circuit approvingly cited the instruction given in *Harris*, 2018 WL 2183992, at *5 (cited by *Patrick*, 974 F.3d at 833):

> The State court decided different issues than those before you when issuing the Certificate of Innocence. The State court was not asked nor did it decide the issue of whether Plaintiff's constitutional rights were violated or whether the Defendants engaged in any misconduct under state or federal law. The State court was not asked nor did it decide the issue of whether Plaintiff's confession was false, fabricated or coerced. These are issues for you alone to decide.

17

You have listened to and heard all the evidence in this case and are to decide this case based on the evidence you heard in this case and this case alone.

The Court is inclined to given this instruction, but of course the parties may comment on it during the instructions conference. The motion to exclude the certificate is denied.

### County Defendants' Motions

**County Defs.' Motion in Limine 1 (bar references to sympathy).** The Defendants seek to bar any attempt to appeal to the jury for sympathy, which Gray does not contest. R. 368, Cty. Defs.' MIL at 1; R. 394, Pl. Resp. at 1. This motion is granted.

**County Defs.' Motion in Limine 2 (bar evidence of rule violations).** The Defendants move to bar any evidence of violations of the Cook County State's Attorney Office (SAO) policies, rules, or regulations, arguing that under *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), violations of municipal policies do not alone establish constitutional liability. Cty. Defs.' MIL at 2. Gray responds with assurances that he has no intention of arguing that violation of a policy on its own equates to a constitutional violation, but goes on to say that *Thompson* does not hold that violation of policies is never admissible. Pl. Resp. at 2–3. *See U.S. v. Brown*, 871 F. 3d 532 (7th Cir. 2017) ("Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry."). Gray makes the additional point that this motion should be reciprocally applied, and so in any case, neither party should be allowed to testify about any SAO rules or regulations as none were produced during discovery. Pl. Resp. at 2–3.

Indeed, it is right that *Thompson* does not necessarily bar evidence of a local-government policy violation if the violation is relevant to some *factual* point and not offered as a stand-in for a federal constitutional violation. But Gray does not identify any SAO policy that he offers to prove a factual point, nor does the defense for that matter. So the motion is granted insofar as no party may argue that a local-government policy violation is equivalent to a federal constitutional violation, but the parties may offer violations for the limited purpose of proving a factual point. The opposing party may ask for an in-trial instruction as appropriate.

**County Defs.' Motion in Limine 3 (bar evidence of disciplinary process).** The Defendants move to bar any mention of how Cook County or the SAO disciplines, monitors, or controls Assistant State's Attorneys (ASAs). Cty. Defs.' MIL at 3. The Defendants argue that whether Brown was motivated by allegedly deficient training, discipline, or supervision is not at issue because there is no *Monell* claim, and thus the evidence would be irrelevant or, at the least, fail Evidence Rule 403. For his part, Gray argues that he does not intend to argue that SAO training, discipline, and supervision were deficient, but again points out that, in theory, there could be probative value to that type of evidence even when a *Monell* claim is not present. Pl. Resp. at 3–4.

The motion is granted. Is it true that absence of *Monell* claim does not necessarily mean that a failure of discipline, training, or supervision does not have some *factual* relevance, but here Gray does not identify anything like that. No evidence of this sort will be allowed.

**County Defs.' Motion in Limine 4 (bar opinions on the ultimate issues of the case).** The Defendants seek to bar lay witnesses from offering opinions on ultimate issues in this case, including whether ASA Brown's conduct was unconstitutional. Cty. Defs.' MIL at 4. The Defendants once again point to *Thompson*, 472 F.3d at 458, for the proposition that the opinions of lay witnesses should be excluded when a jury may draw their own inferences and conclusions. The Defendants specifically express concern over any lay-witness testimony that Brown deviated from SAO policies, including by being present for Gray's confession, not allowing his family access to Gray during the interrogation, and other interrogation tactics. Gray believes this motion is probably moot because he does not intend to elicit any opinions on whether Brown's conduct was unconstitutional, but objects to the motion for its vagueness and lack of specificity. Pl. Resp. at 4–5.

The Court agrees that no witness should go so far as to opine on whether Brown's conduct was constitutional or unconstitutional. Obviously, Gray can attack the interrogation tactics as coercive. What would be out of bounds is a witness offering an opinion on *constitutionality*—the jury will decide that by applying jury instructions to the jury's factual findings.

**County Defs.' Motion in Limine 5 (bar opinions on what others might have done differently).** The Defendants move to bar any witness's personal opinions on what he or she might have done differently during the investigation. Cty.

19

Defs.' MIL at 4–5. Gray, although protesting that the motion is too vague and non-specific, says that no witness will testify that they personally believe Brown should have acted differently. This motion is granted, because Gray concedes that he is not introducing such testimony. The Court notes that asking a witness these categories of information would require that the witness testify (if at all) as an expert, and it does not appear there is any expert on this subject.

**County Defs.' Motion in Limine 6 (bar negative encounter information).** The Defendants move to bar evidence regarding negative encounters with other ASAs, Cook County employees, or other agencies, arguing that the prejudicial effect outweighs the probative value of such evidence, and that there is a likelihood to confuse or mislead the jury. Cty. Defs.' MIL at 6. Gray objects to the wide-ranging nature and vagueness of the motion, which he argue would bar him from testifying about his experience in criminal trial, juvenile detention, and his experiences during incarceration. Pl. Resp. at 5–6. Gray argues that these experiences are natural and probable consequences of the Defendants' actions. *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002) (explaining that ordinary rules of causation apply to constitutional tort suits). The County did not reply to this causation argument, which in any event is correct: ordinary tort-causation rules apply, so there is no basis to just wholesale exclude the conduct committed by other government actors, because the jury may find some of the conduct to be caused by the allegedly wrongful custody. This motion is denied.

**County Defs.' Motions in Limine 7 and 8 (bar questions invoking the "golden rule" and bar attempts to "indoctrinate" the venire).** The Defendants seek to bar Gray from trying to elicit a promise from prospective jurors to return a substantial verdict, and to bar Gary from discussing the law or factual details of the case during jury selection. Cty. Defs.' MIL at 5–6. Gray denies that he plans to ask potential jurors to imagine themselves in his shoes or otherwise ask if they would be willing to award millions of dollars, though Gray does say that he plans to ask if jurors would be willing to offer damages for non-physical injuries. Pl. Resp. 7.

This motion is granted because (it goes without saying) that the Court will not permit so-called "indoctrination" by either side during voir dire. The Court will post the voir dire questions and follow-up questions will be handled on a juror-by-juror basis.

**County Defs.' Motion in Limine 9 (bar comparisons).** The Defendants move to bar Gray from offering any comparison of the facts in this case to the facts in other cases. Gray contends that this motion is moot because he does not intend to do so. The motion is granted because any comparison of that sort is irrelevant. This goes not only for liability but for damages too; there shall be no mention of what damage amounts have been awarded in other cases.

**County Defs.' Motion in Limine 10 (bar treatment of witness as a 30(b)(6) corporate witness).** The Defendants move to bar Gray from treating any witness as a so-called "corporate" witness as defined by Federal Rule of Civil Procedure 30(b)(6) governing depositions, arguing that Gray did not offer notice to the SAO that anyone would be designated as a 30(b)(6) witness during the discovery stage of litigation. Cty. Defs.' MIL at 7–8. Gray argues that simply because a Rule 30(b)(6) deposition was not taken does not mean that he cannot ask the County witnesses about policies or procedures at Cook County or at the SAO, but that ultimately he does not intent to treat Brown or other witnesses as a corporate designee.

This motion is denied. There is no general rule saying that if a party does not take a 30(b)(6) deposition during discovery, then the party cannot ask witnesses about information that would be considered to be about or to belong to the witness' employer, so long as the witness has personal knowledge of it. The Court also notes that Civil Rule 30(b)(6) governs depositions. It is trial time.

**County Defs.' Motion in Limine 11 and Plaintiff's Motion in Limine 8 (bar opinions on witness credibility).** The County Defendants move to bar Gray from eliciting any opinion on whether Gray or other witnesses are believable, arguing that only the jury makes credibility determinations. Cty. Defs.' MIL at 8. Gray has no objection but reveals that the Defendants would not agree, during the conferral, to the motion applying to both sides; rather, the Defendants suggested that they intended to have Brown testify about Gray's credibility. Pl. Resp. at 9. Indeed, Gray's Motion in Limine 8 similarly requests that witnesses be barred from commenting on the credibility of others or on Gray's guilt.

These motions are granted and apply to all parties and all witnesses. No witness (including Brown) can testify as to the credibility of anyone else's *trial* testimony (including Gray's). The Court notes that Brown may still express his own state of mind at the time of the investigation, including whether he believed Gray during his

interrogations of Gray, but he may not make the leap to say that Brown thus does not believe Gray's *trial* testimony.

**County Defs.' Motion in Limine 12 (bar comments on how long it took to arrive at trial).** The Defendants move to bar comments about how long it took for Gray to get to trial or any insinuation that the time lapse was the Defendants' fault in any way. Cty. Defs.' MIL at 8. Gray argues that the reality is that he was arrested at age 14 and incarcerated for so long—and that those facts are probative of damages—but agrees that neither side should suggest it was anyone's fault that the case took this long time to be tried. Pl. Resp. at 9.

The motion is granted with the caveat offered by Gray, that is, he may testify about the length of time that he allegedly suffered emotional distress, but neither side can blame the other for how long it has taken to get to trial.

**County Defs.' Motion in Limine 13 (bar testimony regarding Gray's friends' and family's distress ).** In the opening motion, the Defendants ask to exclude testimony about the emotional suffering experienced by Gray's family and friends as a result of Gray's incarceration. The defense argues that the suffering of others would prejudice them by confusing the issues and drawing sympathy for loved ones. Cty. Defs.' MIL at 8–9. Gray for his part says that he does not intend to ask family members about their own suffering or their own damages, but argues this that motion sweeps broadly and that some examples can only be resolved in the proper context at trial. Pl. Resp. at 10.

The defense's *opening* motion was on target—as much as friends or family might have suffered as a result of Gray's imprisonment, their distress is not relevant to *Gray's* damages. But the defense's reply brief attempted to add another category of barred testimony: "about what Adam Gray may be feeling or how the Defendants' actions allegedly destroyed Adam's life" to their list. R. 445, Cty. Defs.' Reply at 3. But there is no general bar against witnesses (including friends and family) to testify to Gray's suffering if he described it to them as a statement of his then-existing emotional condition. Fed. R. Evid. 803(3). That type of evidence would go directly to *Gray's* emotional distress. Having said that, certainly Rule 403 constraints would kick in at some point to limit the amount of this testimony. In sum, the motion is granted in part: witnesses may not testify on their own personal distress, challenges faced, or suffering. But witnesses may testify about *Gray's* suffering and challenges.

**County Defs.' Motion in Limine 14 (bar burden-shifting arguments).**
The Defendants argue that because—according to them—they are under no obliga-
tion to put on a defense to support a verdict in their favor, Gray should be barred
from suggesting that the Defendants carry any burden of proof. Cty. Defs.' MIL at 9.
The defense cites employment-discrimination cases invoking the *McDonnell Douglas*
framework. *See, e.g.*, *Hall v. Forest River, Inc.,* 536 F.3d 615, 621 (7th Cir. 2008). Gray
argues that the doctrinal analogies are inapt and that although he will not suggest
that the Defendants have the burden of proving anything, he certainly plans to point
to the absence or weakness of their evidence. Pl. Resp. at 10–11.

This motion is granted only insofar as Gray may not argue that the defense
has the burden of proof; obviously, Gray bears the burden. But it is worth noting that
the Defendants go too far in arguing that they have absolutely zero obligation to put
on any defense. Although that is true for defendants in *criminal* cases, this is a civil
trial. In a civil case, if a defendant were to introduce no evidence at all—no cross-
examination, no direct examination, nothing—then the Court might very well be un-
der Civil Rule 50 to grant the plaintiff judgment as a matter of law. So, yes, the mo-
tion is granted insofar as it prevents Gray from actually arguing that the Defendants
have the burden of proof. But Gray otherwise has wide latitude to argue and point
out weaknesses in the defense argument. The Court reserves any decision on poten-
tial missing-witness arguments for trial.

**County Defs.' Motion in Limine 15 (bar testimony that Gray saw a
shadowy figure who was Brown).** Gray has previously testified that, during his
interrogation, at times when ASA Brown was absent from the live interrogation, he
could see a silhouette through the two-way mirror of his interrogation room. Gray has
testified that this shadowy figure was Brown, based on Brown's stocky, muscular
build and his "short and thick" physique. Pl. Resp. at 10–11. The Defendants argue
that Gray's conclusions are based on speculation and thus is barred under Evidence
Rule 602. Cty. Defs.' MIL at 9–10. Gray responds that the testimony is not speculative
because he spent several hours with Brown during the interrogations and was able
to recognize Brown's unique silhouette through the two-way mirror for those sessions
that Brown was not in the room.

This is a close call. On balance, however, there are sufficient facts from which
the jury could reasonably infer that Brown was the person standing outside the in-
terrogation room, and the defense may have at it in cross-examination. Gray can
point to the stocky, short, and thick physique, with which he became familiar in

spending time with Brown through four interrogations. Also, importantly, the summary judgment opinion explain that Brown said that he was one of the primary interrogators and that he ran the interrogation room, R. 239 at 36, so those facts circumstantially support the finding that Brown would naturally observe the interrogation even when not inside the room. Also, the Court notes that the previously assigned judge relied on Gray's testimony in considering the summary judgment motion. *Id.* at 39. So the admissibility of the testimony is also law of the case at this point. The motion is denied. (Despite the denial of the motion, it still would make sense if other circumstantial facts could be offered by the parties, such as whether or not any other interrogator had a similar build.)

**County Defs.' Motion in Limine 16 (bar testimony that Gray was entitled to family presence).** The Defendants seek to bar any testimony that Gray was legally entitled to have his mother or brother present during the interrogation, because there is no legal obligation like that. Cty Defs.' MIL at 10. Gray agrees on the *legal* requirement, that is, Gray promises not to suggest there was a *legal* right for his family to be present. But Gray does wish to argue that the fact that Gray asked for his family and was prevented from seeing them is probative of coercion. Pl. Resp. 13.

This Court agrees with Gray. The motion is granted only insofar as Gray may not argue that the Defendants violates some legal entitlement to the presence of his family during the interrogation. But Gray may make the *factual* point that he asked for his family and was either ignored or told no, and that this relevant to the totality-of-the-circumstances analysis on coercion.

ENTERED:

　　　s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 8, 2023