1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   ADAM GRAY,                      )
                                     )
 4            Plaintiff,             )
                                     )
 5            v.                     )  No. 18 CV 02624
                                     )
 6   CITY OF CHICAGO, et al.,        )  Chicago, Illinois
                                     )  May 8, 2023
 7            Defendants.            )  8:42 a.m.

 8               TRANSCRIPT OF PROCEEDINGS - Trial

 9                        VOLUME 1-A

10       BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11   APPEARANCES:

12   For the Plaintiff:        LOEVY & LOEVY
                               BY:  MR. JONATHAN I. LOEVY
13                                  MS. ROSHNA BALA KEEN
                                    MS. JORDAN POOLE
14                                  MS. ELIZABETH C. WANG
                               311 North Aberdeen Street, Suite 300
15                             Chicago, Illinois 60607
                               (312) 243-5900
16

17   For the City Defendants:  REITER BURNS, LLP
                               BY:  MS. ELIZABETH A. EKL
18                             311 South Wacker Drive, Suite 5200
                               Chicago, Illinois 60606
19                             (312) 982-0090

20

21   Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
22                             219 South Dearborn Street, Room 2342
                               Chicago, Illinois 60604
23                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
24

25
```

1   APPEARANCES (Continued):

2   For Defendant McInerney:     NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
3                                     MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
4                                     MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
5                                33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
6                                (312) 612-1955

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2         THE CLERK:  18 C 2624, Gray versus City of Chicago.

3         THE COURT:  Okay.  You can stay at the tables.  Let's

4    get appearances, first for the plaintiff.

5         MR. LOEVY:  Good morning, your Honor.  Jon Loevy,

6    Elizabeth Wang, Roshna Bala Keen, and Jordan Poole here for

7    Adam Gray who is in court.

8         THE COURT:  And for the defense.

9         MR. NATHAN:  Good morning, your Honor.  Shneur

10   Nathan, Avi Kamionski, Elizabeth Ekl, Neha Locke, Natalie

11   Adeeyo, and Breana Brill for the defendants.

12        THE COURT:  Okay.  Good morning.  And your clients?

13        MR. NATHAN:  Clients are Daniel McInerney, Percy

14   Davis, Geri Lynn Yanow as special administrator for the

15   Estates of Michael Pochordo, George Jenkins, Nicholas

16   Crescenzo, and Fire Marshal Gruszka.

17        THE COURT:  Okay.  And then are you expecting the

18   three, Ms. Yanow and Mr. McInerney and Mr. Davis?

19        MR. NATHAN:  Mr. McInerney and Mr. Davis will be here

20   today, yes.

21        THE COURT:  So they know to be here ASAP?

22        MR. NATHAN:  Yes.  They're on their way.

23        THE COURT:  Okay.  And then Ms. Yanow?

24        MR. NATHAN:  Ms. Yanow, I don't believe, is going to

25   attend the trial.

4

1      THE COURT:  Okay.

2      MR. NATHAN:  If that's a problem, we can address it.

3      THE COURT:  Yeah, I mean, I don't -- is it a problem

4  for the plaintiff?

5      MR. LOEVY:  Not with the plaintiff, your Honor.

6      THE COURT:  Yeah, not really.  Okay.  I'll just have

7  to describe that to the jury.

8      Okay.  So first, I want to ask the plaintiff to go

9  ahead and put on the record the email that we received last

10  night.

11      MR. LOEVY:  Your Honor, last night we reached a

12  settlement with the County defendants to resolve all claims

13  against the County.  We're going to be asking that you enter a

14  stipulation to dismiss this morning.  It's without prejudice

15  for 90 days while the County does its thing and approves it.

16      THE COURT:  Okay.  And the County is on board with

17  that procedure?

18      MR. LOEVY:  Yes.  They proposed the stipulation.

19      THE COURT:  Okay.

20      MS. EKL:  Your Honor, this is Elizabeth Ekl.  Based

21  on counsel's representation this morning --

22      THE COURT:  Throw a mike closer to you.

23      MS. EKL:  Defendants, specifically the City of

24  Chicago, would seek leave to amend the final pretrial order to

25  add the affirmative defense of the setoff.

1        THE COURT:  Okay.

2        MS. EKL:  Well, we can file something in writing.  I

3  just wanted to let your Honor know that we'll be doing that.

4        THE COURT:  Okay.  Do you still intend to call

5  Mr. Brown?

6        MR. LOEVY:  We do, and we've talked to Mr. Battle

7  about it.  It doesn't look like he would testify this week but

8  he's going to -- they're going to cooperate with bringing him

9  to court.

10       THE COURT:  Okay.  All right.  Let's check over the

11  witness list.  I want to make sure the names that I read to

12  the jury -- or the venire is inclusive but also not the

13  several dozen potential names.

14       And so before we march through the witness list, the

15  defense motion to designate these additional witnesses,

16  obviously with Brenda Thomas, you agree with that, right?

17       MR. LOEVY:  Yes, your Honor.

18       THE COURT:  Okay.  What about the other four?

19       MR. LOEVY:  Well, we have a relevance objection to

20  some of them.  We definitely have an unavailability objection

21  to some of them.  Some of them, they didn't -- like, for

22  example, the Marchlewski guy is local.  Apparently his

23  schedule is full but he wasn't asked in time -- oh, sorry.

24       THE COURT:  He's outside the --

25       MR. LOEVY:  Is he outside?  Green Bay.  All right.

6

1    Well, but there was no effort to serve him in time.

2         THE COURT:  Well, whether he was served or not, the

3    problem is he's outside the subpoena power.

4         So let me ask the defense.  With regard to -- setting

5    aside Thomas which everyone agrees designations are

6    appropriate and set aside Ms. Paris for a moment, Barbara

7    Paris, so Dr. Beyer, Ms. Lupa, and Dr. Marchlewski, it's been

8    known that they're outside the subpoena power, right, since --

9    I mean, for at least a couple years, if even longer.

10        So why did you wait to designate until May 2nd?

11        MR. NATHAN:  With respect to Janet Lupa, we were

12    hoping to get her cooperation because she had two addresses

13    where one address is in Chicago and one address is in Florida.

14    We hadn't been able to have her cooperate to come to Chicago

15    or really talk to -- we tried to talk to her, and we hadn't

16    been able to.  We still would like to call her live if

17    possible, and we're going to continue to try.

18        THE COURT:  But if you -- so you have two addresses

19    for her, and you weren't sure she was within the subpoena

20    power, right?

21        MR. NATHAN:  We served her and took her deposition in

22    Florida.

23        THE COURT:  So all the more reason that -- to think

24    that she was not going to be within the trial subpoena power.

25        MR. NATHAN:  That's true.  We just, we were hoping to

1   be able to get her cooperation because it was pretty

2   noncontroversial testimony.  She seemed cooperative at her

3   deposition.  We still were hoping to have her cooperation to

4   do live testimony.

5          THE COURT:  Yeah, that is the problem with not

6   serving trial subpoenas early on or getting a commitment from

7   witnesses.  And it is also problematic that I had to order

8   this, like, much more narrow set of -- and realistic set of

9   witnesses.  So doing this the week before trial when the

10  deposition designations were due -- well, with the final

11  pretrial order -- last year is -- I don't understand what the

12  explanation is, what the good cause for that is.

13         How about Dr. Beyer?  I mean, you knew that she was

14  outside the subpoena power from the very beginning, right?

15         MR. NATHAN:  That's true.  We included -- in our

16  revised list, we included a footnote saying that we intended

17  to provide designations.  It didn't happen until later.

18         THE COURT:  Yeah, I mean, and I have to say, when I

19  saw those footnotes when the list was filed, I actually did

20  assume that the designations had already been done.  So I

21  don't think it was incumbent on the Court to then try to

22  initiate the deposition designation back and forth and

23  counter-designations and objections when the original list was

24  problematic to begin with.  I think that's -- there's a little

25  bit of reaping what you sow here.

1    MR. LOEVY:  Your Honor, there's, if I may, one more

2  fact on Lupa.  She's the court reporter who took the

3  confession.  You know, it was a long time ago.  She doesn't

4  have a real recollection.  What they want to call her for is,

5  "If I would have seen something improper, I would have said

6  something."

7    Well, we looked her up.  She happened to have been

8  the court reporter who took at least four wrongful confessions

9  from people including people we represent.  So that testimony

10  would be problematic substantively for her to say, "Oh, I

11  would never let a wrongful conviction confession happen"

12  because then we would want to say that opens the door to,

13  "Yes, you would."

14    If that's literally the only reason they're calling

15  her because she doesn't remember and it was a long time ago,

16  then that's got a substantive problem.

17    And Byron Marchlewski, we asked them, show us what

18  you want to designate so we can take a position.  And

19  there's -- in our view, if they were to proffer, your Honor,

20  there's almost nothing -- there is nothing that they're

21  bringing them for.  It's sort of to tie up some impeachment or

22  something.

23    THE COURT:  Yeah, so the time -- go ahead.

24    MR. NATHAN:  I'm sorry, your Honor.  I didn't mean to

25  interrupt.

1          The other aspect of Janet Lupa is that she testified

2     in the criminal case.  So we had motions and discussions about

3     whether -- and how exactly to designate testimony that has

4     been introduced at the criminal trial.  We're planning on --

5     it's our preference to streamline the trial as much as

6     possible.  There are certain deposition designations that we'd

7     like to read, and we've done so.

8          We could proceed by stipulation with respect to what

9     Janet Lupa testified to at the criminal trial, and it's

10    essentially the same thing.  So we didn't see this as being

11    something new.

12         THE COURT:  Yeah, the summary of the trial testimony,

13    you ought to proceed as it has in other cases, which is that

14    you'll confer and provide a summary of the prior trial

15    testimony rather than en masse put in all the trial

16    transcripts.  And it sounds like that will include Ms. Lupa,

17    okay, but in terms of actually designating pieces of trial

18    testimony, that was part of the proposed pretrial order

19    preparation.

20         So among the deposition designations that I need to

21    look at, there's also hearing testimony designation and trial

22    testimony designation, but Ms. Lupa was not one of those.  So

23    that's the problem with relying on the fact that she testified

24    to now say that it's okay to designate from her deposition

25    late.

1         So, yeah, I do not hear good cause for designating at

2  this time as opposed to the earlier time when it was due.  And

3  there is a mountain of work still to be done, so I think it

4  is -- I assume that the plaintiffs, you're still in trial prep

5  mode, and to go through these designations would cost you time

6  from that.

7         MR. LOEVY:  Agreed, your Honor.

8         THE COURT:  So Barbara Paris, she passed away after

9  the filing of the proposed pretrial order, and that certainly

10  could be good cause, but that happened October 17 of last

11  year, right, according to the obituary.  I clicked on the

12  link.

13         So why wasn't that proposed earlier?

14         MR. NATHAN:  I don't think we understood that she had

15  expired.

16         THE COURT:  Oh.  When did you find that out?

17         MR. NATHAN:  I don't -- I don't know offhand.  I

18  could figure that out.

19         THE COURT:  But and I guess -- I mean, you did it at

20  least by -- you knew at least by April 13 because you filed

21  the witness list and you wrote "deceased," and then you

22  wrote, "by designation only."  So while I'm glad you flagged

23  that, it's the same issue with, you then have to, like,

24  actually initiate the designation process, and you did not.

25         So approximately how much earlier than April 13 did

1    you all find out?

2         MR. NATHAN:  I don't know but, your Honor, what I

3    would just say is there's absolutely no prejudice to the

4    plaintiff where we flagged early on that we planned on using

5    that testimony.  It's already designated.  It's important

6    testimony.  It's otherwise that, the substance was, the

7    plaintiff knew was going to come in because it was part of the

8    criminal trial testimony and we were saying that that has to

9    come in for purposes of analyzing the *Brady* claim anyway.

10        Certainly, it could have been -- it should have been

11   designated earlier.  It should have been, and but there's --

12   it's substantial prejudice to the defendants, and there's

13   minimal, if at all, prejudice to the plaintiff.

14        THE COURT:  Well, yeah, the summary of the trial,

15   you'll still get that piece, and it is relevant to

16   materiality.  So you're okay there.  But in terms of

17   designating her, I mean, this is the issue also with serving

18   those trial subpoenas as soon as possible.  That's why I

19   always try to flag that as early as possible.

20        And then you would have found out no later -- well,

21   if she had passed October 17, whenever your efforts started to

22   serve trial subpoenas, you would have found it out, and it

23   should have been much, much earlier than April 13.  And so, I

24   mean, I think unless the plaintiff's team has infinite time

25   to -- so do you object to this designation too?

1          MR. LOEVY:  We do on the same grounds.

2          THE COURT:  Yeah, I mean, I just -- I'm sure they're

3    prepping their experts and everyone else to testify, and

4    it's -- so it's not just a small little detour to then go

5    through deposition designations, craft the objections, and

6    then counter-designate, and then you would object and then

7    they might want to reply to that.

8          So it's just -- this is not -- this was not well done

9    and the -- there is not good cause to designate it this late

10   time other than Ms. Thomas.

11         Okay.  So Ms. Thomas' designations, let me ask this

12   question first.  During her live deposition -- or from

13   Minnesota, did she arrive at a final version of her story?

14         MR. LOEVY:  That's an interesting question.  I gave

15   an exam, and she was the plaintiff's side.  Then Matt got up

16   there, and she adopted her trial testimony.

17         And then I said, "Wait a minute.  You didn't remember

18   any of this."  And then she got pretty angry and upset.  And

19   in our view, your Honor, what that illustrates is a witness --

20   you know, our theory of the case is she was a manipulatable --

21         THE COURT:  No, I understand that part of it.  I was

22   just trying to figure out who should designate first because

23   who is her sponsoring witness basically.

24         MR. LOEVY:  We'll be calling her in our case.

25         THE COURT:  Okay.

1          MS. EKL:  Your Honor, I don't think at this point it

2 matters who designates first.  One transcript, we'll designate

3 as if we were going to re-call her if need be.  It doesn't --

4 we'll go from there, but I think it will be pretty

5 straightforward.

6          My testimony was -- and her responses were pretty

7 straightforward, so I anticipate that's what we'll be

8 designating.

9          THE COURT:  And how long did it take, the entire

10 deposition?

11          MS. EKL:  Two and a half.  We had some breaks, so

12 it's not super long.

13          THE COURT:  Yeah, that's pretty short.  Okay.  So

14 just, yeah, do that designation back and forth.  And when were

15 you planning on inserting that testimony?

16          MR. LOEVY:  It would not be before the end of -- or

17 late this week.  It probably would be late this week, so we'll

18 do it promptly.

19          THE COURT:  Okay.  Yeah, let's say -- well, why don't

20 you plan for it on Friday, so then have it done by the close

21 of business Wednesday.

22          MR. LOEVY:  We're going to try to speed it up, your

23 Honor, if we can.  And if we can, we will.

24          THE COURT:  Okay.  And post it on the docket with the

25 highlighted for the deposition designations along with the

1    chart.  And you did video record, correct?

2              MR. LOEVY:  We did.

3              THE COURT:  Okay.  So Mike will need to assist on

4    this to set up the TV screens for -- well, wait.  You can

5    actually play them through your laptop.  Okay.  No, so I

6    don't -- actually, we won't need that then.

7              Okay.  So let's, let me just make sure I understand

8    the witness list that I'm reading off starting with the

9    plaintiff, although I won't describe it as the plaintiff.

10             James Brown -- aside from the parties.  All right.

11   So Mr. Gray will be introduced, Mr. McInerney.  Mr. Davis will

12   have been introduced.  And then I'll also read off James

13   Brown, Gertraud Gray by designation -- and let me know if

14   you've dropped anyone, okay -- John Lentini, Melissa Russano

15   Rodriguez, Geoffrey Loftus, Dennis Smith, Williams Barnes,

16   Julia Campoverde, Denise Chavez.

17             What role did Denise Chavez play?

18             MR. LOEVY:  She was one of his friends before he was

19   arrested and will have information in damages testimony.

20             THE COURT:  All right.  Lisa Clifford, John Davis,

21   Anthony Gonzalez, Lita Gonzalez, Rosemary -- okay.  Is there

22   someone you want to drop?

23             MS. WANG:  John Davis.

24             THE COURT:  Okay.  And the defense would not call

25   that person, right?

1       MR. NATHAN:  Correct.

2       THE COURT:  Okay.  Anthony Gonzalez, Lita Gonzalez,

3   Rosemarie Gonzalez, David Gray.  Michael Gray, is he

4   testifying live?

5       MR. LOEVY:  We hope so.

6       THE COURT:  Terri Mascherin, Murray Shambee, Brenda

7   Thomas, Natalia Zamecka, Craig Miller.

8       Okay.  Did I miss anyone?

9       MR. LOEVY:  No, your Honor.

10      THE COURT:  Okay.  And then can we drop anyone else?

11      MR. LOEVY:  May we have a moment to confer?

12      THE COURT:  Yes.

13      MS. WANG:  Also, and these are off of the defendants'

14  list:  Brij Patnaik and Michael Hedges.

15      MR. LOEVY:  So some of the people on the defendants'

16  list, we may call.

17      THE COURT:  Yeah.  All right.  Let me go through

18  that, and then you can double back if you need to.

19      Okay.  So the defense list, Janet Lupa is off, but

20  the summary is going to mention her, so I'm going to read her

21  name even though she's not going to testify live or by

22  designation.  Okay.  So --

23      MR. LOEVY:  We didn't hear who you said there, your

24  Honor.

25      THE COURT:  Janet Lupa.

1          MR. LOEVY:  Got it.

2          THE COURT:  All right.  So Ann Marie Miller-Bonus, is

3     she actually under trial subpoena?

4          MR. NATHAN:  Yes, but she -- she is outside of the

5     jurisdiction.  She's going to -- she was going to be -- I was

6     going to try to bring up the fact that we need to designate

7     her, but I have to get some of the background fact before --

8          THE COURT:  I'll leave her on for now in case she

9     voluntarily appears, but I don't see how else you're going to

10    get her testimony.

11         Okay.  Linda Martinez; Karrie Kelly; Kasey Paris;

12    Scott Sondelski, also known as Scott Paris; William Rogers.

13    Okay.  I have struck some of the experts.  So Barry Feld,

14    though, will be testifying, right?

15         MR. NATHAN:  Yes.

16         THE COURT:  Okay.  I'm going to leave Barbara Paris

17    on for -- because they'll hear her name in the summary.

18         Chester P-i-e-r-z-c-h-a-l-a; Stephen Ross; Gregory

19    Yacoubian; Murray Shambee again, but I don't need to read him

20    again; Donald Dugard.  Okay.  We've covered Brenda Thomas.

21    Thomas Donegan; Dennis DeGregorio; James Sanford; Jeanne

22    Bischoff; Frank Marek; Michael O'Brien; James Sarros,

23    S-a-r-r-o-s; Michael Hedges; Thomas McGreal; Celeste Stack;

24    Fabio Valentini; Rebecca George; Anthony Marchlewski, which I

25    will -- he testified at the trial?  That was the transfer.

1          MS. WANG:  He did not --

2          THE COURT:  He did the psyche eval for the transfer,

3     right?

4          MR. NATHAN:  Yes.

5          THE COURT:  But he did not testify at trial.

6          MR. NATHAN:  I don't think he testified at trial.  He

7     did a deposition.

8          THE COURT:  Okay.  So I'm not going to read his name.

9          Colleen Koch, K-o-c-h; and then Marty Beyer.

10         Did she testify at trial?

11         MR. NATHAN:  No.

12         THE COURT:  Okay.  I'm not going to read her then.

13         Okay.  Can I drop anyone from that list?

14         MR. NATHAN:  Colleen Koch, we're dropping her.

15         THE COURT:  Oh, you're dropping her?  Okay.  And the

16    plaintiff was not going to call her, correct, the public

17    defender?

18         MR. LOEVY:  I think it would be safe to read her

19    name, your Honor.

20         THE COURT:  To read her name?

21         MR. LOEVY:  Yes.

22         THE COURT:  Because...

23         MR. LOEVY:  They're calling five state's attorneys,

24    and I don't know, we might need the public defender to rebut

25    something.

1          THE COURT:  Was she on your list?

2          MR. LOEVY:  We reserved the right to call anybody on

3   their list.  It's somewhat contingent on how many state's

4   attorneys they have -- I don't think they're going to call all

5   those state's attorneys, but if they make the criminal trial

6   part of the case, then that could change our calculus.

7          THE COURT:  I'll read the name just out of an

8   abundance of caution.

9          Okay.  Anyone else for the defense either to add or

10  drop?

11         MR. NATHAN:  No, your Honor.

12         MR. LOEVY:  There's the name Pyles, Jimmie Pyles,

13  that I'm not sure I heard.  He's one of the witnesses too.

14  P-y-l-e.

15         THE COURT:  He's not on the City's list and not on

16  the County's list.

17         MR. NATHAN:  And we would object to him being called.

18         THE COURT:  Yeah, so what's...

19         MS. WANG:  He was on our original list --

20         THE COURT:  Make sure the microphone is turned on.

21  Go ahead.

22         MS. WANG:  Page 8 of the final pretrial order under

23  the City's list of witnesses, the one that was -- the final

24  pretrial order witness list that was filed in the fall, Jimmie

25  Pyle is on that list right after Chester Pierzchala.  And

1    we -- in that final pretrial order, we said that we may call

2    any of the witnesses on the defense list.

3         THE COURT:  Yeah, but when I made them narrow it down

4    on April 13, he was not on there, so you can't just piggyback

5    that way.

6         Okay.  We're going to need that second row there, so

7    I'm going to ask the gentleman who is sitting there to either

8    sit in the last two rows or on the other side here.

9         Okay.  And do we have McInerney?  No?  Raise your

10   hand, please.

11        All right.  And Davis, with my Sherlock Holmes

12   deduction.  Okay.  So McInerney, Davis.  All right.

13        MS. EKL:  Your Honor, I do have one issue to raise in

14   relation to Mr. Shambee.  I had mentioned at the earlier

15   conference that he had some health issues.  I sent plaintiff's

16   counsel an email yesterday.  I've spoken to him a couple --

17   you know, a few times since the last conference, and I

18   actually went and met with him one-on-one.

19        He is available to testify.  Mentally, he is okay

20   from his two strokes.  I don't know if your Honor recalls, I

21   had mentioned that he has had two strokes since his

22   deposition, but physically he has difficulty not only driving

23   but getting around.  He's short of breath.  And he has

24   concerns about even if someone were to drive him from his home

25   which is in Matteson, Illinois, that he would have difficulty

1    coming into the courtroom, walking, and testifying.

2            So on his behalf, I'm requesting that we be able to

3    present him, or if plaintiff is going to ask him questions,

4    that he be presented via Zoom.  He is available to do that.  I

5    talked to him about what would be required for his appearance

6    via Zoom, but there are some serious concerns about him coming

7    here physically.

8            MR. LOEVY:  Not a problem at all from our

9    perspective, your Honor.

10            THE COURT:  I'm sorry?

11            MR. LOEVY:  Not a problem at all from our

12    perspective.  In fact, we're hoping to have Zoom testimony of

13    multiple -- a few witnesses.  Karrie Kelly, for example, from

14    Arizona.

15            THE COURT:  Okay.  Yeah, so with respect to

16    Mr. Shambee, so are you going to call him or not?

17            MR. LOEVY:  Unlikely.

18            THE COURT:  Okay.  So I'll just -- I just want to

19    know how soon I'll need to get Systems to set up that.  And

20    he's got the technology to do it?

21            MS. EKL:  He -- we will -- we talked to him about

22    having some person come down, an administrative person come

23    and bring a computer and setting it up for him so that we can

24    avoid glitches.  He knows that his wifi needs to be operating

25    and the password available.

1   THE COURT:  Okay.  It's going to have to be Webex but

2   we'll -- which is what the court has been using.  So

3   hopefully, you'll be able to do that on your device that you

4   bring to him.

5   Okay.  And when were you planning on calling Kelly?

6   MR. LOEVY:  Monday.

7   THE COURT:  I'll cut and paste liberally from an

8   opinion I just wrote that says that there is subpoena power

9   over someone to testify by video, but there has to be

10   compelling circumstances.  And given her central importance to

11   this case, I think having her testify by video is superior to

12   her testifying by designation.

13   So it's not something that ought to be done

14   routinely, and far from it, but she is important enough that

15   she ought to testify by video so that the jury can view her

16   live.  All right.  So we at least need it by Monday.

17   MR. LOEVY:  There's one other witness, your Honor,

18   that I know sometimes judges want a heads-up on.  Her name is

19   Kasey Paris.  She has been served.  She was uncooperative with

20   the process server and, you know, a lot of, "F you, I'm not

21   going" -- you know, she didn't say she wasn't going to show

22   up, but I know that we've in the past had judges say, "Why

23   didn't you raise it sooner that they might have a problem with

24   this witness?"

25   We may have a problem with this witness.  We

1    subpoenaed her for Thursday.  She's within 100 miles.  And

2    we're hopeful that we won't need the Court's assistance.

3              THE COURT:  Okay.  Have you been in contact with her

4    or not?

5              MR. NATHAN:  I believe we served her as well.

6              One moment, your Honor.

7              THE COURT:  You can give her the mike too.

8              MS. ADEEYO:  Good morning, your Honor.  Natalie

9    Adeeyo.

10             So we had our investigator go out to serve her last

11   week.  Unfortunately, he was unsuccessful serving her.  We

12   also had a process server try to serve her a few weeks ago

13   around that mid-April date, April 13th, and we were

14   unsuccessful.

15             THE COURT:  Okay.  All right.  It sounds like you

16   have the same -- similar issue.

17             So, yeah, you can reach out to her again and tell her

18   that because she is under subpoena, the Court would be

19   required to send the marshal service to go get her if need be.

20   So I don't want to do that, and you should tell her that too.

21   "The Court does not want to do it," but we'll do it.  So she

22   needs to show up.  So just leave whatever messages you can

23   with her on that.

24             Okay.  Take ten minutes.

25         (Recess from 9:11 a.m. to 9:24 a.m.)

1          THE COURT:  Yeah.  Go ahead.

2          MS. EKL:  Thank you, your Honor.  The City would

3    request that the plaintiff be required to provide us with a

4    copy of the settlement agreement between the plaintiff and

5    Cook County so that we can appropriately address issues

6    related to the setoff.

7          MR. LOEVY:  And there is no such document, but as

8    soon as there is one we certainly -- they're the first ones

9    who should get a copy.

10         THE COURT:  Okay.  Do you have a term sheet?

11         MR. LOEVY:  No.  We have an email confirming that we

12   reached a number together.

13         THE COURT:  Okay.  Yeah, send that to the --

14         MR. LOEVY:  Got it.

15         THE COURT:  -- defense.

16         MS. EKL:  Thank you, Judge.

17         THE COURT:  So for the openings tomorrow, how long

18   were you thinking?

19         MR. LOEVY:  45 minutes, plus or minus.

20         THE COURT:  Plus or minus zero?

21         MR. LOEVY:  Less than an hour.

22         THE COURT:  Mr. Nathan?

23         MR. NATHAN:  I'm going to say the same thing.

24         THE COURT:  Okay.  Are you delivering it?

25         MR. NATHAN:  Yes.

1          THE COURT:  Okay.  And who is delivering the --

2          MR. LOEVY:  I am.

3          THE COURT:  All right.  45 minutes.

4          MR. LOEVY:  Your Honor, how many did you say we were

5    picking again?

6          THE COURT:  Nine.

7          MR. LOEVY:  Thank you.

8       (Pause.)

9          THE COURT:  As a heads-up, I believe I know juror

10   No. 13, Christopher Laughlin.  And we can talk to him at the

11   sidebar about it.

12      (Pause.)

13      (Proceedings heard in open court.  Jury in.)

14          THE COURT:  All right.  You may be seated.

15          Ladies and gentlemen, welcome to federal court.  I'm

16   Judge Edmond Chang, and I'll be presiding over this trial.  We

17   also have in front here, you have already met to my right our

18   experienced courtroom deputy, Michael Wing.

19          And to my left here is Judy Walsh who is our expert

20   court reporter.  Indeed, she has won national championships at

21   court reporter competitions.  So if you ask her to show you

22   the trophy -- she might have had to give it back to the

23   successor.  But, yeah, she even stopped competing because she

24   was just winning every time.  So that's Ms. Walsh.

25          And then in front of me here is Ms. Radhe Patel.  She

1       is a superstar new lawyer, one of my law clerks.

2               Today we're going to be picking in a jury to serve in

3       a case entitled Adam Gray versus Percy Davis, Daniel

4       McInerney, and the estates of Nicholas Crescenzo, Michael

5       Pochordo, Ernest Rokosik, and George Jenkins.

6               And we appreciate your willingness to serve on a

7       jury.  One of our most important community duties to one

8       another is to serve on juries so that everyone can get a fair

9       trial.  You jurors are indispensable to the rule of law in

10      this nation, so I thank you for your patience and your

11      persistence during this trial.

12              We're going to pick a fair and impartial jury by

13      asking you some questions and asking follow-up questions when

14      appropriate.  Because you'll be making statements in court,

15      you do have to be put under an oath to tell the truth.

16              And I'll ask the courtroom deputy to do that now.

17              THE CLERK:  Would all the prospective jurors please

18      raise your right hands.

19          (Venire sworn.)

20              THE CLERK:  Thank you.

21              THE COURT:  All right.  Now, before we start with the

22      questioning, I want to let you know that our goal in asking

23      you questions is simply to pick a fair jury.  It's not to

24      intrude or embarrass you in any way, so if at any time there's

25      some kind of answer that you would prefer to give in private

1   only to the lawyers and to me, we can do that.  We've got a

2   fancy sidebar setup that we'll be using.  And I'll try to

3   anticipate that as well based on some of the questions.

4           To get you started, I'll tell you a little bit about

5   the case.  Please do listen carefully because after I describe

6   the case, I will ask you whether you happened to have heard of

7   it by chance.  Okay.  This is a federal civil rights lawsuit

8   brought under a law that provides remedy -- a remedy to

9   persons who allege that they have been deprived of their

10  federal constitutional rights.

11          The plaintiff in this case is Adam Gray.  The

12  defendants in this case are, and I'll just read the names one

13  more time, Percy Davis, David -- Daniel McInerney, as well as

14  the estates of Nicholas Crescenzo, Michael Pochordo, Ernest

15  Rokosik, and George Jenkins.

16          Mr. Crescenzo, Mr. Pochordo, Mr. Rokosik, and

17  Mr. Jenkins have passed away, so they are represented in this

18  lawsuit by a special representative of their estates, Geri

19  Yanow.  Okay.  And I've excused that representative's presence

20  in court.  She's just representing the estates.

21          For ease of reference, I'm going to call that group

22  of individuals "the defendants."  Okay.  So the defendants are

23  the ones who have been sued.  The plaintiff is Mr. Gray.  He

24  is the one who brought the case.

25          All right.  Now, the plaintiff, Mr. Adam Gray, he

1    alleges that he was wrongfully convicted of a crime that he

2    did not commit involving the death of two people who died in a

3    building fire in 1993.

4          Mike, can you -- thank you very much.

5          All right.  We've reached out to the landlord, so

6    we'll see if the General Services Administration can step back

7    for a bit.

8          Okay.  Now, Mr. Gray alleges that he did not set the

9    fire, the fire was not arson, and that the cause of the fire

10   is undetermined.  Mr. Gray spent 24 years incarcerated from

11   the ages of 14 to 38 before his conviction was vacated by a

12   court and the prosecutor dismissed all charges against him.

13         The plaintiff alleges that the defendants caused his

14   wrongful arrest, prosecution, and conviction which resulted in

15   the violation of his constitutional rights and damages to him.

16   Specifically, the plaintiff alleges that the defendants

17   violated his Fifth Amendment rights by improperly coercing him

18   to give a false confession and violated his 14th Amendment

19   right to a fair trial by fabricating evidence, suppressing

20   favorable evidence, and using suggestive identification

21   procedures that tainted his criminal trial.

22         The plaintiff also alleges that the defendants

23   violated his Fourth Amendment right not to be deprived of

24   liberty without probable cause; agreed to deprive him of his

25   rights; failed to intervene to stop the violation of his

1    constitutional rights; maliciously prosecuted him; and

2    conspired against him.

3           The defendants deny all claims alleged by the

4    plaintiff.

5           Now, by a show of hands, if any, does anyone here

6    happen to know anything about this case?

7           Okay.  I see no hands.  Now I'm going to ask

8    Mr. Gray's lawyers to introduce themselves and their client as

9    well.

10          MR. LOEVY:  Good morning, everybody.  My name is Jon

11   Loevy.  This is Elizabeth Wang, Roshna Bala Keen, Jordan

12   Poole.  We're assisted by Melinda Ek.  This is our client,

13   Adam Gray.

14          THE COURT:  All right.  And then for the defense.

15          MR. NATHAN:  Good morning, everyone.  Shneur Nathan

16   here.  This is Avi Kamionski, Breana Brill, this is Elizabeth

17   Ekl, and here with me is Neha Locke as well as Natalie Adeeyo.

18   We're privileged to represent, this is Youth Officer Percy

19   Davis, and this is retired bomb and arson Officer Daniel

20   McInerney.

21          THE COURT:  Okay.  Does anyone happen to know anyone

22   that was just introduced?

23          All right.  Does anyone happen to know the -- any of

24   the deceased individuals, those names that I read off?

25          Okay.  I'm going to read now a witness list.  This is

1   a potential witness list, okay, and also some people's names

2   that you might hear during the trial.  It is certain that we

3   will not hear from everyone on this list.  Okay.  So do not be

4   intimidated by the length of this list, but I do want to make

5   sure that you don't have any prior knowledge or you happen to

6   know one of these individuals.  Okay.

7           So James Brown, he was a state prosecutor; Gertraud,

8   G-e-r-t-r-a-u-d, Gray; John Lentini; Melissa Russano

9   Rodriguez; Geoffrey Loftus; Dennis Smith, works in the area of

10  fire and arson; William Barnes, Illinois State fire marshal;

11  Julie Campoverde, C-a-m-p-o-v-e-r-d-e; Denise Chavez; Lisa

12  Clifford; Anthony Gonzalez; Lita Gonzalez, L-i-t-a is the

13  first name; Rosemary Gonzalez; David Gray; Michael Gray; Terri

14  Mascherin, M-a-s-c-h-e-r-i-n, she's a lawyer; Murray Shambee,

15  S-h-a-m-b-e-e; Brenda Thomas, now lives in Minnesota, Natalia

16  Zamecka, Z-a-m-e-c-k-a; and Craig Miller.

17          All right.  Moving on, Janet Lupa, she was a court

18  reporter; Ann Marie Miller-Bonus, who used to go by the last

19  name of Hengst, H-e-n-g-s-t; Linda Martinez, a Chicago police

20  officer; Karrie Kelly; Kasey Paris, or Kasandra Paris; Scott

21  Sondelski, S-o-n-d-e-l-s-k-i, also went by Scott Paris;

22  William Rogers, he was a firefighter; Barry Feld; Barbara

23  Paris; Chester, and then the last name is P-i-e-r-z-c-h-a-l-a,

24  Pierzchala; Stephen Ross, expert on eyewitness identification;

25  Gregory Yacoubian, Y-a-c-o-u-b-i-a-n; Donald Dugard,

1   D-u-g-a-r-d; Thomas Donegan, D-o-n-e-g-a-n, he's a Chicago

2   police officer; Dennis DeGregorio, D-e-g-r-e-g-o-r-i-o; James

3   Sanford, S-a-n-f-o-r-d; Jeanne Bischoff, B-i-s-c-h-o-f-f;

4   Frank Marek, M-a-r-e-k; Michael O'Brien, he was a state

5   prosecutor; James Sarros, S-a-r-r-o-s, also a state

6   prosecutor; Michael Hedges, I believe he's a music teacher;

7   Thomas McGreal, M-c-g-r-e-a-l; Celeste Stack; Fabio Valentini,

8   V-a-l-e-n-t-i-n-i; Rebecca George; and Colleen Koch or Koch,

9   K-o-c-h.  She was a lawyer as well.

10          All right.  Any of those names sound familiar?

11          All right.  Very good.  Okay.  So now what we're

12   going to do is get a little bit of background about you.  And

13   the way we're going to do that is by asking you to go ahead

14   and answer the questions on that one-page, double-sided cover

15   letter that we supplied to you in the jury department.  And

16   don't worry if you miss something.  I'll backtrack and ask you

17   to repeat it.

18          So when you deliver your answers in a moment -- for

19   example, I'm going to ask juror No. 1 to come on over to this

20   podium over there.  There's a microphone.  And just talk right

21   into the microphone, and we'll get the answers to the

22   questions.

23          We're going to do, like, maybe three or four of

24   those, and then what I'm going to do is we're going to let

25   rows two and three, so that would be jurors 21 through 32, if

1    I'm doing the math right, go back to the larger courtroom down

2    the hall where -- is that where they came from?

3            THE CLERK:  No, they came from 2.

4            THE COURT:  Oh, okay.  So we will lead you to another

5    courtroom on this floor.  I'm renting it from one of my

6    colleagues, all right, so please treat it nicely.  But this

7    way you don't have to stay here and wait for the period of

8    time when we're talking to the other jurors.  It will be a

9    little bit more comfortable in there.  It's set up very much

10   like this one, so you can sit in nice comfy chairs in the jury

11   box.  There will be chairs around the tables.  Please don't

12   just use any of this bench area here.  So it's Judge Seeger's

13   courtroom down the hall.

14           But I want you to get a little bit of the hang of

15   this, and then I'll let you go after the first few, and then

16   we'll bring you back in when it's your turn.

17           Okay.  So juror No. 1, if you could come to the

18   podium, please.  All right.  And just go ahead and start with

19   your name, please.

20           PROSPECTIVE JUROR:  So I'm Shonali Lothe, and I live

21   in Lincolnshire.  And I've been there for eight years.  You

22   don't need the address, right?

23           THE COURT:  No.

24           PROSPECTIVE JUROR:  Okay.  And I'm a physical

25   therapist.  I went to school in India for that.  I am

1    self-employed.  I do home health.  And I see a lot of

2    geriatric patients at home.

3            So my husband works from San Diego.  He's not here.

4    And he is working for Truvian Sciences.  Before that, he

5    worked for Abbott.  Currently, he is the CEO of the company,

6    Truvian Sciences.  And I think ten years would be Abbott.  And

7    I don't remember before that where he was.

8            THE COURT:  All right.

9            PROSPECTIVE JUROR:  But Abbott was here.

10           THE COURT:  Okay.

11           PROSPECTIVE JUROR:  And I have two kids.  My daughter

12   is 16.  She's currently having her advanced placement exams

13   going on.  So she's a sophomore in high school.

14           And my son is, he is in Seattle, University of

15   Washington, Seattle.  He's doing computer science there.

16           My in-laws and my parents live with me, so I'm

17   currently the sole provider, and my little dog, of course.

18   Hobbies, I've been a CASA in the past, but I couldn't justify

19   because I had younger kids.

20           THE COURT:  I'm sorry?  You've been --

21           PROSPECTIVE JUROR:  Court-appointed advocate for

22   kids, for abused kids, but I couldn't be fair to it because of

23   my kids.  My kids were younger.

24           And where I get my news from is from TV or my phone

25   usually.

1          THE COURT:  Okay.  And do you own or rent in

2     Lincolnshire?

3          PROSPECTIVE JUROR:  I own.

4          THE COURT:  And your education was in India?

5          PROSPECTIVE JUROR:  Yes.  A bachelor of physical

6     therapy.

7          THE COURT:  Got it.  And your spouse, the current

8     company for which he's a CEO, that's a pharmaceutical company?

9          PROSPECTIVE JUROR:  It is.

10         THE COURT:  Okay.  So are your in-laws or your

11    parents working?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  And you have both sets at home?

14         PROSPECTIVE JUROR:  My parents will be coming in in a

15    little bit.  They've just gone to India, but they'll be coming

16    back.  Currently my in-laws are with me and they both -- they

17    don't work.  And they're about 75, 80.

18         THE COURT:  But your parents were living with you

19    before they went on this trip?

20         PROSPECTIVE JUROR:  Yes, yes.

21         THE COURT:  Okay.  Got it.  So what did your parents

22    do, if anything, for a living before they retired?

23         PROSPECTIVE JUROR:  What did they do?  My father was

24    an Air Force pilot in India.

25         THE COURT:  All right.  And?

1         PROSPECTIVE JUROR:  And my father-in-law was also in

2    the Air Force in India, but he worked here somewhere.  I don't

3    really know where he worked.

4         THE COURT:  Okay.  And do you know what field by

5    chance or not?

6         PROSPECTIVE JUROR:  Here, I think he worked for some,

7    I don't know, laser, Lasik surgery.  He was doing the diamond,

8    whatever.  I don't know.

9         THE COURT:  Got it.  And then in terms of your news

10   sources, are there any particular media outlets that you rely

11   on?

12        PROSPECTIVE JUROR:  Well, I go with CNN, CNN news,

13   yeah.

14        THE COURT:  Great.  Okay.  I do want to follow up on

15   the -- your service as a child advocate.

16        PROSPECTIVE JUROR:  Yes.

17        THE COURT:  So what we're going to do, we're going to

18   do that at the sidebar.  So let me describe that to you.

19        And everyone, just please listen in because if you do

20   a sidebar, this is what you'll have to do.

21        So I'll ask you to go to -- that's actually the

22   witness stand right there.

23        PROSPECTIVE JUROR:  Okay.

24        THE COURT:  And at the witness stand, you'll find

25   some headphones.  I'll ask you to put on the headphones, and

1    then I'm going to turn on the worst white noise you have ever

2    heard.

3         And so those of you in the jury box, you think you

4    got the comfortable chairs, but there are speakers in that

5    wooden rail there, and they're going to blast right at you.

6    It's going to sound pretty bad to those of you in the gallery

7    too.  The idea, though, is that you ought not be able to hear

8    our conversation.

9         You, Ms. Lothe, you'll be able to hear what we say,

10   the lawyers and I say, because we're going to speak into the

11   mike and it's going to come out right here.  And whatever you

12   say into the mike, we'll hear as well.  Okay.  And the court

13   reporter also will be able to take it down.

14        So can you join us at the sidebar, please.

15        (Proceedings heard at sidebar:)

16        THE COURT:  Ms. Lothe, can you hear me?

17        PROSPECTIVE JUROR:  Yes.

18        THE COURT:  All right.  Great.  And we'll just wait a

19   moment to make sure the lawyers have their headphones.

20        Okay.  I think we're set now.  So, Ms. Lothe, how

21   long ago did you do the CASA work?

22        PROSPECTIVE JUROR:  I can't really remember.  Maybe

23   three -- not three.  Maybe five years ago, four, five years

24   ago.

25        THE COURT:  Okay.  And how long had you been doing it

1    before you stopped doing it?

2            PROSPECTIVE JUROR:  I just did it for, like, one case

3    because my kids were younger.  And I had to be with the kids

4    at the CASA thing at 3:00 o'clock right when my kids got off.

5    So I couldn't do justice to both of them, so I gave it up.

6            THE COURT:  Okay.  And this was a volunteer role?

7            PROSPECTIVE JUROR:  It was a volunteer role.

8            THE COURT:  And you -- did you receive training for

9    that?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  And the training was to how to be a child

12   advocate --

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  -- in the state court system?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  And the one case, without telling us the

17   name of the child, what did the case involve?

18           PROSPECTIVE JUROR:  Well, it was just that I think

19   they were divorced, and they just wanted to make sure the kids

20   were okay and there was nothing fishy going on around.  And

21   the kids were in good hands, but I just didn't think, if I saw

22   something happen, I would be able to handle because my kids

23   were of the same age.

24           THE COURT:  I see.  And so you thought the emotional

25   impact would have been just overwhelming?

1          PROSPECTIVE JUROR:  It would have been because in

2     certain cases, you want to do a little bit more and you just

3     can't because you're just an advocate.  You're not an official

4     social worker or anything that you could really go and do

5     anything more.

6          THE COURT:  Okay.  So I want to make sure that this

7     experience would not prevent you from being fair to either

8     side in this case because you will hear testimony, as I read

9     in the summary of the case, that the plaintiff was 14 years

10    old when he was first detained.

11         So hearing that, do you have concerns about your

12    ability to be fair to either side in this case?

13         PROSPECTIVE JUROR:  Well, I -- you know, it depends

14    on what I hear for the case, like, you know, what evidence

15    they put up.  I'm really -- I don't know.  I can't really say

16    what I would feel then.

17         THE COURT:  I mean, and I think that's the important

18    point.  Actually, can you --

19         PROSPECTIVE JUROR:  Sorry.

20         THE COURT:  No, that's fine.  Move the water canister

21    a bit.

22         PROSPECTIVE JUROR:  Is that what you were telling me?

23         THE COURT:  So it is important that you be able to

24    assess the evidence in this case and base your decision on the

25    evidence in the case rather than any kind of preconceptions or

1   inclinations you might have.  I think what I heard you say is

2   that's how you would judge the case, based on the evidence.

3   Is that fair?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  So, for example, when Mr. Gray testifies

6   in this case, he doesn't start out with a plus on his

7   testimony just because he was 14 at the time that he was

8   detained.  He doesn't start with a minus either, right, but he

9   doesn't start with a plus.

10           So can you follow that kind of instruction?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  You would have to weigh his testimony the

13   same way you weigh the testimony of any other witness.  Can

14   you do that?

15           PROSPECTIVE JUROR:  I think so.

16           THE COURT:  All right.  Now, when you say "I think

17   so" and you're nodding your head, it looks a little different

18   on paper.  So I do want to make sure, you do have this

19   education.  I think you understand what it means to set aside

20   your prior prejudices, but I also want you to be honest with

21   yourself and obviously with the Court.

22           So can you weigh Mr. Gray's testimony the same way as

23   any other witness?

24           PROSPECTIVE JUROR:  I should be able to.

25           THE COURT:  Okay.  Any follow-up questions from the

1    plaintiff?

2           MR. LOEVY:  No, your Honor.

3           THE COURT:  And Mr. Nathan or from the defense team?

4           MR. NATHAN:  I'm just checking this.

5           Yes.  I may have just not heard correctly, but did

6    Ms. Lothe say that she stopped being a court advocate due to

7    some emotional impact that was having with her?

8           THE COURT:  Yeah, I believe the statement was that

9    because her children were of a similar age, the case that she

10   was working on, it was too much of an emotional impact for her

11   to carry on.

12          MR. NATHAN:  I would ask if the follow-up question

13   could be asked what was that emotional impact.

14          THE COURT:  All right.  Do you want to elaborate on

15   that, Ms. Lothe?

16          PROSPECTIVE JUROR:  Well, for the particular case

17   that I was working on, that was a pretty straightforward case.

18   There was nothing going on there, but I was just more

19   concerned because when we went through training, we had a lot

20   of people come in and talk to us who had been abused earlier

21   and now they are past it.

22          But I just didn't know how I would be able to handle

23   at that point, if my daughter was the same age as the child

24   who would be abused, how I would be able to handle it or if

25   I'm in a position where I know there was something going on

1    and I wouldn't be able to do much other than just, you know,

2    be an advocate.

3         And I didn't know how it would impact me coming back

4    home and, you know, dealing with my kids and also the fact

5    that both -- you know, it just, the school finished at the

6    same time for everyone, and I have to leave my kids and go

7    over to the other kids to look after them.  I didn't think I

8    would be just -- doing justice to either one because I would

9    be overlooking my kids' needs at that point.

10         THE COURT:  All right.  And let me follow up.  On the

11   training, did any training ever involve concepts about

12   criminal law?

13         PROSPECTIVE JUROR:  No, not necessarily, no.

14         THE COURT:  So it was a focus on the physical and

15   mental trauma of abuse?

16         PROSPECTIVE JUROR:  Yes, yes.

17         THE COURT:  Okay.  Anything else, Mr. Nathan?

18         MR. NATHAN:  No.  Thank you.

19         THE COURT:  All right.  Anything else for the

20   plaintiff?

21         MR. LOEVY:  No, your Honor.

22         THE COURT:  Okay.  Ms. Lothe, you can have a seat.

23         PROSPECTIVE JUROR:  Thank you.

24      (Proceedings heard in open court:)

25         THE COURT:  Okay.  Was it as bad as I said it was

1    going to be?  Yeah, I'm sure you're unanimous on that.

2          Okay.  Mr. Herzer.

3          PROSPECTIVE JUROR:  Good morning.  My name is Dillon

4    Herzer.  I've lived in Chicago for the last 18 years, the last

5    eight or so in Lincoln Park with my wife.  We own a condo

6    there.  I went to Michigan State University where I got a

7    bachelor of arts degree in advertising, and I spent the last

8    18 years working for advertising agencies as a creative

9    director making, producing different TV commercials and

10   branding and social media ads and stuff like that.

11         My wife does the same type of thing.  She's now an

12   executive creative director, but we're both on the creative

13   side of the advertising world and create and make ads.

14         I do have two kids.  My son is just over two.  My

15   daughter is six weeks old.

16         THE COURT:  Congratulations.

17         PROSPECTIVE JUROR:  Thank you.

18         And we live, you know, just my wife and the two kids.

19         For hobbies, I like to play soccer and golf.  My wife

20   and I run and go hiking.  We enjoy the outdoors.  And as far

21   as I get my news, mostly from online, social media sites.  I

22   tend to go to either Reddit or Drudge Report and just get as

23   much as I can, but I'm kind of skeptical about all of it.

24         THE COURT:  All right.  And any TV programs that you

25   watch regularly?

1        PROSPECTIVE JUROR:  Just like streaming stuff on HBO

2   or Netflix.

3        THE COURT:  Okay.  I think that's all I have for you

4   right now.  Thanks.

5        Ms. Smith?

6        PROSPECTIVE JUROR:  Hi.  I'm Yue Smith.

7        THE COURT:  And, Ms. Smith, you can bring down the

8   mike a little bit.

9        PROSPECTIVE JUROR:  Sorry.  I'm a little short.

10       THE COURT:  No problem.

11       PROSPECTIVE JUROR:  I live in Lisle for about 15, 16

12  years now.  Before that, I live in Chicago, the city.  And I

13  went to UIC, and I got my master degrees there, MBA.

14       And I've been working for a company, a financial

15  services company called Guggenheim Partners for about 20 years

16  now.  And I worked in HR and then now in finance, and now I

17  oversee, I'm the compensation manager and oversee payroll and

18  the retirement plan for the firm.

19       I am married, and my husband is a lawyer.  I have a

20  daughter.  She is 16, and she's a senior in high school, and

21  she's graduating this year.  She just had her prom this

22  weekend.  And just the three of us in the household.  There's

23  nothing -- no one else.  And a cat.

24       THE COURT:  Don't forget the cat.

25       PROSPECTIVE JUROR:  My hobbies, I like to read and

1　just watching some dramas and maybe just taking a walk every

2　day.  Where do I get my news?  I used to watch, like, WGN

3　every morning or CNBC, but now that I'm working from home, so

4　mostly just online --

5　　　　　　　THE COURT:  Okay.

6　　　　　　　PROSPECTIVE JUROR:  -- is where I get my news.

7　　　　　　　THE COURT:  Great.  And do you own or rent in Lisle?

8　　　　　　　PROSPECTIVE JUROR:  We own.

9　　　　　　　THE COURT:  So you have your MBA.  What was your

10　bachelor's degree in?

11　　　　　　　PROSPECTIVE JUROR:  Education.

12　　　　　　　THE COURT:  And what type of law does your husband

13　practice?

14　　　　　　　PROSPECTIVE JUROR:  I think he used to do -- I'm not

15　completely sure.  We don't really talk about work.  But I

16　think he used to do, like, criminal defense, but then now I

17　think mostly he does, like, personal injury case, I think.

18　　　　　　　THE COURT:  And can I ask his name?

19　　　　　　　PROSPECTIVE JUROR:  Brian Smith.

20　　　　　　　THE COURT:  Okay.  And then any particular type of

21　genre that you like to read?

22　　　　　　　PROSPECTIVE JUROR:  Not really.  I kind of like to

23　read all kinds of stuff just, like, watching TV, like dramas

24　but also documentary stuff.

25　　　　　　　THE COURT:  Okay.  All right.  If I could just follow

1    up at the sidebar briefly, I would appreciate it.

2        (Proceedings heard at sidebar:)

3            THE COURT:  Okay.  Ms. Smith, just to follow up your

4    husband's employment, did he ever work for a public defender

5    office?

6            PROSPECTIVE JUROR:  I'm not sure --

7            THE COURT:  Can you talk into the mike?

8            PROSPECTIVE JUROR:  Sorry.  I'm not sure.  I think

9    before we met, he mentioned that he worked for some -- maybe

10   he was a public defender.  I'm not sure.

11           THE COURT:  So it sounds like you don't talk very

12   much with him about his work.  Is that accurate?

13           PROSPECTIVE JUROR:  Yeah, but, you know, I heard

14   stories maybe, like especially now that he's doing more, like,

15   personal injury stuff and just sometimes we talk about some --

16   not talking about cases but, like, some stories.

17           THE COURT:  Okay.  So with regard to criminal, his

18   criminal defense work, did you talk very much with him about

19   that?

20           PROSPECTIVE JUROR:  No.

21           THE COURT:  And how about criminal law or, like,

22   principles of criminal law?

23           PROSPECTIVE JUROR:  Not like talking about cases so

24   to speak, but sometimes we would be, like, you know, if we see

25   something on TV or even in dramas, something, just curious

1   talking about how, like -- you know, how it works overall but

2   not with specific cases.

3           THE COURT:  Okay.  Now, I will be giving legal

4   instructions to the jury from time to time during the trial

5   and also at the end of the trial.  It will be important that

6   anyone who sits on the jury follows the legal instructions

7   that I give rather than what they might have gotten either

8   from TV or talking with their spouse.

9           So will you be able to do that?

10           PROSPECTIVE JUROR:  Sure.

11           THE COURT:  Okay.  Any follow-up questions from the

12   plaintiff?

13           MR. LOEVY:  No, your Honor.

14           THE COURT:  And Mr. Nathan?

15           MR. NATHAN:  No, your Honor.

16           THE COURT:  Okay.  All right.  Thanks, Ms. Smith.

17   You can have a seat.

18       (Proceedings heard in open court:)

19           THE COURT:  Okay.  Ms. Welsh?

20           PROSPECTIVE JUROR:  My name is Melanie Welsh, and I

21   live in Geneva for about ten years now in my home that I own.

22   I have a bachelor's of science in business administration in

23   the area of information systems.  I've worked in consulting

24   and then HR.  Basically, I'm now all in HR where I work on

25   acquisitions and integrating the -- that employee population

1    into my company through trainings and such activities.

2         My husband, I'm married.  My husband is, he's in like

3    logistics and supply chain.  He currently works for RXO.  It's

4    a newer company that's been through a few name changes and

5    acquisitions.  So it was XPO prior to that and Menlo Logistics

6    prior to that.

7         THE COURT:  Okay.

8         PROSPECTIVE JUROR:  I have two children, a

9    15-year-old and 13-year-old, and we have a dog.  Hobbies, I

10   really like the outdoors.  I do -- I walk my dog every day,

11   and I also do hiking, spend a lot of time doing that, hiking

12   out in the Starved Rock area.

13        And in the mornings, I watch Fox Business for, like,

14   the stock and market watch-type information.  Other than that,

15   I don't really watch any regular TV.  And I do occasionally

16   get news from, like, the Daily Wire.

17        THE COURT:  And then what's the company name that you

18   work for?

19        PROSPECTIVE JUROR:  Accenture.

20        THE COURT:  And was Accenture Andersen at some point

21   long ago?

22        PROSPECTIVE JUROR:  Many years ago, yes.  I had

23   nothing to do with Enron.

24        THE COURT:  All right.  Glad you cleared that up.

25        Okay.  Thanks very much, Ms. Welsh.  You can have a

1    seat.

2              Okay.  Let's let the second and third rows of the

3    gallery go to the other courtroom.  You can spread out and be

4    a little bit more comfortable.  And while Mike does that,

5    we'll ask Ms. Myzia, come on up, please.

6              Hi.

7              PROSPECTIVE JUROR:  Good morning.  My name is Rachael

8    Myzia.  I own a home in Pingree Grove, Illinois.  In regard to

9    school, I went -- I had completed two years of college, did

10   not finish my degree.

11             I currently am a home school mom and also do some

12   light billing for my husband for his business.  Prior to that,

13   I was a pharmacy technician full-time.  My husband is an

14   attorney.  He's got a private practice for the past eight

15   years or so.  Prior to that, he was a prosecutor in Winnebago

16   County.  We have one son.  He's 12 years old.  And no other

17   family member lives with us.

18             In regard to hobbies, I play the flute.  I love to

19   read, also very involved with my son's travel ball team as

20   team mom.  And I get my news with social media, ABC 7 News,

21   WGN.

22             THE COURT:  Okay.  Great.  Let's follow up, I just

23   want to talk about your husband's practice.

24             PROSPECTIVE JUROR:  Sure.

25             THE COURT:  Come on over to the sidebar.  Thanks.

1          I'm not checking texts.  I have two-factor

2   authorization, and my computer locked up.  So I've just got to

3   log back in here.

4       (Proceedings heard at sidebar:)

5          THE COURT:  Okay.  Ms. Myzia, so what field of law

6   does your husband practice in now?

7          PROSPECTIVE JUROR:  He does criminal defense, family

8   law, and some civil cases.

9          THE COURT:  Okay.  And so for criminal defense, does

10  he ever represent juveniles?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  And then before that, he was a state

13  prosecutor with Winnebago County?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  And can you remind me, how long has he

16  now been in private practice?

17         PROSPECTIVE JUROR:  It's been about eight or nine

18  years now.

19         THE COURT:  And then how long was he with the

20  Winnebago County office?

21         PROSPECTIVE JUROR:  I want to say about -- sorry,

22  about ten years.  Prior to that, he was in Boone and before

23  that, Ogle County.

24         THE COURT:  Okay.  And so do you talk very much with

25  him about his practice and cases and so on?

1          PROSPECTIVE JUROR:  Not into detail.  I leave it

2    attorney-client confidentiality.

3          THE COURT:  That's very wise.  So I do still need to

4    ask, though, so to the extent that you have picked up any

5    either criminal law or civil law concepts working with him or

6    just talking with him, it will be important that any of the

7    jurors who are selected apply the law that I give to them.

8    And so I'll give legal instructions from time to time during

9    the trial and then at the end as well.

10          So will you be able to follow my instructions rather

11    than apply anything that you might have picked up along the

12    way?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  And is there anything about the fact

15    that -- I mean, he's been a state prosecutor, but he's also

16    been a criminal defense lawyer.  You might hear testimony from

17    state prosecutors or criminal defense lawyers or both.  If you

18    hear testimony from those kinds of witnesses, do you -- will

19    you be able to evaluate their testimony just like you would

20    evaluate the testimony of anyone else?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Like so, for example, they don't start

23    with a plus, they don't start with a minus just because of

24    their job.  Can you apply that instruction?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Any follow-up questions from the

2  plaintiff?

3          MR. LOEVY:  On these or all subjects, your Honor?

4          THE COURT:  I'm sorry?

5          MR. LOEVY:  Can I ask about her decision to home

6  school her child?

7          THE COURT:  Yeah, sure.

8          MR. LOEVY:  Do you want to ask it?

9          THE COURT:  I'll ask it.

10          Yes, do you want to just elaborate on the decision to

11  home school your child?

12          PROSPECTIVE JUROR:  My husband had poor experience

13  through public school out in Colorado, so he was looking for a

14  good option for our son.  A brother-in-law had home schooled

15  his family all from times they were little and graduated five

16  kids.  So we followed their path, found that it was a good

17  opportunity for us.

18          MR. LOEVY:  One more follow-up, your Honor.

19          THE COURT:  All right.

20          MR. LOEVY:  On the subject of prosecutors, you know,

21  we're alleging that there was a misconduct in the course of an

22  interrogation, and if her husband was a prosecutor, can we ask

23  if that would cause her concern about being fair.

24          THE COURT:  Okay.  I think I did ask a form of that

25  question, but I'll just make it a bit more explicit.

1          One of the allegations is that state prosecutors also

2    committed misconduct.  And so the fact that your husband

3    worked as a prosecutor in the state system for some time, will

4    that prevent you from being fair to either side in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  And so when state prosecutors

7    or former state prosecutors testify, again, you understand

8    their credibility does not start with a plus or a minus but

9    certainly not a plus.  Do you understand that?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Anything else for the plaintiff?

12          MR. LOEVY:  No, your Honor.

13          THE COURT:  And for the defense?

14          MR. NATHAN:  No, your Honor.

15          THE COURT:  Okay.  All right.  Thanks, Ms. Myzia.

16    You can have a seat.

17       (Proceedings heard in open court:)

18          THE COURT:  Okay.  Moving right along, Ms. Zeitz.

19          PROSPECTIVE JUROR:  Good morning.

20          THE COURT:  Good morning.

21          PROSPECTIVE JUROR:  I'm Susan Zeitz.  I live in

22    Gurnee, have owned there for just shy of 20 years.  I too

23    attended Michigan State.  I have a bachelor's in business

24    administration with an emphasis in human resource management.

25    Over the last ten years, I've held a couple of different

1  roles.  I currently work at the Federal Reserve Bank of

2  Chicago in human resources there as the employee relations

3  manager, so managing investigations and discipline discharge,

4  things of that nature.

5          Prior to that with Jockey International, also in

6  human resources and prior to that, built and ran the human

7  resources function for Campus Cooks.  That's a small

8  entrepreneurial firm providing food service to colleges,

9  fraternities, and sororities.

10         My husband is currently a private banker with BMO

11  Harris, prior to that, Fifth Third Bank and prior to that, in

12  hospitality.  The last one was with Red Robin in restaurant

13  management.

14         Just us and our 17-year-old daughter living in

15  Gurnee.  She is a full-time student, also just had prom this

16  weekend.  Hobbies -- oh, sorry.  No other adults live with us.

17         Hobbies, primarily chasing my daughter around, team

18  mom for her travel volleyball team.  I'm also on the board of

19  directors as treasurer for our local cheer program where I

20  volunteered for the last ten years or so.

21         Other than that, news, TV, news is really whatever

22  headlines pop up on my phone.  I try not to watch or read the

23  news, quite honestly, because it's typically so uplifting, so

24  just headlines and anything relevant to my profession

25  primarily.  Apps would be like USA Today, CNN, really any kind

1    of headline-type thing.  Occasionally, I'll watch the local

2    news if there's something going on that I'm trying to get more

3    information about.

4            THE COURT:  Okay.  And the treasurer position, that

5    volunteer position?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Okay.  In what organization is it?

8            PROSPECTIVE JUROR:  It's Warren Township cheer and

9    pom, so it's a cheerleading group for youth.

10           THE COURT:  I see.  Got it.  Okay.  Great.  Thanks

11   very much.

12           And Mr. Patel?

13           PROSPECTIVE JUROR:  Vinit Patel.  I live in West

14   Chicago, work in a nursing home as doing housekeeping there.

15   And I have three kids, two doctor and one business.  Wife, she

16   works our own business in hotel/motel.  And I just watch

17   mostly sports.

18           THE COURT:  Okay.  Thanks very much.  So do you own

19   or rent in West Chicago?

20           PROSPECTIVE JUROR:  Own.

21           THE COURT:  And how far did you get in school?

22           PROSPECTIVE JUROR:  Only high school in India.

23           THE COURT:  Okay.  And your wife owns a motel?

24           PROSPECTIVE JUROR:  Yes.  She mostly operates

25   everything.

```
 1              THE COURT:  And where is that motel located?
 2              PROSPECTIVE JUROR:  It's in Iowa.
 3              THE COURT:  In Iowa.  Okay.  So is she living in the
 4   household, or is she living out in Iowa?
 5              PROSPECTIVE JUROR:  Here in the household at West
 6   Chicago.
 7              THE COURT:  Okay.  But she manages the motel -- the
 8   motel in Iowa?
 9              PROSPECTIVE JUROR:  Uh-huh.
10              THE COURT:  Okay.  And then you said you had three
11   kids.
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  All right.  And are they all adults at
14   this point?
15              PROSPECTIVE JUROR:  They're all adults, yes.  One is
16   a doctor working at a -- I mean, she works at one of the
17   hospitals.  I don't know.  And the second one stays in a
18   hospital doing rotation here in Chicago.
19              THE COURT:  Okay.  And then the last one is in
20   business?
21              PROSPECTIVE JUROR:  Yeah.  He's just graduate from
22   the bachelor.
23              THE COURT:  Okay.  And where is he heading to work,
24   if anywhere yet?
25              PROSPECTIVE JUROR:  He's still in Iowa University.
```

1    THE COURT:  I'm sorry?

2    PROSPECTIVE JUROR:  He's in Iowa University.

3    THE COURT:  Iowa University.  All right.  And does he

4  have a job lined up, by chance?

5    PROSPECTIVE JUROR:  Not right now.

6    THE COURT:  Okay.  And just circling back to your

7  oldest child who is a doctor, is that child in a hospital here

8  in the Chicago area?

9    PROSPECTIVE JUROR:  Somewhere in Randall Road

10  hospital, yes.  I don't remember which one she works.

11    THE COURT:  Okay.  All right.  And then do you have

12  any particular news source?

13    PROSPECTIVE JUROR:  Huh?

14    THE COURT:  Any particular places where you get your

15  news, you learn about the news.

16    PROSPECTIVE JUROR:  Mostly sports.  I watch only

17  sports.

18    THE COURT:  Okay.  Thanks, Mr. Patel.

19    PROSPECTIVE JUROR:  My English not very well, but my

20  kids, mostly I depend on them mostly.

21    THE COURT:  Okay.  I understand.  Thank you.

22    All right.  Ms. Nixon, is it?

23    PROSPECTIVE JUROR:  Good morning.

24    THE COURT:  Good morning.

25    PROSPECTIVE JUROR:  My name is Jean Nixon.  I live in

1    Dolton, Illinois.  I reside by myself.  I have two adult

2    children, though, one in 40s, the other one late 30s.

3          I went to Chicago State University.  I have a BA in

4    psychology.  I've been working at, used to be Ingalls Hospital

5    which is now U. Chicago Medicine.  They took over.  And I've

6    been working there for, I want to say, about 30 years.  I work

7    in the behavior health department, work the night shift.  I

8    don't do much counseling or therapy or groups, but I still

9    work in the psyche department.

10         I'm not married, never been married, should I say.

11    Again, I already said the age of my kids.  And there are no

12    other adults or family members living in the home, no pets.

13    And major hobbies is eating, hanging out with my friends and

14    family.

15         THE COURT:  Okay.  And your oldest child is doing

16    what now for a living, if anything?

17         PROSPECTIVE JUROR:  She used to work for Northwestern

18    doing some clerical work, but now she works from home pretty

19    much the same thing, something on the computer.

20         THE COURT:  Okay.  Some kind of administrative --

21         PROSPECTIVE JUROR:  Like medical billing, like, or

22    medical something.

23         THE COURT:  And how about the younger one?

24         PROSPECTIVE JUROR:  Works for Cook County courthouse.

25         THE COURT:  Okay.  And in what capacity, do you know?

1          PROSPECTIVE JUROR:  Clerk.  She's only been there,

2  what, about -- I want to say about four months.

3          THE COURT:  Okay.  And what did she do before that?

4          PROSPECTIVE JUROR:  Before she worked there?

5          THE COURT:  Yes.

6          PROSPECTIVE JUROR:  Oh, I'm not sure because she

7  moved from Bridgeport to now she's downtown.  I'm trying to

8  think of what she did before.  I think she worked for an auto

9  dealer.

10          THE COURT:  Okay.  And then do you own or rent your

11  home in Dolton?

12          PROSPECTIVE JUROR:  I own my home in Dolton.

13          THE COURT:  And then for your job as behavioral -- in

14  behavioral health.

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  So what -- if it's not counseling, what

17  types of things are you doing?

18          PROSPECTIVE JUROR:  Because I work the night shift, I

19  really monitor the patients' safety.

20          THE COURT:  I see.  And have you done that for your

21  entire career or has it varied?

22          PROSPECTIVE JUROR:  Well, I've been working there

23  longer than 30 years, but I've done other things such as child

24  welfare and outpatient mental health.

25          THE COURT:  Okay.  And so I'm going to ask a few

1    follow-up questions at the sidebar, so if you could please

2    join us over there, I'd appreciate it.

3            PROSPECTIVE JUROR:  Sure.

4            THE COURT:  Thanks.

5        (Proceedings heard at sidebar:)

6            THE COURT:  Okay.  Great.  Ms. Nixon, so throughout

7    your time working for the hospital, you just mentioned that

8    you spent some time working on child welfare.  Can you

9    describe what you did there?  And go ahead and talk right into

10   the microphone.

11           PROSPECTIVE JUROR:  Yes.  I worked with DCFS wards.

12   They're the state -- they was under state guardian.  And when

13   I was a case manager, I did home visits, did court

14   appearances, basically monitored the child's safety in their

15   placement.

16           THE COURT:  Okay.  So you heard in the summary that

17   the plaintiff here, Mr. Gray, was detained when he was 14

18   years old.  And I do want to make sure that your experience in

19   child welfare would not prevent you from being fair to either

20   side.

21           So do you have any concern that your experience in

22   child welfare might slant you one way or the other?

23           PROSPECTIVE JUROR:  No, I don't because actually, I

24   had minors on my caseload that may have some other legal

25   issues besides the issues with their parents or placement.

1      THE COURT:  Okay.  So you saw children of -- some who

2  had got in trouble with the law as well?

3      PROSPECTIVE JUROR:  Yeah.  I started out with working

4  strictly adolescents.  Then it moved to just basic child

5  welfare, any age.

6      THE COURT:  Now, you also have a bachelor's in

7  psychology, and you've worked in this field for 30 years.  You

8  may very well hear testimony about psychological principles,

9  and it will be important that you base your decision in this

10 case on the evidence and not on what you know personally.

11     Can you follow that kind of instruction?

12     PROSPECTIVE JUROR:  Yes, I could.

13     THE COURT:  So if you hear testimony that you believe

14 is believable but conflicts with something you know currently,

15 will you be able to credit the testimony?

16     PROSPECTIVE JUROR:  Well, I've always been able to be

17 objective.  Patients come in for a lot of different reasons

18 and sometimes similar, but it's never the same.

19     THE COURT:  All right.  Any follow-up questions from

20 the plaintiff?

21     MR. LOEVY:  No, your Honor.

22     THE COURT:  And Mr. Nathan?

23     MR. NATHAN:  I don't think so, but just if I may have

24 one second.

25     THE COURT:  All right.

1        (Pause.)

2            MR. NATHAN:  Your Honor, if you may ask Ms. Nixon, in

3    her capacity work connected to DCFS investigations, did she

4    have interactions with police officers and work with police

5    officers.

6            THE COURT:  Yes.  Ms. Nixon, did you encounter police

7    officers when you were working on the child welfare patients?

8            PROSPECTIVE JUROR:  There was -- probably on no

9    occasion because my children were usually in placement, you

10   know, lived in a foster home.

11           THE COURT:  Okay.  And so, for example, you never had

12   to report a child to the police?

13           PROSPECTIVE JUROR:  Oh, yeah, I have to report a

14   runaway or something like that, but that was pretty much it.

15           THE COURT:  All right.  Anything else, Mr. Nathan?

16           MR. NATHAN:  Nothing else, your Honor.  Thank you.

17           THE COURT:  All right.  Ms. Nixon, you can have a

18   seat.  Thanks.

19           PROSPECTIVE JUROR:  Thank you.

20       (Proceedings heard in open court:)

21           THE COURT:  Okay.  Ms. Neustadt?

22           PROSPECTIVE JUROR:  Hi.  My name is Leslie Neustadt.

23   I live in Downers Grove, and I've lived there my whole life.

24   We own our home.  I have a bachelor's in special education, a

25   master's in school administration, and more master's work in

1    English as a second language education.  I am a special

2    education teacher in Lisle.

3        My husband has -- is the assistant director of

4    buildings and grounds for the Downers Grove school district.

5    I have two children, 14 and almost 10.  No one else lives in

6    our house.  I don't have a lot of time for hobbies because I

7    have two young children, but I love to spend time with friends

8    and family.  I golf.  I like to be outside.  When I have time

9    to watch the news, it's usually WGN and then various articles

10   online.

11       THE COURT:  Okay.  Any TV programs you watch

12   regularly?

13       PROSPECTIVE JUROR:  Just kind of stuff on, like, HBO

14   or YouTube TV.

15       THE COURT:  All right.  Great.  Thanks very much.

16       Ms. Su.

17       PROSPECTIVE JUROR:  Hi.  My name is Yu Su.  I live in

18   Edgebrook, that's the north side of Chicago, for 13 years.

19   And I graduated from Wayne State University in Detroit,

20   Michigan, with a master of accounting degree.  I've been

21   working for Cook County Sheriff's Office as a data analyst for

22   eight years.

23       My husband, my husband is a chemist.  He runs a small

24   company of his own.  I have two children.  My daughter, she's

25   17 years old, and my son is 14.  I live with my husband, my

1  daughter, my son, and my dog.  That's it.  My hobby, I like

2  cooking, gardening, hiking.  I get my news most of the time

3  from online often.  That's it.

4  　　　　THE COURT:  All right.  Any particular news outlets

5  that you visit for your news?

6  　　　　PROSPECTIVE JUROR:  I listen to NPR news.

7  　　　　THE COURT:  NPR?

8  　　　　PROSPECTIVE JUROR:  Yes.

9  　　　　THE COURT:  And do you own or rent in Edgebrook?

10  　　　　PROSPECTIVE JUROR:  Own.

11  　　　　THE COURT:  And what do you do as a data analyst for

12  the Cook County Sheriff's Office?

13  　　　　PROSPECTIVE JUROR:  I analyze, like, police activity,

14  court services, the Department of Corrections activities.

15  　　　　THE COURT:  Okay.  Can you give me an example of an

16  analysis of police activity?

17  　　　　PROSPECTIVE JUROR:  Yeah.  Like I, my main

18  responsibility is transporting, like police activity including

19  sheriff's police and also resource activity, all DOC

20  incidents.

21  　　　　MR. LOEVY:  Can your Honor repeat that?

22  　　　　THE COURT:  Actually, let's go to the sidebar.  It

23  might be a little bit easier.

24  　　　　Can you join us at the sidebar?  Thanks.

25  　　　(Proceedings heard at sidebar:)

1          THE COURT:  Okay.  Ms. Su, I want to just follow up

2     with your job as a data analyst.  Can you give me an example

3     of an analysis of data that you have done on, like, police

4     activity for the sheriff's department?

5          PROSPECTIVE JUROR:  Okay.  So, like, it's

6     dashboarding, like -- like, our data connects to database, so

7     we know -- I mean, specifically all the police activity, like

8     how many incidents we took part on a daily basis, monthly,

9     yearly, and also where all those incidents have been and what

10    are the types.

11         THE COURT:  Okay.  Like, so how many incidents have

12    happened, where they happened, and what type of incidents?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  All right.  And then do you work directly

15    with sheriff's deputies?

16         PROSPECTIVE JUROR:  I work under IT, so I work

17    with -- it's not directly.  I mean, they're officers, but I

18    report to, it's called the IPT director.  It's also called the

19    data chief.

20         THE COURT:  I see.  And so if you could talk right

21    into the mike.  I know it's natural to turn to one another but

22    just to make sure everyone can hear us.

23         So you do not work directly with sheriff's deputies?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  And you're working with the data instead?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Any -- the fact that you work for

3    the sheriff's department, I do want to make sure that if you

4    hear testimony from any law enforcement officers, you do have

5    to evaluate their testimony the same way as you would evaluate

6    the testimony of any other witness who's not a law enforcement

7    officer.

8          Can you do that?

9          PROSPECTIVE JUROR:  Yes, I can.

10          THE COURT:  All right.  So for example, if someone is

11    a law enforcement officer and they testify, they don't start

12    with a plus on their credibility.  They don't start with a

13    minus either.  Can you apply an instruction like that?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Okay.  Are there any follow-up questions

16    for the plaintiff?

17          MR. LOEVY:  Yes, your Honor.  Can you ask if it would

18    be hard or if she would come in leaning one way or the other

19    because of working with all the police officers?

20          THE COURT:  Yeah.  Ms. Su, as you sit here today, as

21    every juror sits here today, they do have to come into this

22    case with a neutral, all right, like a neutral outlook.  And

23    so can you apply that kind of instruction?

24          PROSPECTIVE JUROR:  I don't think so.  Like, when

25    analyzing data, I mean, I don't manipulate the data.  I -- the

1    data tells everything.  I base it on the fact.

2              THE COURT:  Okay.  And, yeah, I think just to be

3    clear because I think the answer started out as "I don't think

4    so," and I might have asked the question in a bad way.

5              So would you base your decision on the facts of this

6    case rather than any preference for one side or the other?

7              PROSPECTIVE JUROR:  No, I would base it on fact.

8              MR. LOEVY:  The follow-up question is, would it be

9    hard for you.  Would you be -- find yourself leaning because

10   you work with a law enforcement agency.

11             PROSPECTIVE JUROR:  I --

12             THE COURT:  Yes, go ahead.

13             PROSPECTIVE JUROR:  I don't think so.

14             THE COURT:  Okay.  Thank you.

15             Mr. Nathan, anything else?

16             MR. NATHAN:  Just with respect to Ms. Yu's -- Su's

17   son -- actually, just strike that.  Withdrawn.

18             THE COURT:  Okay.  Thanks, Ms. Su.  You can have a

19   seat.

20        (Proceedings heard in open court:)

21             THE COURT:  Okay.  Ms. Ozier.

22             All right.  I went with three syllables, but what is

23   it?  Your last name, how do you say it?

24             PROSPECTIVE JUROR:  Ozier.  You said it right.

25             THE COURT:  All right.  Okay.  Great.

1          PROSPECTIVE JUROR:  My name is Leondria Ozier.  I've

2     lived in Crestwood, Illinois, for seven years.  I own a condo.

3     I had -- I did school for two and a half years, didn't

4     complete it, of college.  I work for Concentra Immediate Care

5     as assistant supervisor, assistant manager.  I'm not married,

6     no kids.

7          My mom is, she's retired.  My dad is disabled.  My

8     stepdad, he do work for the City.  My hobbies are really just

9     mostly eat and go outside with family on my days off, spend

10    time with them most of the time.

11         I watch news barely, maybe once or twice out the week

12    just to kind of see stuff, what's going on with the world a

13    little bit.  I don't really like to watch it too much because

14    it's kind of depressing, so I don't watch it as much, but I do

15    have the app, the ABC app news app so just in case if it's

16    something serious that I need to know what's going on.

17         Outside of that, I think that's about it.

18         THE COURT:  Okay.  And then had you had a chance to

19    declare a major in college?

20         PROSPECTIVE JUROR:  Oh, yes.  I was going for

21    computer networking.

22         THE COURT:  And can you say the name of the company

23    you work for one more time?

24         PROSPECTIVE JUROR:  Concentra Immediate Care.

25         THE COURT:  Okay.  Can you spell that, please?

1          PROSPECTIVE JUROR:  C-o-n-c-e-n-t-r-a.

2          THE COURT:  And it's -- and what does that company

3  do?

4          PROSPECTIVE JUROR:  It's immediate care.  So we deal

5  with mostly workmen's comp, pre-placement physicals, drug

6  screening, physical therapy, stuff like that.

7          THE COURT:  And then are your parents or stepdad

8  living with you or no?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  I see.  Okay.  And you did mention your

11  stepdad works --

12         PROSPECTIVE JUROR:  For the City of Chicago.

13         THE COURT:  Currently?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Okay.  And what's his job?

16         PROSPECTIVE JUROR:  I know he worked for, like, the

17  Chicago Park District as, like, working with boilers and stuff

18  like that.

19         THE COURT:  Okay.  Great.  Thanks very much.

20         PROSPECTIVE JUROR:  You're welcome.

21         THE COURT:  You can have a seat.

22         Okay.  Ms. Marcano.

23         PROSPECTIVE JUROR:  Good morning.

24         THE COURT:  Good morning.

25         PROSPECTIVE JUROR:  My name is Veronica Marcano.

1    I've lived all my life in the city of Chicago.  I'm from the

2    Hegewisch area, far southeast side by the Ford plant.  My

3    husband and I, we rent.  We've been in our place for the last

4    seven years.  And as far as school, I was a young mother, so I

5    just took jobs whatever I can.  I went as far as getting my

6    GED at the age of 20, took some college experience with word

7    processing, which was back in the day, and typing.  So I was

8    able to get office jobs here and there.

9          Right now, I am with my current employer, Chicago

10   Distribution Center, which is in the Pullman area.  I've been

11   with them for 23 years.  And I do -- I'm a customer service

12   representative.  As far as my duties there, I take book orders

13   over the phone for Barnes and Noble, colleges, individual

14   orders.  We distribute for over 150 publishers.  Okay.  And I

15   also process credit card orders over the phone.  I process

16   checks through order mails as well.  So that's pretty much

17   what I do.

18         There's a lot of activity as far as the phone, so and

19   then there's also just detailed paperwork that we get via

20   emails or, what do I want to say, fax.  Okay.  So my day is

21   pretty full from --

22         THE COURT:  There's still fax machines?

23         PROSPECTIVE JUROR:  Yeah, we still have them, and

24   some people are still using them.

25         THE COURT:  You mentioned a husband.  What does he

1    do?

2              PROSPECTIVE JUROR:  My husband, he worked with the

3    Chicago Distribution for 20 years in the IT department.  And

4    he was in charge of, like, processing the orders at the end of

5    the night for the next day and lining up the wires throughout

6    the building.

7              So it's, like, one huge library in the warehouse.

8    Customer service, I've been doing that for four years.  Prior

9    to that, I worked in the returns department where the

10   shipments come in on pallets and open the boxes and process

11   the books and the invoices to credit the customers' accounts.

12             THE COURT:  Okay.  Great.  And then do you have any

13   children?

14             PROSPECTIVE JUROR:  Oh, yes.  Oh, yes.  I have three.

15   And my oldest, he will be 38 at the end of the month -- no.

16   He's in his 40s.  I'm sorry.  He'll be 43 -- 42?  I'm -- my

17   two oldest, and they're the ones I raised pretty much on my

18   own when I was young.  So my oldest is going to be 42.  My

19   middle one is my daughter.  She's going to be 38 in August.

20   And my youngest is 21.  He's a junior in college in Purdue

21   Northwest in Hammond, Indiana.

22             THE COURT:  Okay.  And then your almost 42-year-old

23   son, what does he do for a living, if anything?

24             PROSPECTIVE JUROR:  He's a welder.

25             THE COURT:  Okay.  And your --

70

1       PROSPECTIVE JUROR:  He's currently living in Oak

2  Lawn, Illinois.

3       THE COURT:  Great.  And your middle daughter?

4       PROSPECTIVE JUROR:  My daughter, she is in between

5  jobs due to injury on her shoulder.  She was working in a

6  warehouse, and she had a muscle pulled lifting pallets or

7  boxes, I should say.

8       THE COURT:  I see.  Okay.

9       PROSPECTIVE JUROR:  And she just now got into

10  Wal-Mart overnight stocking.

11       THE COURT:  And then anyone else living in the home?

12       PROSPECTIVE JUROR:  Well, the two oldest, they're on

13  their own.  My youngest and my college student, it's my

14  husband, myself, and him.

15       THE COURT:  Okay.  And then so what do you like to do

16  in your free time?

17       PROSPECTIVE JUROR:  My free time, I'm involved with

18  church.  And so Monday through Friday, I'm working from 8:30

19  in the morning to 4:30.  Wednesday nights, I go to worship

20  practice.  Friday nights, I go to Bible study.  Sundays, I

21  worship.  I'm on a worship team for two services on Sundays.

22       THE COURT:  Okay.  Great.  And where do you get your

23  news if you have any particular news source?

24       PROSPECTIVE JUROR:  WGN.  Yes, particularly first

25  thing in the morning when I wake up.  I'm up about 4:00

1   o'clock in the morning, so I like to watch them for the first

2   couple of hours.  I can get in touch with the traffic because

3   I do have to jump on the expressway, the weather, and whatever

4   else is going on there, anything exciting these days.

5           THE COURT:  Great.  And then any TV programs that you

6   watch regularly?

7           PROSPECTIVE JUROR:  I like a lot of home shows, HGTV,

8   *Law and Order.*"

9           THE COURT:  Okay.  Great.  All right.  Thanks very

10  much.

11          PROSPECTIVE JUROR:  You're welcome.

12          THE COURT:  Okay.  Mr. Laughlin?

13          PROSPECTIVE JUROR:  Good morning.  I'm Christopher

14  Laughlin.  I live in Northbrook.  I've lived there for 26

15  years.  I own my home.  Let's see.  I have degrees in music, a

16  bachelor of music degree from Johns Hopkins University, a

17  master of music from Yale University.

18          I work at the Christopher Laughlin School of Music

19  which I founded 26 years ago as general manager and guitar

20  instructor.  I don't own the business anymore.  I sold it

21  about two years ago to Ensemble Music Schools.  I also work at

22  Loyola University of Chicago as a guitar and chamber music

23  instructor, and I also perform as a classical guitarist.

24          THE COURT:  Are you saying you like to play the

25  guitar?

1            PROSPECTIVE JUROR:  Hmm?

2            THE COURT:  So you're saying you like to play the

3       guitar?

4            PROSPECTIVE JUROR:  Yeah.  That's my main thing.

5            THE COURT:  All right.

6            PROSPECTIVE JUROR:  Yes, so the school, the school

7       that's named after me is in Northbrook.  Loyola, of course, is

8       in Chicago.

9            As far as my job duties at the Laughlin School of

10      Music, I teach guitar to, primarily to kids, you know,

11      kindergarten through high school.  And then at Loyola, I teach

12      college-age students.  I also am general manager of the

13      school, so I oversee hiring and managing the staff and

14      on-boarding new students, etcetera.

15           I'm married.  My wife was an attorney or -- she's no

16      longer practicing.  She works with me at the Laughlin School

17      of Music.  She's been doing that for seven years.

18           We have two children.  Our son is 26.  He works at

19      Abbvie Pharmaceutical in North Chicago.  Our daughter is 22.

20      She is pursuing a doctorate in occupational therapy at Duke

21      University.  And so neither of them live with us.  It's just

22      my wife and I in the household.

23           My hobbies, in addition to playing guitar two or

24      three hours a day, I golf, ski, windsurf, sail, bike, cook,

25      and I collect -- I collect Japanese kitchen knives.

1          Let's see.  As far as news, I read the Chicago

2     Tribune every day.  I also listen to NPR.  I scroll the CNN

3     app to get, you know, breaking news, occasionally watch CNN or

4     MSN.  And as far as other TV shows, you know, just popular

5     dramadies or comedies.

6          THE COURT:  Great.  And can you join us at the

7     sidebar for a moment?

8          PROSPECTIVE JUROR:  Sure.

9        (Proceedings heard at sidebar:)

10          THE COURT:  Okay.  Mr. Laughlin, do you remember me

11     and our daughter -- so Julia used to be in that kids band with

12     Emily Chang.

13          PROSPECTIVE JUROR:  Oh, right.

14          THE COURT:  Yeah, it's been a while.  So I'm glad to

15     hear everyone is thriving.  That's great to hear.  So Julia is

16     pursuing a doctorate at Duke?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  That's wonderful.  That's great.  So --

19          PROSPECTIVE JUROR:  I never knew you were a judge.

20          THE COURT:  Yeah.  Well, I think we met before I was

21     a judge.  I was probably a practicing lawyer at the time.

22          PROSPECTIVE JUROR:  Okay.

23          THE COURT:  I almost said "just a practicing lawyer,"

24     so sorry about that to the lawyers in the room.

25          So, yeah, so our daughters were in this precocious

1  rock band called Seven Cents.  We never knew how they came up

2  with the name Seven Cents, but they actually played at some

3  pizza joints a couple of times.

4        Anyway, so, Mr. Laughlin, would the fact that we had

5  that acquaintance affect your ability to be fair to either

6  side in this case?

7        PROSPECTIVE JUROR:  I don't think so, no.

8        THE COURT:  Any follow-up questions for the

9  plaintiff?

10        MR. LOEVY:  No.

11        THE COURT:  Okay.  And for the defense?

12        MR. NATHAN:  No.

13        THE COURT:  Okay.  All right.  Thank you.  You can

14  have a seat.

15     (Proceedings heard in open court:)

16        THE COURT:  Okay.  Mr. Peebles.

17        PROSPECTIVE JUROR:  Hello.  How are you doing?

18        THE COURT:  All right.  Good morning to you.

19        PROSPECTIVE JUROR:  Good morning.  My name is Don

20  Peebles.  I live in the city of Chicago, Morgan Park area.  I

21  graduated from high school, a year or two of college, and I

22  didn't complete.  Right now I'm employed with Avery Express, a

23  trucking company and married with 34 years, two kids; one 29,

24  the other one is 38.  The 29-year-old is in between jobs.  The

25  38, he's working at Amazon.  And that's it.

1          THE COURT:  Okay.  Do you own or rent in Morgan Park
2    there?
3          PROSPECTIVE JUROR:  Own.
4          THE COURT:  Okay.  Did you get a chance to declare a
5    major in college or no?
6          PROSPECTIVE JUROR:  I'm sorry?
7          THE COURT:  Had you had a chance to declare a major
8    in college or not?
9          PROSPECTIVE JUROR:  No.
10          THE COURT:  And what do you do for the trucking
11    company?
12          PROSPECTIVE JUROR:  I'm a driver.
13          THE COURT:  And is your spouse working outside the
14    home?
15          PROSPECTIVE JUROR:  Yes.  Home healthcare.
16          THE COURT:  Is that part of a company or like a
17    self-employed?
18          PROSPECTIVE JUROR:  Just with a company, Help at
19    Home.
20          THE COURT:  Okay.  And what does your 38-year-old do
21    for Amazon?
22          PROSPECTIVE JUROR:  I don't know.
23          THE COURT:  Something with Amazon.  Okay.  So what do
24    you like to do in your free time?
25          PROSPECTIVE JUROR:  Mostly I'm outside doing yard

1    work or kicking back, relaxing when I get home from work.

2            THE COURT:  Okay.  And any news source in particular?

3            PROSPECTIVE JUROR:  780.  Well, 105 point, whatever.

4            THE COURT:  105.9.

5            PROSPECTIVE JUROR:  There you go, when I'm driving.

6    And Channel 7 news.

7            THE COURT:  Okay.  Channel 7.  And then what about

8    any TV programs that you watch regularly, if any?

9            PROSPECTIVE JUROR:  Some of everything.  *American

10   Idol*, stuff like that.

11           THE COURT:  Okay.  Thanks a lot, Mr. Peebles.

12           PROSPECTIVE JUROR:  All right.  Thank you.

13           THE COURT:  We've been going at it for a while here,

14   ladies and gentlemen.  Let's take -- we're going to take a

15   ten-minute break, and then we'll get to the first row of the

16   gallery there.  And in the meantime, it is really important

17   that you do -- as the letter said, don't do any research into

18   the case, not the facts, the law, or the parties.  Don't

19   discuss the case, not even amongst yourselves.

20           There are some restrooms on this floor.  If you

21   encounter any of the parties or lawyers, they're going to

22   ignore you, and it's not because they're being unfriendly.

23   It's because they're under instruction from me to not

24   communicate with you in any way.

25           Okay.  So let's take ten minutes, and we'll be back a

1    little bit after 11:00 o'clock.

2         All rise.

3      (Recess from 10:53 a.m. to 11:05 a.m.)

4         THE COURT:  Let's go back on the record.

5         And Mr. Loevy can join us when he's ready.

6         Okay.  Mr. Dinkel?

7         PROSPECTIVE JUROR:  Good morning.  My name is Joe

8    Dinkel.  I have lived in the village of Woodridge for the last

9    15 years.  I have a bachelor of science in mechanical

10   engineering from Michigan Tech.  I work for Greeley and

11   Hansen, a water and waste water consulting located here in

12   Chicago.  I was an owner for the last six years.  Brief

13   description, I manage engineers in the MEP portions.

14        My wife is an attorney practicing employment defense.

15   I have three children.  The boys, 13 and 10, daughter is

16   eight.  No other adults living in the household.  Hobbies and

17   interests are gardening, boating, youth hockey.  Where do I

18   get my news?  Whatever pops up on the phone during the train

19   ride, WLS if I'm driving to and from the train station and if

20   it's on at home, maybe WGN.

21        THE COURT:  All right.  Tom Skilling would be glad to

22   hear that.

23        You -- do you watch any TV programs regularly outside

24   the news?

25        PROSPECTIVE JUROR:  Not really.  It's not enough

1    hours in the day.

2           THE COURT:  Okay.  And has your wife practiced

3    employment defense for pretty much the entirety of her career?

4           PROSPECTIVE JUROR:  Correct, yes, since 2007.

5           THE COURT:  Now, I doubt there's much employment law

6    overlap with this particular case, but will you be able to

7    follow the instructions that I give you, the Court gives you,

8    rather than anything you might have picked up along the way

9    from your wife?

10          PROSPECTIVE JUROR:  Yeah.  She doesn't share much

11   with me.

12          THE COURT:  Okay.  That's not always the most

13   exciting topic anyway, so you're not missing out on much.

14          Okay.  Thanks very much, Mr. Dinkel.  And then

15   actually -- no, you can have a seat but before you sit down,

16   Mr. Laughlin, can I follow up at the sidebar with you with

17   regard to your spouse's employment?

18        (Proceedings heard at sidebar:)

19          THE COURT:  Okay.  Sorry.  I got so caught up in the

20   Seven Cents reunion that I neglected to ask, so your wife

21   stopped seven years ago; is that right?

22          PROSPECTIVE JUROR:  No, at least 15 years ago.

23          THE COURT:  And what did she practice?

24          PROSPECTIVE JUROR:  Tax law.

25          THE COURT:  Okay.  And then I should just ask you the

1    same question that I asked Mr. Dinkel, which is that to the

2    extent you've heard any legal concepts before today based on

3    discussions with her or in any other context, will you be able

4    to follow the legal instructions that I give to you rather

5    than anything else you've picked up?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  All right.  Any follow-up questions on

8    that for the plaintiff?

9            MR. LOEVY:  No, your Honor.

10            THE COURT:  Mr. Nathan?

11            MR. NATHAN:  No, your Honor.

12            THE COURT:  Okay.  Thank you.  You can have a seat

13    again.

14        (Proceedings heard in open court:)

15            THE COURT:  Okay.  Mr. Brown.  I think I can guess

16    your employment, but you should put it on the record anyway.

17            PROSPECTIVE JUROR:  Good morning.  My name is Norval

18    Ignatius Brown.  I reside in Homewood, Illinois.  I've lived

19    with Homewood with my wife since 2002.  I have been a United

20    Methodist pastor since 1976.  I have a B.A. from the

21    University of Chicago in religion and the humanities, a master

22    of divinity from Garrett-Evangelical Theological Seminary in

23    Evanston, and a doctor of ministry degree from the Chicago

24    Theological Seminary in Hyde Park.

25            My work is basically that of a pastor/administrator

1    at a local church.  For the last three years, I've been the

2    pastor of the Cary United Methodist Church in Cary, Illinois.

3    My wife is the CEO and president of a family-owned business,

4    Brookins Funeral Home on the south side of Chicago.

5         We have been married 25-1/2 years.  We have four

6    children.  Our oldest will be 43 in June.  He is a loading

7    supervisor for a meat packing plant in Michigan.  Our daughter

8    is in Atlanta.  She is the chief program officer for the Sandy

9    Hook Foundation.  Our daughter Erica lives at home with us.

10   She's 33 years old.  She works as a customer service rep for

11   the Illinois Secretary of State's office.  And our youngest,

12   Gregory, is in California working as the dean of -- at a

13   charter school there.

14        My major hobbies are reading, writing, and walking.

15   And I get my news basically from CNN and the Chicago

16   Sun-Times.

17        THE COURT:  Okay.  And then do you rent or own in

18   Homewood?

19        PROSPECTIVE JUROR:  We rent -- I mean, we own.  We

20   own.

21        THE COURT:  Okay.  Great.  That's all I have for you.

22   Thanks.

23        Okay.  No. 17.

24        PROSPECTIVE JUROR:  Hello.  My name is Neal Gobrogge.

25   I live in the city of Chicago in the Bridgeport neighborhood.

1    I've lived there for about three years.  Prior to that, I

2    lived in Rolling Meadows, rented both places.

3         As far as employment, I've been employed by Renewal

4    by Andersen for the past two years.  We sell our own Andersen

5    window products through a sales office based out of Glenview.

6    Prior to that, it was kind of like temporary work here and

7    there for about two years, but prior to that, I worked for

8    Verizon Wireless for about a decade as a customer service

9    advisor.

10        I am married to my wife, Heather.  We were married

11   last March, so a little bit over a year.  She is an in-house

12   nurse for Helping Hands which is basically like a housing

13   agency for mentally disabled adults that either can't be

14   provided for by their own families or either are wards of the

15   State because all of their family members are passed on.

16        We do have -- her daughter is 18 and lives with us.

17   She just got her first job at Jewel grocery store, and she

18   also works part-time at White Sox park as a concession stand

19   person.  We're the only ones that live there with her besides

20   our two-year-old Rottweiler, Rocky.

21        As far as major activities, I co-own a gaming

22   organization with a couple of my online friends, so we

23   basically promote the activity of other video game players

24   that have the same moral and upright standings as us and do

25   video production as well as organize events in that honor.

1    When I'm not doing that, it's pretty much just taking care of
2    the house.

3          And as far as news, it's mainly CNN but, you know,
4    some, like, online stuff through Reddit and other forums.  I
5    kind of try and read down the middle of everything if I can.

6          THE COURT:  Okay.  And any other TV programs that you
7    watch regularly?

8          PROSPECTIVE JUROR:  A lot of like Disney-Plus stuff.
9    So I'm a big, like, Star Wars and Marvel person, so anything
10   fantasy or sci-fi based is kind of like right up my alley.

11         THE COURT:  And the gaming organization, is it like
12   formally, like you filed articles of incorporation?

13         PROSPECTIVE JUROR:  Not that big yet but, like, we do
14   have contracts and stuff that we have players sign for like
15   six months at a time and there's, like, penalties and stuff
16   associated.  We do have a lawyer that one of the co-owners has
17   read through all of our documents to make sure they're legally
18   enforceable and stuff like that.

19         THE COURT:  Okay.  And then it's, you promote certain
20   players, is that the --

21         PROSPECTIVE JUROR:  Yes.  So basically, we do like a
22   recruitment phase, like, once or twice a year to refresh
23   players that have either left or whatever.  We do have a focus
24   on, like, *Call of Duty* and *Fortnite* if anyone knows what those
25   two games are, but it's basically like taking clips, basically

1    putting them out on the internet and, like, showing people

2    what, you know, our players are doing, and then we also have

3    tournaments and other things like that to kind of, like, get

4    our name out there.

5              THE COURT:  Okay.  Great.  I think that's all I have

6    for you.  Thanks a lot.

7              PROSPECTIVE JUROR:  Thank you.

8              THE COURT:  And Ms. Garapolo.

9              PROSPECTIVE JUROR:  Hi.  My name is Marissa Garapolo.

10   I grew up in Libertyville with my parents and my brother, but

11   after graduating college I now live in River North.  I rent an

12   apartment.  I live there by myself.

13             I graduated from U of I in Champaign-Urbana with my

14   bachelor's of nursing, and I'm going back for my doctorate for

15   family nurse practitioner at Rush.  I worked my first job at

16   Shirley Ryan Ability Lab as a nurse for their spinal cord

17   injury floor, and now I work at Northwestern on a

18   cardiovascular and thoracic unit, so open hearts, lung

19   transplants, other things.

20             I'm not married.  I have no kids.  I don't live with

21   anyone else.  Hobbies, me and my dad have season tickets to

22   the Blackhawks.  So I'm a big hockey girl, so I'm at the

23   United Center all the time.

24             THE COURT:  My condolences.

25             PROSPECTIVE JUROR:  Yeah.  Other than that, really

1    just like outside, shopping, nothing really special.

2         If I get my news, I really try not to watch anything,

3    but anything in my patients rooms, I guess, I overhear but I

4    don't, like, seek out the news really.  And I just like

5    streaming stuff like *Gray's Anatomy, Friends, Seinfeld.*

6    That's it.

7         THE COURT:  Okay.  Thanks very much.

8         Okay.  Mr. Lanners, is it?

9         PROSPECTIVE JUROR:  Good morning.  My name is John

10   Jack Lanners.  I live in Morton Grove, Illinois.  We own the

11   home, been there about 20 years, my wife and I.  I have a

12   degree in general studies from Northeastern University in

13   Chicago here with a minor in criminal justice.

14        For the last 29-years plus, I've been with the city

15   of Park Ridge, the Park Ridge Police Department as a community

16   service officer.  I am married.  My wife is a high school

17   guidance counselor, Rickover Naval Academy in Chicago.

18        I have one child.  He's 33 years of age.  He's got a

19   degree from Illinois State, alternative energy.  He does not

20   live with us.  He lives on his own.

21        Hobbies, I enjoy working out.  I enjoy the outdoors,

22   walking the dog.  We got a dog back in July.  I play a little

23   golf, do some fishing, really not good at neither.  And the

24   news, I get my news from the phone, TV, radio, and the

25   newspaper.

1    THE COURT:  Okay.  Any particular media outlets or

2  newspapers?

3    PROSPECTIVE JUROR:  For the newspaper, I enjoy Wall

4  Street Journal and Barron's.  I kind of gravitate toward Fox

5  news though I watch all the news outlets.  And I get the

6  Tribune too delivered.

7    THE COURT:  Okay.  And, yeah, let's talk at the

8  sidebar.

9    PROSPECTIVE JUROR:  Yes, sir.

10   (Proceedings heard at sidebar:)

11    THE COURT:  Mr. Lanners, first, with regard to your

12  employment with the police department, can you give us some

13  more details on what does a community service officer do for

14  the Park Ridge police?  And go ahead and talk right into the

15  microphone.

16    PROSPECTIVE JUROR:  Yes.  What we do is we take a lot

17  of the non-emergency calls if I'm outside, calls like

18  ordinance violations, parking complaints, animal control,

19  traffic control, a lot of minor reports, maybe a lost or

20  stolen license plate, a lot of calls where you don't need a

21  sworn officer.

22    And I also work the desk taking non-emergency calls,

23  dispositioning people where they need to go, maybe dispatch,

24  maybe records department.  In the past, I've been dealing

25  with, I was a LEADS agency coordinator for a long time when we

1  used to do the entries, cancellations, confirmation, so forth.

2  Now that's gone to dispatch.  I've done work quite a bit with

3  abandoned vehicles.

4       So essentially, any calls where you don't need a

5  sworn officer, you know, the community service officer will

6  take those calls.

7       THE COURT:  Okay.  And how long have you worked for

8  the police department?

9       PROSPECTIVE JUROR:  I'll be there 30 years come June

10 1st of this year.

11      THE COURT:  Okay.  Congratulations on that.

12      PROSPECTIVE JUROR:  Thank you.

13      THE COURT:  And you've been the community service

14 officer for this entire time?

15      PROSPECTIVE JUROR:  Yes.  I also work part-time for

16 the Park Ridge Park District for the last ten years or so,

17 general security and help other maintenance here and there

18 when I work weekends if it needs -- something needs to be

19 covered.

20      THE COURT:  Okay.  Now, obviously, working for a

21 police department, I do need to ask an important question

22 which is that the jury does have to evaluate the testimony of

23 law enforcement officer testimony in the same way that you

24 would evaluate the testimony of any other non-law enforcement

25 witness.  So a law enforcement witness does not start out with

1    a plus when testifying and does not start with a minus but,

2    you know, not a plus.

3           Can you follow that instruction?

4           PROSPECTIVE JUROR:  Yes, I can.

5           THE COURT:  Go ahead.  Were you going to elaborate?

6           PROSPECTIVE JUROR:  Yes.  I don't think I'd have any

7    problems following that instruction being fair and unbiased.

8           THE COURT:  Have you ever been called upon, for

9    example, in the Park Ridge Police Department to complain about

10    a sworn officer in any capacity?

11           PROSPECTIVE JUROR:  No, I haven't -- well, actually,

12    once, I guess there were some innuendo, sexual innuendo made

13    from one officer to the other officer.  I was asked about it.

14    It was during a lunch.  But there was many of us, and I just

15    didn't hear it.

16           THE COURT:  Okay.  And --

17           PROSPECTIVE JUROR:  And that was in-house.

18           THE COURT:  All right.  So can you accept the

19    proposition -- and, of course, the decision has to be made on

20    the evidence as presented here.  Can you accept the

21    proposition that there are some police officers who do violate

22    the constitutional rights of persons?

23           PROSPECTIVE JUROR:  Yes, I can.

24           THE COURT:  And just like there are obviously ones

25    that do not but you -- so you can accept that proposition?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And do you start out with a preference

3     one way or the other on whether there ought to be liability in

4     a case of this kind?

5          PROSPECTIVE JUROR:  You know what, I don't think so.

6     I don't think I do.  I think I'm just going to wait and see

7     and hear the facts.

8          THE COURT:  Okay.  And then you mentioned that you

9     also do part-time work for the park district.

10         PROSPECTIVE JUROR:  Yes, sir.

11         THE COURT:  Okay.  And that's been for about ten

12    years?

13         PROSPECTIVE JUROR:  About ten years, eight to ten

14    years.

15         THE COURT:  And then as a -- in that capacity, have

16    you -- are you a sworn officer in that capacity?

17         PROSPECTIVE JUROR:  No, I'm not.  I'm basically just

18    general security.

19         THE COURT:  Have you ever had to call the police in

20    to make an arrest?

21         PROSPECTIVE JUROR:  Not an arrest, just vandalism to

22    property.

23         THE COURT:  And then it's also, it's my understanding

24    that, are you related by an in-law relationship to someone who

25    works for the court?

1          PROSPECTIVE JUROR:  I am.

2          THE COURT:  Okay.  And who is that?

3          PROSPECTIVE JUROR:  Claire Newman.

4          THE COURT:  Okay.  And what's her -- I know what it

5   is, but I want to -- I'm kind of quizzing you.  What's her job

6   duty here?

7          PROSPECTIVE JUROR:  Well, she works for Judge

8   Gettleman.  I'm not sure exactly what she does.  I know she's

9   got varied roles.  I know she's with Judge Gettleman quite a

10  bit, and she helps out in other courtrooms, but I'm not sure

11  exactly what she does.

12         THE COURT:  Okay.  And do you talk very much with her

13  about her job duties?

14         PROSPECTIVE JUROR:  She's very -- no, we don't.

15  She's very -- she'll talk at times, but she's very

16  professional.  If she shouldn't say nothing, she says nothing.

17         THE COURT:  All right.  So to the extent that you

18  have, it sounds like maybe you have not, but to the extent you

19  have picked up any legal principles in any discussions with

20  her, will you be able to follow the Court's instruction rather

21  than anything you've heard in the past?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.  Yeah, and for the record, she is a

24  marvelous courtroom deputy and has helped the judges in many

25  ways.  I would not be surprised if she held the record for

1    employee recognition awards every year.

2            PROSPECTIVE JUROR:  It sounds like her.

3            THE COURT:  Yeah, she is terrific.

4            Okay.  Any follow-up questions from the plaintiff?

5            MR. LOEVY:  No, your Honor.

6            THE COURT:  And Mr. Nathan?

7            MR. NATHAN:  No, your Honor.

8            THE COURT:  Okay.  All right.  Thanks, Mr. Lanners.

9    You can have a seat.

10           PROSPECTIVE JUROR:  Thank you, sir.

11       (Proceedings heard in open court:)

12           THE COURT:  Okay.  Ms. Schultz?

13           PROSPECTIVE JUROR:  Good morning.

14           THE COURT:  Good morning.

15           PROSPECTIVE JUROR:  My name is Lauren Schultz.  I'm

16   from Joliet.  I finished some college, but I did get my GED

17   from high school as well.  I currently work for a company

18   called Ideal Net which is a transportation company, and I'm a

19   coordinator there, mainly billing and calling.  It's like a

20   basically call center with the unfortunate side of having to

21   deal with billing transactions and problems --

22           THE COURT:  All right.

23           PROSPECTIVE JUROR:  -- which I do work from home.

24           I live with my sister, my little sister and my mother

25   currently.  My sister just got a degree in horticulture, and

1    my mother runs -- she's a manager of two buildings in

2    Shorewood.

3          And I don't have any kids, and I'm not married.  My

4    hobbies, interests are once I am off work, watch TV, play with

5    my dogs.  My free time, weekends, I coach little league,

6    baseball, softball, umpire, hang out with family.

7          I try not to watch the news.  Locally, I like to just

8    kind of like at The Patch, see what's going on in my area

9    preferably.  Same thing, *Law and Order, SVU, Rookie*.  I like

10   my horror movies and things.  Other than that, pretty much

11   whatever is on.

12         THE COURT:  Do they ever have hammering noises in *Law*

13   *and Order*?  I don't remember ever hearing that.

14         PROSPECTIVE JUROR:  Sometimes.  There was one episode

15   they had to go into the trailer across because of the leaking.

16         THE COURT:  Hopefully no leaks here.

17         Had you had a chance to declare a major in college?

18         PROSPECTIVE JUROR:  I was going in for graphic

19   design.

20         THE COURT:  Okay.  Great.  Thanks very much.  You can

21   have a seat.

22         Okay.  So, ladies and gentlemen, we're going to do

23   the swap here and bring in the other groups.  I will remind

24   you again, though, that you must not do any research into the

25   case, not the law, facts, the parties.  Don't talk about the

1   case.  You can talk about your dogs and so on and how badly

2   the White Sox are doing and so on, but do not talk about the

3   case in any way.  And again, if you happen to encounter any of

4   the lawyers or parties, they will ignore you.

5           Okay.  So let's all rise for the jury.

6       (Venire exits the courtroom.)

7           THE COURT:  Okay.  Please be seated.

8           MR. LOEVY:  Your Honor, is it your intention to ask

9   them about the conflicts and stuff when you bring them all

10  back together, if they have scheduling conflicts?

11          THE COURT:  Yes.  The supplemental questions, we're

12  going to -- we'll go through it at that point.  You mean

13  scheduling conflicts?

14          MR. LOEVY:  Yes.

15      (Pause.)

16      (Venire enters the courtroom.)

17          THE COURT:  Okay.  Please be seated.

18          You know the drill from how we were doing it before.

19  So I'm going to ask Mr. Dequick -- and if it's easier, you can

20  slip around to the side -- to come on up to the podium.

21  Great.

22          All right.  I know you've been rehearsing for the

23  last hour and a half.  Let's hear it.

24          PROSPECTIVE JUROR:  Good morning.  My name is

25  Christopher Dequick.  I live in the city of Chicago in the

1  neighborhood of North Center.  I went to school at Columbia

2  College Chicago.  I have a bachelor of arts in audio design

3  and production.  For the past ten years, I've been working as

4  an audio engineer, and in the last two and a half years, I

5  have moved into television.  And I'm an audio operator, the

6  only audio operator for Weigel Broadcasting, so they're a

7  little stressed without me right now.  We do TV shows and

8  news.

9  I'm not married, but I'm engaged and live with my

10  fiancée.  My major hobbies are watching sports, video gaming,

11  things like that.  Most of the news I get is online, but I

12  also watch, occasionally watch CNN or MSNBC.

13  THE COURT:  Okay.  And so your online news sources,

14  if you visit a website or you have an app, what are those?

15  PROSPECTIVE JUROR:  Probably MSNBC lately.

16  THE COURT:  Okay.  And do you own or rent in North

17  Center?

18  PROSPECTIVE JUROR:  I rent.

19  THE COURT:  And is your fiancée working outside the

20  house?

21  PROSPECTIVE JUROR:  Oh, yes.  I'm sorry.  Yes.  She

22  works at an ice cream parlor right now.

23  THE COURT:  Okay.  As an audio engineer, how is that

24  white noise?

25  PROSPECTIVE JUROR:  It's good.

1          THE COURT:  It's effective.

2          PROSPECTIVE JUROR:  Yes, very.

3          THE COURT:  Okay.  I think that's all I have for you

4    for right now.  You can have a seat.  Thanks.

5          We'll ask Mr. Boushie, is it?

6          PROSPECTIVE JUROR:  My name is William Lee Boushie.

7    I live in Northbrook, lived there for about four years.  I was

8    living in Highland Park before that.  I went to school, have a

9    couple of different degrees, a couple of bachelor's degrees

10   and master's degree.  I have worked as a physical therapist

11   for many years, and I recently retired last year.  My wife,

12   I'm married to my wife who is a schoolteacher.  She was

13   retired.  She just retired in the past year.  I have -- we

14   have three children.  I have two stepchildren and one

15   daughter.  I have nobody else living in my home except my wife

16   and I.  We own a condo in Northbrook.

17         Hobbies, I'm active in a synagogue that we belong to.

18   I play tennis.  I like to walk, like to bike, play a little

19   golf.  I watch TV to get my news, read the Wall Street

20   Journal, watch CNN, Fox news, a couple of websites I get my

21   news from.  Anything else?

22         THE COURT:  Okay.  So your bachelor's and master's

23   degrees were in what areas?

24         PROSPECTIVE JUROR:  Physical therapy.  I worked as a

25   physical therapist for 42 years, so my entire --

1      THE COURT:  And your stepchildren, you have two.

2      PROSPECTIVE JUROR:  I have two stepchildren and

3  one --

4      THE COURT:  And what do they do?

5      PROSPECTIVE JUROR:  My son is unemployed.  My stepson

6  is unemployed.  My stepdaughter works as a surgical tech at an

7  area hospital.  My daughter is a social worker, works in the

8  counseling area.

9      THE COURT:  And is that local here?

10      PROSPECTIVE JUROR:  It's in Northfield.  They all

11  live in the Chicagoland area; stepdaughter in Buffalo Grove,

12  stepson here in the city.

13      THE COURT:  Okay.  And you mentioned watching CNN,

14  Fox news.  Is that Fox news national, local, or both?

15      PROSPECTIVE JUROR:  Both.  I bounce around, WGN,

16  major news networks, couple of --

17      THE COURT:  And then you also -- go ahead.  I'm

18  sorry.

19      PROSPECTIVE JUROR:  A couple of websites.  There's

20  something called the Jewish Telegraphic Agency.  I get news

21  from Israel.

22      THE COURT:  Okay.  Thanks very much, Mr. Boushie.

23      Ms. Chapman.

24      PROSPECTIVE JUROR:  I'm Christina Chapman.  I live in

25  Carol Stream.  We have lived there for five years.  Prior to

1   that, I lived in Indiana, which is where I'm from.  My

2   husband -- we do own as well.  I do have an associate's in

3   accounting and a bachelor in business management.

4           The last year and a half, I worked as a project

5   accountant for a real estate development firm.  Before that, I

6   worked as an accountant for a company called Painters USA.

7   They did painting.  And prior to that when we were in Indiana,

8   I worked for the Wayne Township School District as the CFO's

9   executive assistant.  And the company I work for now is Urban

10  Street Group.

11          THE COURT:  All right.

12          PROSPECTIVE JUROR:  My husband lives with me, and he

13  works for AkzoNobel which is a global coatings company, and

14  prior to that, he was an automotive painter.

15          My oldest son is 19 and works part-time.  My youngest

16  son graduates in three weeks from high school.

17          THE COURT:  Congratulations.

18          PROSPECTIVE JUROR:  Thank you.

19          And then we have two dogs and two geckos.  I've got

20  to include all them.

21          Hobbies and interests, I like to read.  I don't get

22  much opportunity.  I like to go for walks with my family, but

23  most everything is revolved around my children and what

24  they're doing:  Sports, band, things like that.

25          And then news, I really don't watch TV.  I really

1   don't listen to a lot of radio, so I don't really get a lot of

2   news.

3          THE COURT:  Okay.  And then can you say one more time

4   the nature of the XL -- XO Nobel?

5          PROSPECTIVE JUROR:  AkzoNobel?

6          THE COURT:  Oh, AkzoNobel.

7          PROSPECTIVE JUROR:  Yeah.  A-k-z-o, N-o-b-e-l.  They

8   are a global coatings company.  They're out of the

9   Netherlands.  And my husband works for the automotive refinish

10  division of that.  He's a technical instructor.

11         THE COURT:  Got it.  Okay.  Thanks very much.  You

12  can have a seat.

13         Mr. Palumbo.

14         PROSPECTIVE JUROR:  I'm Christopher Palumbo.  I live

15  in Cicero.  I live with my grandparents, my mom.  I graduated

16  high school, went to trade school, got a degree -- or a

17  certificate from there.  I'm employed at Rush Truck Center as

18  a diesel mechanic for the last three and a half years.  Before

19  that, it was Discount Tire and a lifeguard.

20         My mom, she works for Nabisco as a warehouse worker,

21  my grandpa works as a machinist for Star Hydraulics, and my

22  grandma stays at home.

23         Not too many hobbies, just pretty much hang out with

24  my dog and going out with some friends.  That's about it.  As

25  far as news, I don't watch too much news but when I do, I tune

1    in to Fox.

2            THE COURT:  Okay.  And any TV programs you watch

3    regularly?

4            PROSPECTIVE JUROR:  Not really, not a big TV person,

5    just kind of outdoors.

6            THE COURT:  Okay.  And then is that Fox news local,

7    national, or both?

8            PROSPECTIVE JUROR:  Both.

9            THE COURT:  Okay.  And do you know whether your

10   mother or grandparents or some combination, do they own the

11   home in Cicero?

12           PROSPECTIVE JUROR:  Grandparents do, yes.

13           THE COURT:  Okay.  Thanks a lot, Mr. Palumbo.

14           And Ms. Diaz.

15           PROSPECTIVE JUROR:  Good morning.  My name is Marissa

16   Diaz.  I currently live in -- I rent a home in Franklin Park.

17   I've been living there for 14 years.  I've attended only high

18   school at Notre Dame High School for Girls.  I am currently

19   unemployed, got laid off but prior to that, I was with

20   Wintrust Mortgage working in the loan servicing department.

21   We pretty much handle the back end of once the loans are

22   processed, and I also assisted senior management.

23           My husband works as a current journeyman lineman for

24   Mead Company.  We have two daughters.  My oldest is 26.  My

25   youngest is 17.  She's a -- currently a junior at East Leyden,

1 and my 26-year-old works also at East Leyden as an assistant

2 to the dean's office.  And my future son-in-law also lives

3 with us, and he is currently an auxiliary loan -- police

4 officer with Franklin Park.

5 Hobbies and interests, just spending time with my

6 family.  My youngest keeps me busy.  She's involved in a lot

7 of extracurricular activities at school.  As far as news, I

8 normally watch WGN.

9 THE COURT:  Okay.  And then any TV programs you watch

10 regularly?

11 PROSPECTIVE JUROR:  *Yellowstone*.

12 THE COURT:  *Yellowstone*.  I think they've got one

13 more season.

14 PROSPECTIVE JUROR:  Yes, waiting on that one.

15 THE COURT:  Okay.  And let's talk at the sidebar for

16 a moment.

17 (Proceedings heard at sidebar:)

18 THE COURT:  Okay.  Ms. Diaz, so your future

19 son-in-law is living in the home with you now?

20 PROSPECTIVE JUROR:  Correct.

21 THE COURT:  And he's an auxiliary police officer with

22 the Franklin Park Police Department?

23 PROSPECTIVE JUROR:  Correct.

24 THE COURT:  Okay.  And so can you tell me what his

25 duties are generally?

1          PROSPECTIVE JUROR:  He just started about three

2    months ago, but currently right now he assists the police

3    department with special activities, events within Franklin

4    Park.  He's in training, so he's still in that process but as

5    of right now, it's just really assisting the police officers

6    with anything they need assistance with within the department.

7          THE COURT:  Okay.  Is he in training to become a

8    sworn officer, or you're saying he's in training to be an

9    auxiliary officer?

10         PROSPECTIVE JUROR:  He's already been sworn in.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  But he just started his training

13   to be the complete -- to get full training of the auxiliary

14   police officer.

15         THE COURT:  Okay.  And will there come a point as an

16   auxiliary police officer where he can actually make arrests?

17         PROSPECTIVE JUROR:  I don't think with the auxiliary

18   that -- he can assist with the arrests, but I don't think he's

19   at that point yet.

20         THE COURT:  All right.  And so obviously, in a case

21   like this, you will hear testimony from or about law

22   enforcement officers.  And it is very important that whoever

23   serves on the jury can evaluate the testimony of a law

24   enforcement officer the same way that they would evaluate the

25   testimony of any non-law enforcement officer.

1        Can you apply that instruction?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  All right.  So for example, a law

4   enforcement officer does not start with a plus.  He or she

5   doesn't start with a minus but also does not start with a plus

6   on their credibility.

7        Can you apply that instruction?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Okay.  Any follow-up questions from the

10  plaintiff?

11       MR. LOEVY:  No.

12       THE COURT:  And Mr. Nathan?

13       MR. NATHAN:  No.

14       THE COURT:  Okay.  All right.  Ms. Diaz, you can have

15  a seat.

16    (Proceedings heard in open court:)

17       THE COURT:  Okay.  Ms. Heck.

18       PROSPECTIVE JUROR:  Hi.  I'm Sarah Heck.  I currently

19  split my time between Kenilworth and Lincoln Park.  I own a

20  condo.  I have two master's degrees:  A master's in wealth

21  management and an MBA.  I am currently employed at BMO as a

22  private wealth advisor, so I do a combination of relationship

23  management and new business.  And prior to that -- so I've

24  been there for a year.  The nine years prior, I was at

25  Northern Trust as primarily a trust advisor, so I acted in the

1  capacity of both fiduciary and agent.

2          I am not married, no children.  My -- when I am in

3  Kenilworth, I spend time with my parents.  My father has been

4  retired for over 20 years but was in the investment industry.

5  My mother was, she's been retired for probably about five

6  years and was an estate planning attorney at Reed Smith.

7          Hobbies include spending time with my dog a lot in

8  the park, book club.  Let's see.  A lot of travel, things like

9  that.  Let's see.  News, I'd say I don't watch a ton of news

10 but local, WGN, some CNN, I would say mostly watch the

11 markets.

12         THE COURT:  Okay.  It's been sad watching it for the

13 last 12 months.

14         PROSPECTIVE JUROR:  Yeah.

15         THE COURT:  So your mother was a practicing attorney

16 in estate planning at Reed Smith.

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And to your knowledge, had she practiced

19 anything else or just estate planning?

20         PROSPECTIVE JUROR:  Just estate planning.

21         THE COURT:  Not likely to happen, but if you've

22 picked up any legal concepts from talking with her about, I

23 guess, the law generally, will you be able to apply the legal

24 instructions that the Court gives you both during the trial

25 and then after the trial?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  I think that's all I have for you.

3     Thanks.  You can have a seat.

4          PROSPECTIVE JUROR:  Thank you.

5          THE COURT:  Okay.  All the way in the corner there,

6     Mr. Struhar.

7          PROSPECTIVE JUROR:  My name is Greg Struhar.  I live

8     in Elmhurst where I own my home.  I have a master's degree in

9     marketing.  I am currently employed as an insurance

10    underwriter in the medical malpractice space with Berkshire

11    Hathaway specialty insurance.  The nine years prior, I worked

12    with Sapphire Blue, another insurance in the medical

13    malpractice space.  I also have experience underwriting

14    commercial property.

15         I live with my wife and three children.  My wife is a

16    speech pathologist in an area public school.  My children are

17    two boys and a girl.  The boys are five and four, and our

18    little girl is one year old.  No other adults in the home.

19         Hobbies or interests, mostly spending time with our

20    little kids and family, but I also am a runner.  And I get

21    news from the New York Times and the Economist.

22         THE COURT:  Okay.  And what was your bachelor's

23    degree in?

24         PROSPECTIVE JUROR:  Business administration.

25         THE COURT:  Okay.  And so in your underwriting

1    duties, do you ever get involved in evaluating, like, in the

2    later stages specific cases and their valuation for medical

3    malpractice or not?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.  It's on the front end

6    underwriting?

7              PROSPECTIVE JUROR:  Correct.

8              THE COURT:  And I should ask you the same question,

9    though.  To the extent that you have picked up legal concepts

10   in your career, will you be able to follow the instructions

11   that the Court gives to you, that I give to you as opposed to

12   whatever you might have picked up along the way?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Okay.  Thanks very much, Mr. Struhar.

15             Next up, Mr. Cristofaro.

16             PROSPECTIVE JUROR:  Hi.  My name is Tyler Cristofaro.

17   I'm from Bolingbrook, Illinois.  I got a BS in sports

18   management and general business at North Central University.

19   Last year I worked for the Chicago Wolves as a group sales

20   ticket accountant.  Since then, though, I have moved on.  I

21   currently work at Home Depot and am in school to get my EMT

22   certification.

23             I live with both my parents.  My mom is the assistant

24   superintendent of the Lockport School District.  My dad is a

25   service advisor at McGrath Lexus of Westmont.

1      Hobbies include working out and studying a lot.  The

2  only news I really get is from the Sun-Times, the newspaper if

3  my dad doesn't throw it away right away and then whatever is

4  on upstairs in the break room which is normally CBS or Fox

5  news.

6      THE COURT:  Okay.  And do your parents own or rent in

7  Bolingbrook?

8      PROSPECTIVE JUROR:  They own.

9      THE COURT:  And tough season for the Bulls last year.

10  That must not have been an easy job.

11      PROSPECTIVE JUROR:  No.

12      THE COURT:  And you mentioned Fox news.  Is that Fox

13  news national, local, or both?

14      PROSPECTIVE JUROR:  Both, I would assume.

15      THE COURT:  Okay.  All right.  Thanks very much,

16  Mr. Cristofaro.

17      Mr. Yap, is it?

18      PROSPECTIVE JUROR:  Hi.  My name is Joel Yap.  I live

19  in Wauconda for about 18 years.  We own a house.  And I

20  finished bachelor of science in civil engineering and

21  associate's degree in marine engineering in the Philippines.

22  And I'm currently employed at the Wauconda Healthcare.  I've

23  been there for 18 years working as a nursing assistant.  And

24  my wife, she's an RN.  She works at the Avantara in Long Grove

25  and also works part-time at Northwest Community Hospital.

1    I have two kids.  My son works at ITS and works

2    part-time at Half Price Bookstore.  My daughter works at the

3    Kraft Heinz here in Chicago.

4    Hobbies, I like walking, playing basketball, and

5    doing karaoke a little bit.  And I get my news from CNN once

6    in a while.

7    THE COURT:  Okay.  And what is ITS?

8    PROSPECTIVE JUROR:  ITS, it's like a computer company

9    doing, like, web design.

10    THE COURT:  And what does your daughter do for Kraft?

11    PROSPECTIVE JUROR:  Marketing.

12    THE COURT:  Okay.  And then any other programs you

13    watch regularly?

14    PROSPECTIVE JUROR:  Not -- I'm not really a TV guy.

15    I'm tired working.

16    THE COURT:  Got it.  Okay.  Thanks very much.  You

17    can have a seat.

18    All right.  Next up.

19    PROSPECTIVE JUROR:  Hi, my name is Josh Ehart.  I

20    live in River Forest where I own a home.  We've lived there

21    the last ten or so years.  I have a bachelor's of science in

22    biology.  I currently work for Accenture doing marketing

23    consulting, worked there for two years.  Prior to that, I

24    worked at another ad agency in town, Energy BBDO.  My wife

25    also works in advertising.  She's worked for the Publicis

1    Groupe for probably nearly 20 years at this point straight.

2            I have two kids, about to turn 15 and 13, a boy,

3    older boy and younger girl.  No other adults in the household.

4    Hobbies, tennis, I would say tennis and gardening now in the

5    summer.  In terms of news, MSNBC, CNN, New York Times, and

6    Wall Street Journal are kind of the rotation.

7            THE COURT:  Okay.  And any other TV programs?

8            PROSPECTIVE JUROR:  Just sort of the regular,

9    whatever is the new thing on the streaming services.

10           THE COURT:  I see.  Okay.  Thanks very much,

11   Mr. Ehart.

12           And Ms. Miller.

13           PROSPECTIVE JUROR:  I'm so nervous.

14           THE COURT:  Take your time.

15           PROSPECTIVE JUROR:  I'm Kerry Miller.  I'm from,

16   originally from McHenry.  I'm moving back there.  I was born

17   and raised in McHenry.  I got my associate's degree in applied

18   science in nursing.  I've been a registered nurse for about 27

19   years.

20           I'm currently at juvie in Vernon Hills, Hulse

21   Detention Center for Juveniles.  Before that, I was at Lake

22   Behavioral Hospital as an RN and then before that, I worked at

23   long-term care facilities as director of nursing, or ADON.

24           I have four children.  They were born in '86, '88,

25   '90, and '91.  That's easier.  I don't know their ages.  I

1    have seven grandkids.  My oldest son is a teacher at McHenry

2    High School.  He's a graphics arts teacher.  My second son is

3    a nurse, and he works at juvie too.  And then my third son is

4    a fireman/paramedic in Naperville.  And my daughter works at

5    Wal-Mart.

6          I really don't have hobbies.  I just hang out with my

7    grandkids in my spare time if I'm not working.  And sometimes

8    I watch the news if I -- I go to bed at 8:00 o'clock at night.

9    So sometimes I stay up and watch the 10:00 o'clock news on

10   ABC.

11         THE COURT:  Okay.  And do you own or rent your home?

12         PROSPECTIVE JUROR:  I rent.

13         THE COURT:  And, yeah, let's talk at the sidebar

14   about your experience a bit.

15      (Proceedings heard at sidebar:)

16         THE COURT:  Okay.  Ms. Miller, you can talk right

17   into the microphone when you answer.  And I wanted to follow

18   up on your experience at the juvenile detention center.

19         Okay.  So how long have you worked there now?

20         PROSPECTIVE JUROR:  I've only been there since last

21   September.

22         THE COURT:  And before last September, had you had

23   any other experience at this juvenile detention center?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  And before last September, had you had

1  any other experience nursing for juvenile-specific departments

2  or facilities?

3          PROSPECTIVE JUROR:  No -- well, at Lake Behavioral

4  Hospital, not in the jail, but I was at -- I took care of kids

5  sometimes.

6          THE COURT:  Was it specific to kids, though?

7          PROSPECTIVE JUROR:  We had different units.  No --

8  well, we had different units, and one was the juvenile unit

9  and then, you know, ITU.

10          THE COURT:  Okay.  So what's ITU?

11          PROSPECTIVE JUROR:  I can't remember what they are.

12  It's like --

13          THE COURT:  Can you talk right into the microphone?

14          PROSPECTIVE JUROR:  Sorry.  It's like a lot of

15  psychosis and stuff like that.

16          THE COURT:  Is ITU specific to juveniles?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Okay.  Now, we'll circle back in a moment

19  to the Lake Behavioral unit.  With regard to the juvenile

20  detention center, so --

21          PROSPECTIVE JUROR:  The jail?

22          THE COURT:  Yes.

23          PROSPECTIVE JUROR:  Yeah.  That's different.  Lake

24  Behavioral is a hospital.

25          THE COURT:  I see.

1    PROSPECTIVE JUROR:  And then the detention center is

2    Lake County Detention Center for Juveniles.

3    THE COURT:  Okay.  So in your practice currently at

4    the jail, so these are juveniles who are either charged with a

5    crime and awaiting trial or they've been convicted?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  And what -- do you specialize in mental

8    health care or counseling, or what do you do?

9    PROSPECTIVE JUROR:  No, no.  I just am basically

10   there for their pills, medication, and if they need to talk or

11   if we need to get ahold of, like, SAS.

12   THE COURT:  Okay.  So you're not -- do you have a

13   counseling-type role there?

14   PROSPECTIVE JUROR:  No.

15   THE COURT:  Is there anything about that experience

16   that you think would prevent you from being fair to either

17   side in this case?

18   PROSPECTIVE JUROR:  No.

19   THE COURT:  Like, so for example, the -- as you heard

20   in the summary, Mr. Gray, the plaintiff, he was detained when

21   he was 14 years old.  And do you have any concerns that your

22   experience working with juveniles would make you lean one way

23   or the other?

24   PROSPECTIVE JUROR:  No.  I don't even know what most

25   of their things are for.  They don't -- I'm not privy to that,

1      so yeah.

2                THE COURT:  So you're focused on their healthcare?

3                PROSPECTIVE JUROR:  Yes.

4                THE COURT:  Okay.  Then let's just back up a little

5      bit.  So the juvenile units that you worked at before working

6      at the jail, did you have a similar role?

7                PROSPECTIVE JUROR:  That was more hands-on, but I

8      didn't work a lot on the juvenile.  I mostly did the intensive

9      unit.

10               THE COURT:  And anything about that experience that

11     would prevent you from being fair to either side in this case?

12               PROSPECTIVE JUROR:  No.

13               THE COURT:  Now, it sounds like you might have both

14     either trained on or at the very least had experience with

15     mental health; is that correct?

16               PROSPECTIVE JUROR:  Correct.

17               THE COURT:  Now, you may very well hear testimony

18     about things like cognitive skills and including cognitive

19     skills of juveniles.  So it will be important if you're picked

20     for this jury that you base your decision on what you hear

21     here in court, like, from witnesses as opposed to, like, your

22     prior knowledge.  Can you do that?

23               PROSPECTIVE JUROR:  Yeah.

24               THE COURT:  And so for example, if you hear

25     believable testimony that conflicts with maybe something that

1   you have learned in the past, will you be able to set aside

2   your personal experience and base your decision on the

3   evidence?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  All right.  And then you mentioned that

6   one of your children is a firefighter; is that correct?

7           PROSPECTIVE JUROR:  Correct.

8           THE COURT:  And where do they work, which village or

9   city?

10          PROSPECTIVE JUROR:  Naperville.

11          THE COURT:  And for how long?

12          PROSPECTIVE JUROR:  He's been there about ten years,

13  I think.

14          THE COURT:  And do you talk very much with him about

15  what he does?

16          PROSPECTIVE JUROR:  Not -- not so much.  When I see

17  him, you know, all of a sudden if I'm up at 10:00 at night and

18  I see Naperville Fire Department, then I ask, but he really

19  can't tell me what happened and stuff like that.

20          THE COURT:  Okay.  And has he ever had a role in

21  arson investigations?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  So again, have you picked up any

24  background in arson science?

25          PROSPECTIVE JUROR:  No.

1    THE COURT:  Okay.  I'm sorry.  I had to ask the

2  question.  I understand it's chuckle-worthy.

3    All right.  So you may hear testimony either from or

4  about, or both, firefighters.  So the same question here.  In

5  terms of your -- just your personal experience with your own

6  son, can you evaluate that kind of testimony the same way you

7  would evaluate the testimony from someone who is not a

8  firefighter?

9    PROSPECTIVE JUROR:  Yeah.

10    THE COURT:  So, for example, if someone with

11  firefighting experience or from, like, a government fire

12  marshal's office were to testify, he or she could not start

13  with a plus with their credibility.  Do you understand that?

14    PROSPECTIVE JUROR:  No.

15    THE COURT:  Okay.  So here, let me give you an

16  example.  So when you evaluate the testimony of a witness,

17  like, how believable that witness is, the instruction that I

18  give you, it's not going to mention what their job is.  Like,

19  that doesn't give someone a boost in their credibility, and it

20  doesn't hurt their credibility just because they have a

21  certain kind of job.  Do you understand that?

22    Okay.  Can you apply that instruction?

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  Okay.  Including with regard to

25  firefighters?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Any follow-up questions from the

3    plaintiff?

4          MR. LOEVY:  No.

5          THE COURT:  And from the defense?

6          MR. NATHAN:  No, your Honor.

7          THE COURT:  All right.  Thanks, Ms. Miller.

8       (Proceedings heard in open court:)

9          THE COURT:  Okay.  Last but not least.

10          PROSPECTIVE JUROR:  Hello.  My name is Agne Ansah.  I

11   live on the south side of Chicago in the Hyde Park

12   neighborhood.  I've been living there for 16 years.  We rent

13   right now.  I have a bachelor's in theology and journalism.

14   And I've been a stay-at-home mom for the last ten years.  I

15   have two kids.  My oldest is turning ten today.

16          THE COURT:  Happy birthday.

17          PROSPECTIVE JUROR:  Thank you.  And I have a

18   six-year-old.  I live with my husband and two children.  My

19   husband works for Accenture, IT field, IT consultant.

20          And my hobbies are traveling, photography, nature,

21   and volunteering.  I don't watch any TV, haven't watched in

22   probably ten years.  I get my community updates and news on

23   Facebook and other news in Twitter, on Twitter.

24          THE COURT:  Okay.  And then so did you work outside

25   the home before deciding to stay at home?

1        PROSPECTIVE JUROR:  Yes.  I worked for Luther

2  International.

3        THE COURT:  And what do they do?

4        PROSPECTIVE JUROR:  Luther in Evanston.  It's a

5  volunteer-based organization.  I worked as a humanitarian

6  grants coordinator for seven years.

7        THE COURT:  Okay.  And then currently, what sorts of

8  organizations do you do volunteer work for?

9        PROSPECTIVE JUROR:  I volunteer a lot at my

10  children's schools.  They attend Saturday school, so I'm

11  always there every Saturday volunteering, and sometimes I'm a

12  substitute teacher there.

13        THE COURT:  Okay.

14        PROSPECTIVE JUROR:  And a lot of extracurricular that

15  my children are involved in, I volunteer.  And I love

16  organizing parties, so I'm always with my friends planning

17  some events.

18        THE COURT:  Okay.  Great.

19        Thanks very much.  You can have a seat.

20        Okay.  We are into the noon hour.  Actually, can I

21  ask the lawyers, let's get on a sidebar.

22    (Proceedings heard at sidebar:)

23        THE COURT:  Okay.  I'd just propose, let's break

24  until 1:15, and then we'll gather at 1:15.  We'll bring in the

25  jury box and row No. 1, and we'll do the supplemental

1    questions for them and then we'll do the swap for this group

2    after that.  Sound like a plan?

3             MR. LOEVY:  Thank you, your Honor.

4             MR. NATHAN:  Thank you.

5             THE COURT:  Okay.

6         (Proceedings heard in open court:)

7             THE COURT:  Okay.  Ladies and gentlemen, we're going

8    to take our lunch break until 1:15.  So what's going to happen

9    is the following.  I don't know if we have, like, lunch tips

10   or, yes, like a list of local places to go.  You're free to

11   leave the courthouse to go get lunch as well, but do be back

12   in that -- the courtroom that I'm renting, Judge Seeger's, at

13   1:15.

14            In the meantime, do no research into the case, not

15   the facts, the law, the parties, or anything else about it.

16   Don't communicate with each other, with anyone else about the

17   case as well.  You can feel free to talk to one another.  I

18   don't know why there's a Sacramento Kings fan apparently here.

19   So you can talk about your personal lives and professional

20   lives, but don't talk about the case in any way.

21            Try to use the south bank of elevators.  That's the

22   set of elevators closest to this courtroom.  And I'll instruct

23   the lawyers and the parties to use the north side to minimize

24   their contact with you.  If you do have contact with them,

25   they'll just ignore you because I've told them that they can't

1     communicate with you in any way.  They're not being

2     unfriendly.

3          Okay.  I'll see you at 1:15.

4          All rise.

5      (Recess from 12:10 p.m. to 1:15 p.m.)

6                    * * * * * * *

7                 C E R T I F I C A T E

8          I, Judith A. Walsh, do hereby certify that the

9     foregoing is a complete, true, and accurate transcript of the

10    proceedings had in the above-entitled case before the

11    Honorable EDMOND E. CHANG, one of the judges of said court, at

12    Chicago, Illinois, on May 8, 2023.

13

14    /s/ Judith A. Walsh, CSR, RDR, F/CRR_____        June 12, 2023

15    Official Court Reporter

16    United States District Court

17    Northern District of Illinois

18    Eastern Division

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   ADAM GRAY,                      )
                                    )
4           Plaintiff,              )
                                    )
5           v.                      )   No. 18 CV 02624
                                    )
6   CITY OF CHICAGO, et al.,        )   Chicago, Illinois
                                    )   May 8, 2023
7           Defendants.             )   1:15 p.m.

8                    VOLUME 1-B

9          TRANSCRIPT OF PROCEEDINGS - Trial

10      BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11  APPEARANCES:

12  For the Plaintiff:      LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
13                               MS. ROSHNA BALA KEEN
                                 MS. JORDAN POOLE
14                               MS. ELIZABETH C. WANG
                            311 North Aberdeen Street, Suite 300
15                          Chicago, Illinois 60607
                            (312) 243-5900
16

17  For the City Defendants:  REITER BURNS, LLP
                              BY:  MS. ELIZABETH A. EKL
18                            311 South Wacker Drive, Suite 5200
                              Chicago, Illinois 60606
19                            (312) 982-0090

20

21

22  Court Reporter:        Jennifer Costales, CSR, RMR, CRC
                           Official Court Reporter
23                         219 South Dearborn Street, Room 1928
                           Chicago, Illinois 60604
24                         (312) 435-5895
                           jenny.uscra@yahoo.com
25

1   APPEARANCES:   (Continued)

2   For Defendant McInerney:     NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
3                                     MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
4                                     MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
5                                33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
6                                (312) 612-1955

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Proceedings heard in open court. Venire out)

2             THE COURT: All right. Let's go back on the record.

3 You can have a seat.

4             Just before the jury comes in, I want to see if there

5 is any objection to excusing number 7, Mr. Patel, due to the

6 English language barrier?

7             MR. LOEVY: No objection, Your Honor. We were

8 talking about it as well. That's why we're smiling.

9             THE COURT: Okay. You're not smiling because you're

10 in a good mood?

11             Mr. Nathan, what do you think?

12             MR. NATHAN: I would like -- okay. No objection.

13             THE COURT: Okay. Yeah, it seemed to be a real

14 problem. I had to ask like the last question multiple times.

15 Okay. We'll excuse him.

16             So if he answers yes to a supplemental, I'm going to

17 bring him to a sidebar and I'll tell him he doesn't have to

18 answer yes anymore, that he'll be excused.

19             And then what about number 10, Ms. Su, what were your

20 thoughts about her English ability?

21             MR. LOEVY: I think we would consent to excuse her as

22 well.

23             MR. NATHAN: For right now, we wouldn't consent to

24 that. We thought her English was okay. We have been

25 discussing possibly agreeing to her as well based on --

1           THE COURT:  Okay.

2           MR. NATHAN:  -- but we're just not prepared --

3           THE COURT:  Okay.  Well, let's see --

4           MR. NATHAN:  -- right now.

5           THE COURT:  Okay.  Let's see if she has any further

6    yes answers, and we can talk to her a little bit more,

7    although I already did talk to her some.  But okay.  We can

8    play that one by ear for the moment.

9        (Discussion off the record)

10          THE COURT:  Okay.  Let's go back on the record.

11          Okay.  We were not able to locate Ms. Dixon.  She was

12   juror number 8.  We'll see if we can track her down, but we're

13   going to go ahead with the rest of the group.

14       (Venire in.)

15          THE COURT:  Ms. Lothe and Mr. Herzer, you can come

16   this way if you want, or anyone else, wherever you want.

17          All right.  Please be seated.

18          Okay.  Welcome back from lunch.  Ladies and

19   gentlemen, it's a rainy, dreary day.  Sorry I couldn't dial up

20   a nice sunny day in Chicago for you.

21          I do have some additional follow-up questions for

22   you.  And the way we are going to proceed is if you have a yes

23   answer to any of the following questions, just go ahead and

24   raise your hand and then we'll hear the answers at the

25   sidebar, which I'm sure you're all looking forward to that

1    noise.  So it will just be the lawyers and me.

2         The first question is this:  Have you, your spouse or

3    very close family member ever worked as a police officer or in

4    law enforcement?

5         By "very close family member," I mean someone with

6    whom you speak regularly.

7         And if we've already discussed it, as I think I did

8    with a few of you already, you don't have to raise that

9    particular person again, okay.

10        So anyone have a yes answer then in the first row of

11   the gallery?

12        Okay.  Mr. Herzer, why don't you come on up to the

13   sidebar.

14       (Proceedings heard at sidebar:)

15        Okay.  Mr. Herzer, go ahead.  Who is it?

16        PROSPECTIVE JUROR:  It's my stepfather.

17        THE COURT:  All right.  And is he still working at

18   the police department?

19        PROSPECTIVE JUROR:  No.  He's a retired chief of

20   police in a small town in Michigan.

21        THE COURT:  Okay.  And what town, if you know?

22        PROSPECTIVE JUROR:  Marysville, Michigan.

23        THE COURT:  Okay.  That is small.  I've never heard

24   of it.

25        And how long did he work there approximately?

1          PROSPECTIVE JUROR:  His entire career, 40 years plus.

2          THE COURT:  All right.  And so how much of that 40

3  years did you know him?

4          PROSPECTIVE JUROR:  For like the last 20 years, I'd

5  say.

6          THE COURT:  All right.  Okay.  And did you talk with

7  him very much about his duties and what he was doing as chief?

8          PROSPECTIVE JUROR:  Not like day to day, but we'd

9  certainly have conversations about things that he would do as

10  a police officer and the chief of police.

11          THE COURT:  Okay.  And did you talk about specific

12  cases?

13          PROSPECTIVE JUROR:  On occasion we would get into

14  different sort of people that he would pull over or just sort

15  of like anecdotal conversation things when they would come up.

16          THE COURT:  Okay.  And then so amongst these

17  anecdotal conversations, did he ever talk about any arrests of

18  juveniles?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Okay.  And do you remember, can you give

21  me an example?

22          PROSPECTIVE JUROR:  Yeah.  There was like a -- he

23  would tell a story about how they would -- a couple kids were

24  arrested for shoplifting, and how they would separate them out

25  into two different interrogation rooms and try to see who

1  would, you know, break first, like which one would cop to

2  stealing first.

3          THE COURT:  Okay.  All right.  And any instances in

4  which the juveniles were like charged as adults?

5          PROSPECTIVE JUROR:  I don't recall, but I don't

6  believe so.

7          THE COURT:  Okay.  So they were more of the nature of

8  like these shoplifting incidents?

9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Okay.  And then more broadly, did he

11  discuss interrogations with you, even of adults, not just

12  juveniles?

13          PROSPECTIVE JUROR:  No, I can't recall outside of

14  that.

15          THE COURT:  Okay, all right.  Now, first question on

16  this is whether you can evaluate the testimony of a law

17  enforcement officer the same way as you would evaluate the

18  testimony of a non-law enforcement officer.  All right.  Can

19  you do that?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  All right.  So, for example, a law

22  enforcement officer who testifies, they're not entitled to

23  start out with, before any words come out of their mouth, a

24  plus or a minus, all right, but, you know, certainly not a

25  plus.  Can you follow that instruction?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  And, also, you might hear

3    testimony about not just the interrogation in this case, but

4    principles of interrogation, all right, more generally.  Okay.

5    So it is important that whoever sits as a juror in this case

6    evaluate and make decisions based on the evidence in this case

7    rather than their own personal experience, which you might

8    have heard from your stepdad, for example.  Can you do that?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  All right.  Anyone else in the family or

11   close family member?

12         PROSPECTIVE JUROR:  No.  That's it.

13         THE COURT:  All right.  Any follow-up questions for

14   the plaintiff?

15         MR. LOEVY:  Yes, Your Honor.  As long as Mr. Herzer

16   is up here, we did not hear his answer about where he gets his

17   news.  We had from the last round.

18         THE COURT:  Okay.  I believe it was Reddit and

19   Drudge.  But can you go ahead?

20         PROSPECTIVE JUROR:  Yeah.  That's correct, mostly

21   online.

22         MR. LOEVY:  Can we ask a follow-up with that or is

23   that not --

24         THE COURT:  You can propose one.

25         MR. LOEVY:  Sorry.  Can you tell us more about that?

1      PROSPECTIVE JUROR:  Sure.

2      THE COURT:  Go ahead.

3      PROSPECTIVE JUROR:  Is that for me?

4      THE COURT:  Yeah.

5      PROSPECTIVE JUROR:  I just tend to like to get the

6   full picture of everything.  So I think Reddit tends to lean a

7   little bit left, at least the ones that I sort of follow or

8   come up in my feed.  So I like to go to Drudge and to see

9   what's happening on that side, too.

10      MR. LOEVY:  Thank you.

11      THE COURT:  Anything else?

12      MR. LOEVY:  No.

13      THE COURT:  All right.  Mr. Nathan?

14      MR. NATHAN:  No, Your Honor.

15      THE COURT:  Okay.  All right.  Thank you, Mr. Herzer.

16   You can step down.

17      (Proceedings heard in open court:)

18      THE COURT:  All right.  Was there anyone else in that

19   first row?

20      Okay.  Then back to the second row.  Ms. Neustadt,

21   right?  Yeah, okay.  Sorry.  Come on over to the sidebar.

22      (Proceedings heard at sidebar:)

23      THE COURT:  Okay.  Is it you or someone else?

24      PROSPECTIVE JUROR:  Oh, my cousin.

25      THE COURT:  All right.  And who does your cousin work

1    for?

2              PROSPECTIVE JUROR:  He's retired from the DuPage

3    County Sheriff's Department and now works for the Illinois

4    State's Attorney.

5              THE COURT:  Okay.  Okay.  So back when he worked with

6    the DuPage Sheriff's Department, do you know approximately how

7    long he worked there?

8              PROSPECTIVE JUROR:  However long it is until you

9    retire.  I know from he started and when he was 50 he retired.

10             THE COURT:  All right.  So basically his entire

11   working career?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Okay.  And when he retired, do you know

14   what role he played in the sheriff's department?  Was he in

15   patrol?

16             PROSPECTIVE JUROR:  Yes.  He was a detective.

17             THE COURT:  A detective, all right.  And did you talk

18   with him very much about his cases?

19             PROSPECTIVE JUROR:  He would bring things up

20   occasionally.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR:  Things we should have our kids

23   not do.

24             THE COURT:  All right.  So it was more in the line of

25   things he had encountered and did not want your kids or family

1   members to do?

2            PROSPECTIVE JUROR:  Correct.

3            THE COURT:  Okay.  Did he ever talk about like police

4   techniques, for example?

5            PROSPECTIVE JUROR:  He would tell us some of the

6   things he kind of did.  He did a lot with like catching people

7   that were preying on children through cyber crimes.

8            THE COURT:  Okay.  Okay.  And then did he ever talk

9   about, for example, interrogation techniques?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  Okay.  And to your knowledge, was he

12   involved in arson or fire investigation?

13           PROSPECTIVE JUROR:  I don't know.

14           THE COURT:  Yeah, all right.  And then in terms of

15   the Illinois, so he now works for a State's Attorney's office.

16   And do you know which one?

17           PROSPECTIVE JUROR:  No.

18           THE COURT:  Okay.  Do you talk with him very much

19   about what he's doing now?

20           PROSPECTIVE JUROR:  It would be a similar line of

21   work, but not exactly the same.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR:  That's all I know.

24           THE COURT:  All right.  Okay.  And then same things

25   in terms of police practice techniques or interrogation

1   techniques, have you talked to him about that in the context

2   of his State's Attorney's office work?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Okay.  It is important that whoever sits

5   on this jury is able to evaluate the testimony of a law

6   enforcement officer the same way that you would evaluate the

7   testimony of any non-law enforcement officer.  So, for

8   example, a law enforcement officer testifying, he or she does

9   not start with a plus or a minus on credibility, right.  So

10  they don't get a bump up just because they're an officer nor a

11  bump down.  Can you apply that instruction?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And to the extent you've learned anything

14  about police practices in discussions with your cousin, can

15  you set aside that prior knowledge and evaluate the testimony

16  in this case based on what you hear in this case?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  All right.  Any follow up from the

19  plaintiff?

20          MR. LOEVY:  No.

21          THE COURT:  And Mr. Nathan?

22          MR. NATHAN:  No.

23          THE COURT:  All right.  Anyone else, Ms. Neustadt, or

24  just the cousin?

25          PROSPECTIVE JUROR:  Just cousin.

1    THE COURT:  All right.  Okay.  You can have a seat.

2 Thanks.

3    PROSPECTIVE JUROR:  Thank you.

4    (Proceedings heard in open court:)

5    THE COURT:  All right.  Anyone else in the back row

6 on that?

7    Okay.  Is that Mr. Peebles?

8    PROSPECTIVE JUROR:  Yes, sir.

9    THE COURT:  All right.  Come on down, please.

10    (Proceedings heard at sidebar:)

11    THE COURT:  All right.  Mr. Peebles, who is it?

12    PROSPECTIVE JUROR:  My niece and nephew have a --

13 they dad retired as a Cook County sheriff deputy, a

14 correctional officer.  And I also have a friend that's a

15 Chicago police officer.

16    THE COURT:  Okay.  So the sheriff's deputy, are you

17 direct relation with that person?

18    PROSPECTIVE JUROR:  That's my niece and nephew's

19 father.

20    THE COURT:  Okay.

21    PROSPECTIVE JUROR:  But he was never married to my

22 sister.

23    THE COURT:  I understand.

24    PROSPECTIVE JUROR:  Okay.

25    THE COURT:  And how long has he been a deputy if you

1    know?

2            PROSPECTIVE JUROR:  Retired.

3            THE COURT:  He's retired?

4            PROSPECTIVE JUROR:  Yeah.

5            THE COURT:  Okay.  And how long was he with the

6    sheriff's office?

7            PROSPECTIVE JUROR:  At least in like the '80s, '90s.

8            THE COURT:  Okay.

9            PROSPECTIVE JUROR:  When I was in high school, '85 at

10   least, yeah.

11           THE COURT:  All right.  And then when did he retire?

12           PROSPECTIVE JUROR:  I don't know.  I don't see him

13   that often.

14           THE COURT:  Okay.  Did you talk with him regularly

15   about his duties at the jail?

16           PROSPECTIVE JUROR:  Not really per se, no.

17           THE COURT:  Okay.  And like, for example, did he tell

18   you what it was like to be in custody or working there?

19           PROSPECTIVE JUROR:  No, no.

20           THE COURT:  Okay.  All right.  So is there anything

21   about that relationship that would prevent you from being fair

22   to either side in this case?

23           PROSPECTIVE JUROR:  I don't think it would.

24           THE COURT:  Okay.  And, for example, when a law

25   enforcement officer testifies in this trial, he or she is not

1    entitled to any kind of, you know, bump up or plus on their
2    credibility just because of their job.  And they start out,
3    you know, not with a minus, not with a plus, just neutral,
4    like everyone else.  Can you apply that instruction?
5            PROSPECTIVE JUROR:  Sure.
6            THE COURT:  Okay.  All right.  And then with regard
7    to, let's see, you have relatives in the Chicago Police
8    Department, correct?
9            PROSPECTIVE JUROR:  No.
10           THE COURT:  Okay.
11           PROSPECTIVE JUROR:  I was in the Illinois Army
12   National Guard.  I have friends that are in the Chicago Police
13   Department.
14           THE COURT:  I see, a friend, okay.  All right.  And
15   your friend is still with the CPD?
16           PROSPECTIVE JUROR:  Yes.
17           THE COURT:  And what are his job duties, if you know?
18           PROSPECTIVE JUROR:  He be just a patrol officer.  He
19   does, you know, patrol certain areas.
20           THE COURT:  Okay.  And just remember to keep talking
21   right into the mic there.
22           PROSPECTIVE JUROR:  I'm sorry.
23           THE COURT:  I keep making that mistake too because I
24   keep turning towards you.
25           So do you speak with him very much about your --

1    about his job duties?

2             PROSPECTIVE JUROR:  No.

3             THE COURT:  Okay.  So, again, anything about that

4    experience that would prevent you from being fair to either

5    side in this case?

6             PROSPECTIVE JUROR:  No.

7             THE COURT:  All right.  And then, Mr. Peebles, did

8    you just say that you worked in the Illinois National Guard?

9             PROSPECTIVE JUROR:  Yeah.  I was in there for about 9

10   years.

11            THE COURT:  Okay.  And did you serve in any kind of

12   like law enforcement capacity or criminal investigative

13   capacity?

14            PROSPECTIVE JUROR:  No.

15            THE COURT:  Okay.  Okay.  Anything about that

16   experience that would prevent you from being fair to either

17   side in this case?

18            PROSPECTIVE JUROR:  No.

19            THE COURT:  Any follow-up questions from the

20   plaintiff?

21            MR. LOEVY:  No.

22            THE COURT:  And Mr. Nathan?

23            MR. NATHAN:  No, Your Honor.

24            THE COURT:  All right.  Anyone else, Mr. Peebles?

25            PROSPECTIVE JUROR:  No.

1    THE COURT:  Okay, all right.  You can have a seat

2  again.  Thanks.

3    PROSPECTIVE JUROR:  Okay.  Thank you.

4    (Proceedings heard in open court:)

5    THE COURT:  All right.  First row of the gallery.

6  Okay, Mr. Brown.  You just had to experience a sidebar, right?

7    (Proceedings heard at sidebar:)

8    THE COURT:  All right.  Mr. Brown, yeah, who is it?

9    PROSPECTIVE JUROR:  It's my father-in-law.

10    THE COURT:  Okay.  And what department does he work

11  for?

12    PROSPECTIVE JUROR:  Well, right now he's retired, but

13  he is a retired police officer in Chicago.

14    THE COURT:  All right.  And at the time he retired,

15  do you know what role he had?  Was it patrol, detective?

16    PROSPECTIVE JUROR:  No, he was a patrolman.

17    THE COURT:  Okay.  And how long ago did he retire?

18    PROSPECTIVE JUROR:  More than 50 years ago.

19    THE COURT:  Okay.  Yeah.  Did you know him at the

20  time?

21    PROSPECTIVE JUROR:  No, I did not.

22    THE COURT:  I see.  And so these things you learned

23  after he retired?

24    PROSPECTIVE JUROR:  Yes.

25    THE COURT:  Okay.  Now, and have talked with him much

1    about his duties and things he encountered?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  Okay.  Can you think of anything

4    about that relationship that would prevent you from being fair

5    to either side in this case?

6              PROSPECTIVE JUROR:  No, I can't.

7              THE COURT:  All right.  And I'll just give you an

8    example.  The jury in this case does need to evaluate the

9    testimony of law enforcement officers the same way that they

10   would evaluate the testimony of a non-law enforcement officer.

11   So when a law enforcement officer testifies, he or she does

12   not start with a plus on their credibility.  They don't start

13   with a minus either, but just like any other witness.  Can you

14   apply that instruction?

15             PROSPECTIVE JUROR:  Certainly, yes, I can.

16             THE COURT:  Okay.  Any follow-up from the plaintiff?

17             MR. LOEVY:  No.

18             THE COURT:  Mr. Nathan?

19             MR. NATHAN:  No.

20             THE COURT:  Anyone else, Mr. Brown, or just the

21   father-in-law?

22             PROSPECTIVE JUROR:  Just my father-in-law.

23             THE COURT:  Okay.  Thank you.  You can have a seat.

24        (Proceedings heard in open court:)

25             THE COURT:  All right.  Anyone else in that first row

1    of the gallery?

2            All right.  Okay.  Next question:  Have you ever had

3    a strongly positive or strongly negative experience with law

4    enforcement?

5            And, again, we'll take the answers at the sidebar.

6    Anyone in the first row of the gallery?  Not the gallery.

7    Jury box.

8            Second row of the jury box?  Okay.

9            And in the gallery.  Okay, Mr. Gobrogge.  Yeah, come

10   on up.

11       (Proceedings heard at sidebar:)

12           THE COURT:  All right.  Mr. Gobrogge, go ahead.

13           PROSPECTIVE JUROR:  Yeah.  I actually had a police

14   officer basically extend me what would have been rehab and

15   non-prison time for a drug-related offense, which was hugely

16   influential in helping me get my life back on track.  So I

17   have a lot of forbearance for her.  She was really influential

18   in kind of rebranding who I was, you know, about five years

19   ago.

20           THE COURT:  Okay.  Thank you.  That's helpful to

21   know.

22           Was this in Bridgeport or whereabouts?

23           PROSPECTIVE JUROR:  This was when I lived in Rolling

24   Meadows.  Like it was about five years ago, like right before

25   I met my wife.  So I actually was able to get my life back in

1  order.  And that kind of prompted me to move on and, you know,

2  make things right.

3       THE COURT:  I see, okay.  Right.  And let me just ask

4  a couple of follow-ups from that.  So can you tell me about

5  the context of the encounter.

6       PROSPECTIVE JUROR:  Sure.  So I unfortunately had an

7  opioid addiction at one point in my life.  It got so bad that

8  theft was really my only option to make things work.

9       The store that I attempted to steal something from

10 called the police.  They had me tailed back to almost my job,

11 which I'm thankful they didn't actually do the arrest there,

12 because that would have been even more embarrassing.  And then

13 she arrested me.

14      And then I was sitting in a jail cell, and she's

15 like:  Look, you're a non-offender.  You've never had anything

16 bad happen in your life.  I would like to offer this to you.

17 But you have to accept it now and you have to go to rehab

18 today.

19      And I took her up on the offer.  And it was well

20 worth it.

21      THE COURT:  All right.  Wonderful.  And you, it

22 sounds like then, never had to go to court for that instance?

23      PROSPECTIVE JUROR:  I did have to go to court, but it

24 was like I had to follow all that stuff they advised me of,

25 which was I had to go to rehab.  I had to do community

1   service.  I had to go to counseling, like an AA or NA group

2   for about two years.  And I had to do like check-ins with the

3   Court for that two-year period.

4           THE COURT:  I see, okay.  Okay.  Now, given this

5   experience, I do want to make sure the jurors in this case,

6   they do need to be able to evaluate the testimony of law

7   enforcement officers the same way that they would evaluate the

8   testimony of a non-law enforcement officer.  So in other

9   words, a law enforcement witness does not start with a plus

10  just by virtue of the job.

11          PROSPECTIVE JUROR:  Sure.

12          THE COURT:  Yeah, nor a minus, but just --

13          PROSPECTIVE JUROR:  Neutral.

14          THE COURT:  Yeah, exactly.  Can you apply that

15  instruction?

16          PROSPECTIVE JUROR:  Absolutely.

17          THE COURT:  Okay.  And now while we have you here, I

18  should just ask you, aside from this one theft arrest, were

19  you arrested previously to that?  All right.  Can you just say

20  it out loud.

21          PROSPECTIVE JUROR:  Oh, yeah, sorry.  No, never

22  arrested before that point.

23          THE COURT:  Okay, all right.  Yeah, because there is

24  going to be a question on that as well.  Okay.  So that was

25  the first and only time?

1      PROSPECTIVE JUROR:  Yeah.

2      THE COURT:  Okay.  All right.

3      Any follow-up questions from the plaintiff?

4      MR. LOEVY:  No.

5      THE COURT:  Mr. Nathan?

6      MR. NATHAN:  Yes, Your Honor.  I would ask Your Honor

7  to inquire about whether this experience with the Rolling

8  Meadows arrest has led Mr. -- I'm sorry.  I can't --

9      PROSPECTIVE JUROR:  Gobrogge.

10      MR. NATHAN:  I'm sorry.  Thank you.

11      PROSPECTIVE JUROR:  You're welcome.

12      MR. NATHAN:  -- to have any kind of understanding

13  about officer discretion in sentencing or whether an officer

14  has that kind of discretion.

15      THE COURT:  All right.  Let me formulate it this way.

16      PROSPECTIVE JUROR:  Sure.

17      THE COURT:  Are you aware based on this experience

18  whether police officers have control over sentencing?

19      PROSPECTIVE JUROR:  I mean, I know that they have the

20  ability to bend their understanding a little bit of the, you

21  know -- how they apply it to people when they're in the police

22  station.  But as far as actually sentencing and like what

23  happens, I mean, that's ultimately up to the judge to decide.

24      THE COURT:  Okay.  All right.  That's fair.

25      Any other follow-up questions?

1          MR. NATHAN:  No, Your Honor.

2          THE COURT:  Okay.  All right.  Thanks a lot.  You can

3     have a seat.

4          PROSPECTIVE JUROR:  Sure.

5        (Proceedings heard in open court:)

6          THE COURT:  Okay.  Any other yes answers to that

7     question?  Okay.

8          Okay.  Moving along, have you or a very close family

9     member ever been arrested for or convicted of a crime other

10    than speeding and other than routine traffic violations?

11    Though I do need to know about driving under the influence.

12          Once again, by "very close family member," I again

13    mean someone with whom you speak with some regularity.

14          Okay.  Any yes answers to that in the first row of

15    the jury box?

16          Okay.  Second row?

17          A PROSPECTIVE JUROR:  What's the question?

18          THE COURT:  I'll repeat it.  Have you or a very close

19    family member ever been arrested for or convicted of a crime

20    other than speeding and other than routine traffic violations

21    other than, well, like speeding.  But I do need to know about

22    driving under the influence, okay.  Any yeses to that?

23          Okay.  Ms. Marcano, come on up to the witness stand.

24        (Proceedings heard at sidebar:)

25          THE COURT:  All right.  Ms. Marcano, yeah, go ahead

1    and tell us about what happened.

2    PROSPECTIVE JUROR:  This was with my oldest son.  And

3    at the time he was, he was at a young age when we had to send

4    him out to Texas, okay.  He was getting involved a lot with

5    the juvenile courts and running the gangs and stuff like that.

6    But when we -- he came home one morning, and he was

7    beaten on the back due to gang retaliation.  My husband and I

8    said, you know, We have to get you out of this city because

9    it's too much.

10   So during the time that he was in the state of Texas,

11   he got arrested for -- I think he was accused of having -- I

12   can't think of what that's called -- assault with a deadly

13   weapon.  And he went to court, but he had a court date, but he

14   didn't go.  He tried to jump bail, okay.

15   So they did catch him on the bus trying to come back

16   to Chicago.  And he had to do four years.  Ten years was the

17   minimum and the other six years was probation.

18   That's all been cleared up.  It's over and done with.

19   But I'm here in a court, and you have to be honest and

20   truthful, so I'm just gonna give it the way that it is.

21   THE COURT:  Yep.  Thank you.  No, I appreciate it.

22   Let's go back to the experience here in Chicago with

23   the juvenile courts.  Is that where it happened first, the

24   early stuff?

25   PROSPECTIVE JUROR:  The earlier stuff, yes.

1     THE COURT:  Okay.  So these earlier matters, can you

2  give me examples of some of the things that he was getting

3  arrested for?

4     PROSPECTIVE JUROR:  Yeah.  There was a time that he

5  brought a weapon, a sawed-off shotgun into our home.  And I, I

6  took it upon myself to call the police, you know.  If you're

7  gonna raise a child, you've got to be hard on them and not

8  think things are going to be acceptable in your home, okay.

9     THE COURT:  Yeah.

10     PROSPECTIVE JUROR:  So that was one of the things.

11     Other times were -- oh, I don't even know what

12  exactly were all the charges, because I know he got caught a

13  lot in the streets at a young age.  And he was like, it was

14  right after high school.  So he's now going to be 44.

15     THE COURT:  Okay.

16     PROSPECTIVE JUROR MARCANO:  So it was a long time

17  ago.

18     THE COURT:  Yeah.  So did these juvenile arrests

19  start happening during high school?

20     PROSPECTIVE JUROR:  He was going into freshman year,

21  and he never got -- that's when his first --

22     THE COURT:  That's when it started?

23     PROSPECTIVE JUROR:  Yes.

24     THE COURT:  Okay.  And did you ever have to go to

25  juvenile court for any of these cases?

1           PROSPECTIVE JUROR:  Just for the one with the

2   sawed-off shotgun that he had that in the house.

3           THE COURT:  Okay.  And did you have to testify to the

4   Judge?

5           PROSPECTIVE JUROR:  Mm-hmm, yeah.

6           THE COURT:  Okay.  And was he found, you know, guilty

7   or liable for that?

8           PROSPECTIVE JUROR:  Yes, he was.

9           THE COURT:  Okay.  And then what was his sentence for

10   that, if you remember?

11           PROSPECTIVE JUROR:  Oh, I don't know.  He was in,

12   Judge, juvenile detention for a while, yeah.

13           THE COURT:  All right.  And then after that time in

14   detention is when you sent him down to Texas?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Okay.

17           PROSPECTIVE JUROR:  Things just kept progressing with

18   him, and I was having a hard time with him.

19           THE COURT:  For the Texas charge, okay, moving on to

20   Texas, did you ever have occasion to visit him in prison?

21           PROSPECTIVE JUROR:  No, no.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR:  I never went out there.

24           THE COURT:  Yeah.  And then when that all happened in

25   Texas, did you go down to court in Texas?

1      PROSPECTIVE JUROR:  No, no.

2      THE COURT:  All right.  Okay.  And then after he

3  exited that Texas prison sentence, any arrests after that?

4      PROSPECTIVE JUROR:  No.

5      THE COURT:  Okay.  And let me then now ask you some

6  follow-up questions about how it relates to this case, okay.

7  So you will hear testimony and you already heard the case

8  statement about how old, you know, the plaintiff was,

9  Mr. Gray, at the time that he was detained, and that he was a

10  juvenile at that initial time.

11      So does any of these experiences, will they prevent

12  you from being fair to either side in this case?

13      PROSPECTIVE JUROR:  No.

14      THE COURT:  Okay.  Do you have any concern that

15  either you'll be harder on Mr. Gray or more lenient on

16  Mr. Gray and, you know, vice versa with the officers because

17  of this past experience?

18      PROSPECTIVE JUROR:  No, no.

19      THE COURT:  Okay.

20      PROSPECTIVE JUROR:  That's, like, it's the past.

21      THE COURT:  All right.  And then when you evaluate

22  the testimony of a law enforcement officer when they testify,

23  can you evaluate that testimony in the same way you would

24  evaluate the testimony of a non-law enforcement officer?

25      PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  For example, an officer does not

2    start off with a plus, but, also, they don't start with a

3    minus either on this credibility.  Do you understand that?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And you can follow that?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  Any follow-up from the plaintiff?

8          MR. LOEVY:  No.

9          THE COURT:  And Mr. Nathan?

10         MR. NATHAN:  No, Your Honor.

11         THE COURT:  Okay.  Anyone else, Ms. Marcano?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  All right, great.  You can have a seat.

14   Thank you.

15         PROSPECTIVE JUROR:  Thank you.

16      (Proceedings heard in open court:)

17         THE COURT:  Okay.  Anyone else in the back row there?

18         Okay.  And then -- oh, Mr. Peebles is making his way

19   down.

20      (Proceedings heard at sidebar:)

21         THE COURT:  All right.  Mr. Peebles, right into the

22   microphone.  What happened?

23         PROSPECTIVE JUROR:  I have -- I had, he's deceased

24   now, a brother.  He had been convicted before of aggravated

25   arson.

1          THE COURT:  Okay.  So your -- you had a brother who

2     was convicted of aggravated arson.

3          PROSPECTIVE JUROR:  Mm-hmm.

4          THE COURT:  Okay.  And where did this happen?

5          PROSPECTIVE JUROR:  Where?

6          THE COURT:  Yeah.  It would be in the city?

7          PROSPECTIVE JUROR:  Yeah, Chicago.

8          THE COURT:  Okay.  All right.  How long ago was the

9     conviction?

10         PROSPECTIVE JUROR:  Like in the late '80s, early

11    '90s.

12         THE COURT:  Okay.  The last century.  Okay.  So when

13    this happened, around how old were you?

14         PROSPECTIVE JUROR:  My twenties.

15         THE COURT:  Okay.  And did you have occasion in

16    connection with that arrest and conviction to be interviewed

17    by police or anything like that?

18         PROSPECTIVE JUROR:  No, no.

19         THE COURT:  All right.  So were you a witness to it?

20         PROSPECTIVE JUROR:  No.  But you want to know what

21    happened?

22         THE COURT:  Yeah, yeah.

23         PROSPECTIVE JUROR:  Well, he was dating some girl

24    that lived in the neighborhood.  And somehow they had a

25    falling out.  And he lit a garbage can and kicked it in the

1    basement.  And, you know, he kept harassing her and stuff like
2    that.
3           THE COURT:  Okay.  Were you a witness to any of these
4    alleged allegations?
5           PROSPECTIVE JUROR:  No.
6           THE COURT:  Okay.  And did your brother plead guilty
7    or did he go to trial, if you know?
8           PROSPECTIVE JUROR:  I want to say he made a plea
9    deal.
10          THE COURT:  Okay.  And how long ago did he pass?
11          PROSPECTIVE JUROR:  Maybe five years ago.
12          THE COURT:  All right.  And how long was his
13   sentence, if you remember?
14          PROSPECTIVE JUROR:  I think it was 6 to 9 years,
15   something like that.
16          THE COURT:  Okay.  And did you talk with him very
17   much about what happened?
18          PROSPECTIVE JUROR:  No.
19          THE COURT:  All right.  And did he ever admit to you
20   one way or the other or deny what happened?
21          PROSPECTIVE JUROR:  No.  It was just talk around the
22   neighborhood about what was going on.
23          THE COURT:  Okay.  But you never talked to him
24   directly about whether he did it or not?
25          PROSPECTIVE JUROR:  No, not that I can recall, no.

1          THE COURT:  Okay.  And did he ever complain about how

2    he was treated by the police?

3          PROSPECTIVE JUROR:  I mean, he have -- when they

4    tried to arrest him once, and they put a handcuff around him,

5    then he broke away, running with one handcuff on.

6          THE COURT:  All right.  Okay.  Did he suffer any

7    injuries or --

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  All right.  And anything else about how

10   he was treated by the police?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Okay.  Is there anything about that

13   experience that you think would prevent you from being fair to

14   either side in this case?

15         PROSPECTIVE JUROR:  I don't think so.

16         THE COURT:  Okay.  When you say "I don't think so,"

17   right, I just want to make sure.  Like as you sit here right

18   now, is there anything about that conviction and what your

19   brother went through that would prevent you from being fair to

20   either side here?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Okay.  Any follow-up from the plaintiff?

23         MR. LOEVY:  No, Your Honor.  Given that the

24   allegation in this case is that someone was accused of --

25         THE COURT:  Yeah.  We'll talk about it.

1          Mr. Nathan?

2          MR. NATHAN:  Not at this time.

3          THE COURT:  Yeah, okay.

4          Okay.  Anyone else, Mr. Peebles, or just a brother,

5   in terms of, yeah, ever someone being arrested or convicted of

6   anything?

7          PROSPECTIVE JUROR:  Just, I mean, I've got nephews

8   that been in trouble with the law.

9          THE COURT:  Okay.  All right.

10          PROSPECTIVE JUROR:  And I don't know any detail of

11   the case.

12          THE COURT:  Okay.  Was that here in Chicago also?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  And what was it for?

15          PROSPECTIVE JUROR:  I know -- I got a bunch of

16   nephews.  I know one is serving jail time in a federal.  For

17   exactly what, I don't know.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR:  It's ten of us, so there's a lot

20   of nephews.

21          THE COURT:  And you're saying that they've been in

22   trouble at various times?

23          PROSPECTIVE JUROR:  Right.

24          THE COURT:  Okay.  And some of them have to do with

25   the Chicago police?

1          PROSPECTIVE JUROR:  I mean, it happened in the city.

2          THE COURT:  All right, yeah.  So let's just, more

3     globally, have any of your nephews complained to you about how

4     the Chicago police have treated them?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  So is there anything about their

7     experiences that would prevent you from being fair to either

8     side in this case?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Were any of your nephews arrested or

11    convicted for arson?

12         PROSPECTIVE JUROR:  No, not that I know of.

13         THE COURT:  Okay.  All right.

14         Any follow-up questions on that line, Mr. Loevy?

15         MR. LOEVY:  If he thinks he could be a fair juror in

16    this case in light of that.

17         THE COURT:  Yeah, okay.  I think I asked.  But, so in

18    light of your nephews' experiences, can you be fair to both

19    sides in this case?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Okay.  Yeah.  The first category will

22    merit significant discussion.

23         MR. LOEVY:  That's what I --

24         THE COURT:  Let me just put it that way, okay.  Yeah,

25    I don't know if there is more follow-up you have.

1     MR. LOEVY:  Can we ask him about the first category,

2  if he could be fair about that?  And if he is, you know, he

3  hasn't really answered that.

4     THE COURT:  Okay.  So, yeah, Mr. Peebles, you will

5  likely hear evidence that the alleged motive for the alleged

6  arson in this case was in part allegedly based on Mr. Gray's

7  relationship with a girl, okay.  So the evidence is likely

8  also to include allegations that or the argument that Mr. Gray

9  supposedly set the fire in order to harm this girl.

10     So given that like similarity with your brother's

11  situation, do you still believe you could be fair to both

12  sides in this case?

13     PROSPECTIVE JUROR:  Yeah.  Yes, I do.

14     THE COURT:  Okay.  I appreciate the attempt.

15     Anything else for the plaintiff?

16     MR. LOEVY:  What is the concern about?

17     THE COURT:  Yeah, you know, you don't have to ask him

18  more questions.

19     MR. LOEVY:  Okay.

20     THE COURT:  It's okay.

21     Mr. Nathan.  Anything else?

22     MR. NATHAN:  No, Your Honor.

23     THE COURT:  Okay.  All right.  Mr. Peebles, you can

24  step down.  Thank you.

25     (Proceedings heard in open court:)

1        THE COURT:  Okay.  Any yes answer in the first row of

2    the gallery to that question?

3        Okay.  Mr. Lanners, yes, come on up, please.

4      (Proceedings heard at sidebar:)

5        THE COURT:  Okay.  Mr. Lanners, go ahead and tell us

6    what happened.

7        PROSPECTIVE JUROR:  Okay.  It was in either 1980 or

8    '81, I got arrested for disorderly conduct.  It ended in

9    supervision.

10        THE COURT:  All right.  And how old were you at the

11    time?

12        PROSPECTIVE JUROR:  21, 22.

13        THE COURT:  Okay.  And where did it happen?

14        PROSPECTIVE JUROR:  It happened in Wheeling.

15        THE COURT:  Okay.

16        PROSPECTIVE JUROR:  Illinois.

17        THE COURT:  Yeah.  Can you tell me the circumstances

18    generally.

19        PROSPECTIVE JUROR:  Yes.  I was married way too

20    young.  Someone was with my wife.  They ended up getting

21    together.  I was upset and pissed.  We were in the same

22    apartment complex, so I went over there, probably looking to

23    kick his butt.  But I went to the door, hammered on the door.

24    No one was home.  But then his parents shot back, "He's not

25    here," basically go away, which I did.

1          A few days later, the police came and said:  Hey,

2     there is a charge put against you for disorderly conduct.

3          THE COURT:  Okay.  And then did you plead guilty to

4     it or did you go to trial?

5          PROSPECTIVE JUROR:  I pled guilty.  I got that

6     supervision.

7          THE COURT:  Yeah.

8          PROSPECTIVE JUROR:  I had a lawyer.

9          THE COURT:  Yep.  All right.  Did you have to hire a

10    lawyer?  Did you use the public defender?

11         PROSPECTIVE JUROR:  No.  I was working.  I hired a

12    lawyer.

13         THE COURT:  All right.  And after the supervision,

14    the case was over?

15         PROSPECTIVE JUROR:  Yes.  That was, that was it, you

16    know.  I got divorced and that was it.  We had no children,

17    nothing like that.

18         THE COURT:  Yeah.  And then how did the police treat

19    you?

20         PROSPECTIVE JUROR:  They were fine.  They were --

21    they came to the door.  They were nice, polite.  And basically

22    went to the Wheeling police department, did some paperwork,

23    got released and went to court later on, which was in Palatine

24    back then.

25         THE COURT:  All right.  Okay.  Now, so I'll just ask

1    the same or similar question as we discussed earlier, which is

2    anything about that experience that would prevent you from

3    being fair to either side in this case?

4          PROSPECTIVE JUROR:  No, not at all.

5          THE COURT:  Okay.  All right.

6          Any follow-up questions from the plaintiff?

7          MR. LOEVY:  No, Your Honor.

8          THE COURT:  And Mr. Nathan?

9          MR. NATHAN:  No, Your Honor.

10          THE COURT:  Okay.  Mr. Lanners, you can have a seat

11    again.  Thanks.

12          PROSPECTIVE JUROR:  Thank you.

13      (Proceedings heard in open court:)

14          THE COURT:  Okay.  Anyone else with a yes on that?

15    All right.  Okay.

16          Okay.  Next, and if we've talked about this before,

17    probably at a sidebar, there is no need to speak up on it

18    again.  Here is the question:  Have you or a very close family

19    member ever been a firefighter or involved in a fire

20    investigation?

21          Okay.  I see no hands.

22          All right.  Next, this trial is scheduled to be

23    completely over no later than May 26, all right.  You remember

24    getting the earlier letter about three weeks.  And there is a

25    chance that we will finish before that date.  And I'm sure,

1    you know, we'll all keep that in mind and making that a goal.

2         Keeping in mind the crucial importance of jury duty

3    and the crucial function that jurors serve in our system, is

4    there anything in your schedule that would make it difficult

5    for you to serve on the jury?

6         Okay.

7         And then lastly, is there anything else like a

8    philosophical or religious principle that could prevent you

9    from fairly or impartially deciding this case?

10        Okay.  Just sit tight for one second.  Let's get a

11   sidebar.

12        (Proceedings heard at sidebar:)

13        THE COURT:  Okay.  Any follow-up questions for any of

14   these jurors?

15        MR. LOEVY:  Not from the plaintiff, Your Honor.

16        THE COURT:  And Mr. Nathan?

17        MR. NATHAN:  Not from the defendants.

18        THE COURT:  Okay.  All right.  Thank.  We'll swap

19   them out.

20        (Proceedings heard in open court:)

21        THE COURT:  Ladies and gentlemen, we'll do the swap

22   so you can be a little bit more relaxed in the courtroom and

23   I'll see you in a bit.  Again, no research in the case, not

24   the law or the facts.  Don't discuss the case, even amongst

25   yourselves.

1   (Venire out.)

2    THE COURT:  Okay.  You can be seated.

3   (Venire in.)

4    THE COURT:  Okay.  Welcome back, ladies and

5 gentlemen.  I have a few follow-up questions for you.  And the

6 way we'll proceed is I will read off the question.  And if

7 your answer is a yes, just go ahead and raise your hand, and

8 then we'll take the answer over at the sidebar, which is I'm

9 sure your favorite thing to do.

10    First question is as follows:  Have you, your spouse

11 or a very close family member ever worked as a police officer

12 or in law enforcement?

13    And I might have talked to you, some of you about

14 this already.  If you have, you don't need to repeat it.

15    By "very close family member," I mean someone with

16 whom you speak regularly.

17    Okay.  Is there a yes answer to that, anyone?  Okay.

18 So that's Ms. Diaz?

19    PROSPECTIVE JUROR:  Yes.

20    THE COURT:  Okay.  Yeah, come on up to the sidebar.

21    I'll get you, Ms. Nixon, in a second.

22   (Proceedings heard at sidebar:)

23    THE COURT:  Okay.  So aside from the future

24 son-in-law, all right, aside from him, who else are we talking

25 about?

1          PROSPECTIVE JUROR:  I have a nephew that works with

2     the Mount Prospect police department.

3          THE COURT:  Okay.  And is he a sworn officer?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  All right.  And how long has he worked

6     for them?

7          PROSPECTIVE JUROR:  He just started maybe four months

8     ago.

9          THE COURT:  Okay.  And did he work for a police

10    department before that or this is his first time as an

11    officer?

12         PROSPECTIVE JUROR:  This is his first time as an

13    officer.

14         THE COURT:  Okay.  So I should ask you the same

15    thing, do you talk to him very much about what he does, his

16    duties?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  All right.  And do you know whether he's

19    even on patrol or what his assignments are?

20         PROSPECTIVE JUROR:  He just started patrol.

21         THE COURT:  Okay.  All right.  So this will sound

22    familiar, but just to repeat, will you be able to treat law

23    enforcement officers the same way as you evaluate any other

24    non-law enforcement officer testimony?

25         PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Okay.  Anything about your nephew's work

2  that would prevent you from being fair to either side in this

3  case?

4      PROSPECTIVE JUROR:  No.

5      THE COURT:  All right.  Any follow-up, Mr. Loevy?

6      MR. LOEVY:  No, Your Honor.

7      THE COURT:  Mr. Nathan?

8      MR. NATHAN:  No, Your Honor.

9      THE COURT:  Anyone else?

10      PROSPECTIVE JUROR:  Not that I know of.

11      THE COURT:  Thanks.  You can have a seat.  Thank you.

12      PROSPECTIVE JUROR:  Thank you.

13    (Proceedings heard in open court:)

14      THE COURT:  Okay.  Was there another yes in that

15  first row?  No.

16      In the back row, Mr. Struhar, yeah, come on up.

17    (Proceedings heard at sidebar:)

18      THE COURT:  Okay.  Mr. Struhar, who is it?

19      PROSPECTIVE JUROR:  So I never actually met him, but

20  my wife's father was an FBI agent.

21      THE COURT:  Okay.  And did he pass before?

22      PROSPECTIVE JUROR:  Yes.

23      THE COURT:  Yeah, okay.  Has she or maybe another

24  in-law relayed stories about what he did or --

25      PROSPECTIVE JUROR:  Yes.

1          THE COURT: Okay. And can you give me an example?

2          PROSPECTIVE JUROR: Just some examples of cases that

3 he worked throughout his career, but never too specific.

4          THE COURT: Okay. And anything about FBI practices,

5 interrogation techniques, anything of that sort?

6          PROSPECTIVE JUROR: No.

7          And actually, I'm just remembering now, there was a

8 significant fire. He was in the Covington, Kentucky area, and

9 there was a significant fire at, I believe it was a supper

10 club or something of that sort, and he worked the

11 investigation there. But that's all I know about that.

12          THE COURT: Okay. All right. So it doesn't sound

13 like a lot, but to the extent you've picked up anything with

14 regard to law enforcement practices, are you able to set that

15 aside and evaluate the testimony and evidence in this case as

16 you hear it here?

17          PROSPECTIVE JUROR: Yes.

18          THE COURT: Okay. And is there anything about the

19 fact that your wife's father was an FBI agent that would

20 prevent you from being fair to either side in this case?

21          PROSPECTIVE JUROR: No.

22          THE COURT: And so, for example, when you evaluate

23 the testimony of a law enforcement officer, will you be able

24 to evaluate that person's testimony the same way that you

25 would evaluate the testimony of a non-law enforcement officer?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  All right.  So the officer doesn't start

 3    with a plus or a minus.  Do you understand that?

 4              PROSPECTIVE JUROR:  Correct.

 5              THE COURT:  Okay.  Anyone else?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  All right.  Any follow-up questions for

 8    the plaintiff?

 9              MR. LOEVY:  No, Your Honor.

10              THE COURT:  And for the defense?

11              MR. NATHAN:  No, Your Honor.

12              THE COURT:  Thank you, Mr. Struhar.  You can have a

13    seat.

14              PROSPECTIVE JUROR:  Thanks.

15         (Proceedings heard in open court:)

16              THE COURT:  Okay.  Who else in that second row?

17    Mr. Cristofaro.

18         (Proceedings heard at sidebar:)

19              THE COURT:  Okay.  Who are we talking about?

20              PROSPECTIVE JUROR:  My best friend's girlfriend,

21    Katie Huber.  She is a police officer in LaGrange.

22              THE COURT:  Okay.  Your best friend's girlfriend,

23    okay, and in LaGrange.  How long has she worked as an officer,

24    do you know?

25              PROSPECTIVE JUROR:  She's been there about a year.
```

1          THE COURT:  Okay.  And do you know what her duties

2    are, like patrol, detective?

3          PROSPECTIVE JUROR:  I do not.  I know she normally

4    does patrol, but I haven't seen her in a few months, two or

5    three months.

6          THE COURT:  Okay.  Do you talk very much with her

7    about her duties?

8          PROSPECTIVE JUROR:  Her, no.

9          THE COURT:  Okay.  Someone else?

10         PROSPECTIVE JUROR:  No.  I thought you were going to

11   ask how often I see her.  I was going to say I normally see

12   her once a week.

13         THE COURT:  Okay.  But her patrol duties don't come

14   up?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  All right.  So anyone else besides your

17   best friend's girlfriend?

18         PROSPECTIVE JUROR:  No, sir.

19         THE COURT:  Okay.  So I'll just ask you this

20   question:  Is there anything about the fact that she works as

21   a LaGrange officer that would prevent you from being fair to

22   either side in this case?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  All right.  So, for example, when a law

25   enforcement officer testifies, you'll be able to evaluate that

1    person's testimony the same way as a non-law enforcement

2    officer's testimony?

3            PROSPECTIVE JUROR:  Mm-hmm.

4            THE COURT:  Okay.

5            All right.  Any follow-up questions from the

6    plaintiff?

7            MR. LOEVY:  No, Your Honor.

8            THE COURT:  And the defense?

9            MR. NATHAN:  No, Your Honor.

10           THE COURT:  Okay.  Thank you, Mr. Cristofaro.  You

11    can have a seat.

12      (Proceedings heard in open court:)

13          THE COURT:  All right.  Anyone else in that second

14    row?

15          Okay.  Next question then:  Have you ever had a

16    strongly positive or strongly negative experience with law

17    enforcement?

18          Wait.  Did I miss Ms. Nixon?  No.  Did I circle back

19    to you or did I miss you?

20          PROSPECTIVE JUROR:  No, you didn't come back.

21          THE COURT:  Okay.  Ms. Nixon, come on down.  Sorry

22    about that.

23      (Proceedings heard at sidebar:)

24          THE COURT:  Okay, Ms. Nixon.  All right, who was it

25    who was in law enforcement?

1    PROSPECTIVE JUROR:  Okay.  My twin brother.  But he's

2  since been deceased for the past 30 years.

3    Then I have a cousin who's currently serving in the

4  Chicago Police Department and a niece.

5    THE COURT:  Okay.  So let's talk about your twin

6  brother first.  How long ago did he work for the CPD?

7    PROSPECTIVE JUROR:  It was more than 30 years ago.

8    THE COURT:  Okay.  And I'm sorry to ask, but did he

9  pass in the line of duty?

10    PROSPECTIVE JUROR:  No, it wasn't.

11    THE COURT:  Okay.

12    PROSPECTIVE JUROR:  He got into a physical

13  altercation, but it wasn't work time.

14    THE COURT:  I see.  And at the time of his passing,

15  he was still an officer?

16    PROSPECTIVE JUROR:  Yes.

17    THE COURT:  And do you know what kind of duties he

18  was performing in terms of patrol, detective or something

19  else?  Patrol?

20    PROSPECTIVE JUROR:  Yes.

21    THE COURT:  Okay.  And did you talk with him much

22  about his duties and what kinds of things he encountered?

23    PROSPECTIVE JUROR:  He talked about it sometimes,

24  just the type of calls he got or arrests he had.

25    THE COURT:  Okay.  Did he ever talk about things like

1    interrogation techniques or police investigation techniques,
2    anything like that?
3              PROSPECTIVE JUROR:  No.
4              THE COURT:  Okay.  Okay.  Let's talk about, so you
5    have a cousin in the CPD?
6              PROSPECTIVE JUROR:  Yes.
7              THE COURT:  And he or she is still working there?
8              PROSPECTIVE JUROR:  Yes, she is.
9              THE COURT:  Okay.  How long has she worked there?
10             PROSPECTIVE JUROR:  Oh, gosh, probably more than 10
11   years.
12             THE COURT:  Okay.  And is she doing patrol, too?
13             PROSPECTIVE JUROR:  No.  She was originally working
14   women's lockup.  Now I think she's still working women's
15   lockup, yeah.
16             THE COURT:  Okay.  And then same follow-up question
17   there in terms of whether -- has she talked to you much about
18   police investigation techniques, interrogation techniques?
19             PROSPECTIVE JUROR:  No.
20             THE COURT:  All right.  And then you also have a
21   niece with the Chicago Police?
22             PROSPECTIVE JUROR:  Yes.
23             THE COURT:  Okay.  Is that also patrol?
24             PROSPECTIVE JUROR:  She just got promoted.  I'm not
25   sure to what.  But she was patrol.

1          THE COURT:  Okay.  And then same question, did she

2    tell you a lot about her duties and her work?

3          PROSPECTIVE JUROR:  No, we don't talk about her job.

4          THE COURT:  Okay, all right.  Okay.  So keeping these

5    three in mind, is there anything about those relationships and

6    what they did or do for law enforcement that would prevent you

7    from being fair to either side in this case?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And that includes, for example, when you

10   evaluate the testimony of a law enforcement officer, you do

11   have to evaluate that testimony the same way as you would

12   evaluate the testimony of a non-law enforcement officer.  Can

13   you follow that instruction?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  All right.  And so, for example, law

16   enforcement officers start with neither a plus nor a minus,

17   you know, on their credibility.  Do you understand that?

18         PROSPECTIVE JUROR:  Yes, Your Honor.

19         THE COURT:  Okay.  And you can follow that

20   instruction?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  All right.  Any follow-up questions for

23   the plaintiff?

24         MR. LOEVY:  No, Your Honor.

25         THE COURT:  And the defense?

1          MR. NATHAN:  No, Your Honor.

2          THE COURT:  Okay.  Thanks, Ms. Nixon.

3          PROSPECTIVE JUROR:  Thank you.

4      (Proceedings heard in open court:)

5          THE COURT:  Okay.  Let me repeat the question that I

6  prematurely got to:  Have you ever had a strongly positive or

7  strongly negative experience with law enforcement?

8          Okay.  The Sacramento Kings fan, Mr. Dinkel.

9          Are they still in the playoffs?

10         PROSPECTIVE JUROR:  Los Angeles Kings.

11         THE COURT:  Sorry about that.

12         PROSPECTIVE JUROR:  No.  That's all right.

13         THE COURT:  I honestly didn't remember.  I wasn't

14  trying to rub it in.

15         PROSPECTIVE JUROR:  It's their old logo.

16         THE COURT:  Oh, the LA Kings.

17         PROSPECTIVE JUROR:  Yeah.

18         THE COURT:  I see.  Okay.  Let's get the sidebar on.

19      (Proceedings heard at sidebar:)

20         THE COURT:  All right.  Mr. Dinkel, go ahead.

21         PROSPECTIVE JUROR:  I think you've got the last name

22  wrong.  It's DeQuick.  Sorry.

23         THE COURT:  Okay.  We've got the spelling

24  completely --

25         PROSPECTIVE JUROR:  You had it earlier.

1        THE COURT:  Yeah.  I got --

2        PROSPECTIVE JUROR:  Christopher DeQuick.

3        MR. LOEVY:  21.

4        THE COURT:  Yeah, my bad.

5        PROSPECTIVE JUROR:  No worries.  Just wanted to make

6  sure you had it right.

7        I've had some negative experiences with law

8  enforcement.

9        THE COURT:  Okay.  Go ahead and tell me about the

10  most recent one.

11        PROSPECTIVE JUROR:  Oh, it's been years.  Mostly when

12  I was a teenager.  I grew up in a small town in Michigan.  And

13  I was a punk rock kid, so I had weird hair and piercings.  And

14  I used to get harassed by the local police, so.

15        THE COURT:  Were you ever formally arrested?

16        PROSPECTIVE JUROR:  Never arrested.

17        THE COURT:  Okay.  And when you say "harassed," can

18  you give me an example?

19        PROSPECTIVE JUROR:  Yeah.  Asked to get out of the

20  car, searched my car.  They assumed I was on drugs, and I was

21  not.  And that happened multiple times.

22        Another example, I was at a 7-Eleven when I was 16 or

23  17, and someone had robbed it right before I pulled into the

24  parking lot.  And same situation, I was asked to get out of

25  the car, put my hands on the hood, and they searched me.

1          So I've had some negative experiences with law

2   enforcement.

3          THE COURT:  Okay.  And what's the name of the small

4   town again?

5          PROSPECTIVE JUROR:  Harrison Township, Michigan.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR:  But I've never been arrested or

8   anything like that.  Just bad experiences.

9          THE COURT:  Got it.  And so around how long ago would

10  this be?

11         PROSPECTIVE JUROR:  17, 18 years ago.

12         THE COURT:  All right.  Okay.  Anything more recent?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Okay.  Now, it is important that whoever

15  sits on this jury is able to evaluate the testimony of a law

16  enforcement officer --

17         PROSPECTIVE JUROR:  Right.

18         THE COURT:  -- the same way that you would evaluate

19  the testimony of a non-law enforcement officer.

20         PROSPECTIVE JUROR:  Of course.

21         THE COURT:  So officers, yeah, they don't start with

22  a minus, they don't start with a plus.  But, you know, again,

23  they don't start with a minus.  Can you follow that

24  instruction?

25         PROSPECTIVE JUROR:  Absolutely.

1          THE COURT:  Okay.

2          All right.  Any follow-up questions from the

3    plaintiff?

4          MR. LOEVY:  No, Your Honor.

5          THE COURT:  And the defense?

6          MR. NATHAN:  No, Your Honor.

7          THE COURT:  Okay.  Thank you, Mr. DeQuick.

8          PROSPECTIVE JUROR:  Thank you.

9       (Proceedings heard in open court:)

10          THE COURT:  Okay.  Anyone else in that row?

11          Okay.  And then the row behind?  All right.

12          Okay.  Next question.  And, again, if we've spoken

13    about this, you don't have to repeat anything.  Have you or a

14    very close family member ever been arrested for or convicted

15    of a crime, other than speeding and other routine traffic

16    violations?  Although I do need to know about driving under

17    the influence arrests or convictions.

18          Okay.  Once again, by "very close family member," I

19    do mean someone with whom you speak regularly.

20          Okay.  So if we've talked about it before, no need to

21    repeat.  But is there a yes answer to that?

22          Okay.  Mr., is that Cristofaro?  Yeah, come on up.

23       (Proceedings heard at sidebar:)

24          THE COURT:  Okay.  All right.  Can you let us know

25    what happened.

1      PROSPECTIVE JUROR:  Yeah.  My father was arrested for

2  a DUI at this point three years ago.

3      THE COURT:  Okay.  And whereabouts did this happen?

4      PROSPECTIVE JUROR:  Right by Lake Geneva.

5      THE COURT:  Okay.  Did you happen to be with him at

6  the time?

7      PROSPECTIVE JUROR:  I was, yes.

8      THE COURT:  Oh, I see.  So you were a passenger?

9      PROSPECTIVE JUROR:  Yeah, obviously.

10     THE COURT:  Okay.  And so how did the police treat

11 you and your father?

12     PROSPECTIVE JUROR:  Overall, I thought we were

13 treated fairly.

14     THE COURT:  Okay.  And was he brought down to the

15 police station?

16     PROSPECTIVE JUROR:  Mm-hmm.

17     THE COURT:  And then you do need to say "yes" or "no"

18 for the record.

19     PROSPECTIVE JUROR:  Yes.  Sorry.

20     THE COURT:  Okay.  Did you go with him to the police

21 station?

22     PROSPECTIVE JUROR:  Yes.

23     THE COURT:  All right.  And at the police station,

24 how did they treat you?

25     PROSPECTIVE JUROR:  I just sat in a waiting room

1    until he was released.

2           THE COURT:  Okay.  Did they ever ask you questions or

3    not?

4           PROSPECTIVE JUROR:  No, they did not ask me anything.

5           THE COURT:  Okay.  And so three years ago you would

6    have been how old?

7           PROSPECTIVE JUROR:  I would have been -- at the time

8    I was 20.  So I wasn't yet 21.

9           THE COURT:  Okay, all right.  And so then what

10   happened to the case?  Did he plead guilty?  Did he go to

11   trial?  Was it dismissed?

12          PROSPECTIVE JUROR:  Yeah, he went to trial.  He had

13   to drive with a breathalyzer in the car.  So obviously in

14   order for the car to start, he had to blow under .08.  And

15   that was about it.

16          THE COURT:  Okay.  When he went to trial, did you

17   testify in any way?

18          PROSPECTIVE JUROR:  Mm-hmm, no.  Sorry.

19          THE COURT:  Okay.  And when you say he went to trial,

20   I just want to make sure, so he decided to plead not guilty

21   and he went to trial?

22          PROSPECTIVE JUROR:  No.  He did plead guilty.  I did

23   not go with him.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR:  But yes, he pleaded guilty.

1          THE COURT:  I see, all right.  Okay.  Then did he

2     hire a lawyer?  Or did he have a public defender?

3          PROSPECTIVE JUROR:  He hired a lawyer.  Who, I could

4     not tell you.

5          THE COURT:  Okay.  Okay.  Anything about that

6     experience that would prevent you from being fair to either

7     side in this case?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And with regard -- and I think I asked

10    you this with respect to the LaGrange officer.  But same

11    thing, can you evaluate the testimony of law enforcement

12    officers the same way as non-law enforcement officers?

13         PROSPECTIVE JUROR:  Mm-hmm, yes.

14         THE COURT:  Okay.  You'll get the hang of it.

15         All right.  Any follow-up questions from the

16    plaintiff?

17         MR. LOEVY:  No.

18         THE COURT:  And Mr. Nathan?

19         MR. NATHAN:  No.

20         THE COURT:  Okay.  Thank you, Mr. Cristofaro.

21       (Proceedings heard in open court:)

22         THE COURT:  Okay.  Anyone else with a yes in that?

23         A PROSPECTIVE JUROR:  Could you repeat the question?

24         THE COURT:  Sure, I'll repeat it.  It is:  Have you

25    or a very close family member ever been arrested for or

1  convicted of a crime, other than speeding and other than

2  routine traffic violations?  I do need to know about driving

3  under the influence, okay.

4      Okay.  But did I see -- yes.  All right, Ms. Heck.

5      And just so I don't forget, Ms. Miller was the other

6  one who raised?  Okay.

7      (Proceedings heard at sidebar:)

8      THE COURT:  Okay.  Ms. Heck, go ahead and tell us

9  what happened.

10      PROSPECTIVE JUROR:  Yes.  My brother was convicted of

11  driving under the influence.

12      THE COURT:  Okay.  And how long ago was this?

13      PROSPECTIVE JUROR:  Marijuana.  Probably about 12

14  years ago.  And it was removed from his record.

15      THE COURT:  I see.  And so where did this happen?

16      PROSPECTIVE JUROR:  Virginia.

17      THE COURT:  Did you happen to be with him at the

18  time?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  Okay.  So you never had occasion as he

21  was going through the court process to talk to the prosecutor

22  or officers?

23      PROSPECTIVE JUROR:  No.

24      THE COURT:  All right.

25      PROSPECTIVE JUROR:  Just my mother, who was working

1    with one of her colleagues as the attorney.

2         THE COURT:  Okay.  And how old would you have been at

3    the time?

4         PROSPECTIVE JUROR:  I was probably 24.

5         THE COURT:  Okay.  And then how old was he at the

6    time?

7         PROSPECTIVE JUROR:  He was 22.

8         THE COURT:  Okay.  So then what happened with the

9    case?  Did it get dismissed?  Did he plead guilty?  Did he go

10   to trial?

11        PROSPECTIVE JUROR:  I believe that he pleaded guilty

12   and they gave him community service.

13        THE COURT:  Okay.  Is there anything about that

14   experience that would prevent you from being fair to either

15   side in this case?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  And did he, did your brother ever

18   complain, for example, about how the officers treated him?

19        PROSPECTIVE JUROR:  No.

20        THE COURT:  Okay.  So will you be able to evaluate

21   the testimony of law enforcement officers the same way you

22   evaluate the testimony of non-law enforcement officers?

23        PROSPECTIVE JUROR:  Yes.

24        THE COURT:  Okay.

25        All right.  Any follow-up questions from the

1 plaintiff?

2       MR. LOEVY:  No.

3       THE COURT:  And Mr. Nathan?

4       MR. NATHAN:  Just did Ms. Heck's brother give a

5 statement in connection with this incident?

6       THE COURT:  If you know, did your brother actually

7 make statements to the police after they pulled him over?

8       PROSPECTIVE JUROR:  I believe so, but I'm not

9 positive.

10       THE COURT:  Okay.

11       All right.  Anything else, Mr. Nathan?

12       MR. NATHAN:  No, Your Honor.

13       THE COURT:  All right.  Okay.  Thank you.  You can

14 have a seat.

15       PROSPECTIVE JUROR:  Thank you.

16     (Proceedings heard in open court:)

17       THE COURT:  Okay.  Now Ms. Miller.

18     (Proceedings heard at sidebar:)

19       THE COURT:  All right.  Ms. Miller, go ahead and tell

20 us about the answer.

21       PROSPECTIVE JUROR:  DUI.

22       THE COURT:  Okay.  And was that you personally?

23       PROSPECTIVE JUROR:  It was 30 years ago.

24       THE COURT:  Okay.  And so how old would you have been

25 at the time?

1    PROSPECTIVE JUROR:  29 or 30.

2    THE COURT:  And where did it happen?

3    PROSPECTIVE JUROR:  In Fox River Grove.

4    THE COURT:  Can you talk right into the mic.

5    PROSPECTIVE JUROR:  In Fox River Grove.

6    THE COURT:  Okay.  Fox River Grove.  All right.

7    And how did the police treat you?

8    PROSPECTIVE JUROR:  I don't remember.  It was a

9 long -- I mean, I wasn't beaten up or anything like that.

10    THE COURT:  Okay.  All right.  So nothing stands out

11 in your memory as to either bad or good?

12    PROSPECTIVE JUROR:  No.

13    THE COURT:  Okay.  And what happened with the case?

14 Did you plead guilty, go to trial?  Was it dismissed?

15    PROSPECTIVE JUROR:  It was dismissed.

16    THE COURT:  Okay.  Okay.  Is there anything about

17 that experience that would prevent you from being fair to

18 either side in this case?

19    PROSPECTIVE JUROR:  No.

20    THE COURT:  And so, for example, in evaluating law

21 enforcement officer testimony, you'll be able to evaluate that

22 testimony the same way as a non-law enforcement officer?

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  Okay.  Any follow-up questions from the

25 plaintiff?

 1          MR. LOEVY:  No, Your Honor.

 2          THE COURT:  Mr. Nathan?

 3          MR. NATHAN:  No, Your Honor.

 4          THE COURT:  Okay.  Thank you.  You can have a seat.

 5       (Proceedings heard in open court:)

 6          THE COURT:  Okay.  Anyone else in that second row?

 7  All right.

 8          Okay.  Next question:  Have you or a very close

 9  family member ever been a firefighter or involved in a fire

10  investigation?  And, once again, if we've discussed this,

11  there is no need to raise your hand again.  Okay, firefighter

12  or fire investigation.

13          Okay.  Someone other than the --

14          PROSPECTIVE JUROR:  No.  My son.

15          THE COURT:  Yeah.  So yeah, other than him, that's

16  it.  Okay.  That's fine.

17          All right.  Any other yes answers to that one?

18          And just for the record, that was, yeah, Ms. Miller,

19  and we did discuss her son's employment as a firefighter.

20          Okay.  Next question.  So this trial is, as you know

21  from the previous letter you received, is scheduled to be

22  completely over no later than May 26.  And there is a chance

23  that we will finish before that date, and we'll try everything

24  we can in our power to do so.

25          So keeping in mind the crucial importance of the jury

1  system and jury duty, is there anything in your schedule that

2  would make it difficult for you to serve on this jury?

3      Okay.  Mr. DeQuick first.

4   (Proceedings heard at sidebar:)

5      THE COURT:  Okay.  I think you were the solo video

6  editor, is that what is going on?

7      PROSPECTIVE JUROR:  Yeah, I'm the only audio operator

8  at my company right now.

9      THE COURT:  And when you say "Audy," you mean the

10  company Audy, A-U-D-Y?

11      PROSPECTIVE JUROR:  No, no, no.  Audio operator.  I'm

12  sorry.

13      THE COURT:  Audio, okay.

14      PROSPECTIVE JUROR:  So we film television shows

15  there.  We currently are filming three different shows weekly.

16  And I have someone filling in that's not fully trained.  So

17  they're a little -- they're concerned about it.

18      THE COURT:  Okay.

19      PROSPECTIVE JUROR:  That's the biggest issue.  I

20  don't think that I can use this as like an excuse.  I did just

21  found out my best friend's dad passed away yesterday in

22  Michigan.

23      THE COURT:  Okay.

24      PROSPECTIVE JUROR:  And I would like to go to the

25  funeral.  It's on Wednesday.  But I also understand that I got

1    called to do this.

2              THE COURT:  Okay.  Yeah.  I'm sorry to hear about the

3    passing.

4              And that's, it's not local.  You said it's in

5    Michigan?

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  Okay.  And then with respect to your job,

8    so the only person who does what you do is not yet trained?

9              PROSPECTIVE JUROR:  Correct.  Basically, the only

10   person at that building that can do what I do is me, which has

11   been an issue for a while.

12             THE COURT:  So when you go on vacation, let's say,

13   what happens?

14             PROSPECTIVE JUROR:  They throw someone in that

15   doesn't know what they're doing.

16             THE COURT:  Okay.  And so then that impacts the work

17   in that --

18             PROSPECTIVE JUROR:  Quality of work basically.

19             THE COURT:  Okay.

20             PROSPECTIVE JUROR:  Yeah.

21             THE COURT:  Okay.  Any follow-up questions for the

22   plaintiff?

23             MR. LOEVY:  No, Your Honor.

24             THE COURT:  Okay.  For the defense?

25             MR. NATHAN:  No, Your Honor.

1          THE COURT:  Okay.  Thank you, Mr. DeQuick.

2          PROSPECTIVE JUROR:  Thank you.

3      (Proceedings heard in open court:)

4          THE COURT:  Okay.  And then Ms. Heck.  Yep.

5      (Proceedings heard at sidebar:)

6          THE COURT:  Okay.  Ms. Heck.

7          PROSPECTIVE JUROR:  I have vacation scheduled.  I'm

8  supposed to leave for Turkey the evening of the 19th.

9          THE COURT:  Okay.  So had you noted this in the

10  response?

11          PROSPECTIVE JUROR:  I didn't see anywhere to note

12  vacation plans.

13          THE COURT:  Okay.  Yeah, it just asked if, I think it

14  was very generic, like if there was anything that would

15  prevent you from serving.

16          PROSPECTIVE JUROR:  I think that was -- I had noted

17  it stated something about hardship, which I didn't think that

18  this qualified.

19          THE COURT:  Okay.  So this vacation, is it prepaid?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  So if you had to move it, what would --

22  there is a financial penalty involved?

23          PROSPECTIVE JUROR:  I would assume so, but I don't

24  know.  I might be able to reschedule dates.

25          THE COURT:  Okay.  And then how long ago did you make

1    it, the plans?

2            PROSPECTIVE JUROR:  Probably two months ago.

3            THE COURT:  Okay.  Any follow-up from the plaintiff?

4            MR. LOEVY:  No, Your Honor.

5            THE COURT:  And the defense?

6            MR. NATHAN:  No, Your Honor.

7            THE COURT:  Okay.  All right.  Thank you.  You can

8    have a seat.

9        (Proceedings heard in open court:)

10            THE COURT:  Okay.  Anyone else?

11        Okay.  Mr. Cristofaro.

12        (Proceedings heard at sidebar:)

13            THE COURT:  Okay.  All right.  What's going on?

14            PROSPECTIVE JUROR:  I was detained or arrested for my

15    license being wrongfully suspended.  So I have a court date

16    with Cook County on May 18th, which is Thursday of next week.

17            And then I was arrested by North Riverside Police

18    Department.  So I have a court date with their village hall on

19    May 25th or the Wednesday of the following week, which I think

20    is the 25th.

21            THE COURT:  Okay.

22            PROSPECTIVE JUROR:  I can give you a detailed story

23    if you would like to know.

24            THE COURT:  Yeah, go ahead.

25            PROSPECTIVE JUROR:  I got a ticket, a speeding ticket

1   last June.  On the ticket it said I did not need to appear in

2   court as long as I paid the fee online.  I did so on August

3   1st and received a receipt on August 2nd.  For whatever

4   reason, that transaction did not go through through the Cook

5   County Clerk's Office.

6          So when I did not show up for my court date, and they

7   saw that I did not pay, they assumed that I was fleeing or

8   didn't care to show up.

9          Then my license was suspended.  But I was not

10  notified, A, that I missed court or, B, that I -- my license

11  was suspended.

12         So I drove since about November on a suspended

13  license without knowing until I got pulled over for my license

14  plates not being renewed.  And then when they looked up my

15  license, they found that it was suspended and, yeah.

16         THE COURT:  Okay.  And so the first date is for

17  driving on a suspended license?

18         PROSPECTIVE JUROR:  Yep.

19         THE COURT:  The second date is for what?

20         PROSPECTIVE JUROR:  It is for paying $1100 to get my

21  car out from the tow with Riverside Police.

22         THE COURT:  Oh, I see.  So that's not a court date.

23  You just have an appointment.

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Okay.  And you have to make appointments

1    to retrieve your car?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  All right.  And is that like the earliest

4    time appointment you were able to make?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  Okay.  All right.  And then the May 18th

7    date is actually a court date?

8              PROSPECTIVE JUROR:  Is an actual court date.

9              THE COURT:  Okay.

10             All right.  Any follow-up questions from the

11   plaintiff?

12             MR. LOEVY:  No, Your Honor.

13             THE COURT:  And from the defense?

14             MR. NATHAN:  No, Your Honor.

15             THE COURT:  All right.  Okay.  Thank you.

16         (Proceedings heard in open court:)

17             THE COURT:  Okay.  Anyone else?  Okay.  Great.

18             Last question then:  Is there anything else like a

19   philosophical or religious principle that could prevent you

20   from fairly and impartially deciding this case?

21             Okay.  I see no hands.

22             All right.  So I'm going to send you back to the more

23   comfortable courtroom.  The lawyers and I will finish up jury

24   selection in the meantime.  Again, no research into the case,

25   not the law or facts.  Don't discuss the case, not even

1     amongst yourselves.  And I'll see you in a bit.

2          (Venire out.)

3               THE COURT:  Please be seated.

4               Let's power through the for causes challenges so you

5     can have a little more time for peremptories and have a break

6     at the same time.

7               So first, juror number 1, Ms. Lothe, any for cause

8     from the plaintiff?

9               MR. LOEVY:  No, Your Honor.

10              THE COURT:  Defense?

11              MR. NATHAN:  Yes.  We move for cause on juror number

12    1.

13              THE COURT:  Okay.  The basis?

14              MR. NATHAN:  She said that she, in connection with

15    her work as an advocate she -- it was too emotional for her.

16    And given the fact that the plaintiff was at around the same

17    age, we don't think she could be fair.

18              THE COURT:  Okay.  Yeah, I mean, I think her kids

19    were actually much younger.  But more importantly, I did

20    believe her when she said that she could be fair, despite her

21    former role as a CASA voluntary as well as just how it

22    impacted her.

23              I think she volunteered, in fact, that it depends on

24    what I hear, she said.  And so I think she can be fair.  So

25    that for cause challenge is rejected.

1    Okay.  Number 2, Mr. Herzer, any for cause from the

2    plaintiff?

3         MR. LOEVY:  No.

4         THE COURT:  Defense?

5         MR. NATHAN:  No.

6         THE COURT:  Okay.  Number 3, Ms. Smith, any for cause

7    from the plaintiff?

8         MR. LOEVY:  No.

9         THE COURT:  Defense?

10        MR. NATHAN:  No.

11        THE COURT:  Just pause a little bit for the court

12   reporter.

13        MR. NATHAN:  I apologize.

14        THE COURT:  No, no.  I'm doing it.  So don't worry

15   about it.

16        Okay.  Juror number 4, Ms. Welsh, any for cause for

17   the plaintiff?

18        MR. LOEVY:  We didn't like her.

19        THE COURT:  Aside from using a peremptory, any for

20   cause challenge?

21        MR. LOEVY:  No.

22        THE COURT:  Defense?

23        MR. NATHAN:  No, Your Honor.

24        THE COURT:  Okay.  Number 5, Ms. Myzia, any for cause

25   for the plaintiff?

1            MR. LOEVY:  No.

2            THE COURT:  Defense?

3            MR. NATHAN:  No.

4            THE COURT:  Any for cause on number 6, Ms. Zeitz,

5 plaintiff?

6            MR. LOEVY:  No.

7            THE COURT:  Defense?

8            MR. NATHAN:  No, Your Honor.

9            THE COURT:  All right.  We've already struck by

10 agreement Mr. Patel unfortunately due to the English

11 impediment.

12            Okay.  Number 8, Ms. Nixon, any for cause for the

13 plaintiff?

14            MR. LOEVY:  No.

15            THE COURT:  Defense?

16            MR. NATHAN:  No, Your Honor.

17            THE COURT:  Number 9, Ms. Neustadt, any for cause for

18 the plaintiff?

19            MR. LOEVY:  No.

20            THE COURT:  Defense?

21            MR. NATHAN:  No.

22            THE COURT:  Okay.  Now, number 10, Ms. Su -- yeah,

23 Mr. Nathan, do you want to argue your point on the English

24 language issue?

25            MR. NATHAN:  Yes.  I thought that she didn't always

1    speak into the microphone, but she answered the questions

2    without a problem, and I thought she understood the Court's

3    questioning and gave responsive answers and was able to

4    understand without a problem.

5            MR. LOEVY:  Although --

6            THE COURT:  Yeah, and the plaintiff disagrees.

7            MR. LOEVY:  Well, she said she listens to NPR News,

8    you know, which is not something that a non-English speaker

9    does.  You know, we get all kinds of jurors with all kinds of

10   life experiences, you know, that are citizens from a long time

11   ago or recently.

12           THE COURT:  Yeah, I mean, it's absolutely not about

13   experiences.  And both the jury and the nation is enriched by

14   those from different backgrounds.

15           My concern is her language ability.  And I was

16   sitting close enough to hear the words she was saying.  So I

17   don't think it was a microphone issue.  It was more of a, I

18   think, language barrier unfortunately.

19           I did have to ask her several times to give me an

20   example of her data analysis.  She eventually did provide one.

21   But I just, I think it was, it was too difficult and too much

22   of a barrier.  I'm going to strike Ms. Su.

23           Okay.  Juror number 11, Ozier, any for cause for the

24   plaintiff?

25           MR. LOEVY:  No.

1          THE COURT:  Defense?

2          MR. NATHAN:  No.

3          THE COURT:  12 is Ms. Marcano.  Any for cause for the

4    plaintiff?

5          MR. LOEVY:  No.

6          THE COURT:  Defense?

7          MR. NATHAN:  One moment, Your Honor.

8          THE COURT:  All right.

9       (Discussion off the record between counsel.)

10          MR. NATHAN:  Yes, we would move for cause on juror

11   number 12, Ms. Marcano.  She talked about her son having what

12   seemed like extensive experiences in the juvenile justice

13   system.  She mentioned a few of those instances, one where he

14   came home with a sawed-off shotgun and she had to appear in

15   court.

16          He was in the juvenile detention center.  I wasn't

17   clear which juvenile detention center, but it sounded like it

18   may be the same juvenile detention center as the plaintiff

19   spent time in.

20          We didn't get into whether she visited her son at

21   that time, but presumably she did.

22          It also sounded like there were other encounters

23   between her son and the juvenile justice system that we didn't

24   necessarily go into, but her son was -- she mentioned that her

25   son got caught in the streets and that he had been -- had

1    multiple encounters with police as a juvenile before he even

2    went to Texas, when she sent her son to Texas, where he had

3    additional issues with law enforcement and spent years in

4    custody.

5              THE COURT:  Okay.  Response.

6              MR. LOEVY:  Your Honor, we are not, Mr. Gray is not

7    expecting a jury entirely of wealth managers from Kenilworth.

8    It's supposed to be a cross-section of the community with all

9    kinds of experiences.

10             The only relevant question we should be asking right

11   now is could she be fair.  She said, absolutely said she could

12   be fair.

13             THE COURT:  Yeah, I agree.  I think also she

14   described that she was the one, for example, to call the

15   police with regard to the shotgun incident.  And she was

16   espousing basically, you know, a form of getting tough with

17   him as well.

18             So I don't think this experience is going to

19   necessarily make her sympathetic to the plaintiff in any kind

20   of unfair way.  And I credit her response when she said she

21   could be fair.

22             So without disparaging people from Kenilworth, the

23   objection is overruled.

24             Okay.  13, Mr. Laughlin, any for cause for the

25   plaintiff?

1    MR. LOEVY:  No, Your Honor.

2    THE COURT:  Defense?

3    MR. NATHAN:  No, Your Honor.

4    THE COURT:  Okay.  Number 14, Mr. Peebles, okay.  Any

5    for cause for the plaintiff?

6    MR. LOEVY:  No, Your Honor.  I mean, this is the

7    juror that arguably we should be concerned about.  And

8    we're -- we credited him when he said he could be fair.

9    THE COURT:  Defense?

10    MR. NATHAN:  No, Your Honor.

11    THE COURT:  Okay.

12    MR. NATHAN:  No, Your Honor.

13    THE COURT:  Okay.  15, Dinkel, any for cause for the

14    plaintiff?

15    MR. LOEVY:  Not for cause, Your Honor.

16    THE COURT:  Okay.  Defense?

17    MR. NATHAN:  No, Your Honor.

18    THE COURT:  Okay.  Number 16, Mr. Brown, any for

19    cause for the plaintiff?

20    MR. LOEVY:  No.

21    THE COURT:  Defense?

22    MR. NATHAN:  No.

23    THE COURT:  Okay.  17, Mr. Gobrogge, any for cause

24    for the plaintiff?

25    MR. LOEVY:  No.

1          THE COURT:  Defense?

2          MR. NATHAN:  No.

3          THE COURT:  18, Ms. Garapolo, any for cause for the

4  plaintiff?

5          MR. LOEVY:  No.

6          THE COURT:  Defense?

7          MR. NATHAN:  You know, Your Honor, can we just go

8  back to 17?  I meant -- I missed my notes here.  I do have a

9  for cause for 17.

10          THE COURT:  Okay.

11          MR. NATHAN:  Mr. Gobrogge expressed, I believe,

12  confusion as to the role of a police officer.  He talked about

13  how when he was arrested in Rolling Meadows he was -- he

14  thought that it changed his life, the fact that the police

15  officer granted him leniency despite, you know, admitting that

16  there was probable cause for his arrest.  And he admitted to

17  having an opioid addiction at the time and being caught for

18  some type of theft.

19          And he talked about the police being able to bend

20  their abilities in the police station.  And for that reason,

21  we don't think he can be fair.

22          THE COURT:  Yeah.  He was only putting in non-legalese

23  terms the discretion that officers have in terms of arresting

24  someone and what charges to bring.  And then he correctly said

25  that the Court sentences.  So I don't have any concern that he

1  has some incorrect view of police discretion.  So that's

2  rejected.

3       Okay.  Moving forward again, I think we're, yeah,

4  number 19, Lanners.  Any for cause for the plaintiff?

5       MR. LOEVY:  Well, he was aligned with law enforcement

6  extensively, and so we had a question about whether he could

7  be fair.

8       THE COURT:  Okay.  And defense, you object?  Or you

9  oppose the for cause?

10       MR. NATHAN:  Yes.

11       THE COURT:  Okay.  I agree.  I think yes, he's a

12  community service officer.  But he handles nonemergency

13  duties.  And he I think with great confidence expressed that

14  he could be fair.  And he's the one who offered that I need to

15  hear the facts.  So I think I certainly do credit that

16  expression of fairness.

17       So the for cause is rejected.

18       Okay.  20, Schultz?

19       MR. LOEVY:  No, Your Honor.

20       THE COURT:  And defense?

21       MR. NATHAN:  No, Your Honor.

22       THE COURT:  Okay.  21, DeQuick.  I do propose to --

23  we have some flexibility here I think in terms of the numbers,

24  given the scheduling issue that he has, is there any objection

25  to striking him for the plaintiff?

1    MR. LOEVY:  Before I answer that, Your Honor, aren't

2 we past the magic number of how many jurors there is going to

3 be?  If it's 9 plus 3 strikes per side, I think we are past

4 that, unless I'm missing how you are doing it.

5    THE COURT:  Okay.  So let's see, so it's 15.  And

6 we've lost Patel and Su.  Okay.  No, you are correct.  I don't

7 think we can even get to 21 at this point.  Yeah, because

8 we've only got, yeah, just Patel and Su, I think.

9    MR. LOEVY:  Yeah.

10    THE COURT:  Okay, yeah, we can stop, because I'm not

11 going to, you know, shuffle at the end.

12    Okay.  Take 'til 3:10 to think about your

13 peremptories and then hand them up at 3:10.

14    Is the attorney-witness room open for one side or the

15 other?  Okay, great.  Thank you.

16    MR. NATHAN:  Your Honor, maybe we have one moment?

17    THE COURT:  Yes.

18  (Discussion off the record.)

19    MR. LOEVY:  So, Your Honor, I think it's a little --

20 we're going to probably reach an agreement to stipulate to

21 dismiss a juror, with Your Honor's permission.  And that's

22 part of a partial partial partial settlement agreement that's

23 going to be resolving the issue against some of the

24 defendants.

25    So may we have a moment to confer?

1          THE COURT:  Okay.

2          MR. LOEVY:  Thank you.

3       (Discussion off the record.)

4          THE COURT:  Okay.  What's happening?

5          MR. LOEVY:  We're trying to simplify the case, Your

6  Honor.  So that's good if we can achieve that.

7          Do you guys want to do the half?

8          MR. NATHAN:  I'm just trying to tell Your Honor what

9  the situation is.  Mr. Loevy has agreed to dismiss --

10         MR. LOEVY:  Mr. Davis.

11         MR. NATHAN:  -- Mr. Davis in exchange for us agreeing

12  to dismiss one of three specified jurors.

13         MR. LOEVY:  Correct.

14         MR. NATHAN:  And we're supposed to figure out which

15  one of those three.

16         MR. LOEVY:  They get to pick.

17         MR. NATHAN:  That's what we're trying to figure out

18  at the moment.

19         THE COURT:  Are you trying to figure out which one of

20  the three?

21         MR. NATHAN:  Yes.

22         THE COURT:  But you otherwise have an agreement?

23         MR. LOEVY:  Yes.  So Mr. Davis is out.

24         So we could treat it as a peremptory -- you know, if

25  you want to be technical about it, they could strike four, and

1   one of their four will be one of those three people.  But I
2   would like to know which one.
3           THE COURT:  Yeah.  I'm -- okay.  So go ahead.  And
4   you can now strike four, okay.  And let's come back at 3:15.
5           MR. LOEVY:  Okay.
6           MR. NATHAN:  Thank you.
7           THE COURT:  Thank you.
8           MR. LOEVY:  But you guys have got to tell me which
9   one.
10          MR. NATHAN:  Okay.
11          MR. LOEVY:  Thank you.
12      (Discussion off the record.)
13          THE COURT:  Okay.  Let's go on the record then.
14          MR. NATHAN:  Mr. McInerney may not be able to be here
15  throughout the entire trial.  It's due to care he has to
16  provide for his wife.  So I just wanted to give Your Honor a
17  heads-up about that.
18          THE COURT:  Okay.  Is there any objection to that?
19          MR. LOEVY:  No, Your Honor.
20          THE COURT:  Okay.  Any objection to me telling the
21  jury when the first absence happens that I've authorized
22  periodic absences?
23          MR. LOEVY:  No objection.
24          THE COURT:  Okay.  All right.  That's fine.
25          MR. NATHAN:  Thank you.

1        (Recess.  Proceedings heard in open court.  Venire out.)

2        MR. LOEVY:  Your Honor, if you will permit it, we've

3 reached an agreement between the sides that we -- the

4 plaintiffs are going to dismiss Percy Davis from the case in

5 exchange for an agreed stipulation between the two sides that

6 juror number 2 will be struck.

7        THE COURT:  Okay.  That's Mr. Herzer.

8        MR. LOEVY:  Yes.

9        THE COURT:  Okay.  Is that correct, Mr. Nathan?

10       MR. NATHAN:  Yes, Your Honor.

11       THE COURT:  Okay.  I will adopt that.

12       And why don't I not tell the jury until tomorrow,

13 okay.

14       MR. LOEVY:  You are going to make them all come back?

15       THE COURT:  No.  No, no, no.  Not tell the seated

16 jury, which we will bring in in a minute, that Mr. Davis is

17 going to be dropped from the case.  That probably should be

18 accompanied by an instruction that the jury should take no

19 inference from the fact that he's no longer in the case.

20       And then we'll go right into openings, and they won't

21 think about it again, as opposed to if we do it now, I think

22 they'll be kind of wondering what's happening.

23       Any problem with that?

24       MR. NATHAN:  No.

25       MR. LOEVY:  No.

1      THE COURT:  Okay.  So peremptories were -- you can

2  have a seat -- for the plaintiff, number 4, Welsh; 15, Dinkel;

3  backtracking, number 5, Myzia.

4      Okay.  Defense strikes are as we discussed, number 2,

5  Herzer; okay, then 13 is Mr. Laughlin; 16, Mr. Brown; and 17,

6  Gobrogge.

7      So the nine are Lothe, number 1; number 3, Ms. Smith;

8  number 6, Ms. Zeitz; number 8, Ms. Nixon; number 9,

9  Ms. Neustadt; number 11, Ms. Ozier; number 12, Ms. Marcano; 14

10  is Peebles; and 18, Garapolo.

11      Okay.  Does that square with the plaintiff's list?

12      MR. LOEVY:  It does, Your Honor.

13      THE COURT:  And the defense?

14      MR. NATHAN:  Yes, Your Honor.

15      THE COURT:  Okay.  Okay.  So we'll just bring those

16  back into the jury box.

17      (Venire in.)

18      THE COURT:  Ms. Nixon we are going to squeeze in

19  between Ms. Zeitz and Ms. Neustadt.  Sorry about that.  If you

20  can let Ms. Nixon pass you there.  Thanks.

21      There you go.  And then Ms. Ozier, if you can go down

22  to that one.  Yep, that will be great, a little closer to the

23  witness box.

24      Mr. Marcano, there you go.  Mr. Peebles and

25  Ms. Garapolo.  Okay.  Excellent.  Please be seated.

1       Okay.  Ladies and gentlemen, you are now the jury in

2  the case, and we do need to administer another oath to you.

3  And I'll ask the courtroom deputy to do that.

4       THE COURTROOM DEPUTY:  If the jurors could please

5  raise your right hands.

6    (Jury sworn.)

7       THE JURY:  (By all)  Yes.

8       THE COURT:  Okay.  So ladies and gentleman, I do ask

9  you to just go ahead and sit in these specific seats, all

10  right.  So each time that you come into court and are let in

11  either by the law clerk or the courtroom deputy, so try to

12  remember where you are sitting now and who is sitting next to

13  you and so on.

14       I want to take a few minutes to tell you something

15  about your duties as jurors and to give you some instructions.

16       At the end of the trial I will give you more detailed

17  instructions and those instructions will control your

18  deliberations.

19       One of my duties is to decide all questions of law

20  and procedure.  From time to time during the trial and at the

21  end of the trial I will instruct you on the rules of law that

22  you must follow in making your decision.

23       You should not take anything that I may say or do

24  during the trial as indicating what I think of the evidence or

25  what your verdict should be.

1    The trial will proceed in the following manner,

2  following order:  First, tomorrow morning we'll start out with

3  opening statements.  And the plaintiff's attorney will make an

4  opening statement.  Next the defendant's attorney will make an

5  opening statement.

6    An opening statement is not evidence, okay, but is

7  simply a summary of what the attorneys expects the evidence to

8  be.  Okay.  So the opening statements themselves are not

9  evidence.

10    After the opening statements, the plaintiff will call

11  witnesses and present evidence.  The defendants will have an

12  opportunity to call witnesses and present evidence.  And after

13  the parties' main cases are completed, then the plaintiff may

14  be permitted to present some rebuttal evidence.

15    After the evidence has been presented, the attorneys

16  will make closing arguments, and I will instruct you on the

17  law that applies to this case.  After that, you'll go to the

18  jury room to deliberate on your verdict.

19    As I told you earlier, the positions of the parties

20  can be summarized as follows:  This is a Federal civil rights

21  lawsuit brought under a law that provides a remedy to persons

22  who allege that they have been deprived of their Federal

23  Constitutional rights.

24    The plaintiff in this case is Adam Gray.  The

25  defendants in the case are Percy Davis, Daniel McInerney, and

1    then as you will recall the estates of, right, the following

2    deceased individuals, Nicholas Crescenzo, Michael Pochordo,

3    Ernest Rokosik and George Jenkins.

4          They are represented, those deceased individuals are

5    represented in the lawsuit by a special representative named

6    Geri Yanow.  But, again, because that person is just a

7    representative of the estate, I've excused that person's

8    presence.

9          For ease of reference, you know, all of these

10    individuals, including the ones who are still with us, will be

11    referred to as the defendants, okay.

12          The plaintiff, Mr. Adam Gray, alleges that he was

13    wrongfully convicted of a crime that he did not commit

14    involving the death of two people who died in a building fire

15    in 1993.  The plaintiff alleges that he did not set the fire,

16    the fire was not arson, and that the cause of the fire is

17    undetermined.

18          The plaintiff spent 24 years incarcerated from the

19    ages of 14 to 38 before his conviction was vacated by a court

20    and the prosecutor dismissed all charges against him.

21          The plaintiff alleges that the defendants caused his

22    wrongful arrest, prosecution and conviction, which resulted in

23    violation of his constitutional rights and damages to him.

24          Specifically, the plaintiff alleges the defendants

25    violated his Fifth Amendment rights by improperly coercing him

1  to give a false confession and violated his Fourteenth

2  Amendment right to a fair trial by fabricating evidence,

3  suppressing favorable evidence, and using suggestive

4  identification procedures that tainted his criminal trial.

5  The plaintiff also alleges that the defendants

6  violated his Fourth Amendment right not to be deprived of

7  liberty without probable cause, agreed to deprive him of his

8  rights, failed to intervene to stop the violation of

9  constitutional rights, and maliciously prosecuted him as well

10  as conspired against him.

11  The defendants deny all claims alleged by the

12  plaintiff.

13  Okay.  As I said, at the end of the case you'll get a

14  lot more detailed instructions about all the law, okay.  So

15  don't worry about that.

16  Okay.  Now, on the burden of proof, now, this is a

17  civil case, it's not a criminal case, so when I say a

18  particular party must prove something by a preponderance of

19  the evidence, all right, preponderance of the evidence, or

20  when I use the expression "if you find" or "if you decide,"

21  this is what I mean:

22  When you have considered all of the evidence in the

23  case, you must be persuaded that it is more probably true than

24  not true, okay.  That's the burden of proof.

25  The evidence will consist of the testimony of the

1    witnesses, the exhibits admitted in evidence and any facts

2    that I may instruct you to find or the parties may agree or

3    stipulate to.

4         A stipulation is simply an agreement between both

5    sides that certain facts are true.

6         You will have to decide whether the testimony of each

7    of the witnesses is truthful and accurate in part, in whole or

8    not at all.

9         You also have to decide what weight, if any, you give

10   to the testimony of each witness.

11        You should use common sense in weighing the evidence

12   and consider the evidence in light of your own observations in

13   life.  In our lives we often look at one fact and conclude

14   from it that another fact exists.  In law we call this

15   inference.  A jury is allowed to make reasonable inferences.

16   Any inference you make must be reasonable and must be based on

17   the evidence in the case.

18        You may have heard the phrases "direct evidence" and

19   "circumstantial evidence."

20        Direct evidence is proof that does not require an

21   inference, okay, such as the testimony of someone who claims

22   to have personal knowledge of a fact.

23        Circumstantial evidence is proof of a fact or a

24   series of facts that then tends to show some other fact is

25   true, okay.

1    As an example, direct evidence that it is raining,

2    and, sadly, this would have been applicable today, is

3    testimony from a witness who says, "I was outside a minute ago

4    and I saw it raining."

5    Circumstantial evidence that it is raining is the

6    observation of someone entering a room carrying a wet

7    umbrella, okay.

8    The law makes no distinction between the weight to be

9    given to either direct or circumstantial evidence.

10    When the time comes to deliberate on your verdict,

11    you should consider all the evidence in the case, including

12    the circumstantial evidence.

13    Now, the following things are not evidence and you

14    must not consider them as evidence in deciding the facts of

15    this case:

16    First, the attorneys' statements, arguments,

17    questions and objections, all those from the attorneys, not

18    evidence.

19    Any testimony that I instruct you to disregard and

20    anything you may see or hear when the Court is not in session,

21    even if what you see or hear is done or said by one of the

22    parties or by one of the witnesses, okay, it has to happen

23    here in court when we're in session.

24    From time to time during the trial I may be called

25    upon to make rulings of law on objections or motions made by

1   the lawyers. You should not infer or conclude from any ruling

2   or other comment I may make that I have any opinions about how

3   you should decide this case.

4          And if I do sustain an objection to a question that

5   goes unanswered by a witness, you should not guess or

6   speculate, okay, on what the answer might have been. And you

7   should not draw any inferences or conclusions from the

8   question itself.

9          At times during the trial it may be necessary for me

10   to talk with the lawyers at a sidebar or by calling a recess.

11   We meet because often during a trial something comes up that

12   does not directly involve the jury. We will, of course, do

13   what we can to keep the number and length of those conferences

14   to a minimum.

15          But you should remember the importance of the matter

16   you are here to determine and you should be patient, even

17   though the case may seem to go slowly, when that white noise

18   is blasting at you.

19          Now, any notes you take during this trial are only

20   aids to your memory. Tomorrow we'll equip you at the start of

21   opening statements with notebooks, if you don't already have

22   them.

23          The notes that you take are not evidence. If you do

24   not take notes, you should rely on your independent memory of

25   the evidence and not be unduly influenced by the notes of

1  other jurors.

2         Notes are not entitled to any greater weight than the

3  memories or impressions of each juror about the testimony.

4         When you leave the courthouse during the trial each

5  evening, your notes should be left in the jury room.  When you

6  leave at night, your notes will be secured and will not be

7  read by anyone.  At the end of the trial, your notes will be

8  destroyed, and no one will be allowed to read the notes before

9  they are destroyed.

10        Please do pay close attention to the testimony as it

11 is given.  At the end of the trial you must make your decision

12 based on what you remember of the evidence.  You will not have

13 a written transcript to consult.

14        It's true that from time to time you'll see me

15 glancing over at a screen.  And there actually is like a

16 realtime draft transcript that is generated by these

17 incredible reporters, but those are just drafts.  It usually

18 takes around 30 days to finalize a transcript and get it

19 certified.  So we're not going to wait for that.  So please do

20 pay close attention.

21        During the trial I might ask questions of witnesses.

22 Do not assume that because I ask questions that I hold any

23 opinion on the matters I ask about or, once again, on how the

24 case should be decided by you.

25        All jurors must follow certain codes of conduct, and

1  you must follow them, too.  You've already heard this multiple

2  times, you'll be able to repeat it, but they are very

3  important.

4       First, you must not discuss this case with anyone,

5  including your fellow jurors, members of your family, people

6  involved in the trial or anyone else.  You must not let others

7  discuss the case with you.

8       If anyone tries to talk to you about the case, please

9  let me know about that immediately.

10      You, of course, may tell your family and your

11  employer that you are serving jury duty, but you must not tell

12  them anything else about the case.

13      Second, you must not read any news stories or

14  articles or listen to any radio or television reports about

15  the case or about anyone who has anything to do with it.

16      Third, must not do any research such as consulting

17  dictionaries, searching the Internet or using other reference

18  materials, and do not make any investigation about the case on

19  your own.

20      Fourth, if you do need to communicate with me, you

21  must give a signed note to the courtroom deputy or the law

22  clerk to give to me.

23      And, fifth, you must not make up your mind about what

24  the verdict should be until after you have gone to the jury

25  room to decide the case and you and your fellow jurors have

1    discussed the evidence.  You are obligated to keep an open

2    mind until then.

3         Okay.  A little bit just about the scheduling.  We

4    will hear testimony from 9:00 a.m. to 4:30 each afternoon,

5    each late afternoon.  Please do arrive no later than 8:45 to

6    the jury room.  And Mike will give you some details about

7    that.  We'll have a light breakfast for you each morning.

8    We'll take a mid-morning break every morning.  We'll take a

9    lunch break.  We'll take a mid-afternoon break, at which you

10   will be given some snacks for your service and to just kind of

11   pep you up a little bit.  And if you are kind to Mike, he'll

12   take requests.  So we'll see what he does on that.

13        There is one special scheduling note, which is

14   tomorrow.  I serve on a Judicial Council with 20 plus judges

15   from around Illinois, Indiana, Wisconsin.  It is really hard

16   to schedule meetings with them.  And so as much as I tried, we

17   do need to stop tomorrow at 1:45, okay.  So I will, tomorrow

18   only, I will let you out a little early so that I can make

19   this 2:00 o'clock meeting that I have with some of my

20   colleagues.  But other than that, 9:00 a.m. to 4:30 will be

21   our routine.

22        Okay.  So we will start with opening statements

23   tomorrow.  The parties have been authorized to take 45 minutes

24   each.  So I do want to keep it as an integrated unit, and so

25   we'll start with that tomorrow.

1    Okay.  With that, everyone, please rise.  And you can

2  follow Mike and he'll show you the jury room.

3    (Jury out.)

4    THE COURT:  Okay.  Please be seated.

5    Okay.  So tomorrow I'll start by telling them that

6  Mr. Davis is no -- we'll make it passive voice as much as

7  possible, no longer a defendant in the case, and you must not

8  draw any inference from the fact that he is no longer a

9  defendant.  Okay.

10    MR. LOEVY:  What time do you want us here tomorrow?

11    THE COURT:  8:45.

12    So any objection to that for the plaintiff?

13    MR. LOEVY:  No, Your Honor.

14    THE COURT:  And defense?

15    MR. NATHAN:  No, Your Honor.

16    THE COURT:  Okay.  Then maybe I ought to just tell

17  them -- is Mr. McInerney's absence going to be planned or is

18  it just going to be kind of time to time?

19    MR. NATHAN:  We'll try to make it planned.

20    THE COURT:  Yeah.

21    MR. NATHAN:  I just haven't planned it out yet with

22  him.

23    THE COURT:  Okay.  I think what I propose is just

24  tell them tomorrow also that I've authorized him to be

25  periodically absent so that he can -- yeah, well, that I've

1    authorized him to be periodically absent.  And so you should

2    draw no inference from that as well.

3          MR. LOEVY:  We've made them another offer that they

4    are going to take back to the City and it might moot

5    Mr. McInerney's presence as well.

6          THE COURT:  Okay.  Well, I look forward to hearing

7    what that is.

8          Okay.  But I will tell them that as well.

9          Okay.  Anything else today for the plaintiff?

10         MR. LOEVY:  Not from the plaintiff, Your Honor.

11         THE COURT:  Defense?

12         MR. NATHAN:  No, Your Honor.

13         THE COURT:  Okay.  I'll see you tomorrow.  Thank you.

14    (Proceedings adjourned at 3:39 p.m. until Tuesday, May 9,

15    2023, at 8:45 a.m.)

16                  C E R T I F I C A T E

17         I, Jennifer S. Costales, do hereby certify that the
     foregoing is a complete, true, and accurate transcript of the
18   proceedings had in the above-entitled case before the
     Honorable EDMOND E. CHANG, one of the judges of said Court, at
19   Chicago, Illinois, on May 8, 2023.

20    */s/ Jennifer Costales, CRR, RMR, CRC*        June 12, 2023
     Official Court Reporter
21   United States District Court
     Northern District of Illinois
22   Eastern Division

23

24

25