1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   ADAM GRAY,                    )
                                  )
4            Plaintiff,           )
                                  )
5            v.                   )   No. 18 CV 02624
                                  )
6   CITY OF CHICAGO, et al.,      )   Chicago, Illinois
                                  )   May 9, 2023
7            Defendants.          )   8:45 a.m.

8           TRANSCRIPT OF PROCEEDINGS - Trial

9                   VOLUME 2-A

10      BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11   APPEARANCES:

12   For the Plaintiff:        LOEVY & LOEVY
                               BY:  MR. JONATHAN I. LOEVY
13                                  MS. ROSHNA BALA KEEN
                                    MS. JORDAN POOLE
14                                  MS. ELIZABETH C. WANG
                               311 North Aberdeen Street, Suite 300
15                             Chicago, Illinois 60607
                               (312) 243-5900
16

17   For the City Defendants:  REITER BURNS, LLP
                               BY:  MS. ELIZABETH A. EKL
18                             311 South Wacker Drive, Suite 5200
                               Chicago, Illinois 60606
19                             (312) 982-0090

20

21   Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
22                             219 South Dearborn Street, Room 2342
                               Chicago, Illinois 60604
23                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
24

25

```
1    APPEARANCES (Continued):

2    For Defendant McInerney:    NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
3                                     MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
4                                     MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
5                                33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
6                                (312) 612-1955

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     (Proceedings heard in open court.  Jury out.)

2          THE CLERK:  18 C 2624, Gray versus City of Chicago.

3          THE COURT:  All right.  Good morning.  Let's get

4     appearances for today.

5          MR. LOEVY:  Good morning, your Honor.  Jon Loevy,

6     Roshna Bala Keen, Elizabeth Wang, Jordan Poole here for the

7     plaintiff.

8          MR. NATHAN:  Good morning, your Honor.  Shneur

9     Nathan, Avi Kamionski, Neha Locke, Elizabeth Ekl, and Breana

10    Brill here for the defendant officers.

11         THE COURT:  All right.

12         MR. NATHAN:  Natalie Adeeyo will be here in a moment.

13         THE COURT:  Okay.  All right.  Is there anything to

14    put on the record?

15         MR. LOEVY:  Not from the plaintiff, your Honor.

16         MR. NATHAN:  Yes.  There's something we ask -- we

17    would like to raise.  We just received your Honor's ruling

18    from -- regarding the certificate of innocence and the

19    reasoning which, you know, did not address the hearsay

20    argument that we made trying to keep out that COI.  We'd like

21    to have an opportunity to discuss that or file a supplemental

22    brief on that.

23         THE COURT:  Yeah, I don't think you need to file a

24    supplemental brief.  It is a -- I think it does qualify under

25    803(8) as, in effect, a government report after an

1    investigation.  And so I don't think the hearsay issue is an

2    obstacle to its admission.  That's overruled.

3        MR. NATHAN:  There's one more issue we'd like to

4    bring up.

5        MS. EKL:  Your Honor, and I don't know if this is the

6    appropriate time, but one of the first witnesses that

7    Mr. Loevy indicated that he intends to call is Terri

8    Mascherin.  And the parties have a dispute over the scope of

9    her testimony.  So I don't know if you would rather wait

10   until --

11       THE COURT:  Yeah, we have a few minutes, so go ahead.

12       MS. EKL:  Okay.  Ms. Mascherin was disclosed by

13   plaintiff near -- back in September 30th of 2019.  And that

14   was before one of the discovery cutoffs -- I'm sorry.  The

15   discovery cutoff was September 30th.  She was disclosed on

16   September 4th of 2019.

17       Plaintiffs had -- defendants had filed a motion to

18   extend to take a number of depositions.  This was in front of

19   Judge Weisman on September 16th.  And one of the issues that

20   was raised at that time was that Terri Mascherin had recently

21   been disclosed.

22       Plaintiffs filed a response to that motion for

23   discovery extension, and they clarified in their motion that

24   she was being called for a limited purpose.  Sorry.

25   Specifically they said, "Defendants claim they want to depose

1    one of plaintiff's post-conviction counsel from Jenner &

2    Block, Terri Mascherin, but as plaintiff indicated when he

3    sent that disclosure, Ms. Mascherin was only being disclosed

4    as a witness because of the defendants' recent attempts to

5    depose ASA Joe Magats," M-a-g-a-t-s, "Eric Sussman,"

6    S-u-s-s-m-a-n, "and Fabio Valentini," V-a-l-e-n-t-i-n-i.

7            They attached an email that Ms. Wang had provided to

8    defendants when she made the disclosure in which she said

9    that, "In light of defendants' recent noticing of the

10   depositions of Eric Sussman and Joe Magats, plaintiff

11   supplements his Rule 26(a)(1) disclosures."

12           She went on to say in the motion, "but if defendants

13   are going to disclose" -- I'm sorry.  The actual disclosure

14   itself states that she will be called as a witness as an

15   attorney who represented plaintiff during post-conviction

16   proceedings.  She has knowledge of plaintiff's post-conviction

17   proceedings and the circumstances of his exoneration.

18           So based on what they expressed in their disclosures

19   about her intended testimony and based on further explanation

20   in court that she was only going to be disclosed for a limited

21   purpose, we did not -- we decided not to take her deposition.

22           Based on past experiences with post-conviction

23   counsel in similar cases with Mr. Loevy, I questioned last

24   night whether or not they were going to try to get into

25   damages with Ms. Mascherin.  I had actually initially

1   forgotten about the prior exchange.  And they indicated that

2   they do intend to get into talking about Ms. Mascherin's

3   interactions with Mr. Gray during the time of the

4   post-conviction proceedings.

5           And so it's our position that that qualifies as

6   damages if she's going to get up and talk about things that

7   she viewed about how he reacted to the post-conviction

8   proceedings, her interactions with him during the

9   post-conviction proceedings, how, you know -- anything about

10  her feelings about him specifically, that that would be

11  outside the scope of the purpose for which she's been

12  disclosed.

13          THE COURT:  All right.  Response?

14          MS. WANG:  Judge, the disclosure which Ms. Ekl read,

15  that's what it says, but it's pretty broad.  It says that she

16  has knowledge of plaintiff's post-conviction proceedings and

17  the circumstances of exoneration.  Now, we disclosed her, it

18  is true, in response to their disclosure of the ASAs who were

19  involved in the post-conviction proceedings in the COI, but

20  Judge Weisman granted their motion for a four-month extension

21  of fact discovery.

22          They had every opportunity to take her deposition if

23  they wanted to, and they chose not to.  And they did take the

24  depositions of Valentini and -- yes, of Valentini, and I think

25  they chose not to take the deposition of Sussman.  So they had

1   the opportunity.  They filed a motion for extension.  They got

2   it.  We disclosed her.

3          And it's not going to be lengthy testimony.  She's

4   going to talk about her involvement in representing plaintiff

5   during the post-conviction and the COA, and then she's going

6   to just -- it's going to be one or two questions about her

7   interaction with plaintiff afterwards.  It's not going to be

8   extended testimony on that point.

9          THE COURT:  That disclosure is not broad enough to

10  cover damages.  And given the context which generated the

11  disclosure, you can't ask her about that.

12         And by the way, I think -- I'm not sure if your word

13  speed record is close to Mr. Loevy's, not quite there, but if

14  you could just try to slow your pace a little bit, especially

15  for the jury's sake.  Thank you.

16         MS. WANG:  Thank you.

17         MS. EKL:  And, Judge, just for the record, I was

18  reading from the pleading that was docket No. 150.

19         THE COURT:  All right.  Thanks.

20         Okay.  Is Mr. McInerney, he's taking care of his

21  family issues today?

22         MS. ADEEYO:  No, your Honor.  He's in security.  He's

23  on his way up.

24         THE COURT:  Oh, I see.  Okay.  So we won't bring out

25  the jury until he gets here.

1       All right.  Anything else?

2           MR. LOEVY:  Not from plaintiff.

3           THE COURT:  Okay.  Do stick at the podium microphone

4   for your openings.  So if you want to adjust that a little

5   bit, you can, but you've got to talk right into that

6   microphone.

7           Okay.  You can take seven minutes.

8           MR. NATHAN:  Can we just practice with this document

9   camera?

10          THE COURT:  Yes.

11      (Pause.)

12          MR. LOEVY:  Your Honor, can we get a quick

13  clarification?  There are some of plaintiff's photographs, and

14  we believe that the plaintiff's exhibit was not admissible to

15  show what he looked like when he was 13.

16          MR. NATHAN:  I don't think there's any foundation as

17  to when these photographs were, what age.

18          MR. LOEVY:  He can testify --

19          THE COURT:  Presumably Mr. Gray is going to lay the

20  foundation, and if they don't, then opening statements are not

21  evidence.  But yeah, I did not --

22          MR. NATHAN:  I thought we had talked about there's --

23  there's a picture that was that picture that was attached to a

24  letter that was used during an identification process --

25          MR. LOEVY:  It was taken at Chester Mental.

1          MR. NATHAN:  One second.

2          -- for Rebecca George.  That one is, there's no

3     problem with.

4          THE COURT:  What's the exhibit number?

5          MR. LOEVY:  It is Plaintiff's Exhibits 127, 128, and

6     126, the second page.

7          MR. NATHAN:  Just to clarify, there's no issue with

8     Plaintiff's 126.  It's just there's a picture of Plaintiff's

9     128 --

10         THE COURT:  That was allowed.

11         MR. NATHAN:  128?

12         THE COURT:  Yes.

13         MR. NATHAN:  Okay.  Thank you.

14         THE COURT:  All right.

15       (Proceedings heard in open court.  Jury in.)

16         THE COURT:  All right.  Good morning, ladies and

17    gentlemen.  Yeah, your challenge for the next day will be to

18    line up and come in smooth as silk and -- I'm joking.  That's

19    fine.  You can come in however you like.  And I hope you had a

20    good evening.

21         And I'd like to just formally congratulate

22    Ms. Garapolo's Blackhawks on getting the number-one pick in

23    the NHL lottery.  I think we're going to be seeing a lot of

24    Connor Bedard jerseys in the near future.

25         Okay.  We are ready for opening statements.  As a

1    reminder, opening statements are just summaries of what the

2    attorneys believe the evidence will show, so the statements

3    are not themselves evidence.  All right.

4            With that, for the plaintiff.

5            OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

6            MR. LOEVY:  Thank you, your Honor.  May it please the

7    Court, counsel.

8            Before I begin, I want to thank you.  All of you have

9    things going on in your lives, commitments, your lives.

10   You've agreed to take a part from that and come here and

11   participate in the jury system.

12           THE COURT:  Mr. Loevy, take a step back towards the

13   microphone.  Thank you.

14           MR. LOEVY:  Judge Chang spoke yesterday about how

15   important the jury system is.  It's really one of the greatest

16   things about this country.  If you believe your rights have

17   been violated, if you've been victimized even by a powerful

18   government official, you can come to court and get justice

19   from your community.

20           A cross-section of your community decides what

21   justice is.  The police department doesn't decide.  The

22   government doesn't decide.  Not even Judge Chang is going to

23   decide this.  You're going to decide, and it only works if

24   people show up and participate.  So we really do appreciate

25   it.

1       As I said, my name is Jon Loevy.  This is Roshna Bala

2  Keen, Jordan Poole.  This Elizabeth Wang, Melinda Ek.  And

3  here is Adam Gray.  Adam is many things.  He's a brother.

4  He's a carpenter.  He's a husband.  He's married, but

5  unfortunately, one of the most salient details about Adam Gray

6  is he is a wrongfully convicted person.  He spent 24 years in

7  prison for a crime he didn't commit starting at age 14, really

8  13.  He was just a month past his 13th birthday.  And he went

9  to prison for a crime he didn't commit, and he spent 24 years

10  in hell.

11       And I'm going to -- spoiler alert, I'm going to shoot

12  to the end of the story, and I'm going to tell you it had a

13  happy ending.  His conviction was vacated.  It was overturned.

14  He got some good lawyers involved and some people who believed

15  in him, and there was a reinvestigation and there was some new

16  science involved.  And the State's Attorney's office concluded

17  that this conviction should not stand, and it was vacated.

18  And that's not a common thing.  But his lawyers and Adam took

19  it one step further.  He petitioned and received a certificate

20  of innocence.  Not just was he not guilty, he was declared,

21  with the assent of the State's Attorney's office, innocent of

22  this crime.

23       So if Adam is innocent, how did he come to spend 24

24  years in prison for a crime he didn't commit?  And

25  unfortunately, that is a story of misconduct by the

1   defendants, members of the Chicago Police Department.

2          So let's back up now.  Let me tell you Adam's story.

3   He was born in '79.  He grew up in the '80s in a neighborhood

4   in Chicago called Brighton Park.  He had a close family.  His

5   mother worked at a bank.  She worked very hard, provided for

6   the family.  The father -- his father wasn't in the home, but

7   he had the three siblings.

8          THE COURT:  Actually, Mr. Loevy, let me interrupt

9   you.  I'll give you the time back like soccer time.

10          So just, ladies and gentlemen, I want to tell you two

11  things with regard to the defendants.  All right.  So

12  Mr. Percy Davis is no longer a defendant in the case.  You

13  must not draw any inference from the fact that Mr. Percy Davis

14  is no longer a defendant.

15          Okay.  And then second, I have authorized defendant

16  Daniel McInerney to be periodically absent from the trial from

17  time to time.  So again, you should draw no conference from

18  those absences.  I have authorized them.

19          Okay.  Mr. Loevy, please resume.

20          MR. LOEVY:  Sure.  So I was telling you about Adam's

21  family.  He had -- he was the youngest of three siblings.  His

22  older brother Dave, when Adam was pretty young, went to the

23  Navy, joined the Navy, got an education in the Navy, became

24  actually a physicist, has his own company, lives in

25  California.

Opening statement - Loevy

222

1          Dave's older sister -- or Adam's older sister, Lisa,

2     went to college, got an advanced degree.  She became -- she

3     works for an international bank in London.  She's going to

4     come here from London and testify about Adam and their

5     childhood.  Adam's brother closest to him, Michael, he joined

6     the Marines, and Adam will tell you about him too.

7          So they all grew up really in this four-block radius

8     in Brighton Park.  That was where Adam spent most of his life

9     doing what kids do.  He was hanging out with his friends.  He

10    had a lot of friends.  A guy named Mel Gonzalez was his best

11    pal, but there was Robbie.  There was a girl named Kasey.

12    There was a girl named Natalie, Denise, Eddie, Lori.  You'll

13    hear about some of the friends he grew up with.  They were

14    riding bikes, building forts, you know, doing what

15    13-year-olds do.

16         He had a pretty big Nintendo phase, Legos, living his

17    life.  He's 14.  He turns 14 in February of 1993.  Now, that

18    is, you know, an exciting, electric time in a boy's life

19    because now they're getting ready to go to high school.  He's

20    talking to girls.  Him and his buddy Mel met this new group,

21    Natalie and Denise.  They're spending a lot of time together.

22         He's getting ready for high school.  He's going to go

23    to Bogan High School.  He's been accepted in the honors

24    program.  He's proud of that.  He wasn't always a motivated

25    student, but now he's getting a little more serious.  He's

Opening statement - Loevy

1   going to look at computers at Bogan High School. Everything

2   is changing. Everything is exciting.

3          Screeching halt. It's all about to come to a

4   screeching halt on March 24th, 1993, a normal weeknight. Adam

5   has just turned 14. He's over at his best buddy Mel

6   Gonzalez's house. He does that three, four nights a week

7   during this particular time period because his older brothers

8   had moved out, and he spent a lot of time with Mel. And it's

9   a normal night. It's a school night. They do Legos. They're

10   playing Nintendo. They do whatever kids do -- and he was a

11   kid -- and go to sleep about 10:00 o'clock. And he's

12   sleeping, and he's sleeping deeply.

13          Unbeknownst to him having nothing to do with him, in

14   another part of the neighborhood, there's a fire. There's a

15   fire in a three-flat building, you know, with a garden, a

16   three-flat, standard Chicago three-flat. And it burns. And

17   it's unfortunate. It's a big fire, and people die. People on

18   the top floor don't get out and die.

19          Now, I will just say right here, right now, and I

20   think it's going to be clear, fires happen. There's a lot of

21   accidental fires, you know. There's bad -- these are old

22   buildings. There's bad wiring. There's, people leave a space

23   heater on. You know, there's, fires can happen in the

24   kitchen. Fires can happen for all kinds of reasons. That

25   doesn't mean that anybody tried to kill anybody. It's just a

1  fire.

2          So after the fire, the neighborhood, everybody,

3  everybody in the neighborhood is out there, 20-plus people,

4  all the, like, parents.  You know, it happened in the middle

5  of the night, 2:00, 3:00 in the morning, but the whole

6  neighborhood files out, and everybody is crying and there's a

7  dead person and they're screaming.  It's very chaotic.

8          Now, where this went bad for Adam and for the police

9  was one of the kids who lived in the building, a kid named

10  Scott -- actually, his family lived in the building.  He was

11  in his mid-20s.  He had moved out.  And Scott was kind of a

12  partier and a drinker and a rough kid, and he comes out and he

13  hugs his mom.

14          And he looks up and there's Adam's mom and Adam's

15  brother because remember, I said the whole neighborhood is

16  there.  So he sees Adam's mom and he says, "Boy, you'd better

17  hope Adam didn't have anything to do with it."

18          Now, he doesn't know what he's talking about.  He

19  just says that.  That's just words like, you know, it's a

20  rough neighborhood in Brighton Park and, you know, he --

21  there's a lot of fighting.  It's tough.  And he's making these

22  accusations.

23          And Adam's mother and brother -- actually, his

24  brother gets in a pushing match.  "Don't say my brother did

25  it.  There's no -- you don't know what you're talking about.

1    My brother is not even here.  He's sleeping."

2           So that's how it all starts, is that this guy makes

3    this accusation.  And, you know, and this neighborhood, as I

4    said, it was a tough neighborhood.  There's a lot of fighting.

5    Adam laughs when he hears "a tough neighborhood" because this

6    is the only neighborhood he knew, but this is the kind of

7    neighborhood where you can beat up for stuff like that if

8    somebody is going to make that accusation.

9           So his mother and his brother, you know, go pick him

10   up at Mel's, bring him over to Michael's house.  And it's

11   about 4:00 in the morning because they don't want the mob to

12   beat him up.  And unfortunately, the wheels were in motion.

13   Just because this kid said this, what followed was the worst

14   police investigation of all time.  The fire happens at 2:45.

15   Fire trucks get there at 3:00 o'clock.  I don't know what time

16   the fire gets out but it's not much after 3:00.  By 4:00

17   o'clock, they're going to arrest Adam for murder, at 4:00

18   o'clock.

19          And now, why did Scott say, "Oh, you'd better hope

20   Adam didn't do this"?  They were kids.  Adam and Kasey for a

21   time were best friends.  They would play.  Then they had a

22   falling-out.  Then they'd be best friends again, just normal

23   kid stuff.  And Kasey is going to testify and Adam is going to

24   testify, normal kid stuff, you know.  In fact, when they were

25   actually friends was way before the fire.  They had moved

1   apart from each other.  So it was just a wild, baseless

2   accusation.

3          3:00 o'clock the fire, Adam is arrested by 6:30 that

4   morning.  They have closed the case by noon.  So the fire

5   happens at 3:00 in the morning.  Adam, they're going to arrest

6   Adam before breakfast.  They have closed the case by lunch.

7   And it takes him 24 years to unwind what just happened to him.

8          They don't do any kind of investigation.  And if they

9   had, they would have realized it wasn't even an arson.  The

10  police department showed up, the bomb and arson department.

11  They forgot to do the part where you pick through the debris

12  and you look for wires.  You go in the kitchen, you see if

13  there's a grease fire.  They didn't do anything like that.

14  They never even went in.  They just decided this is an arson.

15         And you're going to hear that they relied on science

16  that has been outdated.  At the time, firemen used to tell

17  each other, "Oh, it looks like there's some real charring on

18  the porch there.  It looks really heavily burned.  That must

19  mean an accelerant."

20         And that was conventional wisdom, and they maybe even

21  believed it in good faith.  But science has moved on in the 30

22  years since, and now everybody -- you know, you've heard about

23  junk science in the courtroom.  Now everybody understands,

24  that doesn't mean anything.  Fires burn hot.  It does not mean

25  what they thought it did.  So if you get out a fire textbook,

1    it now says --

2            THE COURT:  I'm sorry.  Too fast?

3            THE COURT REPORTER:  I'm sorry.  I need to restart my

4    computer.

5            THE COURT:  All right.  One moment.

6        (Pause.)

7            THE COURT:  You can resume.

8            MR. LOEVY:  Thank you, your Honor.

9            All right.  As I was saying, worst police

10   investigation of all time.  They believe that it's an arson

11   because, hey, look how burned it is.  If you read the fire

12   textbooks now, it says this is a myth.  You can't tell arson

13   because a fire burned hot.  Fires burn hot for all kinds of

14   reasons.  So they form a false conclusion that this is an

15   arson.

16           And they also jumped the gun because what they do is

17   they believed that the fire had started on the porch by the

18   stairs, and they gather up that fire debris.  They gather up

19   the fire debris, and they send it to the lab.  And they expect

20   the fire debris is going to show that there was an accelerant

21   because their theory is that this was an arson.  An accelerant

22   is something, a liquid you pour to make a fire.

23           Adam is arrested by 6:30, a few hours later, but five

24   days later the lab report comes back.  It's negative for

25   accelerant.  There was no accelerant, but it's too late.  Adam

1    has already been arrested and charged with murder.

2           So they jumped the gun.  They formed a hypothesis

3    that this was arson, and they formed a hypothesis that was

4    wrong.  Not only that, they formed a hypothesis that he did

5    it, and they didn't investigate.  I mean, if you're going to

6    say it's an arson, that's one thing but just because some

7    14-year-old supposedly, you know, didn't get along with one of

8    the girls in the apartment, that doesn't make him guilty of

9    murder.

10          They didn't investigate any other suspects, not one

11   other suspect.  There was a guy who lived in the first floor

12   who got evicted.  They didn't even look at him.  Scott, the

13   guy who pointed his finger, he had all kind of enemies.  They

14   didn't even look at anybody else.  They just washed their

15   hands of it, case closed.

16          When they arrested Adam, the arrest report says 6:30,

17   so just a few hours after the fire, and it says Adam committed

18   arson.  He took gasoline, poured it on the back porch, and lit

19   the fire.  6:30 in the morning, three hours after the fire.

20   So then now after they've decided to arrest him and they go

21   get him and arrest him, now they have to make the case.  So

22   they do it backwards.  They don't make the case and then

23   arrest him.  They arrest him and make the case.

24          So they put 14-year-old Adam in an interrogation

25   room, and they drill him, and they drill him, and they drill

1   him.  And he tells them a thousand times, "I don't know what

2   you're talking about.  I didn't start a fire.  I was sleeping.

3   Can I go home?  I don't know what you're talking about."

4        And a thousand times, they won't listen to him.  And

5   it turns out his mother's downstairs trying to get up there.

6   They won't let her get up there.  His brother is trying to get

7   in.  They won't let him get up there.  And then after a while,

8   they break Adam.

9        So what you're going to hear is that this is a case

10  involving a false confession.  I will tell you what you don't

11  have to decide, is there such a thing as false confessions.

12  It turns out they're very real, and you're going to hear about

13  the science.  It's sort of counterintuitive that you would

14  confess to a crime you didn't commit, but there's now a lot of

15  social science, research, empirical research studies, and it's

16  actually a very disturbing phenomena.  People confess when

17  they're coerced with too much psychological pressure.

18       You're going to hear from a woman named Melissa

19  Russano this week, and she's a scientist, social scientist who

20  spent a lot of her adult life looking at this phenomena.  And

21  she's going to explain to you there is a such thing as false

22  confessions.  It happens.  You're going to hear about a study

23  with some very disturbing numbers.  For example, the Innocence

24  Project she's going to explain did a study with 368 false

25  confessions, false convictions.  So in other words, 368 cases,

1  someone gets convicted --

2          MR. NATHAN:  Objection.

3          THE COURT:  This is --

4          MR. NATHAN:  Objection.

5          THE COURT:  Basis?

6          MR. NATHAN:  Can we do a sidebar?

7          THE COURT:  All right.

8      (Proceedings heard at sidebar:)

9          THE COURT:  All right.  Go ahead.

10         MR. NATHAN:  The objection is based on Mr. Loevy

11  talking about other instances of false confessions.

12         THE COURT:  This is, it's par for the course to

13  discuss the underlying premise for the expert opinions, so the

14  objection is overruled.

15     (Proceedings heard in open court:)

16         THE COURT:  All right.  The objection is overruled.

17         It's not a trial day until we've had a sidebar.  Now

18  we're official.

19         Okay.  Mr. Loevy, you may resume.

20         MR. LOEVY:  So Ms. Russano is going to explain to you

21  her expert opinion, and she's going to tell you about the data

22  she relied on, this study, the Innocence Project study, 368

23  convictions where someone got convicted.  The court system

24  assumed they were guilty.  They got convicted.  They went to

25  prison.

1        Then DNA happens, and 368 times they proved the

2   conviction was false, proved beyond a scientific doubt.  Like

3   a rape case where it's, like, "You, raped me," "No, I didn't,"

4   "You raped me," "No, I didn't," and then they get the DNA and

5   they didn't.  So there's no ambiguity in these 368 cases.

6   They have been proved innocent.

7        And then the social scientists said, "We want to

8   understand, you know, how wrongful convictions happen."  They

9   went back and looked at them.  In 26 percent of those false

10  convictions, there was a confession.  You realize what that

11  means?  Of those 368 cases where they proved beyond a doubt

12  the guy was innocent, in fully a quarter of them, they had

13  managed to get the suspect to confess to the crime even though

14  they didn't do it.

15       And in cases involving juveniles, teenagers, the

16  numbers were even higher.  Of those absolutely definitive

17  proven innocent cases, one-third of the juveniles had admitted

18  they did it when they didn't, and it was scientifically proven

19  they didn't.  So it is a real thing, and you'll learn about it

20  over the course of this week, that false confessions happen.

21       Now, Dr. Russano is not going to tell you that this

22  was or wasn't a false confession.  That's not her role.

23  That's your role.  You'll decide if it was a false confession,

24  but what she will do is tell you what the hallmarks of a false

25  confession are, and she will say this is all the textbook

1    examples of a false confession.

2            For example, youth.  I already alluded to age.

3    Juveniles, and usually a juvenile being interrogated is 17,

4    18, a juvenile, in Adam's case he's barely 13.  He is a child.

5    And juveniles are very susceptible to wrongful convictions --

6    wrongful confessions.  Why is that?  They respect authority

7    figures.  They're easily intimidated.  They're easily

8    manipulated.

9            In scientific terms, their prefrontal cortex is not

10   fully developed which means they rely more on their amygdala.

11   It's, like, emotional decisions instead of reason.  In people

12   terms, that means they make dumb decisions.  They don't think

13   carefully.  It's easy to manipulate them.

14           If any of you know a 14-year-old, and some of you do,

15   many of you are parents, have a 14-year-old or someone who

16   used to be, they are subject -- they're not as sophisticated

17   as an adult.  And they can be manipulated.  And they can make

18   bad decisions.  And in this case, Adam got broken down and

19   gave a false confession.

20           There's other hallmarks of a false confession here:

21   Sleep.  He got woken up in the middle of the night.  He was

22   discombobulated.  They wouldn't let him sleep.  He didn't eat.

23   All day, he didn't eat.  He was isolated.  I told you, his

24   parents -- his mother was trying to get in that room.  His

25   brother was trying to get in the room.  The police would not

1    let them in the room, so he was in there isolated.

2          And they lied to him.  And you're going to hear,

3    nothing wrong with lying to a suspect.  They're allowed to lie

4    to suspects, but it was very confusing to Adam.  It was very

5    confusing when they're telling him, "People said you did it"

6    and telling him that, "Hey, you can go home.  All you got to

7    do is say you did it, and we'll take you back to school."

8          He's working on his homework in between these

9    interrogation sessions and they say, "All you got to do is say

10   you had something to do with it.  We believe you.  Just say

11   you had something to do with it.  Just say you started the

12   fire.  We'll take you home."  And they broke him down, and

13   they broke him down.

14         Now, Melissa Russano is going to explain that it's

15   like pressure.  What you do to get a false confession is you

16   build pressure on the person.  And pressure has to release.

17   So they're increasingly turning up the pressure on him.

18   They're telling him, "You're not going to get out of here.

19   There's no way out of this situation unless you tell us what

20   we want to hear."

21         And after a while, eventually they broke him.  And he

22   believed them, that if he just said he had something to do

23   with it, he could get out of this room and he could go to

24   school.  So he cooperated, and they got him.

25         And what they did next was they didn't go get the

1    court reporter.  They rehearsed five times, six times, over

2    and over for hours.  They kept going getting this how they

3    wanted it.  He didn't know anything about it.  He didn't know

4    how this happened or even where or when, so they had to

5    practice with him, and they did it in an insidious way.

6            Adam cannot explain to you how this happened.  He is

7    going to say, "Look, my 14-year-old self, I know I was

8    tricked.  I know I was manipulated, but I don't understand how

9    anything of this happened" because it went over his head.

10           Melissa Russano, the expert, can explain to you how

11   it happened.  The way they do it is they feed you the false

12   information.  They do accusatory questions.  They say things

13   like, "Where did you get the gasoline, where did you get the

14   gasoline, where did you get the gasoline," and then you start

15   figuring out they're trying to talk about gasoline.

16           And they can tell you, "Hey, remember when you told

17   us you dropped the milk jug in the alley?"

18           And he's like, "No."

19           And they're like, "Yeah," and then the police are all

20   saying, "Yeah, yeah, you told us that."

21           They feed you facts.  They suggest to you.  "Where

22   did you drop the alley -- you know, where did you drop the

23   jug?"  So they're feeding facts.  They're practicing.  Every

24   time he would get it wrong, they would get mad at him, and

25   they went over it, and they went over it, and they went over

1   it until they had it right," and the result was a false

2   confession.

3           And they have an expert too, a guy named Barry Feld.

4   Let's see if they call him because if they call him, he's

5   going to agree, I am predicting, that this has all the

6   hallmarks of a false confession.  So I don't even know if

7   they're going to call their expert.

8           Now, when they finally got the confession how they

9   wanted it, they take the court-reported statement.  And it's,

10  frankly, pretty ridiculous.  You know, it doesn't make sense.

11  Adam is sleeping over at his buddy's house.  He supposedly

12  sneaks out of the house.  If any of the Gonzalez family saw

13  him, he would have been toast.  You know, and there's all

14  leading questions:  Yes, yes, yes; no, no, no.  They get very

15  few details where he has to fill in the blank that they've

16  been practicing with him.

17          But here's the really dirty part.  Here's the

18  insidious part.  The police know some facts about the crime.

19  Adam doesn't know facts about the crime because he has nothing

20  to do with it.  The facts the police knew and only the facts

21  the police knew ended up in the confession, and they ended up

22  to be false facts.

23          So, for example, the police believed at the time that

24  the fire started on the back porch with somebody pouring

25  gasoline down the stairs.  And sure enough, that's what -- by

Opening statement - Loevy

1  the time Adam gives that confession, that's what his story is.

2  It turns out it's false.  They get the lab reports.  Nope,

3  that didn't happen.  So the police thought it was true, it

4  ends up in Adam's confession, and then it turns out to be a

5  false fact.  That's not a coincidence.

6           Their other theory of the case was they went out and

7  they found a milk jug.  And here's some pictures of it.  This

8  is the little milk jug here.  And this milk jug has been

9  sitting out there a long time, as you can see.  And the police

10  smelled it and they said, "You know what, this smells like

11  gasoline.  I bet you Adam put gasoline with the fire in this

12  milk jug."

13           So over the course of rehearsing and practicing,

14  Adam, by the time he falsely confesses, is saying, "Fine.  If

15  you say so, I used a milk jug."

16           And then they took it to the lab, and you know what?

17  There's no gas.  There's no gas in the milk jug.  So they had

18  Adam confess that he took this milk jug, poured the gas down

19  the stairs, dropped the milk jug exactly where they found it,

20  and they pick it up and they say, "Aha, there's gas in the

21  milk jug."  Then they send it to the lab.  There's no gas in

22  the milk jug.  There's no gas in the milk jug.  So the

23  confession, their theory ends up in Adam's mouth, and it ends

24  up false.

25           So before that is sorted out, Adam is taken to the

1   Audy Home.  And that is the juvenile jail.  And Adam thinks

2   he's going home.  "You told me if I cooperated, said I started

3   a fire, I could go home."  He didn't go home.  He's not going

4   home for 24 years.

5          And his odyssey in hell was only just starting.  He

6   ends up at the juvenile jail.  He's -- according to the arrest

7   report, he's 5, 2, 110 pounds.  At the juvenile jail there are

8   teenagers, and there are tough kids, and there are angry kids,

9   and there are maladjusted kids.  And I personally believe all

10  kids are good, and they are, but there's some tough kids and

11  there's some mean kids, especially in juvenile jail.

12         And Adam was instantly a target.  Adam was tiny.  You

13  know, these are big teenagers.  Adam was 110 pounds.  Adam was

14  one of the youngest, if not the youngest person there.  And at

15  this place, people victimize.  That's just the way it was.

16  It's really sad.  He's going to tell you about it.  But people

17  are trying to be tough so that they're not the victim, so

18  they're always looking for somebody to pick on.

19         And this was a lot of kids from the Gangster

20  Disciples and the Vice Lords and really tough kids.  You know,

21  there weren't a lot -- it was a racist system.  He was one of

22  the only white kids in the whole jail, and he was a target.

23  He got picked on.  "He got picked on" is a loose word.  He got

24  attacked.  He got attacked constantly by children who saw him

25  as a target.  And he was attacked over and over and over

1    again, and he was beaten and he was choked unconscious.  And

2    there was people attempting sexual abuse.  And he saw rapes

3    and he saw horrible, horrible, horrible things, and he had to

4    subject to that daily.

5          And he's getting increasingly upset, and nobody will

6    help him and nobody believes him.  "I'm innocent.  I didn't

7    start a fire.  Why is this happening to me?"  And it goes on

8    and on and on.

9          And he has to fight for his life daily.  And a lot of

10   kids at the juvenile center are in and out, so there's

11   turnover.  He's there for years, and he is attacked.  And he

12   grows so hopeless because he didn't do anything, the world is

13   so unfair that he tries to kill himself repeatedly.

14         And he gets increasingly sophisticated.  He's cutting

15   himself.  He's trying to kill himself in different ways

16   because, "I'm innocent.  Why is this happening to me?  Why am

17   I being attacked every day?  Why am I in this place?  I'm

18   supposed to be in school."

19         And he tries to kill himself.  So when you try to

20   kill yourself in the juvenile jail, eventually they send you

21   to the mental health place.  They sent him to the Chester Home

22   for the Criminally Insane.  Now, this is not where the kids

23   who are insane go.  This is the adult, IDOC.  If you're in the

24   Department of Corrections, you commit a terrible crime and

25   you're insane, they send you to Chester.

Opening statement - Loevy

239

1    They sent him to Chester.  So he's out there on the

2    yard.  He's 14 years old and tiny with the criminally insane

3    in Illinois, and he's got to fend for himself.  And think

4    about the insane people.  It's unpredictable.  People can

5    attack you for no reason.  And he gets attacked and people

6    are -- people that have raped people are trying to attack him.

7    And he fights back.

8    He's going to explain to you, when you're attacked,

9    you must fight back.  If you don't fight back, you're a

10   victim.  Somebody tries to take your cookies, you're a victim.

11   You must fight back.

12   And Adam was a tough kid.  I told you, it was a tough

13   neighborhood.  He had been in fist fights.  His brothers used

14   to fistfight him a little bit, but this is different.  These

15   are people trying to kill you when they fight you and try and

16   take your eyes out, choke you out.

17   And Adam would get in fights, and they'd put him in

18   punishment at Chester where he -- he'll tell you the story.

19   They put him in restraints, leather restraints.  His hands are

20   leather.  His feet, he's on a steel gurney with a blanket

21   covering him, the kind you can't kill yourself with.  And

22   he's, like, in the home for the criminally insane thinking, "I

23   didn't do anything.  I didn't start any fire.  What am I doing

24   here?  I'm 14 years old, locked on a gurney, and I should be

25   in math class."

1        So that was very hard on Adam.  And you know what,

2   the interesting thing was the Chester Home for the Criminally

3   Insane was a reprieve.  That was better than living in the

4   juvenile jail because at least in Chester, he was attacked

5   less.  And when they realized that Adam was not insane and

6   that he didn't want to take the psycho med -- psychotropic

7   medications, he didn't want to take those heavy drugs, they

8   sent him back to the juvenile center, and that got worse for

9   him.

10       He -- Adam went into what he calls his war phase.

11  "Listen, I'm innocent.  Nobody is listening to me.  I refuse.

12  I'm out.  I opt out.  I'm not participating."  He stopped

13  going to school, stopped eating.  He was at war with the

14  staff.  It wasn't a mature thing to do.  It wasn't the staff's

15  fault, but the staff weren't listening to him.

16       So he just went into complete opposition mode.  "I'm

17  innocent.  I'm not doing this."

18       And what do they do at the juvenile jail if you do

19  that?  They punish you.  So they put him in segregation.  He

20  spent two years in solitary confinement, his 15th and 16th

21  years, solitary confinement because nobody is listening to

22  him.  And he would act out because if you're a kid, you know,

23  a 15-year-old locked in a room by yourself -- solitary

24  confinement is a thing.  It drives you batty.  Humans are

25  meant to be interactive.  We're meant to interact.  If you're

1    alone, for the first hour, it's tough.  For the second hour,

2    it's tougher.  You know, you start going eight hours, day

3    after day after day, it's psychological torture.

4         So he'd act out, and they'd punish him.  And he'd act

5    out, and they'd punish him.  He tried to kill himself.  And

6    he's writing with blood on the wall and he's writing

7    "innocent" on the floor.  He is just completely, completely

8    lost, all because he's being accused of something he doesn't

9    understand.

10        And it's about to get worse for Adam because when you

11   turn 17 in the juvenile jail, they send you to the adult Cook

12   County Jail.  Cook County Jail in the '90s, not a pleasant

13   place.  And it's full of adults.  It's full of 24-year-old

14   gang members, 30-year-old murderers.  It's full of regular

15   people, but it's full of dangerous people.  And it's very

16   hierarchical based on gangs, and he's in great danger.

17        And he's 17 years old.  He's not -- he's bigger than

18   he was when he was 13, but he's not that big.  And he gets --

19   on his 17th birthday, they put him on a bus.  "Go fend for

20   yourself among the adult prisoners."  And again, he is a

21   victim.  He is attacked, and he is a victim.

22        He's getting ready for his trial.  He spends five

23   months in the County.  They set a bond, $35,000 to walk.  He

24   doesn't have 35,000.  His family is paycheck to paycheck.  It

25   might as well have been 35 million.  So he gets a public

1   defender, and the public defender tries to get him to take a

2   plea.  "You're looking at natural life."  He won't take a

3   plea.  "No way.  I didn't do it.  I'm not pleading to

4   anything.  I'm not guilty."

5          So he gets ready for the trial.  And I've already

6   told you at the trial that they fabricated his confession, and

7   that gets introduced against him, but they fabricated three

8   witnesses.  Let me talk to you about the three witnesses

9   because Adam by the time at trial is saying, "I want a trial.

10  I'm innocent."  And the investigation got dirty.

11         The first witness, a woman named Brenda Thomas, who

12  is Brenda Thomas?  She's -- you're going to see her.  She's

13  going to testify by video.  She gave a deposition in

14  Minneapolis last month.  We went and talked to her.  She was

15  then a 25-year-old woman working in the Clark gas station down

16  the street.  And in their theory with Adam and the milk jug,

17  put gas into the milk jug and there was no gas in the milk

18  jug, she was the one who supposedly was working there.

19         So they go over to the gas station and they say to

20  her, she testifies, they say, "Hey, remember when you sold

21  that boy gas a few nights ago and, you know, he paid for it

22  and he put it in a milk jug?"

23         And she says, "I told them.  I'm not a witness.  I

24  don't know what you're talking about.  I'm not a witness.  I

25  don't want to be part of it.  I'm not a witness."  And they

1  wouldn't let it go, and they wouldn't let it go.  And she

2  said, "Look, this is what I do every day.  I sold gas to a

3  thousand people.  I can't identify a photograph."

4         It's like if you had a waitress a couple weeks ago.

5  You can't do that.  You're going to hear from a social

6  scientist who is going to explain, it's hard to actually

7  pick pictures.  But they wouldn't let it go.  They put the

8  pictures on the table.  "Tell us who it is."

9         And she signed an affidavit.  She says she tried to

10 pick somebody.  She picked the wrong person, and they told

11 her, "Try again."  So she tries again.  "Ah, okay.  Good."

12        And then they tell her, "Hey, listen, this kid burned

13 down a building.  You're an important witness.  We need your

14 help.  You picked him out."

15        And she said, "I didn't want anything to do with it.

16 I spent two years trying to stay away from them.  I had my" --

17 she said, in her words, "Those were my 'getting high' days."

18 She was strung out.  She had her own criminal cases.  It was a

19 cross-racial identification in the first place.  She was

20 black.  He's white.  And you're going to hear a social

21 scientist say that's even harder to do.

22        And she said, "I don't want to do this," but they --

23 a criminal trial, they subpoena her.  She has to testify.  She

24 tells -- they have some preparation sessions.  She has to tell

25 the same story.

1      So we go depose her, and she tells the story I just

2 told you.  And then the City's turn to examine her, and they

3 showed her her criminal testimony.  "Isn't it true you said

4 Adam did this?  Isn't it true, isn't it true?"  And she said,

5 "Okay" --

6           THE COURT:  One second.

7           MR. NATHAN:  Objection.  Just sidebar for one second.

8           THE COURT:  All right.

9      (Proceedings heard at sidebar:)

10          THE COURT:  All right.  Go ahead.

11          MR. NATHAN:  There was a motion in limine excluding

12 the City.  Reference to "the City" shouldn't be made right

13 now.

14          THE COURT:  Yes, just go back to "defendants,

15 defense," that sort of thing.

16          MR. LOEVY:  Got it.

17          THE COURT:  Wait one second.  You don't want me to

18 highlight it any more, Mr. Nathan?

19          MR. NATHAN:  No.

20          THE COURT:  All right.

21      (Proceedings heard in open court:)

22          THE COURT:  All right.  You may proceed.

23          MR. LOEVY:  So the attorney for the defendants shows

24 her her criminal testimony.  "Okay.  Yes, I remember that.  I

25 remember that.  I remember that.  He bought $2 worth of gas."

1   30 years later she's claiming to remember this.

2           And when it was our turn to ask questions, we're

3   like, "How do you remember that?  You just said you don't

4   remember any of this."

5           She starts crying.  She starts freaking out.  She

6   says, "Look, I don't want anything to do with this.  I don't

7   know what you're talking about.  I'm not a witness.  I tried

8   to tell you I'm not a witness.  I don't want to get in

9   trouble.  I don't want to be accused of perjury, of lying.

10  Leave me alone."

11          And you'll see her, and you're going to believe her,

12  that she too is a victim in this.  She too is being

13  manipulated to this day.

14          There's another witness, Kasey Paris, Adam's little

15  friend.  That's why they originally suspected Adam.  Remember,

16  I told you when he was 13, there was a time when him and his

17  buddy Mel, the three of them were inseparable.  They used to

18  build forts, hang out.  She was a tough kid.  She liked to do

19  what boys did, and they were friends and then they weren't

20  friends and then they were friends.

21          And Kasey, by the time of trial, they told her, "Hey,

22  Adam confessed to trying to kill you and your family, and now

23  he's trying to get out of it."  And she testified, and she

24  became the motive.

25          Now, she has signed an affidavit.  She has since

Opening statement - Loevy

246

1  grown up.  At the time, she was a child when she testified.

2  She's grown up, and she says, "I was brainwashed."  That's the

3  word in the affidavit, brainwashed by the police.  And she

4  became the motive.  So Adam and her were holding hands by --

5  maybe spin the bottle.  They were not lovers.  She says, "We

6  weren't even lovers by -- we weren't even girlfriend/boyfriend

7  by child standards.  Maybe we held hands and then we didn't."

8          But they take these letters where, you know, "I love

9  you."  And if any of you had to have your 13-year-old letters

10  exposed to the world, you'd be embarrassed.  It's not funny.

11  But "I love you."  And Kasey was driving a wedge with Mel,

12  silliness, child stuff.

13         And she's going to tell you on the stand it was child

14  stuff, don't blow it out of proportion, but back then, they

15  turned it into Adam is a jilted lover.  The letters he wrote

16  were six months before the fire, and now they're trying to

17  turn it into, he had to burn down this house in silliness.

18         And the letters and she's -- by the time of trial,

19  she's exaggerating.  She's saying, "Oh, he threatened me, you

20  know, and he was going to -- he was a pyromaniac."  She's

21  going to testify, "No, no, no, not true, all exaggerated, kid

22  stuff."  So that's another example of kids being manipulated

23  by adults.

24         The last witness against him is a woman named

25  Kelly -- Karrie Kelly.  She was a friend of Scott's.  And you

1    don't have to remember all these names.  It's like a TV show.

2    You'll get the names later.  You won't have to memorize them

3    as we go.  But Scott is the guy who originally caused the

4    problem, and he's got a buddy named Karrie Kelly.

5         And when there's no evidence against Adam, all of a

6    sudden Karrie Kelly becomes an eyewitness.  Of all the crazy

7    coincidences, Scott's friend claimed to be standing in the

8    alley at 2:45 in the morning and see a kid run by.  So Scott's

9    friend is going to be an eyewitness.

10        Now, there was a police report where Karrie Kelly

11   gave her story, and she said, you know, a kid in a black knit

12   cap, black turtleneck, black pants, black shoes.  So she gives

13   a description of a kid wearing all black.  And by the way,

14   they don't find any all-black anywhere near Adam when they go

15   to get him.  But leaving that aside, she describes a boy

16   wearing all black.

17        By the time of Adam's trial, it's not, "I saw a boy

18   in the alley wearing all black."  She says, "I saw Adam Gray

19   in the alley."  She changes it.  Her story is, "I saw a kid

20   wearing black" to, "I saw Adam Gray.  She says, "I know Adam

21   Gray.  I took him and Kasey to Indianapolis -- or to Indiana

22   for July 4th.  He was in my car.  I know who Adam Gray is, and

23   I saw Adam Gray in the alley."

24        Can they do that?  I mean, they did.  She went from,

25   "I was in the alley, I saw a kid" to "Oh, it was Adam Gray,

1    the kid I took to Indiana." They just let her change -- her

2    testimony evolved. And she's going to testify too, and she's

3    going to have to explain to you why her testimony evolved like

4    that, and it's not going to be credible.

5          And you know what, she doesn't want to be here.

6    She's going to be mad. She's going to be upset just like

7    Brenda was, just like Kasey -- Kasey Paris is going to be mad.

8    None of them want anything to do with it. It's not their

9    case. And it's all fake, and it's not real.

10          You know, before Kelly -- Karrie Kelly gave her

11    deposition, the attorneys for the defendants went and met with

12    her, perfectly proper. They're allowed to interview the

13    witnesses. They're allowed to. But they showed her her

14    criminal testimony, and they showed her, "Here's what your

15    answers were. Here's what your answers were. Here's what

16    your answers were." And 30 years later, she has adopted it.

17    Nobody wants to be accused of having testified falsely.

18          But you're going to have to -- when you view this

19    evidence, that's the lens. They're trying to say, "Everybody

20    testified in the criminal trial. You should accept that."

21    The criminal trial is over. That conviction has been vacated.

22    It's not credible. You're going to see the witnesses on the

23    stand, and they're going to tell you, this is not real.

24          So that's the case against Adam and Adam is, not

25    surprisingly, convicted. He's found guilty. He is sentenced

1    to natural life and sent to Stateville.  He's sent to Joliet

2    first and then Stateville.

3           Now, in Illinois he's now 17 years old.  He's going

4    into the Department of Corrections.  A lot of 17-year-olds get

5    tried as juveniles.  He's tried as an adult, sent to

6    Stateville.  In Illinois if you commit a heinous crime, you've

7    got to go somewhere, and you go to maximum security.  So

8    there's people who decapitate people.  There's people who do

9    terrible things to children.  There's -- you know, the worst

10   crimes in the state of Illinois, you go to max.  You go to

11   Stateville.  That's where they sent Adam.

12          There's not, like, people who have drug crimes or

13   robberies.  It's, 90 percent are murderers.  This is where

14   he's going to spend his life.  He's 17.  He has no idea what

15   they're talking about.  He didn't murder anybody.  He didn't

16   start any fires.  He's going to the IDOC.

17          And not only that, he is sentenced to natural life.

18   You know what that means?  You're never getting out.  You're

19   going to die in prison.  A lot of times if you get sentenced,

20   it's 40 years.  A lot of times it's 90 years, but if you're

21   good, we'll let out in 45 years.  A lot of times you can get

22   parole and go home.

23          Adam, they say, we just want you to understand right

24   now.  No parole.  No good time.  You will die in prison.

25   That's what Adam got sentenced to.  That's what the

1    17-year-old Adam had to go to the Illinois Department of

2    Corrections and try to stay alive so he could die.

3            And so what is he doing here if he got sentenced to

4    natural life?  Well, it's an interesting story.  When Adam was

5    a kid, there was a teacher.  A few nice people tried to reach

6    him.  You'll hear from them.

7            One of them was a young woman named Rebecca.  She was

8    21 right out of school, and she started, she had a project.

9    She was going to write a book.  And she went back, and she

10   started writing letters to some of the people she had

11   interacted with back at the juvie home.  She was an art

12   teacher.  She tried art therapy and didn't quite reach him,

13   but she reached out.

14           And a lot of the kids cooperated.  Adam said, "Screw

15   you.  I was innocent.  You didn't believe me.  Leave me

16   alone."

17           And she got intrigued, and she started looking more

18   into it, and she started doing some investigating.  You're

19   going to hear that.  She went and talked to the witnesses.

20   She talked to Adam.  She got really intrigued.  And then she

21   started to believe that there was a problem here.  And lawyers

22   got involved.  And to make a long story short, you've already

23   heard, the Cook County State's Attorney's office was persuaded

24   to do a reinvestigation.  You're going to hear from Terri

25   Mascherin this morning.  And they decided that the conviction

1 shouldn't stand.

2   So Adam was released, and he got that certificate of

3 innocence.  He went to his mother's home at age 38.  His room

4 was exactly as he had left it.  His mother probably believed

5 he was going to come home at 15, believed he was going to come

6 home at 16.  So he's still got his Nintendo.  He's got his

7 He-Man stuff.  He's got his Legos.  His room is right there.

8   And Adam had a hard time adjusting.  You know, he

9 didn't have an ID.  He didn't have a life.  He didn't have

10 friends.  He didn't own anything.  He was paranoid.  He'd sit

11 in his room, look out the window waiting for the police to

12 come get him.  He couldn't sleep.  It was hard.

13   And he tried to live his life.  It's actually kind of

14 sad.  Remember, I told you he had that girlfriend Natalie

15 before the fire.  And it wasn't really a girlfriend but sort

16 of knew her, and they were going to go to an eighth grade

17 dance.  He never got to go to the dance.

18   So here he is, age 38, he tries to date Natalie.

19 She's the only girl he knows.  They tried, and it didn't quite

20 work because, you know what, Adam, you're not 14 anymore, new

21 life.  So that didn't work out.

22   But what did work out for Adam was Rebecca.

23 Remember, I told you about the woman who got interested in his

24 case and helped him reinvestigate it?  They're seven years

25 apart.  When Adam turned 40, she's 47, so it's no longer an

1  age issue.  And they had grown close.  And there was a

2  courtship period, and they fell in love and they got married.

3  And she is the love of Adam's life, and they live together.

4  And she is his best friend, and they're very close.

5      So they moved out of Adam's mother's home.  They have

6  a cabin in the woods far from people, no surprise.  Nobody

7  attacks Adam today.  He is half a block away from anybody.  He

8  lives with his animals, and he tries to make a peaceful life.

9  His wife has an art business on Zoom, and Adam does some

10 carpentry.  He does the frames and they're -- they're free.

11     But this is not the end for Adam.  This is the final

12 chapter.  This is this lawsuit.  He would like justice.  He

13 would like accountability.  And that's why he's here to get

14 the final closure.

15     So let me tell you a little bit about the claims in

16 the case and the defenses.  Adam is alleging that they

17 violated his rights, the fabricated evidence, the fabricated

18 witnesses.  He's alleging that they withheld exculpatory

19 information, that they didn't give him the whole story.

20     He's suing a group of Chicago police officers.  Four

21 of them are dead.  They're still defendants, but they can't be

22 here.  And one of them is alive.  He's in the courtroom,

23 Mr. McInerney.  And I'm not suggesting Mr. McInerney is the

24 most culpable of the five.  In fact, two of the other ones who

25 are dead were more culpable in telling Adam, "You can go home

1    if you just confess." But Mr. McInerney is the one who's

2    here, but he is also going to be found culpable. And those

3    are the claims.

4           Now, I'm going to tell you a little bit about the

5    defenses, and I just have a few more subjects. I'm almost

6    done. But the defenses in the case, they're going to get a

7    turn, and they're going to present you with the evidence that

8    got Adam convicted last time. They're going to still be

9    talking about the stuff that Adam got framed. They're going

10    to talk about the testimony from 1996. And you're going to

11    say "That's not credible" because that's all been rejected.

12    The state's attorney doesn't stand by that conviction. And

13    yet, they're going to come here and present you with that

14    evidence, the discredited evidence.

15           You know, there was a lot of investigation in this

16    case. There's supposed to be. This case, there was five

17    years. It was nobody's fault that it took that long to get to

18    trial but there was -- the judge read you a long list of

19    witnesses. You're not going to hear from them, from all of

20    them, but both the plaintiff and the defendants went back to

21    the old neighborhood, interviewed everybody, turned over every

22    stone.

23           And when they put up evidence, they're going to show

24    you, you know, some little snippets, the letter,

25    out-of-context letter. They're going to take statements out

1   of context from a letter.  They're going to -- some guy, "Oh,

2   I heard something."  That's the absolute best they got, and

3   it's nothing.  They looked and they looked and they looked.

4   There's no evidence Adam had anything to do with this fire

5   because he didn't.

6          I want to just quickly comment on the standard of

7   proof.  This is not a criminal case.  Nobody is going to

8   prison.  This is about justice between the parties.  So

9   because it's not a criminal case, there's no guilty beyond a

10  reasonable doubt.

11         As you listen to the evidence, Adam has to prove more

12  likely than not that his rights were violated.  Is it more

13  likely his rights were violated, or was it more likely they

14  weren't?  So as you listen to the evidence, you've got to

15  decide "Which side am I believing" because you really do got

16  to pick a side.

17         I mean, they can't both be true.  If Adam didn't do

18  it, then how did the police get him to confess with the exact

19  facts that they thought were facts that turned out to be not

20  facts?  And I would submit to you when you're done, it's much

21  more likely than not that Adam was framed and that his rights

22  were violated and he suffered.

23         And that's going to bring you to the last issue in

24  the case, which is damages.  And Adam is going to be asking

25  for compensation.  You can't undo what happened to Adam.  If

1    you could, we would, but that's not how it works.  So in our

2    jury system, you have to decide what's fair to make him whole.

3           Adam lost his 20s.  He lost his teens.  He lost his

4    30s.  Adam missed all of the life events.  You know,

5    fortunately his mother was still alive, but he had to watch

6    her suffer and that caused him suffering.  He didn't get to

7    know his nieces and nephews.  He wanted to have a family.  He

8    wanted to have children.  His wife was too old to have

9    children.  He's not going to have children.

10          He lost so much, and so much has been taken from him

11   but most of all, it was his sense of self.  He's a resilient

12   guy.  He's a strong guy.  You're going to like him.  He's kind

13   of intense as you would be too if you spent 20 years in the

14   Department of Corrections, but he's a likable and a nice and a

15   smart guy.

16          He's going to be able to explain to you in good terms

17   what this did to him, and what it did to him was, to be an

18   innocent person in prison for something you didn't do is

19   different than if you're a guilty person.  If you're a guilty

20   person, you do the crime, you do the time.  There's a

21   consequence.  You pay your price.  That makes sense.

22          If you're an innocent person suffering and nobody is

23   listening to you, it can drive you nuts because the world's

24   not a fair place.  "Why am I suffering if I didn't do

25   anything?"  If the world is not a fair place, that's not good

1  for humans.  And Adam did his best.  And he's here.  And he's

2  strong.  And he's good.  And he wants justice.  And this is

3  your opportunity to participate in that justice, and we

4  appreciate you doing it.  Thank you.

5        THE COURT:  For the defense?

6        OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

7        MR. NATHAN:  May it please the Court, counsel, ladies

8  and gentlemen of the jury.  Good morning.  Thank you for your

9  attention throughout this case.  Mr. McInerney and my --

10  Mr. McInerney and counsel, we appreciate that attention.

11        As I said, my name is Shneur Nathan.  I'm here with

12  Avi Kamionski, Elizabeth Ekl, Neha Locke, Natalie Adeeyo, and

13  Breana Brill.  I represent a number of deceased police

14  officers.  Thankfully, we still have Mr. McInerney.  Daniel

15  McInerney is 81 years old today.

16        You heard a lot from Mr. Loevy about, they did this

17  and they did that.  It was all at this high level of

18  abstraction.  It's designed.  But actually, he sued specific

19  people and estates.  He's making accusations against

20  individuals.

21        You saw Percy Davis here yesterday, an 82-year-old

22  man, a nice old man.  You're going to hear from him on the

23  witness stand.  He's saying that Percy Davis fabricated a

24  confession from Adam Gray.  That's what he's saying.  He

25  didn't have the ability to -- I guess to say, "Hey, Percy

1    Davis fabricated that confession," but the evidence will show

2    that Percy Davis didn't fabricate anything.  He's a nice man

3    who listened while Adam Gray gave a confession.

4            I also represent the estate of Nicholas Crescenzo, a

5    retired and then deceased Area 1 violent crimes detective.

6    Also he's suing Detective Michael Pochordo who I represent,

7    bomb and arson Detective Ernie Rokosik, and bomb and arson

8    Detective George Jenkins.  These are real people.  These are

9    people who I'm going to go about this morning giving you a

10   preview about the fact and details of the things that they

11   actually did.

12           They're also suing a fire marshal, Joseph Gruszka,

13   who went about his day early in the morning.  And I'll talk

14   about what he did.  And he did a fire investigation and came

15   to conclusions that were reasonable based on the time.  And

16   the evidence is going to show that he too did absolutely

17   nothing wrong.

18           So let's talk about the actual facts, not the "they,"

19   the "them," the innuendo, the abstraction.  On March 25th,

20   1993, at approximately 2:45 a.m., Timothy and Barbara Paris,

21   they were sleeping with their teenage daughter in their

22   apartment, a first-floor apartment located at 4139 South

23   Albany in Chicago when a fire broke out.

24           You'll hear that Timothy Paris was completely blind.

25   He was married to Barbara Paris who was almost completely

1    blind.  She had just had 5 percent of her vision.  They lived

2    with Kasey Paris, their 15-year-old daughter, and their young

3    adult son, Scott Paris or Scott Sondelski, who wasn't home at

4    the time.  They also lived there with their dog and their cat,

5    Fluffy and Cornflake.

6         Barbara Paris, who had just gone to bed, heard the

7    dog barking, and she heard someone walking up the stairwell in

8    the back of her house and then coming down.  She later

9    described in her testimony that the back looked like the sun.

10   She woke up Timothy Paris who made his way to the back and

11   felt the door that it was hot.  And they woke up Kasey who had

12   a bedroom closest to the rear stairwell, and they went out the

13   front.

14        They had neighbors who lived in the upstairs

15   apartment, Peter McGuiness and Margaret Mesa, some elderly

16   neighbors.  They tried calling out to Peter and Margaret to

17   try to wake them up, but it was too hot.  There was too much

18   smoke, and they got out.

19        Even though the fire department came within minutes,

20   Peter McGuiness and Margaret Mesa were stuck on that second

21   floor.  Peter called out to the firefighters but he -- they

22   couldn't get to him in time.  Peter was taken to the hospital.

23   It was too late for him.  He died that night or that early

24   morning.  Margaret Mesa, she suffered longer.  She died from

25   burns and smoke inhalation after being transferred to two

1    different hospitals.

2          You'll hear from actually a friend, a neighbor of

3    Adam Gray's family, William Rogers.  He was one of the first

4    people who made it to the fire scene.  He happens to be a

5    firefighter himself.  He wasn't on duty.  But when he got to

6    that scene, he'll tell you that he smelled gasoline just like

7    Barbara Paris did.

8          Fire Marshal Joseph Gruszka, who is deceased, as I

9    said, arrived at the fire scene about 45 minutes later at 3:20

10   a.m. to make a cause and origin determination.  He inspected

11   the scene.  And contrary to what Mr. Loevy just said, he

12   testified that he inspected the entire fire scene.  He checked

13   for any natural causes.  That would be the simplest, easiest

14   thing to do, but there were no reasons, natural reasons for

15   this fire.  He inspected to see if there was any natural gas

16   problem.  He inspected the wiring.  There was none of that.

17         He determined that the fire engulfed the entire rear

18   staircase of the building.  Here, I'm showing you Plaintiff's

19   Exhibit 217 for a moment.  This is the back of the Paris home

20   after it's been boarded up by fire.  And I'm showing you Joint

21   Exhibit 53.  This is just a totally burnt-out staircase.

22         After Fire Marshal Gruszka finished his

23   investigation, he determined that the fire had started in this

24   back porch area and specifically determined that the ignition

25   point of the fire was at the back staircase near the bottom of

1    the staircase.  He also utilized something called a Sirchie,

2    or a hydrocarbon detector that allowed him to inspect that

3    scene and where it would buzz where hydrocarbons were.  And

4    that's where he would take samples to take to the lab.

5         Fire Marshal Gruszka's hydrocarbon detector had a

6    very strong response by the first landing going up to the

7    second-floor level which indicated to him that there was a

8    possible presence of a liquid accelerant.

9         He did observe, like we can see in the exhibit in

10   front of you, what's called heavy charring.  And because of

11   that blistering of the wood or alligatoring, they sometimes

12   call it alligatoring, but he noted based on the science that

13   was known to him at the time -- and that's going to be

14   undisputed that that is what the fire science said at the

15   time -- is that something that looks like what you're looking,

16   this charring, comes from or is indicative of an accelerant.

17        Members of the bomb and arson unit also responded.

18   That's Detective McInerney and his partners George Jenkins and

19   Ernie Rokosik.  Violent crimes Detective Nick Crescenzo was

20   there as well.

21        Just moving forward to the front of the fire scene

22   now, while the fire was still raging, neighbors came to the

23   front of the scene to watch.  One of the people who came out

24   was Gertraud Gray, Adam's mother.  As soon as she got there,

25   Scott Sondelski, Paris' son, said, "I hope to f'ing god Adam

1    didn't do this." And there's going to be evidence that Scott

2    got into a shoving match with Adam's brother who was out there

3    at the scene.

4         Now, why did Scott Paris think that Adam probably did

5    it? That's because Adam said that he would. The evidence

6    will show that Adam threatened to kill Kasey Paris on multiple

7    occasions over the months immediately preceding the fire.

8         The police were also told, and you'll hear from Kasey

9    Paris, that a dead bird was left on the back porch, the very

10   porch where the fire started. At one point before the fire,

11   Adam Gray even told Kasey Paris, "The fire is coming."

12        The evidence will show that Adam Gray, in fact, was

13   in love with Kasey Paris in December of '92 before this fire

14   but that Kasey was not in love with Adam. She was in love

15   with his best friend, Mel. That upset him. He's going to try

16   to tell you that he didn't care about that, but Adam Gray's

17   own handwritten notes which will be presented to you tell a

18   different story. He says, quote, "If I can't have you, you

19   can't have Mel." His notes, just to take one other example,

20   he says, "I'll be waiting for you in hell."

21        The evidence will show that Adam Gray was also very

22   well versed with fire: How to start fires, Molotov cocktails,

23   little fire bombs out of former fireworks, that he had those

24   stash houses where he would store his things throughout the

25   neighborhood. Given this -- this background, these witness

1   reports, obviously, the police would want to talk to Adam.  So

2   Detective McInerney went to try to find Adam.  He went just

3   about a half a block away to Adam's house and asked his

4   mother, "Hey, where is Adam?  We need to talk to him."

5         She said, "Oh, he's not here.  He's at Mel's house."

6   And she tells, Mel's house is a few blocks away.  And

7   Detective McInerney and Ernie Rokosik, they go over to Mel's

8   house to try to find Adam.  Adam is not there.  He already

9   fled.  And Adam's mom told them a different story.

10        So they go back.  They go back to Adam's house and

11   say, "Hey, he's not at Mel's house."  So that's when Adam's

12   mother Gertie says, "Oh, yeah, we actually took him to his

13   brother's apartment at 3700 South Hermitage."

14        They say, so they say, "We need to talk to Adam."

15   She says now he's over at this other place.  The evidence will

16   show that Gertraud didn't ask to go with the police or object

17   to them interviewing Adam.  She didn't really care much.  She

18   went to work.

19        Detectives Rokosik and McInerney, they did locate

20   Adam at 3700 South Hermitage over at Michael's apartment, and

21   that's where the evidence will show Michael brought Adam.  And

22   when Adam got there, he'll testify he's casually laid on the

23   couch and smoked a couple of cigarettes.

24        There was -- they knocked on the door, and Michael

25   Gray, Adam's brother, is going to testify that the Detective

1    McInerney and Rokosik asked if they can talk to Adam, and he

2    said, "Sure.  Adam, go with them."

3            He then had breakfast and then, Michael Gray, after

4    having breakfast, he took a shower, and he took two buses to

5    the police station, according to him.  According to that story

6    he -- after spending time at the police station, he takes two

7    buses home and locates his mother who is not home and then

8    gets a ride back to the police station.

9            They're going to claim that the mother was denied

10   access to Adam during the time he was being interviewed by the

11   police.  Just based on the timeline I just told you, there's

12   just no -- there was no time for that.

13           When Detective McInerney brought Adam to the police

14   station at 51st and Wentworth, it was early in the morning.

15   They were getting ready to go to court because that's part of

16   what they do every day, is they do investigations and if

17   sometimes then have to testify in court, court is at around

18   9:00 in the morning, they have to get to court.

19           So Mr. McInerney went, put Adam into a squad room.

20   He was not handcuffed.  Adam Gray will tell you that every

21   single interaction that he had with Mr. McInerney was

22   pleasant, was fine, he was never handcuffed, never pushed,

23   never shoved, never yelled at.  McInerney then left and went

24   to court.

25           At about 7:30 a.m., still just hours from the fire,

Opening statement - Nathan

1   another person, an actual person, not a "they," a "them," a

2   person, his name is Prosecutor James Brown.  He came into the

3   squad room where Adam was, and he introduced himself to Adam

4   Gray.  He told him that, "Hey, I'm a lawyer.  I'm not your

5   lawyer.  I'm a prosecutor."  And he gave the Miranda warnings.

6   He then left.

7          At about 8:00 a.m., Youth Officer Davis, again who

8   you saw yesterday, went in because that's what he's supposed

9   to do.  He's a youth officer.  He's supposed to come in to

10  spend the time together with the youth who needs to be

11  interviewed.  And his job, he's going to tell you, is to make

12  sure that no one abuses Adam's rights.  And from the time that

13  he got there, he never left Adam until after the confession

14  and made sure that no one ever abused Adam.

15         Youth Officer Davis, he gave Miranda warnings to Adam

16  yet again.  And you'll hear from Adam in this case that he

17  actually received Miranda warnings about seven or eight

18  different times.

19         The evidence will show that Youth Officer Davis is 82

20  years old and has been retired for about 20 years.  The

21  evidence will show that he's a kind man who did his job, who

22  took it seriously.  He took that job seriously, and he made

23  sure that Adam's rights were protected and respected.

24         Adam Gray, when he was initially interviewed by the

25  prosecutor, ASA Brown, said that he was sleeping at Mel's

1   house and said that he never left until his mother and brother

2   came.  So he's saying he was sleeping from about 10:00 p.m.

3   until his mother and brother come at 4:00 a.m.  So he's --

4   according to Adam's story, he's sleeping for six hours.  So

5   this suggestion that he didn't get any sleep can only be true

6   if he started the fire.  So if he didn't start the fire, then

7   he got plenty of sleep.

8        But he says his alibi is that he's sleeping there.

9   And could anyone corroborate that alibi?  No.  They ask Mel,

10  "Hey, did you see if Adam left?"

11       Mel couldn't say because Mel said, "I was sleeping."

12       Unfortunately, Mel is deceased today, so you won't

13  hear from him live.  You'll hear, you may hear from his mother

14  or his sister, but they too were sleeping, and they won't be

15  able to tell you that Adam Gray couldn't leave.

16       But you will hear testimony from an eyewitness,

17  Karrie Kelly.  She saw Adam Gray running from the alley behind

18  the Paris house shortly before the fire trucks came, showing

19  Plaintiff's Exhibit 213.  Karrie Kelly was leaving her

20  fiancé's apartment in the morning, and she saw Adam Gray

21  running from the area where that X is in the photograph which

22  is by the fire scene northbound.

23       Where you see the KK, those are markings that Karrie

24  Kelly actually put on that exhibit at the criminal trial in

25  1996 in front of another jury showing where she was standing

1    when she saw Adam Gray.  There's a streetlight right above

2    that, well-lit spot right -- she'll testify that she was, when

3    Adam Gray ran past her to the north, she was -- he was just

4    about an arm's length away from her.

5          At 9:15 that morning, Karrie Kelly went to the police

6    station and viewed a lineup, and she'll tell you that she

7    actually knew Adam Gray because she spent about an hour

8    driving with him just that past 4th of July.  She drove him,

9    Kasey Paris, and Scott in her car to Scott's father's house in

10   Indiana, so she knew who he was.  She just didn't know his

11   name.  And they drove back together as well.

12         She viewed this very lineup, Joint -- Plaintiff's

13   Exhibit 205, and she identified Adam Gray at 9:15 a.m.  After

14   Karrie Kelly identified Adam Gray, Prosecutor Brown, Detective

15   Crescenzo, and Youth Officer Davis went back to talk to Adam

16   Gray and said, "Hey, we know a witness identified you.  You

17   don't have a good alibi.  We know you did it."

18         And he confessed.  He gave a very detailed

19   confession.  He told Prosecutor Brown that he did start the

20   fire at Kasey's home.  He left in the middle of the night,

21   walked about two blocks to a Clark gas station, and he bought

22   $2 worth of gas from the Clark gas station, put it in a milk

23   container, and walked the few blocks back to the Paris home.

24         The evidence will show that Adam Gray knew that home.

25   He knew that back door was locked, and he said that in the

1  confession, that the back door was locked, that's how he

2  got -- unlocked.  I apologize.  He knew that back door was

3  unlocked, and that's how he got in.

4        He explained to the prosecutor, James Brown, that he

5  went up the stairs just like Barbara Paris heard.  He went up

6  the stairs, went down the stairs pouring gasoline, and then

7  lit it on fire from the bottom.  He said that he went and ran

8  northbound through this very alley where he said he saw

9  somebody, and then he discarded the milk container.  And this,

10 we'll talk about this later, but the milk container was found

11 right about here just on the path of flight.

12       Let me talk about a minute -- let me pause for a

13 moment and talk about Adam Gray at the time that he gave his

14 confession because Mr. Loevy, he at one point called him a

15 tough kid, sometimes called him a kid doing kid things.  But

16 he wasn't a naive kid at the time that he spoke to the police.

17       The evidence will show that according to

18 psychological testing that was done on Adam Gray very close in

19 time to the fire, he had a performance score IQ in the

20 superior range.  He received the highest possible score on a

21 subtest which measures abstract problem-solving, and the

22 evidence will show that fewer than 1 in 100 adolescents would

23 do as well on the subtest.

24       Now, why am I telling you how smart Adam Gray is?

25 Because he wasn't easily manipulated.  He was also extremely

1  independent.  He traveled to Alsip by himself regularly, and

2  he slept out of his house four to five nights a week.  He knew

3  how to fend for himself.

4         Removing any doubt whatsoever about whether Adam Gray

5  confessed, he repeated this confession before a court reporter

6  just like we have a court reporter taking down everything

7  that's being said today.  He repeated his confession in front

8  of the court reporter named Janet Lupa, and she transcribed

9  exactly what he said.

10        Present at that court-reported statement that Adam

11  Gray gave was not just "they."  It was a prosecutor, a lawyer,

12  James Brown.  It was Percy Davis who you saw yesterday.  And

13  showing you Plaintiff's Exhibit 170, you'll get to see the

14  actual transcribed confession that he gave.  It was signed by

15  the prosecutor, James Brown, signed by Adam Gray, signed by

16  Percy Davis, and signed by a Detective Pochordo dated March

17  25th, 1993, 12:05 p.m.

18        This confession, in fact, says, Page 5, that he went

19  to this Clark gas station at 41st and Kedzie.  "What did you

20  have in your hand?"

21        "I had a gallon."

22        "And when you got there, what did you do?"

23        "I gave the lady two bucks for a can of gas to fill

24     up the can of gas."

25        "Fill up what with gas?"

1          "The gallon."

2          "Container?"

3          "Answer:  Yes."

4          "And what did the lady that you gave the two dollars

5     for the gas look like?

6          "Answer:  She was a black lady."

7          And then he talks about how he went to Kasey's house,

8     how did he know her.

9          This wasn't just yes answers like Mr. Loevy said.

10    He's giving these details.  In the transcribed statement, he

11    admitted that he got into the Paris home through the door that

12    was unlocked.  He said, "Through the back door.  It was

13    unlocked.  It doesn't lock.  It was broken."

14         That's something he would know.  He explained that he

15    poured gasoline from the gallon, lit the fire, and ran away.

16    He admitted that he ran past someone in the alley as he fled

17    back to Mel's house.  He admitted that he discarded the gallon

18    container in the alley.

19         Then he was asked:

20         "Now, could you tell me why you did what you did with

21    the gasoline?"

22         And he answers, "Because I wanted to kill her."

23         "Kill who?"

24         "Kasey."

25         In this very same statement he's asked:

1        "Have you been treated well by the police?"

2        He says, "Yes."

3        "Have you been treated well by myself, Assistant

4    State's Attorney Brown?"

5        "Yes."

6        "Have you been given anything to drink?"

7        "Yes."

8        "What were you given to drink?"

9        "Soda and coffee."

10       "Have you been allowed to use the bathroom?"

11       "Yes."

12       "Are you under the influence of any drugs or alcohol

13   at this time?"

14       "No."

15       And importantly:  "Have you been forced to give this

16   statement?"

17       "Answer:  No.

18       "Question:  Have you been promised anything to give

19   this statement?

20       "Answer:  No."

21       Ladies and gentlemen, when you look at the language

22  of the confession, the details of the confession, and the

23  facts of the confession that only Adam Gray knew, there's only

24  going to be one reasonable conclusion, and that's that the

25  confession was true and reliable.

1       Now, you're going to know that it was true and

2  reliable because there's what we call corroboration of the

3  confession. One of the ways you'll know is that it was

4  corroborated by the person at the gas station, Brenda Thomas.

5  So Adam confessed on March 25th, 1993, and said that he bought

6  the gasoline from a black lady.

7       The very next day, the 26th, the police go to the gas

8  station, the Clark gas station, and talked to Brenda Thomas

9  who is a black lady. And she says, "Yeah, I did sell gasoline

10  to a young man who walked up here on foot. He walked back

11  northbound." And that makes sense. She then identified Adam

12  Gray from a group of photos, four photos.

13       Now, you heard earlier Mr. Loevy talk about Rebecca

14  George, Adam Gray's now-wife. She had been harassing,

15  frankly, Brenda Thomas and her mom many, many times. And

16  you'll hear during Brenda -- I'm sorry. Excuse me. You'll

17  hear during Rebecca George's examination, she'll admit that

18  she didn't care if she was going to harass people or not. She

19  was going to do that because she wanted to get people to

20  change their testimony from what they said in court in 1996.

21       And guess what? It worked. She got Brenda Thomas to

22  be sick of dealing with her. But even after all the

23  harassment that she did to Brenda Thomas, Brenda Thomas still

24  even today says, "Yeah, I testified truthfully when I said at

25  the trial that Adam Gray is the guy who walked up and bought

1    gasoline."

2        Now, she does live in Minnesota now and wants to move

3    on with her life.  And it's not surprising that she doesn't

4    remember every single detail from her testimony last -- from

5    27 years ago.  And the evidence will show that Brenda Thomas

6    had a difficult life over the last 30 years, difficulties that

7    did include struggles with heroin abuse, but she's again

8    always remained consistent, that she didn't get on the stand,

9    on the witness stand in front of a jury like yourself and lie.

10   She's saying, "I did not do that.  I testified truthfully."

11       She, in fact, saw somebody walk up on foot, buy

12   gasoline from her at the Clark gas station shortly before

13   those fire trucks came.  And the evidence will show that

14   there's no way for Prosecutor Brown, Youth Officer Davis, or

15   Detective Nick Crescenzo to know that before they even talked

16   to Brenda Thomas.

17       You'll also know that the confession was true because

18   Adam Gray himself says, "I'm the one who talked about this

19   milk container, not the police, not the prosecutor.  I'm the

20   one who came up with that fact."  And he's the one that said,

21   "I discarded that milk container."  And lo and behold, the

22   police did find a milk container there.

23       In order to avoid this confession that Adam Gray has

24   to admit that he gave including the details that he also

25   admits he said, he's going to have to get some help, call a

 1    friend.  He's going to call a witness, Melissa Russano, who is

 2    a social psychologist, wasn't at the police station.  And

 3    she's going to talk about confessions in general and people,

 4    that it's possible to have a false confession.  She won't be

 5    able to tell you that this confession is false.  She'll say,

 6    "I have no way of telling you if this confession is false."

 7              MR. LOEVY:  Objection, your Honor.  That's not her

 8    role.

 9              THE COURT:  Overruled.  The statement may stand.

10              You can go on.

11              MR. NATHAN:  And she will concede to you, just like

12    I'm telling you, that a confession that has details with

13    corroboration, that has hallmarks of reliability.  That has

14    all the hallmarks of a true confession.

15              Even the plaintiff's experts are going to tell you

16    that given this context, the strong motive, it's obvious that

17    the police are going to have to interview Adam.  There's

18    nothing wrong with the police interviewing Mr. Gray even

19    though he was 14.  The police didn't get to choose his age and

20    didn't get to choose whether he was a suspect in this fire.

21              Adam Gray was convicted of arson and murder at his

22    jury trial in 1996 at the criminal courts building at 26th and

23    California.  A jury just like yourselves listened to the

24    evidence while it was fresh, evaluated the witness testimony:

25    Karrie Kelly who saw Adam running through that alley right

1    past her, Brenda Thomas from the gas station. She was able

2    to -- they were able to look at those witnesses, look them in

3    the eye, assess their credibility, and they concluded that

4    Adam Gray was guilty.

5        You'll learn in this trial that there was

6    overwhelming evidence of guilt beyond a reasonable doubt that

7    included Kasey Paris, the girl from the apartment, who said

8    that Adam Gray was in a fight with her that very day before

9    the fire. Their other friend Donald Dugard testified at that

10   trial that Adam made many statements including this one, that

11   he wanted to, quote, "kill the dirty bitch."

12       Barbara Paris testified that she heard those

13   footsteps and smelled gasoline right before the fire, and

14   Karrie Kelly made the identification. The prosecutor, James

15   Brown, testified that he took that confession and that's what

16   Adam Gray said. Brenda Thomas testified that she can confirm

17   that confession because she was the person at the gas station

18   who sold him the gasoline.

19       And Fire Marshal Gruszka testified that about his

20   investigation as I talked to you before and about his

21   conclusions which included the conclusions about the

22   alligatoring. And I'll talk about that in a moment.

23       This overwhelming evidence led to the jury concluding

24   Adam Gray was guilty, and he spent 24 years in prison. Did

25   any police officer, any of the actual defendants who are being

1    sued here, decide whether Adam Gray was going to be charged

2    by -- as an adult?  No.  That's not their call.  Did any one

3    of them decide what the appropriate sentence was for Mr. Gray?

4    No.  Again, not their role, not their -- they don't have the

5    power to do that.

6         Did they decide how long he should spend in prison

7    given the fact that he did kill two people, Margaret Mesa and

8    Peter McGuiness?  No, they didn't make that decision either,

9    but the sentence that Adam Gray received was for crimes that

10   he committed, and the amount of time he spent was something

11   that the prosecutors and the courts determined.

12        The charges against Adam Gray were dismissed on May

13   3rd, 2013.  And you heard from Mr. Loevy that he was given

14   something called a certificate of innocence.  He's going to

15   present to you like -- just like he did in his opening

16   statement that, oh, because this happened, you don't

17   have --you have nothing to do.  Job's over.  It's insulting.

18        You do have a very important job here.  It's your job

19   to decide what happened here.  It's not just rely on what some

20   document said.  That certificate of innocence is not binding

21   on you.  It's decidedly not binding on you.  Nothing in that

22   document attributes blame to anyone, has nothing to do with

23   whether Detective McInerney did anything wrong, whether George

24   Jenkins, Ernie Rokosik, Nicholas Crescenzo, Michael Pochordo,

25   or Fire Marshal Gruszka did anything wrong.

1    The document has no explanation as to why it's given.

2  And your job in this case is not to decide why that document

3  exists.  You'll hear evidence in this case, and it's you and

4  you alone who are going to be tasked with making a decision

5  about the facts and the claims before you.

6    Now, we readily acknowledge, going back to that

7  blistering, that at the time the prevailing understanding was

8  that along the lines of what Fire Marshal Gruszka testified

9  to.  Heavy charring on the wood, that alligatoring or

10  blistering, was -- at the time they believed it was proof

11  positive that an accelerant was used.  That's no longer true.

12  Science evolved since 1993.  That is not proof positive.

13    Does that mean that the whole analysis ends?  Does

14  that mean the confession never happened?  Does that mean that

15  Karrie Kelly didn't see what she saw?  Does that mean that

16  Brenda Thomas' testimony was false?  Absolutely not.

17    It's true, that little piece of evidence, the fire

18  science did change, and you're not going to hear anything

19  different from us.  But what you will hear is that, and the

20  Court is going to instruct you, that the officers did not

21  fabricate that evidence.  They're claiming that evidence was

22  fabricated.  You're going to get a jury instruction saying

23  they did not fabricate that evidence because there was no way

24  for them to know about that.

25    The question in this case is not whether Adam Gray is

1    guilty beyond a reasonable doubt.  The question in this case

2    is whether defendant police officers had probable cause to

3    believe that Adam Gray started that fire.  The question is

4    going to be, did they have an honest suspicion about this?

5    Was it reasonable for them to think that Adam Gray probably

6    started the fire such that a jury should figure it out?

7            Because the officers unfortunately are not on a

8    mission.  They don't know.  They weren't there.  All they have

9    is the evidence, and they're supposed to present the evidence

10   to the jury, and a jury like you can make that determination.

11           Was there probable cause for them to present these

12   different statements and the suspicion to a jury?  Absolutely.

13   There was overwhelming probable cause.  The plaintiff is going

14   to try to avoid this very obvious conclusion by asserting that

15   every single thing under the sun is fabricated.  The witness

16   statements are fabricated.  Adam Gray's confession that he

17   gave to a lawyer, prosecutor, that he gave to Percy Davis,

18   fabricated.

19           But just calling things fabricated doesn't just wash

20   them away.  We're going to demonstrate in this case that the

21   police officers, McInerney, Percy Davis, and the prosecutor

22   James Brown, they didn't act with malice.  There was no motive

23   whatsoever to frame -- to frame Adam Gray.  They acted because

24   they had probable cause, and that was their job.  They acted

25   consistent with the information that was available to them.

1          Judge Chang instructed you yesterday that you should

2     keep an open mind about the verdict, what that verdict should

3     be, until you go to the jury room to decide the case.  That's

4     the way this process works because the plaintiff has the

5     burden of proof.  They have to prove everything that they're

6     claiming or else we win.

7          And because they have the burden of proof, they get

8     to go first.  They put on all their evidence first.  And you

9     may spend -- and I'm sorry.  You may spend two weeks where

10    only the plaintiff gets to put on evidence, and we're going to

11    be sitting there waiting for them to finish.  And they'll

12    probably call all of our witnesses too because that happens,

13    and we'll -- but you're going to have to wait for us to tell

14    our side of the story.

15         Please keep an open mind and know that there are

16    always two sides to the story, and that's why I'm so

17    appreciative that I have this opportunity to give you a

18    preview of what we have -- what our evidence is going to show.

19         Mr. Loevy talked about the fact that the lab didn't

20    show any evidence of an accelerant.  That's really just going

21    to be a total distraction.  The lab -- the officers did take

22    samples from the lab, they also took -- samples from the fire

23    scene as well as the milk container, and they dutifully

24    presented that evidence to the lab for testing.

25         And the results of that testing didn't show any

Opening statement - Nathan

1  evidence of gasoline.  And that was presented at the criminal

2  trial, the original criminal trial.  That didn't change.

3  Nothing about that changed, but just because the test didn't

4  definitively prove that there was gasoline doesn't mean that

5  the fire wasn't started with gasoline.

6          You still had the evidence of people smelling

7  gasoline.  You had Adam's confession.  It's kind of like the

8  analogy of, if somebody walks down the hall and you walk and

9  you -- they leave, they go in the elevator and you walk into

10  the hall, it doesn't mean they didn't just walk down the hall.

11  It means they're no longer in the hall.  So the absence of a

12  detectable gasoline in a lab test does not mean that gasoline

13  did not exist at the time of the fire.

14          And you know what, you don't have to take my word for

15  it, and you shouldn't.  That's what the plaintiff's own expert

16  is going to have to admit.

17          The bottom line regarding the testing that was done

18  in this case is that the results were properly presented to

19  the jury in 1996 and that it never meant very much.  The

20  evidence will show that the absence of detectable gas, like I

21  just said, doesn't mean that Adam Gray didn't test the fire --

22  didn't start the fire.

23          Even after all these years, you heard some

24  speculation about, oh, maybe the fire was caused by someone

25  else.  You're going to hear no evidence of that whatsoever.

1    Even after all these years, you're going to -- the only thing

2    you're going to hear is a confession from Adam Gray that he

3    started the fire.

4           It's going to be plain that he did because Barbara

5    Paris smelled the gasoline.  Williams Rogers smelled the

6    gasoline.  The fire clearly started in the back of the

7    building.  I mean, that's going to be -- that's pretty clear

8    and obvious.  Karrie Kelly always maintained for the last 30

9    years, despite Adam Gray's wife harassing her over many years,

10   she never changed her testimony.  And Adam Gray, of course,

11   confessed.

12          At the close of the evidence, we're going to ask you

13   to do the only just thing:  To evaluate the actual claims in

14   this case, the claims made against the specific people that

15   were sued.  We're not here saying that the entire criminal

16   justice system is perfect, that the sentence was perfect.  My

17   clients didn't get to choose the sentence.

18          What we're saying is that my clients -- Detective

19   McInerney, George Jenkins, Ernie Rokosik, Nick Crescenzo, and

20   Michael Pochordo and Fire Marshal Gruszka -- were doing their

21   job.  They acted on probable cause, and they just presented

22   the evidence to a jury.  It's those facts, the actual facts,

23   not just generalities, that you, ladies and gentlemen, are

24   going to have to evaluate.  And we're very confident that at

25   the conclusion of you seeing the actual facts, you will render

1    the only just verdict, which is a verdict in favor of the

2    defendants.

3         THE COURT:  All right.  Ladies and gentlemen, let's

4    take our midmorning break.  So we'll break until 5 to 11:00,

5    and we'll start with testimony.

6         All rise.

7    (Recess from 10:37 a.m. to 10:55 a.m.)

8    (Proceedings heard in open court.  Jury out.)

9         THE COURT:  Let's go on the record.

10        MR. NATHAN:   In Mr. Loevy's opening statement, he

11   made several references about Adam doing what kids do, riding

12   bikes and playing -- and building and playing with Legos.

13   Repeatedly, he said doing what kids do, he's a 13-year-old

14   kid.  That, in our view, opens the door to showing -- to the

15   defendants being able to rebut that he's not just doing what

16   kids do.  He's doing these things that are getting arrested

17   and getting him to have encounters with the police.

18        In addition to that, just separate, it's also the

19   arrests are relevant to his state of mind during that

20   interrogation.  So it's not just, the arrests aren't just

21   relevant to whether the officers knew about the arrests for

22   purposes of probable cause.  It goes to whether Adam at 14

23   years old was sophisticated enough during his interactions

24   with the police to understand the situation, understand that

25   it's serious, or based on those interactions think it's not

1   serious because he got away with it multiple times.

2          And because of the coerced confession claim, those

3   arrests, in our view, are independently relevant but besides

4   for that, given that Mr. Loevy's portrayed -- has portrayed

5   Adam as just a kid riding bikes, playing with Legos, we think

6   he opened the door to the arrests.

7          THE COURT:  Okay.  Quick response?

8          MR. LOEVY:  Your Honor, we said he's a tough kid in a

9   tough neighborhood.  He was getting in a lot of fights.  His

10  direct is going to make clear that he's not claiming to be

11  some angel.  He was fighting.

12         The question is, should you bring in that he got

13  arrested, and you already ruled on that, is that the relevance

14  to this case that he's been arrested because he's

15  sophisticated was insufficient to outweigh the prejudice.

16         THE COURT:  Right, yeah.  It's -- so the rules of

17  evidence guard against good character evidence.  I don't think

18  that that is the purpose of the evidence.  It's to show what

19  he lost out on due to the alleged misconduct of the

20  defendants, and so it goes to damages, and so there's actually

21  relevancy theory there.

22         And then the reverse, though, is it's much more

23  dangerous with regard to bad character evidence, and I think

24  that is the risk that we have to avoid.  And so there is just

25  a magnitude of difference between allowing the arrests in and

1   the encounters in with the police from which the jury might

2   draw the -- might very well draw the incorrect bad character

3   inference.

4         And then the flip side of that, with respect to the

5   confession and the circumstances of that interrogation, it's a

6   magnitude different from the prior encounters with the arrest.

7   So it doesn't have sufficient probative force to show that he

8   would be able to navigate the ins and outs of the -- that

9   murder investigation interrogation.

10        All right.  Objection is overruled.

11        Who is up first?

12        MR. LOEVY:  Terri Mascherin.  Do you want her on the

13   stand?

14        THE COURT:  Yes.  Why don't you go ahead and have her

15   come in.  Oh, all right.  There she is.

16        Yes, please have a seat.

17        Are you going to be displaying from your laptop?

18        MS. WANG:  We don't have any exhibits with her.

19        THE COURT:  Okay.

20     (Proceedings heard in open court.  Jury in.)

21        THE COURT:  All right.  Please be seated.

22        All right.  It didn't even take a day.  You were all

23   lined up.  Great.  Congratulations on that.

24        We are ready for the first witness.  Go ahead and

25   announce the witness, please.

Mascherin - direct by Wang

284

1          MS. WANG:  Terri Mascherin.

2          THE COURT:  Okay.  And, Ms. Mascherin, please stand

3     up for a moment and raise your right hand.

4        (Witness sworn.)

5          THE WITNESS:  Yes, I do.

6          THE COURT:  All right.

7          Okay.  Ms. Wang?

8          TERRI MASCHERIN, PLAINTIFF'S WITNESS, SWORN

9                    DIRECT EXAMINATION

10    BY MS. WANG:

11    Q.   Could you please state your name and spell it for the

12    record?

13    A.   Yes.  It's Terri, T-e-r-r-i, the last name is Mascherin,

14    M-a-s-c-h-e-r-i-n.

15    Q.   What do you do for a living?

16    A.   I'm a partner with the law firm of Jenner & Block and one

17    of the co-chairs of the litigation practice there.

18    Q.   Okay.  And what kind of law do you practice?

19    A.   Most of the time I practice commercial litigation, all

20    sorts of business disputes, but throughout the course of my

21    practice, I have also had occasion to get involved in a number

22    of criminal defense engagements and criminal post-conviction

23    including in capital cases.

24    Q.   And what kind of law firm is Jenner & Block?

25    A.   It's a 500-plus lawyer firm with offices in a number of

Mascherin - direct by Wang

285

1   cities in the United States and in London.

2   Q.  How long have you been practicing law?

3   A.  Since 1984.

4   Q.  Can you tell us a bit more about the kind of pro bono

5   cases you have handled?

6   A.  Beginning at the very start of my practice, I got involved

7   in criminal defense pro bono work.  I handled two cases on

8   behalf of inmates who were on death row in Illinois at the

9   time and did a Georgia death penalty case.  And since Illinois

10  abolished the death penalty, I have been involved in

11  representing several individuals who have claimed that they

12  were wrongfully convicted or wrongfully charged.  Most of the

13  criminal cases I've done have been murder cases.

14  Q.  Does Jenner & Block get a lot of requests for pro bono

15  assistance?

16  A.  Constantly, yes.

17  Q.  And how does Jenner decide what cases to take, what pro

18  bono cases to take?

19  A.  We have a pro bono --

20          MS. EKL:  Objection, Judge.

21          THE COURT:  Yeah, let's take a quick sidebar.

22      (Proceedings heard at sidebar:)

23          THE COURT:  All right.  Go ahead and articulate the

24  objection.

25          MS. EKL:  Judge, the defense objects based on

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 77 of 166 PageID #:21079
Mascherin - direct by Wang
286

1  relevance and also that she's a -- bolstering this witness'

2  testimony.

3              THE COURT:  Okay.  Response?

4              MS. WANG:  It's just --

5              THE COURT:  Can you get to a mike actually?

6              MS. WANG:  It's just background information about the

7  kind of cases that they take.

8              THE COURT:  Yeah, I think you've already established

9  that and what her pro bono categories are.  Going further on

10  this is like a good character-type bolstering, and getting

11  into the screening processes of Jenner or Ms. Mascherin is not

12  permitted.  So why don't you go ahead and accelerate to the

13  facts of this case.

14              MS. WANG:  Okay.

15        (Proceedings heard in open court:)

16              THE COURT:  All right.  The objection is sustained.

17  The last answer can stand, but go ahead and move on, please.

18  BY MS. WANG:

19  Q.  All right.  Did Jenner & Block decide to take Adam's case

20  pro bono?

21  A.  Yes.

22  Q.  And could you explain what happened -- before we talk

23  about your involvement in Adam Gray's case, could you just

24  give a little bit of information about what happens in a

25  criminal case after a criminal defendant is tried and

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 78 of 166 PageID #:21080
Mascherin - direct by Wang
287

1   convicted?

2   A.   Sure.   After conviction, the defendant has a right to take

3   an appeal to the Illinois Appellate Court, sometimes also the

4   Illinois Supreme Court, and sometimes a petition for

5   certiorari to the United States Supreme Court.

6        After that, there's an Illinois statute that allows

7   someone who believes that there's new evidence that wasn't

8   available at the time of the trial or wasn't presented by

9   trial counsel at trial to bring what's called a

10  post-conviction action which is a separate case in the

11  criminal court that challenges either his or her conviction or

12  sentence or both based on this new evidence that either wasn't

13  available at the time of trial or wasn't used by trial

14  counsel.

15  Q.   And in your experience litigating these cases, is it easy

16  or common to get post-conviction relief?

17  A.   It is uncommon.

18        MS. EKL:   Objection, your Honor.

19        THE COURT:   Okay.   The objection is sustained, so the

20  jury will disregard the last answer.

21        Next question.

22  BY MS. WANG:

23  Q.   When did you become involved in Mr. Gray's case?

24  A.   December of 2013.

25  Q.   How did you become involved in his case?

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 79 of 166 PageID #:21081
Mascherin - direct by Wang
288

1   A.  My partner Doug Rees was -- had been supervising the case.

2   He was leaving to take a job with the Illinois Attorney

3   General's office and asked me if I would step in and be the

4   partner supervising the case.

5   Q.  Could you tell us a little bit about Jenner's

6   investigation into Adam's case?

7   A.  Sure.  Jenner had -- Jenner & Block had conducted an

8   independent investigation into the case, had discovered

9   some -- through FOIA requests, Freedom of Information Act

10  requests, some information that hadn't been provided to

11  defense counsel by the police at the time of the trial.  They

12  --

13          MS. EKL:  Objection.  Foundation.

14          THE COURT:  All right.  Let's take a sidebar.

15      (Proceedings heard at sidebar:)

16          THE COURT:  Okay.  Are you just trying to lay some

17  background for getting to the filing of the certificate or --

18          MS. WANG:  Yes.  And she'll -- I'll ask her about

19  what's in the petition and then the petition, what happened

20  with it and the COI.

21          MS. EKL:  Judge, the defendants' argument is that

22  she's now trying to get into things that she's claiming

23  weren't provided to him by the police department.  And this is

24  far outside the scope of what's in the petition and what was

25  included or not included in a response to a FOIA request.

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 80 of 166 PageID #:21082
Mascherin - direct by Wang
289

1      MS. WANG:  Judge, he had allegations in his petition,

2   and she summarized it.

3      MS. EKL:  That was not the context in which the

4   question was asked.

5      THE COURT:  Look, right now it's at a high level

6   enough of a generality that it is just the background steps

7   leading up to the filing of the petition.  So the objection is

8   overruled, but you do need to just move on and get to that

9   petition.

10      MS. WANG:  Okay.

11     (Proceedings heard in open court:)

12      THE COURT:  All right.  The objection is overruled.

13   The last answer can stand.  And you can move on as discussed.

14   BY MS. WANG:

15   Q.  Did you argue in your petition that Mr. Gray was entitled

16   to a new trial?

17   A.  Yes, we did.  We argued that he was innocent and that

18   there was new evidence, particularly with respect to the

19   testimony and the physical evidence that had been presented at

20   trial to the effect that the fire that took place was an

21   arson.

22      There was new scientific evidence.  There was also

23   new evidence in the form of witness testimony because a couple

24   of the witnesses who had testified that they had identified

25   Adam at the time or had attributed certain statements to Adam

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 81 of 166 PageID #:21083
Mascherin - direct by Wang
290

1    at the time of the fire had changed their testimony and had

2    said that they had been pressured into giving the testimony

3    that they had given at the trial.

4    Q.  Did you have other Jenner lawyers working with you on

5    Mr. Gray's case?

6    A.  Yes, we did.  There were over time a number of lawyers who

7    worked on it, but the person I worked most closely with was

8    then an associate named Brij Patnaik.

9    Q.  And what was your primary role on the team of lawyers

10   working on behalf of Mr. Gray?

11   A.  I supervised the case overall.  I handled most of the

12   court appearances after I became involved.  I also met with

13   the Assistant State's Attorneys and the conviction integrity

14   unit of the attorney -- of the State's Attorney's office to

15   try to persuade them that they should drop the charges and not

16   pursue the case any further.

17   Q.  And the court system is sometimes described as an

18   adversarial process.  Could you explain what that means?

19   A.  Yes.  The State was represented in the post-conviction

20   proceeding by a woman named Celeste Stack who was a very

21   strong advocate, and she moved to dismiss the petition.  She

22   tried to get rid of basically the whole case.  She argued that

23   there was no basis for the claim, and she did her -- you know,

24   she presented her own evidence that she had developed through

25   investigation to the court to try to persuade the court to

Mascherin - direct by Wang

291

1   dismiss the whole petition and to reject the claim of

2   innocence.

3   Q.  And did the State eventually -- what position did the

4   State take after it did its own investigation?

5   A.  After investigating the case and after we met with the

6   conviction integrity unit concerning their investigation, the

7   State decided that they would agree that Mr. Gray was entitled

8   to a new trial, that the scientific evidence that we had

9   presented showed that there -- that the evidence of arson that

10   was admitted at the original trial was no longer viewed as

11   being scientifically sound and that if they were to try to

12   retry the case based on that same evidence, it would not be

13   admissible.  And so the State agreed with us that Adam should

14   receive a new trial.

15   Q.  Did the State eventually agree to dismiss all the charges

16   against Adam?

17   A.  Yes.  They eventually agreed sometime later that in

18   addition to a new trial, they should simply -- they believed

19   it was most appropriate that the charges simply be dismissed

20   and that the court enter an order that's called an order of

21   nolle pros, which means essentially that all charges are

22   dismissed and Mr. Gray could not be prosecuted again for the

23   alleged crimes.

24   Q.  And do you recall when the charges against Adam were nolle

25   prossed, or dismissed?

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 83 of 166 PageID #:21085
Mascherin - direct by Wang
292

1    A.   In May of 2017.

2    Q.   And was Mr. Gray released from prison at that time?

3    A.   Yes, he was.

4    Q.   After the State dismissed the charges, was the case over,

5    from your perspective?

6    A.   No.  We filed what's called a petition for issuance of a

7    certificate of innocence which is a proceeding that you can

8    bring to ask the court to do an independent review and to

9    decide based on the evidence that Mr. Gray was innocent of the

10   crimes that had been charged so that he could have his

11   criminal record cleared so that if he applied for a job or

12   something like that, the employer would not see on his record

13   that he had ever been charged with or convicted of these

14   offenses.

15   Q.   And what was the State's position to the petition for

16   certificate of innocence?

17   A.   The State agreed that the certificate should be issued.

18         MS. WANG:  Let's -- I'm going to show you Plaintiff's

19   Exhibit 95, Page 3.

20         THE COURT:  All right.  Any objection other than

21   previous ones?

22         MS. EKL:  No, your Honor.

23         THE COURT:  Okay.  It's allowed over the prior

24   objections.

25      (Plaintiff's Exhibit 95 received in evidence.)

Mascherin - cross by Ekl

293

BY MS. WANG:

Q.  I'm showing you Plaintiff's Exhibit 95, Page 3.  Are you familiar with this order?

A.  Yes, I am.

Q.  And what is it?

A.  It's the order that the court entered in February of 2018 granting a certificate of innocence to Mr. Gray.

MS. WANG:  Thank you.  No further questions.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MS. EKL:

Q.  Good morning, Ms. Mascherin.

A.  Good morning.

Q.  I just want to take you back a little bit just to kind of explain to the jury the process that got to your involvement in Mr. Gray's case.  You indicated that criminal defendants are entitled to an appeal after they're convicted, correct?

A.  That's right.

Q.  And was it your understanding that Mr. Gray had, in fact, appealed his conviction for the murder of two people and that that conviction had been upheld before you got involved?

A.  Yes, that's right.  That's why we filed a post-conviction petition.

Q.  And you mentioned that criminal defendants also have the right to seek relief from the next higher court, which would

1    be the Illinois Supreme Court, correct?

2    A.   They have -- they have the right to seek relief.  They're

3    not guaranteed another appeal.

4    Q.   Correct.  And Mr. Gray in this case, he filed a petition

5    for leave to appeal to the Illinois Supreme Court, correct?

6    A.   I don't remember.  It's quite possible that he did.

7    Q.   You have no information that he was ever granted any

8    relief by the Illinois Supreme Court, correct?

9    A.   That's correct.

10   Q.   And in the next phase, a criminal defendant can seek

11   relief through this post-conviction process through the

12   statute that you referenced, correct?

13   A.   Yes.

14   Q.   And in this case, you got involved after the

15   post-conviction proceedings had been going on for a while,

16   correct?

17   A.   That's right, yes.

18   Q.   There were other attorneys in addition to Jenner & Block

19   that were working on the case on behalf of Adam Gray during

20   the post-conviction phase, correct?

21   A.   Yes.  We had co-counsel from the University of Chicago.

22   Q.   And that included a person by the name of Tara Thompson?

23   A.   Yes.

24   Q.   And she is a person who formerly worked for the law firm

25   that currently represents him, correct?

1  A.  Well, she was -- my understanding was that she was

2  co-counsel with us in her role as an instructor at the

3  exoneration clinic at the University of Chicago Law School --

4  Q.  And she used --

5  A.  -- which I believe is managed by the Loevy firm.

6  Q.  Okay.  She worked both places at the same time, correct?

7  A.  That's my understanding, yes.

8  Q.  Okay.  Prior to your involvement, is it fair to say that

9  there was an extensive investigation done by another

10  individual on Mr. Gray's behalf by the name of Rebecca George?

11  A.  I know that Ms. George did some investigation.  I don't

12  know how extensive it was.

13  Q.  Okay.  Were you -- at some point in time, did you review

14  any memos or affidavits or speak to Ms. George about any of

15  the investigation that she conducted?

16  A.  I reviewed several affidavits that she collected from

17  witnesses.  I believe I've only had one conversation with her,

18  and I don't recall it being substantive, about her work.

19  Q.  And did you understand how it was that Rebecca George came

20  to be involved in Mr. Gray's case?

21  A.  I was told that Ms. George had met Adam when Adam was at

22  the Audy Home after he'd been arrested, that she was either

23  teaching there or volunteering there and that she had taken an

24  interest in him and in his case and had started doing some

25  investigation on her own out of her belief that Adam was

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 87 of 166 PageID #:21089
Mascherin - cross by Ekl
296

1   innocent and her desire to try to help him if she could.

2          THE COURT:  Let's take a sidebar.

3       (Proceedings heard at sidebar:)

4          THE COURT:  All right.  I did limit substantially

5   Ms. Mascherin's testimony and tried to keep it focused on

6   what's at issue and what she would have personal knowledge of.

7   So I think this is outside the scope of her direct testimony

8   and wouldn't otherwise be something that you would elicit or

9   be able to elicit by calling her.

10         MS. EKL:  I'll move on.

11         THE COURT:  Are you done with the Rebecca George?

12         MS. EKL:  Other than just to say that she reviewed

13  the investigation and that investigation was presented to the

14  judge in the post-conviction proceedings.  I had not intended

15  to elicit the things she's now gone on to say about -- I just

16  asked generally what her involvement was, how she got

17  involved, but I'll move it along.  And I can ask leading

18  questions to get us where we need to be.

19         THE COURT:  Yeah, so what's your next question then?

20         MS. EKL:  Just that Rebecca George's investigation

21  was included in the post-conviction petition and the

22  proceedings and was considered by the judge in the proceedings

23  in relation to his post-conviction.

24         THE COURT:  Okay.  Any objection to that, Ms. Wang?

25         MS. WANG:  No.

1           THE COURT:  All right.

2       (Proceedings heard in open court:)

3           THE COURT:  All right.  You can proceed as we

4    discussed.

5    BY MS. EKL:

6    Q.   Let me ask you some questions about the actual

7    post-conviction petition that was filed on behalf of Adam

8    Gray.   Is it fair to say that there were a number of different

9    issues that were raised generally in the post-conviction

10   petition?

11   A.   Yes.

12   Q.   And one of those things was a challenge to his sentence,

13   correct?

14   A.   Yes.

15   Q.   And that was based on the fact that there was a change in

16   the law that had occurred from the time that he was sentenced

17   and the time that he was petitioning the court in his

18   post-conviction petition?

19   A.   That's right.  When Mr. Gray was convicted, the sentence

20   of natural life was mandatory given the nature of the crimes

21   of which he was convicted.

22   Q.   Based on the fact that it was a murder of two individuals,

23   that made it a mandatory sentence, correct?

24   A.   I believe that did, along with the fact that it was that

25   the conviction was for arson murder which I think was -- I

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 89 of 166 PageID #:21091
Mascherin - cross by Ekl
298

1    think the conviction of arson was a separate aggravating

2    factor, if I remember -- if I remember correctly under the

3    statute, so both, yes.

4    Q.   In either event, the State's Attorney at that time, Anita

5    Alvarez, was not contesting that he was entitled to some

6    relief on the basis that that statute had been basically

7    overruled by the Supreme Court, correct?

8    A.   That at some point, she stopped contesting when the

9    Supreme Court ruled in *Miller v. Louisiana*, yes.

10   Q.   And another basis for that post-conviction petition, as

11   you stated, was the fact that there had been a significant

12   change in the arson science, correct?

13   A.   Correct.

14   Q.   And was it your understanding that at the time of trial,

15   the arson investigators which included both a bomb and arson

16   investigator by the name of Rokosik and a fire marshal by the

17   name of Gruszka had relied on principles, fire investigation

18   principles that were applicable at the time of their

19   investigation but that were now deemed to be unreliable?

20   A.   I would say yes and no.  They certainly -- it certainly

21   was widespread belief that the methods that they used were

22   appropriate at that time, but there was also at least one

23   scientific publication of which I'm aware which had called

24   that into question.

25   Q.   Okay.  But at the time that you were in front of the court

1    arguing about the fact that Mr. Gray should receive a new

2    trial, do you recall telling the court that scientific

3    standards for arson investigation have advanced leaps and

4    bounds since they were in the early 1990s?

5    A.   Yes.   Absolutely, yes.

6    Q.   And is it fair to say that State's Attorney Anita's

7    office -- Anita Alvarez's office was not disagreeing with you

8    that the fire science had changed and that that entitled

9    Mr. Gray to a new trial?

10   A.   Eventually, they agreed.   Initially, they opposed the

11   argument and took the position that there was nothing that met

12   the requirement of newly discovered scientific evidence but

13   eventually, they did agree, yes.

14   Q.   And during the post-conviction phase, there was extensive

15   investigation both by your office and by the State's

16   Attorney's office into the changes in the fire science,

17   correct?

18   A.   Yes.

19   Q.   You hired some experts to explain how the fire science had

20   changed, correct, and you had presented that to the State's

21   Attorney's office as well as to the court, correct?

22   A.   Yes.

23   Q.   Additionally, there were -- you were also arguing that --

24   a third prong in the post-conviction petition that Mr. Gray

25   was actually innocent, correct?

1   A.   Yes.   The -- I think the scientific evidence, you know,

2   was part of the support for that claim but, yes, one of the

3   claims was that Mr. Gray was actually innocent of the crimes.

4   Q.   And you conducted an investigation in relation to whether

5   or not there was other evidence to support his conviction,

6   correct?

7   A.   Yes.

8   Q.   And that was also presented to the court -- at that time,

9   it was Judge Petrone -- as well as State's Attorney Anita

10  Alvarez's office, correct?

11  A.   Yes.

12  Q.   Is it fair to say that the State's Attorney's office

13  opposed -- or did not agree with your position that Mr. Gray

14  was actually innocent, correct?

15  A.   I think they eventually did agree.   Along the way, they

16  changed their position and conducted more investigation and

17  eventually agreed that a certificate of innocence was

18  appropriate.

19  Q.   Well, when the certificate -- when they made a decision

20  that the certificate of innocence was -- that they were not

21  going to oppose the certificate of innocence, "they"

22  references the State's Attorney office that was now under Kim

23  Foxx, correct?

24  A.   By the time they agreed to the certificate of innocence,

25  Ms. Foxx had been elected, correct.

Mascherin - cross by Ekl

301

1    Q.   Okay.  And my question was specific to Anita Alvarez's

2    office.  So back in 2016 when Anita Alvarez was still in

3    office, the State's Attorney's office opposed Mr. Gray's

4    petition for actual innocence, correct?

5    A.   They didn't oppose it in full.  They agreed that Adam

6    should be entitled to a new trial on the basis of the evidence

7    that was presented in the petition.

8    Q.   But they represented to the court that they believed they

9    had enough evidence to convict your client a second time,

10   correct?

11   A.   I don't recall if they represented that to the court.

12   They may have.

13   Q.   Do you recall telling the court, this is back in 2016,

14   that you believed that Mr. Gray had met his burden to show

15   that it is reasonably probable that if he were to be retried

16   given the record as it stood in the case, the evidence

17   presented at trial and the unreliability of the methods used

18   and testified to by Fire Marshal Gruszka and Detective Rokosik

19   that there was a reasonable probability or possibility based

20   upon the evidence that Mr. Gray would not be convicted?

21   A.   It's a long question, but I think the answer is yes.

22   Q.   All right.  The position of both the State's Attorney's

23   office and yourself on behalf of Mr. Gray was presented to

24   that post-conviction judge, Judge Angela Petrone, correct?

25   A.   Yes.

Mascherin - cross by Ekl

1   Q.   And together, the two sides requested -- or filed a joint

2   motion in front of Judge Petrone requesting a new trial that

3   was agreed upon, correct?

4   A.   That's correct, yes.

5   Q.   And Judge Petrone denied that request, correct?

6   A.   Yes, she did.

7   Q.   Judge Petrone said that she wanted to see evidence and

8   make a decision based on actual evidence, not just an

9   agreement that this individual who had been convicted of two

10  murders should get a new trial, correct?

11  A.   In essence, yes.  She said she felt that she was obligated

12  to conduct a hearing.

13  Q.   And you presented her with all of the evidence that you

14  believe supported his actual innocence and would entitle him

15  to relief that he sought in his post-conviction petition,

16  correct?

17  A.   Yes.

18  Q.   And that included the experts that you had hired to talk

19  about fire science, correct?

20  A.   That's right, yes.

21  Q.   And it also included some experts who you had hired to

22  give opinions related to, for instance, eyewitness

23  identification, correct?

24  A.   Yes.

25  Q.   Including someone by the name of Geoffrey Loftus, correct?

Mascherin - cross by Ekl

1  A.  Yes.

2  Q.  You presented her with affidavits that had been obtained

3  by Rebecca George, now Rebecca Gray, correct?

4  A.  Some of the affidavits, yes.

5  Q.  And the judge issued a 27-page opinion after reviewing

6  that evidence, correct?

7  A.  Yes.

8  Q.  And concluded, in her words -- and this is, counsel,

9  Defense Exhibit No. 66 on Page 27.

10          She stated:

11          "It is clear to this court based on the allegations

12      of the petition and supporting materials that there has

13      been no showing of a substantial deprivation of

14      petitioner's constitutional rights at trial.  Petitioner

15      has failed to present conclusive evidence of his actual

16      innocence or any evidence that is of such a conclusive

17      nature that it would probably change the result at

18      retrial.  Therefore, the request for an order granting

19      petitioner a new trial has been denied."

20          Correct?

21          MS. WANG:  Objection, Judge.  She's -- hearsay.

22          THE COURT:  All right.  Let's take a quick sidebar.

23      (Proceedings heard at sidebar:)

24          THE COURT:  So the objection is hearsay?

25          MS. WANG:  Hearsay and relevance.

1          THE COURT:  Okay.  On the -- on relevance, Ms. Ekl,

2    just go ahead and state it for the record.

3          MS. EKL:  Sure.  Plaintiff is introducing the

4    evidence that they presented to the court in support of his

5    actual innocence claim.  And part of that is they're relying

6    on the certificate of innocence.  Defense is simply putting in

7    additional evidence that was presented to the court with the

8    intent of showing it's the same evidence that was presented at

9    the time of the COI and with a different result.

10         THE COURT:  Yeah, I think this comes in with the

11   certificate of innocence, and then you'll have to duke it out.

12   Overruled.

13        (Proceedings heard in open court:)

14         THE COURT:  All right.  The objection is overruled,

15   and the answer can stand.

16   BY MS. EKL:

17   Q.  After Judge Petrone denied the motion for a new trial, the

18   next step that your office took on behalf of Mr. Gray was to

19   file a notice of appeal now back up into the First District

20   Appellate Court in Illinois, correct?

21   A.  Yes.

22   Q.  And that was filed on December 1st of 20' --

23   A.  2016, I believe.

24   Q.  2016.  And do you know that to be the same date that the

25   new State's Attorney Kim Foxx went into office?

1  A.  I don't know when she came into office.  I know it was

2  around that time.

3  Q.  Do you recall whether or not an appeal was actually

4  finalized and filed in the appellate court?

5  A.  We filed the notice of appeal which lodges the appeal in

6  the appellate court.  Then we had further discussions with

7  Ms. Foxx's first assistant, Eric Sussman, and chief of

8  criminal prosecutions, Joe Magats --

9  Q.  And my question simply --

10  A.  -- regarding disposition, so we never briefed the appeal.

11  We reached an agreed resolution of the appeal.

12         THE COURT:  All right.  That can stand.  Next

13  question.

14         MS. EKL:  Thank you.

15  BY MS. EKL:

16  Q.  So after filing the notice of appeal, you then had these

17  meetings with assistant -- with State's Attorney Kim Foxx's

18  office and her -- basically, her supervisory personnel within

19  the office, correct?

20  A.  Right, her top two people.

21  Q.  Okay.  At the time that you met with Kim Foxx's office,

22  did you have any new evidence other than what had previously

23  been presented to Judge Petrone in the trial court in relation

24  to the post-conviction proceedings?

25  A.  No.

1   Q.   After meeting with Kim Foxx's office, did -- was it then

2   that both her office as well as you as her attorneys came up

3   with some language to present to the appellate court seeking

4   dismissal of the appeal?

5   A.   Yes.  I was Mr. Gray's attorney.

6   Q.   Oh, I'm sorry.

7   A.   But, yes, Mr. Sussman and I came up with language for an

8   agreed motion which we filed with the appellate court.

9   Q.   And that agreed motion sought to vacate Mr. Gray's

10  convictions and enter what is called a nolle pros that you

11  mentioned earlier, correct?

12  A.   That's right, yes.

13  Q.   All right.  And that effectively released or dismissed the

14  charges against Mr. Gray, correct?

15  A.   That's correct.

16  Q.   That was not something that was -- that was not something

17  that was decided by the appellate court based on evidence

18  presented to them, correct?

19  A.   Well, they had the record from the case.  They had our

20  motion, and they granted the agreed motion.  So what they

21  considered, I assume they considered at least the motion.

22  Q.   When you say they had the record from the case, they

23  didn't have a brief from you seeking any relief, correct?

24  A.   That's right, yes.

25  Q.   So you have no reason to believe that they looked at any

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 98 of 166 PageID #:21100
Mascherin - cross by Ekl
307

1    record in support of an agreed order, correct?

2    A.  I don't know what they looked at and didn't look at beyond

3    our motion and what was cited in our motion which were things

4    from the record.

5    Q.  It was after that agreed order was entered that you then

6    sought relief back again in the state court for a certificate

7    of innocence, correct?

8    A.  Correct.

9    Q.  All right.  And again, this was now still during the time

10   when State's Attorney Kim Foxx was in office as she is still

11   today, correct?

12   A.  That's right.

13   Q.  All right.  And when the case was presented for a

14   certificate of innocence, was it in front of the same judge,

15   Judge Petrone, or was it assigned to a different judge?

16   A.  It was assigned to Judge LeRoy Martin, Jr., who I think

17   was the judge who heard all petitions of that sort at the

18   time, if I remember correctly.

19   Q.  So the agreed order was entered on May 3rd of 2017.  And

20   then is it fair to say that the petition for certificate of

21   innocence was filed that same year, in November of 2017?

22   A.  Yes.

23   Q.  Within a couple of months, did yourself and the State's

24   Attorney's office under Kim Foxx submit an agreed order

25   granting Mr. Gray a certificate of innocence?

Mascherin - cross by Ekl

1   A.   Yes.

2   Q.   And is it fair to say that you worked out language that

3   you wanted the judge to sign with the State's Attorney's

4   office, so that was agreed language in the order?  The judge

5   didn't come up with that himself, correct?

6   A.   Well, there's -- the order consists of two parts.  I think

7   there's the printed part which we looked at during my direct

8   testimony, and then there was a motion and agreed order that

9   we submitted to the court.  That motion and agreed order

10  language, Mr. Sussman and I negotiated.

11  Q.   Okay.  Let me show you the first two pages -- counsel,

12  this is Plaintiff's Exhibit No. 95, Pages 1 and 2 -- of the

13  exhibit that you were shown earlier.

14       Do you recognize this document?

15  A.   Yes.

16  Q.   And what do you recognize this to be?

17  A.   This is the agreed order that the State and we submitted

18  to Judge Martin --

19  Q.   And --

20  A.   Sorry.

21  Q.   I didn't mean to cut you off.

22       And again, this is language that you and the State's

23  Attorney's office had come up with, correct?

24  A.   Yes.  My recollection is it's language that the State's

25  Attorney's office requested and we agreed to, yes.

1    Q.   If you could take a look at the last paragraph of that

2    agreed order, the language that reads:

3              "In so ruling, this Court notes that 735 ILCS 5/2-702

4         does not require this Court to make any findings of any

5         potential misconduct by any particular individual or

6         entity related to the granting of a certificate of

7         innocence, and this Court has not" -- "has not asked" --

8         or, I'm sorry, "was not asked by the parties, nor did it,

9         make any findings one way or the other on that topic.

10        Thus, this order and the petitioner's certificate of

11        innocence are not intended to have evidentiary weight in

12        proving, in any other proceeding."

13             Do you see that language?

14   A.   Yes.   I think it may go on after "proceeding," but yes.

15   Q.   I'll just turn it so you can see.   Oh, I'm sorry.   Let's

16   read the whole sentence:

17             "In proving in any other proceeding that the Cook

18        County State's Attorney's office or any of its Assistant

19        State's Attorneys engaged in misconduct with respect to

20        petitioner's wrongful conviction, but the Court expresses

21        no opinion as to whether the order of certificate of

22        innocence may or may not be admissible in another

23        proceeding for some other purpose."

24             Was this language that you agreed to with the State's

25   Attorney's office?

Mascherin - cross by Ekl

1    A.   Yes.   They requested it, and we agreed to include it.

2    Q.   And Judge Martin who was the judge presiding at that time

3    agreed that this order was being entered with the intent that

4    it not have any -- necessarily have any evidentiary weight in

5    any other proceedings, correct?

6    A.   Well, he entered the order.  I don't recall a discussion

7    of that with Judge Martin when we appeared in court.

8    Q.   Okay.  When you presented him with this agreed order, did

9    you present him with all of the evidence that you had

10   previously presented to Judge Petrone including the expert

11   testimony, the affidavits, and the trial testimony that had

12   been provided to her?

13   A.   Yes.  We -- when we filed the petition for certificate of

14   innocence before Judge Martin, we included a -- either a disk

15   or some sort of an electronic file that had the entire record

16   from the post-conviction proceedings, so all of the evidence

17   that had been submitted to Judge Petrone.

18   Q.   So it was all on a disk, correct?

19   A.   Or some sort of other electronic media, yes.

20   Q.   There was no live testimony presented to Judge Martin,

21   correct?

22   A.   That's right.

23   Q.   And there was no additional evidence on that CD that

24   hadn't previously been presented to Judge Petrone, correct?

25   A.   Correct.

1           MS. EKL:  May I have one moment, Judge?

2           THE COURT:  You may.

3     (Pause.)

4           MS. EKL:  Counsel, this is Defendants' Exhibit 66.

5  BY MS. EKL:

6  Q.  Ms. Mascherin, I had asked you earlier about Judge

7  Petrone's ruling that was provided to you on November 7th of

8  2018.  I'm going to show you what's been marked as Defendants'

9  Exhibit No. 66.

10          MS. WANG:  Objection.

11          MS. EKL:  Do you recognize that document?

12          MS. WANG:  Objection.  Hearsay.

13          THE COURT:  Okay.  Other than that, any other

14  objection?

15          MS. WANG:  Objection.  Hearsay.  403.  Relevance.

16          THE COURT:  Okay.  Overruled.  It's allowed.

17     (Defendants' Exhibit 66 received in evidence.)

18          THE WITNESS:  I'm sorry.  What was your question?

19  BY MS. EKL:

20  Q.  Do you recognize this document?

21  A.  Yes.

22  Q.  And what do you recognize this to be?

23  A.  It's the written ruling that Judge Petrone issued.

24  Q.  Okay.  And it's the written ruling that we just referenced

25  that is 27 pages, correct?

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 103 of 166 PageID #:21105
Mascherin - cross by Ekl
312

1   A.  If you say so.  I don't see the page number.

2   Q.  I'm sorry.

3   A.  Yes.

4   Q.  Okay.  And in this ruling, is it fair to say that Judge

5   Petrone set forth various pieces of evidence that she reviewed

6   and considered that you had provided to her in relation to

7   this case including, as we had talked about earlier, for

8   instance, reports of experts, affidavits of people who had

9   testified at trial, correct?

10  A.  Correct.

11  Q.  Was any of the language in this 27-page opinion language

12  that had been worked out between the parties, meaning did the

13  State's Attorney's office agree to the language in

14  Ms. Petrone's opinion?

15  A.  She wrote -- Judge Petrone wrote the opinion.  We didn't

16  have input into the opinion except to argue, present the

17  evidence and argue the issues.

18  Q.  Okay.  And her conclusion on the final page again where

19  she says:

20          "It is clear to this court based on the allegations

21      of the petition and supporting materials, there has been

22      no showing of a substantial deprivation of petitioner's

23      constitutional rights.  Petitioner has failed to present

24      conclusive evidence of his actual innocence or any

25      evidence that is of such conclusive nature that it would

Mascherin - redirect by Wang

313

1          probably change the result at trial.  Therefore, the

2          request for an order granting petitioner a new trial is

3          denied."

4               Those are her words, correct?

5     A.  Yes.

6     Q.  The State's Attorney's office didn't prepare that for her

7     even though they opposed the motion for a new trial, correct?

8     A.  Well, by this point they were agreeing to the motion for a

9     new trial, but as far as I'm aware, they did not write that

10    language.

11    Q.  And you did not write that language either?

12    A.  Of course not.

13              MS. EKL:  I have nothing further, Judge.

14              THE COURT:  All right.  Redirect, if any.

15                       REDIRECT EXAMINATION

16    BY MS. WANG:

17    Q.  Ms. Mascherin, Ms. Ekl asked you some questions about

18    earlier appeals that happened along the way.  Do you know how

19    many years it was that Adam fought his conviction?

20    A.  By the time he was ultimately released, I believe it was

21    24 or 25 years.

22    Q.  Now, Ms. Ekl asked you about the investigation of your

23    office and the investigation of the State's Attorney's office.

24    Can you summarize what the investigation was that the State's

25    Attorneys did?

Mascherin - redirect by Wang

1  A.  The State's Attorneys, we know, interviewed several

2  witnesses because they produced statements or memoranda about

3  that.  And they indicated to us that they had done their own

4  investigation of the arson science and had confirmed that what

5  we had presented with respect to the new scientific knowledge

6  that had been developed since the time of the trial was

7  accurate.

8       They took the deposition of Dr. Hurst, one of our

9  experts on fire investigation and arson science and questioned

10 him for several hours, as I recall.  So they -- they

11 essentially reinvestigated the whole case in the context of

12 the post-conviction proceeding and the discussions that we

13 were having with the conviction integrity unit in our efforts

14 to persuade them to dismiss the charges.

15 Q.  So after the State's Attorney's office did their own

16 investigation, interviewed your arson experts including

17 Dr. Hurst, what -- did they change their position with respect

18 to the request for a new trial?

19 A.  Yeah.  They very much changed their position.  We met with

20 them.  They informed us that they agreed with us on the

21 science and agreed that the evidence that had been used to

22 convict Mr. Gray of the arson, the, you know, so-called

23 science evidence, was not valid and that because of the fact

24 that that evidence, you know, had been used at the time of

25 trial and would not be used today, he was entitled at a

Mascherin - redirect by Wang

1    minimum to a new trial.

2    Q.   And how many cases have you had in your career where the

3    State's Attorney's office agreed to a new trial, dismissed the

4    charges, entered a certificate of innocence?

5              MS. EKL:  Objection, Judge.

6              THE COURT:  Sustained.

7    BY MS. WANG:

8    Q.   So after initially opposing the dismissal, they agreed to

9    a new trial.  Did they then go further and decide to dismiss

10   the charges?

11   A.   Yes.  They -- State's Attorney Foxx and Mr. Sussman, her

12   first assistant, informed us that they had done their own

13   review of the case and that their decision was that it -- that

14   it would be most appropriate for the case to be dismissed and

15   for Mr. Gray not to be retried.

16   Q.   Now, Ms. Ekl spent a little bit of time with you asking

17   you about Judge Petrone's 27-page opinion in the case.  She

18   read you from the court decision.  This was something that

19   happened along the way to getting Mr. Gray's conviction

20   overturned, correct?

21   A.   That's right.  It's one of several rulings Judge Petrone

22   made along the way.

23   Q.   Okay.  And what was the final word after Judge Petrone?

24   A.   Ultimately, the State's Attorney's office agreed, and the

25   appellate court dismissed the case and entered an order of

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 107 of 166 PageID #:21109
Mascherin - redirect by Wang
316

1   nolle pros which means that the State's dropping all charges

2   and Mr. Gray cannot be retried.

3   Q.  Now, what was in the -- we talked -- Ms. Ekl also asked

4   you a bit about the certificate of innocence, and she read to

5   you from the agreed order.  First, let me ask you, what was in

6   the record that was -- that you had given to the State's

7   Attorney's office when they decided to agree to the

8   certificate of innocence?

9          MS. EKL:  Objection, Judge.  Form.

10         THE COURT:  Overruled.

11  BY THE WITNESS:

12  A.  The record that the State's Attorney had when she -- when,

13   you know, her office agreed included everything that we had

14   in -- that we had uncovered in our investigation:  All of the

15   evidence about the change in the arson science; the debunking

16   of the science, the so-called scientific evidence that was

17   used at trial; the evidence that Mr. Gray's confession was not

18   voluntary; the evidence that some of the witnesses had

19   indicated that they had been pressured to give testimony that

20   they now believe not to be accurate.

21         All of the evidence that we had developed in the

22   course of the post-conviction proceeding plus whatever

23   additional investigation the State's Attorney did,

24   Ms. Alvarez's office did and Ms. Foxx's office did, all of

25   that, you know, that -- by the point the State made its

Mascherin - redirect by Wang

317

1    ultimate decision, they had all of that evidence.

2    Q.   Now, I'm showing you Plaintiff's Exhibit 95 which was

3    shown to you by Ms. Ekl.  And at the bottom here it says:

4              "Thus, this order and the petitioner's certificate of

5         innocence are not intended to have evidentiary weight in

6         proving in any other proceeding that the Cook County

7         State's Attorney's office or any of its Assistant State's

8         Attorneys engaged in misconduct with respect to

9         petitioner's wrongful conviction."

10             Does this order say anything about the police

11   officers?

12   A.   No.

13   Q.   And turning to Page 3 of Plaintiff's Exhibit 95, what are

14   the things that Judge Martin found in granting the certificate

15   of innocence?  What are the things that had to be proven that

16   he found was proved?

17   A.   He found that we had shown that Mr. Gray had been

18   convicted, that -- of a crime in Cook County; that the

19   judgment of conviction was reversed or vacated, which it was

20   by virtue of the appellate court's decision and the order to

21   nolle pros the case.

22             He found, you know, that the indictment was dismissed

23   which it was with the nolle pros; that the petition was filed

24   timely within two years; that Mr. Gray was innocent of the

25   offenses that had been charged; and that Mr. Gray had not

Mascherin - recross by Ekl

318

1    voluntarily caused or brought about those charges through his

2    own conduct.

3              MS. WANG:  Thank you.

4              THE COURT:  All right.  Anything else?

5              MS. EKL:  Yes, Judge, very, very briefly to clarify.

6                      RECROSS-EXAMINATION

7    BY MS. EKL:

8    Q.  You mentioned something about Judge -- about State's

9    Attorney Kim Foxx's investigation.  Are you -- it's not your

10   testimony that Kim Foxx's office conducted any additional

11   investigation other than what was already conducted by Anita

12   Alvarez's office, correct?

13   A.  I don't know exactly what they did.  I know that we were

14   informed and Mr. Sussman wrote into the agreed motion that was

15   filed in the appellate court that State's Attorney Foxx and

16   her staff had conducted its own review of the case.

17   Q.  Correct.  But they never stated to you or to any court

18   that they had conducted any additional or new investigation

19   other than what had been conducted at the time that Judge

20   Petrone made her findings in denial of petitioner seeking

21   leave of a new trial, correct?

22   A.  They -- what they -- I don't know what they did or didn't

23   do in their review.  What they said in the language that they

24   wrote for the joint motion to dismiss was that State's

25   Attorney Foxx had conducted her own review.

Mascherin - recross by Ekl

1  Q.  You are Adam Gray's attorney obviously, correct?

2  A.  I was.

3  Q.  Or you were his attorney.  And you have advocated for

4  Mr. Gray throughout the course of his post-conviction

5  proceedings, correct?

6  A.  Yes.

7  Q.  And the order that was eventually agreed to with you and

8  State's Attorney Kim Foxx's office, that did not include any

9  lawyers on behalf of the police officers who conducted the

10  criminal investigation, correct?

11  A.  It -- the parties I was negotiating with were the lawyers

12  from the State's Attorney's office who represent the State of

13  Illinois and the people of Cook County.

14  Q.  Correct.  To your knowledge, the police officers who were

15  involved in the investigation were not asked to provide

16  affidavits that were presented and considered, correct?

17  A.  I have no idea what Ms. Stack asked the police officers to

18  do or didn't ask them to do during the post-conviction

19  proceedings.

20  Q.  You never saw that anyone interviewed any of the police

21  officers in the course of the post-conviction proceeding to

22  determine if their views on the investigation that was

23  conducted had changed, correct?

24  A.  I think there were some interviews of the police that had

25  occurred during the course of the post-conviction proceeding.

1  I know my colleague, Mr. Patnaik, had attempted to talk to

2  some of the officers, I believe had talked to one of them at

3  least.

4         And I don't remember precisely but I know that the --

5  that Ms. Stack produced a number of memos of interviews that

6  she had done, and some of those may have been interviews of

7  the police officers.  I just don't remember.

8  Q.  You don't recall as you sit here today, correct?

9  A.  I don't remember.

10  Q.  And to your knowledge, there was no input by any police

11  officers into whether or not Mr. Gray should -- no input was

12  asked of the police officers as to whether or not Mr. Gray

13  should receive a certificate of innocence, correct?

14  A.  I have no idea what the State's Attorney's office did or

15  didn't communicate.  I didn't communicate with the police

16  officers or anyone representing them.

17         MS. EKL:  I have nothing further.

18         THE COURT:  All right.  Anything else?

19         MS. WANG:  No, your Honor.

20         THE COURT:  All right.  You are excused.  You can

21  step down.

22      (Witness excused.)

23         THE COURT:  And who is the next witness?

24         MR. LOEVY:  Adam Gray.

25         THE COURT:  All right.  Let's take our lunch break

1    then, ladies and gentlemen.  And remember, I do have to break

2    early today, unfortunately, at 1:45.  And maybe you can enjoy

3    the weather in Chicago for a bit.  So let's, we'll take our

4    lunch break to, let's take one hour.  Okay.  So 10 to 1:00.

5           All rise.

6        (Recess from 11:50 a.m. to 12:50 p.m.)

7                      * * * * * * *

8                 C E R T I F I C A T E

9         I, Judith A. Walsh, do hereby certify that the

10   foregoing is a complete, true, and accurate transcript of the

11   proceedings had in the above-entitled case before the

12   Honorable EDMOND E. CHANG, one of the judges of said court, at

13   Chicago, Illinois, on May 9, 2023.

14

15   */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____      June 14, 2023

16   Official Court Reporter

17   United States District Court

18   Northern District of Illinois

19   Eastern Division

20

21

22

23

24

25

322

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   ADAM GRAY,                      )
                                    )
4            Plaintiff,             )
                                    )
5            v.                     )   No. 18 CV 02624
                                    )
6   CITY OF CHICAGO, et al.,        )   Chicago, Illinois
                                    )   May 9, 2023
7            Defendants.            )   12:52 p.m.

8           TRANSCRIPT OF PROCEEDINGS - Trial

9                    Volume 2-B

10      BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11  APPEARANCES:

12  For the Plaintiff:       LOEVY & LOEVY
                             BY:  MR. JONATHAN I. LOEVY
13                                MS. ROSHNA BALA KEEN
                                  MS. JORDAN POOLE
14                                MS. ELIZABETH C. WANG
                             311 North Aberdeen Street, Suite 300
15                           Chicago, Illinois 60607
                             (312) 243-5900
16

17  For the City Defendants: REITER BURNS, LLP
                             BY:  MS. ELIZABETH A. EKL
18                           311 South Wacker Drive, Suite 5200
                             Chicago, Illinois 60606
19                           (312) 982-0090

20

21  Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                             Official Court Reporter
22                           219 South Dearborn Street, Room 2342
                             Chicago, Illinois 60604
23                           (312) 702-8865
                             judith_walsh@ilnd.uscourts.gov
24

25

```
 1   APPEARANCES (Continued):

 2   For Defendant McInerney:    NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
 3                                    MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
 4                                    MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
 5                               33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
 6                               (312) 612-1955

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 115 of 166 PageID #:21117
A. Gray - direct by Loevy
324

1          (Proceedings heard in open court.  Jury in.)

2              THE COURT:  Okay.  Good afternoon, ladies and

3      gentlemen.  We're ready to resume.

4              Go ahead and announce your next witness.

5              MR. LOEVY:  Your Honor, at this time the plaintiff

6      calls the plaintiff, Adam Gray.

7              THE COURT:  All right.  Please stand for a moment,

8      Mr. Gray, and raise your right hand.

9          (Witness sworn.)

10             THE WITNESS:  I do.

11             THE COURT:  All right.  Mr. Loevy?

12                 ADAM GRAY, PLAINTIFF'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14     BY MR. LOEVY:

15     Q.  All right.  If you'd state your name for the record.

16     A.  My name is Adam Gray.

17             THE COURT:  And yes, Mr. Gray, can you pull that mike

18     up?

19             THE WITNESS:  Good?  Testing.

20             MR. LOEVY:  We'll try it.

21             THE COURT:  If you can just level it out this way.

22     There you go.

23             All right.  Mr. Loevy?

24     BY MR. LOEVY:

25     Q.  All right.  How old are you, sir?

A. Gray - direct by Loevy

325

1   A.   I'm 44.

2   Q.   And where do you live?

3   A.   I live in Hastings, Michigan.

4   Q.   And where do you live in Hastings, Michigan?

5   A.   A cabin in the woods with my wife.

6   Q.   And who is your wife?

7   A.   Her name is Rebecca Gray.

8   Q.   How long have you been married?

9   A.   Four years.

10  Q.   And who else there lives in the house with you?

11  A.   Dog, cat, two rabbits.

12  Q.   And what does your wife do?

13  A.   She is an artist, and she has an online gallery, and she

14  represents other artists in that capacity.

15  Q.   Do you have any children?

16  A.   I do not.

17  Q.   All right.  Sir, what happened to you when you were 14

18  years old?

19  A.   I was arrested and charged with a crime I didn't commit

20  and sentenced to life without parole.  I went to prison for

21  nothing.

22  Q.   Where did you spend your life between 18 and -- I'm sorry,

23  14 and 38?

24  A.   In the IDOC, Illinois Department of Corrections, in one

25  form or another.

A. Gray - direct by Loevy

326

1   Q.  And do you remember the date when you were first

2   incarcerated and arrested?

3   A.  I was arrested on March 25th, 1993.  I remember it was a

4   Thursday.

5   Q.  And how old were you at that time?

6   A.  14 and six weeks.

7   Q.  How long had you been 14?

8   A.  Six weeks.

9   Q.  When is your birthday?

10  A.  February 3rd.

11  Q.  Where were you supposed to be on the day that you spent

12  your first day in prison?

13  A.  In school.

14  Q.  How long total did you spend in prison for that crime you

15  didn't commit?

16  A.  24 years and some change.

17  Q.  Did you commit the crime they accused of you, sir?

18  A.  I did not.

19  Q.  Are you innocent or guilty?

20  A.  I am 100 percent innocent.

21  Q.  What eventually happened to your conviction?

22  A.  Science caught up and a lot of other stuff materialized,

23  and it was compelling enough to convince people to let me go.

24  Q.  It was vacated, your conviction?

25  A.  My conviction was vacated.

A. Gray - direct by Loevy

1  Q.  And did you pursue it to the certificate of innocence that

2  Ms. Mascherin talked about this morning?

3  A.  Yeah.  Yes, I did.

4  Q.  All right.  Let's back up then.  Let's start at the

5  beginning.  Where were you born, sir?

6  A.  Olympia Fields.  It's just south of Chicago on Pulaski, a

7  little suburb.

8  Q.  All right.  Is this an easy subject for you to talk about,

9  sir?  You seem a little subdued.

10  A.  No, no, I'm okay.  I'm okay.  I'm just -- I'm all right.

11  Q.  All right.

12  A.  I'm nervy.

13  Q.  What neighborhood did you grow up in?

14  A.  Brighton Park.

15  Q.  And just tell the jury the addresses you were and the

16  geographic context.

17  A.  Between California and Kedzie, between Archer and the

18  Stevenson.

19  Q.  And how many houses did you have growing up or apartments?

20  A.  About three or four in my childhood.  It's apartments.  We

21  moved from one to the next.  My mom rented.

22  Q.  And where were they geographically?

23  A.  We had one apartment, I remember it was on Pershing, 39th

24  and Pershing right off California.  And we lived on 38th

25  Street right off of Sacramento.  And then we lived on 42nd

A. Gray - direct by Loevy

1   Street on Albany.  And we lived on 38th Place when I was real

2   little.  I don't really remember it that much.

3   Q.  And are these all near each other?

4   A.  Yeah, they're all within four blocks.

5   Q.  And what's the name of the neighborhood?

6   A.  Brighton Park.

7   Q.  Who lived in the house there at the beginning when you

8   first got there?

9   A.  When I was born?

10  Q.  Well, who lived there when you were growing up small.

11  A.  My siblings and my ma.

12  Q.  And who -- and your mother was the head of the household?

13  A.  Yeah.

14  Q.  What was she doing?

15  A.  When I was little, nothing.  She was just taking care of

16  us.  And then when I got a little older and I went to

17  kindergarten, she ended up having to get a job.

18  Q.  And where did she work?

19  A.  She was -- I don't remember her first job if it's

20  accurate, but she worked as a bank -- as a teller in a

21  currency exchange when I was little.

22  Q.  And then where did she spend most of her working years?

23  A.  She ended up getting a job at a bank that was about a

24  block and a half from our house, and so that's where she

25  worked when I was taken, so...

A. Gray - direct by Loevy

1  Q.  Do you remember how many years about she worked there?

2  A.  No.  She worked a couple -- she was working there three or

3  four years before I was arrested, but I don't know how long

4  she worked there in total.

5  Q.  All right.  And what -- did your mom provide for you and

6  your siblings?

7  A.  As best she could.

8  Q.  All right.  Was your dad in the house when you were

9  growing up?

10  A.  No.

11  Q.  What was he like?

12  A.  I loved my dad.  My dad was big and stern and no-nonsense

13  and intelligent, and I loved my dad.  I thought he was great.

14  Q.  All right.  Where are your parents now?  Are they still

15  alive?

16  A.  No.  They both passed recently.

17  Q.  All right.  Was there -- you mentioned your siblings.  Was

18  there a big difference between you and your siblings age-wise?

19  A.  The nearest sibling was six and a half years older than

20  me.  So yeah, I got -- my three siblings, they're a little

21  distant from me.  They're all older.

22  Q.  Let's start with your sister.  How much older was she than

23  you?

24  A.  About nine years.

25  Q.  And when you were young, was she -- when your mom was

A. Gray - direct by Loevy

1  working, why don't you tell us about that.

2  A.  Yes.  She was the one who primarily babysat for me if my

3  mom was at work, yeah.

4  Q.  And where did she end up going once she got to the high

5  school years?

6  A.  She went to Wisconsin with my aunt to Racine, and she went

7  to high school up there and graduated.

8  Q.  And then did she go on after high school?  What did she go

9  do?

10  A.  She started -- I think she went to Northwestern first here

11  in the city.  I don't know her timeline, so I can't really

12  tell you.

13  Q.  And --

14  A.  She went to college.  She went on with her life.  I don't

15  know every little detail there, though.

16  Q.  Sure.  And what did she end up doing for her career?

17  A.  My understanding is she's a pretty snazzy accountant for

18  some international bank.

19  Q.  And where does she live?

20  A.  She lives in England.

21  Q.  All right.  And you have a relationship with her to this

22  day?

23  A.  Yeah.

24  Q.  How often --

25  A.  We talk two, three times a week.

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 122 of 166 PageID #:21124
A. Gray - direct by Loevy
331

1 Q. All right. How about your oldest brother, Dave? How much

2 older was he than you?

3 A. He would be eight years older.

4 Q. And did he move out when you were young? You would have

5 been about ten?

6 A. Yeah. He joined the Navy. He was young. I think he was

7 17. I think he had to get my ma's, like a written permission

8 so he could get into the Navy. So he left. He moved out

9 before that. He moved out. He had his own apartment, like,

10 when he was 16, I think. He joined the Navy, and then he was

11 gone.

12 Q. And then what do you know about his Navy career?

13 A. As far as, he had a pretty impressive career. So I don't

14 know all the ins and outs, but he was in the Navy for a long

15 time.

16 Q. And did he get an education?

17 A. He did.

18 Q. What was his profession?

19 A. What is his profession?

20 Q. Yeah. Or what did he study?

21 A. He studied physics and archaeology, I believe.

22 Q. And did he become a physicist?

23 A. He did.

24 Q. And did he -- what's his career?

25 A. He has a business that they do --

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 123 of 166 PageID #:21125
A. Gray - direct by Loevy
332

1    MR. NATHAN:  Objection.  Relevance.

2    THE COURT:  Okay.  Overruled.  I'll give you some

3  latitude on this background.

4    You can answer.

5    THE WITNESS:  He has a business in California.  And

6  my understanding of it is not complete by no stretch, but they

7  do very fine precision machining, him and a bunch of other

8  physicist types.

9  BY MR. LOEVY:

10  Q.  And does he have a family?

11  A.  He does.

12  Q.  And did you know his children before you got arrested?

13  A.  Somewhat.  They were small.  My nieces, they were real

14  young and I didn't -- my nephew was newborn, maybe a year old

15  when I was taken.  I didn't really bond with him or nothing,

16  but I used to babysit for the girls.

17  Q.  All right.  And were you able to see him much during those

18  24 years you were away?

19  A.  I wouldn't say much.  It's not -- that's not accurate, no.

20  Q.  Is that a place for children, in the places you were?

21  A.  No, it was not.

22  Q.  All right.  How about your younger -- your youngest older

23  brother, what's his name?

24  A.  His name is Michael.

25  Q.  And what did he do when it was -- when he got a little

A. Gray - direct by Loevy

1    older?

2    A.   He ended up joining the Marines.  He went and did that.

3    Q.   In the Marines, you said?

4    A.   Yeah, Marines.

5    Q.   All right.  Was your family able to, you know, provide and

6    do the things you needed to do?

7    A.   My ma did the best that she could by us, yeah.

8    Q.   Did you guys have a car?

9    A.   No, we never had a car.  We walked everywhere.  We prided

10   ourselves on walking home with our groceries.  So no, we never

11   had a car.

12   Q.   And did you -- were you provided for with your needs in

13   eating and clothes?

14   A.   My ma always made sure we had food in the house, yes.

15   Q.   All right.  What was it like growing up in Brighton Park?

16   A.   It was a little rough around the edges.  There's a lot of,

17   just, fighting or messing around.

18            MR. LOEVY:  All right.  And we're hearing it's a

19   little hard to hear, your Honor.  Can we ask if the jury is

20   having trouble too, or should we move the mike?

21            THE COURT:  Yeah.  Well, so two things.  One, ladies

22   and gentlemen, if at any time you do have trouble hearing,

23   just wave, do some semaphore, get my attention, and I'll

24   remind the witness.

25            And then, yeah, Mr. Gray, if you can just pull the

A. Gray - direct by Loevy

1    mike as close as you can and lean right into there.

2           Okay.  Go ahead.

3    BY MR. LOEVY:

4    Q.  All right.  As you're getting older, 10, 11, 12, what

5    sorts of things would you do with your friends?

6    A.  Well, mostly ride bikes or just play and just sit around

7    talking and crack jokes.

8    Q.  Did you have a Nintendo phase?

9    A.  Oh, I did.

10   Q.  What was that like?

11   A.  Oh, I got addicted to that stuff.  I love that.  I loved

12   playing Nintendo, me and my friends.

13   Q.  How about sports?

14   A.  Oh, yeah, I was pretty athletic.  I wasn't, like, into

15   specific sports, but I played everything.  I did them all.  I

16   liked sports.

17   Q.  Did you do like the Cub Scout thing with your mother?

18   A.  I did.  My mom was a den mother, and I accompanied her

19   when I was little.  And my two older brothers were Cub Scouts.

20   And then when I came of age, I became a Cub Scout.

21   Q.  All right.  You mentioned there was fighting in Brighton

22   Park.  Can you tell us a little more about that?

23   A.  It's kids in the neighborhood, tough, you know, being

24   prideful or whatever and, I don't know, just neighborhood

25   tension stuff.

A. Gray - direct by Loevy

335

1    Q.   Would people get robbed in the neighborhood too?

2    A.   Yeah.  I got robbed.

3    Q.   All right.  When you say it was a tough neighborhood, is

4    that how you guys thought of it back then?

5    A.   No.  I didn't -- one of my attorneys, Tara, she had said

6    one day to me like offhand, "Yeah, you grew up in a tough

7    neighborhood."  And it just kind of stunned me a little bit.

8    I never considered it that way, but I guess by comparison to a

9    lot of other people, yeah.

10   Q.   All right.  Did people carry things to protect themselves

11   in that neighborhood?

12   A.   Yes, they did.

13   Q.   Why was that?

14   A.   Because you never know when somebody is going to run up on

15   you and try to get you.

16   Q.   All right.  Did you, as you were growing up, spend much

17   time outside of this radius, this few blocks that we're

18   talking about?

19   A.   Can you repeat that, please?

20   Q.   Sure.  Was most of your life focused in Brighton Park, or

21   were there some things outside of Brighton Park?

22   A.   Oh, I'm sure there were some things like -- I don't know.

23   But, yeah, most of my life was Brighton Park.

24   Q.   What would be some examples when you would leave the

25   neighborhood?

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 127 of 166 PageID #:21129
A. Gray - direct by Loevy
336

1    A.   I went to Green Bay to start my seventh grade.  I was up

2    there for a few months.  My dad had a friend up there.  They

3    thought, like, get me out of the city, right.  So I went and

4    lived with this woman and her kids for a couple months,

5    enrolled in school and hung out up there for a few months.

6    And then I got terribly homesick and went home, went back to

7    Chicago.

8    Q.   All right.  And would you sometimes go to Alsip?

9    A.   Yeah, yeah.  I had a buddy, he originally grew up in

10   Brighton Park.  He moved to 125th and Pulaski or something

11   like that, way out there and, yeah, when he went out there.

12   And so on the weekends sometimes, I'd take the bus all the way

13   out there and hang out with them, spend the weekend there with

14   him and his family.

15   Q.   All right.  Where did you attend school?

16   A.   Davis Elementary.

17   Q.   And did you enjoy school?

18   A.   Sometimes, sometimes no.

19   Q.   All right.  And you heard it mentioned that you were a

20   smart kid on some of those tests, huh?  Are you a smart kid?

21   A.   Probably.  Maybe.  I don't know.  Just me.

22   Q.   All right.  Were you a good student with the grades?

23   A.   When I was little, I was on the honor roll.  I got A's.

24   And then it was mixed, and then I kind of started ditching and

25   stuff, and I didn't really take it seriously anymore.  And

A. Gray - direct by Loevy

337

1   then toward the later, when I was seventh, eighth grade, I

2   started being more interested in it.  I had a teacher that I

3   felt saw me, and I felt the courage to proceed with her and do

4   other stuff.  I got more interested, and then I started

5   getting interested in girls.  So they were in school, so I

6   hung out with them.

7   Q.  All right.  Did you ever attend high school before you got

8   arrested?

9   A.  No.

10  Q.  What were the holidays like when you were growing up?

11  A.  I remember most notably Christmas.  Christmas was, like,

12  Hallmark card, idyllic.  We'd go to my German grandma's house,

13  and all of my ma and her sisters and all of my cousins and

14  everybody would go there.  And you'd walk in, and it smells

15  like just delicious food and, you know, Christmas tree and all

16  of that stuff.  So every Christmas, it was the same way.  I

17  always went to my oma's house.  That's German for grandma.

18  And we had a good time.  Yeah, it was a really good time.

19          And other holidays, my mom always tried to cook on

20  Thanksgiving.  Every major holiday, she'd try to get us to

21  adhere to, like, Lent, you know.  And the Easter holiday, she

22  always cooked.

23  Q.  Was your mother religious growing up?

24  A.  She was.  She was religious her whole life.

25  Q.  All right.  As you got older, how -- say, 12, 13, who were

A. Gray - direct by Loevy

1   your friends?

2   A.   12, 13, I had my two best friends which was Mel Gonzalez

3   and Robbie Jaffke, and Kasey, Kasey Paris.

4   Q.   Who else?

5   A.   Other kids from the neighborhood.  I mean, they were in

6   and out.  Sometimes you're friends one weekend, and the next

7   time you're not.  So a lot of kids just circulated in and out

8   like that.

9   Q.   Who were -- throw us some names.  Who were some of the

10  kids you were friends with?

11  A.   Donald Dugard, Eddie Walczak, Lori Walczak, Simon Juarez,

12  Natalie Zamecka, Denise Chavez.  Is that enough?

13  Q.   What was the ethnic mix of Brighton Park back in that

14  time?

15  A.   At what time?  At the time of my arrest?

16  Q.   Yes.

17  A.   I'd say it's about 60 percent Latino, probably 35, 40

18  percent white somewhere.  It was Mexican and white, is

19  primarily what Brighton Park was.

20  Q.   And you mentioned Mel.  Who was your best friend?

21  A.   It was Mel Gonzalez and Robert Jaffke.  I weighted them

22  equally.

23  Q.   All right.  But Robert moved away?

24  A.   Yeah, he moved away, so my daily friend would have been

25  Melchor Gonzalez.

A. Gray - direct by Loevy

1   Q.   And what was Mel like?

2   A.   Oh, he was awesome.  He was daring.  He was bashfully shy,

3   but he was daring.  He was the kind of guy that if you wanted

4   to go throw a rock through a window, he's game.

5   Q.   Was that a good idea?

6   A.   No.  That was stupid.  We did that stuff and it was

7   stupid, but that's the kind of stuff we did.

8   Q.   All right.  What else did you do?

9   A.   That's kind of vague.  A whole bunch.  We lived, so I

10  don't know what you're asking specifically.

11  Q.   Well, would you guys play Nintendo together?

12  A.   Yeah, we played Nintendo.  I would spend the night at his

13  house.  He'd spend the night at my house.  We'd go to school

14  together, hang out, go on adventures around the neighborhood.

15  Q.   Were there train tracks where you guys would go?

16  A.   Yeah, we'd go on the tracks all the time.

17  Q.   And you mentioned the windows.  Where were the windows if

18  you --

19  A.   It was usually, all the industrial buildings on the

20  tracks, ain't nobody working there no more, we'd go up there

21  and just have fun for a half hour.

22  Q.   All right.  Let's talk about, your 14th birthday, I think

23  you said, was February 3rd, right?

24  A.   Yeah.

25  Q.   And what grade are you in at that time?

A. Gray - direct by Loevy

340

1    A.   I was in eighth getting close to graduating.

2    Q.   And you were getting more into school, if I'm not

3    mistaken?

4    A.   Yes, I was interested in school by eighth grade pretty

5    good.  I had that teacher I mentioned.  Her name was

6    Ms. Collins.  She signed me up for what they called the

7    academics league which was like a Jeopardy-style, slam the

8    buzzer, first one gets the answer, you know.

9         And we were going to compete against other schools.

10   And it was an afterschool program.  So, like, I'd go there

11   with these other kids and the teacher, and they were preparing

12   us to go into battle against these other schools, you know.

13   And so, yeah, I was doing that.

14   Q.   And would you go to practices for that and make some

15   friends?

16   A.   Yeah, it was after school.  It was in the school, but it

17   was after school.

18   Q.   Did you ever get to compete on that academic league team?

19   A.   No, I never got there.  I got arrested.

20   Q.   All right.  Where were you planning to go to high school?

21   A.   I got approved for Bogan.  They wanted me in their honors

22   computer classes, if I remember correctly.

23   Q.   And was that the neighbor -- you know, where were your

24   friend going?  Were your friends going to Bogan?

25   A.   All my friends were going to Kelly, Kelly on California.

A. Gray - direct by Loevy

1   That's the neighborhood school.  And Bogan is way out, like on

2   80th, I think.

3   Q.  But you made the decision you were going to go chase the

4   honors computers up there?

5   A.  Yeah, I was going to go there.

6   Q.  All right.  What were your plans for the future at this

7   time when you're 14?  Were you thinking about the future?

8   A.  Not terribly so, but I felt like the change from grammar

9   school to, here we go, we're escalating now, right, I felt

10  that in the time, but that's it.

11  Q.  All right.  You said some of your siblings went to

12  college, some went to the military.

13  A.  Yeah.  Mike went in the Marines.  Dave went in the Navy.

14  Dave went on -- I think my brother Mike got degrees too.  I

15  don't know where they're -- or he's got at least a degree from

16  Westwood, I think.  And yeah, my sister Lisa, I think she went

17  in the military too but she washed out, if I remember

18  correctly, and then she just went to college.

19  Q.  All right.  Which way were you leaning?

20  A.  Oh, I was -- honestly, I don't know which way I would have

21  landed, but I was probably inclined toward the military.

22  Q.  All right.  When you ended up in prison -- and we're

23  jumping ahead -- did you end up taking some college classes?

24  A.  Yeah.

25  Q.  All right.  Now, you're 14.  You're getting ready for high

1    school.  Who was in your friend group at that time?  Who

2    was your -- who were you hanging the most time with?

3    A.  You have to be more precise on timing for me, I guess.

4    Q.  I'm talking about right before you were arrested, who were

5    you hanging out with?

6    A.  Before I'm hanging out with Mel every day, and we're going

7    over to Natalie's house just about every day, Natalie and

8    Denise and hanging out with them.

9    Q.  And who is Natalie and Denise?

10   A.  My sort-of girlfriend.  And she lived about three or four

11   blocks away.

12   Q.  Why do you call her "sort-of girlfriend"?

13   A.  Well, because we weren't doing anything, you know.  But we

14   kind of were boyfriend and girlfriend, I thought.  Maybe.  I

15   don't know.

16   Q.  All right.  Had you asked her to a dance?

17   A.  Yeah, I did.  She accepted.  It was an eighth grade,

18   eighth grade dance for us graduating.

19   Q.  All right.  I want to turn you to March 25th, 1993.  Did

20   your life change that day?

21   A.  Yeah, it did.

22   Q.  Where were you that evening?

23   A.  On the 25th?

24   Q.  Or I guess it would be when you went to sleep on the 24th.

25   Let's talk about that.  Where did you end up?

A. Gray - direct by Loevy

1   A.   On the 24th, I was spending the night at Mel's house.

2   Q.   Was that uncommon for you to spend the night at Mel's?

3   A.   No.   I usually spent the night there about three or four

4   times a week.

5   Q.   His house, your house, or what?  Explain.

6   A.   Yeah, both.  Both.

7   Q.   Which one were you guys more likely?

8   A.   More likely at his house because his parents were more

9   comfortable with me spending the night there, I guess, than

10  him spending the night out by my house.  His dad was a little

11  bit more strict, and I didn't have a dad in the house.  So I

12  don't know.  That's just how it panned out.

13  Q.   And this is a night you've thought a lot about over the

14  years, huh?

15  A.   Yes, it is.

16  Q.   What's your memory of what you did that night at Mel's

17  house?

18  A.   We got to Mel's house before 7:00 because 7:00 was his

19  curfew.  And if he didn't get home by then, his dad would be

20  mad.  So we always got home by 7:00.  And typically, we would

21  bring my Nintendo.  I had a Super Nintendo, and we were

22  playing Nintendo or whatever.

23       And so I had my bag.  I had my clothes, my school

24  clothes and, like, some deodorant, a little cosmetics, and my

25  books.  And we had all the Nintendo stuff except the Nintendo

A. Gray - direct by Loevy

344

1   console, we didn't discover until we got to his house.  So I

2   got -- I started pulling stuff out the bag and there's no

3   console.  And neither one of us wanted to walk back to go get

4   it, so we just ended up drawing that night, just getting

5   pencils and sketching stupid stuff, laying on the floor.

6   Q.   What else happened that night?

7   A.   Well, what I recall is --

8   Q.   And let me be specific on the question.  So you're

9   drawing.  Did you get toward bedtime?

10  A.   Yeah, yeah.  You know, typically we go to bed around

11  10:00, 10:30.  And we had the TV on, but we'd have the volume

12  low because his parents, they went to work early.  And so they

13  didn't mind us being awake if, you know, we didn't disturb

14  them.  So we'd always have the TV on, the volume low mostly.

15           And then we had the TV on when we were drawing.  And

16  I recall at 10:00 o'clock that Family Feud would come on.  We

17  didn't really watch it but it was on, right.  So Family Feud

18  came on, and we shut off the TV and went to bed.

19  Q.   And where are you in the house when you guys go to bed?

20  A.   Me, Mel, and his brother are all sleeping in the living

21  room.

22  Q.   Is that how you would usually do it or always do it or

23  what?

24  A.   That's how we would always do it.

25  Q.   And who slept where?

A. Gray - direct by Loevy

345

1    A.  I slept on a couch, and then they had, right at the time

2    or not -- soon before I was arrested, they had put a bunk bed

3    in there, and so the two brothers slept on the bunk beds and I

4    slept on the couch.

5    Q.  And where was the rest of the family?

6    A.  Rosie had a room in the back of the house by the back

7    door, and the mom and dad had a room right off of the living

8    room.

9    Q.  Were you close to Eric and Rosie too?

10   A.  It's family to me.

11   Q.  What do you mean?

12   A.  They're family to me.  I go over there.  That's my family.

13   That's my other family.  I go over there, that's my family.

14   I'm treated like family.  I go in their fridge.

15   Q.  All right.  What's the next thing you remember after you

16   fell asleep?

17   A.  What I remember is, there was a loud knock on the window

18   like from a ring, you know.  And that wasn't atypical because

19   Rosie, is Mel's sister, she was like 16, I think, she used to

20   babysit.  And the kid, the kid's parents that she used to

21   babysit for, when they would retrieve the kid, they'd come in

22   the middle of the night, whatever, and they'd bang on the

23   window like that and so, you know, wake up everybody

24   obviously, but you'd just go back to bed, you know.

25           And so that's what I heard, was the knocking of the

A. Gray - direct by Loevy

346

1  ring on the window, and I presumed it was that setup I just

2  told you, right.  So I tried to doze back off.

3  Q.  And what was it?

4  A.  Well, it persisted.  And Mel yelled at Eric to go get the

5  door.  And so Mel ended up going to get the door.  And then

6  the next thing I remember was Mel telling me to get up, that

7  my mom was here.

8  Q.  And just in a nutshell, what did your mom -- and who was

9  with your mom?

10  A.  I got up, and I saw my mom and my brother Mike.

11  Q.  And what happened?

12  A.  My brother Mike came in there, and he's like, "Where were

13  you?  Where were you?"

14       And I told him -- I was confused, like, "What are you

15  talking about?  You just found me?  What are you talking

16  about," right?  So and then my ma, she said that Kasey's house

17  burned down.

18  Q.  And just in summary, what did they -- without going into

19  specifics, what was the gist of what was communicated to you?

20  A.  That they were blaming me, and there's a lynch mob out

21  there, and they needed to get me out of there to safety.

22  Q.  And what did you -- where did your mom and your brother

23  take you?

24  A.  My brother was double-parked.  He had a minivan out front,

25  so we went out there.  I grabbed my stuff and I went out

A. Gray - direct by Loevy

1   there.  And we drove, my brother drove my ma home, and then we

2   went to where my brother lived at.  He was staying with

3   another guy on Hermitage.

4   Q.  Who was that?

5   A.  His name is Bill Hangst.  He was kind of like a brother to

6   me.  My ma raised him too, so...

7   Q.  All right.  Do you remember how long you were there at

8   your brother's house?

9   A.  I don't know exactly.  Maybe an hour, maybe an hour and a

10  half.  I don't know if it was that long.  I don't know.  I

11  dozed off, I think.

12  Q.  And what happened then?

13  A.  There was a knock on the door.  I remember -- I don't

14  remember the knock.  I remember my brother telling me to get

15  up.  And I remember sitting up, and there were two guys

16  standing there, like, plainclothes cops obviously, right.  And

17  so he told me to go with them.  So I grabbed my bag, and I

18  walked out with them.

19          And I don't know what I'm doing.  I'm just walking

20  out.  And I just started walking.  And I don't know what's

21  what, so I just started walking toward the alley.  I remember

22  one of them saying, like, something silly about, like, maybe,

23  "If you don't have any rabbit in you or nothing like that, I

24  don't want you running down the alley.  So come here, come

25  here."

A. Gray - direct by Loevy

1    So I don't know.  So I rerouted to him, and we went

2    to his car, put me in the car and drove to 51st and Wentworth.

3    Q.  And what happened at 51st and Wentworth?

4    A.  We got there and went up a flight of stairs to the second

5    floor, and they put me in a small little room.  They had -- it

6    was dark.  The light wasn't on.  They had a bench on one wall

7    and a desk, is all I remember.  And they made me put my bag on

8    the desk, and then I sat on the bench.  And that's how I got

9    there.

10   Q.  All right.  Did they start asking you questions about a

11   fire?

12   A.  Well, I was sitting in this room.  They left me --

13   periodically, different guys would could in and out of there

14   and ask me stuff and they'd go through my bag.  And I

15   remember, I remember one guy went in there.  I had a knife in

16   my bag.  I carried a knife.

17   Q.  Why did you carry a knife?

18   A.  Because of my neighborhood and, you know, just to avoid

19   conflict and to get away if necessary, you know.

20        So he pulled it out, and he's like --

21   Q.  What kind of knife was it?

22   A.  It was a kitchen knife.  I just got it out of my ma's

23   kitchen, just a little stick knife.

24   Q.  Did you ever have to use it in your neighborhood?

25   A.  I never used a knife.

A. Gray - direct by Loevy

1   Q.  All right.  So they asked questions about that?

2   A.  Yeah.  They asked about it, you know.  I had it with me.

3   It's my neighborhood, you know.

4           And then he pulled out -- like, I remember him

5   pulling out, I had a bottle of cologne in there.  And he's

6   like, "Did you use this to light the fire" or something like

7   that.

8           And I'm like, "Whatever.  I don't know.  No, you

9   know."  It's obvious.  But anyway, sorry.

10  Q.  Did they do anything unusual with your clothes?

11  A.  One guy came in, and he asked me to take my shoes off.

12  And I handed him my shoes, and then he put them up to his

13  face, the sole.  You know, the bottom of the shoe, he put it

14  up to his face and was smelling them, like, thoroughly, right.

15  And I thought that was funny.  I thought that was weird and

16  funny, but he did that.  He gave me my shoes back, and I put

17  them on.

18          At one point, I tried to lay down on the bench while

19  nobody was in -- they weren't in and out of there, like,

20  frequently.  There was, like, little lulls.  At one point, I

21  laid down and I tried to doze off.  And somebody came in there

22  and said something like, "Get up, there's no sleeping in

23  here," or something, "ain't no sleeping.  Sit up."  You know,

24  so that was that.

25  Q.  Did they read you your *Miranda* rights?

A. Gray - direct by Loevy

1   A.   Multiple times, yeah.

2   Q.   And that's, you have the right to remain silent and all

3   that?

4   A.   Yeah.  I thought it was funny.

5   Q.   What do you mean, you thought it was funny?

6   A.   I was a kid.  It was like TV.

7   Q.   And did they tell you you had a right to remain silent?

8   A.   They did.

9   Q.   Did they tell you you had a right to a lawyer?

10  A.   They did tell me that.

11  Q.   Did you decide to remain silent?

12  A.   No.

13  Q.   Why?

14  A.   I didn't think I had anything to hide.  I thought that if

15  they were going to ask me questions, I'm just talking to them.

16  I also think that if I don't talk to them, well, then I got

17  something to hide and they're going to think I had something

18  to do with this, right.  So I thought I would go in there and

19  talk to them.

20  Q.   How about a lawyer?  They said you have a right to a

21  lawyer.  Did you say, "I want a lawyer"?

22  A.   Why would I need a lawyer?  I didn't need a lawyer.  I

23  didn't think I needed a lawyer.

24  Q.   Did they start interrogating you?

25  A.   Not at that juncture.

A. Gray - direct by Loevy

1    Q.   At some juncture?

2    A.   Yeah.

3    Q.   And what do you remember about the interrogation?  Did it

4    start cordial?

5    A.   There was a lot of interrogations.  And yeah, the first

6    one was, the first -- the beginning of the first one was

7    relatively cordial where it's, most of the questions are

8    benign like, what's your name?  Where did you go to school,

9    you know, stuff like that.

10         And eventually, they get to the punch line and

11   started asking you some more pointed questions, and then you

12   start answering that stuff.  And then they started asking me

13   about the fire, did I light her house on fire.  And I tell

14   them no.

15         And then immediately it's, like, the room kind of

16   turns a little bit, shifts a little bit and then now, they're

17   telling me -- you know, like, "You asked me, I tell you no, I

18   didn't light the fire."

19         They're like, "Yeah, you did.  Just tell us the

20   truth.  You can tell us the truth," you know.  Or, "You're

21   going to tell us the truth eventually, so you might as well

22   just come out and say -- you know, just tell us what happened.

23   Tell us the story.  How did you do it, you know?  Did you use

24   gasoline?  What did you do?"

25         And so I'm telling him, "Look, I didn't have anything

A. Gray - direct by Loevy

1    to do with this, and that's it."  And so I started crying, and
2    then they left.  And they left me in there.
3    Q.  Did they come back?
4    A.  Yeah.  Yeah, they came back.
5    Q.  How many times do you think you told them you didn't do
6    it?
7    A.  30-plus.
8    Q.  Did they ever accept your statement that you didn't have
9    anything to do with the fire?
10   A.  No.  Any time I told them I didn't do it, they would jam
11   it right back down my throat, "Yeah, you did.  Yes, you did,"
12   you know, stuff like that and say -- they refused to hear my
13   voice, you know.
14           "I tell you I didn't do nothing."  And they didn't
15   hear that.  They never wanted to hear that.  They wanted to
16   hear what they wanted to hear.  So that's how they went.
17   Q.  All right.  How many times would you say there were
18   sessions, how many sessions?
19   A.  Well, of all of them coming in there and questioning me,
20   three to five, three to seven.  I don't know.  At least three
21   but more than that.  They were in and out of there all the
22   time and kind of doing stuff like that.
23   Q.  How long in between them?
24   A.  15, 20 minutes sometimes, maybe 30 minutes sometimes.  I
25   don't know.

A. Gray - direct by Loevy

353

1   Q.   What would you do --

2   A.   I have no chance.  I couldn't gauge that.

3   Q.   What would you do when you were alone?

4   A.   I remember crying a couple of times, then I'd stop crying.

5   At one juncture, because I had my bag, I pulled out my Trapper

6   Keeper because I didn't do my homework the night before.  So I

7   usually did my homework in school like last minute, right.  So

8   I didn't do my homework, so I pulled out my Trapper Keeper,

9   and I started finishing my homework.

10  Q.   What was your homework that day?

11  A.   I had to do a diagram on aluminum and write, like, a

12  little paragraph pretending I understood what I was writing

13  about.

14  Q.   And this is an atom, an aluminum atom.

15  A.   Yeah, aluminum element, yes.

16  Q.   Did you ever get to turn that homework in, sir?

17  A.   No.

18  Q.   When they -- at any point did you ask to speak to your

19  mother or your brother or anybody else?

20  A.   Yeah.  I asked about my mom.  And I think I asked if I

21  could call her, if she was there or something, or I don't

22  remember exactly how it came out.  But I remember them telling

23  me that, "We called your ma, and she says she don't care what

24  happens to you."  She's fed up with all the stuff that I'm

25  doing.  And so it's, like, I don't know, something like that.

A. Gray - direct by Loevy

354

1   And my brother --

2   Q.  Did that make any sense to you?

3   A.  No.  It was just confusion.  It's, like, that doesn't make

4   any sense.  So now I just got this question mark floating over

5   my head, like, I don't understand this.

6           But my brother, they told me he came and left.  I

7   said, "He came and left?"  And so again, another weird,

8   confusing, what does that mean?  How do you make sense of

9   that?

10  Q.  Were you free to leave?

11  A.  No.

12  Q.  At any time, could you have left?

13  A.  No, I could not have.

14  Q.  What was your understanding of when you were going to

15  leave?

16  A.  I had no idea.  I didn't know -- I lost track of what was

17  going on five minutes ago.

18  Q.  All right.  Were you able to sleep?

19  A.  I tried.  I think I dozed off in between, in between the

20  sessions.  I put my arms like this on the long table, and I

21  rested my head crying.  And then I think, I want to say I fell

22  asleep, yeah.

23  Q.  All right.  Had you gotten a full night's sleep the night

24  before?

25  A.  No.

A. Gray - direct by Loevy

1   Q.  At that time in your life, how many hours of sleep were

2   you used to getting?

3   A.  Typically, we'd go to bed around 10:00, 10:30 and we

4   would -- our school started at 9:00, and so we'd, like, wake

5   up at, like, 8:00 and rush to get over there and just make the

6   bell.  So roughly that's, I guess, 10:00 to 8:30, whatever

7   that shakes out to.

8   Q.  How were you feeling?

9   A.  In the police station, I felt -- most of the time I felt

10  cold.  I felt nauseous and kind of shaky, I guess.

11  Q.  Had you eaten?

12  A.  Super nervous.

13          I don't know.  It's my -- how I felt there changed

14  from moment to moment.

15  Q.  Were you handcuffed at some point?

16  A.  Yeah.

17  Q.  What did that look like, and how did that affect you?

18  A.  I don't remember.  I've spent too many years handcuffed to

19  retrieve that.

20  Q.  You mean since you went to prison?

21  A.  Yeah.

22  Q.  Do you remember going to the bathroom handcuffed in the

23  police station?

24  A.  I do.

25  Q.  What was that like?

1    A.   There was this guy, he -- I don't remember how it

2    initiated, but I had to go to the bathroom.  So I walked with

3    this guy, and we went to the bathroom.  I don't remember how

4    it was.  It was super awkward.  He was standing too close to

5    me, and it was a little too hard to pee when somebody is,

6    like, that close to you, you know, but I managed.

7             And on the way out or on the way back to the

8    interrogation room, we stopped at a Xerox machine, and he

9    asked me to Xerox my hands.  I put them up there and he pushed

10   the button, and the thing came out.  And then he looks at it.

11   He's holding it up to me and he's like, "Aha, this proves

12   you've got lead on your hands from the gasoline that you were

13   handling."

14            And what came to my mind was pencil lead because we

15   were drawing.  And so I'm like, "I can explain that.  I know

16   this is a Xerox machine and I know what you're telling me is

17   crazy but -- okay, but if there's anything like that, we had

18   maybe graphite on my hands.  I don't know.  We were drawing.

19   That's it.  I don't know nothing about no lead."

20   Q.   Was it confusing to you?

21   A.   Yeah.  It made no sense because I know that that's just a

22   Xerox machine.  I've seen one of those before.  And he's

23   convincing me that that, the fact that my hand showed up

24   equals I used gasoline, and that did not make sense to me, no.

25   Q.   Did they tell you anything else that didn't make sense to

A. Gray - direct by Loevy

1    you trying to say that you were guilty?

2    A.   They told me a lot of stuff that didn't make sense to me.

3    Everything they told me didn't make sense, to be honest with

4    you, yeah.

5    Q.   Did they tell you they had witnesses that were...

6    A.   At one point, they told me a little old lady said she saw

7    me do it and that why would a little old lady lie.  And that's

8    just, you know, patchworks into all the other nonsense they

9    had going on.

10   Q.   Did they make any threats about what would happen to you?

11   A.   It's not -- it's hard to describe that.  It's like yes and

12   no, right.  So nobody said, "I'm going to hurt you or else,"

13   right, or nobody balled a fist up or nothing, but there was

14   reference to the electric chair.

15            A guy said, you know, "You can get the electric

16   chair."  A guy said, "You can go to -- you can go to, like, a

17   home for the criminally insane where they put little firebugs

18   like you."  That's what they told me.  So that's not a threat,

19   but it's kind of like a threat, right?  So, yeah, that's what

20   happened.

21   Q.   Were they saying that you contradicted yourself when they

22   were interrogating you?

23   A.   All the time.  They had all these notepads, so they're

24   taking notes as they're talking to me, and I'm answering

25   questions, right.  And so-and-so would pop up, "Well, five

A. Gray - direct by Loevy

1   minutes ago, you said you and Mel were this."

2          And I'm like, "I know I didn't say that," you know.

3   I said, "I didn't say that."

4          And they kept -- then this guy would work with him,

5   like, "Yeah, I got it here too.  You did say that."  And so

6   now, you know, that's a thing, right.  So...

7          MR. LOEVY:  Let me show you Plaintiff's Exhibit 126,

8   the second page.

9          Permission to publish this, your Honor.  I think we

10  talked about this being in evidence.

11         THE COURT:  Any objections other than previous ones?

12         MR. NATHAN:  No.

13         THE COURT:  All right.  Then 126 is allowed.

14      (Plaintiff's Exhibit 126 received in evidence.)

15  BY MR. LOEVY:

16  Q.  How old were you in this picture, Adam?

17  A.  This was taken Christmas of '93, so I'm 14 and nine

18  months.

19  Q.  So how long after your interrogation was this taken?

20  A.  Nine months after my interrogation.

21  Q.  This is after you've already been incarcerated?

22  A.  I've been locked up nine months here.

23  Q.  Is that a -- what's that background?  Is that real or

24  fake?

25  A.  That's a real tree, I think.

A. Gray - direct by Loevy

359

 1   Q.  And that's at the Chester where they --

 2   A.  That's at Chester Mental Health, yeah.

 3            MR. LOEVY:  Showing you 127.

 4            THE COURT:  Okay.  Any objection other than previous

 5   ones?

 6            MR. LOEVY:  These are the same ones that we talked

 7   about, your Honor.

 8            THE COURT:  Right.  So any objection other than

 9   previous ones?

10            MR. NATHAN:  No, your Honor.

11            THE COURT:  All right.  Then that's allowed too.

12        (Plaintiff's Exhibit 127 received in evidence.)

13   BY MR. LOEVY:

14   Q.  Can you identify who is in that picture and how old he is?

15   A.  Me or the other kid?

16   Q.  You.

17   A.  Okay.  That's me.  And that's the year before when I was

18   in Green Bay.

19            MR. LOEVY:  And showing you Plaintiff's Exhibit 128.

20            The same protocol, your Honor.

21            THE COURT:  Yes.  Any objection other than previous

22   ones?

23            MR. NATHAN:  No, your Honor.

24            THE COURT:  All right.  128 is allowed.

25        (Plaintiff's Exhibit 128 received in evidence.)

A. Gray - direct by Loevy

360

1  BY MR. LOEVY:

2  Q.  Which one are you?

3  A.  I'm the one on the far right, the good-looking one.

4  Q.  That one?

5  A.  Yeah.

6  Q.  And these are cousins or friends?

7  A.  Oh, those are the kids I was living with.  These are the

8  guys that I was living with up there.

9  Q.  All right.  So that's before the interrogation too?

10  A.  Yes.  That's about a year before.

11  Q.  So you would have been how old?

12  A.  13.

13        MR. LOEVY:  And showing you this picture, this is --

14  what's the exhibit number on this one?

15        MS. WANG:  It should be on there.

16        MR. LOEVY:  I've got the wrong one.  I'll show you

17  that one in a bit.

18  BY MR. LOEVY:

19  Q.  You're being interrogated.  You were an adult or a child,

20  sir?

21  A.  I was a kid, yeah.  I was a kid.

22  Q.  And did they give you anything to eat or drink?

23  A.  At the end -- well, during, I got coffee that I remember.

24  Brown, one of the guys brought me coffee a couple times.  And

25  at the end after they had got the statement, they brought me

Case: 1:18-cv-02624 Document #: 559 Filed: 06/29/23 Page 152 of 166 PageID #:21154
A. Gray - direct by Loevy
361

1    some -- some McDonald's from across the way.  It was one of

2    those weird seasonal things like a McRib or something.  I

3    don't know.

4    Q.  That was before or after you confessed?

5    A.  This would have been after the end of the statement stuff.

6    Q.  All right.  How did the coffee make you feel?

7    A.  I don't -- I couldn't differentiate that.  I was nervy

8    anyway.  It may have made me possibly more nervous.  I don't

9    know.

10   Q.  All right.  When -- as the hours went on, were they ever

11   willing to accept your statement that you were innocent?

12   A.  No.

13   Q.  At any point?

14   A.  No.  They never typed that one up.

15   Q.  And did you consider them authority figures?

16   A.  They were cops.  These guys, yeah, these guys were

17   serious.

18   Q.  Did you think you were going to get out of there?

19   A.  Yeah.

20   Q.  Did they tell you anything at some point that -- to

21   persuade you to confess?

22   A.  Yes.

23   Q.  Tell the jury what.

24   A.  One guy said --

25   Q.  Which guy?

A. Gray - direct by Loevy

362

A.   His name was Nick Crescenzo, and it was just me and him in the big interview room.  He sat next to me, and he told me, "I believe you that you didn't do it, but you're going to have to give us something.  You've got to tell us something.  And, you know, if you say you did it then, whatever, I'll take you home, drop you off."

Q.   Drop you where?

A.   Specifically, he said he'd drop me off in front of my school because we were in the school hours.  I thought home but he saw, "Oh, no, we're in school hours.  I could drop you off in front of your school."

Q.   All right.  When you say "Crescenzo," is this someone you had to interact with over the years?

A.   He was one of the guys asking questions along with everybody else.

Q.   What do you remember about him --

A.   He's the guy that did the Xerox.

Q.   What do you remember about him physically all these years later?

A.   He was big, tall, and maybe salt and pepper hair maybe.

Q.   All right.  When he said he would drop you off at school, what did you have to do to get dropped off at school?

A.   All I had to do was say I did it.

Q.   And so how did it go down?

A.   I said, "I didn't do it."

A. Gray - direct by Loevy

1    He said, "All you've got to do is say you did it,

2    though."

3    I said, "Okay.  I did it."

4    He said, "Well, how did you do it?"

5    And I said, "I didn't, you know."

6    And he's like, "Well, we'll make something up, you

7    know."

8    And I don't remember exactly how that unfolded, but I

9    started talking, and he says, "Hold on.  I've got to go get

10   somebody."  So he goes out, and he walks through the door and

11   then comes back and a couple other people come in, and then

12   we're in that room.

13   Q.   Do you beat yourself up now for being that stupid?

14   A.   I don't now, but I did for the majority of my life, yeah.

15   Q.   Can you explain?

16   A.   I felt like -- I felt like I let them do that to me

17   because I wasn't smart enough or I wasn't shrewd enough or I

18   thought I was smart enough to handle whatever.  And all my

19   life, I sat there and I thought that if I don't let them -- if

20   I don't sign then that I don't go to jail and I don't lose my

21   life.  And so they tricked me, and I wasn't smart enough to

22   stop them.

23   Q.   Can you --

24   A.   So, yeah, I beat myself up over that my whole life, but I

25   was a kid.  In retrospect, I forgive the kid because the kid

A. Gray - direct by Loevy

1  couldn't have resisted them guys.  Those guys were serious.

2  It ain't no resisting them guys.  So yeah, I forgive the kid.

3  I don't hold that anger no more, but I did it.  That was a lot

4  of pain for me for a long time.

5  Q.  All right.  We only have 15 more minutes this afternoon,

6  so I'm going to jump ahead a little bit.  Where did they take

7  you after you said, "Fine, I did it," and gave the statement?

8  A.  I went to the juvenile temporary detention center on 1100

9  South Hamilton.

10  Q.  How many kids are in the juvenile detention center?

11  A.  6-, 700.

12  Q.  Describe what it's like coming into that place.

13  A.  When the squad car takes you there, you're at street

14  level, and then the road dips at a 45, and so now you're kind

15  of going down underneath the street, you know.  And it comes

16  to a big door.  And then they hit the horn.  And then this

17  door opens, goes up, and then you go underground underneath

18  the Audy Home.

19          And it's like a dark underground garage, unfriendly,

20  "you might get mugged" kind of area, you know.  And you go in

21  there, and you go through the intake.

22  Q.  Now, you thought you were going -- where did you think you

23  were going to go after you said what they wanted?

24  A.  I thought -- well, after all the interrogation stuff, I

25  thought I was going to go home.  I thought I was going to call

A. Gray - direct by Loevy

365

1   my ma to come pick me up.

2   Q.  And what happened?

3   A.  The youth officer brought me down to his office.  I

4   presume it's his office.  And I gave him the phone number of

5   my ma's -- or I don't remember what number.  I think it was my

6   mom's phone number.  And I watched him dial, and he only

7   dialled six numbers.

8           And I'm watching him.  He doesn't dial the last

9   number.  And he holds it up.  He's like, "Oh, nobody is home,"

10  and he hung up the phone.  "I guess you got to go to the Audy

11  Home."  And I went to the Audy Home, the juvenile jail.

12  Q.  All right.  Were you one of the older or younger kids when

13  you got to the juvenile jail?

14  A.  I was one of the youngest if not the youngest.

15  Q.  Most of the kids were 16?

16  A.  15, 16, some 17, sometimes 18.  They got some guys,

17  they've got warrants and they're adults now, but they got

18  juvenile warrants, and they put them in there too sometimes.

19  Q.  And were there many 14-year-olds or just barely

20  14-year-olds?

21  A.  No.

22  Q.  How big were you?  Have you seen the arrest report there?

23  A.  I don't know.  I was little.  I wasn't big.

24  Q.  Would you contest 5, 3, 110 pounds?

25  A.  Sounds about right.

A. Gray - direct by Loevy

366

1   Q.  Were there big teenagers in that jail with you?

2   A.  Yes.

3   Q.  How big?

4   A.  6, 5, 380.

5   Q.  All right.  Were you trying to be interacting with them?

6   A.  No.  No.

7   Q.  Did you know anybody in this building?

8   A.  Periodically -- I didn't know anybody going in, but

9   periodically sometimes somebody I might know from the

10  neighborhood might come through on some small, stupid case.

11  Q.  Was that often or not very often?

12  A.  Very infrequently.  Like Mel, Mel caught a case, and he

13  ended up coming through there at one point when I had been

14  there for, like, two years.

15  Q.  All right.  But when you first got there, did you know

16  anybody there?

17  A.  No.

18  Q.  Would people size up who is a victim and who's not?

19  A.  That's what that environment is.  It's all strength and

20  victimization.

21  Q.  All right.  We'll talk about that.  Did you get a phone

22  call at some point?

23  A.  Yeah.  In the intake when they were processing me in, they

24  gave me a phone call, and I called and I got my mom, and I

25  talked to my mom.

A. Gray - direct by Loevy

1  Q.  How did that go?

2  A.  I was -- I was wondering why she didn't pick me up.  I was

3  confused and trying to figure it out and see what was going

4  on.  And I wanted her to come pick me up from the Audy Home

5  right now if she could so I can go home.

6          And then what -- apparently, whatever, the courts, I

7  don't know if the courts were closed or whatever, but you have

8  to wait until tomorrow and figure it out.  So I know I'm

9  spending the night in the Audy Home which is disconcerting.

10          But and then they're telling me they were in the

11  police station the whole time or not the whole -- I don't know

12  how that works, but they were at the station.  And then they

13  got spun around by the cops.  And they would go up to talk to

14  some detective and he would tell them I'm not in the police

15  station or I'm out in the field.

16  Q.  All right.  Well, so did that cause you distress?

17  A.  When I heard that, that they were in the station, it

18  bothered me a lot because there's just more lies from the

19  detectives.

20  Q.  All right.  Did you -- you thought you were going home

21  still?

22  A.  I thought I was going home, yeah.

23  Q.  Okay.  At what point did it dawn on you that you weren't

24  going home?

25  A.  I don't know if it was the next day or a couple days

A. Gray - direct by Loevy

1    later, but my sister had retained an attorney.  And I went to

2    court on one of those -- either the next day or a couple days

3    later.  I can't recall, but I went to court.

4              And when I was in the bullpen, the attorney came to

5    the back and, you know, I'm -- am I going home?  What's going

6    on, you know?  And I'm excited sort of thinking about the idea

7    of going home.

8              And then he made me face that, no, I'm not going

9    home.  Like, you know, he forcefully made me face that, "No,

10   this is serious, and you're going to be here," he told me,

11   "like 11 months."

12             And for me, that was -- that was, like, killing me.

13   It just deflated -- it didn't compute.  But again, he made me

14   face it directly.  And so I just, it defeated me.  It broke me

15   down.  It effectively just -- I don't know.

16             Him telling me 11 months, you stretch out this awful

17   experience and now it just telescopes into infinity now

18   because 11 months is infinity, and I've got to stay here 11

19   months?  That's forever.  "You just told me forever.  'You're

20   dead,' that's what you told me."  And so I became immediately

21   suicidal.

22   Q.  What were -- they put you in a cell, I assume?

23   A.  Yeah.

24   Q.  And what were the cells like?

25   A.  They had brick walls.  The exterior wall facing outside to

A. Gray - direct by Loevy

1   the free world, it was like -- it was metal.  It had a window

2   high up.  You could only look out the window if you could --

3   it had a little tiny little ledge.  You could do a pull-up,

4   you know, if you were strong enough and you could kind of look

5   out, but you really couldn't.  Or if you stood on top of your

6   sink from the back, you could kind of see the Chicago skyline

7   maybe.

8   Q.  All right.  Was this a violent place, Adam?

9   A.  Extraordinarily.

10  Q.  What was the attitude of the kids?

11  A.  Everybody was -- everybody was just fighting or assaulting

12  or taking advantage or all kinds of bad stuff, man.

13  Q.  And if someone attacks you, what are you supposed to do?

14  A.  If you're smart, you're going to fight back real hard.

15  Q.  Why is that?

16  A.  Because if you don't fight back real hard, then you're on

17  the slippery slope of being the guy that doesn't fight back.

18  Q.  And then what happens?

19  A.  Well, you're going to get taken advantage of and that's

20  just -- you're going to get extorted, they're going to beat

21  you, or they're going to rape you.

22  Q.  And were you someone that became a target?

23  A.  Yeah.

24  Q.  Why did you become a target?

25  A.  I was little.  I was little.  I was a little -- I was a

A. Gray - direct by Loevy

1   little kid compared to everybody else.  I'm little.  I don't

2   know.  I stood out because I'm white.  I'm not in a gang.

3   Q.  And what were the gangs in the juvenile center?

4   A.  Primarily like GDs, Vice Lords, Kings, and all those,

5   their little small associate gangs.

6   Q.  When you said you stood out because you were small, and

7   also was there a lot of white people in the jail at the time?

8   A.  No.

9   Q.  How many were there out of the 700 kids?

10  A.  Out of 700 kids, I don't think it ever really ranged more

11  than ten, five to ten.

12  Q.  All right.  And you said that sometimes kids would look to

13  victimize kids.  Why would kids do that?

14  A.  Not sometimes.  That was the way it worked.

15  Q.  Why did kids want to victimize other kids?

16  A.  Kicks and giggles and being sadistic.  And it is the

17  nature of the environment.  It's just a bad, real bad *Lord of*

18  *the Flies* environment.

19  Q.  Were you attacked?

20  A.  Yeah.

21  Q.  How often were you attacked?

22  A.  Very often.

23  Q.  And what would happen, you know?  How would a fight start?

24  A.  Any number of ways.  Traditionally it's, I don't know,

25  somebody is -- like, you caught somebody's eye, and it's time

A. Gray - direct by Loevy

1    to put you in that window of making a decision.  You know,

2    it's either --

3    Q.   Do you remember your first --

4    A.   I had to hesitate because I didn't want to swear right

5    there, so sorry.

6    Q.   Do you remember the first time you were attacked?

7    A.   Yeah.

8    Q.   What, tell the jury.

9    A.   We were sitting at dinner.  There's four people to a

10   table.  And this guy was sitting across from me, and he was

11   bigger.  He was 16.  And he had just got sentenced.  He was a

12   juvenile sentenced to juvenile, not as an adult.

13          So he got sentenced, and that was big.  That's big in

14   the juvenile thing.  If you got sentenced as a juvenile and

15   you're going down to the joint, it's a big thing so -- for us,

16   for the little kids, you know, because the Audy Home, the

17   juvenile jail, it's bad, but St. Charles was worse.  And so we

18   all knew that.  That was like, it was way worse there.  So the

19   guys that were going there, they were more intimidating.  They

20   were only there for a couple more days before they get shipped

21   out.  So he was one of those guys.

22          So he's sitting across from me.  And he said

23   something like, "Give me the" -- they gave us these

24   prepackaged, it was like two oatmeal cookies in a plastic, you

25   know.  And they gave it to us with dinner.  And he's like,

A. Gray - direct by Loevy

1  "Give me those cookies, white boy."

2          And I was like, "No," and whatever.  And I don't

3  remember exactly.  But it was like, "No," right.  And he kept

4  insisting I give him the cookies.

5          And another guy that was sitting at the table, this

6  Mexican guy I was hanging out with, he had been in the Audy

7  Home two years, and he was wiser than me, and he was just a

8  nice guy.  And so maybe it wasn't the right move, but I said,

9  "If you want one of my cookies," and I threw the cookies over

10  there.

11          And the black guy, the kid, he -- we had these

12  plastic cups, these hard plastic cups that we -- that we drink

13  milk out of.  And so he kind of held it in his hand, and he's

14  like, "I'll hit you in the face with this."

15          And I didn't really regard that serious, but next you

16  know, I got hit in the face with this, this hard plastic cup.

17  Q.  How bad was the injury?

18  A.  Oh, it was -- it was, it immediately closed my eye, the

19  whole side of my face.  And so then we got to fighting.  It

20  didn't take me out, got to fighting, and that was it.

21  Q.  And why did you fight him?

22  A.  Because he just struck me and he tried to punk me.

23  Q.  All right.  Were there other incidences where you got

24  attacked?

25  A.  Yeah.

1    Q.  How often would you say you got attacked?

2    A.  Well, you get attacked and then, you know, an attack

3    usually develops into a fight if you survive the attack.  So

4    you get into -- that's how they would classify it, as a fight.

5    So then you go into the hole for a couple of days and then you

6    get out.  It's like three days.  You go in there for three

7    days, they let you out, and then you come back out, you know.

8            So you might, maybe two or three days of mingling and

9    then another situation.  So about every three days or

10   something, some situation would develop, and that would be it.

11   Q.  Now, you grew up in a neighborhood where people got in

12   fist fights, right?

13   A.  Yeah.

14   Q.  And you grew up with brothers who were bigger than you?

15   A.  Yeah.

16   Q.  Your brothers sometimes knock you around too?

17   A.  Yes, they did.

18   Q.  Was this different?

19   A.  Yeah.  This was -- these guys would have killed you if

20   they had the opportunity to kill you.  Yeah, it was much

21   different.  Brothers popping you on the head for trying to

22   cross the street or something stupid when you're little,

23   that's one thing, but somebody hitting you with a weapon, you

24   know, that's a totally different ball game.

25   Q.  All right.  Did you have people trying to take your

1    clothes, different parts of your clothes --

2           THE COURT:  Yeah, let's break here --

3           MR. LOEVY:  All right.

4           THE COURT:  -- and you can resume that line of

5    questioning.

6           Ladies and gentlemen, I'm going to give your daily

7    affirmation.  Please do not research the case, not the law or

8    the facts.  Don't discuss the case, not even amongst

9    yourselves.  You have to wait until the very, very end of the

10   case for that.

11          As I said earlier, feel free to get to know each

12   other.  You can ask Mr. Peebles who is your favorite *American*

13   *Idol* contestant, I think you mentioned during jury selection,

14   or ask Ms. Zeitz what it's like to live near Six Flags and

15   Gurnee, but don't talk about the case.  All right.  And please

16   remember to take the south bank of elevators.  I will see you

17   tomorrow morning.

18          All rise.

19       (Proceedings heard in open court.  Jury out.)

20          THE COURT:  You can step down for the moment.

21          Do you have anyone else lined up in case you finish

22   with Mr. Gray tomorrow?

23          MR. LOEVY:  Yes.  We told defense counsel that we

24   absolutely -- before we leave court today, we'll tell them our

25   backup.

1      THE COURT:  Okay.  Just when you figure that out,

2  shoot an email to the proposed order account too.

3      MR. LOEVY:  We will do that.

4      And, your Honor, we haven't talked about it, but I

5  assume we're going to have an understanding where we always

6  give each other notice the day before of the witnesses who are

7  going to testify so nobody is surprised.

8      THE COURT:  Yes, you should be doing that.

9      All right.  Thanks.

10     (Proceedings adjourned from 1:47 p.m. to 8:45 a.m. on May

11     10, 2023.)

12                     * * * * * * *

13                 C E R T I F I C A T E

14     I, Judith A. Walsh, do hereby certify that the

15  foregoing is a complete, true, and accurate transcript of the

16  proceedings had in the above-entitled case before the

17  Honorable EDMOND E. CHANG, one of the judges of said court, at

18  Chicago, Illinois, on May 9, 2023.

19

20  /s/ Judith A. Walsh, CSR, RDR, F/CRR_____        June 13, 2023

21  Official Court Reporter

22  United States District Court

23  Northern District of Illinois

24  Eastern Division

25