1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   ADAM GRAY,                    )
                                  )
4            Plaintiff,           )
                                  )
5            v.                   )  No. 18 CV 02624
                                  )
6   CITY OF CHICAGO, et al.,      )  Chicago, Illinois
                                  )  May 10, 2023
7            Defendants.          )  8:45 a.m.

8            TRANSCRIPT OF PROCEEDINGS - Trial

9                    VOLUME 3-A

10       BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11   APPEARANCES:

12   For the Plaintiff:        LOEVY & LOEVY
                               BY:  MR. JONATHAN I. LOEVY
13                                  MS. ROSHNA BALA KEEN
                                    MS. JORDAN POOLE
14                                  MS. ELIZABETH C. WANG
                               311 North Aberdeen Street, Suite 300
15                             Chicago, Illinois 60607
                               (312) 243-5900
16

17   For the City Defendants:  REITER BURNS, LLP
                               BY:  MS. ELIZABETH A. EKL
18                             311 South Wacker Drive, Suite 5200
                               Chicago, Illinois 60606
19                             (312) 982-0090

20

21   Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
22                             219 South Dearborn Street, Room 2342
                               Chicago, Illinois 60604
23                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
24

25

377

```
 1   APPEARANCES (Continued):

 2   For Defendant McInerney:    NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
 3                                    MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
 4                                    MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
 5                               33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
 6                               (312) 612-1955

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court.  Jury out.)

2               THE COURT:  All right.  Let's get appearances.

3               MS. KEEN:  Good morning, your Honor.  Roshna Keen,

4     Elizabeth Wang, Jordan Poole for the plaintiff.

5               THE COURT:  All right.  For the defense?

6               MR. NATHAN:  Good morning, your Honor.  Shneur

7     Nathan, Avi Kamionski, Elizabeth Ekl, Neha Locke, Natalie

8     Adeeyo, and Breana Brill for the defendants.

9               THE COURT:  Okay.  Good morning.

10              And the defense had something?

11              MR. NATHAN:  Yes.  Relating to Mr. Gray's

12    cross-examination, I was going to raise something, but maybe

13    it's best -- I'll let your Honor decide if Mr. Loevy should be

14    here.  I'll make the argument.

15              It's, the plaintiff testified yesterday that prison

16    was harder for him because he was not in a gang.  There's

17    evidence that he was a Two Six gang member at the time of this

18    interrogation.  And specifically, plaintiff is testifying that

19    juvenile detention was harder for him because he was not in a

20    gang, but there was evidence that he's a Two Six gang member.

21    That evidence is in his own document where he says that during

22    the interrogation, ASA Brown asked him about being a Two Six,

23    Two Sixer.  He also --

24              THE COURT:  And his response was?

25              MR. NATHAN:  I don't think he said a response to that

1    but --

2         THE COURT:  So Mr. Brown's question is evidence that

3    he was a Two Sixer?

4         MR. NATHAN:  There's also, there's an arrest report

5    separate from that that I wasn't trying to argue should come

6    in, but there's an arrest report where I believe he's -- it's

7    connected with a Two Six incident.

8         THE COURT:  And so does that report say that he

9    admitted he was a Two Sixer?

10        MR. NATHAN:  I can grab it.

11        You know what, it would be more direct to just say

12   that he testified at his deposition that he was a Two Sixer

13   and he claims that he stopped being a Two Sixer as of when he

14   was 11.  That was his testimony.

15        THE COURT:  Okay.  And then so what is there to the

16   contrary, whether it's admissions from him or some other

17   evidence external to him, that shows that he was a Two Sixer

18   at the time that he was 14 onward?

19        You can announce your appearance.

20        MR. LOEVY:  Jon Loevy for the plaintiff.

21        THE COURT:  Okay.  Anything?

22        MR. NATHAN:  It's just his denial that --

23        THE COURT:  That is not sufficient evidence to even

24   put the question to him.  I mean, if you have a good faith

25   basis, you could at least try to ask him, but I don't think

1   you have a good faith basis that from 14 onward, there's any

2   evidence that he was a Two Sixer.

3          MR. NATHAN:  I'll look to see what that arrest report

4   says, and I'll bring it up again if I have that.

5          THE COURT:  Okay.  I did want to talk about the

6   limiting instruction on arson evidence because your arson

7   expert is testifying first.

8          MR. LOEVY:  On-deck.

9          THE COURT:  Yeah.  So here's what I propose:  "I have

10  an instruction to you" -- or "for you," actually.

11          "I have an instruction for you that is specific to

12      the scientific evidence of charring, blistering, or

13      alligatoring of wood as indicating that a fire was

14      started with an accelerant and thus indicative of arson.

15      In light of the state of fire science at the time of the

16      arrest and prosecution of Mr. Gray, you must accept that

17      the defendants did not knowingly fabricate false

18      information that charring, blistering, or alligatoring of

19      wood indicated that a fire was started with an accelerant

20      and was indicative of arson."

21          Comments?

22          MR. LOEVY:  We oppose it, your Honor.  It seems like

23  just a piece of evidence in the case that there could be

24  testimony about.  We understand why you're ruling that way,

25  but we're preserving our objection to it.

1          THE COURT:  Okay.

2          MR. NATHAN:  We don't think the -- we have no

3    objection to there being an instruction being given, but in

4    terms of the language, do you think it shouldn't say that the

5    defendants did not knowingly fabricate, it should just say

6    "the defendants didn't fabricate" because otherwise, it

7    suggests that they fabricated something, just not knowingly.

8    It's clearer without the word "knowingly."

9          MR. LOEVY:  Although they did fabricate it.  They

10   just didn't knowingly fabricate it because it was based on bad

11   science.

12         MR. NATHAN:  That's --

13         THE COURT:  Yeah, that's not -- I mean, I'm not sure

14   removing "knowingly" actually helps the defense, but if you

15   want to remove it, I don't see how it's inaccurate.  Okay.

16   I'll remove "knowingly."

17         MR. NATHAN:  Thank you.

18         THE COURT:  Okay.  Anything else?

19         MR. KAMIONSKI:  I wanted to address one issue

20   regarding, there are demonstratives for Mr. Smith, for the

21   arson expert.  The demonstratives are not indicative of

22   anything that was in the Rule 26 report, so it would be -- we

23   don't think that the content of what's portrayed in the

24   demonstratives, talking about issues that are not in the Rule

25   26 report.  So we think it's a Rule 26 issue.

1      MS. WANG:  Well, with -- I mean --

2      THE COURT:  So what is outside the Rule 26 report?

3      MR. KAMIONSKI:  So, for example, there is --

4      MS. WANG:  We're not going to use that one.

5      MR. KAMIONSKI:  Which ones are you going to use?

6      MS. WANG:  Staircase, growth of a fire.  That's it.

7      MR. KAMIONSKI:  Which one is it?

8      THE COURT:  Yeah, you can confer off the record.  We

9  can be off the record for that.

10      MR. LOEVY:  And, your Honor, I'm going to propose

11  that if people have issues for the Court that we confer with

12  each other before bringing it to the Court so that we're not

13  surprised, and then we won't have this problem.

14      THE COURT:  Well, that is baked into everything we

15  do.

16      (Pause.)

17      THE COURT:  While that conferral is going on -- you

18  can keep conferring.  I just want to make sure that, although

19  maybe Ms. Wang is the one who would know this.

20      So Mr. Smith is going to navigate -- he's not going

21  to try to testify that at the time in '93 and a couple years

22  afterwards that it was already widely accepted.  He's going to

23  navigate around that?

24      MR. LOEVY:  He's in court, your Honor, and he's very

25  intellectually honest about the change in science.  He is

1    going to navigate that.

2          THE COURT:  Okay.  Yeah, because what I don't -- I do

3    intend to read the instruction when you start getting into

4    that testimony.  And what I don't want him to do, you know,

5    inadvertently is to be either asked that or expands upon it

6    and then I have to basically turn to the jury again and say

7    he's wrong.  I don't want to have to do that.

8          MR. LOEVY:  No.

9          THE COURT:  Do you understand?

10          MR. LOEVY:  There is a whole section of his outline

11    explaining that the science changed, what they knew in '93

12    wasn't now.  I think you will find it intellectually honest

13    testimony.

14          THE COURT:  Okay.  Yeah, and I just want to be

15    crystal clear that, of course, experts might disagree, so he

16    might be -- he might believe that he's being intellectually

17    honest.  I just want to make sure that the words that come out

18    of his mouth, if he truly believes it was widely accepted, you

19    have to navigate around that.  Otherwise, I'm going to do

20    something in front of the jury.

21          MR. LOEVY:  I was mis -- not communicating well.  He

22    agrees with you.  He believes you.  He shares that premise.

23          THE COURT:  Okay.  Yeah, from the previous summary

24    judgment opinion.

25          Okay.  Any issues, Mr. Kamionski?

1           MR. KAMIONSKI:  We resolved it, your Honor.

2           THE COURT:  All right.  You have five minutes.

3       (Recess from 8:54 a.m. to 9:01 a.m.)

4       (Proceedings heard in open court.  Jury in.)

5           THE COURT:  All right.  Please be seated.

6           Good morning, ladies and gentleman.  We are ready to

7   resume the trial.  We're going to take a break, which I've

8   authorized, in Mr. Gray's testimony to get in the testimony of

9   another witness that the plaintiff wishes to call.  This is

10  going to happen from time to time during the trial just for

11  the scheduling convenience of the witnesses.  Okay.  So we'll

12  resume with Mr. Gray's direct testimony after this next

13  witness, I believe.

14          And the plaintiff can go ahead and announce that

15  witness, please.

16          MS. WANG:  We call Dennis Smith.

17          THE COURT:  All right.  Mr. Smith, you can come on up

18  to the witness stand over here, please.

19          All right.  You can set your things down, but before

20  you sit down, then raise your right hand.

21      (Witness sworn.)

22          THE WITNESS:  I do.

23          THE COURT:  All right.  Mr. Smith, that mike is

24  pretty important, so can you swing it on over and talk right

25  into it when you deliver your answers.

Smith - direct by Wang

385

1      Okay.  For the plaintiff?

2          DENNIS WILLIAM SMITH, PLAINTIFF'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MS. WANG:

5    Q.   Good morning.  Mr. Smith, could you please state your name

6    and spell it for the record?

7    A.   Sure.  It's Dennis William Smith.  D-e-n-n-i-s,

8    W-i-l-l-i-a-m, S-m-i-t-h.

9    Q.   Where do you work?

10   A.   I work at Premiere Fire Consulting Services.

11   Q.   And what do you do there?

12   A.   I am the president and lead fire investigator.

13   Q.   And is that your own company?

14   A.   Yes, it is.

15   Q.   And what are your duties there?

16   A.   My duties are, besides all the administrative stuff, the

17   evaluation of fires and explosions, also do some building and

18   fire code analysis, review fire reports of other

19   investigators, and also do fire investigation training.

20   Q.   How long have you been a fire investigator?

21   A.   I've been a fire investigator for approximately 35 years.

22   Q.   And can you give some examples of who are the clients of

23   your company, Premiere Fire Consulting Services?

24   A.   Sure.  The clients in Premiere are product manufacturers,

25   attorneys representing manufacturers, insurance companies,

Smith - direct by Wang

1    sometimes people accused of arson by their insurance company,

2    and sometimes building fire code analysis but typically how

3    that's related to fires.

4    Q.  What are your obligations to your clients when you

5    evaluate cases?

6    A.  My obligation is to find out the origin and cause of the

7    fire and responsibility particularly for clients and

8    manufacturers, they want to know if their product in any way

9    is involved in or responsible for causing a fire.

10   Q.  Before you became a fire investigator, were you a

11   firefighter?

12   A.  I was.

13   Q.  Okay.  And for how long?

14   A.  I was a career firefighter for 25 years and a volunteer

15   firefighter for several years before that.

16   Q.  What fire department did you work for?

17   A.  I was a volunteer in the Pleasantville, New Jersey, fire

18   department, and then I joined the Atlantic City, New Jersey,

19   fire department as a career firefighter.

20   Q.  Did you have any responsibilities for fire and arson

21   investigation when you were with Atlantic City?

22   A.  I did.

23   Q.  And for how long?

24   A.  For approximately 11 years.  I had been promoted to fire

25   inspector which included those duties and eventually got

Smith - direct by Wang

387

1    additional training as a certified arson investigator which I

2    did full-time fire investigation, arson investigation duties.

3    Q.   During your years with the Atlantic City Fire Department,

4    approximately how many fires do you think you investigated?

5    A.   There's somewhere -- the last record that I had was

6    somewhere over 400 that I had done reports on.

7    Q.   Did you ever testify in any legal proceedings as an arson

8    investigator with Atlantic City?

9    A.   I did.

10   Q.   And in those cases, were you testifying for the

11   prosecution of arson-related cases?

12   A.   I was.

13   Q.   And so you've worked for both the public and private

14   sectors, it sounds like?

15   A.   Yes.

16   Q.   And how many total fire investigations have you conducted

17   over the course of your career, do you think?

18   A.   That, I don't know.  I've never kept a running total of

19   how many investigations I've done.

20   Q.   All right.  And what types of investigations have you

21   done?

22   A.   The types of investigations I mostly got involved with

23   were ones that we would call major fires or complex fires.

24   Those are fires with large dollar losses, multiple deaths,

25   multiple injuries, fires involving large fire areas, very

1  large warehouses, for instance.  So they were all complex in

2  that you were working with other investigators and other

3  investigative teams besides just myself involved in the fire.

4  Q.  And on average, how long do complex investigations of

5  fires take, especially ones involving deaths?

6  A.  I mean, they can take, obviously, from one day to three

7  days to five days to ten days sometimes just on the fire

8  scene, and then you follow that up with laboratory exams.

9  I've been on laboratory exams that go three weeks, just

10  examining the evidence collected from the fire scene

11  afterwards.

12  Q.  And why did complex investigations take that amount of

13  time?

14  A.  Just because mainly there's a lot of different, what we

15  call, interested parties.  So there's a lot of different

16  interests represented, could be a lot of different

17  manufacturers.  In a house, you may have different

18  manufacturers for all the different products.  So as a result,

19  all those people are involved in the investigation.

20         So it's just a time-consuming process with a lot of

21  people looking at typically a lot of evidence.

22  Q.  Could you tell us a little bit about your education?

23  A.  Sure.  I went first through the fire academy taking over

24  120 seminars on fire investigation, fire codes, building

25  construction.  I have an associate degree in fire control

1  technology, it was called at the time which is basically

2  firefighting.  I have a bachelor of arts degree in criminal

3  justice.  I have a bachelor of science degree in fire science.

4  And I've taken some graduate-level courses in a criminal

5  justice program as well.

6  Q.  Do you have any professional certifications as a fire

7  investigator?

8  A.  I do.  I'm certified by the International Fire Service

9  Accreditation Congress as a fire investigator.  I hold several

10 certifications with an organization called the National

11 Association of Fire Investigators, or the acronym NAFI,

12 n-a-f-i.  I have a certified fire and explosion investigator

13 certification, a certified vehicle fire investigation or

14 investigator, a certified fire investigation instructor with

15 them.

16         I also, at the time I was with the State of New

17 Jersey or through the State of New Jersey when I was with the

18 fire department, I had gone back to the criminal justice

19 academy at the State and become a state certified arson

20 investigator which is, most people would be familiar with as a

21 fire marshal.

22 Q.  All right.  Are you a member of any professional

23 associations?

24 A.  I am.

25 Q.  And do you hold -- have you held any positions within

Smith - direct by Wang

1    these organizations?

2    A.   I have.   I'm a member of the National Association of Fire

3    Investigators -- or National Fire Protection Association is

4    one I've served on a couple committees for different documents

5    with that group.   I've served in that group NAFI I talked

6    about, the National Association of Fire Investigators.   I at

7    one time was on the Board of Directors of the national

8    training staff.

9           With the International Association of Arson

10   Investigators, I've been a member of several chapters and have

11   been involved -- as a matter of fact, I was a district

12   representative as a vice president for northern Indiana for

13   one of those.   And I've been involved with that organization.

14   They actually wrote a textbook kind of based on NFPA 921 for

15   fire investigative -- fire investigators.

16   Q.   What's the NFPA?

17   A.   NFPA is the National Fire Protection Association.   That is

18   the world's largest fire safety organization.   They're not

19   technically geared specifically for fire investigation.   They

20   make -- they make building and fire codes that are used all

21   the time all around the country.   You may be familiar with the

22   things like the Life Safety Code or the National Electrical

23   Code.   That's the organization that fosters those documents.

24   Q.   And you mentioned NFPA 921.   What is that?

25   A.   NFPA designates numbers to all their documents, so NFPA

1    921 is entitled "The Guide for Fire and Explosion

2    Investigations."

3    Q.  And what does NFPA 921 do?

4    A.  NFPA 921 was a breakout from an original document which

5    was called the Manual for Determination of Electrical Fire

6    Causes back in the 1980s.  NFPA 921 started with the first

7    edition in 1992 and basically was to be a more rounded --

8    instead of dealing only with electrical fires like the first

9    manual was, this was to be more rounded to deal with all the

10   issues of fire scene examinations, and eventually as the

11   document grew to include vehicles and wildfire and boats and

12   vessels as well.

13   Q.  Were you involved in writing any portion of NFPA 921?

14   A.  I was.

15   Q.  Can you explain?

16   A.  Yes.  I was on the committee for 23 years really from the

17   inception when it started in 1989.  I served as a coauthor of

18   the chapter on legal considerations in the first edition.  I

19   also wrote a large portion of the text on the physical

20   evidence chapter on preserving the fire scene.

21        I also served as a task group chair for the new

22   chapter at the time on incendiary fires.  And in the following

23   cycle, we added another section to that chapter on motives,

24   and I was the task group chair with that.

25   Q.  Is the NFPA 921 generally accepted by fire investigators

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 17 of 288 PageID #:21185
Smith - direct by Wang
392

1    today?

2    A.  It is.  It's one of the primary documents used by the two

3    aforementioned organizations, but NAFI and the International

4    Association of Arson Investigators, they revere it as a

5    authoritative text and they use it in their training.  And

6    those two organizations also certify fire investigators, so

7    they use it in -- for that purpose as well.

8    Q.  Is there a standard created by the NFPA for job

9    performance requirements for fire investigators?

10   A.  There is.

11   Q.  What is that?

12   A.  NFPA 1033 is another document.  This one is a standard,

13   and this one has the mandatory provisions for a fire

14   investigator.  And it's based on job performance requirement.

15   So what it establishes, it establishes the duties and the

16   tasks that an investigator must do in -- involving fire

17   investigation.

18           It also provides the knowledge, and it links to NFPA

19   921 where the knowledge base applies sections of requisite

20   knowledge to be able to accomplish the task.  And what it

21   does, it references back to NFPA 921 as a reference for where

22   that material can be found on how to gain the knowledge to

23   conduct the investigations.

24   Q.  Were there law enforcement officers on the committee that

25   wrote these documents?

Smith - direct by Wang

393

1    A.  Generally, the committee, the technical committee is

2    limited to 20, and it is an assortment of people.  It has to

3    be balanced so there is no -- there's no more than one-third

4    from any special interest group.  But the groups involve --

5    for instance, 921 includes members of the Alcohol Tobacco and

6    Firearms.  It has several state fire marshals, and they

7    represent state fire marshal organizations.

8            There are local fire department members on the

9    committee.  There's also members of the insurance industry,

10   research engineers.  There's also college professors teaching

11   fire science programs, they're on the committee, as well as a

12   number of different people they categorize as users.

13   Q.  All right.  Now, let's talk about your involvement in

14   court cases.  Do you sometimes do fire investigation work that

15   ends up in court cases?

16   A.  Occasionally.

17   Q.  And specific to this case, were you retained to do some

18   fire investigation work?

19   A.  Yes.

20   Q.  When was that?

21   A.  I was initially retained in the summer of 2011 by a

22   different law firm, Jenner & Block, and an attorney named Brij

23   Patnaik to look at the original fire.  And then subsequently,

24   I've been retained by current counsel, by the Loevy law firm

25   beginning -- I was asked about 2019 to get involved, once

Smith - direct by Wang

394

1   again based on the review I had done back in 2012.

2   Q.   Do you get paid for your time for doing this type of work?

3   A.   Yes.

4   Q.   And what's your typical fee structure?

5   A.   The fee structure varies between the type of work.

6   Basically, the technical work is at 225 an hour.  There are

7   lesser charges for travel time, travel time by car, travel

8   time by air.  I think those are the main divisions of the

9   different rates that are involved.

10  Q.   Do you get paid regardless of what your conclusions are?

11  A.   Yes.

12  Q.   And do you only testify for the plaintiff's side or the

13  defendant's side?

14  A.   I would testify for anybody who called me.

15  Q.   Have you ever rejected a case because you didn't agree

16  with what the lawyer was asking you?

17  A.   No, I don't think so.

18  Q.   What about in criminal cases?  Have you testified in

19  both -- for both the prosecution and the defense?

20  A.   Yes.

21  Q.   Let's talk about the kinds of fires that get investigated.

22  First, is there such a thing as an accidental fire?

23  A.   Yes.

24  Q.   What's that?

25  A.   An accidental fire is a fire that is started by

Smith - direct by Wang

395

1    unintentional means.  It wasn't meant to happen.  So

2    literally, it's an accident.

3    Q.  Can you just give some examples?

4    A.  Yes.  A pot on a stove, a Pop-Tart in a toaster, a space

5    heater too close to combustible materials.

6    Q.  Okay.  And second, is there such a thing as an intentional

7    or incendiary fire or, in legal terms, an arson?

8    A.  Yes.

9    Q.  What is that?

10   A.  Those are fires that are started in locations and under

11   circumstances where fires should not be made.

12   Q.  Are those as common as accidental fires?

13   A.  No.

14   Q.  And are fire investigators trained in determining the

15   cause of a given fire?

16   A.  Yes.

17   Q.  Can you give a brief explanation?

18   A.  Sure.  The fire investigation process, the classification

19   is at the end depending whether it's accidental or

20   intentional.  That's what -- I know some places use the

21   vernacular "arson investigator."  You're really a fire

22   investigator.  You're investigating a fire to determine what

23   the circumstances are, where the fire started, and what the --

24   what the cause is, the elements of the fire cause.

25   Q.  Now, turning to this case, in the fire at 4139 South

1    Albany on March 25th, 1993, did you review certain materials

2    relating to the origin and cause of this fire?

3    A.   I did.

4    Q.   Could you briefly describe the materials you reviewed?

5    A.   Sure.  I reviewed the fire department reports, some

6    testimony from the investigators, interviews that they

7    conducted, as well as depositions or statements from

8    witnesses.  I reviewed the police department reports and some

9    of the testimony of police officers, firefighters; the lab

10   reports that were part of this.

11   Q.   All right.  Do you feel that you reviewed all the

12   necessary evidence?

13   A.   Yes.

14   Q.   Now, back in 1993, what did the original fire

15   investigators conclude about the cause of the fire?

16   A.   The original investigators had concluded that based on

17   certain fire patterns that they saw at the scene, which were

18   at the time commonly referred to as alligatoring or alligator

19   char, that those fire patterns were indicative of the use of a

20   flammable liquid.

21        They also tested their theory.  They used a

22   mechanical device referred to as a hydrocarbon detector.  They

23   went and used that in certain areas, and they got an alert

24   which they thought confirmed the presence of an ignitable --

25   or a lightable or flammable liquid.

Smith - direct by Wang

1  Q.  Now, Mr. Smith, based on everything you reviewed and your

2  decades of experience as a fire investigator, is there

3  evidence that this was an arson?

4  A.  No.

5  Q.  Is there any evidence at all that supports the conclusion

6  that this fire was intentionally set?

7  A.  No.

8  Q.  Let's talk about what the fire investigators did.  What

9  time was it when the fire started?

10  A.  The fire was dispatched at 2:51 a.m.

11  Q.  What temperature was it that night?

12  A.  The temperature was about 38 degrees.

13  Q.  And what time did Fire Marshal Gruszka show up at the

14  scene?

15  A.  The fire marshal arrived at the scene, is approximately

16  3:20.

17  Q.  And was the fire completely out when he arrived?

18  A.  According to the report, it was not.  There were still

19  some hotspots.

20  Q.  Okay.  Could you give us an overview of what Fire Marshal

21  Gruszka did when he arrived at the scene?  And then we'll go

22  through each one in detail.

23  A.  Okay.  What appears from the record, he -- when he first

24  got on the scene, he met with the fire chief in charge, got

25  information from him about what had gone on which is fairly

Smith - direct by Wang

398

1   typical, how the firefighting aspects were, where the fire was

2   located.  He was told it was in the rear of the building, so

3   he went around to the rear of the building, was his next stop.

4   Went to the rear at the ground level of a rear two-and-a-half-

5   story enclosed stairway, made some observations from that

6   point.

7           After that, he went into the building from the front,

8   went into the building, went through the house back to this

9   back enclosed stairway.  And he was at the doorway of both the

10  first-floor apartment and then went up to the doorway of the

11  second-floor apartment.

12          MS. WANG:  All right.  I'm showing you Plaintiff's

13  Exhibit 98, Page 9.

14          Is there any objection?

15          MR. KAMIONSKI:  No objection.

16          THE COURT:  All right.  So you're offering 98?

17          MS. WANG:  Yes.

18          THE COURT:  All right.  Is there any objection?

19          MR. KAMIONSKI:  No objection.

20          THE COURT:  All right.  98 is allowed, and you can

21  publish it.

22          A JUROR:  We can't see it.

23          THE COURT:  That was purposeful.  Now it's in, and

24  now you can see it, but thank you for flagging it.  That's

25  perfectly fine.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 24 of 288 PageID #:21192
Smith - direct by Wang
399

1          So 98 is in.  Go ahead.

2      (Plaintiff's Exhibit 98 received in evidence.)

3          MS. WANG:  There are these little dots.

4          MR. LOEVY:  The top right.

5  BY MS. WANG:

6  Q.  All right.  Now, is this one of the photos that you

7  reviewed for your review?

8  A.  Yes.

9  Q.  Okay.  And what is this?

10  A.  That is the fire building.

11  Q.  Okay.  Can you describe the building?

12  A.  The building from the front here, this is a mostly brick

13  building.  It does appear that the -- in the back you have

14  some better pictures, but it appears it has an asphalt roof on

15  it.  This area in the back -- can I write on it?  Yes.  That

16  area in the back, that is the enclosed stairway.

17          MS. WANG:  All right.  And let's, showing you

18  Plaintiff's Exhibit 97.

19          THE COURT:  All right.  Any objection to 97?

20          MR. KAMIONSKI:  No objection.

21          THE COURT:  All right.  97 is allowed.

22      (Plaintiff's Exhibit 97 received in evidence.)

23  BY MS. WANG:

24  Q.  All right.  Now, Mr. Smith, what does this photo show us?

25  A.  This is a photo of the rear of the building.  I believe

1    that's the east elevation.  What you see down in the corner on

2    the right is the doorway that goes in at grade level.

3    Q.  All right.  This photo -- or I'm sorry.  This doorway

4    right here?

5    A.  Yes.

6    Q.  Okay.  And so where was the porch?

7    A.  The porch, the stairway goes up two floors.  There are two

8    landings for the first floor and a landing for the second

9    floor.  The stairway is in behind here not really visible from

10   this photograph.

11   Q.  Okay.  Because it's inside the walls?

12   A.  Right.

13   Q.  All right.  And what are these -- what are these?

14   A.  This is the first-floor window or the window that would be

15   at the first level of the house.  And you can see that it's

16   open.  This is the second window on the second floor.  And

17   again, what this is showing, this is the indication of heat

18   and flames venting from those windows.  That's what you're

19   seeing.  The siding is aluminum siding or reported to be

20   aluminum siding, so you're seeing that's been melted away in

21   the middle.

22        And this middle section between the two windows -- I

23   wish I had a different color for that to show you -- that area

24   right there, that is what you're seeing is a wall below the

25   window, below the second-floor window.

1    Q.  Now, what do you observe with the roof?

2    A.  Well, you can also see -- and this is a dark photo.  It's

3    taken at nighttime.  But what you can see here, you can see

4    where the actual wall, this is the V.  There's your roof line.

5    These are structures to hold the roof up.  And most of this,

6    at least in the area above the interior stairway, is missing.

7    It's been consumed.  It's been consumed or collapsed down into

8    the stairway.

9            MS. WANG:  All right.  I'm showing you Plaintiff's

10   Exhibit 98 which I believe has already been admitted.

11           THE COURT:  Yes.  So it's a group exhibit because

12   there are multiple photos?

13           MS. WANG:  There's multiple photos.

14           THE COURT:  So just maybe refer to the Bates

15   number --

16           MS. WANG:  Or the page?

17           THE COURT:  -- just for the record or the page if

18   it's in order, yes.

19           MS. WANG:  Plaintiff's Exhibit 98, Page 15.

20           THE COURT:  All right.

21   BY MS. WANG:

22   Q.  Now, Mr. Smith, what does this photo show us?  Does this

23   show us the roof better?

24   A.  Yes, it does.  You can see this is a daytime photo, so you

25   can see where the fire went up -- let me do the outline.  This

Smith - direct by Wang

402

1    is the second-floor window on the stairway.  The first-floor

2    window is covered up by the piece of plywood, but you can see

3    everything above that.  The wall and up through the roof, you

4    can see, obviously see daylight up through the roof.

5            So this fire got into the attic space of the

6    structure from the rear, and it's in the area more or less

7    directly above the interior stairway.

8    Q.  All right.  Did Fire Marshal Gruszka examine the stairway?

9    A.  No, he did not.

10   Q.  And what -- did he look at anything?

11   A.  According to the fire report, he -- his examination was

12   limited to observing the area of origin which he determined to

13   be the entire rear stairs.  So because of the structural

14   damage and it was unsafe, he said in his report he limited his

15   examination to observation.

16           He did observe it at three points, though.  He

17   observed it from the ground floor, that doorway at grade; from

18   inside the apartment on the first level; and inside the

19   apartment on the second level.

20   Q.  What did he see when he observed it?

21   A.  What he saw, what he saw was the fire damage inside.  And

22   he determined at that point that it was too unsafe to even

23   walk on the landing for fear of falling through.

24           He did examine one other thing on one of the floors.

25   He said he examined two electrical wires to one of the lights,

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 28 of 288 PageID #:21196
Smith - direct by Wang
403

1   one of the light fixtures inside the stairway although it's

2   unclear what level that was on.

3   Q.  All right.  Did he make any observations of alligator

4   char?

5   A.  He did.

6   Q.  And what is alligator char?

7   A.  Alligator char is a term that was used in fire

8   investigation to identify basically large, shiny blisters of

9   char.  As things burn, they char, they turn black.  They get

10   these -- and there was a designation.  It's completely

11   subjective, but what a large blister is from a small blister.

12   But that was used as an indicator at the time that this may be

13   or this was an indicator of the use of a flammable liquid,

14   that that's what created those patterns.

15   Q.  Okay.  And --

16         THE COURT:  All right.  Let me -- let me interrupt

17   with an instruction for the jury at this time as we discussed.

18         So I have an instruction for you that is specific to

19   the scientific evidence of charring, blistering, or

20   alligatoring of wood as indicating that a fire was started

21   with an accelerant and thus indicative of arson.  In light of

22   the state of the fire science at the time of the arrest and

23   prosecution of Mr. Gray, you must accept that the defendants

24   did not fabricate false information that charring, blistering,

25   or alligatoring of wood indicated that a fire started -- was

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 29 of 288 PageID #:21197
Smith - direct by Wang
404

1    started with an accelerant and was indicative of arson.

2             Okay.  You can proceed now.

3    BY MS. WANG:

4    Q.  All right.  So at the time in 1993, was it commonly

5    believed that alligator char was an indication of liquid

6    accelerant use?

7    A.  Yes, it was pretty common at the time.

8    Q.  And what about now?

9    A.  Now it's not.  Now it's been debunked.  It's something

10   that's not even used.  It's a term that's rarely discussed.

11   It appears in books like 921 only because the text hasn't

12   changed from the original text in 1992.

13            I used to have to tell investigators when I was

14   teaching that, I'd get a raise of hands, anybody heard of

15   alligator char, and all the young guys in the class never even

16   heard of it.  So it is something from the past that young

17   investigators aren't even aware of, and it's not in the

18   general vernacular today.

19   Q.  All right.  Now, was there any kind of -- at the time, was

20   there any kind of manual that said how big or shiny the

21   blisters had to be to be alligator char?

22   A.  No.  Interestingly, there was no standard.  There was no

23   measure saying that if the blisters are over an inch long,

24   it's a large blister, there was -- or what's a small blister.

25   It was clearly subjective.  It was up to the individual

1    investigator to apply his interpretation to these char

2    patterns.

3              MS. WANG:  All right.  So I'm showing you Plaintiff's

4    Exhibit 96, Page 1.

5              MR. KAMIONSKI:  No objection.

6              THE COURT:  96 is in already -- no, actually, it's

7    not.  All right.  Okay.  It is now.

8         (Plaintiff's Exhibit 96 received in evidence.)

9              THE COURT:  All right.  Go ahead.

10   BY MS. WANG:

11   Q.   All right.  Mr. Smith, is this one of the photos that you

12   reviewed?

13   A.   Yes.

14   Q.   And what does this photo show?

15   A.   None of the photos were labeled as to their direction or

16   what they were showing, but what this appears to be is a

17   picture into the wall -- into the stairway.  These yellow

18   things hanging down appear to be something that was on the

19   landing.  This appears to be one of the landings.  I don't

20   know which one.

21             But as you can see, the construction of the wall, the

22   interior construction of the wall was all wood so there was --

23   it wasn't like your home.  There would be gypsum wallboard or

24   even in an old house like this would be plaster and lathe.

25   There was nothing to protect the wood, so the wood was exposed

1    to the space.

2    Q.  All right.  And do we see anything that could be

3    considered alligator char here?

4    A.  Again, depending on the investigator, just looking at how

5    the blisters show up -- I mean, in this area you can see where

6    they appear to be shiny and large.  And I say, it's a

7    subjective call of the investigator, but an investigator could

8    call that alligator char.

9    Q.  Showing you Plaintiff's Exhibit 96.

10   A.  Yes.  This is another picture, unidentified as far as the

11   location.  It does appear to be -- show a lot of char in the

12   foreground.  It appears maybe this is a downward picture onto

13   stairways down below.  You can see the actual treads from what

14   appear to be a stair based on the -- I'll draw it in there not

15   to make you guess.  But they appear to be treads with a space

16   in between.

17          And this in the foreground is just some other wood

18   material, construction of the stairway I'm assuming, inside

19   the stairway.

20   Q.  Showing you Plaintiff's Exhibit 96, is this another --

21   what is this photo, to your understanding?

22          THE COURT:  Yeah, and this is Page 3, right?

23          MS. WANG:  I'm sorry.  Yes, Page -- Plaintiff's

24   Exhibit 96, Page 3.

25   BY THE WITNESS:

Smith - direct by Wang

407

1   A.   Again, an unidentified kind of photo as far as the angle

2   or location of what it's trying to show.  This clearly shows

3   maybe something, maybe a post because of the size of this.

4   That may be a post or something with the stairway only because

5   of the width.

6           There is some fire debris you can see in here.  And

7   it appears to be even in this, there's maybe a piece of metal

8   chair or metal something back there that's not been identified

9   in any sequential photographs or up-close photographs or notes

10  or sketches, so we don't know what that is.

11  Q.   Showing you Plaintiff's Exhibit 96, Page 15, is this a --

12  I'm sorry.  Is this a photo of debris?

13  A.   Yes.  This just appears to be materials that have fallen

14  in.  At what level or what it is, we don't know, but it does

15  appear to be collapsed or partially collapsed debris.

16  Q.   Is there any evidence that this was examined?

17  A.   No.

18  Q.   Showing you Plaintiff's Exhibit 96, Page 9, is this

19  another photo of the debris in the enclosed porch area?

20  A.   Yes.  This shows quite a bit of material that's -- that

21  has quite obviously fallen.  I mean, you can see here, I would

22  say, probably a rail to the stairway going up.  There's a

23  post.  This may be the level but there's some -- I mean,

24  there's something metal.  This looks like a shopping cart or

25  maybe something like that up on the stairway there.  But most

Smith - direct by Wang

408

1     of this, most of what's in this area here, this is all just

2     collapsed fire debris.

3     Q.   All right.  Now, we've talked about how alligator char was

4     a misconception and it's changed now.  How did it change?

5     A.   It really changed as a result of fire scientists doing

6     experiments.  And one of the things the NFPA 921 did is

7     brought the two groups together.  What happened, people were

8     working independently.  Research scientists were doing burns

9     in either acquired structures or building structures and then

10    burning them.  There's a lot back in this time.  They put

11    rooms with full living room contents and burn them

12    simultaneous, maybe two or three rooms to see what the

13    difference was, start fires in different locations, start

14    fires with different fuels.

15           And by and large, by coming up with that, you could

16    see, particularly with the fires with -- that were attributed

17    to the ignitable liquids, it became pretty apparent that the

18    types of damage done wasn't consistent or wasn't unique to

19    ignitable liquids.  They were getting similar fire damage from

20    other fire effects and other ignition -- other fuels burning.

21    Q.   All right.  So today, is the scientific method applied to

22    fire investigation?

23    A.   Yes.

24    Q.   For a long time, though, before the developed -- advances

25    in science and the misconceptions were debunked, did

1   investigators put into the reports that alligator char meant

2   accelerant use?

3   A.   Yes.

4   Q.   Now, let's talk about, you mentioned earlier that Fire

5   Marshal Gruszka, after he saw alligatoring on the porch, that

6   he went and got his hydrocarbon detector?

7   A.   Yes.

8   Q.   Okay.  So what's a hydrocarbon detector?

9   A.   A hydrocarbon detector is a metal device.  It's used to

10  pick up gases, fugitive fuels, which fugitive fuels just mean

11  gas leaks.  The gas industry uses them for that but -- so it's

12  not unique.  It's not unique to fire investigation or

13  identifying only flammable liquids.  It can pick up melted

14  plastics which are called pyrolysis products, other things in

15  a fire, depends what burned; methane, carbon monoxide.  It can

16  pick up a lot of different vapors that result in a fire scene.

17          One of the problems with it too, not only is it not

18  unique to ignitable liquids or flammable liquids, it also has

19  a record of false-positives and false-negatives which means,

20  false-positives mean that it can miss, it can be waved over --

21  basically, it looks like a flashlight.  And what you're doing,

22  you're running it through the debris.  It has a filter on the

23  end, and the air goes through and it goes through a chamber,

24  and it detects these vapors that may be in the air.

25          But the false-negatives is when it can detect

Smith - direct by Wang

410

1   something when there is no flammable liquid there.  And the

2   false-positives are it can actually not detect when flammable

3   liquids are there.

4           So it's not reliable to the standpoint of using it as

5   a standalone.  That's why we require, any time you use a

6   hydrocarbon detector, you take samples.  But what it's

7   principally used for, it's used to assist the investigator in

8   collecting samples with a better chance of having a positive

9   result.  That's what it is.  So it's just a tool that's used

10  to help them get better samples.

11          MS. WANG:  Showing you Plaintiff's Exhibit 100.

12          MR. KAMIONSKI:  No objection.

13          THE COURT:  All right.  100 is allowed.

14      (Plaintiff's Exhibit 100 received in evidence.)

15  BY MS. WANG:

16  Q.   Mr. Smith, what is this?

17  A.   This is the fire scene sketch.

18  Q.   Okay.  And what did -- did Fire Marshal Gruszka draw this

19  sketch, to your understanding?

20  A.   By his name on it, yes.

21  Q.   Okay.  And so what did he indicate here with the X?

22  A.   What this -- first, this is a very limited photograph.  It

23  shows the area basically inside.  If you look at the bottom,

24  I'm going to draw it right here on the bottom, rear entrance,

25  the grade door, that was that door we saw in the upright.  So

Smith - direct by Wang

411

1    this is the area of, the stairs are then to the left.  And

2    what he's showing here, this X indicates, as it says,

3    indicates where positive presence of an accelerant was located

4    and where samples were removed.

5              MS. WANG:  All right.  Showing you Plaintiff's

6    Exhibit 218.

7              MR. KAMIONSKI:  No objection.

8              THE COURT:  All right.  Is that 218, you said?

9              MS. WANG:  Plaintiff's Exhibit 218, yes.

10             THE COURT:  All right.  It's allowed.

11         (Plaintiff's Exhibit 218 received in evidence.)

12   BY MS. WANG:

13   Q.  Mr. Smith, is this one of the photos that you reviewed?

14   A.  Yes.

15   Q.  And what does this show us?

16   A.  This is a circle made at some point by the fire marshal

17   where he had used this hydrocarbon detector and had gotten a

18   positive response.  So he had done basically the process I

19   just described a minute ago.  And this is an area where they

20   did take a sample from this area.

21   Q.  Okay.  So can we -- what can you tell about what area of

22   the enclosed porch area this is?

23   A.  What this is, if you combine this with the sketch, this

24   looks like it's up the first landing from the -- or the first

25   from grade, from grade level where the door was up to the

Smith - direct by Wang

412

1  first platform, the first porch to the first-floor apartment.

2  This is right in that area right there.

3  Q.  Now, one more observation.  What do you observe about the

4  paneling?

5  A.  Yeah.  Once again, this is a good indication of the fuels

6  involved and how this fire, how this fire burned.  I mean, you

7  can see every bit of the walls in these cases is exposed wood,

8  and it's all charred wood.

9       We do have a couple chairs in there, by the way, that

10  weren't on the diagram either.  So we have no idea what those

11  chairs were, what their coverings were, whether they were

12  cotton, whether they had cotton seating or backing or whether

13  it was polyurethane foam.  We don't have any information about

14  those chairs.

15  Q.  Okay.  Now, you talked a little bit about a hydrocarbon

16  detector and what it does and what it's used for.  To be

17  clear, is an alert from a hydrocarbon detector enough to

18  conclude that a liquid accelerant was used in the fire?

19  A.  No, it's not for the reasons I gave.

20  Q.  And is that something that NFPA 921 comments on?

21  A.  It does.

22  Q.  Okay.  And what does it say?

23  A.  Can I go to my book here?

24       THE COURT:  Any objection to that?

25       MR. KAMIONSKI:  No objection, your Honor.

1          THE COURT:  All right.  Yeah, you can do that.

2          THE WITNESS:  Thank you.

3          MR. NATHAN:  What book is that?

4          THE WITNESS:  This is NFPA 921.  I'll give you the

5     section when I find it.

6          MR. NATHAN:  Thank you.

7          THE WITNESS:  It's Section 6.3.20.7.4, and this is in

8     the fire patterns chapter.  What it says here:

9               "If the presence of ignitable liquids is suspected,

10          supporting evidence in the form of laboratory analysis

11          should be sought.  It should be noted that many plastic

12          materials release hydrocarbon fumes when they pyrolize

13          and burn.  These fumes may have an odor similar to that

14          of petroleum products that can be detected by combustible

15          gas indicators when no ignitable liquid accelerant has

16          been used."

17          And I would just clarify to not confuse everybody

18     that the term they use in this book as "combustible gas

19     detector," that is the hydrocarbon detector.  It's the same

20     term.

21     BY MS. WANG:

22     Q.  Okay.  Is there --

23     A.  Two terms for the same thing.

24     Q.  Is there any evidence of what was on the porch?

25     A.  No.

Smith - direct by Wang

414

1    Q.  Do we know whether there were plastics or plastic plant

2    pots or varnishes or anything else that the hydrocarbon

3    detector could have picked up on?

4    A.  No.

5    Q.  Now, what you testified to earlier and what NFPA 921 says

6    is that the hydrocarbon detector is used to get a better

7    sample for laboratory confirmation; is that right?

8    A.  Yes.

9    Q.  Now, Mr. Smith, did the Chicago police conduct a test on

10   the fire debris that would have detected the presence of

11   gasoline if there had been gasoline in the fire?

12   A.  They did.  They collected samples.

13   Q.  Okay.  And did they test the fire debris from the spot

14   where they believed gasoline had been poured?

15   A.  They tested in an area where they thought the gasoline

16   may -- most likely would be.

17   Q.  Okay.  So let's take another -- actually, no, we don't

18   need -- so that, showing you Plaintiff's Exhibit 218, is that

19   what this circle indicates?

20   A.  Yes.

21   Q.  Now, did the laboratory test results say there was or was

22   not gasoline in the fire debris from where they thought the

23   gasoline had been poured?

24   A.  No, the lab samples were negative for gasoline.

25   Q.  Okay.  Now, why is laboratory confirmation for a flammable

Smith - direct by Wang

415

1    liquid accelerant so important?

2    A.   It's the only method we have to confirm whether gasoline

3    is in a sample.  We talked about all the things we used to

4    think were indicators that meant flammable liquids were there,

5    and they've all been proven to be inaccurate.  So the only

6    method, the only objective method to determine if gasoline is

7    in a sample is to get a positive sample.

8    Q.   So what did the laboratory tests say was in the fire

9    debris?

10           What did the laboratory tests say was in the fire

11   debris?

12   A.   Oh, the laboratory tests came back for positive for high

13   petroleum distillates, commonly referred to as HPDs.

14   Q.   What is that?

15   A.   An HPD is merely when they put it in the test, it has a

16   carbon reading between 9 and 23, I believe.  So it measures

17   carbon atoms, so it's just not in the range of gasoline.

18   Q.   Is HPD gasoline?

19   A.   No, it's not.

20   Q.   What are some examples of HPD?

21   A.   HPDs can be things from kerosene to diesel fuel, is the

22   typical range of things.  But kerosene is used in a lot of

23   products.  Kerosene can show up in insecticides, in waxes, in

24   cleaners.  It could be, HPD could be something that the wood

25   had been treated with if it was a creosote-based preservative

Smith - direct by Wang

1    or insecticides keep it from keep it from falling.

2            The other thing we have in this case too what it

3    could be because of the roof collapse, a good source of HPD is

4    asphalt roof shingles because of their makeup.  As the texts

5    say, they are almost indistinguishable from testing for diesel

6    fuel.  So if that was -- had fallen down and that was in the

7    debris, that could be the source of the HPD.

8    Q.   And showing you again Plaintiff's Exhibit 98, Page 15, the

9    roof had collapsed?

10   A.   Yes.  The roof had collapsed in this area above the

11   stairway.

12   Q.   Okay.  Now, were there any control samples of the porch or

13   the stairs taken?

14   A.   No, there were not.

15   Q.   And what would control samples tell us?

16   A.   Control samples are commonly taken from an area where you

17   find undamaged wood, for instance, the wood for the stairs.

18   You would go find a piece that's undamaged, and what that

19   does, that allows the lab to compare what's inherent, whatever

20   those chemicals or whatever things may be in the wood, in a

21   piece of unburned wood, as opposed to what they're finding in

22   a piece of burned wood.

23           So comparable sample, literally you're able to

24   compare what it looks like, the material before and what it

25   looks like as the burned-up material.

Smith - direct by Wang

417

1    Q.  All right.  So let's turn to a new topic.  Let's talk

2    about origin.  How do fire investigators attempt to determine

3    the origin of a fire?

4    A.  Origin, there's three principal methods that's utilized to

5    determine the origin of a fire.  We use witness observations,

6    the analysis of fire patterns, and the analysis of fire

7    dynamics.  That's the way fire burns.

8    Q.  And is it important to determine the origin of a fire?

9    A.  Yes.

10   Q.  Why?

11   A.  The origin of the fire is where the cause is going to be.

12   So that's what -- ultimately, we want to get to where the

13   origin is because that's going to tell us where the ignition

14   source and the first fuel is.

15   Q.  Where did the investigators in this case believe the

16   origin of the fire was?

17   A.  They were really not distinct and didn't define a specific

18   area.  They -- the reports simply said that the area of origin

19   was within the space of the rear stairway.  They didn't narrow

20   it down further than that.

21   Q.  Did they identify a point of origin?

22   A.  No, they did not.

23   Q.  Now, let's talk about cause, cause of a fire.  What are

24   the elements of a fire cause?

25   A.  The elements of the fire cause the investigator looks for

1    are the ignition source, that's the source of heat.  It looks

2    for a fuel and what's called the ignition sequence.  But what

3    we're doing in the scientific method, we're examining not only

4    heat sources, we want to find heat sources that are capable of

5    igniting the fuel because that heat source has to be capable

6    of raising the temperature of the first fuel, whatever that

7    is, to its ignition temperature.

8           If it can't do that, if it's got limited amount of

9    heat in the ignition source or one such that it cannot ignite

10   the material that we believe was first ignited, then it's

11   eliminated as a potential ignition source.  It's eliminated as

12   the cause.

13   Q.   Did the Chicago police and fire investigators properly

14   eliminate accidental causes?

15   A.   In this fire, no.

16   Q.   Okay.  And what should a fire investigator do as part of

17   examining a fire scene before concluding what caused it?

18   A.   In examining a fire scene, it includes the complete

19   removal of debris from -- well, first of all, you identify the

20   area of origin, and then you work within that area of origin

21   to remove all the debris.  You're looking at all the contents.

22   You're looking at all potential fuels.  You're looking at all

23   potential heat sources, whatever might be in that space,

24   everything from electrical receptacles to appliances that may

25   be plugged into those receptacles.

Smith - direct by Wang

419

1      You may find other things, lawnmowers with a -- that

2  are energized, they have a spark plug in them, and just

3  anything that's plugged into the electrical system.

4  Q.  Now, you mentioned that the first element of a fire cause

5  is an ignition source.  What are some examples of an ignition

6  source?

7  A.  Ignition source can be the heating element in a toaster.

8  It could be the pilot light on your gas stove.

9  Q.  Did the fire investigators identify an ignition source?

10  A.  No, they did not.

11  Q.  And based on the beliefs at the time, the investigators

12  believed correctly or incorrectly that the fire started in the

13  porch area somewhere, right?

14  A.  Yes.

15  Q.  Now, is there any evidence that the fire investigators

16  went to the first floor porch landing to examine for fire

17  causes?

18  A.  There's no evidence that they examined that area.

19  Q.  Did they look at it?

20  A.  Detective Rokosik did look at some of the burning on the

21  first-floor landing, but it's unknown exactly where that area

22  was or what it looked like.  There's certainly no photographs

23  of it.

24  Q.  Now, if a fire investigator believes that the stairway is

25  where the fire started, does it make sense not to search it

1   for accidental causes?

2   A.   Well, yeah, you'd want to check everywhere they said the

3   area of origin was.

4   Q.   Was there any evidence that the fire investigators went

5   onto the second-floor porch landing to look for causes?

6   A.   No.

7   Q.   And the second floor is where people died.  The second

8   floor of the building is where the two people died, right?

9   A.   Right.  That's the top level, yes.

10  Q.   Do you know why they didn't go on there?

11  A.   It was reported in the fire report, the fire marshal

12  reported that it was just unsafe.  The stairway had collapsed

13  going down from the second floor, so he was afraid -- as a

14  matter of fact, I think he made notes or it was in his

15  testimony that he was afraid if he would step on it, it would

16  collapse and he would fall down into it, so that's the reason

17  why.

18  Q.   Does it mean that you don't investigate it, though?

19  A.   No, it doesn't.

20  Q.   Okay.  So could there have been unexamined causes of the

21  fire on the first or second-floor landings?

22  A.   Or pretty much anywhere in the stairway even at grade

23  level or anywhere else it would have fallen.

24  Q.   And we don't know what any of those are, right?

25  A.   That's correct.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 46 of 288 PageID #:21214
Smith - direct by Wang
421

1    Q.   Now, did Rokosik, Detective Rokosik or Fire Marshal

2    Gruszka or any of the other fire investigators dig through the

3    layers of debris to figure out whether there were any

4    potential ignition sources under there?

5    A.   No, they didn't.

6    Q.   Can you eliminate accidental causes without digging for

7    debris, digging through the debris?

8    A.   You can't eliminate anything you don't look at.

9            MS. WANG:   Showing you Plaintiff's Exhibit 96, Page

10   7.

11           MR. KAMIONSKI:   No objection.

12           THE COURT:   Yeah, all of 96 should be in at this

13   point.

14           MS. WANG:   Okay.   Great.

15   BY MS. WANG:

16   Q.   Now, Mr. Smith, I'm showing you Plaintiff's Exhibit 96,

17   Page 7.   What do you see here?

18   A.   That is what's known as BX cable.

19   Q.   What's BX cable?

20   A.   It's, BX cable is unsheathed electrical wiring.

21   Electrical wiring runs through that.   So instead of like

22   typical Romex you see in your house where you see with the

23   white plastic covering, this is what's used kind of in

24   unheated areas, industrial areas, and the wiring is just

25   inside of that cable.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 47 of 288 PageID #:21215
Smith - direct by Wang
422

1   Q.  Is there any evidence that was examined as a potential

2   ignition source?

3   A.  No, there's no documentation that it was.

4   Q.  What is this over here?

5   A.  There appears to be copper wire running down along that

6   post.

7   Q.  Okay.  Was that examined?

8   A.  No.  There's no documentation, photographs, or notes that

9   it was inspected at all.

10   Q.  Could that have been a cause of the fire?

11   A.  It could, or it could have been attached to it, certainly.

12         MR. KAMIONSKI:  Calls for speculation.

13         THE COURT:  I'm sorry.  Go ahead.

14         MR. KAMIONSKI:  Calls for speculation.

15         THE COURT:  Overruled.  The answer can stand.

16   BY MS. WANG:

17   Q.  Showing you Plaintiff's Exhibit 96, Page 8, what do you

18   see in this photo?

19   A.  This is a lot of small fire debris, things that have

20   fallen onto, it could well be, the stairway, but there's just

21   a lot of fire debris, loose fire debris on that.

22   Q.  And what do you see here?

23   A.  That's electrical wiring.

24   Q.  Was that examined?

25   A.  There's no record of it, no.

1   Q.   Could it have been a cause of the fire?

2   A.   Potentially, yes.  It's a potential ignition source.

3   Q.   Why -- why could it have been a potential ignition source?

4            MR. KAMIONSKI:  Objection.  Rule 26.

5            THE COURT:  All right.  Let's take a sidebar.

6        (Proceedings heard at sidebar:)

7            MR. KAMIONSKI:  Your Honor, none of these speculative

8   definitions of the photos were ever identified in a Rule 26

9   report saying that these are potential causes or this is an

10  ignition source.  This is the first time we're hearing about

11  these things and saying they're ignition sources or could be

12  ignition sources, and if the jury is left to speculate that

13  these are potential ignition sources, we can -- never have

14  been able to challenge it through the Rule 26 process.

15           THE COURT:  Okay.  So, yeah, is there some part of

16  his report at which this appears?

17           MS. WANG:  Yes.  The heart of his report is that the

18  fire investigators did not rule out accidental causes.

19           THE COURT:  Yeah, that's too broad.  You do need --

20  the report, if you want to offer an opinion from it, ought to

21  have identified -- so right now, the line of questioning is on

22  this copper wire and the wiring that was in that BX cable.

23           So was there something in the report in which

24  Mr. Smith opined that they could be ignition sources?

25           MS. WANG:  No, he did not attach a specific -- the

Smith - direct by Wang

424

1    specific photo, but he did state in his report that Gruszka
2    did not eliminate electrical causes, and he says it on Pages
3    11 and 12 of his report.
4            THE COURT:  Yeah, what exhibit is the report?
5            MS. WANG:  We don't --
6            THE COURT:  I know it's on the docket, but I have
7    easier access to the exhibits.
8            MS. WANG:  We don't have it labeled as an exhibit but
9    I can --
10           THE COURT:  Is it a defense exhibit or not?
11           MR. KAMIONSKI:  It's not.
12           THE COURT:  Yeah, can you hand it up?
13           Okay.  And there's a reference to electrical where?
14           MS. WANG:  At the bottom of Page 11.  It says Gruszka
15   did not eliminate the electrical wiring as a cause.
16           THE COURT:  What it says is, "Gruszka stated that he
17   had examined certain electrical wiring on the porch.  However,
18   there are no photographs, notes, sketches of the items he
19   examined, nor were any items he examined and eliminated
20   collected as evidence and preserved so that someone else could
21   make an independent analysis or conclusions regarding the
22   evidence and the role it may have played."
23           Okay.  I think that is close enough.  If I had this
24   report at the deposition, I'd be asking about the electrical
25   wiring.  All right.  Objection is overruled.

Smith - direct by Wang

425

1      (Proceedings heard in open court:)

2           THE COURT:  All right.  Objection overruled.  You can

3      proceed.

4      BY MS. WANG:

5      Q.  Why could electrical wiring be a potential cause of the

6      fire?

7      A.  Any heat source, and that's what -- a heat source is a

8      potential ignition source until it's investigated, until you

9      determine that it's not.

10     Q.  Showing you Plaintiff's Exhibit 96, Page 6, what do you

11     see in this photograph?

12     A.  This is a photo of the stairway, a very burnt-up stairway.

13     It appears to be going down to the lower level on the right

14     down in this area.  So this would be the stairway going up

15     from the first platform to the second landing but we also see

16     here, though, in this area right here, this is electrical

17     conduit that's run underneath the stairs.

18     Q.  Was there any evidence that was examined?

19     A.  No.  There's no documentation, no mention of it, and

20     nothing in the sketch to show where that went or what it was

21     to or if it was examined.

22     Q.  Was it eliminated as a potential cause of the fire?

23     A.  It can't be eliminated if it's not examined.

24     Q.  One more, showing you Plaintiff's Exhibit 224.

25          THE COURT:  All right.  Any objection to 224?

Smith - direct by Wang

426

1          MR. KAMIONSKI:  No objection.

2          THE COURT:  All right.  It's allowed.

3        (Plaintiff's Exhibit 224 received in evidence.)

4   BY MS. WANG:

5   Q.   Showing you Plaintiff's Exhibit 224, what do we see here?

6   A.   There on the floor in all that debris, you can see another

7   piece of buried BX cable, again, electrical unsheathed cable

8   in the debris.

9   Q.   Okay.  Was that eliminated as a potential cause?

10  A.   There's no evidence that it was examined.

11  Q.   So these photos that I've shown you of the debris in the

12  enclosed porch area and the electrical cables, these are all

13  in the area where the investigators thought the fire started,

14  right?

15  A.   These were all within the area of origin, yes.

16  Q.   Okay.  And is there -- having seen these photos, is there

17  any reason to believe that there might have been accidental

18  causes to the fire?

19          MR. KAMIONSKI:  Objection.  Rule 26.

20          THE COURT:  Okay.  Overruled.

21  BY THE WITNESS:

22  A.   Without examining them, there's reason to believe there

23  could be other alternate causes that had not been found.

24  BY MS. WANG:

25  Q.   Now, what electrical systems did Fire Marshal Gruszka look

Smith - direct by Wang

427

1   at?

2   A.  What he said in his report, what he examined was the

3   electrical system.  And I believe in his testimony, he looked

4   at the fuse box, and he did inspect several wires that were

5   hanging from a light fixture to one of the lights somewhere in

6   the stairway.

7   Q.  Was that a sufficient examination of potential electrical

8   causes to the fire?

9   A.  No.

10   Q.  Why not?

11   A.  Because he hasn't examined everything.

12   Q.  Did Gruszka say anything about examining any other

13   systems?

14   A.  Yes.  He said he examined the gas system, and that was not

15   an issue with the fire.  He said he examined the heating

16   system, and that was not an -- anything to do with the fire.

17   Q.  And was that sufficient examination when he says he

18   examined systems?

19   A.  Well, there's no details.  I mean, other than looking at

20   it, there's no documentation, there's nothing what he

21   specifically looked at with those systems.

22   Q.  Is there any evidence that any of this examination that

23   Gruszka did and anything he looked at was collected or

24   preserved for further examination?

25   A.  No.  Nothing was collected or preserved --

Smith - direct by Wang

428

1    Q.   Okay.

2    A.   -- except for the two samples.

3    Q.   So let's talk about the second cause -- element of a fire

4    cause, first fuel.  What is a first fuel?

5    A.   The first fuel is the first item ignited by the ignition

6    source.

7    Q.   And did the investigators find a first fuel?

8    A.   No.

9    Q.   Did you examine the investigators' opinions of what the

10   first fuel was?

11   A.   Yes.

12   Q.   And what was their opinion?

13   A.   Their opinion was it was a flammable liquid.

14   Q.   And did they believe what liquid it was?

15   A.   Specifically, they were looking for gasoline.

16   Q.   Is there any evidence for this?

17   A.   No, there's not.

18   Q.   Okay.  Now, Mr. Smith, you told us earlier that when the

19   lab reports came back, there was no gasoline in the debris,

20   right?

21   A.   Yes.

22   Q.   And but the lab reports did show another substance, HPD,

23   heavy petroleum distillate, right?

24   A.   Yes.

25   Q.   And that's the stuff that you said could be varnish or

Smith - direct by Wang

1  preservative, right?

2  A.  Insecticides, lubricants, waxes.

3  Q.  Now, my question is:  Would HPD make a good accelerant in

4  this situation?

5  A.  No.

6  Q.  Why not?

7  A.  HPD is a, what's called a combustible liquid.  That means

8  the liquid has to be preheated to over 100 degrees before it

9  puts off vapors sufficient to be ignited.  We don't ignite

10  liquids.  It's actually vapors above the liquids that is what

11  burns.

12          So with a combustible liquid, it's got to be heated

13  to at least 100 degrees, diesel fuel to 125 degrees, before it

14  even puts off vapors where -- that could be ignited.

15  Q.  So if the temperature is 36 degrees outside, could HPD

16  have been used to set the porch on fire?

17  A.  Well, you've got a lot to overcome there.  You've got to

18  overcome the ambient temperature of 36 or 38 degrees to 100.

19  Then you have to maintain it in such a close relationship to

20  where the fuel is on the wooden stairs.  It's almost

21  impossible in that circumstance to ignite that with a light or

22  a spark.

23  Q.  And by contrast, if gasoline were poured into an enclosed

24  space, how would it react to being ignited?

25  A.  Yes, gasoline is different.  Gasoline is classified as

1  flammable liquid.  That means at normal temperatures, it's

2  giving off vapors capable of being ignited.  As a matter of

3  fact, it gives off vapors down to minus 43 degrees.

4          So at normal temperatures, gasoline, the vapors are

5  moving away from the liquid.  They migrate.  Gasoline is three

6  to four times heavier than air.  So wherever it's poured, it's

7  going to go to the lowest areas, and it's going to migrate.

8  Q.  And what's the significance of the fact that it migrates?

9  A.  The significance that it migrates that if it -- upon

10 ignition, if it's someone close to ignition, they could

11 actually be caught in the vapor, is what is basically a vapor

12 flash which is a rapid movement of a flame moving through a

13 diffuse fuel such as a gasoline vapor.

14 Q.  Now, are you aware that Fire Marshal Gruszka indicated

15 this was a fast-spreading fire?

16 A.  Yes.

17 Q.  Is there any evidence for that?

18 A.  No.  He doesn't go into any discussion, but that was one

19 of the features with recognizing alligator char, that

20 alligator char, because it was use of an accelerant, it

21 represented a fast-moving fire.  In fact, there's no source

22 for it with -- of the fire marshal in his report because quite

23 obviously, he didn't see the fire in progress from the time of

24 the alarm and the time he got there at 3:20.  So he was not

25 personally -- it's not a personal observation.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 56 of 288 PageID #:21224
Smith - direct by Wang
431

1        So in summary, I think just looking at what his other

2   documentation was relative to the alligator char, I think it

3   was related to that.

4        MS. WANG:  Okay.  Now showing you Plaintiff's Exhibit

5   165, Page 3.  It's a demonstrative.

6        THE COURT:  All right.  Any objection to 165?

7        MR. KAMIONSKI:  No objection.

8        THE COURT:  Just as a demonstrative, right.  Go

9   ahead.

10  BY MS. WANG:

11  Q.  All right.  So here's an example of a staircase.  It's not

12  the staircase involved here.  But what is this -- what about

13  the building construction here in this case could result in a

14  fast fire other than gasoline?

15  A.  Yeah, a fast fire is another one of those -- it's kind of

16  an ambiguous term, but definitely this structure had the

17  capabilities of moving faster than what would be expected for

18  a normal living room with an eight- or ten-foot ceiling.

19       As a fire develops, the smoke, the thermal column and

20  smoke goes up to the ceiling.  Well, what it does in an eight-

21  or ten-foot ceiling, it moves horizontally across that

22  ceiling.  Well, when you have a fire in a stairway, that smoke

23  continues to just go up.  So the smoke, the smoke and heat is

24  going to go all the way up to the top floor in this case.

25  It's only going to stop when it's obstructed by a horizontal

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 57 of 288 PageID #:21225
Smith - direct by Wang
432

1    obstruction.

2    Q.  Now, are you aware that Fire Marshal Gruszka relied on

3    reports of the smell of gasoline as an indicator of arson?

4    A.  I'm sorry.  Say that again.

5    Q.  Are you aware that the fire marshal relied on reports of

6    the smell of gasoline as an indicator of arson?

7    A.  He did.  That's in his report.

8    Q.  Okay.  Is that a reliable indicator?

9    A.  No, it's not.

10   Q.  Why not?

11   A.  It's a subjective assessment.  First of all, in a fire,

12   there's a lot of things, plastics, hydrocarbons that are

13   burning, even wood.  A lot of things can smell like gasoline

14   or smell like petroleum products in a fire as it burns.

15   Q.  All right.  And so is there anything in the NFPA that says

16   to be cautious about that?

17   A.  I'm trying to think.  There's one of the witness

18   statements --

19          THE WITNESS:  May I follow this in the book, text,

20   your Honor?

21          THE COURT:  So the question was about NFPA 921

22   specifically.

23          MS. WANG:  Right.  Is -- let me ask the question

24   again --

25          THE COURT:  All right.

Smith - direct by Wang

433

1          MS. WANG:  -- if that's okay.

2    BY MS. WANG:

3    Q.   Is there anything in the NFPA 921 that says to be cautious

4    about witnesses' statements about gasoline smell?

5          THE COURT:  Oh, I see.  All right.  Is there?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  Next question.

8    BY MS. WANG:

9    Q.   Do you need to refer to the section?

10   A.   Yes, please.  Let me see.

11         MR. KAMIONSKI:  Objection.  Sidebar.

12         THE COURT:  All right.

13      (Proceedings heard at sidebar:)

14         MR. KAMIONSKI:  Your Honor, we don't know which

15   edition of the NFPA he's relying on right now.  And there's

16   nothing about the witness statements and the reliability of

17   witness statements from the NFPA in the report that was

18   submitted in the case, so also Rule 26.

19         THE COURT:  Okay.  So is this in his expert report

20   somewhere?

21         MS. WANG:  It is --

22         THE COURT:  Can you --

23         MS. WANG:  It is at his deposition, Page 216.  And

24   our Rule 26(a) disclosure said specifically we were disclosing

25   him on the opinions in his report and any testimony at his

1   deposition.

2          THE COURT:  All right.  Let me look at the deposition

3   page first.

4          MS. WANG:  216.

5          THE COURT:  And what exhibit is his deposition?

6          MS. WANG:  It's not an exhibit.

7          THE COURT:  Okay.  Can you hand it up?

8          Is it a defense exhibit?  Was it marked?

9          MR. KAMIONSKI:  It's not.

10         THE COURT:  All right.  While that's being handed

11  up -- all right.

12         Okay.  What page?

13         MS. WANG:  It starts at the bottom of 215 -- I'm

14  sorry.  It starts at the bottom of 215 and goes to 216.

15         MR. KAMIONSKI:  And there's nothing about NFPA there.

16         THE COURT:  Yes, the defense is correct.  Objection

17  sustained.

18      (Proceedings heard in open court:)

19         THE COURT:  All right.  Objection sustained.  Next

20  question.

21  BY MS. WANG:

22  Q.  If an investigator smells gasoline or what he thinks is

23  gasoline, can he stop his investigation and conclude that

24  gasoline is present?

25  A.  No.

Smith - direct by Wang

435

1   Q.   Now, the last element of a fire cause you talked about

2   earlier is an ignition sequence.  What is that?

3   A.   The ignition sequence is the circumstances or the events

4   that allow the ignition source and the first fuel to get

5   together.

6   Q.   Is there any evidence for the opinions of the fire

7   investigators that the ignition sequence here involved a human

8   act?

9   A.   No, there's not.

10  Q.   Now, Mr. Smith, wrapping up, given everything that you've

11  covered this moving, is there any evidence that the fire was

12  set using a flammable liquid?

13  A.   No.

14  Q.   Is there any evidence whatsoever that the fire was set

15  using an open flame?

16  A.   No.

17  Q.   Is there any evidence whatsoever that the fire was

18  intentionally set?

19  A.   No, there's not.

20  Q.   Back in 1993, the conclusion might have been different; is

21  that right?

22  A.   The conclusion may have been different based on the

23  understanding of fire patterns and what was used at the time.

24  Q.   And what's happened in the years since?

25  A.   In the time since, we've found that those patterns were

Smith - cross by Kamionski

436

1   not unique to liquid accelerants.  We found a number of other

2   misconceptions in the way investigations used to be conducted

3   and what investigators believed.

4           MS. WANG:  Thank you, Mr. Smith.

5           THE COURT:  All right.  Cross-examination?

6           MR. KAMIONSKI:  Can I have one moment, your Honor?

7           THE COURT:  I'm sorry?

8           MR. KAMIONSKI:  If I could just have one moment.

9           THE COURT:  Yes.

10      (Pause.)

11                      CROSS-EXAMINATION

12  BY MR. KAMIONSKI:

13  Q.  Good morning, Mr. Smith.

14  A.  Good morning.

15  Q.  You were asked some questions before about your hourly

16  rates.

17  A.  Yes.

18  Q.  How much have you billed to date on this case?

19  A.  To date, I think it's $16,000.

20  Q.  And does that include also your testimony for your time

21  here today?

22  A.  No, it doesn't.

23  Q.  Okay.  If we include today as well, what is your total

24  bill going to be in this case?

25  A.  I don't know even including today because I really don't

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 62 of 288 PageID #:21230
Smith - cross by Kamionski
437

1    know what's been done since the last billing either, but it

2    could be, if it's 16,000, maybe 26,000.

3    Q.   $26,000 for all of your testimony, for all of the work

4    you've done on this case up until today including today?

5    A.   I think so.

6    Q.   Okay.

7    A.   That's an estimate.

8    Q.   You testified you were first retained by the law firm of

9    Jenner & Block to provide an opinion in the post-conviction

10   proceedings related to Adam Gray; is that correct?

11   A.   Yes.

12   Q.   And you issued a report in 2012 for that opinion?

13   A.   Yes.

14   Q.   And you worked with a lawyer by the name of Brij Patnaik?

15   A.   Yes.

16   Q.   Is that correct?

17   A.   Yes.

18   Q.   From Jenner & Block?

19   A.   Yes.

20   Q.   And the report that you issued included all of the

21   information that you testified to about today, correct?

22   A.   I think so.

23   Q.   And you issued an additional report in -- and your

24   understanding is that that report that you issued in 2012,

25   that was submitted to the court in connection with Adam Gray's

Smith - cross by Kamionski

438

1    post-conviction proceeding, correct?

2    A.  Yes.

3    Q.  And the report you issued in this case on behalf of the

4    law firm of Loevy & Loevy adopted the same report that you had

5    presented -- that had been presented to the court back in

6    2012; is that fair?

7    A.  Yes.

8    Q.  There was no -- nothing new related to the fire scene

9    investigation that you were adding in connection to the work

10   you did in this lawsuit, correct?

11   A.  The only thing new was the context of new codes were in

12   effect at the time.

13   Q.  But all the information you talked about regarding the

14   NFPA, that information was all presented to the court back in

15   2012, correct?

16   A.  Yes.

17   Q.  Now, you indicated you were a -- and you're still a member

18   of the International Association of Arson Investigators?

19   A.  Yes.

20   Q.  And you've been with that organization for how long?

21   A.  Since 1977.

22   Q.  And that organization, they didn't adopt anything related

23   to the NFPA until closer to the 2000s; is that correct?

24   A.  That's the range that's been given by other parties.

25   Q.  So all the information you've been talking about today

Smith - cross by Kamionski

439

1    regarding training that the IAAI, the International

2    Association of Arson Investigators, they were only starting to

3    even train investigators and promote training related to the

4    NFPA 921 after the year 2000; is that fair?

5    A.   Yeah, the training I was referring to today is what's in

6    the codes today.

7    Q.   Today in 2023?

8    A.   Yes, sir.

9    Q.   Okay.  At some point in your career when you were a fire

10   investigator, isn't it true that you also relied on alligator

11   charring as evidence of an accelerant?

12   A.   Yes.

13   Q.   And you conducted lots of investigations in your career in

14   which you looked at a scene and you saw the alligator char and

15   you believed that there was an accelerant present; is that

16   correct?

17   A.   Yes.

18   Q.   And sometimes in those cases, those were actually true

19   arson cases as well, right?

20   A.   Yeah, they may have been.

21   Q.   And in some of those cases, information went to the lab,

22   and the lab found negative presence for accelerants even

23   though you thought there was an accelerant based just on the

24   alligator charring; isn't that correct?

25   A.   That could be possible, yes.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 65 of 288 PageID #:21233
Smith - cross by Kamionski
440

1    Q.   So just because the lab does not find evidence of an

2    accelerant in the future doesn't mean that there wasn't

3    evidence of an accelerant at the scene; is that correct?

4    A.   No.

5    Q.   No, that's not correct?

6    A.   No, it's not correct.

7    Q.   Okay.  And in your cases, did you think you had done

8    things wrong in your career when you were making opinions

9    about evidence of accelerants on the scene?

10   A.   I'm sorry.  Say that again.

11   Q.   When you examined the scene and you had done a fire

12   investigation and you witnessed the alligator charring, did

13   you think that your work was wrong at the time -- strike

14   that -- did you think that you had done a poor investigation

15   on that scene?

16         If you go back and look at that, did you do a bad job

17   on those investigations based on the alligator charring?

18   A.   Yeah, in cases you would have thought I just -- I took

19   samples from the wrong place.

20   Q.   And the fact that alligator charring doesn't mean

21   there's -- it's not evidence of an arson or evidence of --

22   it's, the opinion of the NFPA now is just that it's, you

23   cannot take an indication one way or the other.  Is that fair?

24   A.   No, it pretty much says that the presence of alligator

25   char or the charring in the past has been incorrect.  So if

Smith - cross by Kamionski

441

1    any time -- basically, what it says is any time you think you

2    have an accelerant present, don't base it on the fire

3    patterns, take a laboratory sample and base it on the

4    laboratory.

5    Q.   Right.  So the pattern alone doesn't mean it's an

6    accident, and the pattern alone doesn't mean it's an

7    accelerant; is that fair?

8    A.   Yes.

9    Q.   The pattern is what the pattern is?

10   A.   Yes.

11   Q.   It's just the pattern.

12           So, I mean, if you had a -- you could have a

13   situation where you watch a person -- there's a video of a

14   person pouring gasoline onto a staircase, lighting it on fire,

15   and you take a sample from that stuff, from that scene

16   afterwards despite the fact that we have a video -- let me set

17   this up better.  I apologize.

18           You -- I'm going to come back to this.

19           You do agree that fire patterns are important in

20   order to determine the origin of where the fire started; is

21   that correct?

22   A.   It's a hypothesis.

23   Q.   Okay.  And it's a hypothesis that you've written about; is

24   that correct?

25   A.   Yes.

Q. Okay. And in fact, you wrote an article called "The Firefighter's Role in Preserving the Fire Scene," and you indicated that evidence of charring, heavy charring, is evidence of where the fire origin started; isn't that correct?

A. I don't remember if that's in there or not. It's been so long since I said that. Could you refresh my memory and show me?

Q. Does that sound like something you would have said?

A. No, I'm not sure. I don't think that was it.

Q. Okay. They are equally as valuable as the identification of a potential ignition source such as an incendiary device in an arson fire --

THE COURT: Mr. Kamionski, just slow it down a little bit.

MR. KAMIONSKI: Sorry.

THE COURT: It happens when people read. That's fine, but just please do slow it down.

MS. WANG: Can we see the source?

THE COURT: First, just put the question as to whether the witness wrote that and then if he disclaims memory, then you can refresh.

All right. Go ahead, but slower.

BY MR. KAMIONSKI:

Q. Okay. Do you remember writing an article called "The Firefighter's Role in Preserving the Fire Scene" in January of

Smith - cross by Kamionski

443

1   1997?

2   A.  Yes.

3   Q.  And in that article, do you remember talking about fire

4   patterns?

5   A.  Yes, about preserving fire patterns.

6   Q.  Okay.  And one of those fire patterns is evidence of

7   charring; is that fair?

8   A.  Yes.  That's what fire patterns are.

9   Q.  And do you agree that charring is equally as valuable as

10  the identification of a potential ignition source such as an

11  incendiary device in an arson fire?

12  A.  Yes, for purposes of preservation.  And it was

13  clarification for firefighters of how important it is to

14  preserve the fire scene, so yes.

15  Q.  Right.  And the part where you see the most charring is

16  indicative of where the source of the fire started; isn't that

17  fair?

18  A.  No, it's not --

19  Q.  Well --

20  A.  -- and I don't know if I thought that in 1997.

21  Q.  Okay.

22  A.  Maybe if you show me the article and have it in context of

23  what I wrote.

24          MS. WANG:  Can we have a copy of that, whatever that

25  is?

Smith - cross by Kamionski

444

1          MR. KAMIONSKI:  Sure.

2          May I approach, your Honor?

3          THE COURT:  You may.  And just for speed, you can

4    point out to the witness the paragraph where you think the

5    relevant information is.

6          MR. KAMIONSKI:  I'm showing you the article, and

7    here's the paragraph regarding fire patterns.

8          MS. WANG:  I'm sorry.  What page?

9          MR. KAMIONSKI:  The bottom -- Page 2 of the article

10   entitled "Fire patterns."

11         THE COURT:  So right now, we're going through

12   refreshing memory.  So, Mr. Smith, this is for reading to

13   yourself.  And then when you're done, please let the lawyer

14   know, and he'll take back the article.

15      (Pause.)

16         THE WITNESS:  Okay.  Thank you.

17   BY MR. KAMIONSKI:

18   Q.  Mr. Smith, does that refresh your recollection that the

19   fire patterns are essential in conducting an accurate analysis

20   to determine the area of the fire origin?

21   A.  Yes.

22   Q.  Thank you.  And in this case, the fire patterns, the

23   charring, the heavy charring existed in the rear stairwell,

24   correct?

25   A.  From what we can see.

Smith - cross by Kamionski

445

1    Q.  From the photographs that were taken on the scene that

2    were shown to you today, you agree those are evidence of

3    charring, heavy charring, correct?

4    A.  Well, "heavy charring" is a term, a subjective term.  It's

5    an arbitrary term of what heavy charring is but --

6    Q.  Charring is a term -- sir, charring is a term that you've

7    used in this article, right, charring?

8    A.  In 1997, but I didn't talk about heavy charring.

9    Q.  Right.  Am I correct that "charring" is a term that you

10   used in this article?

11   A.  Charring, yes.

12   Q.  Okay.  And there was charring on the photographs that you

13   looked at here today?

14   A.  Yes.

15   Q.  In the rear stairwell?

16   A.  Yes.

17   Q.  So the source of the fire started in the rear stairwell.

18   Do you dispute that at all?

19   A.  No.

20   Q.  And you understand that the rear stairwell, the door at

21   the bottom of the rear stairwell was unlocked, correct?

22   A.  Yes.

23   Q.  Okay.  You don't dispute that?

24   A.  No.

25   Q.  Now, you're not a chemist; is that correct?

Smith - cross by Kamionski

446

1    A.   Correct.

2    Q.   You don't do any lab testing yourself?

3    A.   No, sir.

4    Q.   You don't know how a gas chromatogram works?

5    A.   No, sir.

6    Q.   You don't know what dynamic headspace extraction is?

7    A.   I mean, I know what it is to read it, but I have no

8    technical aspects of it, no.

9    Q.   Right.  You don't know, you wouldn't be able to conduct a

10   dynamic headspace extraction or a gas chromatogram testing

11   on --

12   A.   That's correct, no.

13   Q.   Now, you were asked a lot of questions about the

14   investigative work of Joseph Gruszka and Rokosik.  Okay.  Both

15   Ernest Rokosik and Joseph Gruszka were experienced fire

16   investigators.  Do you dispute that at all?

17   A.   They had a number of years as investigators, yes.

18   Q.   Okay.  Well, for example, Rokosik was with the bomb and

19   arson for 16 years; isn't that correct?

20   A.   Yes.

21   Q.   And he received extensive training regarding cause and

22   origin of fire; is that correct?

23   A.   Yes.

24   Q.   He did advanced courses and was certified by the State of

25   Illinois as an arson investigator; isn't that correct?

Smith - cross by Kamionski

447

1    A.   Yes.

2    Q.   And he was also a member of the same organization as you,

3    the International Association of Arson Investigators; isn't

4    that correct?

5    A.   Right.

6    Q.   And the same thing with Mr. Gruszka, he was with the fire

7    department for 26 years; isn't that correct?

8    A.   Yes.

9    Q.   And he also was a member of the same organization as

10   yourself, the International Association of Arson

11   Investigators; is that correct?

12   A.   Yes.

13   Q.   And he was an experienced fire investigator, correct?

14   A.   Yes.

15   Q.   And he had made over 5,000 -- strike that.

16        He had been to over 15,000 fires in his career at

17   least at the point of the trial in 1993; is that correct?

18   A.   Yes.

19   Q.   And he had made over 5,000 cause and origin

20   determinations; isn't that true?

21   A.   Yes.

22   Q.   Now, you were not at the fire scene in this case, right?

23   A.   No.

24   Q.   And don't you think the right thing to do is to defer the

25   people that actually went to the fire scene and made the

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 73 of 288 PageID #:21241
Smith - cross by Kamionski
448

1  determinations at the time as opposed to coming in here 25

2  years later, 30 years later and just criticizing them?

3  A.  No.

4  Q.  Do you -- have you ever been criticized in your

5  investigations?

6  A.  First of all, I wasn't criticizing them actually.

7  Q.  Right.  Because they did a good job, correct?

8  A.  No.  It's just because I didn't evaluate their

9  performance.

10 Q.  Well, you can't tell what exactly happened just based on

11 looking at the pictures, correct?

12 A.  But you're supposed to be able to do that.

13 Q.  Okay.  And they were at the scene, and they were the ones

14 that were the ones investigating the fire, correct?

15 A.  They were at the scene, and they were responsible for

16 collecting all the data necessary for anybody else to review

17 to come to a conclusion.

18 Q.  One of the things that it sounded like you were critical

19 about is that they did not go into the stair -- all the way up

20 into the stairwell, correct?

21 A.  It appears they didn't go into the stairwell at all.

22 Q.  Well, they took photos in the stairwell.  We saw those

23 photos today.  So they actually went into the stairwell.

24 Would you agree with that?

25 A.  Well, to the first level, yes.

Smith - cross by Kamionski
449

1    Q.   Okay.  So they did go into the stairwell?

2    A.   Right.

3    Q.   Okay.  Now, Gruszka who was at the scene indicated that it

4    was unstable, unsafe to go all the way up the stairwell,

5    correct?

6    A.   Yes.

7    Q.   So would you go into a -- would you start climbing up

8    stairs that were unsafe to climb up if you were in that

9    situation?

10   A.   No, but you make arrangements to shore the building up so

11   you can continue the investigation.

12   Q.   Okay.  But so you're not going to be critical of him for

13   not going up stairs that are unsafe, right?

14   A.   No.  I'm critical he didn't continue the investigation.

15   Q.   Well, he went up to the floors from the inside of the

16   house; isn't that correct?

17   A.   Yes.

18   Q.   And you were shown some photos here, but there were photos

19   taken throughout the house, correct?

20   A.   Haphazardly, but yes, there are some through the house.

21   Q.   Okay.  And you were shown photos related to the -- this is

22   Plaintiff's 96.  Okay.  And you were asked questions about

23   this item and this item, correct?

24   A.   Yes.

25   Q.   And do -- the photos document these wires, correct?

Smith - cross by Kamionski

1  A.   Excuse me?

2  Q.   The photos document these potential electrical sources,

3  correct?

4  A.   It's showing portions of them.

5  Q.   Right.  And there's no evidence whatsoever that any of

6  these items were the cause of the fire, correct?

7  A.   I can't tell that from the photographs.

8  Q.   Right.  And there's -- exactly.  There's nothing in the

9  photos to indicate that these are the cause of the fire,

10  correct?

11  A.   But you have to examine it to determine if they were.

12  Q.   Right.  And you would just be speculating right now -- for

13  example, if this wire that's encased in this copper had

14  anything to do, you're just pure speculation right now that it

15  could have caused something; is that correct?

16  A.   It's -- my only comment was it's a potential ignition

17  source that was not examined.

18  Q.   Well, it's in the photo, so isn't it examined that he's

19  taking a photo of it?  It's examined.  He's looking at it, and

20  it's not the ignition source?

21  A.   I can't tell that from there.  I don't know what's on the

22  other side of it, and I don't know where the rest of the

23  material is.

24  Q.   Okay.

25  A.   That's what I'm saying.  When you look at this, it's got

Smith - cross by Kamionski
451

1    to be the whole section of BX cable, not just the part that's

2    buried in the debris or visible from buried debris.

3    Q.  Well, that's why -- one second.

4         The fire investigators did actually rule out

5    potential accidental causes.  That's part of their job,

6    correct?

7    A.  They said they did.

8    Q.  So they said they did.  They were on the scene.  Are you

9    disputing that they actually did it?  They said they did it,

10   so are you disputing that?

11   A.  Yes, I'm disputing that there's no documentation, no

12   notes, and no sketches to show what they examined.

13   Q.  Okay.  Well, it's in their report that they examined it,

14   correct?

15   A.  No.

16   Q.  Okay.

17   A.  It says they examined three things.  They examined

18   systems.

19   Q.  Let me go through them with you, sir.

20   A.  Go ahead.

21   Q.  They examined the heating and AC system and found them not

22   to be a factor in the fire.  Do you dispute that?

23   A.  No.

24   Q.  Okay.  So that means they looked at the heating system and

25   anything that had to do with the heating system and the AC

Smith - cross by Kamionski

452

1   system to check whether or not it had anything to do with the

2   fire.  Do you dispute that they did that?

3   A.  No, that's a system.  Yes.

4   Q.  Okay.  And so they -- and you would agree that that's been

5   ruled out of the equation as not causing the fire because they

6   said so.  Do you agree with that?

7   A.  Well, that's what they said.

8   Q.  Okay.  I know that's what they said.  Do you have any

9   reason to doubt what they said or what they did?

10  A.  No, there's no documentation of how they did it.

11  Q.  Okay.  In every -- so does that mean it wasn't done

12  because they didn't actually document exactly how they went

13  through the AC system?

14          This is an investigator with 5,000 prior arson

15  investigate -- he's been to 15,000 fires, 5,000 cause and

16  origin.  When he says that he inspected the heating and the AC

17  system, is that not credible for him to say that?

18  A.  Well, you're not evaluated on the number of inspections

19  that you've done.  You're evaluated on what -- the last

20  investigation he's done; in other words, what has he done to

21  do it.  The same thing, he said he eliminated the electrical

22  system, but he looked at one thing in the electrical system.

23  Q.  Well --

24  A.  Let me clarify.  The electrical system is from where the

25  service comes into the building and what's in the walls.

Smith - cross by Kamionski

453

1  That's the electrical system.  Anything plugged in is not part

2  of the electrical system.

3  Q.  Well, he investigated -- he went in and inspected -- how

4  do you know that?

5  A.  How do I know what?

6  Q.  How do you know that that's not part of the electrical

7  system?

8  A.  That's what the definition of electrical system is if you

9  look in the codes.

10  Q.  It's all the electrical system.  That's what he examined,

11  correct?

12  A.  But even if he did, I'm saying even if he did it, it

13  doesn't include appliances and things plugged into the system.

14  Q.  Okay.  Well, didn't the fire investigators also inspect

15  the cooking equipment and found them not to be causing the

16  start of the fire?

17  A.  That's what he says.

18  Q.  Okay.  I know that's what he said, but you weren't there.

19  He was there.  Don't we take him at his word that he actually

20  investigated these --

21  A.  The obligation is for the investigator to show what he's

22  done.

23  Q.  Okay.  Let's go through them.  The fire investigators

24  inspected the hot water heater and found it not to be a

25  factor; isn't that true?

Smith - cross by Kamionski

454

1    A.   That, he looked at.

2    Q.   I'm sorry?

3    A.   That's true.

4    Q.   That's true.  He investigated the cooking equipment and

5    found them not to be a factor in starting the fire; isn't that

6    true?

7    A.   I'm not sure where that is in his report.  I don't have

8    that in front of me.

9              MR. KAMIONSKI:  Okay.  May I approach, your Honor?

10             THE COURT:  You may, and then just announce what

11   you're showing him and what --

12             MR. KAMIONSKI:  I'm showing him --

13             THE COURT:  Yeah, let me just finish.

14             MR. KAMIONSKI:  I'm sorry.

15             THE COURT:  So just announce what you're showing him

16   and what page number so that the plaintiff can follow along.

17             MR. KAMIONSKI:  Okay.  I apologize, your Honor.  I'm

18   just going to show Defendants' Exhibit No. 1, and it's Page 6,

19   and it's Bates Nos. Plaintiff 16284.

20             THE COURT:  All right.  Go ahead.

21             MS. WANG:  What page, Mr. Kamionski?

22             MR. KAMIONSKI:  It's Page 6.  It's labeled on top,

23   and it's Bates No. 16284.

24   BY MR. KAMIONSKI:

25   Q.   Okay.  And it's the second one from the bottom.  Can you

1    see that, sir?

2    A.  On Page --

3    Q.  It says on the bottom -- it says on the top, 6.  Can you

4    see that?

5    A.  Page 6.  Okay.  Great.

6            THE COURT:  Are you refreshing, or do you want to

7    move Defense 1 in?

8            MR. KAMIONSKI:  We'd like to move Defense 1 into

9    evidence.

10           THE COURT:  A little easier.

11           Any objection?

12           MS. WANG:  No, your Honor.

13           THE COURT:  Okay.  So Defense 1 is in.

14       (Defendants' Exhibit 1 received in evidence.)

15   BY MR. KAMIONSKI:

16   Q.  Okay.  I'm showing you Page 6 of Defense Exhibit No. 1.

17   And isn't it true that the fire marshal inspected the

18   heating/AC system, the hot water heaters, and the cooking

19   equipment inspection and found them not to be a factor in this

20   fire?

21   A.  Yes.

22   Q.  And they also inspected the gas service and equipment

23   inspection data and also found that not to be a cause of the

24   fire; isn't that correct?

25   A.  Yes.

Smith - cross by Kamionski

456

1    Q.   Then going on to Page 7 of Defendants' Exhibit No. 1, the

2    fire marshal also inspected the electrical systems and found

3    them not to be a factor in the fire incident; isn't that

4    correct?

5    A.   And that, there's no way of knowing because he didn't

6    inspect anything in the stairway.

7    Q.   It says here that he inspected it and not found to be a

8    factor in this fire incident.  And I understand, you dispute

9    that he did it, but it's in the report; isn't that correct?

10   A.   Oh, it's in the report.

11   Q.   Thank you.

12          Now, motive is also an element in a fire

13   investigation; isn't that correct?

14   A.   No.

15   Q.   Okay.

16   A.   Not until after the cause has been determined.

17   Q.   Well, are you familiar with *Kirk's Fire Investigation*?

18   A.   Yes.

19   Q.   And you rely on this book in your work; isn't that

20   correct?

21   A.   Yes.

22   Q.   And it's -- would you say it's like the bible in fire

23   investigation work?

24   A.   No.  I only think there's one Bible.

25   Q.   I'm sorry.  I apologize about that.  But it's a -- it's

Smith - cross by Kamionski

457

1   the -- it's a reliable book in your work; isn't that correct?

2   A.   It is a source.

3   Q.   Okay.  And isn't it true that *Kirk's* talks about

4   motive-based approach in fire investigations?

5   A.   I'm not sure where you're referring to.

6   Q.   "General" -- it says in *Kirk's* that, "General acceptance

7   of this motive-based approach is well accepted within the fire

8   investigation and legal communities.  The motivations

9   discussed in this chapter are also outlined in the NFPA 921."

10          So do you dispute that motive is also a factor in

11  fire investigations as stated in *Kirk's*?

12  A.   I don't know the pretext to that.  If he's talking about

13  it like 921 does, the motive aspects are important after the

14  cause of the fire has been determined.  And that's, if he's

15  referring to 921, that's explicitly what NFPA 921 says.

16  Q.   Right.  And the point is that motive, though, is part of

17  the fire investigation process; isn't that true?

18  A.   Only after the cause has been determined.  And you can't

19  use -- and what it says is clearly, you cannot use elements of

20  motive as elements to determine the origin and cause of the

21  fire.

22          The motive is, after the cause has been found to be

23  intentional, then you can use motive indicators for suspect

24  development, for other witnesses to interview, but it's not

25  part -- it doesn't take the place of the origin and cause of

Smith - cross by Kamionski

458

1    the fire.

2    Q.   Why is motive important?

3    A.   Motive is important if you're going to try to identify who

4    a fire-setter is after a fire has been determined to be

5    intentional.

6    Q.   And why is that?

7    A.   Because you want to know who the fire-setter is.

8    Q.   And people that have a motive to start the fire could be

9    potential suspects in the case.  Is that the reason behind it?

10   A.   Well, they could be somewhere to start.

11   Q.   In your career, you've interviewed juvenile suspects in

12   arson cases; isn't that true?

13   A.   I've spoke with juveniles, interviews on the street, yes.

14   Q.   And you spoke to them without any parents present; isn't

15   that correct?

16   A.   I believe so.

17   Q.   And those juveniles in that instance eventually were

18   charged with the arson; isn't that true?

19   A.   I'm not sure what case you're referring to.

20   Q.   Do you remember giving a deposition in this case?

21   A.   Yes.

22        MS. WANG:  What page?

23        MR. KAMIONSKI:  Page 254.  It's Line 10 to Line 15.

24   The question there is as follows.

25        MS. WANG:  Wait.  Hold on.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 84 of 288 PageID #:21252
Smith - cross by Kamionski
459

1    THE COURT:  Yes.  Let's take a sidebar actually.

2    (Proceedings heard at sidebar:)

3    THE COURT:  Okay.  How is this within the scope of

4  the direct testimony and also his expertise on fire science?

5    MR. KAMIONSKI:  It's in cross-examination.  It's

6  something that came up in his deposition about investigations.

7    THE COURT:  Yeah, I mean, I understand why in a

8  deposition, far ranging, perfectly fine.  At a trial now, the

9  direct testimony addressed fire science.  There was not

10  anything about interview techniques and juveniles and so on.

11    I don't see how this is within the scope and then

12  also otherwise within his expertise.  So I'm just going to

13  terminate this line of questioning.  Even if the plaintiff

14  wants it, it's a waste of time for the jury.

15    All right.  Move on, please.

16    How much more do you have actually, Mr. Kamionski?

17    MR. KAMIONSKI:  Let me go check.

18    THE COURT:  Just ballpark.  I don't need an exact.

19    MR. KAMIONSKI:  15 minutes.

20    THE COURT:  Okay.  Let's take our break then.

21    (Proceedings heard in open court:)

22    THE COURT:  Okay.  Let's take our midmorning break,

23  ladies and gentlemen.  We'll come back in 15 minutes.

24    All right.  All rise.

25    (Proceedings heard in open court.  Jury out.)

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 85 of 288 PageID #:21253
Smith - cross by Kamionski
460

1          THE COURT:  You can step down for the moment.  You

2    are on cross-examination, which means don't talk to anyone

3    about your testimony.

4          THE WITNESS:  Okay.  Very good.

5          THE COURT:  15 minutes.

6      (Recess from 10:47 a.m. to 11:03 a.m.)

7      (Proceedings heard in open court.  Jury in.)

8          THE COURT:  All right.  Please be seated.

9          Ready to resume the cross-examination.  Mr. Smith,

10   you understand you're still under an oath to tell the truth?

11         THE WITNESS:  Yes.

12         THE COURT:  Okay.  Mr. Kamionski?

13         MR. KAMIONSKI:  Thank you.

14   BY MR. KAMIONSKI:

15   Q.  You testified on direct examination that Fire Marshal

16   Gruszka did not go up to the second floor; is that correct?

17   A.  No.  I think I said he went to the second floor -- his

18   report says it was the second floor, the second floor

19   apartment viewing into the stairwell.

20   Q.  Right.  And the photographs that you were shown before on

21   Exhibit 96, those were photographs that were taken by

22   Detective McInerney; is that correct?

23   A.  I don't know if all of them were.

24   Q.  Okay.  Well, I'll show you here that Exhibit, Plaintiff's

25   Exhibit 96, the front cover is, part of the exhibit is that

Smith - cross by Kamionski

461

1   they were photos taken by Detective McInerney.

2   A.   Okay.

3   Q.   Exhibit, Plaintiff's Exhibit 97 are photos that were taken

4   by the fire department.  Do you see that?

5   A.   Yes.

6   Q.   And Mr. Gruszka was part of the fire department, correct?

7   A.   Yes.

8   Q.   Now, Mr. Gruszka, you didn't review any deposition of

9   Mr. Gruszka in this case, correct?

10  A.   Reviewed testimony.

11  Q.   You reviewed trial testimony of Mr. Gruszka from 1993,

12  correct, or 1996?

13  A.   I don't remember the date.

14  Q.   But sometime in the '90s, would that be fair?

15  A.   Yes, I believe so.

16  Q.   And Mr. Gruszka is no longer living today, correct?

17  A.   Right.

18  Q.   And so we are just limited -- you didn't get a chance to

19  interview Mr. Gruszka about what exactly he observed at the

20  fire scene; is that correct?

21  A.   Right.

22  Q.   And he wasn't subject to extensive questioning about what

23  exactly he reviewed at the fire scene, correct?

24  A.   Yes.

25  Q.   And he -- we're just limited to whatever questions were

Smith - cross by Kamionski

1    asked on his testimony and his report.  We don't have any

2    other information as to what exactly Mr. Gruszka observed

3    because he was not subject to any serious amounts of

4    questioning; is that fair?

5    A.  Yes.

6    Q.  Now, Mr. Gruszka did take -- did go and observe parts of

7    the scene.  I want to go through some of the things that he

8    observed.  They inspected the fire -- the smoke detectors,

9    correct?

10   A.  Yes.

11   Q.  They took pictures of -- here's Plaintiff Exhibit 97.

12   They went into the scene; is that correct?

13   A.  Yes.

14   Q.  This is a picture of the back building that was taken by

15   the fire department, Exhibit 97; is that correct?

16   A.  Yes.

17   Q.  Pictures of a bedroom that were examined; is that correct?

18   A.  Yes.

19   Q.  Mr. Gruszka also examined bedroom and wires that were near

20   a bedroom.  Do you see that?

21   A.  Yes.

22   Q.  Is that correct?

23        He examined this area of the house, is that correct,

24   Mr. Gruszka?

25   A.  I don't know.  He didn't take these photographs, so I

Smith - cross by Kamionski

463

1   don't know if he examined this or not.  I mean, what you're

2   showing me is photographs and saying somebody took photographs

3   of these.

4   Q.  You reviewed these photographs in preparation of your

5   report?

6   A.  Yes.

7   Q.  Okay.  And you've seen these before?

8   A.  Yes.

9   Q.  And they were taken by the fire department in connection

10  with this case?

11  A.  Right.

12  Q.  Here's more things that were observed by the fire

13  department; is that correct?  This is --

14  A.  Yes.

15  Q.  Here's Plaintiff's Exhibit 97.  That's a look also into

16  that enclosed porch area; is that correct?

17  A.  I don't know.  It wasn't labeled, but I thought that that

18  was a photograph into one of the rear apartments.

19  Q.  Let's look at Exhibit 97.15.  This is some of the same

20  back porch area; is that correct?

21  A.  That's the back porch area, and there's one slightly back

22  from this that does show the doorway and shows the edge of the

23  apartment.  But yes, this is in the stairway.

24  Q.  Right.  That's this photo here, correct?

25  A.  Yes, sir, that's one.

Smith - cross by Kamionski

464

1   Q.  And so Gruszka did -- the fire department and Gruszka did

2   go to the second floor and check into the stairwell from the

3   landing of the apartment, correct?

4   A.  Yes.

5   Q.  They checked these stairs as well, correct?

6   A.  What was the question?

7   Q.  These -- here's another photograph of the stairwell from

8   the inside of the apartment, correct?

9   A.  Yes.  Towards the stairway, yes.

10  Q.  Now, as part of the investigation of the fire

11  investigation, it's important to interview witnesses; isn't

12  that correct?

13  A.  Yes.

14  Q.  And isn't it true that civilian witnesses to the earliest

15  stages of the fire can offer information to investigators that

16  may be impossible for them to establish any other way?  Is

17  that a fair statement?

18  A.  Witness observations are things that the investigator has

19  to try to verify.

20  Q.  Because witnesses can offer information that's impossible

21  to establish any other way; is that correct?

22  A.  I don't know.

23  Q.  Do you agree with that?

24  A.  I'm not sure what the example would be.

25  Q.  Well, for example, like if witnesses can experience -- can

Smith - cross by Kamionski

465

1   see somebody running from the scene of a crime, that's

2   something that a fire investigator couldn't establish without

3   the witness' testimony.  Would that be fair?

4   A.  Well, that's witness information, yes.

5   Q.  Okay.  And that's something that an investigator would not

6   be able to achieve on its own just by looking at the scene,

7   correct?

8   A.  Right.

9   Q.  If somebody confessed to the crime, that's also something

10  that an investigator can't observe just by going to the scene;

11  is that fair?

12  A.  The investigators should evaluate the statement based

13  on -- based on the scene documentation.

14  Q.  Right.  My point is that witness statements are so re --

15  investigators need to rely on witness statements because just

16  by going to the fire scene alone doesn't give you the whole

17  picture about what happened at the fire scene; isn't that

18  correct?

19  A.  Well, witnesses provide information.

20  Q.  Witnesses are critical.  They're important?

21  A.  Well, they can be.

22  Q.  And some of the things that witnesses provide besides

23  observations is also smells.  Witnesses can tell

24  investigators, "I smelled gasoline," correct?

25  A.  Yes.

Smith - cross by Kamionski

466

1  Q.  Now, you had a -- you were, on direct examination, trying

2  to explain away smells of gasoline, but let's be clear.

3  Gasoline also smells like gasoline, correct?

4  A.  It's subjective from someone.

5  Q.  Do you dispute that gasoline smells like gasoline?

6  A.  No.  Gasoline has an odor of gasoline, but having someone

7  try to verify it is subjective.

8  Q.  But I'm saying, you've been to the gas station, and you've

9  smelled gasoline and you know it's gasoline, right?  You've

10  smelled the gasoline?  You've been able to tell that's

11  gasoline, correct?

12  A.  Yes.

13  Q.  Okay.

14  A.  Because of the context, yes.

15  Q.  And am I correct that both fire personnel and civilian

16  witnesses testified in this case that they smelled gasoline at

17  the scene of the fire?

18  A.  Yes.

19  Q.  Detective Jenkins indicated that he smelled an odor of

20  gasoline; is that correct?

21  A.  Yes.

22  Q.  Gruszka noted that he smelled gasoline; is that correct?

23  A.  No.

24  Q.  I'm sorry?

25  A.  He testified he didn't smell any gas at the point where he

Smith - cross by Kamionski

467

1    took the sample, is my recollection.

2    Q.  Okay.  Do you still have Defendants' Exhibit No. 1 in

3    front of you?

4    A.  Yes.

5    Q.  Okay.  And if you turn to Page 4 of that exhibit, take a

6    look where it says, "fire load and logical fuel source at

7    point of origin."  Do you see that part on the page?  It's

8    Plaintiff's 16282.

9    A.  On which page?

10   Q.  16282 at the bottom, or on top it says Page 4.

11   A.  Yes.

12   Q.  In the middle of the page, do you see where it says --

13   I'll put it on the screen.  I apologize.

14           This is Gruszka's report, correct?

15   A.  Yes.

16   Q.  And Gruszka indicated that he smelled an odor similar to

17   that of gasoline, correct?

18   A.  Well, it doesn't say that.

19   Q.  Do you see where it says, "Similar in odor to that of

20   gasoline"?  Do you see that?

21   A.  Yes, but it doesn't say that he smelled it.

22   Q.  This is his report.

23   A.  Right.

24   Q.  Okay.

25   A.  Reporting things even what other people told him.  It

Smith - cross by Kamionski

468

1    doesn't say he smelled it.

2    Q.   Kasandra Paris smelled gasoline; is that correct?

3            MS. WANG:  Objection.  Foundation.

4    BY THE WITNESS:

5    A.   Not that I recall.

6    BY MR. KAMIONSKI:

7    Q.   Did you review the testimony -- I'm sorry.  Strike that.

8            Did you review the testimony of Barbara Paris?

9    A.   Yes.

10   Q.   And did Barbara Paris indicate that she smelled gasoline?

11   A.   Yes.

12   Q.   And did Mr. Paris also indicate that he smelled gasoline?

13           MS. WANG:  Objection.  Foundation.

14           THE COURT:  Reformulate that, please.

15   BY MR. KAMIONSKI:

16   Q.   Did you review a report related to what Mr. Paris

17   indicated that he observed?

18   A.   I believe it was reported Mrs. Paris reported that her

19   husband smelled gasoline --

20   Q.   Okay.

21   A.   -- is what I recall.

22   Q.   And you agree that the smell of gasoline is an indicator

23   of the presence of gasoline, correct?

24   A.   Only in the context which you gave earlier at the gas

25   station.  Pyrolysis products at fire scenes, other things can

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 94 of 288 PageID #:21262
Smith - cross by Kamionski
469

1    smell like gasoline, and it's subjective.

2    Q.   Now, in -- when you reviewed Ms. Paris, Barbara Paris'

3    testimony, she also indicated that she had heard footsteps

4    going up and down the stairwell just prior to smelling the

5    gasoline and the fire; isn't that correct?

6    A.   Yes.

7    Q.   She also indicated that her dog was barking?

8    A.   Right.

9    Q.   And it was at that point that she began to smell the

10   gasoline, correct?

11   A.   As she moved towards the back of the house, yes.

12   Q.   And at some point, her husband, when they were in the

13   house, her husband went to check at the door, and the door

14   handle was hot, correct?

15   A.   Yes.

16   Q.   Indicating that the fire was occurring in the stairwell,

17   correct?

18   A.   Yes.

19   Q.   And the Parises were able to see -- Ms. Paris testified

20   that she was able to actually see the fire, this light that

21   she thought was the fire and was able to get out of the house

22   in time, correct?

23   A.   Yes.

24   Q.   Now, isn't it true so -- that even in the absence of

25   locating the actual incendiary device or evidence of an

Smith - cross by Kamionski

470

1  accelerant at -- the crime of arson can still be proven in the

2  absence of all logically possible accidental and natural

3  causes?

4  A.  No.

5  Q.  Now, I'm reading from Page 446 of *Kirk's*.  Again, *Kirk's*

6  is a book that you have at your house, correct?

7  A.  Yes.

8  Q.  And how many editions of *Kirk's* do you own?

9  A.  Five.

10 Q.  Okay.  And I'm reading -- I'm sorry?

11 A.  At least five.

12 Q.  Okay.  Here's from *Kirk's:*  "Even in the absence of an

13 incendiary device, the crime of arson can be proven in the

14 absence of all logically possible accidental and natural

15 causes at the point of origin."

16         Do you disagree with that statement from *Kirk's*?

17 A.  Yes.

18         What edition are you reading from just so I know?

19 Q.  I'm reading from the eighth edition.

20 A.  Okay.

21 Q.  Is the eighth edition the most current edition of *Kirk's*?

22 A.  It could be.

23 Q.  Okay.  So even in 2023, there are jurisdictions that allow

24 the crime of arson to be proven by the absence of locating

25 incendiary evidence by ruling out other cause s; isn't that

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 96 of 288 PageID #:21264
Smith - cross by Kamionski
471

1    correct?

2    A.   Well, I don't know if there's jurisdictions that do but

3    *Kirk's*, John DeHaan disagrees with 921 on this.

4    Q.   Okay.  And so *Kirk's* indicates that you are allowed to

5    accept ruling out, what we call process of elimination.

6    You've eliminated the accidental causes, so the cause is an

7    arson, that is allowed according to *Kirk's*, correct?

8    A.   *Kirk's* says that, yes.

9    Q.   Okay.  Now, the hydrocarbon detectors, those are still

10   used today; isn't that correct?

11   A.   Some places, sure.

12   Q.   And fire investigators use that even still today?

13   A.   Yes.

14   Q.   And they're used to locate potential locations of evidence

15   of an accelerant even today; isn't that correct?

16   A.   Yes.

17   Q.   Now, I want to direct you to *Kirk's* again.  And isn't it

18   true that according to *Kirk's*, evidence of accelerants are

19   recovered in less than 50 percent of arson cases?

20   A.   I don't know if that's what he says.

21   Q.   Okay.  I'm going to read to you from *Kirk's.*

22              MR. LOEVY:  Can we get a copy, your Honor?

23              MR. KAMIONSKI:  Sure.

24              THE COURT:  All right.  And what page number?

25              MR. KAMIONSKI:  I'm sorry?

Smith - cross by Kamionski

472

1          THE COURT:  What page number?

2          MR. KAMIONSKI:  It is Page 565 of *Kirk's*.

3          THE COURT:  All right.  Go ahead.

4    BY MR. KAMIONSKI:

5    Q.  And I'm reading from the title, "Identification of

6    volatile accelerants."

7          "In what" -- "the primary lab service provided to

8          fire investigators is the analysis of fire debris for

9          susceptible volatile accelerants.  In one laboratory

10         study, ignitable liquids, both flammable and combustible

11         liquids, were found in 49 percent of all arson cases

12         submitted to a major crime laboratory over a three-year

13         period."  That's from a case -- from a study in 1979.

14         "Data from a more recent survey verified the same

15         percentages."

16         That's from a study in 2003.  Do you dispute those

17   studies?

18   A.  No, but the study that they're talking about, they're

19   doing studies of actual fire submissions, and they aren't

20   doing blind tests or tests to show, if you took a sample where

21   known gasoline was there, that's basically irrelevant, I mean,

22   that kind of study.

23         The study would be, the test would be if we put

24   gasoline in a fire scene, then send it to a lab, and then we

25   verify what the error rate is.  That's how you determine error

Smith - cross by Kamionski

473

1    rate.  If you're sending people who fire investigators say, "I

2    know gasoline's here" but it comes back in a sample at 50

3    percent of the time, maybe they were wrong.  That's not a

4    test.

5    Q.   Let's read --

6    A.   That's real world.  That's not a test.

7    Q.   Let's read a little further down.  Here's -- reading a

8    little further on that same section:

9              "In a number of structure fire experiments in which

10         petroleum products such as gasoline had been used to

11         ignite a fire, debris, even though collected directly

12         after the fire, packaged properly, and analyzed by the

13         best available methods, failed to reveal any accelerant."

14             Do you -- so explain to the jury, what is a

15   structured fire experiment?

16   A.   That's one case.  What he's talking about is exactly that.

17   You set up an acquired structure or building.  You pour

18   gasoline through it.  You take samples afterwards even where

19   you know that it was -- there was gasoline, and it's possible

20   that they come back negative.  That's true.

21   Q.   Right.  And *Kirk's* has talked about a number of structured

22   fire experiments.  So they did experiments in which gasoline

23   was thrown onto a fire -- thrown into, let's say, a wooden

24   structure.  The fire was lit.  They took the debris.  They

25   took it to the lab and the lab, even though we know 100

Smith - cross by Kamionski

474

1    percent there was gasoline at the fire, the lab still failed

2    to reveal evidence of gasoline.  Correct?

3    A.   No.  You added a lot of qualifiers there that you don't

4    know were true or not --

5    Q.   I'm going to read --

6    A.   -- about the debris, about how much they took.  It all

7    depends on the quantity of gasoline they used.  It depends --

8    you had a whole lot of debris and things.  They may have just

9    cut a piece of carpet from where the gasoline was.

10   Q.   I'm going to read this again.  "In a number of structure

11   fire experiments" -- do you know anything about these

12   experiments?

13   A.   Not those ones, no.

14   Q.   "In which petroleum products such as gasoline was used to

15   ignite a fire, the debris, even though collected directly

16   after the fire, packaged properly, and analyzed by the best

17   available methods, failed to reveal any evidence of an

18   accelerant."

19   A.   Okay.  That's possible.

20   Q.   And that's possible, correct?

21   A.   Yes.

22   Q.   You don't dispute that?

23   A.   No.  It's possible.

24   Q.   And that's in 2023, correct?

25   A.   Yes.

Smith - cross by Kamionski

475

1   Q.  And it continues, "A negative laboratory finding is not

2   proof that an accelerant was not used.  It merely fails to

3   establish its presence after the fire."

4           Isn't that correct?

5   A.  That's true.

6   Q.  Okay.  So it's misleading to say that just because

7   evidence -- gasoline was not found in a laboratory test

8   doesn't mean that gasoline wasn't used to start the fire;

9   isn't that true?

10  A.  That's true.

11  Q.  Okay.  And in truth -- I'm going to read it some more.

12  "Petroleum products change in their physical and chemical

13  properties as they burn or evaporate during and after a fire,

14  so conclusive identification can be a challenge even to

15  experienced laboratory analysts."

16          Isn't that true?

17  A.  True.

18  Q.  So aren't we basing too much reliance on the laboratory

19  test in a situation where -- strike that.

20          The lab could get a negative finding, but there still

21  could be gasoline at the scene, correct?  That's what *Kirk's*

22  says.

23  A.  That's what *Kirk's* says.

24  Q.  And that's what their experiments revealed, correct?

25  A.  Well, we know that it's possible to take samples where

Smith - cross by Kamionski
476

1   gasoline was present and not have -- get positive results.

2   That's possible.

3   Q.  And it's in the same section in which it only -- where

4   they only found evidence of an accelerant in 49 percent of

5   cases?

6   A.  Well, that's real cases.  That's different.

7   Q.  Okay.

8   A.  I'm more concerned about the experiments where you had --

9   where you establish a failure rate.

10  Q.  You agree that gasoline does evaporate, correct?

11  A.  Yes.

12  Q.  And it evaporates quickly; isn't that true?

13  A.  It depends on what it's caught in.  It can last for

14  several days.

15  Q.  Well, have you ever tested that?

16  A.  Yes.

17  Q.  You've taken a -- you've done a test of how long it takes

18  for gasoline to evaporate?

19  A.  No.  I've gotten samples a couple days later and got

20  positive samples.

21  Q.  Have you ever done an experiment to find out how long it

22  takes for gasoline to evaporate from a sample?

23  A.  No.

24  Q.  So you don't know how long it takes to evaporate?

25  A.  Well, I do.  You just asked me.  I know how long it

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 102 of 288 PageID #:21270
Smith - cross by Kamionski
477

1    evaporates for practical because it was there three days

2    later.  I don't know from experiments how long -- how long is

3    a drop of gasoline going to last, no, I don't know from

4    experiments.

5    Q.  And isn't it true also that another reason why gasoline

6    could not be found at the presence of a scene even after fire

7    debris is collected is based on something you wrote in that

8    1997 article that the use of excessive water at the fire scene

9    can dilute some combustible or flammable liquids?  Isn't that

10   true?

11   A.  That's possible.

12   Q.  Right.  So even if -- again, another reason besides

13   evaporation is that if too much water was used to put out the

14   fire and save, attempt to save lives, that could potentially

15   ruin the collection of the sample from the future, correct?

16   A.  It's possible, yes.

17        MR. KAMIONSKI:  Can I have a moment, your Honor?

18        THE COURT:  You may.

19   BY MR. KAMIONSKI:

20   Q.  Was water used to put out the scene of the fire in this

21   case?

22   A.  Yes.

23        MR. KAMIONSKI:  No further questions.

24        THE COURT:  All right.  Anything else for the

25   plaintiff?

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 103 of 288 PageID #:21271
Smith - redirect by Wang
478

1          REDIRECT EXAMINATION

2     BY MS. WANG:

3     Q.   Mr. Smith, now, Mr. Kamionski asked you a number of

4     questions about, he read to you a section of *Kirk's Fire*

5     *Investigation* about the percentages of cases in which -- that

6     were supposed arsons that involved the use of accelerants.

7               Do you remember those questions that he just asked

8     you?

9     A.   Yes.

10    Q.   Okay.  So he said that there were -- in 49 percent of

11    arsons, there was no evidence of accelerant use.  Now, can you

12    explain whether calling those arsons assumes its own

13    conclusion?

14    A.   They're calling them arson by some other means.  They've

15    already made the conclusion it's arson in the absence of

16    flammable liquids, so either they have some other evidence of

17    someone being caught or they're guessing.

18    Q.   Is there any evidence of somebody igniting the fire in

19    this case?

20    A.   There may be.

21    Q.   Have you seen any in this case of somebody igniting the

22    fire?

23    A.   Oh, in this case, no.

24    Q.   Now, Mr. Kamionski asked you earlier if you should just

25    defer to the conclusions of Fire Marshal Gruszka and Detective

Smith - redirect by Wang

1 Rokosik and the other fire investigators because they were

2 there and you were not.  Do you remember those questions?

3 A. Yes.

4 Q. And you said you should not defer to them, right?

5 A. Right.

6 Q. Why?

7 A. The information is supposed to be available to allow an

8 independent determination based on the facts and data

9 collected from a scene.  This happens every day that fire

10 scenes can't be protected forever.  And what happens is, the

11 initial investigators have responsibility for documenting the

12 scene so other people can look at it later and draw

13 independent conclusions, not come to the ones only that the

14 investigators who looked at the scenes came to.

15 Q. The series of photos that Mr. Kamionski showed you of the

16 bedrooms and the fact that there was a smoke detector on the

17 wall, did that shed any light on the elimination of accidental

18 causes inside the building?

19 A. No.  There's random photographs that shows the

20 photographer, which was not the fire marshal, went through the

21 building and took some random photographs.

22 Q. Now, Mr. Kamionski asked you about the fact that the fire

23 investigators in this case had investigated, had decades of

24 experience, had investigated 15,000 fires, had done 5,000

25 investigations.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 105 of 288 PageID #:21273
Smith - redirect by Wang
480

1      The number of investigations that they did, does that

2  suggest that they were thorough?

3  A.  The number of investigations that an investigator performs

4  over his career has no bearing on the job performance that

5  he's doing by -- measured by the standard.

6  Q.  Could you do a whole lot of investigations and be doing

7  them all wrong?

8  A.  Sure.

9  Q.  And how long could -- how long would a thorough

10 investigation take?

11 A.  Oh, it depends on the circumstances.  You could have an

12 investigation, they could go in a day, you dig everything out,

13 collect the evidence, do the documentation, to others that

14 last weeks and months.

15 Q.  And so if the investigators were doing five investigations

16 a day, what does that tell you about the quality of their

17 investigations?

18 A.  By today's standards, you would not be able to meet the

19 qualifications for professional investigator if you were doing

20 that kind of number a day just because of the documentation

21 and time that it would take to excavate the scene, reconstruct

22 the scene, detailed notes, sketches, photographs to be

23 adequate once again so somebody else could look at your work

24 and come to independent conclusions regarding the origin or

25 cause.

Smith - redirect by Wang

481

1   Q.   Now, Mr. Kamionski asked you if you were speculating --

2   showing you Plaintiff's Exhibit 96, Page 7, Mr. Kamionski

3   asked you if you were speculating when you opined that this

4   copper wire here could have -- or this wire here, this copper

5   wire and this BX cable could have caused the fire.

6          Do you remember those questions?

7   A.   Yes.

8   Q.   Now, is taking a photo of the scene the same thing as

9   examining it?

10  A.   No.  It's part of it.

11  Q.   Okay.  So what would have to be done to actually examine

12  this?

13  A.   What would have to be done is physical examination:  Pick

14  up the wire, feel the wire, look for breaks in the wire, look

15  for places where there may be what we call beads which is

16  where -- which is an anomaly from electricity where you may

17  find breaks that are arcs, that arcs are a potential ignition

18  source.  If a wire arcs and the metal lands on a newspaper,

19  that's a potential cause.

20          So you have to physically examine.  You have to do it

21  with your hands.  This isn't just a look at, because even the

22  one wire here at the bottom, where does that go?  That's in

23  the debris.  We're seeing a part of it.  We can't see the

24  other side.  What if the other side has a hole in it where it

25  shows that it blew through?  We can't tell anything from this.

Smith - redirect by Wang

482

1        This is not -- this is not how you do an

2   investigation even this way.  It's a series of photographs

3   that are all tied together over the whole course of the fire

4   scene, documentation and notes, measurements and notes.

5   Q.   And so is there any evidence that they did the

6   measurements, took the notes, and dug through the debris to

7   find what's on the other end?

8   A.   No, not in this case here, no.

9   Q.   Mr. Kamionski questioned you about the investigators not

10  going up the stairs onto the landing of the porch because it

11  was not safe.  Do you remember those questions?

12  A.   Yes.

13  Q.   Now, is that a reason to simply ignore potential causes?

14  A.   No.  No, it isn't.

15  Q.   Okay.  Can you explain?

16  A.   I've worked many unsafe fire scenes.  Sometimes we bring

17  crews in that rebuild, okay, construction crews literally to

18  rebuild.  They'll put up beams.  They'll put up new wood

19  underneath to hold the existing structure intact.  Sometimes

20  that can take a day to several days to several weeks to get it

21  done.

22        But you don't ignore the fire scene because it's

23  unsafe.  You take methods to mitigate the hazard, mitigate the

24  danger, and then you continue your investigation.

25  Q.   Now, Mr. Kamionski asked you some questions about the

Smith - redirect by Wang

483

1    report and -- the fire report written by Fire Marshal Gruszka.

2    Does the report indicate that the investigators properly

3    excluded all accidental causes?

4    A.   No -- well, not accidental causes.  I would say other

5    causes, other potential causes.  They didn't because they

6    didn't examine the room that they called the area of origin.

7    Q.   Okay.  So let's take a look at Defendants' Exhibit 1, Page

8    4.  So under the section "Points of origin data" it says,

9    "Examination of the subject enclosed rear wooden porches and

10   wooden staircase was limited to observation of same from grade

11   level and from the doorways of both of the upper apartments as

12   the decks and stairs were heavily burned and are unsafe

13   structurally."

14            Do you see that?

15   A.   Yes.

16   Q.   So what does that indicate to you about the elimination of

17   all -- of other potential causes?

18   A.   That indicates to me exactly what he said here.  His

19   examination of the fire scene was reserved to observation.

20   Q.   Observation is not the same as examination?

21   A.   Observation is not getting your hands in there, removing

22   the debris and seeing what's there.

23   Q.   Now, Mr. Kamionski asked you some questions about if there

24   was a video of someone pouring gas on the stairs and then

25   igniting it.  What would happen?

Smith - redirect by Wang

484

1  A.  If someone were to pour gasoline down the stairs at this

2  structure, what would likely happen is, first of all, the

3  gasoline -- as I've explained, gasoline, the vapor is going to

4  expand away from the liquid.  It's going to splash.  It's

5  going to -- it has the potential to be on someone's clothing

6  as it's being splashed and poured.

7           But what that's doing, it's moving, that vapor is

8  moving faster than the liquid is being poured.  And as I said,

9  it's three to four times heavier.  That vapor is dropping --

10 even if we start it on the second floor as the allegation is,

11 that vapor is already at the first floor, and you come down

12 the stairway, the first-floor landing, and then the last set

13 of stairs down to the bottom.  That area is full of vapor.

14          And what would happen upon ignition of that, it would

15 be a flammable vapor cloud.  It would be a flash fire which is

16 a rapidly moving flame -- excuse me, flame front through the

17 gasoline vapor.

18 Q.  Now, Mr. Kamionski also asked you about the supposed

19 confession in this case, and he asked you if you should

20 evaluate the confession.  Do you remember that question?

21 A.  Yes.

22 Q.  And so did you evaluate the confession in this case?

23 A.  Yes.

24 Q.  And what is your examination of it?

25 A.  A confession is no different than a witness statement, and

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 110 of 288 PageID #:21278
Smith - redirect by Wang
485

1    it's the investigator's job to evaluate the witness statement

2    as far as consistency with what he knows about fire dynamics,

3    fire patterns, and fire development.  And I say, a couple

4    things struck me with this.  Someone pouring gasoline --

5              THE COURT:  All right.  Outside the scope.  Next

6    question.

7    BY MS. WANG:

8    Q.  Mr. Kamionski asked you questions about Barbara Paris

9    smelling gas.  Do you know if that was -- do you remember

10   those questions?

11   A.  Yes.

12   Q.  Do you know if that was before or after Mr. Gray

13   supposedly confessed to pouring gas?

14   A.  I'm sorry.  Say that again.

15   Q.  Do you know if Ms. -- Barbara Paris' statement about

16   smelling gasoline was before or after Mr. Gray supposedly

17   confessed to smelling gas -- or to pouring gas?

18   A.  I believe it's after.  It's not in the initial statement

19   on the fire department report.

20   Q.  So --

21   A.  It shows up later.

22   Q.  So Ms. Paris didn't say that initially to the fire

23   investigators?

24   A.  Can I look at this a second?

25   Q.  What are you looking at?

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 111 of 288 PageID #:21279
Smith - redirect by Wang
486

1  A.  The --

2  Q.  The Defendants' Exhibit 1?

3  A.  Exhibit 1, yes.

4         THE COURT:  Yeah, you can look at it.

5  BY MS. WANG:

6  Q.  I'll withdraw the question.  Let's turn to another

7  question.

8         Mr. Kamionski asked you about the footsteps that

9  Barbara Paris said that she heard.  What could explain the

10 footsteps that she thought she heard?

11        MR. KAMIONSKI:  Objection.  Calls for speculation

12 under Rule 26.

13        THE COURT:  It was opened, the door.  Go ahead.

14 BY THE WITNESS:

15 A.  If you look at the timing of events from the different

16 witnesses to try to create a timeline which is a pretty good

17 way to see what happens, this happens fairly quickly with her

18 seeing the fire already on the deck, already on her porch.

19 And it was a fairly sustained fire from what she's describing.

20        It's possible that what she's hearing is actually

21 fire debris and a well-developed fire in that stairwell

22 already and things beginning to fall.

23 BY MS. WANG:

24 Q.  Mr. Kamionski asked you about a dog barking, the Paris'

25 dog barking.  What could explain that?

Smith - redirect by Wang

487

1   A.   The dog could have alerted to the fire.

2   Q.   Now, Mr. Kamionski spoke with you a little bit about

3   witnesses providing information, witness observations, and

4   witness statements.  Is it possible the witnesses are right?

5        You have to answer verbally.

6   A.   Yes.

7   Q.   Is it possible that witnesses are wrong?

8   A.   Yes.

9   Q.   And can witnesses think that it smells like gas and be

10  wrong about that?

11  A.   Yes.

12  Q.   And are there other things that smell like gas?

13  A.   Yes.

14  Q.   Mr. Kamionski asked you about *Kirk's Fire Investigation*

15  and the ruling out of accidental causes.  What's the

16  difference between what *Kirk's Fire Investigation* says and

17  what NFPA 921 says about whether you can conclude that it is

18  an incendiary or intentional fire simply by ruling out

19  accidental causes?

20  A.   *Kirk's* still subscribes even in the current edition to

21  allow a determination in the absence of evidence which is

22  commonly called negative corpus.  One of the problems I have

23  with Mr. DeHaan over the years, he's --

24  Q.   And just to be clear, DeHaan is the author of *Kirk's Fire*

25  *Investigation*?

Smith - redirect by Wang

488

1    A.  He's the author.

2            THE COURT:  Yeah, and the question was the difference

3    between *Kirk's* and NFPA 921, so let's answer that question.

4            THE WITNESS:  Okay.  The difference is, 921 says you

5    cannot do what *Kirk's* says you can.

6    BY MS. WANG:

7    Q.  Was there even any evidence here that accidental causes

8    were ruled out?

9    A.  In this case, no, there's no evidence that it was.

10   Q.  Mr. Kamionski asked you about Rokosik's extensive

11   training, courses that he took.  Is it fair to say that that

12   training was by 1993 standards?

13   A.  Yes, most of it was.

14   Q.  And any -- or even older actually?

15   A.  Yes.

16   Q.  He could have been trained in the '80s --

17   A.  Yes.

18   Q.  -- right?

19           And so has fire science changed a lot since the '80s

20   or 1993?

21   A.  Significantly.

22   Q.  And has a lot of what Rokosik concluded about the fire and

23   alligator char and so on been thoroughly debunked?

24   A.  Some of it, yes.

25   Q.  Now, in your career in the past, you may have made some of

Smith - redirect by Wang

489

1    the same mistakes that the detectives made about conclusions

2    regarding alligator char, right?

3    A.   Oh, I did.

4    Q.   Okay.  You thought you were right at the time?

5    A.   Yes.

6    Q.   But were you, as it turns out?

7    A.   No.

8    Q.   Okay.  And why has your opinion changed?

9    A.   Because the technology has changed.  The science has

10   changed.  I mean, when you're confronted with evidence that

11   says, here's what you were thinking and here's why that is no

12   longer right, you got to change your way of thinking.

13   Q.   And so when Mr. Kamionski showed you your article from

14   1997 which was 26 years ago, have your opinions changed since

15   then?

16   A.   Pretty safe to say some of them have, yes.

17   Q.   Now, let's talk a little bit about the amount of money

18   that you have billed to date, the $16,000 that you've billed

19   to date.  Is that amount within your standard range?

20   A.   Yes.

21   Q.   Okay.  And if you weren't working on this case, would you

22   be working on cases for other paying clients?

23   A.   Yes.

24   Q.   And how many years have you been working on this case?

25   A.   This has been almost three years now, four years now from

Smith - recross by Kamionski

490

1   2019, and the previous case was about a year.

2   Q.  Okay.  The civil case versus the post-conviction.  And how

3   many hours have you spent studying the fire in this case?

4   A.  I don't know.  Hundreds.

5   Q.  And is your billing standard and customary in your

6   industry?

7   A.  Oh, yes, sure.

8   Q.  Let's conclude.  Was there any evidence of arson in this

9   case, or is there any evidence of arson in this case?

10  A.  No.

11         THE COURT:  All right.  Anything else?

12         MR. KAMIONSKI:  Yes, your Honor.

13                   RECROSS-EXAMINATION

14  BY MR. KAMIONSKI:

15  Q.  Mr. Smith, I'm going to show you again what's marked as

16  Plaintiff's Exhibit 96.  Do you know --

17         THE COURT:  And the page number?

18         MR. KAMIONSKI:  I apologize.  It's Page 96.007.

19  BY MR. KAMIONSKI:

20  Q.  Do you know one way or the other if Fire Marshal Gruszka

21  picked up this item and checked it out?

22  A.  No.

23  Q.  You were asked questions about -- and again, the

24  electrical system was checked by Gruszka and ruled out as a

25  potential cause of the ignition source, correct?

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 116 of 288 PageID #:21284
Smith - recross by Kamionski
491

1          MS. WANG:  Objection.  Asked and answered.  Outside

2    the scope of the redirect.

3          THE COURT:  Asked and answered.  Next question.

4    BY MR. KAMIONSKI:

5    Q.  You were asked questions about when Barbara Paris

6    indicated that she smelled gasoline, correct?

7    A.  Yes.

8    Q.  Isn't it true that she reported on the night of the

9    incident to the reporting investigators that she smelled

10   gasoline?

11   A.  Yes, I'm sure she did.

12   Q.  And it was reported that it wasn't later on in the future

13   but it was, she related to the reporting investigators that

14   night on the 25th before the confession, before Mr. Gray's

15   confession, Barbara Paris reported that she smelled gasoline,

16   and that was at the time the dog began to bark, correct?

17   A.  Yes.  That's in the CFD report.

18   Q.  That's in the case report that was completed that night,

19   correct?

20   A.  Yes.

21   Q.  And that she smelled gasoline and that her husband smelled

22   gasoline, correct?

23   A.  Yes.

24   Q.  Isn't it true that in your report that you issued in this

25   case both in 2012 and again for this lawsuit, you've relied on

Smith - recross by Kamionski

492

1   and cited to *Kirk's* several times, correct?

2   A.  Yes.

3   Q.  And you find *Kirk's* to be a reliable source, correct?

4   A.  Reliable generally, yes.

5   Q.  And that's why you cite it in your report --

6   A.  Sure.

7   Q.  -- correct?

8        And in the end, you can't tell in this case whether

9   it was in your opinion that -- when it's all said and done,

10  your opinion is you can't tell in this case whether it's an

11  arson or an accident, correct?

12  A.  An arson or -- say that again.

13  Q.  An arson -- if the fire was caused by an arson or it was

14  an accidental cause, you can't tell either way; is that

15  correct?

16  A.  That's what I so determined.

17  Q.  Right.  You're not saying it wasn't an arson, and you're

18  not saying it wasn't an accident, correct?

19  A.  Yes.

20       MR. KAMIONSKI:  No further questions.

21       THE COURT:  All right.  Anything else?

22       MS. WANG:  No, your Honor.

23       THE COURT:  All right.  You are excused.  You can

24  step down.

25       THE WITNESS:  Thank you, your Honor.

Gray - direct by Loevy

493

1     (Witness excused.)

2          THE COURT:  All right.  You can re-call Mr. Gray.

3          You can have a seat.  Mr. Gray, you understand you're

4     still under an oath to tell the truth?

5          THE WITNESS:  I do understand that.

6          THE COURT:  Okay.  Mr. Loevy?

7          ADAM GRAY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8                    DIRECT EXAMINATION (Resumed)

9     BY MR. LOEVY:

10    Q.  Good morning, Adam.

11    A.  Good morning.  It's still morning.

12    Q.  And would it be fair to say back in 1996 when you went on

13    trial, did you have any idea about the changes in arson

14    science at the time?

15    A.  I did not.

16    Q.  And did you know anything about alligatoring or charring

17    or causes of arson whatsoever?

18    A.  I did not.

19    Q.  When did you learn about it other than today?

20    A.  I think reading about alligatoring while I'm in the joint

21    a couple years already when I got the transcripts.

22    Q.  All right.  I want to turn your attention back now, we

23    left off when you were in the Audy Home, in the juvenile jail.

24    And you've got to brace yourself because we're going back,

25    talking about an experience that I know is unpleasant for you.

Gray - direct by Loevy

494

1  And to reorient, you're there.  You got there after you

2  confessed.  You said, "I did it."  They take you to juvenile

3  jail.  You told us yesterday that there was some violence.

4         How frequently were you attacked?

5  A.  I'd say twice a week at least.

6  Q.  And in addition to being attacked, were there indignities

7  such as strip searches?

8  A.  Yeah.  Yes.  You're 14 years old, you've got to strip and

9  lift your scrotum and spread your cheeks to grown adults.

10 Q.  Was that hard for you to do?

11 A.  Yeah.  Yeah, to me it's sexual assault.  That's what I had

12 to go through, yeah.  To me, it was very hard.

13 Q.  Well, how about your state of mind?  Would it feel unfair?

14 A.  It was extraordinarily unfair because I didn't belong

15 there and to have to undertake a strip search ever.

16 Q.  What were the strip searches like?

17 A.  They're humiliating.  They take you in the back, you know,

18 like four or five boys at a time.  And some random dude tells

19 you to take your clothes off and you've got to do it, you

20 know.  So you take your clothes off, set them on your shoes,

21 and then you've got to do what he tells you to do:  "Turn

22 around.  Let me see the bottom of your feet."

23        Like I said, they tell you to spread your cheeks.

24 They tell you to lift your stuff.  They want to see

25 everything, and they're doing it with other little kids to

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 120 of 288 PageID #:21288
Gray - direct by Loevy
495

1    this grown adult dude, and that's -- yeah.

2    Q.  All right.  Were you at the point of your life or your

3    personal body images where that was easy for you?

4    A.  No, I certainly was not.

5    Q.  All right.  I want to bring you back to, you started --

6    before we broke last night, you were talking about a time you

7    got attacked when someone tried to take your coat in the

8    bullpen.

9    A.  Yeah.  I was in the bullpen with, it was, like, 25, 30

10   guys.  And some guy decided he wanted to make a move on me,

11   and he was messing with me.  I was sitting there, I had my

12   coat across my lap.

13           And he said, "Let me get that coat."

14           And I was like, "No."  And he kept kind of pushing at

15   it and kind of trying to -- like, playing, sort of playing,

16   not playing.  He tried to knock it off my lap, you know,

17   trying to grab at it.  So it ended up developing into a fight

18   because you can't just allow that to occur or you're on the

19   slippery slope to a very dangerous existence.

20           So we got into a fight.  And in this scenario here,

21   it's hard to describe, so I'm going to look at you guys so you

22   can understand it.  You're in a bullpen with 25 guys.  And in

23   this case, this is very gang oriented.  All right.  So it's,

24   like, 15 GDs and six Vice Lords and a couple other odds and

25   ends.  Okay.  And what that means is that the GDs know that

1    they got the numbers and so they don't mind, you know, flexing

2    a little bit.  They don't mind flexing because the Vice Lords

3    are not deep enough to interact.  They're not doing it.  And

4    me, I'm just some random dude sitting there.

5             So anyway, this guy that was trying to pick a fight

6    with me, he was a GD.  And so we got a little -- into a little

7    scuffle.  All the other GDs stood up.  And I was about to get

8    it.  The sheriff saw it.  Sheriffs came in.  When the sheriffs

9    come in, they pull out the batons, and they just start

10   swinging and smacking.  So they come in the room, they swing,

11   smack at everybody, and that's how that temporarily resolved

12   and --

13   Q.   What happened in the van on the way?

14   A.   Well, on the way back, on the way back to the Audy Home,

15   to the juvenile jail, the sheriffs thought it would be funny

16   to cuff me to the guy that was trying to steal my jacket, and

17   so they cuffed me to him.  And they cuff you left hand to left

18   hand.  So I was like this, all right, cuffed to the guy that

19   was trying to take my coat.

20   Q.   In a nutshell, what happened next?

21   A.   Well, then they put all -- because there were so many GDs

22   that was in the van, there was a whole row of GDs behind me

23   and along in the same row.  So as we started to drive, they're

24   all whispering about trying to kill me.  They want to kill me.

25   They want to grab me.  They want to -- the guys behind me want

1   to use the cuffs to try to get my throat, right, so they can

2   kill me.

3          And so and they're also simultaneously trying to talk

4   up this guy who was trying to take my coat to swing on me,

5   right, to swing on him, right.  "Swing on him.  Just swing on

6   him, whatever."

7          So he didn't have a whole lot of courage, but he

8   eventually swung in the van while we're driving back to the

9   juvenile jail.  And when he swung, I kind of pulled, and I

10  pulled him here like in front of me like this and leaned

11  forward.  And they all started attacking me from behind.  So

12  they're, like, standing up and they're trying to punch me and

13  kick me -- or not kick me.  They were punching me and trying

14  to hit me with the cuffs and --

15  Q.  What happened when you got to the jail?

16  A.  Well, the sheriffs accelerated, got us there, and when

17  they -- while these guys were trying to attack me, I was

18  leaning far enough forward, all they could get at was my back.

19  So my back was all bruised up.

20         But when we got to the jail, the sheriffs were none

21  too happy about that.  So as we filed out of the van, the

22  sheriff that was driving knocked the kid out that I was

23  handcuffed to, just one punch straight to the chin, straight

24  down.  So I'm handcuffed to this kid, 15-year-old kid who is

25  just laying there on the ground, and I got all these GDs

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 123 of 288 PageID #:21291
Gray - direct by Loevy
498

1  staring daggers at me talking about how they're going to kill

2  me if they see me anywhere, right.  So that's pretty much

3  where that ended.

4  Q.  Was there that kind of violence regularly that you were

5  confronted with?

6  A.  Yeah.

7  Q.  All right.  Was there sexual abuse in the juvenile jail?

8  A.  Yeah.

9  Q.  And if you don't fight back when you're attacked, what

10 happens?

11 A.  Oh, if you're the guy that don't fight back, you're the

12 guy that don't fight back.  You're the vic.  You're going to

13 be victimized.  In some capacity, way, shape, or form, they're

14 coming at you.

15 Q.  Did you have to witness that?

16 A.  Yes, I did.

17 Q.  What were some of the -- and I realize it's horrific and

18 difficult to talk about, but what did you have to witness?

19 A.  I saw a kid that he got anally raped.  I saw my own eyes.

20 I saw him forced to give oral sex to multiple kids, multiple

21 boys that were bullying this guy.

22 Q.  Was it hard?

23 A.  Yeah.  It scarred me, scarred me for life.

24 Q.  Are you allowed to intervene in a situation like that like

25 you would be in the outside?

Gray - direct by Loevy

1    A.   Oh, you get out of there.  You get out of there.

2    Q.   Is that an easy way to live?

3    A.   No.  It's bad.  It's -- no, it's not an easy way to live.

4    Q.   You used the phrase -- is there a phrase that they

5    describe the sexual abuse in with the hips and --

6    A.   There's a term, a stupid term.  It's hips, lips, or

7    fingertips.  And when you mess up and you're going to pay,

8    you're going to pay with sex, your hips; with your mouth, your

9    lips; or with your fingertips, your hand.

10   Q.   Was that difficult and stressful for you to be confronted

11   with it?

12   A.   That was just a fact of what was going on in there.

13   That's part of the stuff to navigate, the lions and tigers and

14   bears.  That's the stuff to watch out for.

15   Q.   Did people try to makes sexual attempts on you?

16   A.   Yeah.

17   Q.   Can you tell us about the one in the dayroom there or the

18   TV room?

19   A.   Oh, I don't know how to describe this accurately but

20   basically, he had designs on me.  And he had grabbed me in a

21   headlock.  And I grabbed him and kind of pulled him down and I

22   dropped him.

23   Q.   How did it start?

24   A.   I don't remember exactly.  I just, I knew there was some

25   weird going on.  I don't know.  I don't know how to describe

Gray - direct by Loevy

500

1   it exactly.

2   Q.  All right.  Let's turn to school.  Was school a dangerous

3   place?

4   A.  Yes.

5   Q.  Or was there school in the juvie center?

6   A.  Yes.

7   Q.  Was it a good school?

8   A.  No.

9   Q.  What went on in school?

10  A.  We fought and we got assaulted.  That's all that the

11  school was.

12  Q.  Did you get assaulted sometimes at school?

13  A.  Yes.

14  Q.  Tell the jury about that.

15  A.  I was sitting in the school minding my own business, and a

16  guy just randomly walked up behind me and choked me

17  unconscious.  I don't know, just, whoop, got sewed up.  And I

18  woke up, and I was convulsing on the desk, and my head was

19  just pounding on the desk and some -- you know, and he was

20  sitting over there.  He was too big to go at, right.  He was a

21  big dude, and so I just came out of it disoriented, and he's

22  just over there laughing at me.  And I don't know.  That was

23  it.

24  Q.  All right.  Was that the only time you got unconscious,

25  choked unconscious in the juvie jail?

Gray - direct by Loevy

501

1    A.  No.  The staff choked me out a time or two.  I don't

2    remember how many.

3    Q.  Were there some good guards in the juvenile center?

4    A.  Yes, there certainly were.  There was real good guards

5    there sometimes.

6    Q.  Were there some bad ones?

7    A.  Absolutely, there were, real bad ones.

8    Q.  What were the bad ones like?

9    A.  They break your bones.  They choke you out.

10   Q.  Did that happen to you?

11   A.  Yeah.

12   Q.  Tell us a little bit about that.

13   A.  So one of the ways that we would be undisciplined is that

14   we're locked in the cell, we'd flood -- sometimes we'd flood

15   the toilet.  You know, we'd stuff stuff in the toilet.  You

16   flood the toilet just to kind of be difficult to the staff or

17   just to act up because you're acting up because we're all in

18   there being crazy.

19        So I flooded the room one day.  Just, that's what I

20   was doing.  I'm not proud of it, whatever.  But this guy came

21   in, the staff, and he just grabbed me up in a headlock.  And

22   again, I woke up facedown in the water convulsing, just

23   twitching into the water.

24   Q.  You mentioned there was -- was there organized violence

25   that was sanctioned by the guards sometimes?

Gray - direct by Loevy

502

1    A.   Yeah.  They used to make us fight in the cells.

2    Q.   What would that look like?

3    A.   If you had a beef with somebody, there was a guy, the

4    staff member, he was about a 55-year-old guy, I don't know,

5    but his name was Godfather, and he made you go in the cell.

6    And so in one instance, some Puerto Rican guy wanted to fight

7    me.

8         And so how this looks, to set the table is that they

9    go to the last cell on the deck, and you go in that cell.  And

10   so I go in the cell and then all the kids --

11   Q.   Let me interrupt you and ask a question so we have a

12   question and answer.

13   A.   All right.

14   Q.   If you were being pushed into a situation with a violent

15   situation like that, are you allowed to say no, or is it a

16   good idea to say no?

17   A.   It's not a good idea to say no, no, because that paints

18   you a certain way.  It paints you as weak.

19   Q.   And was it a spectator event?

20   A.   Yeah.  They all watched.  They all come.  Some staff, all

21   the kids, they all come to the door, and they watch.

22        MR. LOEVY:  Your Honor, can I have five more minutes?

23   I know you wanted to break.  Can we go until about -- to

24   finish one area, until about 12:04, 12:05?

25        THE COURT:  Yes.

1          MR. LOEVY:  Thank you.

2     BY MR. LOEVY:

3     Q.  All right.  With all this violence and all the things you

4     were being subjected to, what was going on mentally for you?

5     A.  Oh, it's extremely unfair.  I was in there for something I

6     didn't have anything to do with, and that just made me hate.

7     I just, like, everything, everything and everyone.  So me

8     being in there, it's not just, like, I'm just in there and,

9     oh, I belong there because I did bad and this is what I've got

10    to deal with, right.

11         No, it's, I'm in there for something I didn't have

12    nothing to do with, and now I've got to contend with all

13    stuff, with all these crazy people, you know, and that's what

14    I...

15    Q.  Did you lose your will to live at any point?

16    A.  Yeah.  I wanted to die.  That's all I wanted to do.

17    Q.  Tell the jury about that.

18    A.  When I first went in, my first day, I thought I was going

19    home.  I thought that when I go in front of the judge because

20    that's usually, my mom -- I had been to the juvenile jail, I

21    think, like, once, once or twice.  And my mom come picked me

22    up the next day, right.  And so I'm thinking, I'm here,

23    whatever, my mom comes the next day, I go home.

24         And I'm in the bullpen waiting to go in front of the

25    judge.  My sister had, she hired -- she retained an attorney,

Gray - direct by Loevy

504

1  some guy.  He come back there, and he had a hard conversation

2  with me.  And I asked if I was going home.

3          And he says, "No."  He says, "They're charging you

4  with murder, and you're going to be here," he told me, "11

5  months."

6          And for me that just, it let the wind out.  It popped

7  the balloon.  I just -- from there, I couldn't deal with it

8  anymore.  It was too much crazy.  And I just, I couldn't

9  contend with reality anymore.  I couldn't -- it made no sense.

10  I wanted to die.

11  Q.  Did you literally try to kill yourself?

12  A.  Yes, I did.

13  Q.  How did you do that?

14  A.  Every which way imaginable.  I tried hanging myself.  I've

15  cut open veins.  I've -- I took Tylenol, aspirin.

16  Q.  How would you cut yourself?

17  A.  With whatever I had on hand that I could conceivably do

18  some damage with.

19  Q.  What were some examples?

20  A.  Paperclips, staples, if I can get a piece of glass.

21  Q.  Did you try to poison yourself?

22  A.  I did.

23  Q.  What did you try to poison yourself with?

24  A.  I took a whole bottle of Tylenol once.  I took a whole

25  bottle of aspirin once.  I took a bottle of oxy, like acne,

Gray - direct by Loevy

505

1    you know, those little pimple pads, and I squeezed all the

2    juice out of them, and I slammed that.

3    Q.  Did it work?

4    A.  No, none of that stuff worked.  I went deaf for three days

5    after the aspirin.

6    Q.  Why did you want to die so bad, sir?

7    A.  Because I was in there for something I didn't have

8    anything to do with, that I didn't belong there, and I

9    couldn't -- I couldn't deal with that.  It's too much to deal

10    with.

11           MR. LOEVY:  Your Honor --

12           THE WITNESS:  Everybody is lying.  Nobody is -- my

13    word, ain't nobody is listening to me.  So what am I here for?

14    Why am I here?

15           MR. LOEVY:  Your Honor, if this is where you want to

16    take a lunch break before I start another area.

17           THE COURT:  Yes.  And I've got another hearing over

18    the noon hour.

19           So we'll take until 1:15, ladies and gentleman.  All

20    right.  Because I'm not going to see you for an entire 75

21    minutes, I'm going to remind you to do no research into the

22    case, not the law or facts.  Don't discuss the case, not even

23    amongst yourselves.

24           All right.  All rise.

25      (Recess from 12:01 p.m. to 1:15 p.m.)

506

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    ADAM GRAY,                        )
                                        )
 4               Plaintiff,             )
                                        )
 5               v.                     )   No. 18 CV 02624
                                        )
 6    CITY OF CHICAGO, et al.,          )   Chicago, Illinois
                                        )   May 10, 2023
 7               Defendants.            )   1:15 p.m.

 8                TRANSCRIPT OF PROCEEDINGS - Trial

 9                          VOLUME 3-B

10          BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11    APPEARANCES:

12    For the Plaintiff:       LOEVY & LOEVY
                               BY:  MR. JONATHAN I. LOEVY
13                                  MS. ROSHNA BALA KEEN
                                    MS. JORDAN POOLE
14                                  MS. ELIZABETH C. WANG
                               311 North Aberdeen Street, Suite 300
15                             Chicago, Illinois 60607
                               (312) 243-5900
16

17    For the City Defendants: REITER BURNS, LLP
                               BY:  MS. ELIZABETH A. EKL
18                             311 South Wacker Drive, Suite 5200
                               Chicago, Illinois 60606
19                             (312) 982-0090

20

21    Court Reporters:        Jennifer Costales, RPR, CRR
                              Judith A. Walsh, CSR, RDR, F/CRR
22                            Official Court Reporters
                              219 South Dearborn Street, Room 2342
23                            Chicago, Illinois 60604
                              (312) 702-8865
24                            judith_walsh@ilnd.uscourts.gov

25
```

507

1    APPEARANCES (Continued):

2    For Defendant McInerney:    NATHAN & KAMIONSKI, LLP
                                 BY:  MR. SHNEUR Z. NATHAN
3                                     MR. AVI T. KAMIONSKI
                                      MS. NATALIE ADEEYO
4                                     MS. BREANA L. BRILL
                                      MS. NEHA S. LOCKE
5                                33 West Monroe Street, Suite 1830
                                 Chicago, Illinois 60603
6                                (312) 612-1955

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Gray - direct by Loevy

508

1       (Proceedings heard in open court.  Jury in.)

2              THE COURT:  All right.  Please be seated.  Welcome

3       back from lunch, ladies and gentlemen.  We are ready to resume

4       with the direct examination.

5              Mr. Gray, do you understand you are still under an

6       oath to tell the truth?

7              THE WITNESS:  I do understand that.

8              THE COURT:  Okay, Mr. Loevy.

9              MR. LOEVY:  Thank you, Your Honor.

10             ADAM GRAY, PLAINTIFF HEREIN, PREVIOUSLY SWORN

11                  DIRECT EXAMINATION (Resumed)

12      BY MR. LOEVY:

13      Q.   All right.  When we left off, you were talking about a

14      very dark period in your life.  When you're in the Audy Home

15      and you're expressing suicidal ideations, where do you get

16      sent?

17      A.   They put me in medical isolation in what they called

18      medical confinement.  And I was in a room by myself basically,

19      isolated.

20      Q.   At some point did they change institutions?

21      A.   Yes.  They sent me to Chester Mental Health, which is a

22      home for the criminally insane.  And so in southern Illinois,

23      so the juvenile temporary detention center put me on a bus and

24      sent me down there to the crazy place.

25      Q.   How old were you when you were sent to Chester Home for

A. Gray - direct by Loevy

509

1    the Criminally Insane?

2    A.   Still 14.

3    Q.   All right.  Is this for the juvenile criminally insane or

4    the Illinois department criminally insane?

5    A.   This was an adult facility that had one juvenile wing with

6    about seven to ten kids on it at any given time.

7    Q.   And would there be interaction between the juvenile

8    criminally insane and the --  by the way, you had not been

9    adjudicated criminally insane, correct?

10   A.   Oh, no.  I was still fighting this.

11   Q.   Was there interaction between the adult criminally insane

12   people and the juveniles, the kids?

13   A.   They put us all out on the yard together.

14   Q.   Excuse me?

15   A.   They put us all out on the yard together.

16   Q.   All right.  What were those interactions like?

17   A.   Uncomfortable, scary.

18   Q.   When you are dealing with a person who is mentally ill or,

19   you know, not to be pejorative, but, you know, some people

20   were pretty criminally insane, were they not?

21   A.   These people were crazy people that murdered people.  I

22   knew a guy that literally kicked somebody's head off his body.

23   And I had a guy stabbed his sister 50 times or whatever, just

24   in a weird catatonic -- I don't know, man.  These guys were

25   nuts.  They were nuts.

A. Gray - direct by Loevy

1    Q.   All right.  Did they --

2    A.   They're erratic.  These people are erratic.  You know, you

3    don't know what they're going to do next.

4    Q.   Well, how did that increase the danger to you, the

5    unpredictability?

6    A.   It made it something you want to be snappy, you want to be

7    on your toes around these guys.

8    Q.   What kind of things could happen?

9    A.   You're talking -- I don't know.  Anything, anything.  They

10   could kill you.  I don't know.  They could bite you.  They

11   could just run up to you and bite your face.  I don't know.

12   They did all kinds of weird stuff.

13   Q.   All right.  Were there some people who had -- who were

14   like on psycho medications?

15   A.   All of them were, just about all of them.

16   Q.   And what did that do --

17   A.   Heavily medicated.  Thorazine people.  You know, these are

18   -- they dope them.

19   Q.   All right.  Do you remember having some negative

20   experiences out on the yard?

21   A.   Yeah.  A guy -- I was sitting at a bench, and a guy just

22   came and sat down.  And he didn't seem overtly aggressive.  He

23   seemed kind of a peaceful-looking guy.  And he sat there and

24   he just started spinning me a yarn, telling me a story.  And

25   it was vile.  And so, anyway, I ended up getting out of there.

A. Gray - direct by Loevy

1    Q.   Is that something that stuck with you?

2    A.   It did.  You know, what he told me was that -- this guy is

3    like 35.  He had a beard, you know.  And I'm a little kid.

4    He's telling me:  Yeah, my stepdad, he put his penis in my

5    mouth.  And he peed in my mouth.  And that's why I'm here, you

6    know.  Fleshing out the details, you know, so...

7    Q.   Did you need that at age 14 to be hearing?

8    A.   No, no, I did not.  It is another unfair thing I got to

9    experience because I've got to go through all of this for

10   something I didn't have anything to do with.

11   Q.   Were there, among the juveniles, were you subjected to

12   violence, and was there risk to you?

13   A.   Yeah.  That's, again, just the rape stuff.  That's where a

14   lot of the rape stuff happened was down there with them guys.

15   Q.   Did you get attacked?

16   A.   Yeah, twice.

17   Q.   Tell us about the situations where you got into fights

18   there at Chester.

19   A.   Well, one of the guys that was sexually molesting this

20   other 14-year-old that was down there, he was trying to soften

21   me up with insults.  You know, you can soften up -- you can

22   call him, "You're a bee-ach," you know, or something like

23   that, and if you let that stuff stand, well, then some more

24   insults will come at you because obviously my insults are

25   true, right.  So I'm going to keep throwing some insults at

A. Gray - direct by Loevy

1    you.  I'm going to soften you up to put you in your place.

2    That's what I'm gonna do.

3            And that's how -- you've got to react to that.  So

4    him trying to soften me up, you can only take so much of that

5    before you're in that window of it's you're going to fight or

6    you are going to other F word, you know.  So that's what

7    happened.  And so him and I got into a fight.  I had to let

8    him know that I wasn't soft food.

9    Q.  And what happens when you get in a fight?

10           How about after the fight, what did they do?

11   A.  After the fight, what they did to me, where we lived at,

12   at the end of the hall, they had a special room, crazy room.

13   And in the crazy room, they got a steel bed frame kind of

14   bolted to the floor, generic little mattress on there.  And

15   they put you in there.

16           And they got this, these leather restraints, big

17   leather restraints, and it's like football skin, and they put

18   it around your ankles, and they put it around your hands, and

19   you don't move very much.  There is not much give.  And so you

20   just lay there.  And they -- there is this weird kind of quilt

21   blanket that's super thick, and you can't bend it or nothing.

22   You can't do anything anyway, you're just laying there.  And

23   they lay that over you.

24           And then a guy sits there, he pulls up a chair, sits

25   there, and he watches you all day and doesn't move and doesn't

1    talk to you or nothing like that either.  But you lay there

2    strapped down, having been brought in there by five or six

3    guys, carried you on your arms and legs and just, you know,

4    dropping you in there and then strapping you down, like you

5    would imagine five or six guys holding you down.

6            And I wasn't resisting.  I was defeated.  I was limp.

7    I'm a limp fish, you know.  And I just remember laying there

8    after, like after I'm tied down, and the mob walks away.  I

9    just got this guy here watching me all uncomfortable like, you

10   know.  And I just remember being like, oh, my God, dude, like

11   I'm -- for nothing now, I'm in a crazy house.  I'm in a mental

12   institution.  And I'm strapped down to a gurney.  And I'm a

13   child.  That's who I am.  That's me.

14           And so I don't know, so I cried.  I just sat there

15   and/or laid there for however long.  And I went to -- I had, I

16   had two scenarios where they put me in there that I recall.

17   Q.  What was the other?

18   A.  I got into a fight or I don't remember.  Something, some

19   other kid, me and some other kid got into a fight over

20   something.  I don't remember exactly.

21   Q.  All right.  Was it psychologically -- is it torturous to

22   be strapped down like that?

23   A.  Yeah.  It's bad.

24   Q.  All right.  As you were lying there, where were you

25   supposed to be in your alternate life?

A. Gray - direct by Loevy

514

1    A.   I would have graduated eighth grade, so I probably would

2    have been a freshman somewheres.

3    Q.   Did they try to medicate you in Chester?

4    A.   Yeah.   They wanted -- well, the way that they told me is

5    they wanted to give me something to help me because I was

6    super depressed, and I was always talking about wanting to

7    kill myself stuff.

8         And so I thought -- I agreed to take something

9    like -- they give me some liquid, some like little liquid in

10   one of those little plastic shot glasses, like little red

11   liquid.   And I did that for, I don't know, a week or two.

12        There was nothing that was going to make me not feel

13   depressed, because I'm in here for something I didn't do.

14   There is no drug, there is nothing that takes that away.

15        So I did that for a little while.   I didn't feel any

16   better.   I felt cloudy.   And I felt like they're messing me up

17   more.   So I'm not taking that no more.   So I stopped.   I

18   refused.   I started refusing.   I said I'm not taking that.

19   Q.   You didn't like the cloudy feeling?

20   A.   No.   I felt like I was on an assembly line of insanity.

21   And this was another escalation, another thing, another --

22   more ground I got to give to these, to these people that are

23   turning me into a monster that I'm not.

24        And so that's what I went through.   And so I just --

25   when I realized, I'm not taking this no more.   No.   I felt

A. Gray - direct by Loevy

515

1    like it was too much.

2    Q.   Did you get relief though from the drugs to ease the

3    depression?

4    A.   No, no, I most certainly did not.  There is no drug that

5    gives you that relief.

6    Q.   All right.  When you stopped taking the drugs, at some

7    point did they -- did you leave Chester?

8    A.   Yeah.  They ended up sending me back to the juvenile jail

9    up north.

10   Q.   Now, which actually was a better experience for you, the

11   juvenile jail or Chester Mental Home for the Criminally

12   Insane?

13   A.   The looney bin was better than the juvenile jail, believe

14   it or not.  It's actually less violent, despite all the

15   uncertainty of what these guys might do at any given moment.

16   Q.   Why was it better?

17   A.   It was less violent, much less violent, better food --

18   Q.   All right.

19   A.   -- if that matters, if that matters, you know.

20   Q.   When you got sent back to the juvenile jail, where were

21   you taken to?

22   A.   They put me in medical isolation.

23   Q.   Excuse me?

24   A.   Medical isolation is what they called it.

25   Q.   What is it?

A. Gray - direct by Loevy

516

1   A.   There is a wing in the building on Hamilton that is the

2   medical wing.  And traditionally it's medical, medical kids

3   that either got, you know, broken jaws in the joint or broken

4   arms and legs and stuff.  And so they put them down there

5   because you can't -- they don't want you with a cast on the

6   deck.

7           Or, you know, I had a neighbor that -- well, it's not

8   funny.  I'm sorry I laughed.  But I had a neighbor that he was

9   a good guy, but the cops shot his leg off.  He was like 15.

10  The cops shot his leg off.  So he only had one leg.  And he

11  was my neighbor for a while.

12          And so there is guys like that in there and the

13  occasional suicide case that they couldn't easily contend with

14  and me.

15  Q.   All right.  But what I was more asking is like what is it

16  physically?  You've got a cell or what have you got?

17  A.   You're in a cell, that's it.

18  Q.   What's in cell with you?

19  A.   A toilet and a mattress that's on the floor, because they

20  don't give you a bed frame or anything else.

21  Q.   Why?

22  A.   And a blanket.  And you don't get a sheet because they

23  think you'll hang yourself.  So you only get a weird blanket

24  and that's it.

25  Q.   All right.  You've got to slow down, Adam.

A. Gray - direct by Loevy

517

1     A.   I'll slow down.

2     Q.   And the court reporter is trying her best to get it all.

3          But you said you don't get a sheet why?

4     A.   The threat of possibly trying to strangle yourself.

5     Q.   When you got there, was the toilet working?

6     A.   When I got back from Chester, no.  They put me in the

7     cell, and the toilet was full of feces, urine and toilet

8     paper, and the toilet didn't flush.

9          And so I asked them, like, if they would turn the

10    water on.  And they said, Oh, no, no.  You've got to wait

11    until psychologist comes in on Monday.  So I sat there

12    whatever, however, three days, whatever, I don't remember, but

13    like three days until my ma came to visit me.

14         My ma came to visit me, and she raised hell with the

15    staff about why I'm living like that, because during that

16    period of time, those two or three days, you know, I'm adding

17    to the filth, you know.  And I'm living in there.  And my only

18    recourse is the blanket I had, I folded up, you know, and I

19    kind of just set it on top of the toilet so the vapors didn't

20    completely ruin the room too much.  But that really didn't

21    work that much either.

22         But my ma raised a fuss, and they flushed the toilet.

23    And the next day the psych came in, and he left the water on

24    so that I could flush the toilet like a normal person.

25    Q.   Now, this room that you are in with the bad toilet, how

A. Gray - direct by Loevy

1   big a room?  Give us a perspective with that jury box, say.

2   A.  I don't know how wide the jury box is.  It was about 6

3   foot wide, maybe 11 feet broad, and that's it.

4   Q.  Was there bars or anything to clear the circulation?

5   A.  You had two -- you got two brick walls on either side.

6   The front of the cell, there is the toilet on one side and the

7   door out.  And the door is tempered glass floor to ceiling,

8   all right, and so you can see through it.

9          And then in the back of the cell, the walls are

10  metal, they're like brown metal and they're higher than your

11  head.  And the window is above that.

12         And so like I described I think yesterday, that the

13  only way you are looking out the window is if you pull up, all

14  right, or if you climb on top of the -- if you stand on top of

15  the toilet, you can kind of see the sky a little bit, but

16  that's about it.

17  Q.  All right.  When you got back to the juvenile jail, did

18  you conform to the rules of the juvenile jail?

19  A.  No, no.  At that stage, no.  I was, I was going from bad

20  to worse again.  So no.  When I got back there, I told them, I

21  said, I'm not -- you're not putting me in general population.

22  I'm not going to school.  The buck stops here.  I'm not

23  cooperating with nothing.  It's over with.

24  Q.  What was over with?  What was motivating you?

25  A.  I didn't belong there.  I had nothing to do with being

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 144 of 288 PageID #:21312
A. Gray - direct by Loevy
519

1   there.  I'm not some normal kid getting processed through the

2   system who is in there for something he didn't do -- or

3   something he did.  I'm in there for something I didn't do.

4   And so F that, we're going to war now.  Everybody is my enemy,

5   everybody.  Every staff, every kid, everybody is my enemy and

6   ain't nobody, ain't nobody trustworthy.  That's my life now.

7   And I'm in that cell from there.

8   Q.  So you declared war, in your words?

9   A.  Yeah, that was war for me.

10  Q.  What does that mean?

11  A.  Because I'm going to die.  I'm willing -- I'm trying to

12  kill myself, right.  So that's part of, that's part of my

13  agenda at that stage.  But everybody else is the enemy.  I

14  don't care.  Nobody is trustworthy.

15  Q.  Did you act out?

16  A.  Except my family, my ma.  That's the only people that are

17  trustworthy to me.

18         THE COURT:  Mr. Gray, it is important to slow down if

19  you can, okay.

20         THE WITNESS:  All right.

21         THE COURT:  Okay, Mr. Loevy.

22  BY MR. LOEVY:

23  Q.  You're in the cell.  Did you act out?

24  A.  Yes.

25  Q.  What kinds of things can you do in a cell to go to war?

A. Gray - direct by Loevy

1    A.   Like I mentioned, the flooding of the toilet.  But that

2    doesn't -- that's only fun so many times.

3            And the suicide stuff, when I would cut on myself and

4    bleed, I didn't want the bleeding to stop.  I wanted to bleed

5    out.  So if I cut myself, when the bleeding would start to

6    stop, I would smack the wound or scratch it on the wall or

7    whatever I could to try to keep the blood flowing.

8            And then I ain't got nothing else to do, right, I'm

9    just sitting in the cell now and trying to die, so I started,

10   I started using my blood that I'm trying to bleed out with to

11   paint the walls in there.  So I started painting the bricks

12   just out of boredom.

13   Q.   Did you start refusing food?

14   A.   Yeah.  I went on hunger strikes.  I'd go two or three days

15   without food or water.  And then they start threatening me

16   that if I didn't go back to eating, that they were going to

17   intubate me and force me to eat.

18   Q.   Did you refuse court?

19   A.   I tried.  That didn't go over so well, but I tried.

20   Q.   Tell us what you mean it didn't go over so well?

21   A.   Well, the staff in the Audy Home, the juvenile jail, I

22   could -- I wasn't too afraid of them.  Like they were, they

23   were dangerous, but I knew that if I said no -- I just went

24   limp, and like they would have had to carry me to the

25   courtroom, and that's what they did.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 146 of 288 PageID #:21314
A. Gray - direct by Loevy
521

1           But they brought me downstairs to the Cook County

2    sheriffs, who would take us over to Cook County jail to go to

3    court because they're trying me as an adult, and when I got

4    around those guys, oh, no, I'm not messing around because

5    those guys were way more serious and way more leave me in a

6    ditch, so I didn't play that stuff with those guys.

7    Q.   All right.   How would they punish you for this acting out?

8    Did they take away privileges?

9    A.   Yeah.   So there is a lot of in and out in terms of the

10   privileges.   You know, so like if I don't act up for a couple

11   days, maybe they'll give me, maybe they'll give me a bed

12   sheet, right, maybe they'll give me a bed sheet for a couple

13   days or whatever.   I'm not -- you know.

14          Or we had these little radios, you can get a little

15   radio, and like just a generic little thing to listen to AM,

16   FM, nothing fancy.   Again, if I don't act up too long or if I

17   go a few days without acting up too much, then they would --

18   my ma bought this thing for me.   And so most of the kids in

19   there had those regularly all the time.   But mine was taken

20   from me when I acted up.   Then when I acted good for a little

21   while, they would give it back to me for a little while.   So

22   it was an in and out thing.

23   Q.   How about your shoelaces?

24   A.   Yeah, if you are suicidal, they take your shoelaces, which

25   is another -- with the boys, they see a kid without shoelaces,

A. Gray - direct by Loevy

522

1   they know to play, and they know you're vulnerable.  So it

2   makes you stand out that much worse, right.  So then you've

3   got to contend with that stuff.

4            And you go through, you go through the Audy Home and

5   you see there is more than one or two kids walking around

6   without shoelaces, right.  And so they stand out and then they

7   draw attention, you know.  And you don't want attention.  You

8   want to be invisible in there.

9   Q.   Is it a stigma, you know, or a weakness?

10  A.   Yeah, it's a stigma of weakness.  And weakness gets the

11  vultures.

12  Q.   Did they put you in solitary?

13  A.   Yeah.  That's what medical isolation was.

14  Q.   So what is solitary?

15  A.   You're in a cell all day.

16  Q.   Are you doing a lot of interacting with other kids at that

17  point?

18  A.   Maybe if you got a guy in the room next to you --

19  Q.   Is it --

20  A.   -- you can talk through the brick wall kind of.

21  Q.   All right.  Is it hard to be -- first of all, how long did

22  you spend in solitary confinement?

23  A.   Two years.

24  Q.   Is it hard to be in solitary confinement for two years?

25  A.   Oh, it will drive you batty.

A. Gray - direct by Loevy

523

1    Q.   Tell us what you mean.

2    A.   I was painting the wall with my blood from my own arm.

3    That's batty.  It will make you question your own sanity.  It

4    makes you question everything.

5    Q.   How about like the noises?  I mean, what stimulation was

6    there?

7    A.   All right.  So another thing that they do when you are on

8    suicide watch is they don't let you sleep with the light off.

9    They leave the light on.  And the lights they've got in those

10   rooms, they sound like that, you know, that buzz, closer

11   though and louder.

12        And so when you are in there -- and it's kind of like

13   a yellow or a more orangey light than this.  It's more

14   orangey, but it's got that loud buzz.  And they never shut it

15   off.  So it's just on.  And that will drive you nuts.

16        And one day I just -- I couldn't take it no more.

17   And I had a novel, a Stephen King novel, and I just, I just

18   started whipping it up there.  And it's not like an easy thing

19   to get, it's not like a light bulb, right.  It's a thing

20   that's underneath a hinge and all this other stuff.

21        But anyway, I threw it up there for about a half hour

22   until I started making progress up there, and then I busted

23   out the light one day.  And that got me into a whole 'nother

24   realm of trouble.

25   Q.   Were you allowed to read in there?

A. Gray - direct by Loevy

1   A.  Yeah, the book was a privilege thing.  But I was only

2   generally allowed one at a time.  I had some good books that

3   they left outside the cell so I could switch out, you know.

4   But I was allowed to read most of the time.

5   Q.  Were you a reader?

6   A.  I was.

7   Q.  What kind of stuff did you read?

8   A.  Everything, anything I can get my hands on.

9   Q.  All right.  How much reading -- eventually, is there only

10   so much reading you can do in a cell by yourself all day?

11   A.  Yeah.  It gets so -- I can't, like, I can't read a novel

12   now.  Like, I read so many novels in my life that I look at

13   one, I want to throw up.  You know, I can't do it.  I can read

14   like if I am researching or something interesting to me on the

15   phone, but I can't read a novel no more.

16   Q.  All right.  Did some kids go batty in ways that you could

17   tell?

18   A.  Yeah.

19   Q.  What did that look like or sound like?

20   A.  I don't know.  I mean, most of the time kids scream, you

21   know, kids will scream and beat.  In the juvenile place, a lot

22   of kids when they start losing it -- not always.  I mean,

23   sometimes they're doing it to break -- you know, to vent

24   steam, you know, they start beating on stuff.  And they'll

25   beat on a metal wall.  And so at any given time you'll have

A. Gray - direct by Loevy

1   five or six kids beating on a wall, you know, either rapping,

2   you know, creating a little something trying to alleviate

3   tension, you know.

4           But some guys will just sit there and beat on that

5   thing for two days straight because they're gone.  But it

6   reverberates.  So the guy who is 20 cells away starts beating

7   on that, and that thing goes all the way across, and we all

8   feel and hear it.  So, and then there is five of those guys at

9   any given time.

10  Q.  Were you surveilled?  Were they watching you on medical

11  surveillance?

12  A.  Yeah.  They had my cell right in front of the nurses,

13  like, their station, you know.  So there was always a nurse

14  sitting there watching me.

15  Q.  Would you try to hide sometimes?

16  A.  Yeah, yeah.  So the doors, it's a door, right, but next to

17  the door is the toilet.  And so I used to go and I'd go sit

18  behind the toilet or hide behind the toilet.  And it used to

19  infuriate them because they would have to come into the room

20  to see me.  And so they periodically did that.  But they used

21  to be mad and try to get me to not do that.  But they had no

22  control there.

23  Q.  And when they wanted to punish you, did they do anything

24  with the toilet, too?

25  A.  Well, they shut it off.  And a couple instances they

A. Gray - direct by Loevy

1    shackled me to it, where you get your feet shackled, your hand

2    shackled, and then they shackle you to the toilet, and then

3    they leave you there for a while.

4    Q.   What does that feel like?

5    A.   Until you get right, you know, until you get right.

6    Q.   And what does that physically -- explain it better.

7    A.   Like this (indicating) behind your back.  And your feet or

8    under, under the toilet -- excuse me, under the toilet where

9    you would flush and the water would go there's, you know, the

10   little circle, and so they put you with the chain through

11   there.  Your feet are chained to the toilet.

12            And then you are right here facing the toilet with

13   your hands like this, like that (indicating), right, and then

14   they'd leave you there for a half hour or whatever.

15   Q.   And as a 15 and a 16-year-old, was this a tough way to

16   spend those formative years?

17   A.   I don't think you should put anybody in a situation like

18   that, even if they're an adult at 30.

19   Q.   Did you get increasingly sophisticated about trying to

20   kill yourself?

21   A.   I think so.

22   Q.   You mentioned the thing about writing on the walls.  What

23   were you doing there?

24   A.   I wasn't, I wasn't -- I don't remember writing on the

25   walls.  I was just coloring in bricks, just kind of color this

A. Gray - direct by Loevy

527

 1 brick and this brick, you know, just trying to do stuff with

 2 the blood while I'm trying to bleed out.

 3 Q.  Do you remember writing words?

 4 A.  I did.  I think I wrote some stuff on the floor about me

 5 being innocent --

 6          MR. LOEVY:  Your Honor, at this time --

 7 BY THE WITNESS:

 8 A.  -- in my own blood.

 9          MR. LOEVY:  At this time we'd move to admit Exhibit

10 17 -- no.  18, 19 and 20.

11          THE COURT:  All right.  Any objection?

12          MR. LOEVY:  I'm sorry, these are defendants'

13 exhibits.

14          THE COURT:  All right.

15          MR. LOEVY:  Defendants' Exhibits 18, 19, and 20.

16          THE COURT:  Any objection?

17          MR. NATHAN:  No, Your Honor.

18          THE COURT:  Okay.  So Defense 18, 19, and 20 are

19 allowed.

20      (Defendants' Exhibits 18, 19, and 20 were received in

21      evidence.)

22 BY MR. LOEVY:

23 Q.  All right.  Showing you a memo.  Do you remember who David

24 Schwartz was?

25 A.  Yeah.  That was, that was enemy number one right there.

A. Gray - direct by Loevy

528

1    Q.   What do you mean enemy number one?

2    A.   That was the psych.  That was the primary guy who was in

3    control of whether I had privileges or whatever was ongoing

4    with me, that was the guy who was in charge.

5    Q.   And since your return, would it be accurate that you

6    scratched your arms apparently with a wire, had eaten little?

7    A.   Anything I can get my hands on.  I was trying open wounds.

8    Q.   And reviewing that paragraph, does that look like an

9    accurate paragraph in the first paragraph?

10   A.   Give me a moment.

11       (Pause.)

12   BY THE WITNESS:

13   A.   The first paragraph appears fairly accurate I think.

14   BY MR. LOEVY:

15   Q.   Let me show you here a progress note on 9/23/93.  See if

16   this refreshes your recollection about what you were writing

17   in blood there.

18   A.   9/23/93 was before I was in --

19   Q.   Right here.

20   A.   -- yeah, before I was in isolation I think.

21   Q.   That was before, all right.

22   A.   That time, that date might be off though.

23   Q.   Well, assume it's accurate.  Does that refresh your

24   recollection of this incident that you wrote in your blood on

25   the floor "innocent"?

A. Gray - direct by Loevy

1   A.   Oh, yeah.  Okay, yeah.  That would be in medical, yeah.

2   Q.   Was that the kind of thing you were doing in the juvenile

3   detention home?

4   A.   Yes, evidently.

5   Q.   Anybody listening to you?

6   A.   Nobody believed me that I was innocent.  I was just

7   getting processed.  That's what was going on.

8   Q.   All right.  Were there some bit of happy during those

9   three years?

10  A.   Yeah.  So when I was in isolation, they ended up assigning

11  a rec work, two rec workers to me so that they could -- well,

12  it was one at a time.  The first one was Mike Hedges.  They

13  assigned a rec worker to me named Mike Hedges.  Mike Hedges,

14  he was rec worker for the guy.  So he would take lines of kids

15  to the gym or to the yard, and that was kind of one of his

16  jobs.

17          And so they assigned -- or Schwartz asked him if he

18  would take me occasionally out of the cell one on one, without

19  any other kids around, just to kind of see if he could, you

20  know, get me to do some rec, maybe loosen me up, you know.

21          And so like I don't remember how often, but

22  occasionally he would come by, and then I would go walk with

23  him.  And I didn't trust him because everybody is the enemy.

24  But eventually he showed enough to me that I kind of felt like

25  he was -- he wasn't quite as bad as everybody else.  And we

A. Gray - direct by Loevy

1  kind of became, from my end, friends a little bit.

2  Q.  Did you make a nice relationship with him?

3  A.  I believe so, yeah.

4  Q.  Did he help you or you help him with a library or

5  something?

6  A.  Yeah, yeah, yeah.  Because I was reading so much, and he

7  used to take us down -- take me down to the school building

8  and let me grab as many books as I wanted to bring back up,

9  and then I could leave them in front of my cell, and that was

10  cool.

11          And then he had a design to start another library in

12  the units, like a big library upstairs.  And me and him wrote

13  like all the -- we grabbed a bunch of books and wrote like the

14  publishers down, like Penguin Publishing or whoever, and then

15  I wrote letters to all them, me and him wrote letters to all

16  of them to get donations so that we got a whole bunch of books

17  for the juvenile center that, you know, the kids could read

18  because there wasn't a whole lot of that.  And the books they

19  had were all from like the '60s.

20  Q.  Were was there an art therapy teacher who tried to reach

21  you?

22  A.  Yeah.  It's the same schematic where Dr. Schwartz guy, I

23  guess, he set it up where maybe they would get through to me

24  with art therapy.  And so she came to my cell one day with,

25  you know, a pad of paper and charcoal, real soft charcoal and

A. Gray - direct by Loevy

531

1   was trying to engage me on drawing with charcoal and stuff.

2   Q.   What was her name?

3   A.   Rebecca George.

4   Q.   Did that make you feel better?

5   A.   No, no, it didn't.  I didn't really get into that stuff at

6   all.  I did a little bit.  I mean, I tried.  She was very

7   friendly, right, she was super friendly and understanding.

8   But no, I didn't really get into that too much.

9   Q.   You weren't in a frame of mind to --

10  A.   No, you can't be.  You can't be.  Everything, everything

11  around you is just -- everything is war right now.  That's it.

12  That's like that's distraction, that's nothing.

13  Q.   Did you have a chance to talk to Mel during these years?

14  A.   Yeah.  He came through.  He came through once.  And I saw

15  him.  I was out with Mike Hedges.  And I saw him in the school

16  building.

17  Q.   How about visits when he wasn't, when he wasn't in?

18  A.   He couldn't visit.  Juveniles couldn't visit in there.

19  Q.   No visits?  Did you get phones and letters a little bit?

20  A.   I talked to him on the phone.  You know, the phone is like

21  twice a week maybe.  And most of the time if I got the phone,

22  I called my ma.  And sometimes she's not home.  I called who I

23  call, right?  Who do I remember what number, right, because

24  this is before all the fancy phones.

25          So I'd call Mel's house, and I'd catch him sometimes,

A. Gray - direct by Loevy

1    yeah, so I'd talk to him or Rosie or Eric.

2    Q.   Were you able to keep up with Natalie, the girl you

3    mentioned yesterday that you were going to go to a dance with?

4    A.   Sort of, but not really.  I was writing here a lot when I

5    first got locked up.  But apparently my letters were just so

6    messed up because of my emotional mental state, right, and I

7    got a letter from her ma, which kind of chagrinned and

8    embarrassed me, but it was like don't write no more because

9    you sound like you're a maniac, you know.

10          And so I was like, I don't know, just kind of -- it

11   hurt.  It hurt.  But anyway, I was still writing my other --

12   Natalie's best friend was Denise, and I was writing Denise.

13   And Denise was trying to be as understanding with me as she

14   could.  And sometimes I'd slip in a letter to Natalie through

15   my letter to Denise and it would get to her.  And sometimes

16   I'd get a letter from Natalie, and she'd send me pictures

17   occasionally.

18          You know, it wasn't like -- it was few and far

19   between the deeper we get in, until much later, until I've

20   been locked up a long, long time, then Natalie showed back up

21   again.

22   Q.   Was it good or bad to connect with the outside?  Was it

23   painful or happy?

24   A.   Super bittersweet, man, super bittersweet because I can't

25   be there with them.  Those are all my friends.  They're all

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 158 of 288 PageID #:21326
A. Gray - direct by Loevy
533

1    telling me their high school experiences and what's going on.

2    And I don't got nothing like that.  I'm on Mars, you know.  So

3    it's like they're telling me stuff, I see it, I can't relate

4    to that.  And I don't get to have that fun either.  So, yeah,

5    it was, it was difficult.

6    Q.  How about your mom, how often would she write or visit?

7    A.  When I first went in there, she was sending me like three

8    or four cards, letters everyday.  And it made me feel kind of

9    special, because I was a kid that would get called up there,

10   and I would get three, four cards, you know, and making

11   colored stickers and all that, you know.  She was trying to do

12   what she could to cheer me up.

13          And a lot of those kids, they ain't got nobody.  They

14   ain't got nobody in there sending them nothing, you know.  And

15   the deck is 30 kids, 25 kids, I don't know.  And mail time is

16   like five kids go up there maybe, right, that's it.  And so

17   everybody is watching.

18   Q.  All right.

19   A.  And so it made me feel important, I guess, you know, to

20   get -- made me feel better just to get the mail, obviously

21   from my mom, but also that little bonus of being one of the

22   kids that got mail.

23   Q.  Was she visiting?

24   A.  Yeah, every time.

25   Q.  How often?  And how would she get through that?

A. Gray - direct by Loevy

534

1   A.   It was twice a week.   It was like Wednesday and Sunday or

2   something.   And it was every Wednesday and Sunday for the

3   three years I was there.

4   Q.   How were those visits?

5   A.   She tried to reassure me.   And I cannot be reassured

6   because I don't belong here.   And so she tried.   And sometimes

7   -- well, from my end, I'm mad, I'm angry.   You know, and I

8   blame her.   I blamed my ma.   I blame her, unfairly, right.

9   She's supposed to protect me so I don't go, so I don't go to

10  this place.   And so I yelled at her, I called her names, you

11  know, because she can't help me, she can't help me through

12  this.   So, so I, so I --

13  Q.   How do you feel about that?   Do you feel embarrassment or

14  shame?

15  A.   In saying the words, yeah, it's shameful.   But it's also

16  the kid that's going through that got no way to express

17  anything.   And my mom is the only person that sees me true.

18  She sees it.   She knows.   She knows I didn't do nothing.   And

19  she knows that this is all BS.

20         And so she sits there and she eats, she eats my

21  hatred, my rage because she loves me.   She listens to me.   And

22  she hears it.   She witnesses me go through this.

23         And the kid couldn't, the kid couldn't have done

24  differently.   My little, my little me in the Audy Home

25  couldn't have expressed better than that.   And so I have

A. Gray - direct by Loevy

535

1   compassion for that.

2           But no, it is shameful, and I wish I had not done

3   that to her.  And I wish we didn't have to go through that.

4   But I didn't cause her to go through that.  I didn't cause me

5   to go through that.  They did.  So I could forgive myself for

6   doing that as painful as it is to look at, but --

7   Q.  Now, as long as we're talking about your mother, her

8   damages are not the issue.  She's not entitled to

9   compensation.

10  A.  No.

11  Q.  But did it affect you to see what this did to your mother?

12  A.  Yes.  It shames me.  That's what that is.  And I'm trying

13  to make sense of that, you know.  That's what I'm trying to

14  explain.

15          What I think, what I think is that I don't have a

16  choice, and even being mad at my mom, calling her names,

17  right, I don't have a choice in that.

18  Q.  But, Adam, as the years went by, did you see this affect

19  your mom in a way that caused you sad?  As the years went by

20  and then more years and then more years, did your mother

21  struggle because of this in a way that caused you pain?

22  A.  My mom, she was -- she always just tried -- again, I don't

23  know -- I don't know how to answer that question, man.

24  Q.  When you turn 17, what happens?

25  A.  On your 17th birthday, the birthday present they give you

A. Gray - direct by Loevy

536

1   is you go to Cook County jail.

2   Q.  Just so everybody understands, what is the Cook County

3   jail?

4   A.  Cook County jail is, if you're an adult and you are

5   charged with a crime, you get put in lockup, Cook County jail

6   on California.

7   Q.  And are there juveniles in the Cook County jail?

8   A.  Depends on where you draw the line at juvenile.

9   Q.  Is it full of adults?

10  A.  It is mostly adults.  They have like school wings with

11  some 17, 18-year-olds, but the vast majority of it is adults.

12  Q.  As you were approaching your 17th birthday, had you gotten

13  a little bigger than your -- well, you said you were five-two

14  110 when you were 14.

15  A.  I would imagine I was a little bigger, but I wasn't big.

16  Q.  All right.  Did you experience fear and concern?

17  A.  Everybody that -- everybody knows in juvenile that the

18  county is no nonsense.  And so I wasn't the first one to take

19  that birthday present either, right.  So some of the other

20  guys that had been in the Audy Home and juvenile jail, they --

21  I seen them go before me, right.

22          Anyway, and then guys get beat up and you hear about

23  it, it comes back, you know.  And so it wasn't something to be

24  happy to look forward to.

25  Q.  Did they give -- did they set a bond?

A. Gray - direct by Loevy
537

1    A.   Yeah.  It was 350,000, which was 35,000 to walk.

2    Q.   Was your family able to come up with $35,000?

3    A.   No.

4    Q.   Was your mother wealthy?

5    A.   No.  We didn't even have a car.  We walked everywhere.

6    Q.   All right.  What happened on your 17th birthday?

7    Literally, what is the day of your 17th birthday?

8    A.   Okay.  So --

9    Q.   What is date of your 17th birthday?

10   A.   February 3rd, and that would have been '96.

11   Q.   All right.  February 3rd, what happens on February 3rd?

12   A.   So they wake you up early and you, you go -- I don't

13   remember exactly how I got there.  But they wake you up early

14   and they dress you out, and they hand you off to the sheriffs.

15   And the sheriffs get you over there.  And then they deposit

16   you in Cook County jail's intake processing center.

17          And what that looks like is it's a huge room.  It's a

18   huge, long, long room.  And there is one wall is all bullpens,

19   like, I don't know, eight bullpens.  And they're all nasty,

20   smelly and dirty.  And then they've got all these different

21   stations and things you've got to go to in these snake lines.

22          So think like cattle, right.  There is 200 guys

23   snaking around.  And then everybody has got to get in line

24   over here.  And then sometimes they route that line over there

25   to this line over here.  And now you've got to talk to this

A. Gray - direct by Loevy

538

1    guy and make sure this.  And so there is all kinds of lines

2    like that.  And then intermediate sitting in the bullpens with

3    all these guys, you know, and they pack you in there like

4    sardines.

5              And then they got what's called the -- well, I don't

6    want to say the word, but the penis doctor.  And a lot of guys

7    were intimidated with that, because what they do is they take

8    a long Q-tip and they jab it in there for gonorrhea or to

9    check you ain't got nothing, right.

10             So I didn't want to experience that.  And so when the

11   snake line started going to that guy, I was kind of like the

12   kid that was backing up, you know.  And I wasn't the only one

13   either.  It was like there, woo, there were a lot of guys that

14   didn't want to experience that, so everybody is backing up to

15   the back of the line, right.

16             But the line, you know, the line is moving.  We're

17   moving forward on this train.  And when you get there -- I

18   tried to refuse.  And apparently this wasn't their first rodeo

19   in that regard either.  So they said, Look, you ain't

20   refusing, man.  So like a snap of the fingers, and now there

21   is sheriffs in here, like six, right.  And it's like we can do

22   it the easy way or the hard way, right?  So I relented and

23   then I had to deal with that.  And that hurt for about three

24   days after that every time you pee.

25   Q.  Where did they put you in the early days of the Cook

A. Gray - direct by Loevy

539

1    County jail?

2    A.  Well, I went to Division 10, which was triple max as I

3    understood it.

4    Q.  And was there a time you spent on the psych wing?

5    A.  Oh, yeah, the first day -- when I got up there, transit,

6    the very first day I was on the psych wing when I got there.

7    After I got through the snake lines at like 10:00 o'clock at

8    night, they dropped me off at the psych wing.

9            And that was a weird experience.  They put me in this

10   room.  It wasn't a cell.  It was a room.  And in that room was

11   I don't how many beds, I don't know, 8, 12, 16, I don't

12   remember, but they were about half occupied.  And these guys

13   were crazy.  And I get there and these, these two crazy dudes

14   were talking, right.  And it's like you know how two babies

15   will talk, and they're not meaning nothing, but they

16   understand what each other is saying, that's what these guys

17   were talking, except they weren't talking baby talk.  They

18   were using English.  And it didn't make no sense, but they

19   understood each other.

20           And that's what I sat there and listened to all

21   night, because I'm not going to bed with that.  And then the

22   next morning I said, Let me out of here.  Just put me in GP.

23   I'm not staying here.  And that's where I went.

24   Q.  So they have a deck for the juveniles and a deck for the

25   general population.  Where did you get sent?

A. Gray - direct by Loevy

540

1   A.   General population deck.

2   Q.   So that's with the adult prisoners?

3   A.   Yeah.

4   Q.   Back in the early '90s, was the Cook County jail a place

5   to be trifled with there?

6   A.   No.  People killed in there all the time, murdered all the

7   time.

8   Q.   Was it a lethal environment in there?

9   A.   Oh, yeah.  Everybody had knives.  Everybody was just armed

10  to the Ts in every regard.

11  Q.   Were there a lot of Gangster Disciples and Latin --

12  A.   Every gang in the city was there en masse, yeah.

13  Q.   Did you know anybody in the Cook County jail?

14  A.   I had a couple guys that came through that I grew up with.

15  We went to grammar school at different points from any

16  neighborhood.

17  Q.   How about when you first got there --

18  A.   They were in and out though.

19  Q.   When you first got there, did you know a soul in the

20  institution?

21  A.   I didn't know anybody there.  I got on the deck, 74 guys,

22  I didn't know nobody.

23  Q.   74 guys and how many cells?

24  A.   I mean, there was like 74 guys.  There was 24 cells.

25  There was three men to a cell.  So whatever that maps out to.

A. Gray - direct by Loevy

1    Q.  All right.  So now you're in a cell with other men?

2    A.  Yeah.  It was three guys to a cell, the bunk beds and then

3    they had a mattress on the floor, and I was on the mattress on

4    the floor.

5    Q.  All right.  Were you able to navigate the violence at the

6    Cook County jail?

7    A.  Honestly, the county, my county experience was much

8    different than I would have anticipated, because most of those

9    guys -- I was a non -- I was a noncombatant, right.  I'm a

10    neutron.  So I'm not gang-banging with them guys or doing none

11    of that stuff.

12         And in there it's different than juvenile.  These are

13    adults.  And they're more financially oriented than kids,

14    right, and they're not as reactive.

15         So the decks were -- like, I was only on the one

16    deck, but the deck that I was on was relatively peaceful.  And

17    the hostilities that existed there, they still exploited

18    people and stuff, but most of the hostilities was regulated to

19    the gangs and who was trying to do what.

20    Q.  Were there weapons that you had to be afraid of?

21    A.  Yeah.

22    Q.  What kind of weapons?

23    A.  Everybody had knives.  Everybody had knives.  I moved into

24    a cell with two Kings.  And everyone there was like, Oh, let

25    me show you the knives.  He was holding all the knives for the

A. Gray - direct by Loevy

542

1    Kings.  And this guy got 40 knives in the cell with him.  And

2    if they come in on a raid, guess who's getting a knife case?

3    Me.  So that's what I'm in.  Any cell you're in, they've got

4    knives.

5    Q.  Were you concerned about sexual abuse being a 17-year-old

6    in the Cook County jail?

7    A.  Not specifically so.  And in the county I didn't really

8    see too much of that going on.  That was mostly juvenile.  It

9    did occur, but most of the stuff in the county was just guys

10   sabre rattling and gang-banging.

11   Q.  Would sometimes cellmates kill each other?

12   A.  In prison, for sure.  In the county, I don't know that to

13   be factual.  But guys did get murdered in the county.  And so

14   I don't know if it was cellmates killing each other or who

15   killed who.

16   Q.  All right.  Were the strip searches the same in the county

17   jail as they were in the juvenile center?

18   A.  With some exceptions, like because they tended to strip us

19   in the basement in the county.  On the way to court, they had

20   this real, like this long, this long tunnel.  You could drive

21   in underground.  They've got tunnels under there you could

22   drive in.

23          And they just line you up on this long wall like with

24   a yellow stripe on the ground.  And get naked and put your

25   feet on the yellow stripe and, you know, grab the wall.

A. Gray - direct by Loevy

543

1    You've got to go through all that.

2    Q.  How many men?

3    A.  It was cold, super cold down there.

4         Oh, I don't know.  A lot.  They take you down there

5    en masse because they're getting everybody to court to all the

6    courthouses all over, all over, you know.

7    Q.  Did you ever get used to that?

8    A.  No, no.  It's embarrassing and humiliating is what it is.

9    Q.  You survived the county jail?

10   A.  If you say so.

11   Q.  As the criminal case approached, could you -- were you

12   tried as a juvenile or an adult?

13   A.  I was tried as an adult.

14   Q.  Why did you wait until you were 17 to get tried?

15   A.  I didn't wait 'til I was 17 to get tried.  I was just in

16   the process.  I didn't wait.  It was how it manifested.

17   Q.  All right.  When you were transferred from juvenile to

18   adult, did the juvenile judge say something that didn't sit

19   well with you and cause you distress?

20   A.  Yeah.  I had a hearing.  A judge made a determination on

21   whether or not I would be tried as a juvenile or an adult.

22   And in his determination that I would be tried as an adult, he

23   told me:  Yeah, you'll do good in prison.  You can mentor

24   other students, and you can get into a vocation program and

25   stuff like that.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 169 of 288 PageID #:21337
A. Gray - direct by Loevy
544

1    Effectively -- not effectively.  Directly telling me

2    that you are guilty, right.  I didn't have a trial yet or none

3    of that stuff.  And he sent me to the adult court.  And lo and

4    behold, apparently, he was correct because I certainly went to

5    prison for something I didn't do.

6    Q.  All right.  Were there continuances?  And, you know, what

7    was going on in the court proceedings?

8    A.  I don't know.  It was background noise to me, man.  I

9    didn't care about that.

10   Q.  Did you --

11   A.  I had to go to court every 30 days.  And for me I wasn't

12   going to court to establish my innocence in the court of law.

13   It's I'm going to court, which means I'm going to a bullpen

14   full of dudes.  And so I'm going into a gladiator school

15   scenario.  I didn't care about the court.  I cared about

16   getting out of that, you know, and navigating that.

17        So we go to court, it's who do I got to fight?  Who's

18   going to hit me?  Who do I got to avoid, you know?

19   Q.  As you were getting closer to the case, did you do

20   anything to get ready?

21   A.  I don't -- I don't recall anything specific.  I don't

22   remember.  I didn't think I was going to win.  I thought that,

23   you know, their frame job was pretty fucking tight.  Pardon my

24   language.

25   Q.  And who was defending you?

A. Gray - direct by Loevy

1    A.   I had a public defender.  His name was Paul Stralka.

2    Q.   All right.  Let's talk about some of the evidence that was

3    being presented against you at that trial.  One of the pieces

4    was the confession, correct?

5    A.   They had a statement, yeah.

6    Q.   The statement.  So let's bring it back.  Yesterday before

7    we broke, we talked about how you broke.  You talked about the

8    process by which you came to say, All right, fine, I'll say I

9    did it.

10        If you could just back up one question.  What were

11   you experiencing at the time when you decided to stop fighting

12   them?

13   A.   I was defeated.  You know, I just wanted to go home.  It's

14   all pressure, pressure, pressure.  I just wanted to go home.

15        And so he opened the door and said:  You can go home.

16   Just tell us you did it, right.

17        So why not?  And then I say I did it.

18        Then he says, Well, how did you do it?

19        And I'm like, well, I didn't, you know.

20        So I was just -- you are just defeated.  You are just

21   defeated, man.

22        And the moment I gave him that little bit of ground

23   because I wanted to go home, oh, it's over with now because I

24   gave ground.  You give ground once, they're taking more ground

25   now.  Jump through another hoop now, you know.  And then it's

A. Gray - direct by Loevy

546

1    done, you're cooked, they've the got the hooks in you.

2    Q.  Were you able to stop the train at that point?

3    A.  No.  There ain't no stopping them.

4    Q.  And do you remember which detectives it was that you were

5    interacting with at the time?

6    A.  It was Crescenzo that told me that I would be going home.

7    Q.  And did you believe him?

8    A.  Yeah.

9    Q.  Why?

10   A.  I did believe him.  I believed him sincerely, because that

11   was my only thing I could believe.  I wanted to leave.  I

12   wanted to go.  I didn't do nothing.  I wanted to go.

13   Q.  All right.  When you first said, "Fine, I'll say what you

14   want to hear," did they go get the court reporter and just

15   take your statement?

16   A.  No.  They never took my statement.  That statement is not

17   my statement.  That's their words.

18   Q.  All right.  How much time went by until you agreed to

19   cooperate with what they were trying to do and when they wrote

20   that down?

21   A.  Infinity.  I don't know.  You don't got -- I don't got a

22   good gauge on that.  I'm in a police station.  And they're

23   coming at me.  And I'm trying to do what I can to be

24   cooperative and answer questions.  And now they're badgering

25   and asking me all this stupid stuff and forcing words down my

A. Gray - direct by Loevy

547

1    throat that I didn't say.  I don't know where the clock is at

2    during all of this.

3    Q.  How many times did you guys go through it at that point?

4    A.  After I told them that I did it, if I go home, we kept

5    going over it, over and over and over again, until it got

6    right, until it got how they wanted it.  We ad-libbed.  We go

7    back and forth.  I say something.  Maybe it's close or correct

8    to what they want.  They say something.  I don't know, it was

9    this back and forth stuff.  We kept going the back and forth.

10        I know that my answers weren't the answers that

11   landed, right.  If I said something they didn't want in there,

12   it didn't get in there, you know.  And that's what happened.

13   And that's the product to that process.

14   Q.  What would happen if you said something that wasn't the

15   right answer?

16   A.  It wouldn't get in there.  They would be mad at me.  They

17   would get mad, visibly angry at me.  And they would not accept

18   that answer.  Change your answer.

19   Q.  And did you allow yourself to be redirected?

20   A.  Evidently.

21   Q.  Was there any suggestion going on?

22   A.  If there was, it's over my head.  How do I know if there

23   is suggestion?  You know, it's back and forth.  I don't know

24   where one idea came from to the next, you know.

25   Q.  Was there repetition?

A. Gray - direct by Loevy

1   A.   Insane repetition, yes.  We kept going over the same thing

2   over and over and over again.

3   Q.   Do you remember if there were accusatory questions?

4   A.   If I were going to categorize something as an accusatory

5   question, it's like "Where did you get the gasoline?" because

6   who says gasoline, right?  I don't know.  What are you

7   talking?  Is it gasoline?  I know I think that's a little

8   suggestive, right?  And that was definitely asked of me before

9   gasoline was introduced.

10         But I don't know.  It's them dudes mind-bend you.

11  They will bend your mind.  And so I don't know.  I don't know

12  what came from where at this stage.  It's 30 years ago.  And

13  they ruined my brain as a little kid.  And I got all those

14  years of everything else in between.  So I'm a little fuzzy on

15  what happened there, okay, so...

16  Q.   All right.  So when you went through it before they called

17  the court reporter, would it be -- was that like a rehearsal

18  or what would you describe that as?

19  A.   Yeah, we rehearsed it.  We kept going over it.  He was

20  writing it out on his little yellow notepad.  Again, and so he

21  was making sure I got it right.  And every time I get an

22  answer wrong, "Oh, we've got to go over it again.  Start from

23  the top and let's do it again."

24         And then we get, "Oh, you messed up again.  Got to

25  get it again."

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 174 of 288 PageID #:21342
A. Gray - direct by Loevy
549

1    You know, we kept doing that.  And then eventually it

2  was polished enough.  Let's get a court reporter in here.

3  Q.  Did they ever tell you that you had said things that you

4  didn't think you said?

5  A.  All the time.

6  Q.  How about --

7  A.  They were saying stuff all the time.  So we're having a

8  conversation and like, "Well, 5 minutes ago you said your gym

9  shoes were blue," just for example, you know.  I don't

10  remember the specifics.  But I know I didn't say my gym shoes

11  were blue, and it's stupid.  But officer number two now

12  co-signs officer number one.  He said, "Yeah, you clearly --

13  we all heard you."

14    So now blue gym shoes are a thing.  And I don't got

15  blue gym shoes on.  And so there is all kinds of stuff like

16  that.

17  Q.  How about the part of your statement when you talk -- they

18  say, Hey, you know, porch and the back stairs.

19    Did you have any idea where the fire started at the

20  Mesa-McGinness house?

21  A.  I don't.  I knew there was a fire.  I knew it was Kasey's

22  house.  I got that from my ma, right.  And I might have got

23  that maybe somebody died.  Or I think that my ma told me that

24  they were blaming me.  I don't -- again, this is a long time

25  ago, buried under a lot of stress.  So I don't remember every

A. Gray - direct by Loevy

550

 1   little thing.  But I didn't have a lot of details, except

 2   Kasey's house burned down.  They're blaming me.

 3   Q.  So do you know where you got the detail back porch?

 4   A.  No.

 5   Q.  How about the part about the gas can or the milk jug

 6   container, where did that detail come from?

 7   A.  Can I -- can I see the confession, please?

 8   Q.  Yes.

 9         MR. LOEVY:  May I approach, Your Honor?

10         THE COURT:  You may.

11   BY MR. LOEVY:

12   Q.  All right.  This is Plaintiff's Exhibit 169.  You don't

13   need the actual confession yet, Adam.

14         I want to ask you though, generally, at the trial

15   there was an allegation that you supposedly put gasoline in a

16   milk jug and poured it on the stairs where the police thought

17   the fire started and started the fire, right?  That was the

18   allegation against you?

19   A.  That's the allegation, yeah.

20   Q.  And you were constantly being accused of using a milk jug,

21   right?

22   A.  Yeah, I think, I think.  I don't remember if it was clear,

23   but yeah.

24   Q.  And do you remember how the milk jug became part of this?

25   A.  I don't remember clearly.  You know, part of me wants to

1   think it came from my imagination.  But, man, they were doing

2   stuff that's over my head.  I don't know if that came from my

3   imagination or that came from their imagination, or I don't

4   know at this point though.  I don't know how to describe it,

5   man.  It's all I got.

6   Q.  You've used in the past the phrase "ad-libbing."  Was

7   there ad-libbing going on?

8   A.  Yes.  We, them and I, ad-libbed that statement.  It's

9   their answers.  It's like I ask you, Well, did you turn left

10  or did you turn right?  And you're gonna answer whether you

11  went there or not.  You're giving us an answer.

12          And so I ad-libbed:  Left.

13          And they say:  Oh, it's not left.  You should go

14  right.

15          And so now, okay, now I understand.  So now for the

16  next series of questions if I say left, I get, I get, I get

17  the anger, you know, I get their anger.  So I learn.  Okay,

18  they don't want left, right.  So now we go right.

19          That's ad-libbing, you know.

20  Q.  All right, Adam.

21  A.  Their answers, that's their answers.  It's not my answers.

22  My answer is I didn't have nothing to do with it.  I was

23  sleeping at my best friend's house.  Those are my answers.

24  They didn't want that statement.  They didn't get a court

25  reporter for that one.

A. Gray - direct by Loevy

552

1    Q.  How many times do you think you told them where you were

2    and what you did?

3    A.  I don't know, man.  I don't know.  A lot, over and over

4    and over again.

5    Q.  And they didn't let you --

6    A.  They wouldn't even let -- you know, after the first

7    couple, they didn't want to hear it.  Well, what did you do

8    after that?  You know, what did you do after you went to

9    sleep?  They just kept redirecting me back to I did it and so,

10   you know, just flesh out the details.

11          THE COURT:  Let me just gently remind you one more

12   time to try to slow it down, all right.

13          Okay, Mr. Loevy.

14          MR. LOEVY:  Thank you, Your Honor.

15          May I have a moment?

16          THE COURT:  All right.

17      (Discussion off the record.)

18   BY MR. LOEVY:

19   Q.  All right, Adam.  At some point did they get the statement

20   how they wanted it enough to call a court reporter?

21   A.  Yeah, after we rehearsed it a bunch, yeah, they called in

22   a court reporter.

23   Q.  Were the detectives involved in the rehearsal?

24   A.  I don't remember who all was in the room.

25   Q.  Who was in the subset of people that was in there?

A. Gray - direct by Loevy

1   A.  It would have been the state's attorney.  It would have

2   been probably the youth officer guy may have been in and out,

3   maybe another cop in and out, and then the lady.

4   Q.  And who was the main --

5   A.  The lady was the court reporter.  I'm sorry.

6   Q.  Who was the main police officer you interacted with during

7   the investigation?

8   A.  If I had to single one out, it would have been probably

9   Crescenzo.

10  Q.  And he was the one who was responsible at the beginning

11  when you first, you know, agreed to cooperate?

12  A.  When I said that I did it, when I agreed to say that I did

13  it, he's the guy that sold me a dream, yeah.

14  Q.  Was he in and out during the interrogation as well?

15  A.  Yeah.

16  Q.  All right.  After you gave the court reported statement,

17  I'm going to show you Plaintiff's Exhibit 206, page 3.

18          MR. LOEVY:  And I believe this is already in

19  evidence, Your Honor.  This is the picture that -- it's not in

20  evidence?  Then we move it into evidence.

21          THE COURT:  It's 206?

22          MR. LOEVY:  206, page 3.

23          THE COURT:  Okay.  Any objection?

24          MR. NATHAN:  No, Your Honor.

25          THE COURT:  All right.  206 is allowed.

A. Gray - direct by Loevy

554

1          (Plaintiff's Exhibit 206 was received in evidence.)

2               MR. LOEVY:  Permission to publish it, Your Honor?

3               THE COURT:  Yeah.

4     BY MR. LOEVY:

5     Q.  All right.  Tell the jury what that is.

6     A.  That's a picture of me after signing their script, and

7     they brought me some food.

8     Q.  Did you eat it?

9     A.  Yeah, I think I tried to eat it.  I think I got about

10    halfway.  And I was just nauseous, and it was kind of gross,

11    so...

12    Q.  And after that, what happened?

13    A.  Well, I thought I was going home.  And so they handed me

14    over to the youth officer, who brought me down to what I

15    believed to be his office.  It was back downstairs to the

16    first floor.

17              And then he asked for the phone number.  I gave him

18    the phone number.  And then I watched him.  And it was a push

19    button phone.  And he dialed six numbers, not seven.  And he

20    held it up to his ear, and then he's like, "Oh.  Oh, well,

21    nobody is home.  I guess you got to go to the Audy Home."

22              And I know what happened there.  And so I asked, let

23    me call, let me call.  I know how to use a phone.  You know,

24    you didn't -- and he wouldn't hear none of that, and he walked

25    out.  And I was left in his office.

A. Gray - direct by Loevy

555

1          And then a little while later, two, two uniformed

2     cops came in there, got me and put me in like a minivan cop

3     car and took me to the juvenile place.

4     Q.   Now, in the statement that you gave, do you remember why

5     you supposedly killed Pete McGinness and Ms. Mesa?

6     A.   I don't know.  I don't understand that question.

7     Q.   What was the motive that they provided -- you provided in

8     the statement?

9     A.   I don't think there is a motive in there.

10    Q.   It says you wanted to kill somebody.  Who was that?

11    A.   Oh, they got Kasey.

12    Q.   All right.  Who was Kasey?

13    A.   Kasey was my friend, my on-again-off-again friend,

14    girlfriend.

15    Q.   All right.  How did you know her and from when?

16    A.   I knew, so Kasey was -- I got an older brother named Dave.

17    He's eight years older than me.  And he had a friend named

18    Scott when we were little.  And Scott's little sister was

19    Kasey, and she was my age.  And sometimes Scott will come to

20    my house and sometimes she would tag along.  And so we kind of

21    became playmates when we were little, like 5 years old, you

22    know, we were little.  So we were kind of friends from age 5.

23    Off and on, mostly off.  We didn't really become friend

24    friends until we were like 12, 13.

25    Q.   And how did you guys start hanging out when you were

A. Gray - direct by Loevy

556

1    younger?

2    A.  We had moved, we moved from 38th Street to 42nd.  And

3    Kasey lived on 41st.  And so I was a half block away from her.

4          And then she was also babysitting my niece at the

5    time.  My niece lived right around the corner from her, Dave

6    and his daughter.  And so I'd go over there, and she would be

7    over there babysitting, or I'd babysit sometimes, and then

8    we'd babysit together my nieces.  And so we'd spend the night

9    there.

10   Q.  And who else would hang out when you would hang out with

11   Kasey?

12   A.  Sometimes Mel, Mel Gonzalez, my best friend.  And

13   sometimes Lori and Eddie Walczak, brother and sister that were

14   friends with Kasey, sometimes they'd tag along.  Or Donald

15   Dugard, another neighborhood kid we hung out with or his

16   brother.

17   Q.  Now, when you're a kid, I know it changes a lot, but was

18   there a period of time when you and Kasey were hanging out a

19   lot?

20   A.  Yeah, yeah.  We were best friends.

21   Q.  When were you best friends?

22   A.  '91, '92, somewhere in there.

23   Q.  Do you remember what season it was?

24   A.  No, I don't know.  Summer, winter, I don't know.  It's

25   like we're cool one minute, you know, one, two months in the

A. Gray - direct by Loevy

1   summer.  And then maybe we have a little falling out and hate

2   each other for a month.  Then it's winter and now we're

3   friends again, and that lasts a month.  And then I don't know,

4   it was off again, on again, crazy stuff.

5   Q.   What did you like about Kasey?  And what did you do

6   together with her?

7   A.   Kasey was pretty, and she was daring, right.  She wasn't

8   afraid to go up on the railroad tracks and hang out with us,

9   right, and do stuff, you know.

10  Q.   Was she into Nintendo?

11  A.   Not so much.  She had a Nintendo.  She wasn't into it as

12  like me and Mel were.

13  Q.   All right.  Did you like her parents?

14  A.   Yeah, I did, I really did.

15  Q.   Did you have any relationship with them?

16  A.   A little bit, yeah.  I had -- I went over there one day

17  after school, she wasn't home yet, and her ma let me in.  And

18  her ma was cooking red velvet cakes.  And so I went in the

19  kitchen and helped her, and I got to lick the bowls and stuff.

20  Q.   All right.  Do you have any animus or ill will toward

21  Kasey's ma?

22  A.   No, never.

23  Q.   How about Fluffy and Cornflake?  We heard about them

24  during opening.  Did you know Kasey's cats?

25  A.   It was a cat and a dog.  Fluffy was a dog.

A. Gray - direct by Loevy

558

1   Q.  Did you guys make forts together?

2   A.  Yeah, yeah.  We'd go and, you know, grab scrap, scrap wood

3   wherever we get it and make forts, yeah.

4   Q.  And what would you and Kasey and Mel do in the forts

5   there?

6   A.  Just hang out.  We had, we had -- we built these on --

7   well, we built a fort, not forts.  We built a fort.  And it

8   was on top of like a three-story commercial building on Archer

9   Avenue.  We figured out how to climb up there through the back

10  door in the alley.  And so we went up there.  Then we started

11  trafficking wood up there.  And then we got a bunch of wood up

12  there and other stuff.  We just kind of assembled a little

13  fort.  And that was our little hideout on top of the roof.

14  And, you know, that's where we'd go if anybody was chasing us,

15  you know, or anything like that or whatever.  We just went up

16  there to go chill, get away from people.

17  Q.  Did you date Kasey?  You know, "date" is I guess a word to

18  define.  But how would you say, when you were 12 or 13, did

19  you date her?

20  A.  Yeah, 12, 13, we did date, yes.

21  Q.  What did it mean to date a 12 and a 13-year-old?

22  A.  We walked around holding hands.  That was about it.  We

23  drew little chalk hearts on the street.

24  Q.  Did you ever, you know -- how far did it go sexually?

25  A.  It never went anywhere sexually.  We kissed.  We play a

A. Gray - direct by Loevy

1   lot of truth or dare and stuff like that and spin the bottle,

2   but nothing beyond that.  Nothing really, no.

3   Q.  And how long was this boyfriend-girlfriend phase?

4   A.  We only dated three days.

5   Q.  Three days?

6   A.  She asked me out because I looked like my older brother

7   Dave, who is tall and good looking.  He's taller than me and

8   good looking.  So she was enamored with him, and I was a

9   miniature version, and so she liked me.  So she asked me out,

10  and so we started dating.

11          And then three days later we went to my brother's

12  house, and him, him and his wife were arguing, and so the boys

13  gravitated to the boys, the girls gravitated to the girls, and

14  then we're all in it, right.

15  Q.  Did you stay friends though?

16  A.  Oh, we stayed friends.  I broke up with her.  I knocked

17  her purse off the table just to be stupid, whatever, you know,

18  dumb kids stuff, and then two days later we're back being

19  normal friends.

20  Q.  All right.  How long were you when you dated her?

21  A.  I'm guessing this is like 12, 12, 13.

22  Q.  All right.  Did Kasey also show interest in your best

23  friend Mel?

24  A.  Yeah, yeah.

25  Q.  Tell us about that.

A. Gray - direct by Loevy

560

1   A.  Well, when we started hanging out a little later, this is,

2   I guess, well, fall, somewhere Augusty of '92, August,

3   September '92 maybe.  Maybe later than that.  I don't know.  I

4   don't know, man.  But yeah.  I don't remember exactly how it

5   unfolded.  I think -- I don't know.  Yeah.

6           Long story short, Mel and Kasey started dating.  But

7   before they started dating, what I recall is Mel had asked me

8   if it would bother me.  And I told him no, it wouldn't bother

9   me.  I didn't care.  And they started dating.

10  Q.  Did it bother you?

11  A.  It did.  A couple days later, I don't remember how, maybe

12  a week later, I don't know, it started, it started to bother

13  me, so yeah.

14  Q.  All right.  Long story short, was there -- so you got

15  three people there.  How did it, how did it shake out?

16  A.  I made Mel break up with her.  And, you know, I gave him

17  the ultimatum act, and he chose me over her.  And it didn't --

18  that created tension there, too, you know.

19  Q.  So did you guys go on?

20  A.  Yeah.

21  Q.  So the three of you, who ended up with who?

22  A.  Kasey ended up alone.  And me and Mel went off to hang out

23  with some other girls.

24  Q.  All right.  Did it affect your friendship with Mel a

25  little bit?

A. Gray - direct by Loevy

561

1    A.  No, not really.  I thought we were still doing good.

2    Q.  All right.  And who did you end up going to hang out with

3    there?

4    A.  Natalie Zamecka and Denise Chavez.

5    Q.  All right.  Would you see Kasey around the neighborhood

6    sometimes?

7    A.  Yeah, yeah.

8    Q.  Did you guys sometimes yell at each other?

9    A.  Yeah.  We were still tense.  So, you know, I might yell

10   something at her.  She might yell something at me.  And then,

11   you know, we just -- we're two blocks away from each other

12   just yelling down the street like idiots.

13   Q.  All right.  Is there ever a time in your life where you

14   threatened to hurt her?

15   A.  I never threatened Kasey, ever.

16   Q.  All right.  And when you guys were getting along, you and

17   Kasey wrote notes to each other, right?

18   A.  Yeah.  We sat in a bedroom and passed notes back and

19   forth.

20   Q.  What time period was the note period?

21   A.  October '92.

22   Q.  So how many months before the fire?

23   A.  Well, actually, yeah, this is about, this is about -- I

24   think the notes is what led me to -- I don't remember.  I

25   think the notes is what led me to cause or to ask Mel to break

A. Gray - direct by Loevy

562

1   up with her is what it boiled down to.  So it's the same time

2   frame, but --

3   Q.  So how many months before the fire are we talking about

4   right there?

5   A.  Six.

6   Q.  All right.  And then after -- and by the way, have you

7   gone back and read those notes?  When is the last time you

8   read them?

9   A.  Maybe in one of these -- I had so many depositions and so

10  many lawyers talking to me about all this stuff over the

11  years, and so I'm sure I looked at them.  I'm sure somebody

12  said:  Did you write that?  And yeah.

13  Q.  All right.

14  A.  So I'm sure I looked at them.  I don't remember like

15  reading them, you know, like avidly, like, what is this about,

16  you know.

17  Q.  What do you remember about those notes?

18  A.  They're embarrassing.  I remember that.

19  Q.  Why are they embarrassing?

20  A.  It's stupid stuff.  I'm trying to, I'm trying to play

21  puppy love stuff with this girl.

22  Q.  All right.  After this October, November time, you said

23  you found a new girl, and that was Natalie?

24  A.  That was Natalie, yeah.

25  Q.  How serious did you get with Natalie?

A. Gray - direct by Loevy

1    A.   Not too serious.  Like, I mean, I liked her, right.  And I

2    thought she liked me.  Mel and, Mel and Denise were starting

3    to kind of navigate each other.  So I thought, I think we

4    liked each other.

5    Q.   And Mel and Denise were navigating each other.  What did

6    that mean?

7    A.   Like me and Natalie were kind of almost a thing.  They

8    were maybe tiptoeing towards almost being a thing, too.

9    Q.   And the four of you would hang out?

10   A.   Yeah, yeah, as often as we could.

11        MR. LOEVY:  Your Honor, what time is your intention

12   to take the afternoon break?

13        THE COURT:  2:45.

14        MR. LOEVY:  All right.

15   BY MR. LOEVY:

16   Q.   Changing subjects, you understood that they were going to

17   use this statement against you in the criminal trial, right?

18   A.   At what point did I understand that would be the question.

19   Q.   All right.  At some point when -- I'm sorry.  I'm shooting

20   you fast forward now.  You're talking to the public defenders.

21   You're getting ready for your trial.

22        You knew -- what did you understand the evidence was

23   against you?

24   A.   I didn't really think about it too much.  I knew that

25   there was a statement.  And I knew Kasey and everybody was

A. Gray - direct by Loevy

564

1    lying.  And I knew the police were lying.  And that was it.  I

2    didn't, I didn't really mind it too much, because I had my own

3    little war to mind during that period.

4    Q.  All right.  But at some point the trial is getting closer

5    and closer, correct?

6    A.  Yeah.

7    Q.  How old were you when the case came to court?

8    A.  Seventeen and a half.

9    Q.  And did you have any conversations with your lawyer --

10   well, first of all, also, there was an eyewitness or something

11   that they were saying was against you?

12   A.  In the police station or like going to trial?

13   Q.  No.  Getting ready for trial.  Sorry to jump around on you

14   like that.

15   A.  Yeah.  Karrie Kelly, one of Kasey's friends, was lying for

16   Kasey in my estimation.

17   Q.  That's how you felt anyways?

18   A.  Yeah.  So I didn't -- again, I'm not mapping out the

19   evidence against me in a way where I can mount, mount a fight

20   against it.  Again, that's all background noise.  That's all

21   police BS.

22   Q.  Did you know Brenda Thomas, the woman in the gas station,

23   who supposedly was going to be a witness against you?

24   A.  I did not know her, no.

25   Q.  What did you know about the Clark Gas Station?

A. Gray - direct by Loevy

565

1   A.   I knew that they had some girl, some black girl that

2   worked in the gas station that was saying that she sold me

3   gas.

4   Q.   And did you ever see young black women working in the

5   Clark Gas Station?

6   A.   Yeah, when we go there and buy cigarettes.  When we go

7   there, there is a black girl behind the counter giving us

8   cigarettes.

9   Q.   All right.  Was it always the same one?

10  A.   I have no clue.

11  Q.   All right.  If you saw any of them again, could you

12  identify them at this point?

13  A.   Any of them who?

14  Q.   The people who were working in the Clark Gas Station.

15  A.   No.

16  Q.   Did you have conversations with your -- and you said you

17  had been in the Clark Gas Station, correct?

18  A.   Yeah.  We went in there about every two weeks and bought a

19  pack of cigarettes.

20  Q.   Had you ever --

21  A.   Me and Mel, we really didn't smoke that much.  We split a

22  pack of cigarettes and that would last about two weeks.

23  Q.   All right.  And back then it was not uncommon for

24  teenagers to try to smoke cigarettes?

25  A.   No.  It was pretty common.

A. Gray - direct by Loevy

566

1  Q.  Although how would you buy cigarettes?

2  A.  Well, traditionally, Mel's mom would send us with a note

3  to go buy her cigarettes.  And so when we realized that we can

4  get our own cigarettes with a fake note, we just started

5  writing fake notes and doing that.

6         But we only had to do that at like a liquor store.

7  And if we went to the gas station, they didn't care.  They

8  would just give you the cigarettes.

9  Q.  All right.  Had you ever bought gas at the gas station?

10 A.  Yes.

11 Q.  What was that for?

12 A.  We had a go-kart that we were trying to get operational,

13 and we needed fuel for it, and so we went and got gas.

14 Q.  Did that have anything to do with the night of Kasey's

15 fire?

16 A.  That was like -- I don't know when that was.  That was

17 either in the summer of '92 or the summer of '91 even.  That

18 was a ways before that.

19 Q.  All right.  How old were you when you're facing the trial?

20 A.  Seventeen.

21 Q.  And what were you facing as far as a sentence?

22 A.  Mandatory life.

23 Q.  What were your emotions?

24 A.  I didn't really care at that stage.  That's just a show

25 going on in the background.

A. Gray - direct by Loevy

1   Q.  That sounds real tough, Adam.

2   A.  It is tough.  It's harsh.  I know the conclusion was in

3   three years ago in the police station.  I didn't have any

4   realistic chance of undoing what they did.  So I didn't think

5   I was going to beat them.

6   Q.  Well, would they talk about taking a plea and cutting a

7   sentence?

8   A.  Yeah.  My lawyer, my public defender, he came and talked

9   to me a couple times before the trial.  And he's like I've

10   been trying to talk to the state's attorney about, you know,

11   getting you a plea and see if we can get you, you know, 20

12   years or something.  And I told him I didn't want that.  I'm

13   not pleading out.  I'm not pleading guilty, period.  And he

14   kept trying to insist and blah, blah, blah.  And I told him

15   no.

16   Q.  Why?

17   A.  Because there is no way on earth that I would plead guilty

18   to something I did not do.

19   Q.  All right.  The trial happened?

20   A.  Especially at that stage.

21   Q.  The trial happened?

22   A.  The trial happened.

23   Q.  What do you remember about going to trial?

24   A.  Honestly, it's not so much the trial itself that I

25   remember.  It's the process of getting to the trial, which is

A. Gray - direct by Loevy

1    them waking you up at like 3:30 in the morning.  And then

2    they've got to rapid feed you some garbage.  And then you

3    start the snake line journey from early, while it's still dark

4    out, your snake line journey.  Get all everybody else going to

5    court from every other cell house on that gigantic compound of

6    Cook County jail, and they just start -- you're just in a line

7    with everybody else, like cattle lines.

8          And they get you down to one bullpen.  And maybe

9    there is some fight in there.  Who knows?  Sometimes yeah,

10   sometimes no.  And then you go to another bullpen.  Then you

11   go to another bullpen.  And then eventually you end up in a

12   bullpen behind your courtroom.

13         And then you sit there for -- because you've got to

14   be there before the judge, right.  So you're there pretty

15   early.  And then you wait until court.  And maybe court is in

16   the afternoon.  So you sit in that bullpen for, you know, a

17   couple hours.  And then you do your frivolous court procedure

18   where nothing occurs and it's just a 30-day continuance or

19   just whatever.

20         Well, we're talking about the trial, so in the case

21   of the trial, in the case of the trial, it was Monday through

22   Friday, and it was pretty much all day, 9:00 a.m. to whenever

23   in the evening, 5:00, 8:00, I don't know.

24         And so then at the end of the day, you go back

25   through the snake lines, you get back to your cell about

A. Gray - direct by Loevy

1    10:30, 11:00, to wake back up at 3:00 to start it all again.

2           So the trial itself was kind of not as memorable.

3    I'm also, like, I wear glasses, and my eyes were bad back

4    then, but I didn't have glasses back then, so I was like, you

5    know, what's going on?

6    Q.   When did you start needing glasses?

7    A.   When I got to the joint.

8    Q.   So when did you first get the glasses?

9    A.   I think I was 18 or 19.

10   Q.   So when all the time you were in the juvenile jail and the

11   Chester, did you need glasses?

12   A.   Yeah.  My eyes had just started -- I was just starting to

13   not see the blackboard right before I got locked up.  And so I

14   couldn't see the blackboard, so I had to go sit up front or

15   walk up there.  They weren't bad, bad.  But in the Audy Home

16   my eyes went bad, bad.

17   Q.   Did that create more risk for you?

18   A.   I don't know, maybe.  I don't -- my pride won't let me

19   register that as a risk.  But maybe, I don't know.

20   Q.   All right.  Back to the trial, what were you wearing to

21   the best of your recollection?

22   A.   They want -- they didn't, they didn't want you wearing the

23   DOC stuff in the courtroom.  So I think they gave us some

24   clothes, some generic clothes.  I don't remember, man.  I

25   think -- I don't remember.

A. Gray - direct by Loevy

570

1   Q.  Do you remember who in your family attended?

2   A.  Yeah.

3   Q.  Who was that?

4   A.  My mom primarily, my brother, my brother Michael I think

5   sometimes here and there, yeah.

6   Q.  Did you hear Kasey testify?

7   A.  I think so.  I think I recall her -- I kind of remember

8   it.  But, again, it's through the prism of what I've just

9   described.  And I'm not -- I know it's her, like, I remember

10  when they called her up, you know.  But I don't really

11  remember too much, none of that stuff.  I was in a different

12  frame of mind.

13  Q.  Do you remember Brenda Thomas and Karrie Kelly?

14  A.  Same, same concept.  I remember them going up there.  I

15  remember their testimony from being in jail and reading it

16  mostly.  I read it when I got the transcripts in prison.  So

17  I've read it, and I understood what they were communicating

18  that way more so than I understood what was going on in the

19  moment.

20  Q.  What were your emotions as you had to go through this?

21  A.  I was just, I was just waiting to die.  I didn't care

22  about nothing that was going on there.

23  Q.  When did it end?

24  A.  Friday, five days later.

25  Q.  And what happened?

A. Gray - direct by Loevy

1   A.   The jury deliberated like an hour and a half, two hours,

2   and I got found guilty.

3   Q.   And where were you when you found out?

4   A.   I was in the bullpen behind, behind the courtroom.

5   Q.   And what do you remember about the sentencing?

6   A.   Sentencing was a couple weeks later.  And we went in

7   there, and my lawyer tried a hail Mary pass to see if he can

8   get me sentenced as a juvenile.  And they wouldn't have none

9   of that.  And the judge sentenced me to mandatory natural life

10  without parole.

11          And he tried some weak shaming thing about, oh, you

12  killed some people and you should feel bad.  I don't remember

13  exactly what he said.  But that didn't land, because I didn't

14  kill nobody.  And so he said something like that.  And then

15  after that I went to prison.

16  Q.   All right.  Let me ask you some questions for purposes of

17  the Brady claim.

18          Did you know at the time of the criminal trial that

19  Kasey Paris had been, quote, brainwashed by the authorities to

20  testify the way she did?

21  A.   No.  I thought she was just lying.  I thought she was just

22  being a villain, just being that person, you know.  She's just

23  lying.  And she got, whatever she got going on in her mind,

24  she was just being -- I don't know, man.  I don't know what to

25  make of none of that stuff.

A. Gray - direct by Loevy

1    Q.  You didn't know that then?

2    A.  I had no idea.

3    Q.  Did you know at the time you --

4           MR. NATHAN:  Objection, objection.  Assumes facts not

5    in evidence.  Foundation.

6           THE COURT:  Okay.  The objection is overruled.  And

7    if it gets tied up, it gets tied up; and if not, then it will

8    fall on its own.

9    BY MR. LOEVY:

10   Q.  You didn't have her affidavit saying that she believed she

11   was brainwashed at the time, correct?

12          MR. NATHAN:  Objection.  Foundation, hearsay.

13          THE COURT:  Overruled based on the formulation of

14   that question.

15          Go ahead and answer.

16   BY THE WITNESS:

17   A.  Can you repeat it, please.

18   BY MR. LOEVY:

19   Q.  At the time of the criminal trial, you had no affidavit

20   from her affirming that she believed she had been brainwashed

21   to testify as she did?

22   A.  I had never heard anything like that.  I had no

23   documentation of anything like that.  And no, I did not have

24   any information to that end.

25   Q.  How about Brenda Thomas, at the time of the criminal

A. Gray - direct by Loevy

573

1    trial, did you know that she felt that she had been pressured

2    into picking somebody?  And she actually first picked the

3    wrong person and wasn't even claiming to be a witness.  Did

4    you know anything about that at the time of the criminal

5    trial?

6    A.  No, I did not.  I had none of that information.

7    Q.  And did you have the information about the true

8    circumstances by which Karrie Kelly came to be a witness

9    against you?

10   A.  No.  I just thought she was just lying for Kasey for

11   whatever end that was.

12   Q.  And then on the question of the milk jug, do you remember

13   either way whether you and your lawyers at the time knew that

14   the testing had showed that there was no gasoline in the

15   container that you supposedly used to commit this arson?

16   A.  No.  I think that that was all -- no.  Hold on.  That

17   question is a little bit sideways.  Can you just give me

18   another one?

19   Q.  Sure.  Back when the trial happened, did you know that the

20   City, the Chicago Police Department had performed testing on

21   the milk jug?

22   A.  No, no, I did not know that.

23   Q.  All right.  That revealed the absence of gasoline?

24   A.  I did not know that.

25   Q.  And back at the time of the trial, did you know that the

A. Gray - direct by Loevy

574

1   chemicals found in the milk jug, the chemicals found in the

2   fire debris and gasoline were three separate things, none of

3   which overlapped?  Did you know that at the time of the trial?

4   A.   Did I know that at the time?  I think, no, I did not know

5   that.   I think everybody was just saying gasoline was

6   everywhere, so...

7   Q.   And you already said this morning you didn't know about

8   the arson science evolving because it hadn't evolved yet,

9   right?

10  A.   I did not know about any arson science at all.

11  Q.   All right.  At the sentencing, what do you remember about

12  the sentencing, about what you were facing?

13  A.   Oh, mandatory life, that's it.  There was no discretion.

14  Q.   And what were you sentenced to?

15  A.   Mandatory life without parole.

16  Q.   And tell the jury what that means.

17  A.   You don't go home, never.  You are going to die in prison.

18  There is no parole.  There is no good time.  You are just

19  going to get warehoused until you die.  That's it.

20  Q.   What if you are a real good model prisoner?

21  A.   You are going to be warehoused until you die.

22  Q.   What if the governor wants to let you out?

23  A.   No.  Well, he can do that, I guess.  It's conceivable, I

24  guess, clemency.

25  Q.   I guess he can issue you clemency?

A. Gray - direct by Loevy

575

1    A.   Yeah.

2    Q.   But how about if he wanted --

3    A.   Those are questions.

4    Q.   Sorry.  Good answer.

5         A pardon though, I mean, you can get a pardon if the

6    governor gives you a pardon.  In fact, did you try to get the

7    governor to give you a pardon?

8    A.   Yeah, yeah.  I had been locked up a ways.  I tried filing

9    for clemency, and it didn't go nowheres.

10   Q.   How did you do that?

11   A.   I started writing out a clemency petition, and I typed it

12   up and I mailed it in.

13   Q.   Did you try to communicate directly to the governor?

14   A.   I'm sure I wrote the governor letters many times.

15   Q.   What was your message?

16   A.   Let me out.  I didn't have anything to do with this.

17   Q.   Where did they send you in the Illinois Department of

18   Corrections?

19   A.   My first destination was Joliet Correctional, big Joliet.

20   Q.   And where were you in Joliet?

21   A.   What do you mean?

22   Q.   When you first got there -- well, let me strike that.

23        Describe the cells at Joliet.  Were they smaller?

24   A.   Yeah, the cells were way smaller.  Bunk beds, two-man

25   cells.  And you could lean your head on one wall and your

A. Gray - direct by Loevy

576

1    feet, and your feet -- the bottoms of your feet will touch the
2    other wall.  So it's like 5 feet.  They're not very big.  Five
3    and a half feet maybe, maybe 9, 10 feet wide front to back.
4    Q.  Were you concerned about Joliet?
5    A.  Everybody -- so a lot of the older guys in the county, I'd
6    go talk to the older guys, because them dudes been down, and
7    they know the play, and so you want -- you need as much
8    information as you can, you know.
9         And so I'd go talk to older guys.  And I met this old
10   guy, and he knew -- he had known my dad.  So that was kind of
11   like a little connection.  This was after I got convicted and
12   sentenced, but I hadn't went yet.
13        And he was just telling me like there is a thing,
14   it's called the wall.  Maximum security is the wall.  And I
15   don't care how brave you think you are or how crazy you think
16   you are, when you go on the other side of that wall, it's
17   different.  You know, it's not -- all that tough stuff goes
18   out the window.
19        And so he stressed that to me.  And he told me the
20   kind of things to avoid.  He said don't gamble.  Don't talk
21   smack about people behind their back and you'll do fine,
22   because that's the stuff where those are dead-end pathways,
23   you know.  So I took that to heart.
24   Q.  When they -- where did you go between your conviction and
25   Joliet?

A. Gray - direct by Loevy

577

1    A.   Between my -- oh, so after -- all right.  I had been

2    sentenced, and I was waiting to go to the joint.  And usually

3    they're snappy about it, a couple of days, you know.  And I

4    had been there like a week after I was sentenced.  And so I

5    went and I found a white shirt, a lieutenant.  And I told him

6    my situation.  And he turned around -- or he told me to turn

7    around and cuff up.  So I turned around and he cuffed me up

8    and then he took me, he took me to the hole.

9          And he explained it to me as like, you know, because

10   you got sentenced, you might be, you know, susceptible to

11   doing something to somebody, who knows.  So then they isolated

12   me out.  And then whenever, a couple days later, they put me

13   on a bus.

14   Q.   And what do you remember about the bus ride to Joliet?

15   A.   I don't remember.  Just sitting on the bus.  Guys back

16   then, you could look out the window.  So they're driving down

17   the highway, you could look at the people in the cars a little

18   bit.  You can't do it now.  Now it's they got them things you

19   can't see nothing.  They're real bad now.  But you used to be

20   able to look out the window like a person, like a normal

21   person on the long drive to the prison.

22   Q.   All right.  You said later, when you've been incarcerated

23   for longer, they took that away?  What is it like now?

24   A.   Yeah, they modernized the buses.  And now it's like it's

25   solid steel on the inside.  Everything is steel.  So you don't

A. Gray - direct by Loevy

1    see nothing.

2    Q.   Is that a humanizing or dehumanizing experience?

3    A.   Oh, it's awful.  It's terrible.  If you are sitting on the

4    bus, and you can look out the window and look at people, you

5    know, you can see stuff and it's normal, you know.  But even

6    if it's crazy, it's sort of normal.

7             But when they just put you in there, and it's guys

8    and guys and guys all in there, and it's black, just it's all

9    steel, you don't get to see nothing, you're just seeing the

10   guy in front of you.  And you don't talk.  You can't -- they

11   don't let you talk.  It's nothing.  You're just in there,

12   cattle cars, one destination to the next.

13   Q.   And do you feel as you are getting disconnected from the

14   outside world if you can't even see it when you are in

15   transport?

16   A.   Yeah.  Those things are bad.  Those things mess with you,

17   I think in my opinion.  It messed with me.

18   Q.   As you are approaching Joliet, as you are entering the

19   Illinois Department of Corrections, what is Joliet?  What do

20   you see?

21   A.   The castle wall.  It's a castle.  That's what it looks

22   like.  And you drive through the portcullis of the castle.

23   And you see the guys standing up there, you know, with the

24   sunglasses and the shotgun, like TV, you know.

25             And then you get a little deeper in there, and then

A. Gray - direct by Loevy

579

1    you start seeing guys on the yard and people moving around,

2    inmates, and it's some real stuff to see.

3    Q.   Were you one of the youngest and smallest at that point in

4    the IDOC?

5    A.   Yeah.  There were other young guys there, but yeah.

6    Q.   And what do you remember about the first -- the shower

7    house on the first stop there?

8    A.   Yeah.  So the shower house in Joliet, it's kind of hard to

9    describe.  But it's big.  I would say almost comparable to

10   this room.  I don't know if it's this big, but it's big like

11   this.  And the showers are straight up above.  And then they

12   file down straight down, and they're in like rows.  So it's

13   like five or six showerheads, five or six showerheads, you

14   know, and they're high.  But coming straight down like that,

15   it's like raining, but it kind of messes with you, how you can

16   see clear, you know.  And so it's a little dangerous.  And

17   it's steamy.  And so it's not a safe place to go take a

18   shower.

19   Q.   And you spent a bunch of years in Joliet, and then you

20   went where?

21   A.   Yeah, I was in Joliet like five and a half years.  And

22   then I went to Stateville when they closed Joliet.

23   Q.   What's Stateville?

24   A.   Another maximum security prison in Romeoville.

25   Q.   Is that an escalation or a deescalation?

A. Gray - direct by Loevy

580

1    A.   It was an escalation.

2    Q.   What do you mean?

3    A.   Joliet -- so back then there was four max joints.  You had

4    Stateville, Pontiac, Menard and Joliet.  Of those four, Joliet

5    was the least dangerous.  And young guys that would come in

6    with murder cases or whatever, little small like me, right,

7    they would house them there.  And you might make your way to

8    another joint.  But, you know, they kept the younger, smaller

9    guys there so they didn't go to the big joints, the big,

10   harder joints.  And you also had like guys that were rats from

11   the big joints that couldn't be there no more, so they put

12   them in Joliet.

13          And so it was a weird mix, but it wasn't as harsh as

14   Stateville, Pontiac or Menard.  And so going to Stateville,

15   now we're going into again it's another dimension of

16   escalation, I think that's the word.

17   Q.   What kind of inmates in Stateville?

18   A.   90 percent of them are never going home, natural-lifers

19   with multiple murder bodies stuff kind of thing, almost

20   everybody.

21   Q.   What kind of crimes, the people you would have to

22   encounter in there?

23   A.   Mostly murder of every way, shape or form, murder, rape,

24   child molesters, child molesters that killed their victim, you

25   know what I mean.

A. Gray - direct by Loevy

1   Q.   Were there some heinous crimes?

2   A.   Yeah.

3   Q.   And you interacted with them?

4   A.   You've got no choice.  You're sitting down with whoever is

5   sitting down there.  You're rubbing elbows and having

6   conversations with these guys.

7   Q.   Now, if someone is in there for natural life, does that

8   make them more dangerous in some ways?

9   A.   Yes.

10  Q.   Why is that?

11  A.   They're never getting out.  You play with that bull if you

12  want to.

13  Q.   People have nothing to lose, they act differently?

14  A.   They have nothing lose.  Yeah, they will, they will show

15  you the gravity of that.

16  Q.   And in Stateville, were there dayrooms?  Or where do you

17  spend your time in Stateville?

18  A.   In the cell.

19  Q.   How many hours a day?

20  A.   All of them, except like they had yards occasionally.  But

21  Stateville is lockdown oriented.  So like if somebody gets hit

22  in the head somewhere, they lock the joint down for 30 days,

23  you ain't going nowhere.  And so on a given year in

24  Stateville, you're locked down seven, eight months a year.

25          And so when you're off lockdown, it's like it's

A. Gray - direct by Loevy

1   interspersed.  It's not like you've got four months or five

2   months off.  It's interspersed.  But most of the time you're

3   on lockdown.

4   Q.  And when you're on lockdown, you're in a cell 24/7?

5   A.  Yeah.

6   Q.  With how many --

7   A.  You got a cellie, you know.  If you got cash, you got a TV

8   or something maybe.

9   Q.  How big are those cells?

10  A.  They were bigger than Joliet, 6 by 11 maybe.

11  Q.  Is that bigger than --

12  A.  You could pace in them a little bit.

13  Q.  The jury box, how big would you say the jury box is?

14  A.  It depends on where we're at.  Like from there to there is

15  about 7 foot.  It's about 7 foot square I would guess.

16  Q.  And they put two men and what in that cell?

17  A.  Stateville is two-man cells.

18  Q.  And what else is in there?  What else fits?  What else has

19  got to fit?

20  A.  Stateville they've got, well, the bunk beds are, they're

21  affixed to the wall, you know, so they got the bunk beds.  And

22  then some, some -- sorry about that.

23          Some, some cells, not many, had a desk in the front

24  of the cell where you could like sit and write.  And there is

25  a toilet in all the cells obviously and outlets so you could

A. Gray - direct by Loevy
583

1    plug, if you got a TV or a fan, you could plug it in.  And
2    that's it.
3    Q.  How long did you end up staying in Stateville?
4    A.  Eight years.
5    Q.  Was --
6            MR. LOEVY:  Your Honor, instead of starting a new
7    area, can we take a break now?  Thank you.
8            THE COURT:  We'll take our afternoon break until 3:00
9    o'clock.  All right.
10       (Jury out.)
11           THE COURT:  All right.  You can step down.  We'll see
12   you at 3:00.
13       (Recess from 2:43 p.m. until 3:00 p.m.)
14       (Change of court reporters.)
15      (Proceedings heard in open court.  Jury in.)
16           THE COURT:  All right.  Please be seated.
17           Okay.  Welcome back.  And if you need to open
18   anything up drink-wise, go ahead and do that now so it doesn't
19   get captured on the record with a little pop and fizz.
20           Okay.  We are ready to resume the direct examination.
21   Mr. Gray, do you understand you're still under an oath to tell
22   the truth?
23           THE WITNESS:  I do, sir.
24           THE COURT:  Okay.  Mr. Loevy?
25   BY MR. LOEVY:

A. Gray - direct by Loevy

584

1    Q.   All right.  You got to the IDOC at 17.  So how many years

2    did you end up spending in the Illinois Department of

3    Corrections?

4    A.   24 years and three months.

5    Q.   No, just in the IDOC part, not total incarceration.

6    A.   Not in juvenile and everything like that?

7    Q.   Right.

8    A.   From 17 to 38.

9    Q.   So 21 years in the Illinois Department of Corrections.

10   And we haven't yet talked about it.  I'm going to go much

11   faster on the violence in the IDOC, but was the IDOC again a

12   violent place to spend 21 years?

13   A.   Yes.

14   Q.   And were there times where you were attacked?

15   A.   Yes.

16   Q.   Was there a time, for example, you got thrown off the

17   deck?

18   A.   Yeah.  It was -- in the joint, depending on which joint,

19   but in Joliet, they had two-tier galleries.  And I had to

20   fight this guy that was a lot bigger than me, and I hit him a

21   couple of times, but he grabbed me and he tried to throw me

22   over the gallery, but I had just enough ninja in me to not get

23   killed falling down to the gallery below.

24   Q.   And what kind of weapons were there that you got -- that

25   people could attack you with?  Were people creative about

A. Gray - direct by Loevy

585

1  creating weapons?

2  A.  Oh, yeah.

3  Q.  How creative were they?

4  A.  They were creative.  I mean, it's not just knives.  You've

5  got all kinds of stuff, you know, blunt weapons.  The guys

6  will poison you.  They'll do all kinds of stuff in there.

7  Q.  Did you have to witness extreme brutality in addition to

8  being attacked?

9  A.  Yeah.

10  Q.  What kind of extreme brutality?

11  A.  I seen guys jumped all the time.  I seen this old, he was

12  like 60 years old, this lieutenant and a guy had -- a little

13  guy, a little tiny -- the lieutenant was like 6, 2 or

14  something.  He was a tall guy.  And this little guy was real

15  small.  He jumped and he caught him.  He caught him right on

16  the chin, and the old man fell.  And then this guy's buddy, he

17  ran and kicked that dude in the face like it was a football

18  right in the mouth, you know.  And that was like five feet

19  from me, and that's -- and that's par for the course kind of

20  stuff, you know.

21  Q.  Is it hard to witness that much violence for that long?

22  A.  I don't know.  It's all I know now.  I didn't have an

23  alternative experience to compare it to.

24  Q.  Was it dangerous to report things to the authorities?

25  A.  Yeah.  You don't do that.

A. Gray - direct by Loevy

586

1   Q.   Why not?

2   A.   Well, first of all, the staff will drop your name that

3   you're one of those guys, so then that circulates out.  And

4   it's just, you don't want to be -- you don't want that label.

5   Q.   In the IDOC, was there sexual abuse?

6   A.   Yeah.

7   Q.   Something called a booty bandit or some such thing?

8   A.   Booty bandits.  Every joint had multiple guys that were

9   raping guys.

10  Q.   Would you have to navigate your way?

11  A.   I mean, they existed but they generally -- again, most

12  rapes in prison are not like five guys strong-arming somebody.

13  Most of it is one-on-one, and a guy works a guy

14  psychologically.  Like, he's in the cell with him, and he just

15  puts the pressure on him until gets him to break.  So that's a

16  booty bandit, is they get you in the cell and then they work

17  you until they rape you, and then that's your fate.  And I

18  seen that many times.

19  Q.   Did you have all kinds of cellmates over the years?

20  A.   I did.

21  Q.   Did you have some that you liked?

22  A.   I had a lot that I liked, quite a bit, and I had a lot

23  that I didn't like at all.

24  Q.   Was it trouble when they were -- was it dangerous if you

25  didn't like them?

A. Gray - direct by Loevy

587

1    A.   Yeah.  I had -- yeah.  I had a bunch of guys that I had to

2    either threaten to not create a situation or I just get moved

3    or I try to get them moved or whatever.  You got all kinds of

4    situations like that.

5    Q.   All right.  Were there some guys you bonded with a little

6    bit?

7    A.   Oh, absolutely.  You can't help bonding with somebody when

8    you're on the frontline of that kind of experience and you got

9    other people that were shared experiences.  Yeah, you bond.

10   Q.   Who were some of the cellmates that you had formed bonds

11   with?

12   A.   Well, my father.  My father was my cellmate for a while.

13   Q.   And let's back up there.  Your father was arrested before

14   you were born, correct?

15   A.   Yeah.

16   Q.   Was that unusual in your neighborhood?

17   A.   For -- to have a father get arrested?  No.  To be in

18   prison?  No.

19   Q.   Was it a --

20   A.   It wasn't common, but it wasn't abnormal at all.  I wasn't

21   the only kid in the neighborhood with a daddy in jail.

22   Q.   All right.  And you actually intersected with him for a

23   period of time?

24   A.   Yeah, yeah.  He was in Pontiac originally and then when

25   they closed Pontiac and he came to Joliet, and then we were in

A. Gray - direct by Loevy

1   Joliet.  And then they closed Joliet and we all went to

2   Stateville.

3   Q.  All right.  Was it, how about some of the other cellmates?

4   A.  Yeah, I had a lot of -- I had 1,000 cellmates.  I don't

5   know.  But I had guys that I bonded with as friends, you know.

6   I don't know.

7   Q.  All right.  I want to talk a little bit about the

8   indignities of those 21 years, the indignities of prison.  Is

9   there privacy in prison?

10  A.  No.  No.

11  Q.  Is it tough to live without privacy?

12  A.  Yeah.  It's -- yeah.  I mean, yeah.

13  Q.  Even something as simple as using the bathroom, tell the

14  jury how you do that.

15  A.  So the prison system was a little easier and they treated

16  you a little bit more human in the '90s than they did later on

17  than how they do it now.  Back then, if you had to go number

18  two, you could take a bedsheet and hang it up, and then your

19  cellie can go stand by the bars and you go to the back of the

20  cell, you go do your business, right.  He don't see you.  You

21  don't see them.  Anybody walking by in the gallery, they don't

22  see nothing either so, you know, it has privacy.

23          But then the guards, they don't want you to hang up

24  sheets no more, right.  And if you do, you go to the hole or

25  whatever.  So then now it's, now you're sitting there doing

A. Gray - direct by Loevy

1   number two open air.  And anybody walks by, man, woman,

2   anybody, they're seeing you there.  And so that's your

3   experience of that.

4   Q.  Did the toilets always work at Stateville?

5   A.  No, no.  Oftentimes the -- no, the toilets didn't always

6   work.  It wasn't like a super common thing but we had, like,

7   three or four days without water once or twice.  I don't know

8   how many times.

9          But what would happen in the scenarios where there's

10  no water, and Stateville -- Joliet is two galleries, right,

11  high.  Stateville is five.  So it's five tiers of guys.  And

12  when there's no water, five tiers of guys, one cell house is

13  29 cells, I think, they -- they don't keep the stuff in the

14  cell with them, so they throw it.

15         And so, you know, they'll bag it up, and they'll

16  throw it out there and throw it through the bars.  And then it

17  will go all the way down five flights of stairs, and then the

18  four flights of stairs, and then the three flights of stairs

19  guys, and everybody else.

20         So for three or four days, you got raining bags of

21  feces and pee that just -- the staff ain't cleaning it because

22  they don't want to clean that stuff either.  So the cell house

23  gets pretty putrid pretty quick.  And maybe we come off

24  lockdown to get some inmates to come clean all that stuff.

25  Q.  How about, are there times when you didn't have access to

A. Gray - direct by Loevy

1    a bathroom when you were in prison at all?

2    A.   I mean, there's a lot of instances where they'll make you

3    hold your pee, right.  And some of them are bad and torturous

4    and they shouldn't do.

5         And a lot of scenarios, like I can describe one where

6    we were on lockdown, and they shook down the whole joint.  A

7    shakedown is they're going in every cell, strip search, going

8    through every piece of paperwork you got for everybody, right.

9    And it's a big thing.  It's a big stressful event.

10        And they don't -- they don't broker no nonsense when

11   they come through on that stuff.  They got a thing called

12   Orange Crush which are tactical unit guys dressed in orange

13   jumpsuits, and they come with oak sticks and shields, and they

14   manage everyone.

15        And on this instance that we're talking about where

16   basically they took us to the yard early in the morning so

17   that they could do the cell house at like, I don't know, say

18   8:00 in the morning, they got us all -- they got the whole

19   joint in these yards.  All everybody is handcuffed behind your

20   back.

21        And then we stayed there until about 7:00 o'clock

22   that night.  And there were guys that were peeing on themself,

23   guys that pooped on themself.  And we're just out there.  And

24   the guard, we were trying to get the guards but they're not --

25   they're all not wanting to get involved.

A. Gray - direct by Loevy

591

1    And but, yeah, so there are things like that.  I've

2    been on buses going to court and guys have had to urinate on

3    themselves.

4    Q.  They don't treat -- do they treat you like humans

5    sometimes?

6    A.  I mean, some guards are -- some guards are people, you

7    know.  Some guards will see you.  They're people and they're

8    not -- but it's the environment.  And so most guards are not

9    people.  Most guards are just there, and you're just an

10   obstacle and you're just a monster to be monitored, you know,

11   and...

12   Q.  How about the showers in prison?  Would you -- were they

13   dangerous and would you use them?

14   A.  Yeah, I used them, but they were dangerous, yeah.  They

15   are dangerous.  It is a source of danger, mostly for fighting

16   more so than the sexual stuff but, yeah, it is a source of

17   danger.

18   Q.  How about like at Joliet?  Were there stalls or --

19   A.  Joliet had different, like, they had the shower house I

20   already described, but they had other types of showers in

21   different cell houses and the honor dorm.  So there's all

22   kinds of different things.  Not stalls.  I don't think there's

23   any stalls there.

24   Q.  How about for those 21 years, how was the food?

25   A.  It was better in the '90s than -- I don't know.  About the

A. Gray - direct by Loevy

592

1     time Blagojevich took office, things started to deteriorate

2     pretty quick.

3     Q.   How bad did the food get?

4     A.   Oh, pretty bad, real bad, inedible.  I got food poisoning

5     a lot.  I almost died from food poisoning not too long before

6     I left Stateville.  I think I lost, like, 40 pounds in three

7     days.

8     Q.   Would inmates sometimes defile the food?

9     A.   Yeah.  They'd put feces into it.  They'd masturbate into

10    it.  They'd do all kinds of stuff like that.  They'd put blood

11    in it, you know, just to -- just some guys are messed up.

12    Q.   Would the inmates prepare the food in prison sometimes?

13    A.   Yeah.

14    Q.   And did it make you sick at least once?

15    A.   I've been sick, I had food poisoning so many times in

16    prison, it isn't even a joke.

17    Q.   And how bad did it get?

18    A.   The last one, they called it a norovirus, and they

19    quarantined the entire prison, and all -- and just about

20    everybody got it, one gradient of it or another.  And I got

21    the bad one.

22              And I said, I was so messed up, I couldn't drink

23    water.  If I drink water, it was glass.  It felt like glass

24    shards going through my whole system.  I couldn't drink water

25    for I don't know how long.  And I was messed up for months and

A. Gray - direct by Loevy

593

1    months and months.  I'm still messed up today.

2    Q.  All right.  I don't want to belabor the food, but you said

3    it was bad.  What did you eat?  What is food?  Would you get

4    food or you get, like, soy products?

5    A.  It used to be -- well, again, we're talking about timing,

6    where we're at on the timeline.

7    Q.  Say when it got bad.

8    A.  '90s, it was more or less normal food.  It wasn't quality,

9    but you'd get food.  You'd get meat.  You'd get hot dogs.  You

10   know, you'd get fried chicken once a week or something, you

11   know, and you could buy stuff in the commissary, you know.

12   But for the most part, they fed you quite adequately in the

13   '90s.

14            And then when they introduced all this soy trash and

15   it's, like, so you take ground beef and you cut it and it's 70

16   percent soy, it don't look much like ground beef no more.  It

17   looks white, and it tastes god awful.  So that became our

18   usual food.

19            And so they take this soy Frankenburger stuff and

20   they turn into Polish sausages and they turn it into meat

21   patties and they throw it on your thing.  And you eat it or

22   you don't -- you eat it or you don't eat, you know.

23   Q.  How about the water?

24   A.  The water in Stateville, when I got to Stateville they

25   give you a flyer that says, "There's radium in our water, but

A. Gray - direct by Loevy

594

1    it's just, just exceeding the EPA level requirements" or

2    something like that, parts per million.

3            Anyway, yeah, it tastes awful.  All the water comes

4    out of them things, it's always rusty.  The water, you push

5    the button, it comes out rusty and nasty, and that's what you

6    drink.

7    Q.   Were there temperature issues in prison?

8    A.   Yeah, all the time.

9    Q.   And you mentioned -- which was worse?  Cold or hot?

10   A.   I think hot was always worse than cold because cold, you

11   could put something on.  Hot, you're just laying there.

12   Q.   How bad did the heat get?

13   A.   Real bad.  I mean, depending on where you're at, it gets

14   bad.  It's not like you're sitting there, you know, under AC

15   all day.  Ain't no AC in the cell house.  So it's hot.  You

16   know, you make do.  You can buy, like, a personal little fan

17   or something to have on you.  But when it's 95 outside and

18   you're inside a steel and concrete building, it get pretty

19   toasty and wet in there, you know, humid.

20   Q.   There's no air-conditioning?

21   A.   At different points early, no.  There's no

22   air-conditioning in the cell house.  There's just windows.

23   Q.   If it's 95 outside and there's no air-conditioning, how

24   hot would it get in the building?

25   A.   It would get pretty bad.  It gets pretty bad.  Like, the

A. Gray - direct by Loevy

1    walls sweat.  You could lick the wall, you know.

2    Q.   What would inmates do?

3    A.   Endure.

4    Q.   Was it -- I'm a cold person, but so if it's, like, cold

5    and it's not getting warm, is there any way to heat up?

6    A.   You can pace, you know.  You can exercise.  You can put

7    clothes on, you know.  I -- anyway...

8    Q.   What would make it cold?

9    A.   When I -- I was in seg at one instance, and whenever

10   somebody would light a fire on the gallery -- in seg, guys, a

11   lot of crazy guys out there and do stuff.  And these guys

12   would light fires back there.  And whenever somebody would

13   light a fire, the system would catch the smoke or whatever,

14   the alarm would go off, and then all the windows would flare

15   open, right, on the cell house, and then that would let the

16   cold in, right.

17          And so I was in seg during the winter, and the guards

18   got tired of putting out the fire, closing the windows, and

19   then some other guy lights another fire, cracks open the

20   windows, you know.  So for the winter after they did this back

21   and forth and these guys were lighting all these fires back

22   there, they just left them open for the rest of the winter, so

23   it was cold all winter.

24   Q.   How cold would it get?

25   A.   Me and my cellie put on all our clothes, like three pairs

A. Gray - direct by Loevy

596

1    of pants, three shirts, all your socks, your boots, your

2    jacket, your blanket.  And then me and him climbed up in the

3    top bunk, and we would sit up there and play cards.  That's

4    how cold it was.

5    Q.   Was there diseases in prison?

6    A.   Yeah.

7    Q.   What kinds of diseases?

8    A.   AIDS, hepatitis, TB, MRSA.  I think that's the main batch.

9    Q.   How was the medical care?

10   A.   Grossly inadequate.  They don't care.

11   Q.   Did it create problems for you?

12   A.   There's instances where it has.  I had an ear infection

13   that I had trouble getting treated, and I thought it was

14   starting to get real bad in my ear.  And I had to kind of make

15   a big fuss to get somebody to come down there to get me

16   some -- to try to get some antibiotics.

17   Q.   Was there religion in prison for you?

18   A.   Not for me, no.

19   Q.   As growing up, did you have some religion?

20   A.   Yeah.  I was a Christian when I was little.

21   Q.   And how was your relationship with God over this whole

22   situation you got going here?

23   A.   When I was in the juvenile stuff, I tried -- I tried to

24   pray.  I tried to get involved with God.  And my ma brought

25   me, she brought me, like, our family Bible, a big one, black

A. Gray - direct by Loevy

597

1    leather one.

2              And then she gave me, like, the comic book version,

3    right, where it's got, like, it's the whole Bible, but it's a

4    big comic book Bible so you can kind of read it and see what's

5    going on.  So I read through all that stuff.  And my ma was

6    always trying to encourage me that.

7              But what I wanted was to go home, and I wasn't going

8    home.  And so the God, my relationship or whatever I thought I

9    was going to get out of God or praying to God to stop this, it

10   didn't happen, and so I became resentful to God and I

11   didn't -- I lost religion.

12   Q.  How about loneliness?  Is there loneliness in prison?

13   A.  Yeah.  Yeah.

14   Q.  Are you a person who cries easily?

15   A.  No.

16   Q.  Did you cry in prison sometimes?

17   A.  Occasionally.

18   Q.  Is it a good idea to show weakness in prison?

19   A.  It is not.  I'm crying, I'm crying alone, ain't no cellie

20   in there.

21   Q.  How about the holidays in prison?

22   A.  In the '90s, again, there were -- the people that ran the

23   prison system were better in the '90s because they gave you

24   stuff.  Christmas comes around, they're coming and giving you

25   socks, T-shirts.  They're feeding you.  They want to feed you.

A. Gray - direct by Loevy

1          Like, all these religious groups would come to the

2     prisons and donate stuff and just try to engage and interact

3     with the inmates.  But again, it petered off, and they kept

4     dehumanizing the prison population more and more and more.

5     And they don't do none of that stuff no more.  They get dirt.

6     They get nothing --

7     Q.  Did --

8     A.  -- for any of the holidays.  They used to do it for all

9     the major holidays.  You know, like, 4th of July, they might

10    have a -- you go to the chow hall, they give you hamburgers

11    and hot dogs, go out in the yard and have fun.  They didn't

12    care.  It was -- being in the house, like, you're not getting

13    nothing nowhere.

14    Q.  Were they hard, the holidays, Christmas, Thanksgiving?

15    A.  The major ones, yeah, back then.

16    Q.  Why?

17    A.  Why did they honor them?

18    Q.  No, why was it hard to be --

19    A.  Oh, I'm sorry.  I didn't --

20    Q.  -- having Christmas and Thanksgiving in prison?  I guess

21    it's kind of an obvious question.

22    A.  Well, for me it was -- Christmas for me and my family was,

23    that's when we were at our happiest.  You know, we go to my

24    grandma's house, and everybody's there and everybody's eating

25    good food.  And it's all my cousins and all my aunts and

A. Gray - direct by Loevy

599

1   uncles, and everybody is having fun.

2          And my first Christmas that rolled around, it was

3   heartbreaking.  And then my second Christmas rolled around,

4   and it was heartbreaking but -- and then my 15th Christmas

5   rolled around, and I didn't feel that no more and it's...

6   Q.  I'm going to ask you about a hard subject, and if you

7   don't feel comfortable, you won't talk about it.  But your sex

8   life, you know, you went away very early there.

9          Was it healthy to go -- was there any sex, you know,

10  with women in prison -- or I'm asking bad questions.  Was this

11  hard on your sex life?

12  A.  I didn't have sex until I was 38.

13  Q.  All right.  Was that hard for you?

14  A.  Yes.

15  Q.  Is it good for, you know, a young man and a medium man to

16  repress sexual urges for that all through your 20s and 30s?

17  A.  No.

18  Q.  What does it do to a person?

19          MR. NATHAN:  Objection.

20          THE COURT:  Yeah, you do need to reformulate it so

21  it's more direct.

22  BY MR. LOEVY:

23  Q.  All right.  To you, sir, what did you experience from not

24  having sex with women for that -- your life?

25  A.  It messed with me my whole life.  That's like a, I don't

A. Gray - direct by Loevy

600

1    know, rite of passage.  I'm a half tough guy in my own

2    imagination, right.  So it's, like, I got all of these -- I

3    don't know.  It messes with you hard.  I don't know how to --

4    I don't know.  I don't know how to describe it.

5    Q.  Were you -- did you repress the urges?  What did you do

6    with the urges in prison?

7    A.  Oh, no, you're masturbating in prison.  You ain't

8    repressing nothing.

9    Q.  Were there women at all in prison?

10   A.  There was -- I mean, some of the guards, and every blue

11   moon some guy might sweet talk some girl into something, but

12   that is unlikely and extraordinary cases.

13   Q.  Did they allow conjugal visits with girlfriends from the

14   outside in the prisons you were in?

15   A.  No.  There's no conjugal visits in Illinois.

16   Q.  Did the lack of access to sex make the inmates act out?

17   A.  Most certainly.

18   Q.  All right.  Did it bother you to be approaching 30 and

19   then beyond without any sexual experience?

20   A.  Yes.

21   Q.  All right.  Let's talk about people that you could relate

22   to.  Did you find some people in prison -- were there people

23   in prison like you who were innocent?

24   A.  Yes.

25           MR. NATHAN:  Objection.  Foundation.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 226 of 288 PageID #:21394
A. Gray - direct by Loevy
601

1      THE COURT:  Sustained.  You can probably reformulate

2   it, though.

3   BY MR. LOEVY:

4   Q.  Yes.  Was there -- did people who were professing

5   innocence gravitate toward each other or not?

6   A.  Generally, yes.  There's some negotiating there because if

7   somebody says they're innocent, you've got to kind of -- some

8   guy in the joint tells me they're innocent, right, I'm looking

9   at them skeptical, and I'm innocent, right.  So they're

10  looking at me that way too, and they're looking at the third

11  guy who says he's innocent as well.

12      But you talk, right.  You talk and you start to see

13  that this guy has got some of the same pain I got, and you

14  know you don't fake that, right.  So you see that.  And then,

15  you know, you start talking and you can relate.

16      And, yeah, so I believe those guys, and I've seen

17  some of those guys actually establish their innocence and go

18  home just like me.

19  Q.  How did that make you feel when guys would get exonerated

20  and go?

21  A.  It was bittersweet, man.  I see my friends go, and it's

22  not me and it's never going to be me, so that shit hurts.

23  Sorry.  I swore.

24  Q.  Did you make some close friends in prison?

25  A.  Yes.

A. Gray - direct by Loevy

602

1    Q.  People that you're -- how many are you still tight with

2    today?

3    A.  I don't know.  Five or six maybe.

4    Q.  What are some of their names?

5    A.  Philip Johnson, William Carlson, Edward Barkowskas,

6    Anthony Walsh, Joseph Arietta.

7    Q.  Were they professing their innocence?

8                MR. NATHAN:  Objection.  Hearsay.

9                THE COURT:  Because of the formulation of the

10   question, it's not objectionable on that basis.  Go ahead.

11   BY MR. LOEVY:

12   Q.  I don't want you to get anybody in trouble if that's

13   awkward.

14   A.  No, no, no, that's not -- I've just got to think here for

15   a second.  Phil was guilty.  I think they were all guilty.

16   Yeah, I'm pretty sure -- I'm not positive on that.  I don't

17   recall having innocent conversations hardcore with any of

18   those guys.

19   Q.  All right.

20   A.  I'm pretty sure I can map -- if I dig deep enough, I could

21   probably retrace what they were telling me about their cases

22   or whatever.

23   Q.  All right.  Did -- have you maintained contact with them?

24   A.  Off and on, sometimes, yeah.  It's hard, though, because

25   I'm out here now.  And honestly, for me it's like -- I feel

A. Gray - direct by Loevy

603

1    like I left them behind in a bad way.  Like, I got -- I got

2    guilt getting out, feeling, you know, like I'm leaving these

3    guys in there, you know, and it messes with me.

4          And so when I'm writing, if I get a letter -- or they

5    got this email system.  You can email guys, right.  So I get

6    emails from them.  We're not talking about nothing, just dumb

7    stuff, but for me, it's like a tether.  It's a tether back to

8    prison.  They tell me a story and it's, like, oh, I'm back in

9    prison with this guy.  And so it's, like, hard.

10          And I feel bad that they ain't got nobody, so I'll

11   still -- they are my friends and I communicate with them, but

12   it's also, I communicate with them and I'm still in prison,

13   you know.  And it's -- so it's like they're my friends and I

14   love them but they also, just by being my friends and I love

15   them, it causes me pain too.

16   Q.   All right.  Let's talk about your education.  Did you ever

17   end up going to high school at all?

18   A.   No.

19   Q.   And once you got to -- was there high school available to

20   you in the Illinois Department of Corrections?

21   A.   You can get a GED.

22   Q.   Is that what you did?

23   A.   Yeah.

24   Q.   And what does that mean?

25   A.   When I got to Joliet, they have, like, an entrance test

A. Gray - direct by Loevy

604

1   you got to take.  And it gives you a rough calibration on what

2   you know, like, your math skills or your reading skills.  And

3   if you -- if you're basically above a sixth grade level,

4   you're okay and you can go and you're fine.  But if you're

5   below, like, a sixth grade level, you've got to take mandatory

6   classes.

7           So I scored high.  And then because I scored high, I

8   wanted to take a GED.  So I was talking to the -- whoever, the

9   proctor.  And I said I don't want to go to school or nothing,

10  so they just let me take the test, and I took the test and

11  passed.

12  Q.  Was there a graduation ceremony?

13  A.  If there was, I didn't go.

14  Q.  Did you pursue more education in prison?

15  A.  Yeah.  I took some college classes until they took them

16  out of the prison.

17  Q.  What were the classes you took, and tell us about that.

18  A.  So you had college in prison for guys, and a lot of guys

19  would utilize it and they -- I knew guys that got all kinds of

20  degrees in prison and just -- they just love that.  They just

21  love going to school and doing that kind of stuff and

22  learning.

23          But I took -- I took, like, four college math

24  classes, you know, algebra, that kind of stuff.  And I took

25  political science and biology, philosophy.  I don't know.  I

A. Gray - direct by Loevy

605

1    got, like, 30 credits or so.  I don't know.

2    Q.  What did the prison system do to the college education?

3    A.  Well, I don't know if it was the prison system or the

4    State, but my understanding is they used to have -- they were

5    funded through grants.  And the grant condition changed, and

6    if you had a life sentence, you could no longer go to

7    prison -- or, I'm sorry, you could no longer go to school in

8    prison or to college in prison if you had a life sentence.

9    Q.  So they had college, but you weren't eligible?

10   A.  Yeah.  I got the boot.  I think I stopped going before

11   they did it anyway, though.  I kind of -- I was fed up with

12   it.

13   Q.  All right.  I think I want to cover one more subject in

14   prison.  And you sort of backed away from it when I asked you

15   that question before, but I want to double back to it about

16   your mother.

17           Did your mother make sacrifices that affected you,

18   sacrifices?

19           MR. NATHAN:  Objection.  Form.  Motion.

20           THE COURT:  Okay.  The objection is overruled.  I

21   will just instruct the jury that the -- there's no issue at

22   trial with regard to compensation to any family members or

23   anyone else, and it's -- the only decision you'll have to make

24   if you find liability as to damages is the emotional distress

25   and physical distress that the plaintiff might have felt.

A. Gray - direct by Loevy

606

1    Okay.  So with that instruction, you can go ahead

2  and ask the question again so that it's all clear that it's

3  about how it affected the plaintiff.

4  BY MR. LOEVY:

5  Q.  Did you observe sacrifices by your mother that caused you

6  distress?

7  A.  Yeah.

8  Q.  What were those sacrifices?

9  A.  My ma, she might have made $20,000 a year, and she made

10  it -- she did all that she could to try to either send me

11  money or come down to visit all the time, spending every

12  dollar she had for that.  And to me, because that's what we're

13  talking about, what that is to me, it don't feel right.  It

14  don't sit right because it's not -- it's not just, like -- I

15  don't know.  I don't know how to answer that, Jon.  That's the

16  best I can do, man.

17  Q.  Was it hard for her to get to these prisons?  Where were

18  they geographically?

19  A.  We didn't have a car, so she either had to hitch a ride

20  with somebody else or sometimes like at Stateville, they take

21  the train and the bus to get down there and back, you know.

22  So you've got to spend money to do that and then...

23  Q.  All right.  As the years went on, sir, did you reconcile

24  yourself and make peace with spending your life in prison?

25  A.  Yeah.  Somewhere, somewhere in there, I -- I think I was

A. Gray - direct by Loevy

607

1    locked up 18, 20 years, and I just -- I had to face the dark

2    reality that I'm here and I'm never getting out.  And so,

3    okay, I'm here.  This is my life now.  I'm never getting out.

4    I'm in here for something I didn't do, but don't nobody care

5    about that no more neither really.  And so, yeah, this is it.

6    This is how I'm just going to live now.  I'm going to do my

7    thing, I guess.

8    Q.   Did that give you more peace or less peace?

9    A.   It gave me a little bit of peace but I felt kind of,

10   like -- I don't know, like I lost a dimension of myself.

11   Q.   Did you suffer institutionalization, if you know what I'm

12   talking about there?

13              MR. NATHAN:  Objection.  Foundation.  Calls for --

14              THE COURT:  Why don't you try to define the term and

15   then ask.

16              MR. LOEVY:  All right.  Your Honor, can I ask him his

17   understanding of it, or do you want me to try myself?

18              THE COURT:  You can ask him that question.

19   BY MR. LOEVY:

20   Q.   How would you -- are you familiar with that concept, or

21   how would you describe it?

22   A.   Yes, I am familiar with the concept.  I don't think I am

23   exceptionally institutionalized.  I have seen guys that go

24   down there, and you lose your soul there so...

25   Q.   Talk a little slower and louder.  Guys that what?

A. Gray - direct by Loevy

608

1   A.   Guys that get institutionalized, they don't got a soul no

2   more.   They're gone.   Okay.   So it's, like, they're there,

3   they're going through the motions, but there's not much there

4   left, I don't think.

5          It's hard to -- it's hard to bridge.   There's a

6   bridge of language here.   I've got to get you, but I don't

7   know how to get there.   But the guys that get real

8   institutionalized, there's not much left to them.   And then

9   they become too comfortable with their routine, right, and so

10  that's what it is.   They become kind of too comfortable,

11  almost OCD about it.   And so if the routine breaks, now

12  they're kind of -- they don't know how to handle stuff.

13         So I don't have that necessarily, right, but I can

14  see elements of that that I have.

15  Q.   When did you stop trying to kill yourself, at what point

16  in the process there?

17  A.   Oh, I would guess in the '90s, late '90s, somewhere in

18  Joliet.   I don't remember, though, exactly when.   I think the

19  last time is when I took a bottle of aspirin.

20  Q.   That was in prison at that point?

21  A.   Yeah.

22  Q.   Are you done trying to kill yourself?

23  A.   Oh, I never wanted to kill myself to begin with.   I was

24  trying to kill myself because I didn't want to be in prison

25  for something I didn't have anything to do with.

A. Gray - direct by Loevy

609

1  Q.  Now, I want to talk about the bonds in your life.  Besides

2  your -- does prison sort of break the bonds with people that

3  were in your life?

4  A.  Yeah.  You're out of sight, out of mind.  That's it.

5  You're out of sight, out of mind, easily.  The people that

6  really care about you, they ain't going nowhere.  They love

7  you.  But everybody else is, like, you're a phantom.  You're

8  gone.

9       Your -- I mean, most of your friends, like I say, if

10  they love you, they love you, they're there, but a lot of

11  people just, you drift.  You can't stay connected.  My life

12  experiences -- one of my best friends, I had two best friends,

13  one Robbie, one Mel.  And Robbie, I met him when I got out.

14  We stayed in contact off and on but it's, like, your life

15  diverges so much that you can't relate no more.  This was my

16  best friend, you know, for years and we -- we talked and we

17  were friendly and everything, but you could see he's a

18  different person.  And I'm on the other side of the world, you

19  know, in terms of experience.  So it's hard to relate, you

20  know.

21       Even now, I go out there, I chat with some random guy

22  up on the street, it's hard to relate because you don't got

23  the same experiences I got, you know.

24  Q.  Did you find that people were willing to invest in people

25  that were never going to get out of prison, invest

A. Gray - direct by Loevy

610

1    relationship-wise?

2    A.   Yes, believe it or not, yeah, because that's not -- just

3    because you're never getting out don't mean you're a crumb

4    bum, right.   There are some guys, they do quite -- some guys

5    could be real bad villains, but they get in there and time,

6    time will modulate you.

7          And I've seen guys that became really good, really

8    good guys.   And sometimes they find a woman.   They get

9    married, you know, or there's all kinds -- yes, they have --

10   those experiences do occur.

11   Q.   Who did you stay connected with then?   Who in the outside

12   were you able to keep a connection with?

13   A.   Over all this time?

14   Q.   Yes.

15   A.   I mean, over time, I got -- I stayed in contact with Mel

16   off and on.   Mel ended up killing himself at one point.

17         But Robbie off and on, my buddy Rob.   I stayed in

18   contact with my family off and on, you know, because sometimes

19   I get mad or whatever and I wouldn't want to write nobody.

20   I'd start ignoring people just because I'm pouting.

21         And Natalie, Denise, they'd come in and out, right.

22   And, like, the last couple years I was in prison, Natalie was

23   visiting a lot.   Natalie and Denise would come visit me a lot

24   and my brother Mike.   And Rebecca George, she'd come up there.

25   Q.   We'll talk about her in a minute.

A. Gray - direct by Loevy

611

1          Did you miss life events, people dying and, you know,

2     life events?

3     A.   Yeah.  It was kind of hard too because my grandfather

4     died, my grandmother died all in that first couple years of me

5     being locked up.  And I don't get to go to no funerals.  I get

6     a picture from the funeral maybe.  I didn't get none of those

7     experiences.  A lot of my family died while I was in there.  I

8     mean, most of my uncles died.

9     Q.   All right.  Were there some efforts to overturn your

10    conviction, an appeal?  You heard Ms. Mascherin talk about

11    appeal, a direct appeal, a post-conviction.  Were you engaged

12    in trying to do something about this?

13    A.   Really, I mean, the appeal process, when you get -- when

14    you get to prison, right, you don't know nothing, right.  You

15    don't know nothing.  You get to prison, "Oh, I'll go home on

16    appeal."  Everybody thinks that.  All right.  It is immature

17    to think that because that's one in a million that your appeal

18    has any chance of landing right.  So you ain't going nowhere,

19    but everybody thinks that.

20         And so I thought that.  And so I spent some time in

21    the law library, and I got assigned up there.  And I'd go to

22    the law library five, two, seven days a week.  And I'd be up

23    there all day, you know, eight hours a day, and I started

24    learning.  And I did that for about six months, and I got fed

25    up.  I saw I was going nowhere.

A. Gray - direct by Loevy

1    And while this is going on, the appeals are dropping

2 off, right, because reality sets in, and those appeals don't

3 go nowhere.  And so when that started happening, I gave up and

4 I threw out all my transcripts and all that.  I said, eh,

5 screw that stuff.

6 Q.   What was the turning point?  Were you contacted by someone

7 who took an interest in the case?

8 A.   Yes.

9 Q.   Who was that?

10 A.   That was Rebecca George, the art teacher from the juvenile

11 center.

12 Q.   Someone from when you were locked up in the juvie center,

13 you were struggling, there was that one teacher of art who

14 tried to reach you?

15 A.   Yeah.

16 Q.   How did she reconnect with you?

17 A.   So I had been locked up -- this is probably, like, '02,

18 '03 now, and I was in Stateville.  And I got a letter, you

19 know.  It was from her.  And she tells me she's writing a

20 book, a compilation book because she used to teach a lot of

21 the other kids in the juvenile, right, and so -- and she

22 stayed in contact with them.

23    And so a lot of the kids that were in juvenile, they

24 were fighting adult cases and went to adult prisons.  And so

25 she stayed in contact.  And her book that she was putting

A. Gray - direct by Loevy

1    together was, like, letters from them that she had

2    accumulated, right, of all -- in all shapes and sizes.  And

3    she wanted me to participate in the book.

4            And so I wrote her back.  I said, "F you.  You didn't

5    believe that I was innocent.  I don't want nothing to do with

6    you."

7            And my understanding is that that kind of piqued her

8    interest because all the other kids who previously claimed to

9    be innocent had since declared their guilt to her now that

10    they were down, you know, down where they were down to and --

11    Q.  She took an interest in your case, though?

12    A.  Yeah.

13    Q.  And then what did she start doing?

14    A.  She started asking questions.  She started looking around.

15    Q.  And did she start investigating a little bit?

16    A.  Yeah.  I think she -- yeah, I guess.  I guess that is an

17    accurate word to characterize it, yes.

18    Q.  How would you characterize it?

19    A.  Well, she first just started asking questions.  I think

20    she talked to my ma.  She talked to me.  It was just, she was

21    perplexed, you know, and figuring out what's what.  And then,

22    like -- I don't remember the exact data point, but something

23    from my mom or somebody, a letter, I think the Hope Rogers

24    because somebody said Hope said she saw somebody --

25            MR. NATHAN:  Objection.  Foundation.  Hearsay.

A. Gray - direct by Loevy

614

1          THE COURT:  Sustained.  Move on.

2     BY MR. LOEVY:

3     Q.  Sure.  But she started talking to people?

4     A.  Yes.

5     Q.  And she took an interest in the case?

6     A.  Yes.

7     Q.  Did lawyers start getting involved?

8     A.  Eventually.

9     Q.  And did any of the witnesses actually come visit you?

10    A.  Kasey did.

11    Q.  Do you remember what year it was that Kasey visited you?

12    A.  She came twice.  I don't know exactly how far apart.  I

13    would say maybe a month apart at the most, somewhere in there.

14    I don't know.  She came twice to visit me in Stateville.

15          And it was because, so I got a story.  Kasey got a

16    story.  Rebecca talks to me.  I tell her one thing.  Kasey

17    tells her something different.  And so I say Kasey's lying,

18    and Kasey says I'm lying, and so whatever.

19          Rebecca mediates and says, "Okay.  Well, do you want

20    to go visit Adam to go -- why don't you sort this out in

21    person.  If both you guys are lying, go sort it out."

22          So Kasey did.  To her credit, she came up there, and

23    so we had a conversation.

24    Q.  Was it pretty intense?

25    A.  It was awkward.  I wouldn't say it was intense.  It was

A. Gray - direct by Loevy

615

1  awkward, you know.

2  Q.  How old were you now?

3  A.  This is -- like I said, it's probably -- I don't know what

4  year this would be.  2005 maybe, maybe.  So I'm 20-something,

5  I think.  What am I?  I was born in '79, so what was that?

6  Like, 26?

7  Q.  Were you satisfied with the visit?

8  A.  Well, the first visit was to clarify some stuff, and some

9  stuff clarified because I reminded her that we did, in fact,

10  date.  And her BS about we never dated, that was BS because

11  she asked me out and just like I described earlier.  And then

12  she remembered that, you know.

13        So just having that frank conversation without a

14  chaperone to try to impress, yeah.  We had a conversation, a

15  real conversation and broke through some of the BS, right.

16  So, yeah, and...

17  Q.  All right.

18  A.  Go ahead.  Sorry.

19  Q.  And let's -- well, I guess, what happened next?

20  A.  Well, part of the reason why there was a second visit was

21  it wasn't just -- this wasn't just us reconnecting.  That's

22  not what's going on, right.  So we're trying to see what's

23  what.

24        And from my end, I'm pursuing the theory that this is

25  still an arson, right, because I think this is still an arson.

A. Gray - direct by Loevy

616

1    And I know I didn't commit this arson.  So Kasey's got to have

2    some kind of information that I might find relevant.  So in my

3    cell, I got a list of potential suspects that I'm

4    investigating, looking at, right.

5            And so I'm talking to her, and I'm trying to get bad

6    on them.  And I'm asking her, "Did you have a beef with this

7    guy that I don't know about," or anything like that.  Did a

8    kid -- to give me any direction to try to data mine, right,

9    and so...

10   Q.  All right.  And so you tried.  Did you talk to any other

11   witnesses?

12   A.  I don't think so.  Not off the top of my head, I don't

13   think -- not that came to visit me, I don't remember.

14   Q.  How long did the process play out before you started

15   making progress here?

16   A.  I don't know.  It was a long time.  I don't know.

17   Q.  Did you --

18   A.  Forever.

19   Q.  Did you and Kasey stay in touch?

20   A.  No.  She told me she wanted me to write her.  And I think

21   she sent me a letter or card or something.  And she's, like,

22   "It's okay.  You can write me.  My husband doesn't get the

23   mail."

24           And I was like, "Whoa, I'm not writing you."  I gave

25   all that stuff to my lawyers.

A. Gray - direct by Loevy

1   Q.  All right.  Do you -- what is your -- do you resent Kasey

2   at this point?

3   A.  Nah.  Nah.  We were kid friends, man.  And I think we both

4   got -- we both got caught in the whirlwind of bad cops, is

5   what happened.

6   Q.  How about the reinvestigation with the State's Attorney?

7   Did you cooperate with that?

8   A.  Yeah.

9   Q.  And how did that go?

10  A.  They came to -- I was in Galesburg at that time.  And I

11  remember my lawyers, they set it up, I guess, but they told me

12  they were going to come down there for an interview.  And so I

13  sat in a room with Tara Thompson, and I don't remember her --

14  I don't remember if my other lawyers were present during this,

15  but I remember Tara was there and then just the State's

16  Attorney woman.  Her name was Celeste.  And then they had some

17  guy who read like a cop, and he was over there taking notes.

18  Q.  Did you cooperate and talk to them?

19  A.  Yeah.  I had a conversation with them, about four hours.

20  Q.  All right.  What happened in -- did the case eventually

21  break?

22  A.  What does that mean?

23  Q.  Thank you for asking for the clarification.  Did you win?

24  A.  Yes.

25  Q.  Do you remember where you were when you found out they

A. Gray - direct by Loevy

618

1   were going to vacate your conviction?

2   A.   Yeah.   I was in Galesburg.

3   Q.   And what were you experiencing at the time?

4   A.   Oh, I thought it was BS.   I thought this was a Lucy and

5   the football move.   They told me, when they told me, "You're

6   going home," I'm going through the motions, right.   I'll pack

7   up my stuff.   I'll take it over there so they can put it in a

8   box so I can take it with me.   I'm going through the motions.

9          And I talk to my lawyers on the phone, right.   They

10  called, and everybody is excited.   "Oh, we're coming to get

11  you," ah, you know.   I'm not excited.   This is not -- this

12  ain't happening.

13  Q.   Had you had your hopes dashed in the past?

14  A.   Yeah, not too -- in recent era to that, so...

15  Q.   What was that?

16  A.   I went to court, and I get to the bullpen.   And this is on

17  appeal, right.   We're appealing, and we've been appealing for

18  years and years.   So we get to court, and I got -- I got all

19  these lawyers representing me that see me and believe me

20  and --

21          MR. NATHAN:   Objection.   Foundation.

22          THE COURT:   Okay.   The jury will disregard the

23  "believe me" part.

24          Why don't you ask a question so that you can move

25  forward.

A. Gray - direct by Loevy

1    BY MR. LOEVY:

2    Q.   All right.  You were explaining the situation where you

3    thought you were going to get out and then you got the rug

4    pulled.

5    A.   Yeah.  So my lawyers told me, "You're going home today.

6    The State agreed that -- to vacate the conviction but -- and

7    to maybe do a new trial."  They didn't really think there was

8    going to be a new trial, maybe 50/50, but that I was going

9    home today, that they're dropping the case.  It's over with.

10            So I'm in the bullpen waiting to go to court.  And I

11   didn't believe that either, right.  And so we go to court.  We

12   get in the courtroom.  And my lawyer talks for a few minutes.

13   Then the State says, "Yeah, we're going to drop the case,

14   Judge, and we're done," whatever.

15            And then the judge got mad, got furious and refused

16   to drop the case and so --

17   Q.   How many years until that got sorted out?

18   A.   Like five or six, I think.  I don't know.

19   Q.   So then you had -- was that a hard --

20   A.   Oh, it was stupid.  It was stupid.  Like I say, there

21   was -- there's always some ridiculous, evil villain trying

22   to just -- to support this nonsense narrative that these guys

23   got, right.

24            So this was just another person.  I'm sitting there

25   thinking, I bet you she knows some of these people involved,

A. Gray - direct by Loevy

620

1  you know.

2  Q.  Well, don't --

3  A.  I'm just telling -- you want my mindset.  I'm just telling

4  you my mindset, right.

5        And so she's just another villain in the long line of

6  villains that did this to me.  So that's all that that was.

7  So it was just another opportunity for them to block the truth

8  from coming out, and they took it, in my opinion.

9  Q.  But then there did come a day when they let you out?

10 A.  Yeah.

11 Q.  Tell me what you remember about that news.

12 A.  Well, I was in the process of describing it.  I have to --

13 I didn't believe it.  Despite the fact of talking to my

14 attorneys and despite the fact that the staff in the joint

15 telling me that I'm going home, I don't believe it.

16 Q.  Was it -- did the staff treat you differently?

17 A.  Yeah.  I mean, after running around and, like, with my

18 property and talking to this staff or that staff, they dressed

19 me up.  They ended up taking me to the hole, right.  And he's

20 taking me to the hole not because I did anything bad but he's,

21 like, because you're no longer technically in custody by the

22 judge's order, right, you're innocent now effectively.

23        Then if anybody does something to me, they're liable.

24 So they put me in the hole to protect me in case something

25 developed, and then they would have been in trouble.  So they

A. Gray - direct by Loevy

1    put me in the hole.  So then I sat in the hole alone in the

2    cell for, I don't know, like six hours or something until the

3    lawyers got there.

4            So here I am, I'm thinking, oh, they got me.  They

5    got me good with this one, right.  "You're going home.  Get in

6    the hole."  And that's what's going on, right.  And that's

7    where I sat for six hours thinking, oh, they got me good, man.

8            But there were some guards that came by because they

9    were curious.  Like, that's a big event.  A guy who

10   affirmatively establishes his innocence, that's a big event in

11   prison.  And so some guards, they came and they were just,

12   like, they'd come talk at the door.  And they were all smiles,

13   man.  And they were encouraging me, "You're going to do good.

14   You're going to have fun."  And they were stoked.

15           So it was -- for me, them showing me a humanizing

16   face, right, it -- I don't know.  It softened me, I guess,

17   from -- but I still didn't believe until I was out, out.  Even

18   then, I didn't believe it.  Even when I got home, I didn't

19   believe it, so...

20   Q.  Were these guards who had previously not showed you so

21   much humanity?

22   A.  Oh, no, these guys were indifferent to everything,

23   indifferent or hostile mostly.

24   Q.  Did they release you?

25   A.  They did.

A. Gray - direct by Loevy

1   Q.   And who did they release you to?

2   A.   My lawyers and my brother, they all came in, like, a big

3   van to pick me up.

4   Q.   And where did you go?

5   A.   Initially, we drove to, like, some restaurant maybe half

6   an hour away from the prison.  And it was like one of those

7   motif ones that got, like, I don't know, a barrel decoration

8   up there or a whale over there kind of thing.  And it was

9   surreal.  It was overstimulating, like too many flashy lights

10  and stuff in there and people moving around.  And I was kind

11  of freaked out.  But so we went to eat, and then we -- and

12  after that, we drove to my ma's house.

13  Q.   What happened when you got to your ma's house?

14  A.   I was -- like I said, I was freaking out.  And I kind of

15  fell out of the van and threw up right in front of my ma's

16  house across the street.  And then I went in my house, my

17  home.  I was home.

18  Q.   Would you -- what would you describe as your feelings to

19  be back in your childhood home?

20  A.   I don't know, man.  Not real.  It didn't feel real.  It's

21  not my home, it's my mom, you know.  She got all my stuff.

22  She kept all my stuff in there.  And she kept my Nintendo.  I

23  was big on Nintendo.  She kept my Nintendo, all my games, all

24  in working order.  Once I figured that out, that's how I kept

25  my sanity for the first couple months when I got out, was

A. Gray - direct by Loevy

1  trying to, I don't know, deal with it but...

2  Q.  Adam, was it euphoria?  I mean, what were you

3  experiencing?

4  A.  No, no.  It's terror, man.  It's terror.  I'm thinking

5  they're coming back to get me any minute.  They're going to

6  come snatch me.  The cops are going to come get me.  They're

7  mad.  They're mad.  They're mad that their lies unfurled,

8  right.  So they're coming to get me.  That's what I think.

9       And I can't -- I'm not sleeping.  I'm not sleeping,

10  not today, not tomorrow, not for weeks.  I'm not sleeping no

11  more.  So I'm looking out the window.  I'm paranoid, you know.

12  And I'm not going nowhere.  I don't want to go to no

13  restaurants.  You know, you can bring me food.  I ain't going

14  out.

15  Q.  When you say "not sleeping," humans got to sleep a little

16  bit.  What were you --

17  A.  No, I didn't sleep.  If I lay down and maybe I do some

18  lucid dozing for 15 minutes, but I'm up and at 'em.  I'm

19  adrenalized all day, 24 hours a day.

20  Q.  How long did that period last?

21  A.  Oh, like two months.  My brother Mike, he ended up, he

22  gave me some CBD gummies, and he said this might help.  And

23  this is before this is half legal in Illinois, but -- and I

24  took the CBD gummies and I slept for, like, four hours.  And

25  that was the first time I had, like, sleep, sleep.  And then

A. Gray - direct by Loevy

624

1    so I started doing that to try to sleep.

2    Q.   What did you own at that point when they released you?

3    A.   My Nintendo.  I don't know.  My prison stuff.  I brought

4    my junk from prison home with me.

5    Q.   How long did you live with your ma?

6    A.   Oh, I don't know.  Maybe a year.  I don't know.  Not even

7    that long.  Not too long.

8    Q.   And you said that she kept your stuff.  In addition to

9    your Nintendo, was your room --

10   A.   Oh, she had all my old clothes and everything.  I had to

11   throw that stuff out.  She kept it -- my ma became a hoarder,

12   and my bedroom was everything.  And so I opened the door to my

13   bedroom, it's boxes floor to ceiling and falling on each

14   other.

15           And I had to start pulling stuff out.  I couldn't

16   sleep, so I just started trying to pull stuff out of there one

17   box at a time.  By the time I got to the window, she had some,

18   like, cans on the window that had been -- they were rusted

19   out.  They had been there so long, they just popped, you know,

20   like cans of beans and stuff.  And I was, like, wow.

21   Q.   Did you find your old stuff?

22   A.   I did.  She kept all of that stuff and roughly wherever it

23   was at in the room of boxes.

24   Q.   All right.  Did you leave your house much when you got

25   out?

A. Gray - direct by Loevy

625

1   A.   Not when I first got out.  I eventually started exploring.

2   Q.   When you were -- even when you started exploring, did you

3   spend a lot of time in your room?

4   A.   Yeah.

5   Q.   How would you characterize that?

6   A.   Oh, that was my new cell, you know.  That was --

7   Q.   What do you mean?

8   A.   That was my new cell.  I was staying in there.  I wasn't

9   going with them places.  I deferred to staying in there, you

10   know, and that was about it.

11   Q.   Do you remember what -- why you were thinking that way?

12   A.   That's what I was accustomed to.  Like, I -- yeah, I don't

13   know.  That was my new cell.  That's how I kind of treated it.

14   Q.   Video games had evolved a little bit in those --

15   A.   Yeah, I eventually bought, like, a Playstation and messed

16   around with that for a little while, but I've outgrown all of

17   that stuff.

18   Q.   Has it been hard to reacclimate to life?

19   A.   Overall, I think so, yeah, but I think I'm doing okay.

20   Q.   Was there a transition to getting used to freedom?

21   A.   Yeah.  And I don't know that I'm all that used to it, but

22   it's easier living than it is in there.

23   Q.   What was hard about adjusting having gone in at 14, coming

24   out at 38?

25   A.   Oh, I don't exist.  I come out at 38, I don't got a credit

A. Gray - direct by Loevy

1    history.  I never had a credit history.  I don't got an ID.

2    And I couldn't get an ID because they didn't believe I was a

3    person, and so I couldn't -- and without an ID, guess what,

4    you can't do nothing.

5         And so, like, I wanted -- my brother would go to,

6    like, a Planet Fitness and go swimming and stuff.  And I

7    really wanted to go swimming.  That was, like, one of the

8    bucket list items.  If I ever get the chance in the world, I

9    wanted to go swimming.  And I couldn't go swimming because I

10   couldn't get an ID.  I needed an ID to get into the place.

11        And that was the thing everywhere.  You ain't going

12   nowhere without an ID.  So I had to jump through some hoops to

13   try to convince the DMV that I existed.  And eventually, after

14   some months, we figured that out and I got an ID.

15   Q.  Did you know how to drive?

16   A.  No.

17   Q.  How --

18   A.  I had to learn how to drive.  My brother, he would take me

19   to a parking lot and let me mess around and stuff like that,

20   and I got the feel for it and then I took the test eventually

21   and got it.

22   Q.  Did you figure out the new phones?

23   A.  Yeah, yeah.  One of my lawyers, Tara Thompson, she bought

24   me a phone the day after I got out, and my brother showed me

25   how to make it work.

1   Q.   Did you go find some of the people from your old friends?

2   A.   Yeah, yeah.   I was trying to reconnect with all kinds of

3   people.   You know, like, I was on Facebook for a while.   I was

4   looking for people.   And I'd just -- I was talking and

5   interacting and telling people what I thought over the years

6   or whatever.

7   Q.   Now, how about earning a living?   What was your -- how did

8   you earn a living early on?

9   A.   What was the first thing I did?   Oh, I don't even

10  remember.

11  Q.   How about when you hooked up with Kluppelberg?   When was

12  that?

13  A.   Oh, yeah.   Sorry.   I'm a little mind mushy.   A buddy of

14  mine from prison who had gotten exonerated a few years before

15  me had gotten out, and he was kind of established already.

16  And when I --

17           MR. NATHAN:   Objection.   Foundation.

18           THE COURT:   Overruled.   You can proceed.

19  BY THE WITNESS:

20  A.   So my buddy Kluppelberg, he had his own business.   And he

21  did electrical work and plumbing work and just handyman stuff.

22  And he knew I was -- he experienced it firsthand, so he knew

23  that I was super disoriented.   And so he kind of took me under

24  his wing, and I started working with him and going out with

25  him all the time, and he paid me pretty good, I thought.   So I

A. Gray - direct by Loevy

628

1   was doing that for a ways.

2   Q.   What kind of work was it?

3   A.   Mostly electrical but also plumbing, all kinds of handyman

4   stuff.  And so he was kind of teaching me different trades,

5   stuff like that.

6   Q.   How about your dating life?  Did you try to start one?

7   A.   Yeah.  So I -- me and Natalie were kind of fumbling around

8   a little bit.  And I looked at, what is it, Tinder and Plenty

9   of Fish and a couple of those, and I mingled with that a

10  little bit, but I didn't have any success there.  And I

11  thought it was kind of weird, so nah.

12  Q.   Did you go on any dates with the dating apps?

13  A.   No.

14  Q.   Zero?

15  A.   Zero.

16  Q.   How about Natalie?  How did that dating go?

17  A.   We did okay, but it was -- it wasn't meant to be.  We

18  weren't compatible.

19  Q.   This is the girl from when you were 14, you were going to

20  take to the dance?

21  A.   Yeah.

22  Q.   Did you take her to a dance?

23  A.   Nah, no.  No, I did not.  We went to a movie.  We did a

24  couple things.  We went out to eat and did stuff.  We did

25  stuff but, I don't know, it just became apparent it wasn't a

A. Gray - direct by Loevy

629

1    thing, you know.

2    Q.   Did you try to be a couple with her?

3    A.   Yeah.

4    Q.   It didn't go so good?

5    A.   Nah.

6    Q.   All right.  Is it -- you know, you went a long time

7    without relating to too many women.  Is it hard to relate to

8    women?

9    A.   Well, I don't think so now, no.

10   Q.   How about men?

11   A.   I don't really interact with nobody, to be honest with

12   you.  I don't go out of my way.  I mean, I know how to be

13   friendly, but I'm not trying to bond with anybody

14   particularly, going out of my way to do it.  I don't know.

15   Q.   Did you start spending time with Rebecca, the woman who

16   had helped exonerate you?

17   A.   Yeah.

18   Q.   And what's your age difference?

19   A.   She's seven years older than me.

20   Q.   So when you turned 40, she was what?

21   A.   47.

22   Q.   And at what point did you and her start -- tell us how it

23   all started and how it went down.

24   A.   I don't know exactly, but we had -- I guess over the years

25   back and forth in jail during the course of the investigative

A. Gray - direct by Loevy

630

 1   stuff, we connected, you know, and off and on feelings.  I

 2   don't know.

 3         But you can't -- it's so -- it's so constricted when

 4   you're in prison.  You can't -- there's so much you can't

 5   express.  You can't really have a real fundamentally sound

 6   bond with someone like that, you know.  If -- your boy/girl

 7   scenario, you know, it's -- I don't know, because all you got

 8   is phone and all you got is letters and that carries you, but

 9   it only carries so far, you know, but I guess we made do.

10         But when I got out, you know, I'm out.  And I don't

11   know.  Maybe I want to sow my wild oats.  I don't know.  I

12   don't know what's going on.  So I get out.  And eventually,

13   yeah, me and Natalie didn't work out, and me and Rebecca ended

14   up working out.

15   Q.  Is that someone you've grown close to?

16   A.  Yeah.  We got married.

17   Q.  Was she able to help you get out of the house and be a

18   little bit more social?

19   A.  Yeah.  Yeah, she's -- that's my whole support system right

20   there, yeah.

21   Q.  How long have you been with her?

22   A.  We've been married four.

23   Q.  Four years.  Is she your best friend?

24   A.  She is.

25   Q.  Did you make a good choice to marry Rebecca?

A. Gray - direct by Loevy

631

1   A.   Oh, I certainly did.

2   Q.   Did you and your wife try to have kids?

3   A.   Yeah.

4   Q.   How did that go?

5   A.   It didn't work out.

6   Q.   And how old was she when you started trying?

7   A.   Oh, as soon as we could.

8   Q.   And do you have regrets about that?

9   A.   No.  I accepted it's just the way it worked, you know.  I

10  wanted kids.  And maybe if I got out a few years sooner maybe,

11  but it didn't work out that way.  I love my wife, period.  So

12  that's where I'm at.

13  Q.   Okay.  When you were younger, did you always see yourself

14  as a parent, as a dad?

15  A.   I did.  I did.  Under any other set of circumstances, I'm

16  having kids, you know, but that didn't work out.

17  Q.   Why did you want to be a parent?

18  A.   I just did.  I don't know why.

19  Q.   All right.  What do you do now with your free time?  Do

20  you -- where do you live?  You said it yesterday back in --

21  way back, you live in the woods.

22  A.   Yeah.  I live in Hastings, Michigan, but I live in a cabin

23  in the woods.

24  Q.   And you live there with Rebecca?

25  A.   Yeah.

A. Gray - direct by Loevy

1  Q.  And what do you do with your free time?

2  A.  I like to write poetry, and I like to tend the grounds.

3  We've got -- I like to mow and -- you know, my house is like

4  this completely surrounded by forest, and I've always got to

5  move logs and get rid of debris and stuff like that and get

6  the driveway clear, but I like to spend time outside.  And

7  that's about it.

8  Q.  Do you -- are you able to make money with your wife's

9  business too?

10  A.  Yes.

11  Q.  Tell the jury about that.

12  A.  My wife has an online art gallery, and she represents a

13  lot of artists from all different walks of life.  And she also

14  teaches people how to paint, you know, like on Skype or Zoom

15  so...

16  Q.  And what do you do to assist?

17  A.  I day trade a little bit.

18  Q.  What's that?

19  A.  I day trade, like stocks a little bit, just messing

20  around.

21  Q.  You try to day trade.  Do you do any carpentry?

22  A.  I did.  I had a small business.  When we were in Chicago,

23  the timeline is a little wonky, but when we were in Chicago,

24  she had, her gallery was a brick and mortar on Irving Park

25  Road.  So she had her students in Chicago, you know.

A. Gray - direct by Loevy

1    I would build her frames for her paintings, or I'd

2    build the supporting structures, they're called stretchers for

3    the canvas to get stretched over.  And I had to learn all of

4    that, so I bought some saws and I watched a bunch of You Tube

5    and I learned how to cut stuff.  And so I started doing that

6    and making money, building frames and stuff for her, for her

7    students and for her.

8    Q.   Do you still do that?

9    A.   Occasionally.  Mostly, if I do it, I'm just building it

10   for her, but I don't really do that, no.

11   Q.   Did you try to start a business for the inmates and the

12   games?

13   A.   Yeah.  I was trying to do something, kind of like an

14   interactive game, not a video game.  But, like, they had an

15   email system, so I was kind of setting up, trying to set up

16   something, but it didn't work out.

17   Q.   What was the idea?

18   A.   It was going to be like a war kind of thing with different

19   armies combatting against each other.  They would communicate

20   moves through the email system, so I would relay to you what

21   happened to you and then you would adjust and make moves, just

22   like your chess move turn, and then that gets trafficked along

23   the way to the next guy.

24   Q.   And the world works at a little faster pace these days to

25   have a game like that, doesn't it?

A. Gray - direct by Loevy

634

1    A.   Yeah, but when you're in prison, them guys will wait two

2    or three weeks for an email that might have some impact on

3    that little dumb stuff, you know, because that's -- I know how

4    that works, you know.

5    Q.   Who do you interact with on a regular basis?  Who are your

6    friends?

7    A.   My wife, I interact with her on a regular basis.  And my

8    brother Dave, I talk to him every day.  And I talk to my

9    sister Lisa a couple times a week.  And that's it.

10   Q.   Do you have friends that you socialize with?

11   A.   Nah.

12   Q.   All right.  The last area -- and I'm almost done, sir --

13   do you sometimes experience bothersome thoughts about prisons

14   going forward?

15   A.   Yeah.  I get all -- I got all kinds of prison-y thoughts

16   that occasionally -- you know, you never know just whatever

17   weird trigger might bring back a memory or something, you

18   know.  Yeah, I have bad prison thoughts a lot.

19   Q.   Does it still affect you?

20   A.   It does.  I don't let it cripple me, but it does affect

21   me.

22   Q.   Do you expect this will be a part of you?

23   A.   I don't understand that.

24   Q.   Going forward into the future, have you conquered this?

25   A.   No, I didn't conquer it.

A. Gray - direct by Loevy

635

1    Q.  Are you trying --

2    A.  I'm working on it.  I'm working on it.  I'm trying to -- I

3  don't want none of this imagery in my head, man.  That's why I

4  write poetry.  I'm trying to take these graphics and get 'em

5  out.  I don't want none of this -- I don't want none of these

6  memories, to be honest with you.

7    Q.  Are you good at defeating the negative emotions?

8    A.  I think I am, yeah.

9    Q.  Are you bitter and angry?

10    A.  I don't think so.

11    Q.  Are you totally over it?

12    A.  I'm not holding on to any -- I mean, look, I'm free,

13  right.  And that's it.  They can't drag me back to hell.

14  Pardon my language.  But they can't drag me back, so I don't

15  have anything there.  But again, we're all here because this

16  ain't resolved yet, you know what I mean.  So it ain't

17  resolved yet and so, therefore, yeah, I still feel this stuff,

18  but I'm not holding on to any kind of, like, resentments or

19  nothing like that.  I'm here.  I'm here willingly, right.  So

20  I'm not dragging my feet to talk.

21    Q.  Is it good for you if you feel negative emotions?

22    A.  I don't like this stuff at all, no.  I don't think so.

23    Q.  Has this been a hard week for you in preparing for this?

24    A.  Yes.  This is -- this is toxic, man.  This is

25  extraordinarily toxic.  Frankly, just talking about this

A. Gray - direct by Loevy

636

1    stuff, it's pollution.  It fractures your psyche.

2          Like, you guys don't -- you guys don't get to see me,

3    you know, and I'm trying.  I'm trying to communicate to you

4    but, like, when I talk about this stuff, I talk about this,

5    these experiences, I'm not trying to convey to you I'm like

6    some tough stuff, you know.  I'm not tough because I got into

7    a fight in jail or none of that stuff.

8          But talking about it, just talking about it brings

9    that stuff, that ego, it brings up, you know, the negative,

10   you know, and the adaptive personality I had to have to get

11   through prison in different spots, you know.  And that ain't

12   none of me.  I'm still the dumb kid that was 14 years old, you

13   know, running around, riding my bike in the neighborhood

14   trying to make sense of stuff but, you know...

15   Q.  What are you --

16   A.  I don't have dark in me.  I don't live with dark in me,

17   and I don't direct it outward either.

18   Q.  What are you trying to accomplish in filing this lawsuit?

19   A.  I think that the kinds of people that would exploit a kid

20   like that with those kinds of tactics need to be stopped.  And

21   if in any way, shape, or form this manages to affect effort in

22   that direction, then that's what this was for.

23   Q.  You want to see accountability and responsibility?

24   A.  Yes.  Yeah, I do.

25   Q.  And do you believe you're entitled to be made whole and

A. Gray - cross by Nathan

1   have justice for what happened to you?

2   A.  I think so, yeah.  I do think that.

3           MR. LOEVY:  All right.  I don't have any other

4   questions, your Honor.

5           THE COURT:  All right.  Cross-examination?

6       (Pause.)

7           THE COURT:  You can set up.  We need to reboot the

8   reporting system.

9           A JUROR:  Can I use the restroom?

10          THE COURT:  Of course.  Let's take a quick break.

11      (Proceedings heard in open court.  Jury out.)

12          THE COURT:  Mr. Gray, you're technically on cross, so

13  you can't talk with anyone.  I think we've got at least ten

14  minutes.

15      (Recess from 4:11 p.m. to 4:15 p.m.)

16          THE COURT:  All right.  Please be seated.

17          Okay.  Mr. Nathan?

18                      CROSS-EXAMINATION

19  BY MR. NATHAN:

20  Q.  Good afternoon, Mr. Gray.

21  A.  How is it going?

22  Q.  When you were 14, you were not a dumb kid, right?

23  A.  Depends on how you want to cut it.

24  Q.  Well, let's -- if you cut it, when you were 14, you were

25  the captain of an academics league?

A. Gray - cross by Nathan

638

1    A.   Uh-huh.

2    Q.   Yes?

3    A.   I was.

4    Q.   And the academics league was meant for the school's

5    brightest?

6    A.   Yeah.

7    Q.   You scored extremely high on Iowa testing, correct?

8    A.   I did.

9    Q.   And you also took an IQ test in 1993 too, right?

10   A.   I took an IQ test after I was incarcerated, yeah.

11   Q.   And we're talking about close in time to March of '93,

12   right?

13   A.   Yeah, but under duress.

14   Q.   When did you --

15   A.   Also under duress.  I'm not contesting what you're saying.

16   All I'm saying is that I parse it out, I differentiate before

17   I was locked up to after they kidnapped me.  And so if that's

18   an event that occurred after they kidnapped me, it's so -- I

19   don't know.  Maybe just --

20           THE COURT:  Yeah, let me just -- let's conclude the

21   answer right there.  And do try to listen closely and deliver

22   an answer responsive to the question.

23           THE WITNESS:  Okay.

24           THE COURT:  All right.  Go ahead and ask again.

25   BY MR. NATHAN:

A. Gray - cross by Nathan

639

1    Q.   Mr. Gray, you did take an IQ test in 1993, correct?

2    A.   Yes.

3    Q.   And you were told the results of your IQ test, right?

4    A.   I think so, yeah.

5    Q.   Right.  And you remember that you received the highest

6    possible score on the IQ test regarding a subtest which

7    measured your abstract problem-solving ability, right?

8    A.   Okay.

9    Q.   And you also did extremely well on a subtest that

10   measured -- was considered to be a good measure of general

11   intelligence, correct?

12   A.   I'll take your word for it.

13   Q.   Well, you also learned after you took the IQ test that you

14   scored in the 99th percentile and that fewer than 1 in every

15   100 people would have done as well on that test about general

16   intelligence?

17   A.   Okay.

18   Q.   So can we now agree you were not a dumb kid?

19   A.   Oh, I think I was quite dumb since I let the bunch of

20   detectives convince me to sign something that wasn't true.  I

21   think that makes me pretty stupid by that estimate.  That's

22   why I said it depends on how you want to cut it.

23           Yeah, I might have been book smart, but I didn't have

24   smarts like they had.  I couldn't overcome that.  So I wasn't

25   that smart, now, was I?

A. Gray - cross by Nathan

640

1   Q.  You made honor roll many, many times in grade school,

2   right?

3   A.  In first, second, third grade.

4   Q.  And sometimes in school, you would apply yourself, right?

5   A.  Off and on.

6   Q.  And sometimes you wouldn't.  That's what "off and on"

7   means, right?

8   A.  That is correct.

9   Q.  And when you applied yourself, you were a straight-A

10  student, true?

11  A.  I guess.  There's an argument to be made that that is

12  true.

13  Q.  And you even qualified for a Chicago public school magnet

14  called Bogan High School, right?

15  A.  I wasn't getting straight A's then, but I did get that

16  because of the Iowa test scores.

17  Q.  And you got that GED once you were in prison without even

18  opening a book, right?

19  A.  Yeah.

20  Q.  Let's just skip for a moment to today.

21  A.  Okay.

22  Q.  You started -- after you got out of prison, you started a

23  company, correct?

24  A.  A couple of them.  Tried to, yeah.

25  Q.  And so you started more than one company?

A. Gray - cross by Nathan

641

A.   Sort of, yeah.

Q.   And one of those companies was called Ninja Pillow Games,
LLC, right?

A.   Yes.

Q.   And you incorporated that company pretty much yourself,
right?

A.   Yes.

Q.   And the whole -- before you did that, you also took a
computer programming course, right?

A.   I don't think so.

Q.   You learned how to program in a language called Unity?

A.   Unity is not a language.  Unity is a platform.

Q.   All right.  What did you do to learn how to use the Unity
platform after you had been --

A.   Oh, I --

Q.   One second.  Let me just finish my question, sir.  Sorry.

        What did you do in order to learn how to use that
Unity platform after you came out of prison?

A.   I paid a guy on, what is that, one of them apps where you
can get the guy.  Was it Fiverr?  I don't remember.  There was
an app where you can get guys that will do stuff for you, and
he was trying to instruct me.

        So I paid him -- I don't remember what it was, but
some guy in England, and he was walking me through some
functions, and I gradually learned some of the functions.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 267 of 288 PageID #:21435
A. Gray - cross by Nathan
642

1   Q.   And you learned through this Fiverr app or a similar app

2   in studying, applying yourself independently, you learned how

3   to use this Unity platform, right?

4   A.   That's incorrect.  I didn't get very far with Unity.

5   Q.   Okay.  So going back to Ninja Pillow Games, LLC, that you

6   incorporated, that was your idea, right?

7   A.   Yes.

8   Q.   And your idea was that you were going to create a world

9   that people could pay for licensing fees in order to

10  participate in your game, right?

11  A.   Correct.

12  Q.   And you were going to have war games, right?

13  A.   Yeah.

14  Q.   And you actually did that, right?

15  A.   We attempted.  There was -- it was a soft launch, but we

16  didn't get nowhere.  It became logistically impossible because

17  of the time lag, so it didn't really go nowhere.

18  Q.   But you created a system with Ninja Pillows games where

19  you had a real game, right?

20  A.   I did.

21  Q.   And you took in income, right?

22  A.   I didn't take in any income.

23  Q.   You didn't ever make any money off of that?

24  A.   No.  I soft launched.  It was free.  I didn't do -- I

25  never took any income in.

A. Gray - cross by Nathan

643

1   Q.   You created this game that you were able to operate

2   independently, and it actually worked, right?

3   A.   Apart from the logistical issues that made it not work.

4   Q.   And I think you were referencing that some of the

5   logistical issues that you were having was that your main

6   clientele in this game was supposed to be IDOC prison inmates,

7   right?

8   A.   That was -- that was a steppingstone, yeah, but yeah.

9   Q.   And those were people that you had relationships with and

10  you -- your idea was that you were going to have, take

11  subscription fees from the inmates, and they were going to

12  have access to your game, right?

13  A.   That's the idea.

14  Q.   And you would have monthly subscriptions, right?

15  A.   No.   The -- I don't remember exactly how I had it mapped

16  out, but it's something like a credited system.   So if you put

17  down $20, you would have $20 worth of play money.

18  Q.   You were able to also learn how to day trade in the stock

19  market, right?

20  A.   Yeah.

21  Q.   Play with options?

22  A.   Yeah.

23  Q.   Is that your favorite thing to trade?

24  A.   No.   I'm more into just day trading.   I don't really do

25  too many options anymore.

A. Gray - cross by Nathan

644

1  Q.  Why not?

2  A.  I didn't find them as -- I don't know.  I got tired of

3  them.  They're not as lucrative or, I don't know, the market

4  kind of turned a bit lately, so I just stopped messing with

5  them.  Occasionally maybe if something catches my eye but in

6  general, no, I don't mess with them.

7  Q.  Earlier -- actually yesterday, you testified when

8  Mr. Loevy was asking you questions that your father was a

9  disciplinarian?

10  A.  I don't know if he was a disciplinarian.  He's never hit

11  me or any of my siblings so, no, I wouldn't characterize him

12  as a disciplinarian.  He's stern.

13  Q.  Yesterday you characterized him as a disciplinarian, true?

14  A.  If I did, I might have misspoke because he never

15  disciplined anything.  That's not -- that wasn't his thing.

16  If I did, I misspoke.

17  Q.  Well, you would have misspoke because your father never

18  actually lived with you outside of prison, did he?

19  A.  Not outside of prison, no.

20  Q.  And, in fact, isn't it true that there was no point in

21  your life where you were alive and your father lived in your

22  house?

23  A.  That is correct.

24  Q.  And so if you told the ladies and gentlemen of the jury

25  yesterday that your father was a disciplinarian, you just

A. Gray - cross by Nathan

1    misspoke?

2    A.   I misspoke if I spoke about my father being a

3    disciplinarian if it led you to believe that my father was in

4    the house disciplining us, and for that, I apologize.

5    Q.   Now, going back to 1993 before March when you -- after the

6    fire, around the time of the fire, you would spend about every

7    weekend or every other weekend in Alsip, right?

8    A.   That's correct.

9    Q.   And how would you get to Alsip?

10   A.   I'd take the Kedzie bus usually.  Sometimes his parents

11   might pick me up, but usually the Kedzie bus.

12   Q.   And you would go there because that was Robert Jaffke's

13   house?

14   A.   Yeah.  His family.

15   Q.   Did I pronounce that correctly?

16   A.   Jaffke, yeah.

17   Q.   Jaffke.  Okay.  Thank you.  And you would go by bus

18   yourself, right?

19   A.   Uh-huh, yes.

20   Q.   And which bus would you take by yourself?

21   A.   Kedzie from Archer.  It runs all the way down to 115th,

22   and then it turns on 115th to go to Pulaski.  And I'd get off

23   at 115th and Pulaski.  He lived a half block from there.

24   Q.   And you'd spend from Friday through Sunday night there,

25   right?

A. Gray - cross by Nathan

646

1   A.   Yes.

2   Q.   Sometimes you'd even stay until Monday morning, right?

3   A.   Infrequently.  I usually got out of there Sunday night,

4   but sometimes I stayed until Monday.

5   Q.   And when you were in eighth -- in seventh grade, so that

6   would be 1992, right, you would -- you were sent to live with

7   a woman named Denise Campbell?

8   A.   In the beginning of my seventh grade is when I went to

9   live with Denise, so that would have been '91, yeah, somewhere

10  in there.

11  Q.   '91 or '92?

12  A.   I think the end of '91, whatever -- I don't know how it

13  maps out where I was in seventh grade, but I started seventh

14  grade up there.

15  Q.   And that was in Green Bay, Wisconsin, right?

16  A.   Yes.

17  Q.   You weren't there with your mother, right?

18  A.   I was not there with my mother.

19  Q.   You were with Ms. Campbell?

20  A.   Yes.

21  Q.   You actually enrolled in school in Green Bay, Wisconsin,

22  right?

23  A.   Correct.

24  Q.   You spent at least three months there?

25  A.   Somewhere in that range.

A. Gray - cross by Nathan

1   Q.   When you did come back to your house, that was at 4208

2   South Albany, correct?

3   A.   From Green Bay?

4   Q.   Yes.

5   A.   Yes -- oh, wait.  Let me think.  Yeah, probably.  Yeah.

6   Q.   Well, at the time of this fire in March of 1993, you were

7   living at 4208 South Albany?

8   A.   Yes, but we're talking about the year before that, and so

9   I had to think if we were living there.  Yeah, we were still

10  living at 4208.

11  Q.   But your brother had moved out, your oldest brother,

12  right?

13  A.   Dave moved out long -- years before that.

14  Q.   He moved out actually when he was 16 years old or earlier?

15  A.   Somewhere around there.

16  Q.   And --

17  A.   I don't know exactly when he moved out, but somewhere in

18  that age range.

19  Q.   That's because he had a kid, right?

20  A.   He -- I don't know why he moved out.  He moved out.  You

21  can ask him.

22  Q.   How old was Dave, if you know, when he had a kid?

23  A.   Somewhere in that range.  I don't know exactly.

24  Q.   And at that point somewhere in that range, he moved out

25  and got his own apartment, right?

A. Gray - cross by Nathan

648

1  A.  He might have moved out before the kid.  I don't think --

2  that's my niece Alex.  I don't think she was born when he got

3  his first apartment.

4  Q.  So you think he was -- he possibly moved out when he was

5  15 or 14?

6  A.  No.  I'm saying that the apartment that he got, I don't

7  have any memory of Alex being around at that stage.

8  Q.  I mean, I'm just trying to follow you.  I think you just

9  said that when Dave was 16, he had a kid and he moved out, but

10  he moved out before that, right?

11  A.  No, that's not what I'm saying at all.  I'm saying I don't

12  know when he moved out exactly.  And also his first apartment,

13  I don't think the baby was born.  So that's what I'm parsing

14  out there for you.  That's all that I'm saying.

15  Q.  But it is possible -- I know that your memory is a little

16  vague on this, but it's possible that he moved out when he was

17  15 or even earlier?

18  A.  I don't think so, but I don't know because that ain't my

19  life and I was, like, seven.  So I wasn't charting his age and

20  when he was moving out when I was seven.

21  Q.  And in March of 1993, your other brother Michael was not

22  living at home either, correct?

23  A.  March when?

24  Q.  At the time of the fire.

25  A.  He lived on Hermitage.

Case: 1:18-cv-02624 Document #: 560 Filed: 06/29/23 Page 274 of 288 PageID #:21442
A. Gray - cross by Nathan
649

1   Q.  You did not have a phone in your home at 4208 South

2   Albany, correct?

3   A.  I believe we did.

4   Q.  You have no idea what the number was, right?

5   A.  254-9325, I think.  That sounds about right.  Maybe not.

6   I don't know.  Don't quote me on that.

7   Q.  Did you just kind of guess?

8   A.  That's probably -- I'm guessing that might be our number,

9   but I don't know.  I don't know.

10  Q.  Is there some reason why you'd say the number, specific

11  numbers today when you don't actually know?

12  A.  It could have been her number from before.  It could have

13  been her number after.  I don't know.  I don't remember.

14  Q.  Again, my question, is there some reason why you just told

15  us specific numbers --

16  A.  That's the number --

17  Q.  One second.  Let me finish.

18         (Continuing) -- specific numbers when you actually

19  don't remember what phone number it was?

20  A.  You are correct, I do not remember exactly which phone

21  number it was at the time of the fire.  I do believe, however,

22  that we had a telephone.

23  Q.  Were you ad libbing your phone number today?

24  A.  Was I ad libbing my phone number today?  No.  A phone

25  number that previously we had as a phone in our home, that was

1    the phone number.

2    Q.  Did you spontaneously just want to fill in facts today

3    whether or not they were true?

4    A.  No.  For a brief moment, I recollected that that was --

5    and that's probably the number, to be honest with you, but I'm

6    not 100 percent convinced, and I wouldn't put a $100 bill on

7    it.

8              THE COURT:  All right.  Let's -- we can break.  It's

9    4:30, so we'll call an end to the trial day.

10             Ladies and gentlemen, do remember to do no research

11   into the case, not the law or facts.  Don't discuss the case,

12   not even amongst yourselves.  I hope you have a good evening.

13   And all rise.

14             A JUROR:  See you tomorrow bright and early.

15         (Proceedings heard in open court.  Jury out.)

16             THE COURT:  All right.  Mr. Gray, you can step down

17   for the day.  You are on cross, so do not discuss your

18   testimony with anyone.

19         (Witness excused.)

20             THE COURT:  Is there anything for the end of the day

21   right now?

22             MR. NATHAN:  Yes.

23             THE COURT:  Okay.  You can be seated.

24             MR. NATHAN:  This relates to a couple of issues that

25   will come up during cross-examination.  At the beginning of

1   the day, I mentioned that we thought that the plaintiff had

2   opened the door to his Two Six gang membership, and your Honor

3   asked about what the good-faith basis would be for him

4   being -- still being a gang member so I can ask him about

5   that.  And there was -- and we checked that arrest report, and

6   the arrest report was from 1991.  And it was an incident where

7   he got into a fight and was yelling about Two Sixes.

8        And we think it's relevant given the plaintiff's

9   testimony earlier, it was even on day one, that said juvenile

10  detention center was particularly difficult for him because he

11  wasn't in a gang.

12        THE COURT:  Okay.  There is a two-year gap there, but

13  you can hand up the police report.

14        MR. LOEVY:  Shneur, can we get a Bates number?

15        THE COURT:  Let's go off the record for a second.

16    (Discussion off the record.)

17        THE COURT:  Okay.  Let's go back on the record.

18        So what I'm looking at -- and I just want to make

19  sure that the plaintiffs have the same thing -- there's a

20  number 160325 in the upper right.  Do you have a copy of this

21  now?

22        MR. LOEVY:  We do.

23        THE COURT:  Okay.  And so it is dated April 10, 1991.

24  So from this offense report, what was the disposition of the

25  case, Mr. Nathan?

1          MR. NATHAN:  I'm just looking at his deposition

2    because -- I don't know, but he admitted to this incident in

3    his deposition.

4          MR. LOEVY:  We believe the answer to your question

5    was SOL, your Honor.  That was our understanding.

6          THE COURT:  But you're saying that, Mr. Nathan, in

7    his deposition that Mr. Gray admitted he yelled "Two Six

8    love"?

9          MR. NATHAN:  No, I'm not saying that.  I'm saying he

10    admitted that he had this assault incident on April 10th,

11    1991.  He portrayed it as a fight.

12          THE COURT:  Okay.  So then you don't have independent

13    evidence that he, for example -- I know the answer to this

14    question.  It's not like you have the victims who were going

15    to testify.

16          MR. NATHAN:  Your Honor asked if I had a good-faith

17    basis to ask the question about it, and I think this is.  In

18    addition, I would also say that this incident came up at his

19    sentencing hearing with the testimony of Officer Koontz who is

20    the arresting officer as well as I would -- just one more

21    thing that I wanted to raise, was that Defendants' Exhibit 20

22    Mr. Loevy put into evidence, Page -- Page 2 says, "Patient did

23    belong to a gang before incarceration.  According to patient,

24    he belonged to the Two Sixes."

25          So that presumably the source of that information of

1   "according to the patient" would have come from Adam Gray.

2   And this is dated June 29th, 1994.

3           MR. LOEVY:  Your Honor, "did belong to a gang" is

4   past tense.  And it's not disputed that when he was 10 or 11

5   that he ran around and called himself part of the Two Sixes.

6           My recollection of the dep is they didn't even ask

7   Adam if this incident that they're talking about as their

8   good-faith basis if Adam did do this.  This other person Tom

9   Galinsky could very well have been a Two Six person.  I asked

10  Adam.  He said he got in a fight.

11          So they don't have a foundation through any witness

12  including the plaintiff who they could have asked that two

13  years before the incident, he shouted, "Two Six love."  And

14  moreover, it's still two years before the incident.

15          THE COURT:  Yeah, so a good-faith basis is just the

16  first step.  Okay.  So the first step is you need to have a

17  basis to ask the question that as of 1993 when he was detained

18  that he was in a gang, and specifically the Two Sixes.  So

19  that's the first step.

20          I'm still not even sure you're there because the --

21  so there's a two-year gap between this arrest report and the

22  detention, and then Defense 20 is not specific as to the

23  membership time as well, and it is put in the past tense.

24          All right.  So you still cannot go down that path of

25  questioning.

1    MR. NATHAN:  Another thing that we wanted to raise

2   with your Honor is that on direct examination, plaintiff

3   testified that he had been to the juvenile facility twice

4   before.  And given all the testimony that he talked about at

5   length about how traumatic that was for him, about the fights

6   that would go on there and that the risk of sexual assault

7   there, we think he's opened the door by testifying already

8   that he's been there before.  And I'd like to ask him about

9   whether he saw any of these things the last time he was there.

10    THE COURT:  Yeah, so the context of that was when he

11   was testifying that he was frustrated at his mother for not

12   being able to get him out because in the past he had -- the

13   one or two times that he mentioned, he had gotten out in one

14   or two days.

15    So is there a basis to believe that he, in fact, was

16   in juvenile detention for longer than those one or two days

17   such that it would be comparable to the actual stay after the

18   fire?

19    MR. NATHAN:  I -- I don't know, but I -- I don't --

20   in my opinion, and my argument is that I don't need to show

21   that it was a lengthy stay, but he's talking about how he was

22   shocked by these experiences.  And I think it's reasonable for

23   me to ask him, "Isn't it true you've seen those things before?

24   You were in those same places.  You've been in that place

25   before."

1        THE COURT:  If you can -- and you ought to have

2    his -- you have his juvenile records, right?  I don't mean

3    just necessarily standing right here, but you have his

4    juvenile records.

5        MR. NATHAN:  We have his arrest reports.  Juvenile

6    records are, they're not easy to get a clear picture of

7    especially from back then.  So I don't -- I don't have good

8    juvenile records.

9        THE COURT:  Okay.  So, for example, in the

10   deposition, did you ask him about prior stays in the juvenile

11   detention center?

12       MR. NATHAN:  I did ask him that about whether he had

13   been there before, and he said yes.

14       THE COURT:  Okay.  And then did you ask him how long

15   he had been there on previous occasions?

16       MR. LOEVY:  My recollection is he said he had an

17   overnight.  You know, the same thing he said just now.

18       THE COURT:  Okay.  So here's what we'll do about

19   this.  You can, Mr. Nathan, go back to the deposition or

20   elsewhere if you have some other records.  And if there is a

21   stay of comparable length, then you can re-raise that question

22   with me first before you ask him about it, but the

23   comparability in length is important.

24       So, yeah, I do agree that he came closer to opening

25   the door than I'm sure he had been prepared to do, but as it

1    came out, the only thing that came out was that he was

2    frustrated because he typically had been able to get out much

3    faster.

4         So it does not open the door, you know, to all this

5    other highly problematic Rule 403 incidents that I had

6    excluded unless, okay, unless there's some prior stay of

7    comparable length which, you know, I very much doubt, but you

8    can look for that in the record.

9         Okay.  Next issue?

10    (Pause.)

11         MR. NATHAN:  Nothing more at this time.

12         THE COURT:  Okay.  Who are the witnesses up tomorrow

13    aside from finishing the cross?

14         MR. LOEVY:  You know, we'll need something of a

15    guidance from them how long.  Russano is in town and needs to

16    go, can't go Friday.  Lita Gonzalez also very much wants to go

17    tomorrow, but that's a short witness.  And then the wild card,

18    your Honor, is Kasey Paris is under subpoena to show up

19    tomorrow.

20         THE COURT:  Were you able to tell her either directly

21    or by leaving messages that a bench warrant would be issued?

22         MR. LOEVY:  Yes.

23         THE COURT:  Okay.

24         MR. LOEVY:  Our --

25         THE COURT:  Go ahead.

1          MR. LOEVY:  Not by phone.  We have not been able to

2  reach her by phone.  Our investigator went and saw her, got a

3  lot of hostility but said, "It's going to be a real problem

4  for you if you don't show up."

5          She was in court on Monday.  I saw a woman and a

6  biker-looking dude, and I said, "Are you Kasey Paris?"

7          And she said, "Yes."

8          And I said, "You're not supposed to be here today.

9  It's Monday."

10         And she said, "Well, you know," anger, anger, anger.

11  "I have a subpoena for" -- we gave her one for May -- for

12  Thursday, whatever date that is.  She's supposed to be here on

13  Thursday.  She says she got one for Monday.  We think she may

14  be mistaken because we didn't give her one for Monday, and you

15  guys said you didn't serve her.

16         MS. EKL:  It's my understanding that her -- that a

17  subpoena -- I might be wrong.  I thought a subpoena was left

18  with her boyfriend.  So we didn't have personal service.

19         MR. LOEVY:  I thought --

20         MS. EKL:  I'm not sure the exact --

21         THE COURT:  Okay.  So that's the second subpoena.

22  But then what was her --

23         MR. LOEVY:  So I expect --

24         THE COURT:  That was Monday, though.

25         MR. LOEVY:  Right.  And I said, "It was a

1    misunderstanding.  Our cover letter said you're testifying

2    Thursday.  You're going to have to come back Thursday."

3           "I'm not coming.  Screw you.  I" -- anger, anger,

4    anger.

5           And I said, I said personally, "I believe that you

6    will be creating a problem with the marshals if you don't

7    come."

8           And she said, "I'm not coming, I'm not coming," but I

9    didn't believe her.  I think she's coming.

10          THE COURT:  Okay.  And was the investigator

11   conversation with her after Monday?

12          MR. LOEVY:  No.  No.

13          MS. WANG:  It was at the time she's served the

14   subpoena initially.

15          MR. LOEVY:  Back when she served it.

16          THE COURT:  Okay.  And then do you -- do you have an

17   email address for her?

18          MR. LOEVY:  I don't think we have any --

19          MS. WANG:  We have an email address.  We tried to

20   find some phone numbers for her and we tried them, and they

21   didn't work -- well, actually I think there were three

22   numbers.  Our investigator tried a couple of them and left

23   voicemails, but it was unclear whether they were either

24   working numbers or --

25          MR. LOEVY:  Just to be clear, they asked us yesterday

1    if we had any phone numbers for her, and we don't.  Today we

2    said, use Locate Plus.  So we just used the computer sources.

3    We've never been given a contact number for her and have no

4    way to contact her.

5              THE COURT:  Okay.  So do you have a phone number or

6    email for her?

7              MS. ADEEYO:  No.

8              THE COURT:  Okay.

9              MS. EKL:  Your Honor, obviously, we'd be concerned,

10   if she shows up tomorrow and she gets sent away, that we're

11   going to get her.

12             THE COURT:  No, no, we're not going to do that.  So

13   okay.  Before I map this out, anyone else then?

14             MR. LOEVY:  You know, we have backups -- I'm sorry.

15   We have backups that we could call.  We have the Gertraud Gray

16   deposition which has now been edited by your Honor or decided.

17   And the backup after that would be Percy Davis.  But the big

18   wildcard is how long Mr. Nathan is going to go with Adam, I

19   think.

20             THE COURT:  Okay.  And I'll ask him that in a minute.

21             So how long would the Russano direct be?

22             MR. LOEVY:  The Russano direct, Roshna?

23             MS. KEEN:  I'm guessing between about an hour and a

24   half, just a little bit shy of that hopefully.

25             MR. LOEVY:  Although an hour if it had to be because

1   we want her to fit.

2          THE COURT:  Okay.  And let's see.  Okay.  So how long

3   do you think the cross is, Mr. Nathan?

4          MR. NATHAN:  It's very difficult for me to say

5   without getting into any kind of rhythm.  I would think -- and

6   I hope I'm not being held to this.  I would think probably

7   four hours.

8          THE COURT:  Okay.  All right.  And then Russano, can

9   she stay the entire trial day?

10         MS. KEEN:  Tomorrow, your Honor.

11         THE COURT:  Tomorrow.

12         MS. KEEN:  But she has a late flight back tomorrow

13  night because she has a non-negotiable conflict for Friday.

14         MR. NATHAN:  Would -- may I just confer for one

15  second?

16         THE COURT:  Yeah, go ahead.

17      (Discussion off the record.)

18         MR. LOEVY:  It sounds like she couldn't testify

19  either by video?

20         MS. KEEN:  No, she has, like, a personal conflict

21  that she's told us about.  She's totally off the table Friday.

22         THE COURT:  So one way to do this -- because, look,

23  the Kasey Paris testimony, as important as it is, you will,

24  both of you, will be facing hostility.  And so I think you're

25  going to want to be as surgical as you can with her.  It just

1    seems like the greatest risk that we have is losing her.

2         Okay.  So if she shows up at 9:00 a.m. tomorrow, then

3    I think we ought to get her on and off the stand.  Then the

4    cross would resume of Mr. Gray, and if you are not done

5    crossing Mr. Gray by 2:00, then we'll break to get Russano in.

6         MR. LOEVY:  Thank you.

7         THE COURT:  Is Lita Gonzalez local?

8         MS. WANG:  She is local, your Honor.

9         THE COURT:  Okay.  And does she have some

10   irreconcilable conflict?

11        MS. WANG:  No, no.  She's retired.  She just -- she

12   needs transportation.  That's all.

13        THE COURT:  Okay.  Yeah, so I'm afraid we're going to

14   have to be least kind and accommodating to her.

15        MR. LOEVY:  That's a good plan.

16        THE COURT:  Okay.  So you may get one more night to

17   prep for the cross as well.

18        Okay.  So Paris, Mr. Gray, and if you're not done by

19   2:00, Russano.  Okay?

20        MR. LOEVY:  And then if Paris throws us a wildcard

21   and shows up in the afternoon, then we'll just --

22        THE COURT:  Yeah, we'll have to break for that.

23   There's no reason because it said 9:00 a.m. on her -- both

24   versions of the subpoena, correct?

25        MR. LOEVY:  We never saw theirs.

662

1          THE COURT:  The defense, I presume, says 9:00 a.m.,

2     right?  Because that's when she showed up.

3          MS. EKL:  I'm assuming.  She's checking.

4          THE COURT:  Although openings were in the afternoon.

5     Yeah, please do check that.

6          MS. WANG:  I mean, ours said either 9:00 --

7          THE COURT:  Oh, no, Mr. Loevy, you said you saw her

8     Monday, like, during jury selection then.

9          MR. LOEVY:  It was Tuesday.

10         MS. ADEEYO:  I saw her too.  Yeah, Tuesday,

11    approximately 11:00 a.m. when we were on that midmorning

12    break.

13         Our subpoena that we handed to her boyfriend said

14    9:00 a.m.

15         THE COURT:  Okay.  All right.  So in theory, that

16    shouldn't happen.

17         MS. WANG:  Ours was 9:00 a.m. as well for tomorrow.

18         MR. LOEVY:  I think we are going to ask our

19    investigator to try to find her tonight and tell her because

20    it couldn't hurt.

21         THE COURT:  I agree.  Okay.

22         Any other issues?

23         MR. LOEVY:  Not from the plaintiff, your Honor.

24         MR. NATHAN:  Not from the defendants.

25         THE COURT:  Okay.  Then let me -- I'm going to ask

1    every non-court staff to just clear out except the excess

2    insurer, you can stay.  Everyone else who is not in my

3    chambers staff, please step out.

4              And we'll go off the record.

5         (Proceedings adjourned from 4:53 p.m. to May 11, 2023, at

6         8:45 a.m.)

7                        *  *  *  *  *  *  *

8                    C E R T I F I C A T E

9              We, Jennifer Costales and Judith A. Walsh, do hereby

10   certify that the foregoing is complete, true, and accurate

11   transcript of the proceedings had in the above-entitled case

12   before the Honorable EDMOND E. CHANG, one of the judges of

13   said court, at Chicago, Illinois, on May 10, 2023.

14

15   */s/ Jennifer Costales, RMR, CRR, CRC* _____    June 14, 2023

16   */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____     June 14, 2023

17   Official Court Reporters

18   United States District Court

19   Northern District of Illinois

20   Eastern Division

21

22

23

24

25